UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

CLAUDETTE DE LEON,              *

        Plaintiff               *     Case No.

    vs.                         *     05-126E

CRAWFORD CENTRAL                *
SCHOOL DISTRICT                 *
CRAWFORD CENTRAL                *
SCHOOL BOARD,                   *

        Defendants,             *

MICHAEL E. DOLECKI,             *
Superintendent,                 *

        Defendant,              *

CHARLES E. HELLER,              *
III, Assistant                  *
Superintendent,                 *

        Defendant               *

DEPOSITION OF
CLAUDETTE DE LEON

April 4, 2006

Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.

Sargent's Court Reporting Service,
(814) 536-8908

EXHIBIT
A

Multi-Page™

**Page 2**

```
 1   DEPOSITION
 2   OF
 3   CLAUDETTE DE LEON, taken on behalf of
 4   the Defendants herein, pursuant to the
 5   Rules of Civil Procedure, taken before
 6   me, the undersigned, Shannon C.
 7   Fortsch, a Court Reporter and Notary
 8   Public in and for the Commonwealth of
 9   Pennsylvania, at Crawford Central
10   School District, 11280 Mercer Pike,
11   Meadville, Pennsylvania, on Tuesday,
12   April 4, 2006, beginning at 10:30 a.m.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1
 2
 3              A P P E A R A N C E S
 4
 5   CALEB L. NICHOLS, ESQUIRE
 6   P.O. Box 1585
 7   Erie, PA 16507
 8   COUNSEL FOR PLAINTIFF
 9
10   ROBERTA BINDER HEATH, ESQUIRE
11   Andrews & Wagner
12   3366 Lynnwood Drive
13   P.O. Box 1311
14   Altoona, PA 16603
15   COUNSEL FOR DEFENDANTS
16
17
18
19
20
21
22
23
24
25
```

**INDEX**

| | | |
|---|---|---|
| WITNESS: CLAUDETTE DE LEON | | |
| EXAMINATION: | | |
| By Attorney Heath | 8 - | 165 |
| CERTIFIED SECTION | 165 - | 181 |
| EXAMINATION | 181 | |
| By Attorney Heath | 181 - | 213 |
| DISCUSSION AMONG PARTIES | 213 -219 | |
| EXAMINATION | | |
| By Attorney Nichols | 219 - | 227 |
| EXAMINATION | 227 | |
| By Attorney Heath | 229 | |
| CERTIFICATE | 230 | |

**EXHIBIT PAGE**

| NUMBER | DESCRIPTION | PAGE IDENTIFIED |
|---|---|---|
| Three | Documents | 10 |
| Four | Letter of 4/2/06 | 26 |
| Five | First set of Interrogatories | 29 |
| Six | Response to first set of Interrogatories | 29 |
| Seven | Chronology of events | 33 |
| Eight | Chronology of events | 43 |
| Nine | Job description | 117 |
| Ten | Authorization | 120 |
| 11 | Notice | 120 |
| 12 | Notice | 120 |
| 13 | 2001/2002 School year | 121 |
| 14 | Notice of Fact Finding | 126 |
| 15 | Department of Human Relations Commission | 126 |
| 16 | Code of Professional Practice and Conduct | 136 |
| 17 | Crawford School District Regulations | 181 |
| 18 | Areas of concern | 184 |
| | Action Plan 02/03 | 191 |

Multi-Page™

**Page 6**

```
 1     E X H I B I T S (cont.)
 2
       02/03
 3 19  Revised action plan              193
 4
 5 20  Discipline Log                   195
 6 21  Discipline Log                   195
 7 22  Memo 3/20/03                     202
 8 23  Memo 11/27/02                    203
 9 24  Notice of Hearing                204
10 25  Evaluation                       207
11 26  Evaluation of                    207
12     Employees
13 27  Professional Evaluation          207
14     Instrument
15 P-1 Claim for unpaid wages           219
16
17
18
19
20
21
22
23
24
25
```

**Page 7**

```
       OBJECTION PAGE
 1
 2
 3  ATTORNEY                            PAGE
 4  Nichols                      97
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 8**

```
 1            P R O C E E D I N G S
 2
 3  CLAUDETTE DE LEON, HAVING FIRST BEEN
 4  DULY SWORN, TESTIFIED AS FOLLOWS:
 5  ----------
 6  EXAMINATION
    ----------
 7  BY ATTORNEY HEATH:
 8  Q. Ms. de Leon, we've met before.
 9  My name is Roberta Binder Heath, and I
10  represent the School District, as well
11  as Mr. Dolecki and Mr. Heller, in a
12  lawsuit that you have brought in
13  Federal Court. As I'm sure you recall,
14  on March 6th, last month, we started
15  your deposition and were unable to
16  finish it, and that's why we're here
17  today to finish your deposition.
18  The instructions that I had
19  given you last time, I'll just go over
20  them quickly. You have Counsel here,
21  and certainly, you're free to take a
22  break at any time to speak to your
23  Counsel, use the restroom, whatever you
24  may need. So if you need a break, let
25  me know and we'll be happy to
```

**Page 9**

```
 1  accommodate you.
 2  It's very important that your
 3  responses are verbal so that the court
 4  reporter can take them down. She
 5  cannot make a clear record or an
 6  accurate representation of the
 7  testimony with simply a gesture or
 8  shrug of the shoulders or nod of the
 9  head, or an uh-uh or uh-huh. It has to
10  be yes or no.
11  I would also ask that you answer
12  my question so that we will have a
13  clear record, and that only one person
14  speak at a time. So it's important
15  that you let me finish my question
16  prior to you answering my question.
17  And also, that allows you an
18  opportunity to make sure you understand
19  my question prior to you answering it.
20  If you don't understand my question,
21  please let me know and I'll be happy to
22  repeat or rephrase it for you. Is that
23  clear?
24  A. Uh-huh (yes).
25  Q. Okay. And you said uh-huh. You
```

1 I have to say yes.
2 A I'm sorry. Yes.
3 Q Okay. Thank you. And also,
4 please keep your voice up so that she
5 can hear you, as well. One of the
6 issues that we had discussed last time
7 was what is referred to legally as a
8 mitigation of damages. And
9 essentially, what that means is I was
10 asking you since your termination with
11 the School District, what efforts had
12 you made to obtain other employment?
13 And you had given me a variety
14 of places where you had applied. And
15 currently, you are working, and I
16 understand that. After your
17 deposition, then you had given me some
18 documents, and I want to mark these
19 collectively, they're 17 pages, as de
20 Leon Exhibit Three.
21 (de Leon Exhibit Number
22 Three marked for
23 identification.)
24 BY ATTORNEY HEATH:
25 Q And I had asked you prior to the

1 deposition to take a look at these
2 documents to make sure that these were
3 the ones that you had given me the last
4 time we met?
5 A Yes.
6 Q And you had indicated, I
7 believe, that you thought that there
8 were more, but you could not locate
9 those documents?
10 A Yes. I'm missing Gannon
11 University and I'm missing the welfare
12 office, also. I applied there, and
13 some newspaper announcements. So I
14 still have those.
15 Q And I would just ask on the
16 record if you could please look through
17 your documents, your records to see if
18 you can produce that information. I .
19 notice that the top two documents, one
20 is a letter dated December 12th, 2005,
21 thanking you for your interest in the
22 adult basic education teacher position,
23 then the second letter is dated June
24 1st, 2004, relative to the Luther
25 Memorial Learning Center School Board.

1 Some of the other information, however,
2 that I have that you provided to me
3 simply looks more like the fact that
4 you filed an application. There's no
5 indication as to whether or not you
6 ever had an interview or any letters
7 from the employer.
8 A I did have an interview. They
9 just never got back to me.
10 Q And you're looking at which
11 document now?
12 A The Hispanic American Council.
13 They have three different positions.
14 Q And you did have an interview?
15 A And I had an interview.
16 Actually, I had two interviews. But
17 they never got back to me.
18 Q And do you have any other
19 dates or times when you had those
20 interviews?
21 A The only thing I can get is a
22 letter from them.
23 Q Okay.
24 A Because they might have a record

1 of that. But I never heard from them.
2 Q Because what this indicates, on
3 the second page of this document for
4 the Hispanic American Council of Erie,
5 is that you were to submit a r r sum and
6 complete an application, but there's no
7 documentation from you that you
8 actually did submit an application.
9 A Yes, I did. And they have a
10 copy, I'm sure. But I can request a
11 copy on my r sum . I just gave them my
12 r sum and I took my professional
13 portfolio with me. And they had three
14 positions. One was employer officer.
15 One was extracurricular school, after
16 school, only a few hours. And the
17 other one, it was to help people to
18 stop smoking. But I was more
19 interested in the employment job kind
20 of officer.
21 Q Were you offered any job with
22 the Hispanic Council?
23 A None at all.
24 Q Okay. The next piece of
25 information is the Conroe School

## Page 14

1 District?
2 A.Yes. I applied on the Internet.
3 Q.And it's the Conroe Independent
4 School District. And did you ever
5 receive any information from them,
6 giving an interview or any information?
7 A.Yes. Just the information that
8 says, we did receive your application.
9 Q.Right.
10 A.That's the only thing that I
11 received from them.
12 Q.And you never received any other
13 information?
14 A.Anything else. But I did send
15 --- as you can see, I applied via
16 Internet. And they never got back to
17 me.
18 Q.The next piece of information is
19 with the Department of Public Welfare
20 relative to a job posting?
21 A.Uh-huh (yes).
22 Q.Did you apply for any of the
23 positions here?
24 A.Yes, I did. It was for clerk
25 typist. It was the position that they

## Page 15

1 had available. I wanted to see if
2 maybe by working as a clerk at the
3 welfare office, perhaps they will offer
4 me a job as a social worker working for
5 the welfare. But of course, I took the
6 test and they never got back to me.
7 I'm on the list.
8 Q.You mean you took the civil
9 service exam?
10 A.I took all of them, yes.
11 Q.And do you have your results
12 anywhere?
13 A.Yes. I would imagine they would
14 be there, but if not, I can probably
15 get them through the Internet. There
16 is one here, final earned report. This
17 one is 89. This one I cannot recall,
18 but probably I can download it.
19 Q.Well, I'd appreciate if you'd
20 try to do that.
21 A.This one is 89 for the several
22 positions.
23 Q.And is it your testimony that
24 relative then to these other pieces of
25 paper with regard to the EEOC --- I'm

## Page 16

1 sorry, the Civil Service Commission
2 information, that you applied for each
3 of these positions?
4 A.Yes.
5 Q.And do you have any
6 documentation that shows that an actual
7 application was submitted other than
8 --- what you provided me are job
9 postings.
10 A.Of course. I have to send all
11 my communication to them by mail, I
12 have to fill out an application, then I
13 file through the Internet. I fill out
14 information. That was the test, to
15 fill out the application and send it by
16 mail. Then I went to the interview,
17 and then they told me that they hired
18 somebody that was better because I
19 wasn't qualified.
20 Q.Was there anything that you
21 kept, though, other than, you know,
22 some sort of an e-mail saying that your
23 application was received, or some sort
24 of information confirming that you had
25 an interview for any of these

## Page 17

1 positions, other than what you've given
2 me here, which are these job postings?
3 Do you have any other information ---?
4 A.This is not a job posting. This
5 is the interview, the evidence of the
6 interview.
7 Q.And it says, do not ---.
8 A.And I sent it to them and I went
9 to the interview. But they never got
10 back to me.
11 Q.Do not report for an interview.
12 Okay. Now, with regard to these pieces
13 of paper also, where it says, for
14 example, score, final earned rating,
15 89, was that when you were saying you
16 were taking the test online?
17 A.I actually filled out the form
18 in writing and I sent it to them along
19 with all my communication, my r sum.
20 I answered all the questions. And tha.
21 was the rating that they gave me, 89.
22 However, when I went to the interview
23 --- actually, I went to two interviews
24 in Albion Prison. They told me that
25 there were veterans that had

Multi-Page™

Page 18

1 preference. Because that's why they
2 couldn't give me ten points. I argued
3 that when my son died, because they
4 said that if I applied for a federal
5 job, they would give me ten points.
6 And I said, but when my son went
7 to fight in Iraq or was in Afghanistan,
8 he didn't fight only for the state, but
9 for the whole entire country of the
10 United States. So they should consider
11 giving me that because I was his
12 mother, to give me those ten points.
13 And although I called them and argued
14 about that, but they didn't want to
15 give me the extra ten points. So I
16 have only 89.
17 Q. And you said that you actually
18 had two interviews. And that was for
19 Albion Prison, and what was the other
20 one?
21 A. At the same place.
22 Q. Oh, the same place?
23 A. I went twice.
24 Q. Okay.
25 A. Yeah. I interviewed with the

Page 19

1 principal, as well, and human
2 resources.
3 Q. The last two documents you gave
4 me are newspaper clippings. Now, the
5 first page, there does not appear to be
6 a date on this anywhere.
7 A. Okay. Very sorry. I will let
8 you know. Which ones are you talking
9 about?
10 Q. This page here where it says
11 Spanish teacher, Kiski Area School
12 District, it's circled. And then
13 French and Spanish and ESL substitute.
14 A. That was last summer.
15 Q. Okay.
16 A. It was last summer that I was
17 --- and I'm still looking.
18 Q. Did you ever apply to these?
19 A. Yes. I sent a letter of
20 inquiry.
21 Q. And did you keep a copy of that
22 letter?
23 A. Yes. And unfortunately, it's in
24 my computer. And I wish I could fix
25 it, but my computer has a virus and

Page 20

1 the Erie School District?
2 A. In the fall.
3 Q. Of 2005?
4 A. Of last year, 2005. And they
5 said that they would consider my
6 application. And if they still have
7 the position, they'd call me. And the
8 principal interviewed me, and he told
9 me for kids. And I said, of course.
10 So I went there for one day at the end
11 of the day. He said, I'm sorry, but
12 the teacher is not going to retire yet.
13 She's coming back. If we need you,
14 we'll call you. But they never did.
15 Q. Now, back to the Kiski Area
16 School District that you have circled
17 on the second to the last page of
18 Exhibit Three. That's the last page.
19 The one before last. Did you ever
20 interview there?
21 A. No, no. I never heard from
22 them. I never did.
23 Q. And what about with regard to
24 the substitute positions?
25 A. I never heard from them. I just

Page 21

1 nothing can get in it. The only way I
2 could retrieve anything is ---
3 actually, I don't think so. I will
4 have to erase everything. I've had
5 everything in a file for job
6 applications, and unfortunately, I
7 couldn't even bring those today. But I
8 can get copies for Albion Prison. I
9 can contact Mr. --- cannot recall his
10 name, and be can testify that I was
11 there for two different interviews.
12 I'm trying to think of his name.
13 Q. Did you ever have an interview
14 with the Kiski Area School District?
15 A. No. Oh, with the school
16 district, yes. Twice.
17 Q. After last summer?
18 A. It was last fall, the Erie
19 School District. That's something else
20 I'm missing.
21 Q. No, the Kiski Area School
22 District.
23 A. Oh, no, no. I'm talking about
24 Erie School District.
25 Q. And when did you interview with

Page 22

1 I sent a letter of inquiry, a letter of
2 interest, along with my r sum. They
3 never even responded.
4 Q And you're saying this is the
5 summer of 2005?
6 A I think it was summer of last
7 year. And the summer before, I also
8 sent a couple, but they never respond.
9 Q And then this is the GECAC —
10 the next to the last page of this is
11 dated May 27th, 2005, as the deadline
12 for applications for the GECAC
13 Community Charter School?
14 A Uh-huh (yes).
15 Q Did you send an application
16 there?
17 A Not for GECAC. No, I did not.
18 Nor for this one. It was a
19 possibility. And I felt sending an
20 application, or perhaps maybe go out in
21 person, but I was just looking for work
22 to seek work in the Erie School
23 District. So it was just put on
24 resource — this is my resource page.
25 I did not apply there.

Page 23

1 Q So in 2004, did you apply
2 anywhere other than the Luther Memorial
3 Learning Center School Board and the
4 Hispanic American Council of Erie?
5 A And I believe I also applied on
6 this. I submitted my application. The
7 first one, it was for education
8 certification evaluator since 2003.
9 And I was waiting for a response from
10 them. And then after that, then there
11 was another one, vocational
12 rehabilitation counselor in November of
13 2005.
14 And in 2004, at the beginning, I
15 was still going to school because I
16 couldn't graduate when my son died. I
17 had to stop school. I couldn't go back
18 to school. So for the first three
19 months, I worked only on my thesis. I
20 couldn't work right away. Then my
21 friend called me and told me that there
22 was an older lady, that she was dying,
23 that she was ill of cancer. She was
24 ready to die. And I went and took care
25 of this lady for about three months.

Page 24

1 And I was hoping to get pay, and
2 she paid me only $300. So it was just
3 right before she died. I left because
4 she was not paying me. So that was
5 another job. And then I started
6 working at Latino — playing the
7 piano, only one day a week, and then
8 teaching also another day a week, on
9 Friday nights. That's it.
10 Q So essentially, is it fair to
11 say that the documents that you've
12 given me would encompass what you
13 applied to do in 2003 and 2004? And
14 then the only thing that's missing
15 would be —
16 A Gannon University.
17 Q — Gannon University, and that
18 would have been in 2005?
19 A And Erie School District. That
20 wasn't 2004, Gannon University. There
21 was an ad in the newspaper.
22 Q And Erie was 2005?
23 A And Erie was last fall.
24 Correct.
25 Q So essentially, Gannon

Page 25

1 University and Erie are what's missing
2 from Exhibit Three?
3 A Right. Only two. Gannon and
4 Erie.
5 Q And then again, it's possible,
6 if you could just take a look for
7 information concerning those two job
8 possibilities and anything you might
9 have to verify that applications were
10 sent to these other employers, I would
11 appreciate that.
12 ATTORNEY HEATH:
13 Mr. Nichols, this is
14 probably the appropriate time on
15 the record for you to — you
16 had indicated to me prior to the
17 deposition you wanted to address
18 my request for tax returns?
19 ATTORNEY NICHOLS:
20 Yes, Ms. Binder. You had
21 recently written a request for
22 Ms. de Leon's tax return for tax
23 years 2003, 2004, 2005, together
24 with a subpoena. We acknowledge
25 receipt of that. And the

Multi-Page™

**Page 26**

1 Plaintiff's response to that
2 request is in the form of a
3 written submission, which I now
4 ask be marked Plaintiff's
5 Exhibit One.
6 ATTORNEY HEATH:
7 Or do you want to mark it
8 as Exhibit Four?
9 ATTORNEY NICHOLS:
10 Exhibit Four. Whichever.
11 (de Leon Exhibit Number
12 Four marked for
13 identification.)
14 ATTORNEY HEATH:
15 And are you denying my
16 request for the tax returns?
17 ATTORNEY NICHOLS:
18 As of this time.
19 ATTORNEY HEATH:
20 Okay. And you understand
21 that I will file a motion with
22 the Court?
23 ATTORNEY NICHOLS:
24 Understood. And there is
25 also another matter I would like

**Page 27**

1 to bring to the --- reflect on
2 the record. I would ask that
3 this be marked Plaintiff's
4 Exhibit Five, I guess is
5 correct.
6 ATTORNEY HEATH:
7 And what is that?
8 ATTORNEY NICHOLS:
9 What this is, is Mr.
10 Arnis, Lewis Arnis, the Arbitrator
11 for the arbitration proceeding,
12 made an adjustment in the last
13 --- Ms. de Leon was suspended
14 for five days for ---
15 ATTORNEY HEATH:
16 Okay. May I just stop
17 you for a second?
18 ATTORNEY NICHOLS:
19 Sure.
20 ATTORNEY HEATH:
21 Just as a matter of
22 procedure, I think the record
23 would be clearer if I just
24 finished my questions, and then
25 when you had your opportunity to

**Page 28**

1 ask her questions, then we can
2 attach that ---
3 ATTORNEY NICHOLS:
4 All right.
5 ATTORNEY HEATH:
6 --- at the end. And I
7 understand what you're saying,
8 but ---
9 ATTORNEY NICHOLS:
10 Okay.
11 ATTORNEY HEATH:
12 --- just as a matter of
13 procedure, I think it would be
14 clearer this way.
15 ATTORNEY NICHOLS:
16 All right.
17 ATTORNEY HEATH:
18 That was marked as
19 Exhibit Four, correct?
20 COURT REPORTER:
21 Yes.
22 ATTORNEY HEATH:
23 I'd like to then mark as
24 Exhibits Five and Six, two
25 documents. One is the first

**Page 29**

1 response to the Defendant's
2 Interrogatories, and then a
3 supplemental response. And then
4 going to ask that the court
5 reporter mark these and then
6 show them to the witness.
7 (de Leon Exhibits Five
8 and Six marked for
9 identification.)
10 BY ATTORNEY HEATH:
11 Q And looking at the --- I'm
12 getting ahead of myself now. This
13 would be Five and Six, Number Five
14 would be the Plaintiff's response to
15 Defendant's first set of
16 Interrogatories. Have you seen this
17 document before?
18 A Uh-huh (yes). Yes.
19 Q And in looking through this, and
20 I'll give you a couple minutes to look
21 through this, what I'm going to be
22 asking you is there's certain
23 information in here that's incomplete,
24 or at least from my perspective, it's
25 incomplete. And then I had then sent

Multi-Page™

1 the request to your Counsel to have
2 additional answers provided, which then
3 are Exhibit Six. And have you seen
4 Exhibit Six before? And this is the
5 supplemental responses.
6 WITNESS REVIEWS DOCUMENT
7 A Uh-huh (yes). Yes.
8 BY ATTORNEY HEATH:
9 Q And looking to Exhibit Six, the
10 answer that was provided as a
11 supplemental response to number one, I
12 want you to take a look at subparts A
13 through E. And the question had asked,
14 was ---
15 ATTORNEY NICHOLS:
16 You're talking about
17 Five, Exhibit Five; right?
18 ATTORNEY HEATH:
19 I'm talking about Exhibit
20 Six because that has a
21 supplemental response.
22 ATTORNEY NICHOLS:
23 Which number, Ms. Heath?
24 ATTORNEY HEATH:
25 It would be Exhibit Six.

1 which is supplemental responses,
2 the answer to number one.
3 ATTORNEY NICHOLS:
4 Okay.
5 BY ATTORNEY HEATH:
6 Q And in both Exhibits Five and
7 Six, obviously, the questions will be
8 the same, but the answers are going to
9 be different in some cases. And
10 essentially, it looks to me as if you
11 were trying to provide more detail to
12 them than was provided in the original
13 answer to question one.
14 And I'm just asking you now, the
15 question was, set forth the bases of
16 your allegation in paragraph 20 of your
17 first amended complaint that you were,
18 quote, unlawfully abused, harassed,
19 suspended, fired and discriminated
20 against, end quote. And then you have
21 subparts A through E. And I'm asking
22 you to review that. And as you sit
23 here today, I'm asking if there's any
24 other information that you would wish
25 to add to that answer that shows

1 examples of when you believe that you
2 were abused, harassed and discriminated
3 against.
4 And you're asking if I would
5 like to add something to this?
6 Q Is there anything else that you
7 would like to add in response to that
8 particular question?
9 A I'm sure that I could add a lot
10 more information, and I can give you a
11 more definite detail. That's why I
12 wrote my chronology of events, in which
13 I cited every little detail of what had
14 took place. But we tried to summarize
15 everything and compound it into what
16 they did generally.
17 But if I was to go step by step
18 of the constant harassment, of the
19 constant abuse, of the constant double
20 standard, the different treatment when
21 other teachers really were totally
22 incompetent, then I would have to add a
23 great deal of information. I could add
24 my chronology of events to this, if
25 that's admissible.

1 Q I actually have it as an
2 exhibit.
3 A Okay.
4 Q And let me just ask you this,
5 then. We're going to mark this as
6 Exhibit Seven.
7 (de Leon Exhibit Number
8 Seven marked for
9 identification.)
10 BY ATTORNEY HEATH:
11 Q Relative to Exhibit Seven, you
12 had mentioned to me just now that the
13 chronology of events that you prepared
14 sets forth every detail about which ---
15 or on which you base this complaint; is
16 that correct?
17 A Not every detail. It's kind of
18 general information. But if I'm to
19 include every detail, I have to ... the
20 every letter, every piece of the
21 communication that I have, including
22 all the things that I have from
23 arbitration one, arbitration two,
24 arbitration three, which it was already
25 settled. And the records speak for

Multi-Page™

Page 34

1 themselves, but you're not allowed to
2 use that, but I am. And I'm using some
3 of this information. That can be a lot
4 more detailed. This is just a
5 chronology. It gives detail, but it is
6 not exactly every single detail of what
7 bad took place.
8 Q.This chronology was prepared for
9 what reason?
10 A.To send it to human relations.
11 Q.And that was what you based your
12 complaints on; correct?
13 A.On everything. I gave the very
14 first complaint, which was on March
15 18th, which I was suspended. But I
16 mentioned to them, in order to
17 understand what is going on, to
18 history of the of the constant harassment and
19 abuse, I have to go back to the
20 beginning.
21 Q.And is that what is contained in
22 this chronology of events?
23 A.Part of it, because then I would
24 have to contain the arbitration one,
25 arbitration two, arbitration three, so

Page 35

1 you can see the history of the constant
2 harassment.
3 Q.Well, what is the difference?
4 What is missing from this chronology
5 that you believe supports your case?
6 A.Maybe my first and second and
7 third grievance, all the documentation.
8 Q.And what documentation would
9 that --- what was not reflected in this
10 chronology? This chronology dates
11 back ---.
12 A.Every single detail, every
13 discipline problem, every time that
14 abuse, consistently harassing me,
15 insulting me, and he was not
16 disciplined. And then the School
17 District, what did they do, they sat on
18 my discipline problem. They were
19 looking ---
20 Q.But my question is, in looking
21 at this chronology of events, first,
22 you testified that it essentially puts
23 forth the details of what you base your
24 claim of harassment on, and
25 discrimination.

Page 36

1 A.Okay. Then I would like to
2 rephrase that. A general overview.
3 Q.And you say this plus any
4 exhibits from the arbitrations would be
5 the entire record concerning your
6 harassment; is that accurate?
7 A.Perhaps.
8 Q.Well, it's your case.
9 A.Because also, there are all the
10 misconduct slips that they were never
11 supported by the administration, every
12 single pink slip that I submitted. And
13 they did not discipline the students.
14 That's what I was talking about detail.
15 Every memo of reprimand.
16 For example, on arbitration
17 number two, when they accused me of all
18 these things, that they were going in a
19 very old trailer, 30-year-old trailer.
20 There was not even a thermostat, and
21 they were accusing me of tampering with
22 the thermostat. There was not even a
23 thermostat. I had to turn it on by
24 hand. Somehow, the janitor ---.
25 Q.Turn what on by hand?

1 A.I had to turn on the heat by
2 hand. There was no thermostat until
3 later on, they came and installed one.
4 But then, all these little memos
5 saying, she was tampering with the
6 thermostat. There was no thermostat.
7 Then the temperature was extremely hot.
8 I didn't turn it on. I turned it off
9 when I left. Somebody turned it on.
10 Then nails found on the floor
11 from chairs that you need a special
12 kind of tool, they were not my
13 students. The doors were rotten. They
14 were not my students that were breaking
15 the door. But they accused me of every
16 little detail. I have all this
17 documentation, all these little memos,
18 which even Dr. Berkebile said, if you
19 continue breaking this classroom,
20 you're going to be moved in the
21 schedule again. And I said, Dr.
22 Berkebile, this is a very old trailer.
23 And I mentioned to him all the details.
24 The windows, they couldn't even be
25 opened.

Multi-Page™

**Page 38**

1 Q. Let me just stop you there.
2 Looking at the chronology of events
3 that you have here, it seems to me,
4 upon reviewing it, it's pretty
5 detailed, and it looks to me as if you
6 had kept some sort of supplemental
7 notes or log or something, because you
8 have specific dates, specific instances
9 recalled, quotes in some cases as to
10 what the administrators had said to
11 you. So is there another logbook that
12 was the basis for writing this
13 chronology?
14 A. The documentation.
15 Q. Or —
16 A. The reprimands.
17 Q. Are you referring, in this
18 chronology, to the reprimands and the
19 other memos and other information that
20 you have?
21 A. In general, everything.
22 Q. Do you understand that when you
23 have a case like this, in order to
24 prove your case, if you're going to
25 rely on documentation, you have to

**Page 39**

1 provide that to the other side?
2 A. Correct.
3 Q. Have you provided me with all of
4 the documentation in your possession
5 that proves your case?
6 A. I have provided to my attorney,
7 and it's up to him whatever he's going
8 to provide to you.
9 Q. But do you understand what I'm
10 saying?
11 A. Correct.
12 Q. If it's not provided to me, you
13 cannot rely on it.
14 A. And also, let me tell you
15 something. The School District has all
16 these reprimands with my incompetency.
17 They can provide you with all this
18 documentation, as well. I will provide
19 you what I have to by law, whatever the
20 Judge says, to prove my case. That's
21 why it's written down, because I have
22 proof.
23 Q. Let me ask you this. In looking
24 at this chronology of events, have you
25 looked at this chronology of events recently?

**Page 40**

1 A. Of course, I wrote it. And I
2 was just reviewing this with Cal. And
3 also —
4 Q. I just want to know if you've
5 looked at it recently.
6 A. Yes.
7 Q. Is your review of this
8 particular document, was there anything
9 that struck you as being a gap in
10 information or some glaring omission
11 that you wish to tell me today under
12 oath that you want to add to this
13 chronology of events?
14 ATTORNEY NICHOLS:
15 Let us have a moment to
16 review and see —
17 ATTORNEY HEATH:
18 Okay.
19 A. Let me review these, because
20 maybe they are missing some copies.
21 And I realized that when I was
22 reviewing. But I went over it and I
23 thought, they are missing some copies
24 of though —
25 BY ATTORNEY HEATH:

**Page 41**

1 Q. Take your time and review it
2 because I don't really want you to
3 speak off the top of your head. I want
4 you to take the time so that I'm clear
5 what your allegations are.
6 OFF RECORD DISCUSSION
7 BY ATTORNEY HEATH:
8 Q. Just in order to save time and
9 move on, you've indicated when we were
10 off the record that you believe that
11 this may not be a complete document?
12 A. I know that it was missing some
13 pages. I would like you, before you
14 submit this as evidence, to go back and
15 review in more detail because I realize
16 that they were missing some pages. I
17 wanted to include all my grievances.
18 There are three given.
19 Q. And may I just stop you there?
20 A. Go ahead.
21 Q. I received this from your
22 Counsel, this document. Certainly, I
23 want it to be complete. So I would
24 request on the record, and we are
25 running short of time here to complete

Multi-Page ™

Page 42

