1

2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3

4

CLAUDETTE deLEON,

Plaintiff,

5

vs.    )    (CIV.-DKT. 05-126-Erie

6

CRAWFORD CENTRAL SCHOOL    )
DISTRICT, CRAWFORD CENTRAL    )
SCHOOL BOARD,    )

7

MICHAEL E. DOLECKI,    )
SUPERINTENDENT    )

8

(Suable and Liable in    )
Personal Capacity)    )

9

CHARLES E. HELLER, III,    )
ASSISTANT SUPERINTENDENT,    )

10

(Suable and Liable in    )
Personal Capacity)    )

11

Defendants    )

12

13

14

15

Deposition of GEORGE DESHNER, taken on

16

Tuesday, March 7, 2006, at Crawford Central School

17

District, Meadville, Pennsylvania commencing at 1:35

18

p.m., before Linda K. Rogers, Shorthand Reporter and

19

Commissioner of Deeds in the Commonwealth of

20

Pennsylvania.

21

22

23

24

* * *

25

1

A P P E A R A N C E S

1
2
3
4   For the Plaintiff:
5
6          Caleb L. Nichols, Esquire
           P.O. Box 1585
7          Erie, Pennsylvania 16507
8
9
10  For the Defendant:
11
12         Roberta Binder Heath, Esquire
           Andrews & Beard
13         3366 Lynwood Drive
           Altoona, Pennsylvania 16603-1311
14
15
16                                    *   *   *
17
18
19
20
21
22
23
24
25

2

1    G E O R G E   D E S H N E R, first having

2    been duly sworn, testified as follows:

3

4                              DIRECT EXAMINATION

5

6

7    BY MR. NICHOLS:

8    Miss deLeon.

9         A.    Uh-huh.

10        Q.    And thank you for coming to be deposed today.  I

11   have a few questions I would like to ask you, but prior to

12   that I would just like to state for the record preliminary

13   instructions.  You have been deposed in a deposition before,

14   haven't you?

15        A.    Yes, I have.

16        Q.    And for this purpose I would ask that you

17   verbalize all of your responses as possible so that the

18   court reporter can understand you.  And also I ask that if

19   you have any questions, that you -- concerning questions I

20   ask of you, feel free to stop me.  Feel free to ask me to

21   rephrase the question if you don't understand.

22        A.    Okay.

23        Q.    I would start off asking if you would state for

24   the record your professional background include -- start

25   with your academic background, college.  Bring us current,

3

1    up to including your present status.

2         A.    Okay.    After high school I attended Edinboro

3    University.    Was an education major.    Started out as a

4    history major but halfway through switched to science.    I

5    wanted to teach biology.    Graduated in the spring of 1969

6    with a bachelor's in education for science.

7         That summer I was hired in Meadville to teach

8    physical science at the junior high school.    I taught

9    physical science for four years there.    Then I transferred

10    to the high school to teach biology.    While I was doing

11    that, I was also attending classes back at Edinboro working

12    on my master's degree.    I received an MED in education from

13    Edinboro.

14         After I had been at the high school three years, I

15    was asked to assume the responsibility of attendance officer

16    for the school district.    I did that for, I think it was

17    four years.    And while I was doing that, I attended

18    Westminster College down in New Wilmington, Pennsylvania.

19    And worked on a second masters in school administration.

20         Upon completion of that, I was hired -- well, not

21    really hired but transferred from my position of attendance

22    officer to assistant principal at the Meadville Junior High

23    School.    That would have been I believe in about 1980.    I

24    was there for two years, then I transferred to the high

25    school as an assistant principal for two years.    That would

4

1    have been through '84.

2             And then in the fall of '84, the principal had

3    left to accept another position in another school district.

4    I was appointed the interim principal or acting principal

5    until they had gone through the process of getting

6    applications and interviewing. And after that process, I

7    was named the principal of the high school in the fall of

8    1984.

9        Q.    Meadville?

10       A.    Meadville, yes. Until -- and I maintained that

11   position until I retired in June of 2003.

12       Q.    Okay.

13       A.    It was 19 years I held the position of principal

14   at the high school.

15       Q.    Now, in my review of the records, there are

16   certain names, staff people of yours that I am going to ask

17   you about in terms of, one, their areas of responsibility.

18       A.    Okay.

19       Q.    Dr. Berkebile.

20       A.    Dr. Berkebile was an assistant principal.

21       Q.    Is he currently employed?

22       A.    No, Dr. Berkebile retired. Boy, and I'm sketchy

23   on the years at this point. But Dr. Berkebile retired. And

24   after retirement he became the head of a private school just

25   to the north of us. And he held that for a couple of years

5

1    and then I believe he has since left the area.

2        Q.    As best you can, what years was he employed with

3    the Meadville High School, senior high school.

4        A.    Dr. Berkebile started at the junior high then he

5    transferred to Cochranton, was an assistant principal down

6    there.  And then came to the high school probably late '90s

7    maybe through 2000.  Somewhere around in that vicinity.  I'm

8    really sketchy on the exact years.

9        Q.    Miss Templeton?

10       A.    Mrs. Templeton was an assistant principal at the

11   high school during the time that I was principal.  And she

12   was there approximately the same years that Dr. Berkebile

13   was.  She and Dr. Berkebile were the assistants together.

14       Q.    Mr. Higgins?

15       A.    Mr. Higgins came on board I'm going to say

16   somewhere around 2001, 2000 -- I think around 2001 maybe.

17   He had been an art teacher in the middle school.  And we had

18   an assistant principal who came to Meadville, just stayed a

19   short time and then accepted a job up in the New England

20   states and left.  And then Mr. Higgins had received his

21   administration degree.  He applied for the job along with

22   some other people and was the successful candidate.  So he

23   was there approximately two years, two to three years, in

24   that vicinity during my -- end of my term as principal.

25       Q.    These people, these staff people; Berkebile,

1   Higgins, Miss Templeton, all report to you on a daily basis,

2   right?

3       A.    Yes.

4       Q.    Okay.  Now, in terms of the hierarchy of your

5   position as principal, you report directly to Mr. Dolecki,

6   the superintendent.

7       A.    The superintendent, yes.

8       Q.    And Mr. -- his assistant, Mr. Heller?

9       A.    Mr. Heller.

10      Q.    Right?

11      A.    Yes.

12      Q.    And that's for all purposes, right?

13      A.    Correct.

14      Q.    And that would include operational matters?  That

15   would include hiring?  That would include firing of teaching

16   staff; is that correct?

17      A.    That's correct.

18      Q.    And in 1989 you hired Miss deLeon, didn't you?

19      MS. HEATH:  Objection to form.

20      Q.    Did you hire Miss deLeon in 1989?

21      MS. HEATH:  You mean him personally?

22      A.    I don't believe I did.

23      MS. HEATH:  Do you mean did he interview her or

24   what are you asking him?