```
 1 the discovery process, that you review
 2 this, and if there gaps in information,
 3 kindly provide this to your Counsel, so
 4 that he can provide it to me as soon as
 5 possible.
 6 A.Correct. I will.
 7 Q.Because also, I will tell you
 8 this. This chronology of events, you
 9 gave me a folder of what you had given
10 to Mr. Flipping at the PHRC, this
11 chronology of events was included. And
12 from my review of this document that
13 was presented by your Counsel, and also
14 the document that was in the PHRC
15 folder, they looked to be the same to
16 me. Now, I'm saying that, but again,
17 the pages aren't numbered. So if you
18 are aware of any gaps, I would request
19 that you provide that to me as soon as
20 possible.
21 A.Yeah. I will go ahead in more
22 detail. I will review that to make
23 sure I have everything. You have to
24 understand, every time I read that
25 chronology of events, I get a
```

Page 43

```
 1 stomachache because this is like going
 2 back to the same, over and over. But I
 3 will do it again and rewrite it. Well,
 4 not rewrite it, but review.
 5 Q.Please review it. This we'll
 6 mark as Exhibit Eight.
 7 (de Leon Exhibit Eight
 8 marked for
 9 identification.)
10 BY ATTORNEY HEATH:
11 Q.And I'm going to ask you to take
12 a look at this. If you look at the
13 last page, this appears to be a sworn
14 statement and was notarized?
15 A.Uh-huh (yes). Correct.
16 Q.Dated 12/20 of '02?
17 A.Correct.
18 Q.Do you recall why this was
19 prepared?
20 A.Yes. My Counsel asked me to
21 prepare these so I could give kind of
22 an idea to Mr. McLaughlin, the Judge.
23 ATTORNEY NICHOLS:
24 Judge McLaughlin.
25 A.Judge McLaughlin.
```

Page 44

```
 1 BY ATTORNEY HEATH:
 2 Q.But this is dated 12/20 of '02.
 3 But then there's a notary statement
 4 here that's December 20th of '05. I
 5 don't understand why there is this
 6 disparity of dates on the last page.
 7 A.Oh, it should say '05. That was
 8 a mistake. My mistake.
 9 Q.So that is your handwriting that
10 you did give testimony, ---
11 A.Yes.
12 Q.--- and your signature there?
13 A.And the date is wrong. It
14 should say '05.
15 Q.So that should say 12/20/05, as
16 well?
17 A.Correct.
18 Q.And when did you prepare this
19 document?
20 A.When Mr. Nichols asked me to do
21 it, I went ahead and did like a quick
22 review. It's not as detailed --- I
23 wish I could have submitted this
24 chronology of events to the Judge.
25 Q.If you look to the first page of
```

Page 45