25      Q.    Well, did you -- let's put it that way.  Did you

1   interview Miss deLeon in 1989 for a teaching position?

2   A.   I honestly don't remember that.

3   Q.   Don't remember that.

4   A.   I don't believe I did.  That's --

5   Q.   Would you have had any involvement in the hiring

6   of teaching staff at your school during that period, 1989?

7   A.   Yes, I would have.

8   Q.   If memory serves me correctly Miss deLeon was

9   employed as a teacher at your school during that period.

10  A.   She did --

11  Q.   Started in 1989; is that correct?

12  A.   Again, that's --

13       MS. HEATH:  I'm going to object for the record.

14       It speaks for itself and I believe she was at

15       Cochranton first.

16  A.   Mrs. deLeon did substitute work for the district

17  prior to her being --

18  Q.   At your school.

19  A.   And she did some substitute work at Meadville High

20  School, yes.

21  Q.   Okay, you do remember that?

22  A.   I do remember that.

23  Q.   What time frame are you talking about?

24  A.   It would have been prior to her being hired at

25  Cochranton.  And I believe that was possibly the early '90s

8

1       that she was hired in Cochranton.

2           Q.    I saw one evaluation as early as 1991 which you

3       signed off as having evaluated Miss deLeon.  And my question

4       is, sir, does that jog your memory in terms of the time

5       frame we are talking about?

6           A.    She transferred back to Meadville High School some

7       time in the early '90s after being hired at Cochranton High

8       School.

9           Q.    Okay.  Now, and as I read the record, you or your

10      staff, and that would include the people I referred to;

11      Miss Templeton, Dr. Berkebile and Mr. Higgins.  They --

12      based upon my review of the record, they were involved in

13      evaluation of the teaching staff at school; is that correct?

14          A.    Yes, all three administrators in the building

15      evaluated the staff members.

16          Q.    Including yourself.

17          A.    Yes, I was part of that.

18          Q.    And as principal, did you have any input in the --

19      whether or not teachers were granted a tenure?

20          MS. HEATH:    Objection to form.

21          A.    I guess I'm not --

22          Q.    I'm saying as a principal, was it your position

23      that you held as principal, did you have any input in

24      teachers or the staff who were candidates for tenureship?

25          A.    Yes, we provided through our observations and that

1  and we provided -- a teacher had to teach so many years to

2  get tenure and we provided support materials to the central

3  office on teachers getting tenure.

4  Q.    You provided -- I'm sorry, the last statement.

5  A.    Support information.

6  Q.    Support information.

7  A.    Like our observations and things of that nature.

8  Q.    Would that include a recommendation?  Would that

9  be correct to call it a recommendation?

10 A.    I believe that would be correct.

11 Q.    And would that be inclusive -- would that be your

12 exclusive opinion or recommendation or would it be inclusive

13 of your staff's opinion as well?

14 A.    It would involve the assistant principals as well.

15 I mean, those came out of the administrative staff from the

16 building.

17 Q.    Miss deLeon came up for tenureship in 1993, as I

18 recall, the school year 1993.  Do you recall her candidacy

19 for tenure in 1993?

20 A.    I really don't recall that.

21 Q.    But based upon what you've just testified to

22 during your involvement in that particular processes along

23 with involvement of your staff, you would have had input?

24 A.    I would have had input if she came up for that.

25 Q.    The record shows that, I believe 1993-'94 I think

1    maybe I think that year, that Miss deleon was given a

2    negative evaluation for her performance as a teacher in the

3    school year.

4        A.    I believe that's correct.

5        Q.    And that particular matter subsequently went

6    before an arbitration and the arbitrator rendered an award,

7    Arbitrator Stoltenberg rendered an award. My question is:

8    Do you remember having reviewed that award that was rendered

9    in her case?

10       A.    Yes.

11       Q.    Did you participate at the arbitration hearing?

12       A.    Yes, I did.

13       Q.    And as best as you can, may I ask can you testify

14   what position you took or what did you testify to in terms

15   of the claim that was put forward by Miss deleon at that

16   time?

17       A.    As I remember, there was a lot testified to but I

18   took the position that she should have had an unsatisfactory

19   rating that year.

20       Q.    And moving forward, I believe in 19 -- the school

21   year, another school year, moving forward. It may have been

22   1995-'96, she also received another negative evaluation.

23       A.    Correct.

24       Q.    And you were also -- you also participated in that

25   one --

1    A.  Yes.

2    Q.  -- as well.  And there was an award rendered by

3    Arbitrator Talarico, I believe.  And I believe that -- now,

4    let's step back.  Let's step back if I may.  To the award

5    rendered by Mr. Stoltenberg.  Mr. Stoltenberg ordered that

6    certain records or record relating to the negative

7    evaluation be removed from Miss deLeon's file.

8        MS. HEATH:  Talking 1993-1994, correct?

9        MR. NICHOLS:  Right, I'm stepping back a moment to

10   that Arbitrator Stoltenberg.

11   Q.  Okay.

12   A.  Uh-huh.

13   Q.  Now, having been aware of the arbitration award as

14   you just acknowledged, as to compliance with this directive

15   of Arbitrator Stoltenberg, did you -- that would have been

16   your responsibility to ensure that what he ordered in terms

17   of records removed from that that file was carried out?

18       MS. HEATH:  I'm going to object --

19   Q.  Was that your function?  Were you involved in that

20   function?

21   A.  That would --

22       MS. HEATH:  Let me just say this first.  The

23   record speaks for itself relative to that order.

24   I just want to make that clear.

25   Q.  Right, but I am asking now, who carried out --

12

1        MR. NICHOLS: I understand. I understand,

2    Counselor. I'm asking now who makes execution of

3    the record. I am asking Mr. Deshner was he

4    involved in the execution of the order.

5        A.    The personnel records were kept at central office.

6    So that would have occurred here in this building for the

7    purging of the files, if that's what you're asking me.

8        Q.    Right.

9        A.    And I would have not had a part of that.

10       Q.    Okay. Moving forward again. Moving forward back

11   to Arbitrator Talarico's award that he rendered. You

12   testified that you recall that proceeding, arbitration

13   proceeding?

14       A.    Uh-huh.

15       Q.    And you did participate in that?

16       A.    Yes.

17       Q.    Okay. And, again, I'm not sure what -- I have

18   read the arbitration hearing transcript. I am not sure what

19   position you took. But state for record what position you

20   took.

21       A.    I took the position that Mrs. deLeon should have

22   had an unsatisfactory rating for that school year.