```
 1 Exhibit Eight, it says, chronology of
 2 events as soon as the second
 3 arbitration was awarded on my behalf.
 4 But you're saying you didn't prepare
 5 this until 2005?
 6 A.Right.
 7 Q.And that you were just trying to
 8 recount what happened from ---
 9 A.Correct.
10 Q.--- 1997 forward?
11 A.And I'm missing my first
12 arbitration, as well.
13 Q.But I'm saying, this is just
14 representative of something that you
15 prepared in anticipation of this
16 litigation?
17 A.Right.
18 Q.Or in the course of this
19 litigation, I should say.
20 A.In the course of this
21 litigation.
22 Q.And it goes from the date of the
23 second arbitration award forward; is
24 that correct?
25 A.It should be from the first one.
```

Multi-Page™

Page 46

1 Q. But I'm asking what this is. It
2 goes from the second arbitration award
3 forward. ---
4 A. Correct.
5 Q. --- correct? And this
6 information, is this the same
7 information --- or some of the same
8 information that was contained in the
9 prior exhibit I showed you?
10 A. Correct.
11 Q. The larger chronology of events?
12 A. Some of it.
13 Q. And can you tell me as you sit
14 here today what's different?
15 A. The difference ---
16 Q. Other than --- I'm not talking
17 about the time frame from before August
18 of 1987. I understand in Exhibit
19 Seven, there's prior information
20 included.
21 A. Right.
22 Q. But in this particular document,
23 Exhibit Eight, is there anything
24 different that's included in this
25 particular chronology that you prepared

Page 47

1 in 2005 as opposed to the other
2 chronology that you submitted to the
3 PHRC?
4 A. Right. This is supposed to be
5 more in detail.
6 Q. Exhibit Seven?
7 A. Exhibit Seven. And this one, it
8 was just like a general view of what
9 had took place. But it's not as
10 detailed as the other one. However,
11 that's why I am not sure if I'm
12 answering the question when I keep
13 going back to this. The grievances
14 already dealt with all these issues in
15 more detail to find out exactly what
16 had took place. I'm sure that you
17 already read them. That was already
18 dealt with. And all the information is
19 just right there. This is just a
20 chronology.
21 Q. This is your basic overview?
22 A. Right.
23 Q. Okay. And I apologize for
24 jumping around, but I'm trying to at
25 least keep the same issues together.

Page 48

1 Going back to the Interrogatories and
2 the supplemental responses to the
3 Interrogatories, which were Exhibits
4 Five and Six, if you look to Exhibit
5 Six, number four, question number four,
6 it says, set forth the bases of your
7 allegations in paragraph 21(c) of your
8 first amended complaint. The
9 administration of Crawford Central
10 School District sought to, quote,
11 muzzle or forbade, end quote, you from
12 conversing with colleagues in the
13 workplace.
14 And I said, please provide
15 specific examples, incorporated by
16 reference, all supporting data and
17 documentation. And your answer was,
18 Plaintiff will be available to address
19 query when she is deposed. So I'm
20 asking you now to answer that question.
21 A. That time when he was screaming
22 and yelling to me, that's when he
23 forbade me. And also, we dealt ---
24 Q. He being Mr. Deshner?
25 A. Mr. Deshner. And we dealt with

Page 49

1 this in our second arbitration.
2 Q. And was this anything to do with
3 the testimony of Mr. Stanford?
4 A. Well, he already mentioned that
5 he'd walk away and he couldn't hear
6 everything. He couldn't hear
7 everything. But it's already dealt
8 with on the second arbitration.
9 Q. Well, let me put it to you this
10 way. And I don't want to get into a
11 legal argument with you on the record.
12 But from my perspective, there is an
13 issue as to whether or not any of the
14 arbitration Decisions are going to come
15 before the Judge. Even if Judge
16 McLaughlin allows them into evidence,
17 they are merely going to be persuasive
18 and they are not determinative of any
19 facts in this federal case.
20 So the problem that I continue
21 to face is, many of the times, your
22 answers are, look at the arbitration or
23 look at the grievance. One of the
24 problems I have with that, too, is I
25 don't have any of the transcripts. And

Multi-Page™

## Page 50

1 abused me and harassed me ---.
2 Q I'm trying to get a time frame
3 from you. I want to know what
4 happened. And you're telling what
5 happened now. I want to know where it
6 happened, I want to know when it
7 happened, and I want to know who saw it
8 happen.
9 A Mr. John Stanford was there. He
10 saw it happen, but he couldn't hear it
11 at all. But he said he walked away.
12 And we were talking exactly outside the
13 office. And I was talking to John, but
14 he said I was crying because I was
15 constantly being reprimanded for
16 anything.
17 Q Okay. That's my question.
18 A Okay.
19 Q That's one instance. And I
20 understand what you're saying happened.
21 I understand that is your position.
22 Are there any other instances that
23 you're referring to when you say in
24 your complaint that the District sought
25 to muzzle or forbade you from

## Page 51

1 conversing with colleagues? Is there
2 anything else, other than that other
3 issue we talked about? Is there any
4 other instance you can tell me, any
5 other example you can think of?
6 A I can think of that one, and I
7 will have to go ahead and if I can find
8 a memo, perhaps --- I'm just going to
9 stay with that instance. But that
10 doesn't mean I'm not going to look for
11 maybe perhaps something that she says
12 about confidentiality. When the whole
13 entire school knew I was getting fired,
14 talking about confidentiality. That's
15 exactly what he did, told the whole
16 entire parents, told the whole entire
17 students, she's getting fired.
18 Q But what you say here, you're
19 specifically talking about 21(c) of
20 your first amended complaint, instances
21 where they sought to muzzle or forbade
22 you from conversing.
23 A He did. He forbade me from
24 talking to my colleagues.
25 Q And that's what I'm asking you.

## Page 52

1 your Counsel doesn't have the
2 transcripts. So I can't even look at
3 the testimony specifically to see ---
4 A Just go ---.
5 Q --- what you're relying on. All
6 I have are all the Decisions. And we
7 don't know whether or not the Court is
8 going to even entertain those Decisions
9 and allow them into evidence. But it's
10 not good enough for you to tell me in
11 this lawsuit, look at the arbitration
12 Decision. So you have to give me more
13 than that.
14 And I'm trying to give you some
15 leeway because I don't want to depose
16 you for five days when you say in the
17 previous answers, look to the
18 arbitration or look to what the
19 arbitration award says. I understand
20 what you're saying, but I'm asking you,
21 what do you recall --- as you sit here
22 today, what is your independent
23 recollection of specific issues or
24 examples where the Crawford Central
25 School District sought to, quote,

## Page 53

1 muzzle or forbade you from conversing
2 with colleagues in the workplace?
3 A And I'm very sorry. I don't
4 understand. I do understand. And it's
5 my word --- Mr. John Stanford said he
6 talked to her stern in a loud voice,
7 and he'd walk away. Now, it's my word
8 against Desimer, which I don't have to,
9 I don't want to say this word, lie.
10 I'm telling you what he told me. He
11 forbade me to talk to any of my
12 colleagues about anything, yelling and
13 spitting on my face, just when I was
14 telling him that they did fire me.
15 All this abuse, it was enough. And I
16 said, whatever you have done --- they
17 have no conscience. The way they have

Multi-Page™

**Page 54**

1  Is that the example you're using?
2  A  I'm using that, exactly, that
3  day. We dealt with it in my third
4  arbitration.
5  Q  And you say here, number five,
6  I'm asking you again about paragraph 21
7  of your amended complaint, but this
8  time it's 21(e). And you say that
9  you're more stringently micromanaged,
10  scrutinized and subjected to a
11  professional improvement action plan.
12  And what I was asking you is to set
13  forth the bases of that allegation.
14  And what you said here is, in addition
15  to the allegations set forth in answer
16  one, which we've already talked about,
17  and that would be in Exhibit Six, a
18  more complete statement is stated in
19  the amended complaint which was filed
20  with the PHRC. Are you satisfied with
21  that response?
22  A  I'm very, very sorry, but I —
23  on this one about the action plan,
24  where is it where you read the rest?
25  ATTORNEY NICHOLS:

**Page 55**

1  The supplement she is
2  reading.
3  A  Oh, this supplement. I see. I
4  did not read that. Okay.
5  BY ATTORNEY HEATH:
6  Q  And you're referring to a
7  statement that was filed with your
8  amended complaint to the PHRC on
9  February 18th, 2003. And I'm asking if
10  you're satisfied with your response
11  that you provided to the PHRC. Is that
12  an adequate response to my question?
13  Because if not, this is your
14  opportunity to supplement that
15  response.
16  A  In addition to what I wrote here
17  on number five, you're talking about if
18  I can also ---?
19  ATTORNEY NICHOLS:
20  Counsel, did you receive
21  a copy of Ms. de Leon's
22  submission to the PHRC?
23  ATTORNEY HEATH:
24  I did.
25  ATTORNEY NICHOLS:

**Page 56**

1  Do you have a copy of
2  that?
3  ATTORNEY HEATH:
4  I don't know where it is
5  right now, but I did.
6  BY ATTORNEY HEATH:
7  Q  But this is what you're
8  referring to?
9  A  Uh-huh (yes).
10  Q  And this is what you answered
11  when I asked the question in the
12  Interrogatories.
13  A  Yes.
14  Q  Did you review that statement
15  before you answered this question?
16  A  This statement?
17  Q  The statement that you sent to
18  the PHRC.
19  A  I did review this.
20  Q  And when you responded to number
21  five in your supplemental responses,
22  and I'm looking at that in conjunction
23  with your initial responses, ---
24  A  Yes.
25  Q--- are you satisfied with that

**Page 57**

1  response?
2  A  I'm not sure that I'm satisfied.
3  I hope I do — when I submitted most
4  of the documentation, I just want to
5  make sure that you understand that I
6  was under a great deal of anxiety,
7  depression. It was extremely difficult
8  for me to concentrate on all this I
9  did my best trying to submit the best
10  information.
11  Q  But I want to stress to you that
12  under the law, you have a continuing
13  obligation to supplement your
14  responses. If you don't, then this
15  will be the response that's adequate.
16  You can either do it with your
17  testimony, such as today, or other
18  documentation. So what I'm allowing
19  you to do, in looking at these
20  Interrogatory answers, because in many
21  instances, you and/or your Counsel have
22  stated that I can ask you in your
23  deposition. That's what I'm doing.
24  But this is your opportunity to
25  give me your side of the story, to give

Multi-Page™

## Page 58

1 me your case. And if you don't
2 supplement your responses, then what
3 you have before you is what's going to
4 be admissible. So I just want you to
5 be clear on that. So if you continue
6 to tell me, I'm not sure, there might
7 be something else, if, in fact, there
8 is something else, at some point, you
9 have to give that to me.
10 A.Okay.
11 Q.Okay?
12 A.I will go ahead and review them.
13 Because I did submit as much --- I
14 prepared a whole entire portfolio and I
15 gave it to my lawyer. And that doesn't,
16 mean that includes everything. I'm
17 consistently giving more documentation
18 in order for me to to be able to submit
19 more information that can back up all
20 my claims. But I ---
21 Q.I just want to make sure that
22 you're comfortable with what you've
23 given me and that I have everything
24 that you believe supports your claim.
25 A.Correct. And also, I would like

## Page 59

1 to add that if you need, I will submit
2 more documentation that I can --- I
3 hope I can. I don't know when is the
4 due date that I cannot submit any more
5 documentation that is applicable.
6   ATTORNEY NICHOLS:
7       And also, let me just
8 state for the record, in respect
9 to the documentation that has
10 been submitted, you know, that
11 speaks for itself, one. We
12 covered it. Two, as to whether
13 or not at this junction, whether
14 what we have put in the file is
15 complete, we can't make that
16 representation because the
17 discovery's not complete. We
18 will depose more witnesses, to
19 do more discovery, it may well
20 be that we have more
21 documentation to divulge to you.
22 We do recognize our continuing
23 obligation ---
24   ATTORNEY HEATH:
25       That's fine.

## Page 60

1   ATTORNEY NICHOLS:
2       --- of disclosure.
3 That's what I want the record to
4 reflect.
5   ATTORNEY HEATH:
6       That is fine.
7   ATTORNEY NICHOLS:
8       All right.
9 BY ATTORNEY HEATH:
10 Q.If you look to Exhibit Six ---
11 or, number six, actually, question six,
12 I asked for the bases of your
13 allegations in paragraph 21(e) that you
14 were sanctioned for tardiness more
15 frequently than co-workers. And you
16 said that you would be available to
17 address the query when deposed. So do
18 you have any specific instances about
19 which you are aware where other
20 teachers were not treated the same way
21 that you were?
22 A.Correct.
23 Q.And I ---
24 A.I was placed on hall duty for a
25 whole entire year, on hall duty, just

## Page 61

1 right at the door. And I documented
2 many of the teachers' arrivals, and I
3 have the communication. I have it on a
4 memo with every single teacher that
5 came consistently late. However, when
6 I was being harassed because they
7 refused me union representation, next
8 thing, they started bringing that up,
9 when Mr. Destiner called me to his
10 office, he showed me all these tardies.
11 And I proved to him that they
12 were wrong because I was sitting in
13 study hall and I was even talking to
14 the counselor. I was able to prove
15 that they were totally wrong, but he
16 did not address the fact that he denied
17 me union representation. He showed me
18 all these tardies. Even by Mr. Higgins
19 recently, this teacher stops me to ask
20 me for a special ed student.
21 Q.Okay. I understand what you're
22 saying, but let me just stop you there.
23 With regard to the tardy issues, these
24 were addressed in your chronology;
25 correct?

Page 62

```
1 A. Correct.
2 Q. And there were certain teachers
3 that were mentioned in your
4 chronology —
5 A. Yes.
6 Q. — that you believe were
7 treated more favorably than you were?
8 A. They were never reprimanded.
9 Q. And how do you know that?
10 A. Because I asked them.
11 Q. But you don't have any
12 independent knowledge other than asking
13 them whether or not they were ever
14 reprimanded?
15 A. Well, for example, I asked Mrs.
16 Rappa when they sent me a memo, because
17 I allow my students to leave early, I
18 told Dr. Berkebile, I'm not even
19 teaching during the eighth period. I'm
20 assigned at the cafeteria. And Mrs.
21 Rappa did because I asked her, are you
22 teaching in my classroom? And she said
23 yes. Did you allow your students to
24 leave early? She said yes. And I
25 would like to subpoena her. Did they
```

Page 63

```
1 reprimand you? She said no.
2 Q. You're saying Mrs. —?
3 A. Mrs. Rappa
4 Q. Rappa?
5 A. Rappa.
6 Q. Rappa.
7 A. Which I don't know if she's on
8 any witness list. And she was not
9 reprimanded. And many other teachers,
10 I asked them, were you reprimanded?
11 No. Were you reprimanded for taking
12 your students out of your classroom?
13 No. Were you reprimanded for taking
14 them out of your classroom and walking
15 around? No. If they were standing
16 outside? No.
17 I was reprimanded when I even
18 didn't do it. But Mr. Higgins says,
19 oh, yeah, she took them out. No, I did
20 not. I sent them to the office. I
21 followed directives every inch of the
22 way. I could've kissed their feet, and
23 you know what they would have said?
24 She was trying to buy us. Although I
25 complied with every directive. But as
```

Page 64

```
1 soon as I said, I'm going to court, I'm
2 going to fight you, oh, you're very
3 physically aggressive. How can I? I'm
4 a Christian person. I'm a student of
5 the Bible. How could I be physically
6 aggressive?
7 Q. You're getting off on a tangent.
8 A. I know. I'm going to try —.
9 Q. And I'm trying to ask you some
10 specific questions concerning other
11 teachers and tardiness; okay? One of
12 the people that you mentioned in your
13 chronology was a Mrs. Sylka, S-Y-L-K-A.
14 Isn't her first name Mrs. Raman?
15 A. Yes.
16 Q. And her first name is Sylka?
17 A. Correct.
18 Q. So it's Mrs. Raman? That's not
19 Mrs. Rappa or somebody else?
20 A. It's Sylka Raman. I didn't make
21 a mistake.
22 Q. When you're saying about Mrs.
23 Rabba, is that the same person?
24 A. Rappa (corrects pronunciation).
25 No. Rappa. That's the physical ed
```

Page 65

```
1 teacher.
2 Q. Okay. But Sylka Raman, it isn't
3 Mrs. Sylka. It's Mrs. Raman?
4 A. Mrs. Raman. Correct.
5 Q. Okay. And she's German;
6 correct?
7 A. Yes, she is.
8 Q. Now you had also mentioned in
9 your chronology that you think Doug
10 Mehok was not reprimanded for being
11 tardy; is that correct?
12 A. Never.
13 Q. How do you know that?
14 A. When I was there, Mr. Berkebile
15 and Mr. Desimer looked at him and
16 greeted him and continued walking like
17 nothing.
18 Q. But you don't know for a fact
19 that he was or wasn't reprimanded!?
20 A. I'm sure that if they subpoena
21 him, I'm sure that he's going to say
22 that he did. But I would like to see
23 the documentation on any of these
24 teachers.
25 Q. But you don't have anything to
```

Multi-Page™

## Page 66

1  I prove that they weren't reprimanded?
2  A I saw them. I saw them that
3  they weren't.
4  Q And essentially, it would be
5  something that you would not be privy
6  to because it would be a personnel
7  matter?
8  A That's right. But they were
9  able to know about mine.
10  Q You also discuss a Debbie
11  Lemansky.
12  A She walked with me the day I was
13  given a tardy.
14  Q Wasn't it true that she had a
15  different schedule, she was permitted a
16  different, flexible schedule?
17  A Why?
18  Q Well, were you aware that she
19  was?
20  A But why?
21  Q Well, there's issues of
22  confidentiality here.
23  A Oh, I see.
24  Q But were you aware that she was
25  on a different schedule?

## Page 67

1  A And there's another teacher that
2  walked with me late as well.
3  Q And also, isn't it Debbie Lemansky
4  a secretary, not a teacher?
5  A And also there was another
6  teacher that walked with me.
7  Q I'm asking about Debbie
8  Lemansky.
9  A Yes, she's the secretary.
10  Q And so she would be on a
11  different schedule?
12  A I'm not sure. I don't know.
13  Q Okay. You wrote these people's
14  names down?
15  A Right. I wrote the time of
16  these teachers. I did. And I kept
17  them on a daily basis, how late they
18  are each day, did they get a memo each
19  day. I would like to see the
20  documentation of each day. I know
21  they're going to come and say yes
22  because they're afraid for their job,
23  of being harassed like I did. They
24  don't have any backbone to stand for
25  their rights. As long as — I'm the

## Page 67

1  vulnerable person that they can walk
2  all over. And they don't care. They
3  have their job. Why should they care?
4  They're going to come and say, oh,
5  yeah, yeah, she even tried to hit
6  Desimer, like Mr. Roznowski said.
7  Q What about Meg Daniels? You
8  indicated you believe she was tardy,
9  also.
10  A She's the one who stopped me to
11  ask me about the special ed kids —.
12  Q Was this when Mr. Higgins spoke
13  to you?
14  A Mr. Higgins gave me a tardy but
15  never went to investigate her. And she
16  had class, as well, as you can see on
17  her schedule. And I asked her.
18  Q I'm just trying to ask you about
19  the time frame you're talking about
20  with Meg Daniels.
21  A And I asked her, I said, did
22  they give you a tardy like they did to
23  me? She said no. And I said, well,
24  the day that you talked to me, they
25  gave me a tardy.

## Page 6

1  Q Wasn't it that you were just
2  reminded that you were supposed to be
3  on time? You weren't actually given
4  anything in writing?
5  A He gave me in writing — it is
6  in writing. I have it in writing.
7  Q You weren't reprimanded or
8  disciplined in any other way?
9  A No, no. I wasn't.
10  Q Wasn't it just a reminder that
11  is as part of your corrective action plan,
12  you were to be on time?
13  A It's not a reminder. It's a
14  tardy. Do you have a copy of that?
15  Q But as your corrective action
16  plan, you were to be on time; correct?
17  A I was always on time.
18  Q But wasn't that part of your
19  plan?
20  A I was always on time.
21  Q So when Mr. Desimer recalled
22  that there were students standing out
23  when you were at the trailer in the
24  snow because you were late, that was
25  not correct?

Multi-Page™

**Page 70**

```
1  Many times, if I was a minute or two
2  late, many times, because also they
3  stopped me in the classroom, and then
4  I'd have to run to a different
5  classroom, running and trying to speak
6  with my students. If I was tardy
7  because of the traffic or because of
8  not being able to walk around or park
9  my car, grab my things, run to the
10 other classroom, it's not because I was
11 being unprofessional. It's because
12 they refused me the right to have my
13 classroom.
14 Q  Are you saying that you may have
15 been tardy, but only after you became a
16 traveling teacher? Is that what you're
17 saying?
18 A  I was a traveling teacher for
19 almost the whole entire time I was
20 there until the last few years. And I
21 was not late because I wanted to.
22 There was a blind student in my class.
23 If the aide didn't come to pick him up,
24 I wasn't allowed to leave him alone.
25 And I wrote memos to Mr. Desiner
```

**Page 71**

```
1  saying, the aide is not picking up this
2  kid. And they would give me tardies
3  for coming to study hall. I told him,
4  this student suffered convulsions. The
5  mother told me. I cannot leave him
6  alone.
7  And then when he brought this to
8  this lady, the teacher, and she said
9  that she was never tardy. And the
10 student said himself, she was always
11 late, which would make me late. So
12 when I was late, it was not because I
13 was being unprofessional and I wanted
14 to be late. I was late, yes, because
15 of the circumstances.
16 Q  So your testimony is that you
17 may have been tardy, but either it was
18 because you were a traveling teacher or
19 there were other reasons, such as
20 staying with a student waiting for an
21 aide?
22 A  Very extenuating circumstances.
23 Q  Were there any times that you
24 were tardy just because you were tardy?
25 A  On one occasion when the weather
```

**Page 72**