23       Q.    Okay. Now, coming forward to 1997, and, in fact,

24   I should note for the record that Arbitrator Talarico

25   invalidated the negative evaluation that Miss deLeon had

1   received for the school year. Coming forward to 1997 --

2       MS. HEATH: And, again, for the record that,

3   again, it will speak for itself and the basis for

4   that decision will also speak for itself.

5       Q.  All right. Okay. Coming forward to 1997,

6   Mr. Deshner, I note in the record that Miss deLeon received

7   at one point, October, several reprimands within a span of

8   seemed like at matter of at least two or three weeks.

9       MS. HEATH: October, what year?

10      MR. NICHOLS: October 1997.

11      Q.  Several reprimands. I'm not sure whether you

12  signed off on them or not but could you just enlighten us on

13  the reason for the reprimands --

14      MS. HEATH: Objection. Lack of foundation.

15      Q.  -- that she received in October 1997?

16      A.  I would have to see those reprimands to be able to

17  answer that question.

18      Q.  I think we have them. I stand to be corrected on

19  that. We do have sanctions but they do not reach back

20  beyond 1997. Okay. And I don't have them in the record yet

21  for the reprimands that I do note I have, there is

22  documentation in the record but I haven't made them --

23  offered them yet. Okay.

24      MS. HEATH: If this is helpful to you, and I don't

25  know if it is, because I don't know if this is

14

1    what you're talking about. But I have some

2    information, a couple notations prior to the DUI

3    incident.

4    MR. NICHOLS: Yes.

5    MS. HEATH: Relative to the bell schedule, is that

6    what you're talking about, two memos?

7    MR. NICHOLS: Yes, I think so. They're

8    reprimands, right?

9    MS. HEATH: Well, I don't know. Do you want to

10    take a look at them?

11    MR. NICHOLS: Yeah.

12    MS. HEATH: And I just note for the record, they

13    are not from Mr. Deshner. One is from

14    Dr. Berkebile. One is from Miss Templeton. I

15    don't know if you have something else in mind.

16    MR. NICHOLS: I do know there are more. I don't

17    have them. You have them. Okay.

18    MS. HEATH: Do you want to mark these or not?

19    MR. NICHOLS: Yes, I'm going to ask the court

20    reporter to mark these. Will you mark these,

21    please, whichever number is --

22    (Discussion held off the record.)

23    MR. NICHOLS: Okay. I will ask the court reporter

24    to mark these each Plaintiff's Exhibit 12 through

25    19.

1    (DESHNER PLAINTIFF'S EX. 12 THROUGH 19 –

2    SANCTIONS, marked for identification.)

3        Q.    Mr. Deshner, I now show you what the court

4    reporter has marked as Plaintiff's Exhibits 12, 13, 14, 15,

5    16, 17, 18 and 19. These are various sanctions or

6    punishments in the form of reprimands that were issued.

7    Now, the first one, of course, is from Dr. Berkebile. Next

8    is Miss Templeton. The next, Miss Templeton,

9    Miss Templeton.

10        MS. HEATH:    Are all of these from October of '97?

11        MR. NICHOLS:    As far as I can see October '97. I

12    think so. This will show. And I'm not sure whose

13    name -- whose name is shown there on this one?

14        MS. HEATH:    What exhibit number?

15        MR. NICHOLS:    It's Exhibit 18. I'm not sure I see

16    where it came.

17        Q.    I don't know whether you can recognize that or

18    not, Mr. Deshner, 18?

19        A.    I believe that's says deLeon/McCracken. This is a

20    requisition for supplies.

21        Q.    Okay. And so it's a requisition that most likely

22    would have fallen in whose bailiwick in terms of staff

23    person would have written that, Miss Templeton perhaps?

24        A.    Any one of the three of us could have approved

25    these. Oftentimes most of the teachers' requests for

1   requisitions came to my office because I had direct

2   responsibilities for the budget.

3        Q.   Any one of your three staff people could have

4   written that, right?

5        A.   Yes.

6        Q.   Okay.  All right.  And, of course, there is 19 by

7   Dr. Berkebile.  My question is this, if you take a moment to

8   look at these.  My question is:  In terms of --

9        MS. HEATH:  Can you just let him look first and

10   then you can ask questions.

11        MR. NICHOLS:  Yeah, sure.

12        (Brief pause.)

13        A.   I've had a chance to review those.

14        Q.   Okay.  Having reviewed those, Mr. Deshner, do you

15   recognize those documents?

16        A.   Yes.  These were issued from Dr. Berkebile,

17   Mrs. Templeton and there is one in there concerning ordering

18   of supplies that was from me.

19        Q.   Right.  And the ones which were written by your

20   staff there to Miss deLeon would have come to your attention

21   in the normal course of business, right?

22        A.   Yes.

23        Q.   Now, in terms of these types of sanctions

24   or reprimands of documented suspensions, would you then have

25   passed those on to the office of the superintendent?

17

1    A.    They would have been -- some would have been.

2    Depending upon the severity, it might have just been an

3    in-house type of thing.

4    Q.    But as a standard operating procedure sanctions,

5    punishment which is meted out to teaching staff routinely,

6    would that routinely been brought to the attention of the

7    superintendent's office, superintendent or assistant

8    superintendent?

9         MS. HEATH:    Objection.    Asked and answered.    He

10        said it depends on the severity of it.

11   Q.    Well, could you specify, Mr. Deshner, be a little

12   more specific when you say depending on the severity.    Where

13   would we draw the distinction between what would be severe

14   enough to have been brought to the attention of the

15   superintendent and that which would not have been severe

16   enough to have been brought to the attention of the

17   superintendent's office?

18   A.    Something like the ordering of supplies more than

19   likely would not have been brought to the attention of the

20   superintendent's office.    Something like the letters

21   regarding the tardies, those would go.

22   Q.    Would it routinely have gone to the

23   superintendent's office?

24   A.    Yes.

25   Q.    What about a suspension?    What about --

1     A.    Suspensions always came from the central office.

2    Principals did not have the authority to suspend staff.

3         Q.    So they would have come -- authored -- issued by

4    the superintendent?

5         A.    Yes.

6         Q.    Or his staff?

7         A.    Yes.

8         Q.    I see.    Okay.    Now, based upon -- what struck my

9    attention was this, in terms of the framework that I ask the

10   question, there are at least three or four reprimands that

11   were issued in the matter -- of October, span of the month

12   of October.    I didn't see that duplicated or replicated

13   throughout her tenure anywhere in terms of the time, you

14   know, the temporal framework given that.

15              And also in terms of the sequence in which it was

16   issued in the time frame that she, as of 1997 had just won

17   two arbitrational awards against the school district.    Is

18   there a correlation between these two things?