```
1  A  I wasn't late. And we already
2  dealt with those issues. The records
3  speak for themselves on my first,
4  second and third arbitration.
5  Q  And again, I disagree. This is
6  a different case.
7  A  Correct.
8  Q  And I disagree that the merits
9  on those two arbitrations were decided.
10 So you disagree ---?
11 A  But we already dealt with those
12 issues and those sections.
13 Q  And that is not sufficient
14 evidence to say that in a federal
15 action.
16 A  Did you read the letter? I have
17 the letters that my students said that
18 they were never out there.
19 Q  You have to answer my question.
20 ATTORNEY NICHOLS:
21 Don't yell at her.
22 A  I'm sorry, I'm sorry. I don't
23 want to be --- let me tell you
24 something.
25 BY ATTORNEY HEATH:
```

**Page 73**

```
1  Q  Hold on one minute.
2  A  I'll be just like ---
3  Q  Hold on a minute.
4  BRIEF INTERRUPTION
5  BY ATTORNEY HEATH:
6  Q  Now you can finish.
7  A  There is a letter that my
8  students wrote that says they were not
9  stupid to be standing out there in the
10 snow. They wrote it themselves. They
11 sent it to Mr. Desiner. They would
12 never wait outside in the snow. That
13 was my Spanish 5 class. And I don't
14 know if he --- I have the letter. Did
15 you provide that letter from my Spanish
16 5 class?
17 Q  So is it your testimony that you
18 were never tardy throughout the whole
19 time you taught here?
20 A  I'm going to tell you that since
21 I was a traveling teacher and I had to
22 walk to the students, trying to steer
23 my portable cart, which now I have a
24 mark on my chest from pushing and
25 pulling that cart that was so heavy.
```

Multi-Page™

Page 74

1 I was extremely bad, I arrived with Mrs.
2 Maruzka, and we were walking, the two
3 of us. I received a tardy. She
4 didn't. And Mr. Destiner referred to
5 her when she is delayed. However, I
6 was tardy. If she was delayed, she
7 always called. There were no cellulars
8 at that time, but I was always tardy.
9 So I don't know when she called. There
10 were no cellulars, but she called. I
11 didn't. So yes, I remember that time
12 in which I wrote him a memo about it.
13 Q. Any other time that you can recall
14 tardy that you can recall that didn't
15 involve extenuating circumstances?
16 A. Most of the time, I was there
17 way before. I usually tried to be
18 there on time and I tried to be there
19 earlier than my usual period scheduled,
20 because since I was a traveling
21 teacher, I had to go and pick up my
22 car, I had to get my things from my
23 office and then move from classroom to
24 classroom to classroom. Then when
25 finally they gave me a classroom, it

Page 75

1 I was in the trailers. And when I had to
2 go to the office and I went into the
3 trailers, I'd have so much trouble
4 because the trailer was breaking apart.
5 They told me, you have to close the
6 trailer. Make sure that it's not ---
7 there was the other door open all the
8 time because there was another teacher.
9 So my students, there is no way that
10 they could just be there and be reading
11 because there was another classroom.
12 Q. Okay. Let's move on from the
13 tardies. Looking at Exhibit Six ---.
14 A. Six or Seven?
15 Q. And when I say Exhibit Six, I'm
16 also looking at it in conjunction with
17 Five because you responded once and
18 then you responded again. So I'm
19 looking at Five and Six together. So I'm
20 question eight. And I asked you to set
21 forth the bases of your allegation in
22 paragraph 22(b) in your first amended
23 complaint, that you were reduced to a
24 position, quote, inferior, end quote,
25 to the one you allegedly possessed

Page 7

1 prior to taking your medical sabbatical
2 leave. And then you said --- I don't
3 know what you were saying about when
4 you became a traveling teacher, but
5 then it seemed to me you were saying
6 that basically, you were a traveling
7 teacher for most of the time that you
8 were there. But from this response, it
9 doesn't seem to have happened until
10 1999. But you were in the trailer
11 prior to 1999; correct?
12 A. That was my classroom when he
13 gave me a classroom.
14 Q. And prior to that, you were
15 traveling or ---?
16 A. Prior to that, yeah. The first
17 time they gave me a classroom, that DD,
18 the trailer, and then when they
19 finished building the school I came
20 back --- no, no, not came back. Way
21 before that, I was an aide. Actually,
22 before I moved into the trailer, they
23 had given me one classroom. It was
24 A-1. Then since they were remodeling
25 the school, then they moved all the

1 foreign language teachers to the
2 outside. And they changed ---.
3 Q. So it wasn't just you that moved
4 to the outside? There were other
5 teachers?
6 A. There were several. All the
7 foreign language. All the foreign
8 language. Janine, Mr. Eimers
9 (phonetic), myself, and there was a
10 special ed teacher beside me, because
11 you went through that door and then you
12 could go into my classroom. And that
13 door was not locked. Then what
14 happened is that they gave me that
15 classroom. I had A-1. They gave me
16 DD.
17 And then I was suspended by Mr.
18 Dolecki, and I never went back. I went
19 into all these medical leaves. A year
20 later, when I came back, they had
21 already hired Mrs. Barbara Kurtz, and
22 said they gave her a classroom. Mr. Destiner
23 said they gave her a classroom because
24 I left. And I said, but Mr. Destiner,
25 she doesn't have seniority. I do. And

**Page 78**

```
 1 I left not because I wanted to. I
 2 said, I was on a medical leave, which I
 3 have the documentation.
 4 Q.On the collective bargaining
 5 agreement, was that a grievable issue?
 6 A.Most of the time, it's seniority
 7 that they are the one to keep the
 8 classroom.
 9 Q.Did you try to grieve that
10 issue?
11 A.I talked to everybody I could,
12 including Mr. Deshner, and they said,
13 because you left. And I said, is there
14 anything I can do? Nonetheless, they
15 didn't want to do anything. Actually,
16 they encouraged me to look for another
17 job because they said, we cannot
18 continue defending you all the time.
19 Unfortunately, that's what Mr. John
20 said, to look for another job in
21 another place.
22 Q.And is it your understanding
23 that under the contract, the
24 administration can schedule teachers
25 wherever is necessary?
```

**Page 79**

```
 1 A.Okay. I was teaching Spanish 5
 2 and Spanish 4 and Spanish 3.
 3 Therefore, I'm supposed to be the
 4 teacher with more experience, and I
 5 never had problems with my Spanish 5
 6 until there was an incident. I don't
 7 want to deviate again. I was
 8 consistently teaching these hard
 9 courses because I spoke Spanish better
10 and I was a native from the country.
11 When I came back, they gave it to the
12 white teacher that was not as fluent as
13 I was. They gave her my hard levels of
14 Spanish. I witnessed some of the
15 classes. I witnessed some of the
16 classes.
17 Q.Your certification is just to
18 teach Spanish, ---
19 A.One through 12.
20 Q.--- not particularly any type of
21 Spanish?
22 A.One through 12. And then,
23 instead of giving me my classes back
24 and my classroom, what did they do?
25 And I told Mr. Deshner, according to
```

**Page 80**

```
 1 the medical leave, it states that when
 2 you go on a medical leave and you come
 3 back, you are to come back to the same
 4 position, the same circumstances. What
 5 did they do? I went to seven different
 6 classrooms. Did you know how much my
 7 chest hurt from pulling and pushing
 8 that cart?
 9 Q.But you were not the only
10 teacher that was traveling?
11 A.Of course not. No one pushed a
12 cart because they were not being
13 scolded consistently because the kids
14 did not have enough books or because
15 they did not have enough workbooks. I
16 had to make sure I had everything in my
17 cart. Darned if I did, darned if I
18 didn't.
19 Q.You were not the only teacher
20 that was traveling; correct?
21 A.Do you remember that we were
22 dealing with departments? I'm talking
23 about the foreign language department.
24 My classroom was given to the American
25 white teacher. And even the students
```

**Page 81**

```
 1 would question, why does she have a
 2 classroom and you don't? Haven't you
 3 been here longer? And I said, well,
 4 that's not my decision.
 5 Q.Okay. I heard you, but I'm
 6 asking you, were other teachers
 7 traveling as well at that time?
 8 A.I already answered.
 9 Q.I don't know what you said.
10 A.Just the foreign language
11 department.
12 Q.I'm asking in general.
13 A.With the other teachers? I know
14 Mr. Melok, because they were waiting
15 for a math classroom. And I don't know
16 how much seniority he had or not. To
17 tell you the truth, I don't know. I
18 just remember Mr. Melok. I don't know
19 any other teachers. Because even Mr.
20 Kurtz, I know that when somebody moved,
21 they'd give her a classroom.
22 Actually, I thought I was going
23 to get it, and they said, no, because
24 Mrs. Kurtz has seniority over you.
25 That's what Mr. Deshner told me. There
```

Multi-Page™

**Page 74**

1 I was extremely bad, I arrived with Mrs.
2 Maruzka, and we were walking, the two
3 of us. I received a tardy. She
4 didn't. And Mr. Desimer referred to
5 her when she is delayed. However, I
6 was tardy. If she was delayed, she
7 always called. There were no cellulars
8 at that time, but I was always tardy.
9 So I don't know when she called. There
10 were no cellulars, but she called. I
11 didn't. So yes, I remember that time
12 in which I wrote him a memo about it.
13 Q.Any other time that you were
14 tardy that you can recall that didn't
15 involve extenuating circumstances?
16 A.Most of the time, I was there
17 way before. I usually tried to be
18 there on time and I tried to be there
19 earlier than my usual period scheduled,
20 because since I was a traveling
21 teacher, I had to go and pick up my
22 car, I had to get my things from my
23 office and then move from classroom to
24 classroom to classroom. Then when
25 finally they gave me a classroom, it

**Page 75**

1 I was in the trailers. And when I had to
2 go to the office and I went into the
3 trailers, I'd have so much trouble
4 because the trailer was breaking apart.
5 They told me, you have to close the
6 trailer. Make sure that it's not —
7 there was the other door open all the
8 time because there was another teacher.
9 So my students, there is no way that
10 they could just be there and be reading
11 because there was another classroom,
12 Q.Okay. Let's move on from the
13 tardies. Looking at Exhibit Six —
14 A.Six or Seven?
15 Q.And when I say Exhibit Six, I'm
16 also looking at it in conjunction with
17 Five because you responded once and
18 then you responded again. So I'm
19 looking at Five and Six together.
20 question eight. And I asked you to set
21 forth the bases of your allegation in
22 paragraph 22(b) in your first amended
23 complaint, that you were reduced to a
24 position, quote, inferior, end quote,
25 to the one you allegedly possessed

**Page 76**

1 prior to taking your medical sabbatical
2 leave. And then you said — I don't
3 know what you were saying about when
4 you became a traveling teacher, but
5 then it seemed to me you were saying
6 that basically, you were a traveling
7 teacher for most of the time that you
8 were there. But from this response, it
9 doesn't seem to have happened until
10 1999. But you were in the trailer
11 prior to 1999, correct?
12 A.That was my classroom when he
13 gave me a classroom.
14 Q.And prior to that, you were
15 traveling or —?
16 A.Prior to that, yeah. The first
17 time they gave me a classroom, that DD,
18 the trailer, and then when they
19 finished building the school I came
20 back — no, no, not came back. Way
21 before that, I was an aide. Actually,
22 before I moved into the trailer, they
23 had given me one classroom. It was
24 A-1. Then since they were remodeling
25 the school, then they moved all the

**Page 77**

1 foreign language teachers to the
2 outside. And they changed —.
3 Q.So it wasn't just you that moved
4 to the outside? There were other
5 teachers?
6 A.There were several. All the
7 foreign language. All the foreign
8 language. Janice, Mr. Elmers
9 (phonetic), myself, and there was a
10 special ed teacher beside me, because
11 you went through that door and then you
12 could go into my classroom. And that
13 door was not locked. Then what
14 happened is that they gave me that
15 classroom. I had A-1. They gave me
16 DD.
17 And then I was suspended by Mr.
18 Dolecki, and I never went back. I went
19 into all these medical leaves. A year
20 later, when I came back, they had
21 already hired Mrs. Barbara Kurtz, and
22 they gave her a classroom. Mr. Desimer
23 said they gave her a classroom because
24 I left. And I said, but Mr. Desimer,
25 she doesn't have seniority. I do. And

Multi-Page™

Page 78

```
1  I left not because I wanted to.  I
2  said I was on a medical leave, which I
3  have the documentation.
4  Q. On the collective bargaining
5  agreement, was that a grievable issue?
6  A. Most of the time, it's seniority
7  that they are the one to keep the
8  classroom.
9  Q. Did you try to grieve that
10 issue?
11 A. I talked to everybody I could,
12 including Mr. Deshner, and they said,
13 because you left. And I said, is there
14 anything I can do? Nonetheless, they
15 didn't want to do anything. Actually,
16 they encouraged me to look for another
17 job because they said, we cannot
18 continue defending you all the time.
19 Unfortunately, that's what Mr. John
20 said, to look for another job in
21 another place.
22 Q. And is it your understanding
23 that under the contract, the
24 administration can schedule teachers
25 wherever is necessary?
```

Page 79

```
1  A. Okay. I was teaching Spanish 5
2  and Spanish 4 and Spanish 3.
3  Therefore, I'm supposed to be the
4  teacher with more experience, and I
5  never had problems with my Spanish 5
6  until there was an incident. I don't
7  want to deviate again. I was
8  consistently teaching these hard
9  courses because I spoke Spanish better
10 and I was a native from the country.
11 When I came back, they gave it to the
12 white teacher that was not as fluent as
13 I was. They gave her my hard levels of
14 Spanish. I witnessed some of the
15 classes. I witnessed some of the
16 classes.
17 Q. Your certification is just to
18 teach Spanish, --
19 A. One through 12.
20 Q. -- not particularly any type of
21 Spanish?
22 A. One through 12. And then,
23 instead of giving me my classes back
24 and my classroom, what did they do?
25 And I told Mr. Deshner, according to
```

Page 80

```
1  the medical leave, it states that when
2  you go on a medical leave and you come
3  back, you are to come back to the same
4  position, the same circumstances. What
5  did they do? I went to seven different
6  classrooms. Did you know how much my
7  chest hurt from pulling and pushing
8  that cart?
9  Q. But you were not the only
10 teacher that was traveling?
11 A. Of course not. No one pushed a
12 cart because they were not being
13 scolded consistently because the kids
14 did not have enough books or because
15 they did not have enough workbooks. I
16 had to make sure I had everything in my
17 cart. Darned if I did, darned if I
18 didn't.
19 Q. You were not the only teacher
20 that was traveling, correct?
21 A. Do you remember that we were
22 dealing with departments? I'm talking
23 about the foreign language department.
24 My classroom was given to the American
25 white teacher. And even the students
```

Page 81