19         A.    There's no correlation between those.

20         Q.    You see no correlation whatsoever?

21         A.    No.

22         Q.    Coming forward to 1988 -- '98 rather, '98-'99

23   school year.    Miss deLeon requested a medical sabbatical.

24   Were you aware of that?

25         A.    Yes.

1    Q.    Okay. And how did that come to your attention?

2    MS. HEATH: Just for the record, I think it began

3          in '97.

4    Q.    Okay. Well, may I ask you then, did you -- were

5    you aware of her request -- well, first of all, her medical

6    condition. I'm referring to the depression. Were you aware

7    of her medical condition?

8    A.    Was not aware of that.

9    Q.    As of 1997?

10   A.    As of 1997 I was not.

11   Q.    Did there come a time after 1997 that you did

12   become aware?

13   A.    I believe that came in a statement from a

14   doctor that she was seeing at the time that stated that she

15   was unable to perform her duties in the classroom.

16   Q.    Do you recall the time frame of that statement,

17   and the doctor who wrote that statement?

18   A.    If I remember correctly, I believe it was

19   Dr. Mercatoris at the time.

20   Q.    And the date, do you recall?

21   A.    It was sometime after the incident where she had

22   been suspended for the classroom incident that I had

23   overheard regarding the DUI. I believe it came after that

24   which was sometime in October of '97, I believe.

25   Q.    '97.

1    A.    I believe that's the --

2    Q.    How did that come to your attention?

3    A.    The which?  The letter?

4    Q.    The statement, the letter.

5    A.    The statement?

6    Q.    Uh-huh.

7    A.    I don't remember whether that was sent to me in

8    the mail or whether somebody brought it into me.  I remember

9    seeing it.  Boy, I can't remember if that --

10   Q.    But you do remember?

11   A.    I do remember seeing it.

12   Q.    And you remember that the doctor -- what the

13   doctor said relative to her condition?

14         MS. HEATH:  Are you asking if he remembers

15   specifically what was said?

16   Q.    Do you remember specifically what the doctor said

17   concerning her condition?

18         MS. HEATH:  Because I think if you look at what

19   you had marked as plaintiff's exhibits concerning

20   Mr. Dolecki's deposition, potentially that is what

21   he's referring to in there and the date is on

22   there too.  I'm saying if you want to have him

23   review a document.  It's in the yellow folder.

24   Q.    Oh, yeah.  Okay.  Okay.  Right here, Mr. Deshner.

25   A.    No, that's --

1    Q.    That's not it?

2    A.    No.  This is from Edinboro Medical Center.

3    Q.    What about this one here?  This one here.

4    Dr. Bybel.

5    A.    I remember getting a copy of this from

6    Mr. Dolecki's office but -- and I believe that request went

7    directly to the central office for that leave.

8    Q.    All right.  I see here in the file that's already

9    in record, sick leave bank request all these --

10    A.    Right.

11    Q.    And then there's a request for sabbatical

12    submitted by Miss deLeon to then superintendent Mr. LaScola.

13    A.    Uh-huh.

14    Q.    But I noticed in each of these letters, at least

15    in some of them, you were cc'd, courtesy copy sent to you?

16    A.    Yes.  Right.

17    Q.    So by that do you acknowledge that, having

18    received these correspondence between Miss deLeon and the

19    then superintendent Mr. LaScola?

20    A.    Yes, I received copies of those.

21    Q.    Okay.  And so and then the contents, by virtue of

22    the contents of these documents bearing on Miss deLeon's

23    condition, you became aware of her mental condition, didn't

24    you?

25            MS. HEATH:  I'm going to object for the record

22

1    because I think the documents speak for themselves

2    and those documents that you're talking about are

3    the correspondence and don't specifically give any

4    diagnosis. It just requests a sabbatical leave

5    for restoration of health. So it's unclear --

6    Q.    Well, let me ask you this, Mr. Deshner. Do you

7    recall having seen a letter from -- there is one here from

8    Dr. Luis Torres who diagnosed Miss deLeon for psychotherapy?

9    MS. HEATH: Can you give him the letter and the

10   date.

11   Q.    Luis Torres. Yeah, right here. Okay. And

12   Dr. Luis Torres, psychotherapy specialist, dated April 29,

13   1998.

14   A.    I have not seen this document before.

15   Q.    Never saw that document before?

16   A.    No.

17   Q.    But you were aware that or I'll ask you, were you

18   aware that Miss deLeon requested a sabbatical --

19   A.    Yes.

20   Q.    -- leave? And while you yourself did not approve

21   it, as the record shows Mr. LaScola approved, you were aware

22   of that, that it was approved.

23   A.    Mr. LaScola would have made the recommendation and

24   the school board would -- it would have to go to the school

25   board for approval.

23

1   Q.   Right.  Okay.  Now, when Miss deLeon returned from

2   the medical sabbatical, and I think that that was 1999-2000

3   school year she returned.  Now, the first question I have is

4   that when she returned, wasn't her classroom taken away from

5   her?  She was not privileged to return to the classroom that

6   she had before leaving?

7                MS. HEATH:  Objection to form.  Go ahead and

8                answer.

9        A.   It wouldn't have been taken away from her because

10  there was no set rule that once a person had a classroom

11  that that was their classroom.  That if they went on

12  sabbatical, they came back to that classroom.

13       Q.   Whose prerogative or authority had authority to

14  assign the classrooms?

15       A.   Assigning of classrooms --

16       Q.   Yes, sir.

17       A.   -- lies with the administration in the building.

18       Q.   And that's you, right?

19       A.   One of them.

20       Q.   You're the principal?

21       A.   I was the principal, correct.

22       Q.   And so in terms -- I understand that when she

23  returned from sabbatical she did not have the same

24  classroom.  She didn't have a classroom, that she was

25  reduced to a traveling teacher.

24

1        MS. HEATH: Objection to form.

2        Q.    I'm simply asking -- the question I'm asking is

3    this: Who removed her privilege by access to that classroom

4    she had before she went on sabbatical?

5        A.    When she went on sabbatical, someone else was

6    assigned to that classroom.

7        Q.    And that would have been an official act on your

8    part, right?

9        A.    Yes.

10       Q.    You would have authorized that?

11       A.    It would have been done through the

12   administration, correct.

13       Q.    Well, when you say administration, we're talking

14   about you. You are the principal. You are the

15   administration, right? For that purpose.

16       A.    And my two assistants.

17       MS. HEATH: Object to form.

18       Q.    I'm sorry, sir.

19       MS. HEATH: Wait for him to ask you before you

20   answer his question so I can object.

21       A.    And my two assistants when I say administration.

22       Q.    Well, when they act, they'll be acting for you.

23   You are aware of what they are doing, they do apprise you,

24   right?