```
1  I would question, why does she have a
2  classroom and you don't? Haven't you
3  been here longer? And I said, well,
4  that's not my decision.
5  Q. Okay. I heard you, but I'm
6  asking you, were other teachers
7  traveling as well at that time?
8  A. I already answered.
9  Q. I don't know what you said.
10 A. Just the foreign language
11 department.
12 Q. I'm asking in general.
13 A. With the other teachers? I know
14 Mr. Mehok, because they were waiting
15 for a math classroom. And I don't know
16 how much seniority he had or not. To
17 tell you the truth, I don't know. I
18 just remember Mr. Mehok. I don't know
19 any other teachers. Because ever Mr.
20 Kurtz, I know that when somebody moved,
21 they'd give her a classroom.
22 Actually, I thought I was going
23 to get it, and they said, no, because
24 Mrs. Kurz has seniority over you.
25 That's what Mr. Deshner told me. There
```

Multi-Page™

Page 82

1 became a classroom available and I
2 thought I was going to get it, and they
3 gave it to Mrs. Kurtz.
4 Q.And did she have seniority over
5 you?
6 A.That's what Mr. Deibner said,
7 because she had been there longer than
8 I had been. And they'd give her a
9 classroom when I thought I was going to
10 get it.
11 Q.So when you're talking about, in
12 response to number eight, an inferior
13 position, you're saying because you had
14 to travel and because you were not
15 teaching upper level Spanish? That's
16 what you mean?
17 A.When I came back from my
18 sabbatical.
19 Q.That's what you mean, then;
20 correct? Yes?
21 A.Yes.
22 Q.Did anyone ever specifically say
23 anything derogatory to you about being
24 Hispanic?
25 A.Many times, many students.

Page 83

1 Q.I mean administration.
2 A.Not in my face. I'm sure they
3 did because some of the students, they
4 came out — and this is hearsay, they
5 told them, but since our last time that
6 some of the students approached me that
7 they heard Deibner saying some things.
8 And I said, I cannot use it in court
9 because it's hearsay, that he said, I'm
10 going to get this little — whatever.
11 Q.But you never heard that?
12 A.Not in my face.
13 Q.Now, looking at number ten in
14 Exhibits Five and Six, again, I am not
15 sure that I have all of your medical
16 records, but since our last time that
17 we met for your deposition, I did
18 receive medical records from Dr.
19 Mercatoris. And I provided them to Mr.
20 Nichols.
21 ATTORNEY NICHOLS:
22 I got a couple.
23 BY ATTORNEY HEATH:
24 Q.But in the supplemental response
25 to Interrogatory ten, again, it says

Page 84

1 that I can ask you additional questions
2 during your deposition. And it says
3 here, Plaintiff can elaborate on her
4 medical condition and how the stress
5 and tension of the workplace
6 exacerbated her condition. And I'm
7 asking you then to elaborate how you
8 believe that the stress in the
9 workplace either caused your condition
10 or exacerbated your condition.
11 A.Exacerbated my condition to the
12 point that I had a nervous breakdown.
13 That's when I had to take off the
14 school. And I began to suffer these
15 horrible psychotic nightmares, always
16 dreaming with these horrible three
17 people, which in my mind, they were
18 Deibner, Templeton and Berkobie, and
19 there were all these horrible monsters
20 kind of like, when I had a nervous
21 breakdown, because I couldn't think
22 normally.
23 And they were consistently
24 hurting me. I don't want to be very
25 specific on the kind of psychological

Page 85

1 abuse that I went through when I had
2 all these horrible nightmares. And I
3 just remember screaming and screaming,
4 and I had to go to the hospital. And I
5 told them, I cannot even close my eyes
6 because these creatures, these three
7 creatures, they're constantly hurting
8 me, abusing me, ripping my skin off,
9 raping me. It was so terrible.
10 And then I was constantly
11 looking for a place. I have to go to
12 class, I have to go to class, I have to
13 find my classroom. And I explained to
14 them. They even thought, oh, well,
15 maybe she's into drugs. But when they
16 did a blood test, they realized that I
17 wasn't into drugs. I was just — and
18 they gave me medication.
19 Q.These are things you were
20 dreaming; correct?
21 A.I couldn't even close my eyes
22 because the things were so real. And I
23 don't take drugs, and I don't drink,
24 although I have the reputation of being
25 an alcoholic, but I don't. I have very

Multi-Page™

Page 86

1 little tolerance for that. Needless,
2 to say, it was extremely horrible. And
3 it took me about six months, but to
4 live with the constant fear, the
5 constant dread of losing my job, losing
6 my career after I have worked extremely
7 hard, it was ---.
8 When I came to this country, I
9 had to be born again. And I wanted to
10 do my best to be a productive citizen
11 of this country, because I love the
12 United States. Just as I have answered
13 evil, wicked people, that they have no
14 scruples and they are slanderous and
15 they hurt people and they want to tear
16 their lives apart, I find all these
17 loving, beautiful people, especially
18 beautiful people at my church.
19 And Uncle Sam has been so good
20 to me because he gave me the
21 opportunity to re-educate myself. I
22 wanted to be a productive citizen. And
23 then I struggled so hard to be a
24 teacher again, because I was a music
25 teacher. My parents were teachers. My

Page 87

1 brother's an engineer. My sister is a
2 dentist. We come from a middle class
3 family, but educated, the culture. I
4 love music, I love Broadway. I grew up
5 with that kind of music. So I wanted
6 to do well in this country and be a
7 productive citizen, not be like some
8 other people, which is why I didn't
9 apply for a benefit, taking from the
10 government. I didn't want to do that.
11 I said, I'm going to get ahead.
12 And then, when I live with a
13 constant fear that they were going to
14 take my job away, constantly, three
15 arbitrations ---. Did you have the
16 slightest idea each arbitration, how
17 mentally emotional, devastating,
18 psychological ---?
19 Q Would you agree with me that you
20 had prior problems?
21 A From the very first arbitration.
22 Q Prior psychological problems
23 prior to coming to this job?
24 A Well, not really, and I'm going
25 to tell you why. I'm going to tell you

Page 86 - Page 89

Page 88

1 why. Because I left my country; right?
2 And I start all over again. I start
3 fresh. I came to this country, I was
4 married. It was everything new. I was
5 very excited about learning English,
6 going to school. It was everything. I
7 graduated. I found a job. I
8 substituted. I got ESL. And then
9 finally, I got a permanent job, and
10 everything was incredible. It was
11 fine.
12 Q But my question was, prior to
13 this job ---.
14 A I have no problems until 1995.
15 Q Isn't it true that you were
16 molested as a child?
17 A That's what I'm telling you.
18 ATTORNEY NICHOLS:
19 Counsel, you're going
20 beyond ---.
21 A Right. That's what I'm telling
22 you.
23 ATTORNEY NICHOLS:
24 First of all, let me
25 say ---.

Page 89

1 ATTORNEY HEATH:
2 I'm asking about the
3 origin of her alleged mental
4 disability.
5 A And I'm going to tell you.
6 That's what I'm telling you. When I
7 came to this country --- you see how
8 far I am? 2,000 miles. I don't see my
9 family. I'm here. I started a new
10 life. And also, remember I'm a
11 Christian person. And knowing that you
12 have to deal with these wicked, evil
13 people, you still have to forgive them.
14 BY ATTORNEY HEATH:
15 Q And throughout this time frame
16 though ---.
17 A And that helped ---.
18 Q --- isn't it fair to say that
19 your relationships at home were less
20 than stable?
21 A But I'm not going to say because
22 of that. I have to say that the second
23 time I got married, I have to say that
24 a great deal of problems I had with my
25 husband, it was because of my first

1 QAnd I understand that. But
2 that's what you're referring to here?
3 Is that what you mean?
4 AThey asked me to resign. It was
5 not a suggestion.
6 QOkay. But that's what I'm
7 asking. When you're talking about this
8 arbitration award, I'm not sure.
9 You're just saying that the --- again,
10 you're referring to the arbitration
11 award, that you did not --- that the
12 emotional distress you exhibited on
13 March 12th, 2002 did not warrant a
14 premature unsatisfactory rating for the
15 entire year. But that's what you're
16 basing your claim that you were being
17 regarded as disabled as to what, your
18 behavior in March of 2002?
19 AMy mental condition. I only
20 asked for three days to cool off
21 because I realized at that moment ---
22 you see my evaluations. You see all
23 satisfactory.
24 QI'm just trying to narrow down
25 what it is you're claiming.

1 grievance. I explained that to you
2 last time. The third one, I'm not
3 going to blame it on anybody because it
4 was a psychotic pedophile, American man
5 that I met, so I cannot categorize and
6 say that they are all the same. That's
7 entirely not relevant. So I cannot
8 blame for the other ones. I gave
9 responsibility because I felt lonely.
10 I needed support. Since I don't have
11 my family here, then -- when you are
12 lonely ---.
13     ATTORNEY NICHOLS:
14         That's not relevant. You
15     don't have to answer that.
16     ATTORNEY HEATH:
17         It is relevant in the
18     sense that if she's indicating
19     that her mental problems were
20     caused by the job ---.
21 ABut remember we said.
22 exacerbated. We used the word
23 exacerbated. That's what we used. In
24 1995, after I went to my first
25 grievance, that's when my whole entire

1 ordeal began. Prior to that, I never
2 had to see a psychologist, even with my
3 molestation I didn't. I didn't because
4 I learned to forgive, and also, I was
5 2,000 miles away. And I started a new
6 life. And you know, when you
7 mature, ---
8     ATTORNEY NICHOLS:
9         Just answer the question
10     you had. That's all.
11 A--- you don't have. But
12 in this particular case, I blame others
13 because they robbed me of my career, of
14 my life.
15     ATTORNEY HEATH:
16         You have to answer the
17     question that you were asked.
18     Just answer the question.
19     please.
20 BY ATTORNEY HEATH:
21 QDo you know how to spell
22 depression?
23 A.Of course.
24 QWould you spell it for me?
25 A D-E-P-R-E-S-S-I-O-N. I hope I

1 did it correctly. Oh, just one P. So
2 I shouldn't say yes, I do.
3 QLooking at answer 12, again, I'm
4 confused as to what you're trying to
5 allege here. I'm asking for factors
6 that you believe support your
7 contention that Defendant either
8 regarded you as being legally disabled
9 or that you had a record of impairment.
10 And then you were talking about the
11 understanding why that relates to how
12 the administration viewed you relative
13 to your mental position.
14 AI'm disabled. They asked me to
15 resign.
16 QSo what are you talking about
17 here? You're talking about what, the
18 issue that came up concerning the
19 suggestion that you could resign?
20 AIt was not a suggestion.
21 QOkay. I know we talked a little
22 bit about this before.
23 AAnd there is a memo that
24 says ---.

Multi-Page™

Page 94

1 A.Well, I'm going to try to
2 explain to you if you allow me to do
3 so.
4 Q.But let me stop you, because
5 what I'm asking you --- to be clear on
6 what I'm asking you. I'm asking you
7 what your claims are that you were
8 regarded as being disabled. And you're
9 focusing on what happened here in March
10 of 2002. So I want to know if that
11 incident is the basis of your claim
12 that you were discriminated against and
13 then later terminated because you were
14 regarded as being disabled.
15 A.Correct.
16 Q.Is there anything else that
17 you're basing that regarded as being
18 disabled claim on?
19 A.From the very beginning that I
20 took off in 1997, all my excuses, my
21 medical leave, everything, the whole
22 entire history of my medical and
23 depression and stress. When I took
24 three days, because they began to
25 exacerbate that, ---

Page 95

1 Q.Is 2002?
2 A.In 2002. When Mr. Higgins had
3 been totally honest, very truthful as
4 supposed to be --- I'll ask. He saw me
5 teaching. He saw how well I was
6 performing. And then suddenly turned
7 around because he was pressured, I'm
8 sure they said, whether you help us to
9 get rid of her and you go and find
10 faults in her teaching, or his job
11 might be at stake. All these men have
12 no balls to be real truthful, and
13 they're afraid of losing their job. So
14 they take down a little Mexican. Who
15 cares? Let's get rid of her. Take her
16 back to Mexico.
17 Q.And this is your supposition?
18 A.Like so many students, they
19 said, why don't you go back to Mexico?
20 And Dr. Berkebile, their mothers will
21 discipline them. Do you have a green
22 card? Do you want to get a second job?
23 The parents will discipline. But
24 you're lying. You are not really
25 disciplining them. They say that they

Page 96

1 didn't do anything. They never said
2 anything. Anyway, I'm sorry.
3 ATTORNEY NICHOLS:
4 Counsel, I don't think
5 she understood your question.
6 You asked her question 12;
7 right?
8 ATTORNEY HEATH:
9 Yes.
10 ATTORNEY NICHOLS:
11 And I don't think you
12 understood the question. So
13 take a moment.
14 A.They ---
15 ATTORNEY NICHOLS:
16 Wait a minute. You have
17 given her answers, and I think
18 you should read that. Take a
19 moment and read --- wait a
20 minute. The supplement. Take a
21 moment and look at the
22 supplement.
23 A.That's what I thought that she
24 just read. On March 12, it was not
25 reason for them to give me an

Page 97

1 unsatisfactory.
2 ATTORNEY NICHOLS:
3 Well, that ---
4 A.They regarded me as disabled
5 And I thought you already read the
6 arbitration.
7 ATTORNEY NICHOLS:
8 I understand. You notice
9 with respect to question 12, I
10 answered, that is not her
11 statement. That is drawn from
12 the arbitration conclusion.
13 ATTORNEY HEATH:
14 Again, I don't care what
15 the arbitrator said. I want to
16 know what the basis of her claim
17 in this particular action is.
18 ATTORNEY NICHOLS:
19 Asked and answer'ed.
20 A.They asked me to resign because
21 I submitted --- they saw me as
22 disabled. Why did they send me for a
23 psychological evaluation? Why? If
24 they didn't see me as disabled, why did
25 they ask me?

1 BY ATTORNEY HEATH:
2 Q.And that's what I'm asking you,
3 if that's what you're focusing on.
4 A.And the suspension for two
5 months.
6 Q.Now, when you're talking about
7 the suspension, you mean when?
8 A.On that time.
9 Q.In March of 2002?
10 A.March 12th. As soon as I came
11 back from taking that medical leave,
12 they suspended me for two months and
13 they sent me for a psychological
14 evaluation. And their own psychologist
15 told them, she's just depressed. That
16 doesn't mean she's not fit to work.
17 And I complied with every single
18 request they did, every single thing,
19 even when my depression ---. You know,
20 I stayed after school every day ---
21 ATTORNEY NICHOLS:
22 Did you even ask her a
23 question?
24 A.--- to be able to do all the
25 work.

1 BY ATTORNEY HEATH:
2 Q.Okay. Looking at number 13 now,
3 and the answers that you put forward on
4 Exhibits Five and Six, you're
5 indicating here that you returned to a
6 hostile and stressful work environment
7 upon your return from medical leave.
8 And what are you talking about? Are
9 you talking about 1999?
10 A.1999, 2000.
11 Q.Is that what you're talking
12 about?
13 A.They gave me Spanish 1 with all
14 these special ed students that they
15 have problems as much with any other
16 teacher. The only problem with my
17 class, Spanish 1, is that special
18 education, you might have maybe a few,
19 seven of them. This other class might
20 have only two over here. I get them
21 all. All the special education kids.
22 Q.So you're saying ---?
23 A.If they have problems, another
24 teacher's with them.
25 Q.You have a problem teaching

1 special education children?
2 A.Not a problem, because I still
3 discipline them. What is the big
4 problem here? As soon as I discipline,
5 oh, you're lying. The students didn't
6 say it. They didn't do it. Lack of
7 support from administration. I
8 discipline. I wish you would come in
9 to see my classes, and all the
10 classroom expressions that they need.
11 Even the substitute teacher said she
12 was amazed at how much Spanish --- that
13 was my job. I speak Spanish. And I
14 discipline.
15 Q.So the reason you're saying it
16 was a hostile --- you believed it was a
17 hostile and stressful work environment
18 was because you were given what you
19 believe was a disproportionate number
20 of special education and problem
21 students?
22 A.That is not the reason. The
23 main reason is the lack of support from
24 administration.
25 Q.I'm asking because of what you

1 just said.
2 A.They gave me all these special
3 education --- unruly, special
4 education. And also in my claim is the
5 lack of support from administration in
6 disciplining these unruly students.
7 Q.Okay. Then if you look to,
8 again, 13, the supplemental answer that
9 you have on Exhibit Six, the last
10 sentence there is, the administration
11 showed no regard or accommodation for
12 her medical condition. What
13 accommodation did you ever request that
14 was denied to you?
15 A.I told Mr. Deshner to please
16 give me back my higher classes. And if
17 Barbara was so great in disciplining,
18 why didn't he give all these special ed
19 kids to her?
20 Q.So that was your request?
21 A.I asked him to ---.
22 Q.And that was your request for
23 accommodation?
24 A.I did. Just give me my higher
25 classes and my classroom.

Multi-Page™

Page 102

1 Q.Because you felt what, you were
2 unable to teach special education or
3 problem students?
4 A.It's not that I wasn't able. It
5 was more stressful. And the lack of
6 support from the administration made it
7 even harder. When the students come
8 and say, Mr. Higgins said that you're
9 going to get fired, Mr. Higgins said
10 that he's so sick and tired of you
11 sending kids to the office, that's what
12 he told me to do. They didn't want me
13 to put them outside the classroom.
14 Other teachers did.
15 And even the student that
16 attacked me and hit me and beat me up,
17 they put her back in my classroom. And
18 then he came and said, she wasn't
19 sleeping in your classroom. I woke her
20 up very tactfully. This girl is the
21 one that would say, you don't even know
22 how to speak English, and she would
23 call me all kinds of horrible names.
24 But I asked her to please sit up nice
25 and straight, Mr. Higgins is watching.

Page 103

1 And he saw everybody was behaving
2 because I discipline. But when the
3 students know that the administration
4 doesn't back you up, it makes it
5 harder, more stressful.
6 Q.And looking at 18, and look at
7 Exhibit Six, which is your supplemental
8 response.
9 A.Eighteen (18). Okay.
10 Q.The question was, identify each
11 and every alleged incident of
12 discrimination referring or relating to
13 your alleged complaint. Include the
14 following information for each
15 incident. Then I asked for the date,
16 time and place of the incident, the
17 person engaging in the conduct, the
18 nature of the conduct and why you
19 believe it was based on your gender
20 and/or in retaliation for engaging in
21 protected activity, and all witnesses
22 to the incident.
23 And I understand that we've
24 already talked about what you believe
25 the basis for your complaint is, is

Page 104

1 primarily contained in your chronology
2 of events.
3 A.I'm sorry, but it's not what I
4 believe. It's what happened to the
5 point that I'm fired right now. I
6 don't have a job. And I'm —.
7 Q.I'm just saying that I think the
8 answer to this question, if I'm
9 correct, is primarily contained in your
10 chronology of events; is that correct?
11 A.And my grievances.
12 Q.Okay. I'm not going to, you
13 know, make you rehash all of that
14 again. I'm just trying to be clear.
15 But you do say here that some of the
16 witnesses to the incidents would be
17 John Stanford, Marlene Gourdy, Joanne
18 Williston and Jasine — how do you say
19 her last name?
20 A.Maziarz.
21 Q.Maziarz. Now, John Stanford,
22 you already deposed him; correct?
23 A.We already did.
24 Q.And Marlene — it actually says
25 Gourdy, but I believe it's Gourly.

Page 105

1 A.It's Gourly with an L.
2 Q.And Joanne Williston's already
3 been deposed; correct?
4 A.Correct.
5 Q.And then what do you believe
6 that Marlene Gourly is going to testify
7 about?
8 A.Well, she was there when she
9 realized that Mrs Templeton forbade me
10 to give detentions and sent me a letter
11 saying, oh, you're picking on the kids.
12 You sent all these kids and they said
13 that you're picking on them. And we
14 already called the parents. I forbid
15 you to give them detention. You have
16 the letter.
17 And also, she was yelling and
18 screaming. I told her, I said, well,
19 you want me to be consistent. I have
20 the classroom rules. And she said, I
21 don't care. And I said, Mr. Deshner
22 signed them. I don't care. They're
23 not flexible. So I changed my
24 classroom rules so many times because
25 they were flexible, they were not

**Multi-Page™**

1 flexible, they were too long, they were
2 too big, they were too little. I even
3 used Barbara Kurtz's classroom rules.
4 Q You indicated to me that ---
5 when you're talking about this, Mrs.
6 Templeton issue, ---
7 A She was screaming and yelling.
8 Q --- that she gave you a memo;
9 correct?
10 A Yeah. We have it. Do you want
11 it?
12 Q I'm going to ask you to take a
13 look at it, and ask if this is the
14 memo. And it's dated October 3rd,
15 1997.
16 WITNESS REVIEWS DOCUMENT
17 A Yeah. They were being treated
18 unfairly. Yeah, that's the memo.
19 Yeah. They were singled out. Poor
20 things. They had no problems with
21 anybody but me.
22 BY ATTORNEY HEATH:
23 Q Okay. I'm just trying to ask
24 you if that's what you're referring to.
25 A Yes. Uh-huh (yes). And then we

1 listen to what she was saying, and that
2 you continued to interrupt her, then
3 site asked you not to speak until she
4 finished? Do you recall that?
5 A I do have all the discipline
6 that she suggested, teacher detention,
7 teacher detention, teacher detention,
8 Q I'm just asking if you recall
9 that particular exchange.
10 A I do not recall that. No, of
11 course not.
12 Q Do you recall at the end of the
13 meeting that you pointed your finger at
14 Mrs. Templeton and made accusatory
15 statement such as, quote, you are
16 unprofessional, you are always siding
17 with students, end quote, and quote,
18 Mrs. Templeton, you know we have this
19 thing between us, end quote, and then
20 she asked you to explain and you said,
21 quote, because of what happened in the
22 past, I know you were trying to get rid
23 of me, and you were pointing your
24 finger and raising your voice? Do you
25 recall that?

1 A had a meeting.
2 Q And Mrs. Gourly was at the
3 meeting? Is that what you're saying?
4 A Yes, she was at the meeting.
5 Q Yeah. We are going to try to
6 her and see if we can get the notes. I
7 don't know if she wants them, other
8 than why it took place, because she
9 even talked to Mr. Lescola (phonetic),
10 and she told Mr. Lescola that she had
11 never, never seen anybody being treated
12 so rude and so unprofessional like they
13 treated me.
14 Q And you're saying that you
15 believe Mrs. Gourly's going to testify
16 to that?
17 A I hope that she does.
18 Q Do you recall the meeting that
19 occurred and Mrs. Templeton indicating
20 to you that she was trying to explain
21 the situation and you were constantly
22 interrupting her? Do you recall that?
23 A I just remember ---.
24 Q She was talking about the
25 student complaints and had asked you to

1 A No. When people say I'm
2 pointing my finger, did you see how
3 sometimes I roll my hands? It's not
4 pointing fingers. Pointing fingers is
5 like this. I move my hands many times
6 when I talk. Now, I was telling her
7 the truth, that since I won that
8 arbitration, they were retaliating.
9 As soon as I filed my complaint
10 with PHRC, what did they do? Memo
11 after memo, memo after memo, memo after
12 memo. Danced if I disciplined, danced
13 if I didn't. And then they say, your
14 classes were chaotic. Well, she's
15 telling me not to give them detention.
16 The students that I sent, when I was
17 suspended, the other teacher sent them
18 to them. And they did nothing to her.
19 They did not tell her, you are picking
20 on the students.
21 But it was the same pattern,
22 consistently, never supported me. They
23 supported other teachers, no question.
24 With me, they even called them to
25 testify.

**Page 110**

1 QBut my question was, do you
2 recall that particular exchange between
3 you and Mrs. Templeton?
4 A.That's what Mrs. Gourly can
5 testify because she was there.
6 QAnd so you're saying it didn't
7 happen? You didn't point your finger,
8 you didn't raise your voice?
9 A.I don't point my finger. I did
10 not raise my voice. I told her that
11 she was being totally unprofessional
12 the way she was treating me and totally
13 rude, and that she was trying to get
14 rid of me. They were trying to get rid
15 of — no, they weren't trying. They
16 did, by the book, like they told them
17 that they wanted to do it, to some of
18 the union reps. They wanted to fire me
19 by the book.
20 Why do you think they took my
21 students to have a test two months into
22 the school year? They were not even my
23 students, none of them but two. They
24 were Mrs. Maziarz's students, all of
25 them. And Mr. Destner said, because I

**Page 111**

1 was not teaching. It was only October.
2 And two of them were only my students,
3 former students, only two.
4 Why did they take only my
5 students, nobody else's? Two months
6 into the year, we had just started.
7 Because I was not teaching, that's what
8 he said. And none of them were my
9 students. Because they were planning
10 this. It didn't matter if they were
11 going to get rid of me. It didn't
12 matter what I already won three
13 grievances. I had already filed with
14 the HRC. It didn't matter. They were
15 going to —.
16 QAgain, my question really was
17 I just specifically related to that
18 particular meeting with Mrs. Templeton.
19 Because I'm asking you, again, I want
20 you to focus back on Exhibit Six and
21 these particular Interrogatory
22 questions and your answers. And you
23 were telling me who the witnesses were.
24 And I'm trying to determine what you
25 believe these particular people that

**Page 112**

1 have not yet been deposed are going to
2 testify to. Is there anything else
3 that you think Marlene Gourly could
4 testify to other than that meeting we
5 just discussed —?
6 A.You will have to ask her.
7 QJust tell me that. Other than
8 the meeting we finish.
9 Templeton that you can think of as you
10 sit here today?
11 A.I cannot think of anything.
12 QOkay. Now, Janine —
13 again —?
14 A.Maziarz.
15 QMaziarz. What do you believe
16 she can testify to?
17 A.Since she was my close friend,
18 probably the number of times that she
19 just saw me crying and crying, and she
20 doesn't understand how I can deal with
21 such harassment. And —.
22 QWas she a teacher?
23 A.She was my friend and we were
24 co-workers. We taught in the same
25 classroom for 15 years.

**Page 113**

1 QIs she retired from the
2 District?
3 A.She's retired. But her husband
4 was in the School District for many,
5 many years. And although I'm sure —
6 I love her dearly. I really, really
7 love her and I'm not going to talk
8 about her, but I know that she had a
9 great deal of problems with the
10 students. If I would have done what
11 she did with some of the students, my
12 class, I would have been fired on the
13 spot.
14 But remember, her husband was on
15 the school board. He was the
16 president. So they didn't put her in
17 an actual classroom until the very last
18 year prior to her retirement.
19 QWhat is her national origin?
20 A.She's Arab and —
21 ATTORNEY NICHOLS:
22 Moroccan.
23 A— Moroccan Arab. Yeah, I
24 don't know if she has some French. I
25 know she knows Spanish. But she was

Multi-Page™

**Page 114**