25       A.    Yes.

1    Q.    Right.    Now, also when she returned, she no longer

2    was privileged to teach the courses that she taught before

3    she went on sabbatical.    Her Spanish courses that she taught

4    before going on sabbatical were taken away from her and

5    given to someone less experienced, less experienced than

6    she.

7         MS. HEATH:    Objection to form.

8    Q.    And who did not have tenure, did not have the

9    experience that she had; is that correct?

10        MS. HEATH:    Again, objection to form.    Do you

11        understand the question?

12   A.    I don't understand.    I guess I'm --

13   Q.    I'm, again, focusing on the time frame as when

14   that would have been the school year 1999-2000 school year,

15   okay?

16   A.    Uh-huh.

17   Q.    And when she, Miss deLeon, returned from a medical

18   sabbatical the first question I asked you dealt with the

19   assignment of the class she lost, the privilege of having a

20   class, of her class.    All right.    That's the first question.

21   All right.    The second question I'm asking you, same time

22   frame, is that she also lost a privilege to teach Spanish

23   classes upon returning; is that correct?

24        MS. HEATH:    I object to form.    Go ahead.

25   A.    That's not correct.

1    Q.    What would be correct, then, Mr. Deshner?  What

2  would be the correct answer to that?

3    A.    There was -- no one had any guaranteed classes

4  that they taught in any of the departments.  Those were

5  assigned on a yearly basis when the master schedule was

6  made.  And in the language department, any of the teachers

7  could teach.  As long as they were certified in that

8  language, they could teach any level of that language being

9  taught.

10    Q.    Okay.  Who makes the assignment?  The teaching

11  assignment courses?

12    A.    The assignments are made by myself and my two

13  assistants when we make the master schedule for the

14  building.

15    Q.    Okay.

16    A.    And it is always -- and I would meet with the

17  department heads prior to doing that to get input from the

18  department heads.  So it was -- I mean, it was a multiple

19  decision.

20    Q.    What courses did she teach upon returning from

21  sabbatical; do you remember?

22    A.    I couldn't tell you without looking at the

23  schedule for that year.

24    Q.    Let me ask you this:  As a matter of practice and

25  policy, what factors do you take into account when you make

27

1    assignments of who will teach what in your school?

2    A.    I guess you mean in the language department?    It

3    could vary between departments.

4    Q.    Okay.    Let's take the language department because

5    that's the most pertinent here.    Let's take the language

6    department.    What factors do you take into account in

7    determining who to assign to teach what?

8    A.    First thing we look at is their certification.

9    Q.    Okay.

10    A.    Secondly, we look at the number of classes that we

11    have at each level of the -- because we offer five years of

12    a language or offered five years of a language and that

13    could vary from year to year.    One year you might have five

14    classes of Spanish II and the next year you might have three

15    classes of Spanish II.    So you looked at the numbers that

16    you had.    You looked at your staff.    You looked at plugging

17    into schedules --

18    Q.    You looked at the qualifications of the staff?

19    A.    We looked at the qualifications of the staff and

20    make assignments.

21    Q.    On that basis.    Okay.    Now, coming forward, 2001

22    school year, 2001, 2000.    I think 2000-2001, that school

23    year.    Did you assign Miss deLeon an action plan?

24    A.    Yes, we did.

25    Q.    Tell me, what -- first of all, what is the purpose

28

1    of an action plan?

2        A.    Purpose of an action plan is to help the teacher

3    improve in areas that we have identified that need

4    improvement in the classroom.

5        Q.    Okay.  And in the case of -- now, is it -- based

6    upon your experience in assigning teachers to an action

7    plan, is it more the case that you assign younger teachers,

8    inexperienced teaching staff, the action plans than more

9    senior teachers?

10        A.    Not in my experience.

11        Q.    Well --

12        A.    There are young teachers that need them; there are

13    experienced teachers that need action plans as well.

14        Q.    What in particular, then, prompted you to assign

15    Miss deLeon to an action plan?

16        MS. HEATH:    You're talking to 2000 and --

17        MR. NICHOLS:    1.

18        MS. HEATH:    1.

19        MR. NICHOLS:    2001.

20        A.    That was done based on the observations that we

21    had done, the discipline referrals, the inability to manage

22    the classroom that we were seeing.

23        Q.    Was that your decision alone or in concert with

24    your staff?

25        A.    That was in concert with the staff and central

1    office personnel that I reported to.

2    Q.    You're referring to Mr. Dolecki?

3    A.    Could have been Mr. Dolecki.

4    Q.    Mr. Heller?

5    A.    Or it could have been Mr. Heller.

6    Q.    And is it correct to say then that you did not

7    have authority to institute such a plan absent approval of

8    Mr. Dolecki or Mr. Heller?

9    A.    I had the authority to institute a plan but

10   anytime I would institute a plan it would be with their

11   knowledge.

12   Q.    let me be clear here.   I am asking you:  Did you

13   have unilateral authority that you -- could you act

14   unilaterally and institute an action plan in the case of

15   Miss deLeon without regard to input or approval on the part

16   of Mr. Dolecki or Mr. Heller?

17   A.    I'm not -- are you asking me did I have the

18   unilateral authority to put an action plan in place?

19   Q.    Yes, sir.

20   A.    I believe I had that authority as principal to do

21   that with any staff member in the building.  Would I have

22   done it unilaterally?

23   Q.    Right.

24   A.    No, I would have --

25   Q.    What was your practice then?  In instituting a

1   plan, to institute an action plan in terms of consultation

2   with the executive officers?  I'm referring to Mr. Heller

3   and Mr. Dolecki.

4       A.   I would have consulted with them.

5       Q.   Unfailingly?  Always?  You would have

6   unfailingly --

7       A.   Yes.

8       Q.   -- have done that?

9       A.   Yes, I would have.

10      Q.   And you would have unfailingly done that because

11  what reason would that have been, by a matter of practice,

12  was it a matter of because of delineation of authority you

13  could act, was something you could act alone or because as a

14  matter of practice that was the proper thing to do?

15           MS. HEATH:  Objection to form.  You can answer if

16      you understand it.

17      A.   I would have done that just because I wanted them

18  to know what was going on with staff in the building.

19      Q.   Who devised the action plan?

20      A.   The action plan was --

21           MS. HEATH:  Are you talking about the 2001?

22           MR. NICHOLS:  2001.

23           MS. HEATH:  Do you want to mark it?  Do you want

24      to mark the evaluation?

25           MR. NICHOLS:  Yes, please, please.

1

2          (DESHNER PLAINTIFF'S EX. 20 - 2001 EVALUATION,

3          marked for identification.)