```
 1 born in Morocco. It's Arab. But she's
 2 a wonderful person, though. I know she
 3 had problems with the kids because she
 4 was just extremely, extremely, I think,
 5 very ---
 6    ATTORNEY NICHOLS:
 7        Counsel, ---
 8 A-- loving to them.
 9    ATTORNEY NICHOLS:
10        --- with respect to
11        question 18, the answers at
12        question 18, subpart E, we may
13        well alter that list of
14        individuals.
15    ATTORNEY HEATH:
16        Okay.
17    ATTORNEY NICHOLS:
18        Okay.
19 BY ATTORNEY HEATH:
20 Q Is there anyone else as you sit
21 here today that you can think would
22 have information concerning the alleged
23 discrimination that occurred?
24 A Just the records, they speak for
25 themselves. And I'm out of a job. And
```

**Page 115**

```
 1 what did they do? They hired young,
 2 white male ---
 3 Q I'm asking about people.
 4 A Just documentation. We'll think
 5 of more witnesses if we have to.
 6 Q As you sit here today, can you
 7 think of anybody else ---?
 8 A Yeah. We are going to call
 9 Englebaugh.
10    ATTORNEY NICHOLS:
11        Yes. Ms. Englebaugh.
12 BY ATTORNEY HEATH:
13 Q And who is she?
14 A She was involuntarily
15 transferred to another school until
16 they made her resign because it was
17 living hell when she got here with
18 Desimer. It was a living hell.
19 Q Is she Hispanic?
20 A She looks like me, but she's
21 Italian. But she looks like me.
22 Q And does she have any perceived
23 mental disabilities or ---?
24 A I don't know if she does or not.
25 You will have to ask her.
```

**Page 116**

```
 1 Q But she believed that she was
 2 not treated well under Mr. Desimer,
 3 also?
 4 A She refers to it as a living
 5 hell under Desimer because he hates
 6 women. Well, you know, he's gay, which
 7 is detestable to Jehovah, really. To
 8 God, it's unacceptable. But that's
 9 immorality. That's immoral. They
10 accuse me of immorality because I gave
11 information to my lawyer. That's
12 immorality.
13        And you know what I heard the
14 kids were saying? This is terrible. The
15 kids were saying, don't let yourself go
16 with the principal, because he's gay
17 and he may rape you. They were afraid
18 of him. And they had him as a
19 principal. That was immorality.
20 Q All right. But my point was, I
21 was just trying to determine if, in
22 fact, --- what's her name? Mrs. ---?
23    ATTORNEY NICHOLS:
24        Englebaugh.
25 BY ATTORNEY HEATH:
```

**Page 11**

```
 1 Q Englebaugh was in any type of
 2 protected class such as being of a
 3 different national origin or ---
 4 A Unfortunately, she wasn't, no
 5 Q --- had any disability?
 6 A She didn't do anything.
 7 Q Okay. Let me show you what
 8 we'll mark as Exhibit Nine. And it's a
 9 job description.
10        (de Leon Exhibit Number
11        Nine marked for
12        identification.)
13 BY ATTORNEY HEATH:
14 Q Just take a minute and look it
15 over, please. Look it all over.
16 pages.                 There's only three
17 A Uh-huh (yes).
18 WITNESS REVIEWS DOCUMENT
19 A Okay.
20 BY ATTORNEY HEATH:
21 Q And is that your signature? Or
22 I'm sorry. Is this something that you
23 received? Was that your name at the
24 time, McCracken?
25 A I'm sure that I did, yes.
```

Multi-Page™

1 Q.And was this something that you
2 were aware of?
3 A.Of course I was. Uh-huh (yes).
4 Q.And you were aware of what your
5 performance responsibilities were;
6 correct?
7 A.Which I did. Look at my --- the
8 records speak for themselves. Look at
9 my evaluations.
10 Q.And this goes from one to 13.
11 I'm just wanting to make sure that
12 you're aware of all of these aspects of
13 what was expected of you concerning
14 your performance?
15 A.Yeah. And look at my.
16 evaluations, my observations.
17 Q.Well, I'm asking you. You were
18 aware that these were the criteria upon
19 which you were going to be ---
20 A.Correct.
21 Q.--- evaluated?
22 A.Right.
23 Q.And please wait until I finish
24 asking before you answer, just so that
25 she's not typing when two people are

1 speaking, okay? Have you ever been
2 spoken to by anyone in the
3 administration concerning issues
4 concerning your English spelling or
5 grammar?
6 A.No, not really.
7 Q.When you say not really, what
8 does that mean?
9 A.Nobody ever did. Because if
10 they would have done that, they would
11 have had to talk to all the other
12 teachers as well. You should have
13 heard Mr. Elmer's talking.
14 Q.When you were saying --- for
15 example, I had asked you if you could
16 spell depression, and you spelled it
17 with two P's; correct?
18 A.Yeah. I think it's just one.
19 Sorry. Do you know what I do most of
20 the time? Whenever I want to write, I
21 try to get my dictionary, but sometimes
22 I just --- it depends what I write.
23 Most of my schoolwork, I did.
24 Q.I'm going to show you what we'll
25 mark as Exhibit Ten.

1 (de Leon Exhibit Number
2 Ten marked for
3 identification.)
4 BY ATTORNEY HEATH:
5 Q.This was something that you
6 provided to me in response to when I
7 requested HIPAA releases from you in
8 this lawsuit. And would you agree with
9 me that that's your handwriting on the
10 front page?
11 A.Yes, it is.
12 Q.And you spelled depression with
13 two P's?
14 A.I'm very sorry. It's just one
15 P?
16 Q.And looking at the second page,
17 you spelled it with two P's twice.
18 A.I'm sorry. And what does that
19 have to do with my English? Does that
20 mean that I'm unfit to teach Spanish?
21 Q.Well, I'm just asking. I'd like
22 to mark this as Exhibit 11 and ask you
23 to take a look at that.
24 (de Leon Exhibit Number
25 11 marked for

1 identification.)
2 A.They said I'm incompetent.
3 BY ATTORNEY HEATH:
4 Q.Can you see any misspelled word
5 there?
6 A.Okay. Receive, I-E. Placed,
7 E-D. Under, she was never under.
8 Q.What about chaotic? Do you know
9 how to spell chaotic?
10 A.Chaotic, I think it's
11 C-H-A-O-T-I-C, chaotic. C-H-A-O-T-I-C.
12 Q.So there's at least two mistakes
13 in here; correct?
14 A.Oh, I'm very sorry. However,
15 I remember, I'm a Spanish teacher. But
16 when I do, I always check my
17 dictionary. Everything is written with
18 the textbooks.
19 Q.I want to show you what we'll
20 mark as Exhibit 12, which is five
21 pages.
22 (de Leon Exhibit Number
23 12 marked for
24 identification.)
25 BY ATTORNEY HEATH:

Multi-Page™

Page 122

```
 1  Q I'm just going to ask you first
 2  to look at page two. And this page two
 3  is something that you prepared; is that
 4  correct?
 5  A No, it was Mrs. Barbara Kurtz.
 6  I copied from her. I just wrote Mrs.
 7  de Leon on top. But it's Mrs. Kurtz's.
 8  She uses ---
 9  Q No, page two.
10  A Oh, page two.
11  Q It says parent conferences,
12  school year '01, '02.
13  A Okay.
14  Q For example, it says under the
15  first subject there, K.B., special ed
16  conference held with mother and I.
17  Then again it continues saying mother
18  and I, with mother and I. Did anyone
19  ever bring to your attention that's
20  incorrect?
21  A No. What should I write?
22  Q Well, I'm just asking if you
23  know whether or not that's correct.
24  A I assume that it was correct,
25  mother and I, but if you say it's not,
```

Page 123

```
 1  I would like to know what is wrong with
 2  it.
 3  Q Well, you have to teach Spanish
 4  grammar, correct?
 5  A Yes. And we say yo, su madre y
 6  yo.
 7  Q What if you have something with
 8  with?
 9  A Con. Con su mama y conmigo and
10  with me. Con su mama y conmigo. With
11  me.
12  Q Correct.
13  A Mother and ---
14  Q Me.
15  A And me? Is that right?
16  Q Right.
17  A Me is wrong.
18  Q With me. It's the same
19  grammatical concept.
20  A With me and the mother.
21  Q Con su madre y migo?
22  A Right. But in this particular
23  case --- when I was learning English,
24  you would say, and I.
25  Q Not when there's a with there.
```

Page 124

```
 1  A You don't say, and me.
 2  Q Not when there's a with. I was
 3  an English major. I think I'd know.
 4  A I know. But with mother and I.
 5  And we have a preposition, and I.
 6  Q So you think that's correct?
 7  That's all I'm asking you.
 8  A I don't want to say yes or no.
 9  I will have to ask an English teacher.
10  Q Okay.
11  A Con su madre, with their mother
12  and I --- and myself. I could say on
13  myself. I think that's what I heard,
14  it's an I. But if you have an English
15  major ---. This one I copied from Mrs.
16  Barbara Kurtz, where you copied this.
17  And if it's a mistake, these are from
18  Barbara, not from mine, because I just
19  copied it from her. She allowed me to
20  copy it. That's Mrs. Kurtz's classroom
21  rules. She allowed me to copy them
22  from her.
23  Q Okay. Looking at the last page
24  of this exhibit, this is from you to
25  Mr. Higgins. It's a handwritten memo
```

Page 125

```
 1  dated 3/13/02. Do you see anything
 2  wrong with the first sentence there?
 3  A Okay. Are you talking about
 4  number 1?
 5  Q Yes. It says D-17. It's the
 6  last page of this exhibit.
 7  A Okay. And what's wrong?
 8  Advised?
 9  Q It says adviced.
10  A Should it be advice without
11  the ---?
12  Q A-D-V-I-S-E-D. Advised. Advice
13  is a noun. Advise is a verb
14  --- now I'm getting myself confused.
15  Advice is a noun. Advised is a verb.
16  A Okay. Please be advise ---
17  Q Okay.
18  A --- without the D.
19  Q Without the C. It would be an
20  S.
21  A Oh, with an S? But it's correct
22  with the E-D?
23  Q Correct.
24  A Okay.
25  Q Let me show you two exhibits
```

Multi-Page™

Page 126

```
 1  that we'll mark --- what are we up to
 2  now?
 3        COURT REPORTER:
 4           Thirteen (13).
 5        ATTORNEY HEATH:
 6           Thirteen (13) and 14.
 7           (de Leon Exhibits 13 and
 8           14 marked for
 9           identification.)
10  A.Let me ask you something.  I
11  hope that --- because of those little
12  tiny grammar mistakes, do you think
13  maybe that's why I lost my job?  Does
14  that make me incompetent?
15  BY ATTORNEY HEATH:
16  Q.I was just asking if you were
17  aware that there were grammatical
18  errors there, or spelling errors.
19  A.Most of the time I would use the
20  dictionary.
21  Q.I'm asking you now to take a
22  look at what's been marked as 13 and
23  14.  And these are two complaints that
24  were filed with the PHRC.  And I won't
25  get into what we discussed at the last
```

Page 127

```
 1  deposition.  And I know there is an
 2  issue as to whether or not your PHRC
 3  complaint was ever formally amended to
 4  incorporate your termination.
 5  A.I did ---.
 6  Q.And I know you indicated to me
 7  --- you gave me the packet of what you
 8  sent.  But in that packet of what you
 9  sent, you didn't send your statement of
10  charges letter.
11  A.It is.
12  Q.You believe that it is in that
13  packet?
14  A.I do have it.
15  Q.I mean, did you send that to the
16  PHRC?
17  A.I did.  And they sent it back to
18  me.  I do have the whole entire
19  portfolio.  And I have a witness.  One
20  of my portfolio went with me, and i
21  handed it to him, and also, I sent it
22  by mail.  As soon as they sent me a
23  copy ---.
24  Q.I understand that.  But what I'm
25  asking you, do you know if your
```

Page 128

```
 1  statement of charges letter, that was
 2  your termination letter in there, ---
 3  A.It is.
 4  Q.--- was that in there?
 5  A.It is in here.  It is in there.
 6  Q.Is it correct; that these two
 7  complaints were the only complaints
 8  that you filed?
 9  A.I also filed my filing.
10  Q.I mean, I know you're saying you
11  gave them documents and they were to
12  amend it.
13  A.Right.
14  Q.But you never signed any
15  amendment, did you?
16  A.I signed everything that he sent
17  me, Mr. Flipping.  That's his job.
18  He's the one responsible for that.
19  Q.I understand that your position
20  is that you provided the PHRC with the
21  information and they may have failed to
22  follow up.
23  A.I know Mr. Flipping did.  Did
24  you ask him?
25  Q.But you didn't sign any ---
```

Page 129

```
 1  there's no other complaint that I don't
 2  have; is that correct?  You don't have
 3  something else other than what I have
 4  here?
 5        ATTORNEY NICHOLS:
 6           Counsel, I have to say,
 7  first of all, this is all ---.
 8        ATTORNEY HEATH:
 9           I'm just ---
10        ATTORNEY NICHOLS:
11           Let me just say
12  something.
13        ATTORNEY HEATH:
14           I know we went through
15  this last time.
16        ATTORNEY NICHOLS:
17           Yes.  We went before
18  Judge McLaughlin.
19        ATTORNEY HEATH:
20           Well, we didn't --- we
21  didn't.
22        ATTORNEY NICHOLS:
23           Yes, we did.  On the
24  question of amendment, the Judge
25  clearly said on the record ---
```

Multi-Page™

### Page 130

```
1  and again, I'm going to remind
2  you the Judge remembers.  He
3  told you, Counsel, I'm not going
4  to till this ground again.  And
5  the issue dealing with
6  exhaustion of remedies, that's
7  what you're asking.
8       ATTORNEY HEATH:
9            Please stop.  Can we
10  stop?  We did this last time?  I
11  don't want to do this now.  It's
12  wasting time.
13      ATTORNEY NICHOLS:
14           But you brought it up.
15      ATTORNEY HEATH:
16           We will be going before
17  him anyway.  You can bring it up
18  before the judge.  You don't
19  have to argue your point here.
20  There is no one to say whether
21  you're right or wrong.  You know
22  I disagree.
23      ATTORNEY NICHOLS:
24           He'll remember.
25      ATTORNEY HEATH:
```

### Page 131