4     Q.     First of all, who devised the action plan,

5   Mr. Deshner?

6          MS. HEATH:  You can let him look at it.

7     A.     Could I see it?

8     Q.     Please.  Please.

9     A.     (Witness reviews document.)  The action plan would

10  have been developed by myself, generally an assistant

11  principal that had responsibility for observations and it

12  more than likely would have been Mr. Heller from the central

13  office because he was in charge of personnel matters.

14    Q.     And over the span of, let's say, from 1990 up to

15  2003, how many people did you require to perform under the

16  action plan?

17    A.     What were the dates again?

18         MS. HEATH:  An action plan?

19    Q.     Inclusive.  1990 up to and including 2002-3 school

20  year.  Do you remember how many?

21    A.     That's what I am trying to think.  To the best of

22  my recollection, it would have been two or three people.

23    Q.     All right.  And of those two or three, how many

24  were inexperienced?  I mean, what were their experience

25  level?

          MR. NICHOLS:  If I may continue.

32

1    A.    Two were experienced.

2    Q.    How much experience are we talking about in terms

3    of years teaching? You said two, right?

4    A.    Yes.

5    Q.    Two of the three. And that's inclusive of

6    Miss deLeon?

7    A.    That includes Mrs. deLeon, yes.

8    Q.    And would that other person's experience also have

9    been a tenured teacher?

10   A.    Yes.

11   Q.    A tenured as well as Miss deLeon?

12   A.    Uh-huh.

13   Q.    Correct?

14   A.    Correct.

15   Q.    And the other person was less experienced then,

16   right?

17   A.    But I believe tenured.

18   Q.    All three were tenured?

19   A.    Uh-huh.

20         MS. HEATH: Say yes or no.

21   A.    Yes.

22   Q.    Did they have -- of those two other two people,

23   did they have less experience than Miss deLeon in terms of

24   years teaching?

25   A.    One would have had more, one would have had less.

33

1       Q.      Okay.  You and your staff --

2               MS. HEATH:  Wait a second.

3       Q.      You and your staff would devise the action plan.

4       Do you have expertise in the area, your background, to

5       devise such plans?

6       A.      Yes, I do.

7       Q.      Was Miss deLeon evaluated on the basis of the

8       action plan?

9               MS. HEATH:  You mean the next year?

10              MR. NICHOLS:  Well, I'm coming to that.  There was

11      a second plan and then there was a revised plan.

12      I haven't reach that yet.  I'm talking just the

13      first plan in the year 2001.

14      Q.      Was she evaluated on the basis of this?

15      A.      Classroom observations would have been made on the

16      basis of the plan and that would also have played into the

17      year-end evaluation.

18      Q.      And also played into her termination, didn't it?

19      A.      In the next school year?

20      Q.      No, no, 2003.  I do believe I read the letter

21      where Mr. Dolecki recommended her firing, termination.  He

22      referred to this.  He referred to the action plan.  So my

23      question is this:  Did the action plan -- well, she was --

24      you said she was evaluated on it.  I'm asking you, didn't it

25      play also a role, taking into account the recommendation

34

1  made by Mr. Dolecki and maybe the others in terms of whether

2  or not she should be terminated?

3      MS. HEATH:  Objection.  The question is very

4  misleading and confusing.  Because I think you're

5  mistaking -- that action plan was attached to a

6  satisfactory evaluation from the 2000-2001 school

7  year.  So, therefore, she was acting pursuant to

8  that action plan for 2001-2002 and then had

9  another action plan which was then revised and

10  then subsequently her termination occurred in

11  2003.

12  Q.    All right.  Let's deal with that then, what your

13  counselor has talked about.  That is the revised plan.

14  Okay?

15  A.    In 2002-2003?

16  Q.    Right.  Why did you revise the plan?

17      MS. HEATH:  Well, there was the plan, then it was

18  also then revised.

19  A.    Well, we would look at the plans and if they

20  needed revision along the way we would make revisions.

21  Q.    Why was that necessary in Miss deLeon's case?

22  A.    I believe at one point Mrs. deLeon made the

23  statements to me that that action plan was doing nothing for

24  her.  It was of no consequence and only through her hard

25  work was she able to improve and our action plan had nothing

35

1  at all to do with that. With making statements like that,

2  we would go back and look at that action plan to see why it

3  wasn't helping her.

4      Q.  Well, that's the question I want to ask you. You

5  devised a plan, you say, in cooperation with your staff.

6  How do we know this plan was valid? What did you do to

7  validate the plan?

8          MS. HEATH:  Objection.

9      Q.  You didn't test -- what did it seek to test and do

10  we -- can we -- and I know I'm asking a lot of questions. I

11  am going back. But I am concerned about was this test

12  validated. Did it test what it was supposed to test?

13          MS. HEATH:  Objection to form. I don't know what

14  you're asking. All right. Can you just repeat

15  what you're asking.

16          MR. NICHOLS:  Well, I am talking about this plan

17  and I'm describing in terms of --

18          MS. HEATH:  The 2002-2003 plan?

19          MR. NICHOLS:  Right.

20      Q.  It was revised and you just testified -- I don't

21  know whether you revised it at the -- as a result of the

22  comments that you say Miss deleon made to you.

23      A.  Uh-huh.

24      Q.  All right. Why did you revise -- and I'm asking

25  you is how do you -- what steps did you take to validate

1  this test, this plan?  To validate it.

2       MS. HEATH:  Object to the form.  Go ahead.

3   A.   Number one, it's not a test.

4   Q.   Well, whatever it is, purports to be.  You know,

5  whatever it purports to be, how do we even know it's valid.

6       MS. HEATH:  Object to form.

7   Q.   That's what I'm saying.  You made it.  I have a

8  right to ask you as to was it valid.  Do you understand what

9  I'm saying?

10  A.   I don't understand what you're saying.  I' kind

11 of --

12  Q.   You just referred to what my client told you.  It

13 was not helpful to her, right?

14  A.   Uh-huh.

15  Q.   You made that statement?

16  A.   Yes, I did.

17  Q.   Right.  And I'm asking you now, having made that

18 statement, as whether the test was purported to be -- well,

19 maybe you say it's not a test but whatever it purported to

20 be, a measurement, how do we know it was valid?

21       MS. HEATH:  Again, objection to form.  You may

22       answer.  I don't know what you mean by valid.

23  A.   We sat down and looked at the areas that there

24 needed to be improvement in the classroom.  We put together

25 a form that helped address those issues.  That was discussed

37

1   with Mrs. deLeon.  It was discussed with members of the

2   bargaining unit present.  Everyone agreed that this was a

3   valid, workable plan to be implemented to seek the

4   improvements that we were trying to seek.  Now, and I'm lost

5   on what other kind of validation we were looking for.