```
1            Okay.  Great.  Then we'll
2   bring it up before Judge
3   McLaughlin.  I just want to make
4   sure, as I'm sitting here, that
5   there's no other complaint
6   that's amended that suddenly is
7   going to appear at some later
8   date.
9       ATTORNEY NICHOLS:
10           I'm just saying, please
11  don't waste the Judge's time.
12  Because if you bring it up
13  again, you're wasting taxpayers'
14  money and you're really
15  insulting the Judge, continuing
16  to bring this up again.
17      ATTORNEY HEATH:
18           Well, that's your
19  opinion.
20      ATTORNEY NICHOLS:
21           He told you two or three
22  times.
23      ATTORNEY HEATH:
24           What he said was, I could
25  braze it again at summary
```

### Page 132

```
1   judgment.  That's what he told
2   me.
3       ATTORNEY NICHOLS:
4            He told you ---.
5       BY ATTORNEY HEATH:
6   Q  All I'm asking is, there isn't
7   anything else that I don't have; is
8   that right?
9   A  I don't know because --- you
10  subpoenaed the file, right?
11  Q  Right.
12  A  And they should have that in
13  there because I sent it by mail twice,
14  and I took it in person the third time.
15  So they should have a copy.
16  Q  But you never signed another
17  verification for an amended complaint;
18  right?
19  A  I'm telling you, what I signed,
20  I sent it back to him.  He should have
21  a copy of it.
22  Q  So if it's not in the file, it
23  doesn't exist?
24  A  It has to exist.
25  Q  If there's no amended complaint
```

### Page 133