6       Q.   Well, when I use the term validation, I'm using it

7   in the sense -- I think most academics use it in the sense

8   that is there a correlation between, for example, you test

9   her for competency in a classroom, then does whatever you

10  put forward to gauge or measure the competency, is there

11  some correlation between testing that on the one hand and

12  the performance on the part of the teacher in the classroom?

13  The correlation.  That's what I'm simply saying when I say

14  validate.

15       MS. HEATH:  If you don't understand.

16       A.   I don't understand.  I'm kind of lost.  I'm sorry.

17       Q.   Well, let me ask you this:  Is this the first time

18  this type of action plan was administered to someone in your

19  teaching staff in your school, 2001, was that the first

20  time?

21       A.   One this extensive, yes.

22       MS. HEATH:  2001, he's talking.

23       A.   Oh, wait.  I'm sorry.

24       MS. HEATH:  See, we have three action plans, so

25  which one --

38

1    MR. NICHOLS: Right. 2001, the first time.

2    MS. HEATH: Right.

3    MR. NICHOLS: And then we have the revisions.

4    Right?

5    MS. HEATH: Well, I don't recall the next one a

6    revision, but.

7    MR. NICHOLS: Well, if you revise it, I mean, what

8    do we call the second one?

9    BY MR. NICHOLS:

10    Q.    What do we call the second one? Is that a

11    revision of the first? Was that a revision?

12    A.    I just called them action plans.

13    Q.    Action plans. But there's a distinction, though,

14    right? Are they distinguishable?

15    A.    I believe they're distinguishable when you --

16    Q.    And what I am just asking is these two now: We

17    are talking about the first one. And I'm not going to

18    belabor the first one. Let's move to the second one. I'm

19    asking you if they're distinguishable; how is the second one

20    distinguishable from the first?

21    MS. HEATH: Do you want to look at the first

22    again?

23    A.    I would have to sit down and completely review

24    these to --

25    Q.    Uh-huh. And that would be true for even the

39

1  revision of the second one, right? And there was another

2  revision I understand?

3      A.  Uh-huh.

4      MS. HEATH: Mr. Nichols, I have copies if you want

5  to mark them. I have copies 2002-2003 plan.

6      MR. NICHOLS: Okay.

7      MS. HEATH: And the revision to the 2002 plan.

8      All right. I ask the court reporter to mark them,

9  if you would please.

10     (DESHNER PLAINTIFF'S EX. 21 AND 22 - ACTION PLANS,

11     marked for identification.)

12     Q.  Before I leave this area, that is; these action

13  plans and going back to how you're formulating this plan or

14  devised it. Did you consult authorities in the field

15  concerning how these action plans should be devised? Did

16  you consult with colleagues outside of the school or was it

17  just a product of you and your staff?

18     A.  It was a product of the staff knowing the good

19  practices that needed to be in place and what needed to be

20  going on in a classroom.

21     Q.  Now, coming forward, also in 2000, 2002 school

22  year, see if I can get the evaluations.

23     MS. HEATH: Year 2000?

24     MR. NICHOLS: Huh?

25     MS. HEATH: Which year are you talking about?

40

1          MR. NICHOLS:  2001 and 2 school year.

2      Q.   She, Miss deLeon, was evaluated not at the

3   conclusion of the semester, which would be June, I

4   understand, but in March 2002.  And she was given an

5   evaluation.  I'm trying to find that evaluation.  And my

6   question is:  Why was she prematurely evaluated?  Matter of

7   fact, it was a negative evaluation she got.

8      A.   That's correct.

9      Q.   Why was she evaluated out of sequence in March

10  rather than in June?

11     A.   I believe it was because to the problems that we

12  were seeing and the improvement that was not occurring.

13     Q.   Now, she had been suspended on the 18th, a letter

14  written by Mr. Dolecki, served on her by Mr. Heller.  Were

15  you present in that occasion?

16     A.   I was.

17     Q.   And Miss deLeon?  So on that may I ask who was in

18  attendance at that meeting on March 18th when Mr. Heller

19  delivered a letter to my client, Miss deLeon, stating that

20  she was suspended.  And the reason she was suspended for

21  because of the medical excuses that he had received from the

22  doctor with whom Miss deLeon was treating at the time.

23         MS. HEATH:  Objection to the form.  What was your

24         question?

25         MR. NICHOLS:  Who was in attendance at that

1       meeting.

2              MS. HEATH:  Okay.

3       Q.     You said you were present, Mr. Deshner.  Who else

4   was present?

5              MS. HEATH:  At the time when the evaluation was

6       reviewed or at the time --

7              MR. NICHOLS:  No, no, we are now at this letter.

8       A.     This letter.

9       Q.     Yeah.  And the letter of which Mr. Dolecki wrote,

10  March 18, 2002, delivered to Miss deLeon by Mr. Heller.  You

11  were present, Miss deLeon was present, Mr. Heller, of

12  course, right?

13      A.     I don't remember who all was present.

14      Q.     But you were present, right?

15      A.     I believe I was because I was present for a lot of

16  the --

17      Q.     Do you recall that Mr. Heller asked Miss deLeon

18  for her resignation on that occasion?

19             MS. HEATH:  Objection to form.  You may answer.

20      A.     I do believe there was some mention made of that.

21      Q.     Can you be more specific, Mr. Deshner?

22      A.     If there was reference to it, I didn't make it.  I

23  couldn't tell you now the exact words that were used.

24      Q.     But you do recall Mr. Heller made --

25      A.     Yes.

1    Q.    -- a statement to Miss deLeon relative to that

2    subject matter?

3    A.    Yes.

4    Q.    And was the statement initiated by Mr. Heller or

5    was it initiated by him or did Miss deLeon volunteer to

6    submit a resignation?

7    A.    She did not volunteer, that came from Mr. Heller.

8    Q.    That came from Mr. Heller.    Now, did Mr. Heller

9    say on that occasion that he was authorized to make such an

10   offer or a request, I should say, request, of Miss deLeon?

11        MS. HEATH:    Objection.

12   Q.    By Mr. Dolecki?

13        MS. HEATH:    Objection to form.

14   A.    I don't remember.    Like I said, I don't remember

15   his exact words that he used.    I don't know if that was a

16   part of it or not.    I just don't remember.

17   Q.    Do you know of other occasions in which the

18   administration asked for the resignation of a teacher?

19        MS. HEATH:    Again, I'm going to object to form.    I

20   think there was testimony that it wasn't

21   necessarily asked for, not by Mr. Dolecki.    That

22   it was discussed as an option but that's not

23   asking for it.