```
1   with a signed verification in that
2   file, you don't have anything else;
3   right?
4       ATTORNEY NICHOLS:
5            Well, wait a minute.  She
6   can't speak to what happened and
7   what they did.
8       ATTORNEY HEATH:
9            I know that.
10      ATTORNEY NICHOLS:
11           She is not responsible.
12      ATTORNEY HEATH:
13           I understand that.  I'm
14  asking her ---.
15      ATTORNEY NICHOLS:
16           So don't ask her the kind
17  of question which impuses
18  responsibility on her ---
19      ATTORNEY HEATH:
20           I understand your
21  position.
22      ATTORNEY NICHOLS:
23           --- if they are
24  careless.
25      ATTORNEY HEATH:
```

Multi-Page™

Page 134

1 I'm asking her what she
2 signed, for God's sake.
3 A.ATTORNEY NICHOLS:
4 All right. I just wanted
5 to be clear.
6 A.I signed whatever they sent me.
7 I do have the documentation.
8 BY ATTORNEY HEATH:
9 Q.All right.
10 A.Don't you think that it would
11 have been the most important thing?
12 The first person I called, it was Mr.
13 Flipping, when they fired me, the very
14 first person. And I cried and cried on
15 his shoulder, and I told him, they just
16 fired me. You knew they were going to
17 do it. That's what they were looking
18 for, not to help me to improve when
19 they knew I had a Master.
20 They even said in one of the —
21 on the third evaluation that they gave
22 me unsatisfactory, she doesn't show
23 professional improvement. And I was
24 taking a Master's at Mercyhurst. They
25 didn't even ask —

Page 135

1 Q.Now, you say you were crying and
2 crying on Mr. Flipping's shoulder, but
3 I believe, didn't you say in the last
4 deposition that you were dissatisfied
5 with the way that he handled your file?
6 A.Not just him, all of them.
7 Q.You were dissatisfied with —
8 A.All of them.
9 Q.— all of the what?
10 A.I won the grievances. They
11 closed the case. Every time I won a
12 grievance, they closed the case.
13 Q.Who's they?
14 A.Human relations, the department.
15 Q.And again, I think you're
16 confusing the basis of the grievance in
17 the law versus what Title VII or the
18 Pennsylvania Human Relations Act
19 specifies.
20 A.That's what they said. You won
21 the grievance, we are going to close
22 your case. And they did. Every time I
23 won a grievance, they said, okay, we'll
24 close your case. That's it.
25 Q.So in spite of the fact that you

Page 136

1 I won your grievance, they didn't find
2 probable cause for you. —
3 A.They closed the case.
4 Q.— correct? They never found
5 probable cause —?
6 A.They closed the case. They
7 closed the case.
8 Q.Did they ever find probable
9 cause?
10 A.They never came to it because I
11 won the grievances. And I didn't win
12 the fourth one, and then I never heard
13 from them after three years. It will
14 be four.
15 Q.I'm going to show you what we'll
16 mark as Exhibit 15.
17 (de Leon Exhibit Number
18 15 marked for
19 identification.)
20 SHORT BREAK TAKEN
21 BY ATTORNEY HEATH:
22 Q.Actually, I'm sorry. Can we
23 just go back a second to the prior
24 complaint? I'm sorry. I apologize.
25 And I believe this was — and I don't

Page 137

1 really know which one was 13 and which
2 one was 14. Which one —
3 A.I have one 13.
4 Q.— had the notice to defend on
5 the front?
6 A.Oh, this one, 14.
7 Q.Okay. Going back to Exhibit 14.
8 A.What page?
9 Q.When you were talking — in
10 response to one of the interrogatory
11 questions, you referenced the complaint
12 that was filed with the PHRC that was
13 dated February 18th of 2003. And I'm
14 just making sure this is what you
15 meant.
16 A.It was 2002. Or was that an
17 amended complaint?
18 Q.Well, take a look at this
19 complaint —
20 A.The first one was in 2002.
21 Q.— that's an amended complaint.
22 A.It says amended complaint. Okay? And
23 if you look to the end, it says 2/18/03
24 on your verification.
25 A.2/18/03? Okay. Is that the

1 last page?
2 Q What I'm asking --- if you go
3 back to the Interrogatory responses,
4 and I know I put them back now, but if
5 you look to Exhibit Six, ---
6 ATTORNEY NICHOLS:
7 Exhibit Six. Okay.
8 Which number?
9 ATTORNEY HEATH:
10 Number five.
11 BY ATTORNEY HEATH:
12 Q This is when I was asking about
13 the fact that you were claiming you
14 were more stringently micromanaged and
15 scrutinized in your complaint. And
16 what you refer to is your supplemental
17 answer in number one in Interrogatory
18 one, and then your amended complaint
19 filed with the PHRC on February 18th,
20 2003. And at the time, I didn't have
21 it handy. So I want to make sure this
22 is what you were referring to in that
23 answer.
24 A Yes.
25 Q Yes?

1 A Uh-huh (yes). Yes.
2 Q And I'm sorry. Looking at this
3 complaint, this PHRC complaint ---.
4 A What page?
5 Q We've been talking about
6 tardiness, as well. And on page three,
7 most of the people I had already
8 mentioned to you. But then there are a
9 couple of ---.
10 A Are we on Exhibit Six, page
11 three?
12 Q No. We're on Exhibit 14, page
13 three, PHRC complaint.
14 A Okay.
15 Q And we already talked about some
16 of these people.
17 A Page three?
18 Q Look at 14.
19 A Page three?
20 Q Of the complaint --- or amended
21 complaint. I'm sorry.
22 A But you're talking about page
23 three?
24 Q Of the amended complaint.
25 ATTORNEY NICHOLS:

1 Is that attached to ---?
2 We are looking at Exhibit 14;
3 right?
4 ATTORNEY HEATH:
5 Right.
6 ATTORNEY NICHOLS:
7 You have marked it.
8 A Where's page three?
9 ATTORNEY NICHOLS:
10 And the amended complaint
11 is attached you're the amended complaint
12 Oh, I see. Okay.
13 ATTORNEY HEATH:
14 Fourteenth page in is the
15 amended complaint.
16 ATTORNEY NICHOLS:
17 Oh, okay. All right
18 You're talking about what we
19 filed with the PHRC, the
20 administrative complaint?
21 ATTORNEY NICHOLS:
22 The amended complaint is
23 page 14 of that exhibit, it
24 starts. There's no page number,
25 but it's the 14th page in.

1 ATTORNEY NICHOLS:
2 Okay.
3 ATTORNEY HEATH:
4 It says amended
5 complaint.
6 ATTORNEY NICHOLS:
7 Yes, I see it. Okay.
8 All right. What was filed with
9 PHRC?
10 ATTORNEY HEATH:
11 Correct.
12 ATTORNEY NICHOLS:
13 Okay.
14 ATTORNEY HEATH:
15 Turn to page three of the
16 amended complaint.
17 ATTORNEY NICHOLS:
18 All right.
19 BY ATTORNEY HEATH:
20 Q And if you look under count two,
21 you are setting forth your allegations
22 as to why you believe that you were
23 treated differently based on your
24 ancestry. Under count two. And then
25 in paragraph 14, you were talking about

Multi-Page ™

Page 142

1 other teachers that were not treated in
2 a similar fashion, and for example,
3 were not disciplined, at least as far
4 as you know, concerning their being
5 tardy. You're talking also about
6 disciplining students, and you said
7 here --- I'm sorry. Relative to the
8 tardiness, we talked about Mr. Mehok
9 already. There's a --- Froelick?
10 A.Uh-huh (yes).
11 Q.And what was the circumstance
12 there?
13 A.That I probably was late. Mr.
14 Morfenski --- and there were several
15 others on the list in the chronology of
16 events. I was more detailed when I was
17 in the hallway looking at all these
18 different teachers. But there were a
19 lot more that were consistently late.
20 These are only a few. He mentioned
21 only a few.
22 Q.But we already established that
23 you have no independent knowledge as to
24 whether or not they were disciplined,
25 correct?

Page 143

1 A.Of course they were going to say
2 they were, but we would like to see the
3 documentation. Can we subpoena ---
4 they are subpoening my taxes. Can we
5 subpoena their documents?
6 Q.I'm just asking if you have any
7 knowledge, as you sit here today, as to
8 whether or not they were ever
9 reprimanded.
10 A.I asked them and they said no.
11 Q.And that includes --- is it Mr.
12 Froelick or ---?
13 A.Mrs. Froelick.
14 Q.Mrs. Froelick. Does that
15 include her?
16 A.Yeah. She came late the very
17 last day. I saw her and she said, I
18 just got here. She said, I didn't
19 realize how late it was. It was
20 already after an hour that we'd been
21 there when she came in, and I happened
22 to be walking in the hallway when she
23 was coming in.
24 Q.And you don't know if she had
25 called ahead or if she was disciplined?

Page 144

1 A.I'm sure that she called.
2 Because remember, all the white people,
3 they call.
4 Q.What about Morfewski?
5 A.Morfenski.
6 Q.Okay. It says Morfewski, but
7 it's Morfenski?
8 A.Morfenski.
9 Q.With an N?
10 A.Morfenski. There's an N here.
11 Q.Remember, somebody else typed this. I
12 didn't.
13 Q.Okay. And what was the story
14 there?
15 A.I'm talking about teachers that
16 arrived late the same day I did. I saw
17 them personally. I saw them coming in
18 after I did. This particular instance,
19 in addition to all the other ones that
20 I recall before, but I'm sure that they
21 called because they were delayed. I'm
22 tardy. They were delayed.
23 Q.Okay. Then you talk about ---
24 relative to disciplining students, you
25 reference a non-Hispanic substitute

Page 145

1 teacher, Ms. Lynn.
2 A.Right.
3 Q.And you say, the Respondent has
4 not criticized non-Hispanic teacher Ms.
5 Lynn for disciplining students while
6 she acted as my substitute. What is
7 the basis of that statement?
8 A.Well, I have the discipline
9 slips, and she did it with the same
10 students that I did. And she was not
11 --- nobody wrote a letter saying that
12 she was picking on them and that she
13 was lying. They actually disciplined
14 the students. And they were the same
15 students. But Mr. Higgins told me, oh,
16 you're picking on them. You favor some
17 more than the others. You're lying.
18 No. They disciplined the students.
19 And also, her lesson plans, did
20 you see her lesson plans? And you see
21 mine? Mine are typed, very
22 professional, because I always wrote my
23 agenda, my objectives. I struggled to
24 do my best on my job because they were
25 paying me. But not just for that.

Multi-Page™

**Page 146**

1 Because that's my nature. I do things
2 the best way I can. But hers, you
3 should see her lesson plans. Two
4 sentences about what she was going to
5 do.
6 Q.When was she your substitute
7 teacher?
8 A.When I was suspended because I
9 took my medical leave. They suspended
10 me for two months.
11 Q.Are you talking about 2002?
12 A.When they sent me for a
13 psychological evaluation to see if I
14 was fit to teach. She was. I wasn't.
15 But she was. All of her classes were
16 horrible, but she was.
17 Q.That was in 2002?
18 A.In 2002. The same students she
19 had problems with, I did. But the
20 administration supported her, backed
21 her up. They said she was an excellent
22 teacher. She was a science teacher.
23 She didn't even speak Spanish, but she
24 was better than I was.
25 Q.So how many days did you teach

**Page 147**

1 with Ms. Lynn when you came back ---?
2 A.It was the very first day for
3 --- I didn't teach at all. The very
4 first period, she taught. I didn't
5 teach until fifth period.
6 Q.We're talking one day?
7 A.Just the very first day. And
8 the fifth period, I taught, and she was
9 sitting in the back. And as soon as we
10 walked in, that's when Mr. Desimer said
11 that he wanted to talk to her. And I
12 told her, Mrs. Lynn, Mr. Desimer wants
13 to see you in the office. He wants to
14 talk to you. From that moment on, she
15 never walked away. But in the letter,
16 she says that she left because she
17 couldn't stand what I was talking
18 about. I said, what is she talking
19 about? I never taught at all until
20 that moment that she walked away, and
21 then I took over.
22 Q.It wasn't a matter of teaching.
23 Wasn't she talking about what you were
24 saying to the students in the class?
25 A.Oh, no, no. But she was

**Page 148**

1 teaching. I wasn't. I was working on
2 my lesson plans. I just told the girl
3 to put that thing away or I was going
4 to take it away. I said, why are you
5 making such a big thing about somebody
6 farting? It's a natural physiological
7 need. And then I realized that she had
8 that machine, and I said, just put it
9 away. She was just fooling around,
10 this girl, with that farting machine.
11 Q.Okay. Back to my original
12 question, which was, did you ever
13 observe her teaching? That was the
14 only day; is that right?
15 A.For classes, actually.
16 Q.Okay. And that was the only
17 time?
18 A.Uh-huh (yes).
19 Q.Okay. If you look to page five
20 of this PHRC amended complaint,
21 paragraph 24, ---
22 A.Okay.
23 Q.--- you indicate that the
24 administrators were harassing you and
25 that they did not discipline teachers

Multi-Page™

**Page 150**

1 Nina Girganelli —
2 A.Girganelli (corrects
3 pronunciation). I did not write this,
4 remember?
5 Q— and Luanne — and I don't
6 know what their names are, so I'm
7 asking you, Masychak (corrects
8 A.Masychak (corrects
9 pronunciation).
10 Q.For calling homes of the
11 students. What are you talking about
12 there?
13 A.Well, I was there when they had
14 said that they had called the students,
15 especially Luanne. But of course, she
16 denies it now. I was there. We were
17 eating lunch when she said, and when
18 she was talking to everybody, that she
19 had just told a student to settle down
20 or she was going to call the mother.
21 And she said, the student didn't
22 believe me.
23 And she said — and actually,
24 when I grabbed the phone and I called
25 the mother, then she believed me that I

**Page 151**

1 was going to do it, because she did.
2 She said, I called the mother. She
3 said she did. I was there. She did
4 it. Nina Girganelli, she told me that
5 She always calls home in the class
6 because she deals with these suspicious
7 students. But she said, if you ask me,
8 I will deny it because of job security.
9 You have to understand. They're
10 not going to back me up. They're not
11 going to be truthful. It's their job
12 and they don't want to be reprimanded
13 and say you're not allowed to call
14 students. But with me, the students
15 happened to be — but they wanted me
16 to be consistent. I told the student,
17 if you continue — I'd already given
18 detention. I said, if you continue, I
19 said, the condition, I'll let you just
20 sit there. Otherwise, I'm going to
21 have to call the mother.
22 It was just five minutes before
23 the end of the school — the class
24 period and I called the mother. They
25 wanted me to be consistent. But they

**Page 152**

1 already nailed me because this other
2 girl was sleeping, Stephanie Morack,
3 the one that attacked me, Stephanie
4 I did, darned if I didn't.
5 Q.And what you're talking about
6 with the phone call is when you
7 called —?
8 A.Yeah. And I never gave anybody
9 their grades. Never. I said be did
10 not have a grade.
11 Q.All right. We're going to get
12 to that. We're going to take a break
13 and we're going to get to that after
14 lunch because confidentiality is a
15 separate issue.
16 A.I know. Yeah. It didn't
17 matter. Darned if I did, darned if I
18 didn't. They were going to nail me.
19 They were going to get rid of me. It
20 didn't matter what.
21 Q.Okay.
22 A.That was their only objective.
23 Not to help me to improve.
24 ATTORNEY NICHOLS:
25 We'll come back at 1:30.

**Page 153**

1 ATTORNEY HEATH:
2 Right. Okay.
3 LUNCH BREAK TAKEN
4 BY ATTORNEY HEATH:
5 Q.Okay. Where we had left off, we
6 were talking about your amended
7 complaint dated February 18th, 2003
8 that was submitted to the PHRC. And we
9 had stopped with talking a little bit
10 about confidentiality, student
11 confidentiality. What is your
12 understanding or was your understanding
13 of the School District's policy
14 concerning student confidentiality?
15 A.You never give the students
16 grades in front of anybody. Nobody's
17 allowed to know other kids' grades.
18 Q.What about discipline record?
19 A.Discipline record, I would
20 imagine it's the same, but I —
21 Q.But you wouldn't be discussing
22 that in front of other students?
23 A.In front of other students.
24 Q.And with regard to the
25 particular classroom situation that we

Multi-Page ᴰˣ

Page 154

1 were talking a little bit about before
2 lunch, you said that it was about five
3 minutes before the end of class you
4 called Robin Stockton concerning her
5 son who was sleeping in the class; is
6 that right?
7 A. And everybody could see him
8 sleeping.
9 Q. And was it something that you
10 discussed in front of the classroom?
11 A. I didn't have to discuss. They
12 saw him. I woke him up several times,
13 and I had already told him, I'm going
14 to let you go back and sit down. If I
15 catch you sleeping, I'll call your
16 mother.
17 Q. And where were you sitting at
18 the time, or where were you?
19 A. I was usually standing, walking
20 around.
21 Q. At the time you called Robin
22 Stockton, where were you in the
23 classroom?
24 A. Probably up by the phone when I
25 decided to go ahead and call her.

Page 155

1 Q. Is there a phone mounted on the
2 wall or your desk or ---?
3 A. Uh-huh (yes). It is just right
4 on the wall by the door.
5 Q. And at that time, did you talk
6 about this particular student's grades
7 with the mother?
8 A. No. I just told him --- this is
9 what I said. And there is a memo that
10 I sent to Mr. Higgins telling him what
11 had happened. And I told him I wanted
12 to schedule an appointment with her, a
13 conference, because I had already
14 warned her son to wake up several
15 times. And I had warned him that I was
16 going to go ahead and call his mother.
17 That's why I was calling her, because I
18 was supposed to be consistent.
19 And I said, last grading period,
20 he didn't have a grade. This is what I
21 said. Nonetheless, I would like to go
22 over all this information with you.
23 And it is in my memo. And therefore,
24 when the student said --- when I was
25 telling her that --- and I said, right

Page 156

1 now, we are reviewing for a test for
2 tomorrow and he's refusing to wake up
3 and follow along. That's when he
4 pulled out his sheet, his worksheet,
5 claiming that it was completed.
6 And I said, I'm not questioning
7 whether he completed it or not. What
8 I'm questioning, I said, he's not
9 reviewing and correcting the mistakes
10 so he can be prepared and go over his
11 mistakes, grammatical mistakes,
12 grammatical spelling errors, so be
13 could be prepared, and the
14 conjugations, and be ready for the
15 quiz. That's what I was questioning,
16 not whether he did it or not.
17 When he pulled out this sheet,
18 that's when everybody said, oh, but he
19 had already done it, and the whole
20 entire class screamed. And what the
21 mother said, are you calling me in
22 front of the kids. And I said, he's
23 been sleeping in front of the kids and
24 I've been waking him up for the whole
25 entire period. He woke up, I turn

Page 15

1 around, he fell asleep. He woke up,
2 turn around, he went back to sleep.
3 Until I told him, I'm going to have to
4 call your mother. And I said,
5 everybody can see that he's sleeping.
6 So that is when she said, I don't like
7 the way you handled this. I'm going to
8 contact the administrators. Fine.
9 Q. Prior to this particular
10 instance, had you been talked to at all
11 about student confidentiality issues in
12 the past?
13 A. The administrator did, which I
14 never did provide any confidential
15 --- I think I was the only teacher that
16 --- one time, I was criticized by
17 Destiner that I refused to give the
18 students their grade. No, I never did.
19 I did it on a confidential basis. Each
20 student, if they asked me, I'd walk
21 around, I wrote in a little piece of
22 paper, and I gave it to them, because
23 it was very important that I will keep
24 all this information on a confidential
25 basis.

**Multi-Page™**

Page 158

1 Some other teachers say it out
2 loud. They say, you're failing.
3 Because I heard them, especially when I
4 was witnessing other teachers and I'd
5 have to go to several other classes.
6 They'd say, hey, you, you're failing.
7 They did. I never did because I know
8 it was confidential. So I wrote it in
9 a little piece of paper, and I'd give
10 it to them, and any other information,
11 of course. I never called any other
12 parent before, prior to that.
13 Q.And you never opened any grade
14 books and showed the class other
15 students' grades?
16 A.Of course not. My grade book
17 was my grade book.
18 Q.Now, if you will recall from the
19 last arbitration, there was an issue
20 about your copying Mr. Flipping on
21 correspondence that related to
22 students' discipline and identified the
23 students by name; do you remember that
24 issue?
25 A.Yes. Uh-huh (yes).

Page 159

1 Q.And it is correct that Mr.
2 Flipping was copied on some of that
3 information, correct?
4 A.It was only one page that I
5 recall that Mr. Deshner brought up.
6 And I was explaining to him --- I can't
7 recall if it was when I was talking to
8 Mrs. McDaniels about this particular
9 student. And I cannot recall the issue
10 that we were discussing, that he
11 happened to be --- that I told him the
12 kind of students ---
13 Oh, I know. If I recall very
14 well, these students were screaming,
15 yelling in front of my class, you're
16 going to be fired. Because of you, I
17 already went to the office because Mr.
18 Higgins is asking us, how'd you act,
19 what'd you say, what'd you do in class?
20 And because of you, I had to go to the
21 office. And you are going to get
22 fired. In front of the whole entire
23 class.
24 And I sent him a memo saying,
25 this is what the students are saying.

Page 160

1 And this other student, Megan --- I
2 can't recall her name right now. Once
3 is Thomas. The other one is Megan. I
4 have the memo, if you have a copy of
5 that. And I said, this particular
6 student, that I'm having a great deal
7 of difficulty with him academically. I
8 already called his mother, he was a D
9 student, that I was having difficulty
10 keeping him on task. The other girl, I
11 didn't have that much problem. But
12 still, at the beginning, she was a very
13 nice student.
14 And after Mr. Higgins told her
15 to ask them how I act --- because she
16 said the same thing. Yeah, we were
17 called to the office because of you.
18 If you keep sending students to the
19 office, you are not going to be
20 teaching here for too much longer.
21 That's what Mr. Higgins said in front
22 of the whole entire class.
23 So I copied Mr. Flipping with
24 all the comments and telling him, this
25 is the kind of student, and they're

Page 161

1 asking him about my professional
2 performance when this is a D student
3 that is not even paying attention, and
4 I have so much difficulty keeping him
5 on task and turning in his homework.
6 I explained to him the situation
7 and the type students, that they were
8 being questioned about me, how I acted,
9 what I said, what did I do. And there
10 were two incidents which also
11 aggravated my lawyer. Cassandra Prenak
12 (phonetic) was asking Higgins about me,
13 how I act, what did I say in class.
14 Well, he observed me. He gave me S.
15 Q.And you didn't feel that that
16 type of exchange was a violation of the
17 student confidentiality policy?
18 A.Do you think that it was a
19 violation of the teacher's
20 confidentiality?
21 Q.I'm asking if you believe that
22 was in violation of the student's
23 records privacy.
24 A.Telling the students that I was
25 going to be fired and telling the

Multi-Page™

**Page 162**

1 parents ---?
2 Q.My question is, didn't you
3 believe that that kind of exchange, in
4 identifying a student by name ---?
5 A.Not to human relations, no.
6 Q.And who told you that, or is it
7 just your own feeling?
8 A.It's not my own feeling. I did
9 provide him with all the documentation
10 that was necessary, and my lawyers,
11 because I have filed a complaint. And
12 legally, I was allowed --- if they
13 weren't allowed, they did, too. They
14 sent all the documentation, including
15 all my documentation, my medical files.
16 All this is confidential information.
17 And they sent it to human relations, as
18 well, even documentation that they were
19 not allowed to submit. Remember when
20 the arbitrator said what's good for the
21 goose ---?
22 Q.Again, you're confusing the law
23 that is the basis of this action for
24 what the arbitrator said, which was to
25 purge your file so it was not to be

**Page 163**

1 used for further disciplinary action
2 against you on that basis. That is a
3 separate issue, completely separate.
4 Let me show you what's already been
5 marked as, I believe, Exhibit 15. Ms.
6 de Leon, have you ever seen this
7 document called the Pennsylvania Code
8 of Professional Practice and Conduct
9 for Educators?
10 A.No. I never seen it until just
11 now. Have they seen it? Have they
12 seen the Professional --- have you seen
13 this document? Why don't you give him
14 a copy?
15 Q.This is the law, and I'm going
16 to direct your attention under
17 practices, which is 22 Pa.C. 235.4,
18 that's practices. And looking to page
19 two, there are a variety of practices
20 that are listed that are expected under
21 the law of professional educators. And
22 one of them, if you look to number (9),
23 it states, professional educators shall
24 keep in confidence information obtained
25 in confidence in the course of their

**Page 164**

1 professional service unless required to
2 be disclosed by law or by clear and
3 compelling professional necessity as
4 determined by the professional
5 educator. So my question to you is, do
6 you believe that your copying Mr.
7 Flipping on all of that student
8 information falls within number nine?
9 A.Correct. Yes.
10 ATTORNEY NICHOLS:
11 Counsel, let me state for
12 the record before you continue
13 to put this question to my
14 client like that, I have to
15 remind you of the ruling by
16 Arbitrator Arnis on this
17 particular issue dealing with
18 the release of student
19 information to Mr. Flipping and
20 other members of the PHRC. That
21 did come before Mr. Arnis. Mr.
22 Arnis specifically ruled on ---.
23 ATTORNEY HEATH:
24 Please do not lecture me
25 about the arbitration.

**Page 16**

1 ATTORNEY NICHOLS:
2 No, I'm saying --- but
3 you asked her ---.
4 ATTORNEY HEATH:
5 I don't want to know
6 about that. What I'm asking
7 her ---.
8 ATTORNEY NICHOLS:
9 But it's not fair for
10 you ---.
11 ATTORNEY HEATH:
12 Oh, dear God.
13 ATTORNEY NICHOLS:
14 It's not fair for
15 you ---.
16 CERTIFIED SECTION
17 ATTORNEY HEATH:
18 Certify this on the
19 record. I'm going to the Judge.
20 I cannot put up with this. I
21 will not put up with this.
22 ATTORNEY NICHOLS:
23 But I welcome my
24 opportunity to go to the Judge
25 and listen because this is not

Multi-Page™

**Page 166**

1 fair. It's unfair for
2 you ---.
3 ATTORNEY HEATH:
4 This is ridiculous.
5 ATTORNEY NICHOLS:
6 Let the record reflect
7 it's unfair for you to, one,
8 first of all, suggest that my
9 client violated the law in any
10 fashion ---.
11 ATTORNEY HEATH:
12 Put your objection on the
13 record and move on. This is a
14 deposition under the Federal
15 Rules.
16 ATTORNEY NICHOLS:
17 No. Wait a minute. You
18 asked her a question and she has
19 a right to --- we have a right
20 to respond.
21 ATTORNEY HEATH:
22 You do not testify. She
23 can testify.
24 ATTORNEY NICHOLS:
25 No, no. I have a right

**Page 167**

1 to speak to this legal issue.
2 ATTORNEY HEATH:
3 Oh, dear God.
4 ATTORNEY NICHOLS:
5 And the legal issue is
6 this, Arbitrator Amis
7 ruled ---.
8 ATTORNEY HEATH:
9 Sir, as we're going to
10 the Judge ---.
11 ATTORNEY NICHOLS:
12 The arbitrator --- yes,
13 we're going to the Judge.
14 ATTORNEY HEATH:
15 Certify this. I will
16 move on. I will move on.
17 ATTORNEY NICHOLS:
18 We're going to the Judge
19 on this.
20 ATTORNEY HEATH:
21 This is ridiculous.
22 ATTORNEY NICHOLS:
23 No, no, no. It
24 isn't. You raised it.
25 ATTORNEY HEATH:

**Page 168**

1 I'll call him. Call him.
2 Want to call him on the phone?
3 ATTORNEY NICHOLS:
4 Yes. Please, please.
5 ATTORNEY HEATH:
6 All right.
7 ATTORNEY NICHOLS:
8 Arbitrator Amis ---
9 ATTORNEY HEATH:
10 I don't care about that.
11 ATTORNEY NICHOLS:
12 --- ruled, invalidating
13 the charge which Mr. Dolecki
14 charged her with immorality. He
15 expunged it. He said it's
16 invalidated because she was
17 authorized to do what she did.
18 I have the opinion here. Now,
19 this here is saying she is
20 violating a section of code in
21 light of that. Arbitrator Amis
22 ruled what she did with this
23 information is authorized.
24 You are now saying ---
25 and you not only implied, you

**Page 169**

1 insisted that she violated these
2 Professional --- and the law in
3 professional code is just plain
4 wrong. And he said that when
5 Mr. Dolecki charged her with
6 immorality. This is what he
7 said. I have the record. He
8 said one, there was no time that
9 she sought to deceive.
10 ATTORNEY HEATH:
11 Again, ---.
12 ATTORNEY NICHOLS:
13 Obviously, that's in the
14 record.
15 ATTORNEY HEATH:
16 Okay.
17 ATTORNEY NICHOLS:
18 And I'm not going to have
19 you charge my client unfairly.
20 I welcome the opportunity. We
21 will talk to the Judge.
22 ATTORNEY HEATH:
23 I'm not talking to you
24 until you calm down.
25 ATTORNEY NICHOLS:

Multi-Page ™

## Page 170

1 I will not allow you to
2 impugn her motive.
3 ATTORNEY HEATH:
4 Please let the record
5 reflect ---
6 ATTORNEY NICHOLS:
7 I've got the record
8 saying otherwise. The
9 arbitrator said otherwise.
10 ATTORNEY HEATH:
11 --- Mr. Nichols is
12 pounding his fist on the table.
13 He has stood up and he is
14 screaming.
15 ATTORNEY NICHOLS:
16 That's right.
17 ATTORNEY HEATH:
18 Let the record reflect
19 that. And at this point, I
20 don't think it would be
21 professionally in your best
22 interest to speak to the Judge
23 unless you calm down.
24 ATTORNEY NICHOLS:
25 Well, I'll tell you, I'm

## Page 171

1 not going to allow you to say
2 that.
3 ATTORNEY HEATH:
4 This is absolutely
5 absurd. If you want to take a
6 deposition ---.
7 ATTORNEY NICHOLS:
8 I'm not going to allow
9 you to impugn her character that
10 way. You impugned her
11 character.
12 ATTORNEY HEATH:
13 If you want to end this
14 deposition, then withdraw your
15 complaint and let the
16 termination stand. If you want
17 to talk about arbitrations, the
18 award was that she was fairly
19 terminated for just cause. Let
20 it stand.
21 ATTORNEY NICHOLS:
22 No. I'm talking about
23 Arbitrator Amis.
24 ATTORNEY HEATH:
25 I can ask about the

## Page 170

1 confidentiality issue. I have a
2 right to.
3 ATTORNEY NICHOLS:
4 He ruled on that very
5 issue you couldn't before.
6 ATTORNEY HEATH:
7 What?
8 ATTORNEY NICHOLS:
9 He has ruled. He has
10 ruled.
11 ATTORNEY HEATH:
12 Ruled what? So what?
13 ATTORNEY NICHOLS:
14 And now you are saying
15 --- you asked her to ---.
16 ATTORNEY HEATH:
17 It's not res judicata.
18 ATTORNEY NICHOLS:
19 You were just saying
20 --- you impugned her character.
21 ATTORNEY HEATH:
22 Oh, yes, because she's
23 put her character at issue.
24 ATTORNEY NICHOLS:
25 No, she hasn't.

## Page 17...

1 ATTORNEY HEATH:
2 Well, her credibility is
3 at issue.
4 ATTORNEY NICHOLS:
5 I'm not going to sit here
6 and allow you ---
7 ATTORNEY HEATH:
8 I can't believe this.
9 ATTORNEY NICHOLS:
10 --- to impugn her
11 character away when I know what
12 the arbitrator said. He said
13 that those charges of immorality
14 that were brought against
15 her ---
16 ATTORNEY HEATH:
17 I'm asking about
18 confidentiality.
19 ATTORNEY NICHOLS:
20 --- by the
21 administrator ---
22 ATTORNEY HEATH:
23 How is confidentiality
24 and immorality ---
25 ATTORNEY NICHOLS:

Multi-Page™

## Page 174

1 --- were wrong.
2 ATTORNEY HEATH:
3 --- the same thing? How
4 on God's earth is that true?
5 He's not even listening to my
6 question at this point. He's
7 throwing a fit and a tantrum.
8 ATTORNEY NICHOLS:
9 Please ask Mr. Dolecki.
10 He brought the charges.
11 ATTORNEY HEATH:
12 This is the most
13 unprofessional, ridiculous
14 action that I have heard ---
15 ATTORNEY NICHOLS:
16 The question, is it true?
17 ATTORNEY HEATH:
18 --- in 18 years of
19 practice.
20 ATTORNEY NICHOLS:
21 The question, is it true,
22 though? Is it true? Counsel,
23 is it true?
24 ATTORNEY HEATH:
25 I'm asking if she

## Page 175

1 believes that her copying Mr.
2 Flipping was ---
3 ATTORNEY NICHOLS:
4 And the arbitrator
5 answered that. He answered
6 that. You might not want to
7 read it, but I'm not going to
8 sit here and allow you to impugn
9 her character. You ask your
10 client, did he charge her with
11 immorality? You ask him.
12 ATTORNEY HEATH:
13 I'm not talking about
14 immorality.
15 ATTORNEY NICHOLS:
16 Well, what are you
17 talking about here? You're
18 waving the Professional Code at
19 her.
20 ATTORNEY HEATH:
21 Yes.
22 ATTORNEY NICHOLS:
23 A code about immorality.
24 Please don't be disingenuous
25 with us.

## Page 176

1 ATTORNEY HEATH:
2 Have you read it?
3 ATTORNEY NICHOLS:
4 What are you talking
5 about?
6 ATTORNEY HEATH:
7 Have you even read it?
8 ATTORNEY NICHOLS:
9 I read it.
10 ATTORNEY HEATH:
11 It's the law.
12 ATTORNEY NICHOLS:
13 I've seen it before.
14 A They should read it.
15 ATTORNEY HEATH:
16 It has nothing to do with
17 immorality except for one part.
18 It talks about professional
19 educators shall exhibit ---
20 ATTORNEY NICHOLS:
21 Precisely.
22 ATTORNEY HEATH:
23 --- consistent and
24 equitable treatment of
25 students, ---

## Page 177

1 ATTORNEY NICHOLS:
2 Look, you're not ---.
3 ATTORNEY HEATH:
4 --- fellow educators and
5 parents.
6 ATTORNEY NICHOLS:
7 Counsel, Counsel ---.
8 ATTORNEY HEATH:
9 You haven't even read it.
10 ATTORNEY NICHOLS:
11 I have. You know why I
12 read it?
13 ATTORNEY HEATH:
14 Oh, dear God.
15 ATTORNEY NICHOLS:
16 You know why I read it?
17 Because the district has moved
18 to decertify her. And they
19 wrote me. She gave it to me,
20 and I had to respond to it.
21 ATTORNEY HEATH:
22 But this has nothing to
23 do with the question of ---.
24 ATTORNEY NICHOLS:
25 Oh, it is. This is what