24        MR. NICHOLS:    Yeah, well, let's --

25        MS. HEATH:    Or directing someone to resign.

43

1    Q.    All right.  Well, then let's say, I'm asking you,

2  have you ever been privy to any prior -- any situation in

3  which the administration had discussed or requested or

4  discussed options along this line with a teacher?

5         A.    When you say was I privy to, you mean was I

6  present?

7         Q.    Yes, present, on any other occasion.

8         A.    I cannot recall of any.

9         Q.    You can't point to any other occasion where that

10  occurred?

11              MS. HEATH:    In his presence?

12         A.    Where I was present?

13         Q.    Right.

14         A.    There were -- I had 100 and some teachers --

15         Q.    Right.

16         A.    -- in the district under my --

17         Q.    Right.

18         A.    -- supervision.  There were just teachers all over

19  the district.

20         Q.    I understand.

21         A.    Yeah.  And I wouldn't know, I wouldn't even have

22  an idea what went on in other buildings with staff.

23         Q.    No, but I'm only talking about what would have

24  been under your supervision in a given time, right?  I'm

25  saying that any kind of conversation involving the

44

1   resignation or asking for a buyout, whatever you want to

2   call it on the part of a teacher by the administration. You

3   would have been involved in it if it involved your teacher,

4   right?

5        A.   If it was --

6        Q.   You would you have been involved in it, wouldn't

7   you?

8        MS. HEATH:   I'm just going to object to form

9   again.  I'm not sure if you're talking about

10  buyout, if you're talking about retirement which

11  is something the principal wouldn't necessarily be

12  involved in anyway, but go ahead.

13       Q.   You may answer.

14       A.   Do I know of any others?

15       Q.   Right.

16       A.   No.

17       Q.   Uh-huh.   And how long have you been with the

18  Crawford Central School District, the system?  How long have

19  you been?

20       A.   As an administrator?

21       Q.   Administrator.

22       A.   I was an administrator for 23 years.  For 4 years

23  as an assistant principal and 19 years as a principal.

24       Q.   Okay.  This would have been unusual then, wouldn't

25  it?

1    A.  I don't know that I would use the term unusual.

2    Q.  How would you describe it? Unprecedented?

3    A.  From my knowledge, from my dealings, I do not know

4    of any others but I wouldn't use the term, again, unusual.

5    Q.  Uh-huh.  All right.  Now, again, this letter of

6    March 18, 2002, which was written by Mr. Dolecki.  Okay.

7    And then in that time frame Miss DeLeon received a negative

8    evaluation to which we just referred.  You acknowledge that?

9    A.  Uh-huh.

10   Q.  All right.  Now, she was on leave when that

11   evaluation was done, wasn't it? She was on leave, wasn't

12   she?  She had been suspended so she was not there teaching.

13   She was -- having been suspended, right? Isn't that

14   correct?

15        MS. HEATH:  Is there any particular letter you're

16   referring to?  I am not sure that's the case.

17   Q.  The reason I ask is this, because at the bottom of

18   her evaluations you would note there's a notation that's

19   incomplete.

20        MS. HEATH:  She was off work because of her

21   doctor.

22        MR. NICHOLS:  No, you're looking at the wrong one.

23   Look at the one, he has evaluation.  There's a

24   notation at the bottom that says that it's

25   incomplete because they had to wait her return in

46

1       May.

2       MS. HEATH:  Look here.  Her doctor in that time

3   frame -- there's a letter from her doctor dated

4   March 12, 2002 saying that she should take off

5   work from 3/13 to 3/17, 2002.

6       MR. NICHOLS:  Right, right.  Now, put that in

7   sequence.

8       MS. HEATH:  It is in sequence.

9       MR. NICHOLS:  The sequence I'm saying, that's what

10  prompted Mr. Dolecki to write the letter of March

11      18.  His having received the letter from

12  Dr. Mercatoris which you just referred.  He then

13  writes the letter of suspending her.

14      Q.  And then what I'm asking is:  This document here,

15  which is her evaluation, is negative but it's in the same

16  time frame.  And also what troubles me, what I'm asking you

17  is --

18      MS. HEATH:  Can you please just ask the question?

19      Q.  Yeah, my question is this:  At the bottom of that

20  notation that says incomplete and why the administration did

21  not wait until she returned to complete it.  Why did they do

22  this negative evaluation in her absence?

23      A.  It wasn't done in her absence.

24      Q.  How do you explain the notation at the bottom?

25  How do you explain that?

1    A.    You're talking this notation due to Mrs. deLeon's

2 leave?

3    Q.    Right, right.

4    A.    This -- she was off, as this letter says, from

5 3/13 to 3/17. When you -- following an observation or when

6 you want to do this, you have a certain number of days that

7 it needs to be completed in. Because of her being off, it

8 couldn't be completed in those number of -- that number of

9 days as referred to in the contract. That's why the

10 notation is made at bottom here that due -- and the rest of

11 it is it cut off here. I just --

12    Q.    No, the rest of it speaks to May. And this is why

13 I'm asking you: Why didn't it wait until May to correct.

14 Her absence was not due to her choice. It was due because

15 Mr. Dolecki had suspended her. It had nothing to do with

16 her having a choice of being absent. It was because

17 administration had suspended her.

18    MS. HEATH:    Do you have a question?

19    Q.    No, that's what I am saying. Why did you issue

20 the negative evaluation in her absence?

21    A.    It wasn't issued in her absence. That's what I --

22 I'm not following.

23    Q.    Well, it was incomplete. That what's I'm saying.

24 Because the notation -- what does that notation mean at the

25 bottom? What could they mean otherwise?

48

1    A.    The rest of that is out off so I don't know

2  what's -- what's underneath that. I --

3       MS. HEATH:    It would be helpful when you were

4  asking these questions if you could at least

5  provide the witness the documents you're referring

6  to.

7       MR. NICHOLS:    Well, we have a document. It's does

8  not show the complete. But there was a document

9  this morning that showed the full text. Well,

10 anyway, I'm not going to belabor the point. Let's

11 take a five-minute break, okay? Come back and I'm

12 going to wrap it up, okay?

13      (Brief recess.)

14      MR. NICHOLS:    Back on the record. It's now 3:05

15 p.m., the day being March 7, 2006.

16      Q.    Mr. Deshner, I want to continue with you, if I

17 may, a few more questions.

18      A.    Uh-huh.

19      Q.    Now, we're up to Miss deLeon returns to work per

20 order of Dr. McFadden. It says she is able to return to

21 work. Now, that time frame I'm focusing on when she returns

22 to work on that occasion, that was May 2002, what did you

23 do, if anything, to facilitate her return to work?

24      MS. HEATH:    Objection to form. What do you mean

25 by facilitate?