1    Q.    All right.  You knew of her medical condition, why

2    she had been suspended.  You knew of that.  You knew of the

3    sabbatical reasons.  You knew of her medical condition.  You

4    certainly knew, you acknowledged.  Now, I'm asking now that

5    Dr. McFadden said she was able to return to work -- let me

6    ask you, I should put it this way:  From September 2002 to

7    April up to and through including April 2003 you and your

8    staff subjected Miss deLeon to seven evaluations within a

9    span of eight months.

10                MS. HEATH:    Objection.

11        Q.    Seven class evaluations.

12                MS. HEATH:  I believe you're --

13        Q.    What I'm asking you is --

14                MS. HEATH:  Let me just object.  I don't believe

15    you mean evaluation.  I think you mean

16    observation.

17        Q.    Observation.  Classroom observation, okay.  Now,

18    that is found in Arbitrator Armis (phonetic) statement,

19    award rather, he writes, and that's the fourth arbitration.

20    He writes that you subjected her to seven observations

21    within a span of eight months.  And he describes who does it

22    on your staff.  Including Mr. Heller, I believe, also

23    conducts one of the evaluations.  Miss Templeton,

24    Dr. Berkebile and then the other person, Mr. Higgins.

25                MS. HEATH:  I'm going to object.  First of all,

1  you're mischaracterizing what the arbitrator said

2  she was subjected to those evaluations, which is a

3  negative connotation. That's particularly

4  important given the fact that the arbitrator

5  upheld the termination of Miss deLeon based upon

6  the unsatisfactory evaluations which were

7  supported by those classroom observations to which

8  you're referring.

9       Second of all, I don't think that your time

10  frame is correct and I'm not even sure that at

11  this time frame of 2002-2003, Berkebile and

12  Templeton were even at school anymore. And so I

13  just want to put my objection on the record that

14  your recitation of the facts does not accurately

15  reflect the record.

16  MR. NICHOLS:   Well, I'm perfectly willing to

17  recite, refer to what Mr. Armis as the arbitrator

18  described in his opinion relative to this period.

19  MS. HEATH:   I don't think there's any

20  disagreement.  We have the records for the

21  observations.

22  MR. NICHOLS:   Right, right.

23  BY MR. NICHOLS:

24       Q.   My question, though, is this, Mr. Deshner, is

25  this.  One, given that number of observations, class

51

1    observations within that span of time.  Two, given the fact

2    that Miss deleon was already to have to undergo to perform

3    on the action plan.  And three, having just returned from

4    being required to undergo a psychiatric exam, what justified

5    these onerous measures on the part of the administration?

6              MS. HEATH:  Objection to form.  If you can answer,

7         you may answer.

8    Q.   What's the justification for this?

9              MS. HEATH:  You're asking what justified the fact

10        that she had those evaluations or those

11        observations in that time period?

12             MR. NICHOLS:  Right.

13   A.   That was all part of the action plan.

14   Q.   That was unusual, though, wasn't it?  I mean,

15   wouldn't that be unusual -- no other staff member you can

16   point to was required to undergo such stringent evaluations

17   and the number of evaluations during that time frame.  Can

18   you point to me -- point me to any other faculty member that

19   was subject to that level of scrutiny, that level of

20   stringent oversight?  Can you?

21   A.   I didn't have any other faculty member on an

22   action plan at that point.

23   Q.   Right.  You didn't have.

24   A.   So it was not unusual based on the action plan

25   that we had put together and everyone had agreed to when we

1    put that action plan in place.

2        Q.    Let me ask you this:  The other two whom you had

3    on the action plan, did they also have to undergo seven

4    evaluations within a span -- observations rather, in a span

5    of eight months?

6        MS. HEATH:  Those are the people you said from

7    1990 through 2001 who were on the action plan and

8    he said three people that he could think of?

9        MR. NICHOLS:  Right.  Including Miss deLeon.  Now,

10    I'm asking the other two.

11        Q.    Did they also have to undergo that same level of

12    scrutiny?

13        A.    They would have had more scrutiny than normal.

14    Was it at that level?  I couldn't say without going back and

15    reviewing.

16        Q.    Uh-huh.  Let's move forward now to meetings.  Two

17    meetings occurred.  One on November 10, other one

18    November 11.  There was a meeting with Miss deLeon.

19        MS. HEATH:  2000 and -- wait.

20        MR. NICHOLS:  2003.

21        MS. HEATH:  2002?

22        MR. NICHOLS:  2003.

23        MS. HEATH:  November, she was already terminated.

24        MR. NICHOLS:  No, I'm sorry, not November.  April,

25    April.

53

1     MS. HEATH: Okay.

2     MR. NICHOLS: 2003.

3     MS. HEATH: April. What do you want now?

4     Q.  There were two meetings, two meetings where the

5  administration met with Miss deLeon. I believe you were

6  present, right, Mr. Deshner?

7     A.  Yes.

8     Q.  On the 10th there were several things discussed

9  for her, I'm not going to reiterate those, but I simply ask

10  you this: At any time during that -- who was present during

11  that meeting; do you recall?

12     MS. HEATH: April 4?

13     MR. NICHOLS: April 10th.

14     MS. HEATH: April 10th.

15     MR. NICHOLS: Uh-huh.

16     Q.  Do you remember? Other than yourself and

17  Miss deLeon?

18     A.  I believe there would have been -- trying to

19  remember specifically which day. And I believe Mrs. Willison from the --

20  who was a building rep. And I believe Mr. Roznowski, who

21  was also a building rep was present, Mrs. DeLeon, myself. I

22  think Mr. Heller might have been present. He was there at

23  that meeting --

24     Q.  That's the April 10 meeting, right?

25     A.  -- April.

1    Q.    Okay.    At any time during that meeting, did

2    Miss deLeon swear or use a profanity at you, directed

3    profanity at you?

4    A.    I don't remember of any profanity at this time.

5    Q.    All right.    At any time during that meeting did

6    she physically accost you in any way?

7    A.    She became physically aggressive towards me.

8    Q.    No, no, I mean -- what do you mean by physically

9    aggressive?    Did she swing at you?

10   A.    She got up out of her chair --

11   Q.    Right.

12   A.    -- and started around the table and was coming

13   right up to me on the other side of the table.

14   Q.    Did she swing at you?    Did she try to assault,

15   physically assault you?

16         MS. HEATH:    What's your question?    Did she swing

17   at you?

18   Q.    That's my question.    Did she physically assault

19   you?

20         MS. HEATH:    That's a compound question.

21   Q.    Well, let's take that one at a time.    Did she

22   physically assault you?

23   A.    She didn't have the chance to.

24   Q.    Well, that's not my question.    Did she physically

25   assault you?    Please answer that question.

1    A.    She did not physically assault me.

2    Q.    All right.  That's all.  That's all.  That's

3 enough.  All right.  And let's move to the 11th.

4    A.    I'd like to finish --

5    Q.    Well, I asked you a question and then you answered

6 it.  That's fine.  Okay.  I asked you a question, you

7 answered it.

8    A.    Okay.  Thank you.

9    Q.    All right.  Let's move to the 11th.  Let's move to

10 April 11, 2003.  Again, there was another meeting of

11 Miss deLeon with the administration.  I think you were

12 there, right?

13    A.    (Witness moved head up and down.)

14    Q.    You say that Miss Willison was there.  I think

15 also at this meeting, right, was she?  Mr. Roznowski, right?

16    A.    I think so.

17    Q.    Anyone else other than them, in addition to that?

18    MS. HEATH:    On the 11th, you're asking?

19    MR. NICHOLS:    On the 11th.

20    A.    I don't remember.

21    Q.    Again, my question is the same.  During that

22 meeting did -- at any time did Miss deLeon direct profanity

23 at you?

24    A.    Not that I remember.

25    Q.    Again, my question is the same question:  Did she

1   physically assault you?

2   A.   No.

3   Q.   All right.  Fine.  Now, last question.  And this

4   leads up to her termination recommendation by Mr. Dolecki at

5   the end of the month, April 30 letter recommending

6   termination issued by Mr. Dolecki.  Now, were you a

7   participant or a contributor to those recommendations, that

8   is, that she be recommended terminated?

9   A.   Yes, I was.

10  Q.   You contributed to that?

11  A.   Yes.

12  Q.   As best you can, could you elaborate on the degree

13  of your participation and what was the nature?

14  A.   I was a part of it to the degree -- I mean, did I

15  play a bigger part in it than anyone else, no.  I mean --

16  Q.   What was your input, if any?

17  A.   What was my input regarding her termination?

18  Q.   Uh-huh.

19  A.   She should have been terminated.

20  Q.   Okay.  As for your staff, did they also have

21  input?

22          MS. HEATH:  Are you saying assistant principals

23  when you say staff?

24          MR. NICHOLS:  Right, the assistant principals.

25  A.   I believe they would have had some input in that

57

1    as well.

2        Q.    Did they also attend the meetings, the

3    November 10th and 11th -- not November, April 10th and 11th

4    meetings, your staff?

5        A.    I don't believe -- can't remember if Mr. Higgins

6    was present or not.  He was doing a lot of the evaluations

7    but I believe Mr. Higgins would have been present but the

8    other assistant principal, Mr. Morgan, would not have been.

9        Q.    Would not have been.  Okay.  I just got a couple

10   things I want to clean up here before I close down with you.

11   And that is, one, is a letter here I have from you, you

12   prepared to Miss deLeon dated April 7, 2003.  And there you

13   make certain remarks there, you stated at this point

14   became -- that she, you accused her of having made sarcastic

15   remarks, statements against the administration.  You say

16   these were unacceptable.

17            MS. HEATH:  What date are you looking at?

18            MR. NICHOLS:  April 7th.  I would ask that you

19        mark this please.

20            (DESHNER PLAINTIFF'S EX. 23 - APRIL 7, '03 LETTER,

21        marked for identification.)

22        Q.    You accused her of having made certain remarks

23   against the administration and you said that that was

24   unacceptable.

25            MS. HEATH:  Do you have another copy?

58

1    Q.    I'm simply asking you, what specific remarks were

2    you referring to that you found unacceptable -- remarks she

3    had made that you found were unacceptable?

4         A.    Well, I think I have outlined some of those in

5    this letter that she was making -- instead of listening to

6    what we were talking about there's a statement here, that's

7    the problem with administrators here you always believe the

8    kids and never the teachers.  Mr. Roznowski had asked her to

9    refrain from making comments that she had been making.

10              We weren't -- we were dealing with issues

11   involving classroom management, things that had been

12   observed, not statements that kids were making to us.  It

13   was the same kind of negativity that I had seen at other

14   meetings towards the administration that, you know, past

15   statements.

16        Q.    Was she punished for having made that statement?

17   When I say punished, was she reprimanded; was she suspended

18   for having made that statement?

19        A.    No, she was not suspended.  She was given this

20   letter which was put in her file.

21        Q.    So that was a cautionary measure, you would call

22   it, right?

23        A.    Yes.  This would be considered a written

24   reprimand.

25        Q.    A reprimand.  So she was, in fact, punished then

59

1    to the extent that's a reprimand.  You'd say it's a

2    reprimand.  It would be some form of punishment?

3         A.   Sure.  Sure it would be.

4         Q.   Does freedom of expression, which is cherished in

5    academia, does that trouble you to punish someone for simply

6    speaking like that, making a statement like that?  I always

7    say in academia we cherish the freedom of expression.  Are

8    you troubled by -- you issued -- reprimanded her for having

9    made a statement like that?

10             MS. HEATH:  Objection.  You may answer.

11        A.   No, I'm not troubled by reprimanding her for that.

12        Q.   Okay.  One other question here.  Now, if I may

13   turn your attention to 5/24, May 24th, 2001.  Miss deLeon

14   called you and left a message that she was taking off that

15   day due too illness.

16             MS. HEATH:  When's that?

17             MR. NICHOLS:  That's May 24, 2001.

18        Q.   She called your office and said that she was not

19   feeling well, having a problem with her condition,

20   depression.  And then that was May 24th, 2001.

21             May 25, 2001 you came to observe her class.  You

22   came to observe her class the very next day.  And I believe

23   you gave her a negative evaluation.  And following that on

24   June 6 -- no, no, June 7, rather, same year, 2001.  You told

25   her she didn't know how to teach or she was told she didn't

60

1  know how to teach and you thereupon put her on an action

2  plan.  Is that correct?

3       MS. HEATH:  Can you break that down because that's

4  a compound question you just asked him.

5       MR. NICHOLS:  Okay.  Well, getting back to the

6  dates.  Let's go ahead and recite the dates here.

7       MS. HEATH:  If you're looking at a document,

8  perhaps that would refresh his recollection.

9       MR. NICHOLS:  Well, it's a document we prepared by

10  Miss deLeon.

11       MS. HEATH:  That's based on Miss deLeon's --

12       MR. NICHOLS:  Yeah.

13       MS. HEATH:  -- own personal?

14       MR. NICHOLS:  Well, I mean, I have no reason to

15  think that it's less than accurate and authentic.

16       MS. HEATH:  Less than accurate?

17       MR. NICHOLS:  Huh?  No, I say I have no reason to

18  think it's not accurate and --

19       MS. HEATH:  Do you have the --

20       MR. NICHOLS:  She has -- I can have --

21       MS. HEATH:  Do you have the classroom observation

22  from that day?

23       MR. NICHOLS:  The what?

24       MS. HEATH:  The classroom observation.

25       MR. NICHOLS:  No, I understand she didn't appear.

61

1    She called in on the 25th, May 25th, 2000 [sic]

2    and reports I'm sick, I'm not coming in.

3    MS. HEATH:  I thought you said that was the 24th,

4    on the 24th --

5    MR. NICHOLS:  25th.

6    MS. HEATH:  -- she was observed.

7    MISS deLEON:  24th.

8    Q.    The 24th.  All right, 24th.  The 25th, you

9    appeared, Mr. Deshner appeared in her class and did an

10    observation.

11    MS. HEATH:  Do you have that observation because I

12    don't not have a copy?

13    (Discussion held off the record.)

14    MS. HEATH:  Do you want to mark that?

15    MR. NICHOLS:  Yeah, I want to mark that, please.

16    (DESHNER PLAINTIFF'S EX. 24 -- OBSERVATION,

17    marked for identification.)

18    A.    I remember this observation.

19    Q.    You remember that.

20    A.    Yes.

21    Q.    And the important thing there is that that led to

22    placing her on the action plan, did it not?

23    A.    Yes, this was part of it.

24    Q.    Yeah.  Well, you placed her in the first place --

25    the action plan the first place.  That's correct, isn't it?

1      MS. HEATH: Objection to form. You mean this is

2   one of the reasons she was put on the --

3      MR. NICHOLS: Action.

4      MS. HEATH: -- action plan for 2000-2001?

5      MR. NICHOLS: Uh-huh.

6      A.   For 2000-2001? No, this was --

7      MS. HEATH: I'm sorry, 2001-2002.

8      A.   2001-2002 because this was done in May of 2001.

9      MS. HEATH: For the next year.

10     A.   Yes, it was before the next year.

11     Q.   Okay. One other thing here. Now, I have a batch

12  of student discipline logs here. One thing the action plan

13  required is that Miss deleon maintain student discipline

14  logs. Okay. Now, I have a couple questions here relative

15  to that. One is I have testimony on the record from

16  Miss Willison yesterday testified that the maintaining of

17  student discipline logs was optional. Some teachers did,

18  others didn't. Clearly optional as Miss Willison testified.

19     MS. HEATH: Objection. What she said was --

20     Q.   My question was --

21     MS. HEATH: -- action plan it was mandatory

22  otherwise it was optional.

23     Q.   Right. All right. And in Miss deLeon's case it

24  was mandatory?

25     A.   Uh-huh.

1    Q.    It was mandatory?

2    A.    Yes.

3    Q.    Okay.  Now, is that a correct statement, those two

4    statements correct?  One, is that it was optional as

5    Miss Willison said generally speaking in terms of the

6    teaching staff.

7    A.    Right.

8    Q.    In Miss deLeon's case, it was mandatory.  Are

9    those two statements correct?

10    A.    That is correct.

11         MR. NICHOLS:  Mark this exhibit, whatever the

12    appropriate number is.

13         (DESHNER PLAINTIFF'S EX. 25 - STUDENT DISCIPLINE

14         LOGS, marked for identification.)

15    Q.    Okay.  Two other things, Mr. Deshner and that

16    would be it.  We have another witness coming on.  I have a

17    letter here -- well, first of all, I have not a letter but

18    it's a memorandum prepared by Miss deLeon in which she says

19    that -- and she writes this letter to Mr. Jones, I think she

20    directed to Mr. Jones.  The letter, it's the counsel for the

21    Union PSEA.

22         And she says, I request immediate advise

23    concerning whether to file a grievance against my supervisor

24    with regard to past incidents, and with regard to an

25    incident which occurred on this date.  And she goes on to

1   describe the incident that occurred, I believe in your

2   office involving the Hogans. Does that trigger --

3       A.    Yeah.

4       Q.    -- your memory?

5       A.    We had a parent conference.

6       MS. HEATH:    Is there a date?

7       A.    It should have been about March.

8       MR. NICHOLS:    Well, we are talking March 12, 1996

9   according to the memo. Please mark this.

10      (DESHNER PLAINTIFF'S EX. 26 - MARCH 12, 1996 MEMO,

11      marked for identification.)

12      Q.    I will show you if you wish but I just want to

13  briefly touch on this. The subject matter. Miss deLeon

14  says is that because she I think disciplined the Hogan's

15  son. They came and in your presence verbally attacked her,

16  unfairly attacked her in a very intimidating way. Is that

17  correct?

18      A.    They did not attack her in an intimidating way.

19      Q.    You used the term a while ago "aggressive". You

20  used the term physically aggressive. Well, I think it's

21  fair to say, as I understand it, Miss deLeon's account of

22  this event that they were very aggressive, verbally, at

23  least verbally.

24      A.    They had a lot of concerns and questions that they

25  had that were not being addressed. And they became upset

1    that their questions were not being answered.

2    Q.    This was in your presence, right?

3    A.    This was in my presence.

4    Q.    In your office?

5    A.    In my office.

6    Q.    And they abused her in your presence, didn't they?

7    A.    Abused her?

8    Q.    Yes.

9    A.    I don't believe they abused her.

10   Q.    You don't think -- is it fair to characterize that

11   event as being an abuse?  That they degraded her in your

12   presence?

13         MS. HEATH:  What are you asking?

14   Q.    I am asking you, Mr. Deshner, this was in your

15   presence and you being the principal of this school, and you

16   have the parents of one of the students that she sought to

17   chastise and you didn't stand up for her.

18         MS. HEATH:  Objection.  What is your question?

19   Q.    My question is:  Did they abuse her?

20   A.    They did not abuse her.

21   Q.    Were they very vocal towards her?

22   A.    They were vocal, yes.

23   Q.    And don't you think they were unjustified --

24   A.    No, I don't.

25   Q.    -- in the manner which they presented themselves?

66

1   A.   No, I do not believe they were.

2   Q.   Okay.  And then, also, following this, I believe

3 Miss deLeon asked to grieve the situation as an unfair labor

4 practice.  Excuse me.

5        MR. NICHOLS:  Was it unfair legal practice?

6        MISS deLEON:  No, I asked for representation.

7   Q.   Yeah, representation.  She asked for

8 representation to be represented and she was denied to be

9 represented on this occasion at this what is called

10 parent-teachers conference, I believe.  She was denied that,

11 I believe.

12        MR. NICHOLS:  Who denied you that?

13        MISS deLEON:  Mr. Deshner.

14   A.   Mr. Deshner, you denied her right to be

15 represented?

16        MS. HEATH:  At a parent-teacher conference?

17   Q.   Well, the Hogans.  You called this meeting with

18 the Hogans.  I don't know what you call it.

19   A.   It was a parent-teacher conference.

20   Q.   Right.  With the Hogans.

21   A.   She wanted to bring a union rep into that meeting.

22 I denied that request because this was confidential student

23 information that was being discussed and a union

24 representative, I felt, was not privileged to that

25 information.  If I remember correctly, I went and got a

1    guidance counselor and brought a guidance counselor into

2    that situation.

3        Q.    Well, I have backup information here.  As a matter

4    of fact I have a letter from the lawyer, John Jones, writing

5    to Miss deLeon concerning this event.  And then I have a

6    further letter from the Pennsylvania Labor Relations Board

7    written by one of the hearing examiners and where this

8    matter was not fully aired by a hearing.

9            But, I mean, it does exist.  The question here is

10   the fact that she requested counsel is certainly true

11   because I have it here from my counsel, the union counsel.

12   I'm just asking this be marked as an exhibit.  John Jones.

13       MS. HEATH:    What are you asking now?  Can we look

14   at that?

15       MR. NICHOLS:    Yes.

16       (Discussion held off the record.)

17       (DESHNER PLAINTIFF'S EX. 27 - JOHN JONES' LETTER,

18       marked for identification.)

19       Q.    Just one last thing, Mr. Deshner.  Miss deLeon

20   tells me there was one occasion in which in the hall you

21   were very unprofessional towards her, to say the least.

22   That you came toward her in a very intimidating way.  That

23   you were loud and belligerent.  That you pointed your finger

24   in a very demonstrative way, pointing your finger at her.

25   I'm asking you now, was that true?

1          MS. HEATH:  When was that?

2     A.     Could I have a date on when this occurred?

3          (Discussion held off the record.)

4     Q.     You don't remember?  You don't remember at all?

5  Does that jog your memory?  Mr. Deshner, I am asking.

6     A.     Well, I guess I would like to know what it was in

7  reference to.  The only -- I can only remember one time --

8     Q.     Well --

9     A.     -- that was -- that had to have been back in maybe

10 1994, '95, somewhere around in that time frame.  And that

11 was involving an incident with a student that she had in her

12 classroom by the name of Brian Gray.

13     Q.     I am asking this question because I have a witness

14 now coming who confirmed that, who was there.  And that's

15 Mr. Stanford.  He was present and observed your behavior.

16          MS. HEATH:  Well, we don't know what he's going to

17     say yet.

18     Q.     Well, that's why he's coming next, I mean.  And I

19 wanted to get your -- you know, give you the opportunity to

20 state for record what happened.

21     A.     I would like to know if I could have a date and

22 what it was in reference to.  So that I --

23     Q.     Mr. Stanford was present.  Does that jog your

24 memory?

25     A.     The thing that I can remember about the Brian Gray

69

1   incident is the only one that I can think of was there were

2   a lot of people present. It was at dismissal time in

3   school. There were teachers going by, there were students

4   going by.

5       Q.    Right. And that was the troubling part about it.

6   It was so public and demeaning in the presence of teachers

7   and students.

8       A.    I don't believe that's the case. She --

9   Mrs. deLeon was making statements out loud that were drawing

10  people's attentions that were very inappropriate at the

11  time.

12      Q.    Was she crying? Was she crying? Was she visibly

13  upset?

14      A.    I remember her being upset at that time.

15      Q.    Did you observe her crying on that occasion?

16      A.    I don't know that she was crying.

17      MR. NICHOLS:  Okay. All right then. Well, thank

18  you, Mr. Deshner.

19      MS. HEATH:  I have a few follow up for him as

20  well.

21

22                          CROSS-EXAMINATION

23  BY MS. HEATH:

24

25      Q.    Referring back to the meeting with Scott Hogan's

70

1    parents.  What were his parents' positions?  What did they

2    do?

3        A.    What jobs did they hold down?

4        Q.    Uh-huh.

5        A.    They were both teachers in a neighboring school

6    district.

7        Q.    And at that meeting do you recall what was brought

8    up?  There were issues concerning his behavior; is that

9    correct?

10       A.    That's correct.

11       Q.    Well, what was the primary questions the parents

12   had of Miss deLeon which she refused basically to answer

13   relative to that child's behavior?

14       A.    The conference started out on a very negative

15   basis by Mrs. deLeon making statements to the Hogans that

16   there son was a very bad young man and had caused all kinds

17   of problems in the classroom.

18       Q.    This was in March, correct?

19       A.    This was in March.  And Mrs. deLeon said, I have

20   been keeping a record on your son since the beginning of the

21   year, and she proceeded to pull out all these slips of paper

22   that she had kept notes on on their son.

23       Q.    Did you notice anything odd about this paper or

24   the notes?

25       A.    Yes.  All the of notes were done on the very same

71

1    tablet, all in the same ink.

2        Q.    Was that something that Mr. Hogan noticed as well?

3        A.    The Hogans noticed that as well and had a question

4    concerning that.

5        Q.    They had a question concerning what, the

6    authenticity of those notes?

7        A.    The authenticity of the notes.

8        Q.    Did they also ask why they had not been informed

9    of his behavior until March of that year?

10       A.    Mr. Hogan indicated that both he and his wife were

11   teachers and if they had a student that was that disruptive

12   from the beginning of the year, why was it just in March

13   that they were being notified of all these behaviors that

14   had gone on since September, October.  Why weren't they

15   notified immediately.  And they were wanting that question

16   answered.

17             And then also Mr. Hogan indicated in that meeting

18   he said, I'm a teacher and from day-to-day I have different

19   pens, different pieces of paper.  He said, for that length

20   of time that you're covering those things would be in

21   different colors of ink or pencil, different tablets.

22             And he looked right at Mrs. deLeon and he said,

23   you sat down and wrote all of these up so you would have

24   some kind of documentation to show me how bad my son was.

25   And he said, I don't believe those notes that you have laid

72

1    down in front of me.  That was his statement.

2    Q.    And during that year Miss deLeon had gotten an

3    unsatisfactory evaluation, correct?

4    A.    Yes.

5    Q.    That later went to arbitration?

6    A.    Yes, it did.

7    Q.    Did this issue come up at the arbitration?

8    A.    Yes, it did.

9    Q.    Did she produce these notes that she produced at

10   the meeting with the Hogans in your presence?

11   A.    Yes, they were entered into as exhibits.

12   Q.    Were they the same notes?

13   A.    They were different notes than had been presented

14   to the Hogans.

15   Q.    Now, did you face an evidentiary issue at that

16   time concerning the Hogans not being there to testify?  Was

17   that an issue that came up?  The Hogans didn't testify at

18   the arbitration, correct?

19   A.    No, the Hogans did not testify at that

20   arbitration.

21   Q.    So is it fair to say it was basically your word

22   against Miss deLeon's word that those were different notes

23   that she produced at the arbitration than from what she had

24   produced at the meeting?

25   A.    Yes, it was.

1    Q.    And there is an issue about her bringing a

2    building rep into this meeting with the parents.    Isn't it

3    true that pursuant to the law in the Collective Bargaining

4    Agreement a professional employee would have an ability to

5    bring in a union representative if they thought that the

6    meeting was going to result in disciplinary consequence?

7    A.    Correct.

8    Q.    Why would Miss deLeon think that this meeting with

9    the parent would result in a disciplinary consequence if she

10   didn't have something to hide?

11   A.    That was my question why you would have to have a

12   building rep present for a parent conference.    I saw no --

13   it was -- I mean it was not a disciplinary meeting or in

14   reference to anything that had been observed, it was just a

15   parent conference.

16   Q.    Relative to the April 10th meeting of 2003 and

17   there was a question of whether or not you were physically

18   assaulted by Miss deLeon.    What do you recall about that

19   meeting, and we did have the union individuals in here

20   testifying about this yesterday.    And I am not going to lead

21   you by telling you what they said.    What do you recall?

22   A.    I recall Mrs. deLeon getting up, starting around

23   the table coming towards me.    Mrs. Willison had to

24   physically restrain her.    She had to get between Mrs. deLeon

25   and myself, and I believe had her hand trying to push or

74

1       pull Mrs. deLeon back.

2       Q.    Did Mr. Roznowski also have to hold her by the

3    arms?  If you recall.

4       A.    I don't remember that occurring.  I guess I was so

5    shocked by the action that had occurred and Mrs. -- excuse

6    me, Mrs. Willison had been immediately to my left so when

7    she stood up, she was right there and it kind of blocked my

8    view from what was transpiring as well.

9       Q.    Is it fair to say that both of those union

10   representatives had to physically remove her from the room?

11      A.    They did have to take her from the room.

12      Q.    And was she yelling at the time?

13      A.    She was visibly upset and yelling.

14      Q.    Relative to the one question that Mr. Nichols

15   asked you concerning, I believe it was 1990 to 2001 time

16   frame of other teachers that were on action plans.  You

17   indicated that the three people that you could think of,

18   which included Miss deLeon, were all tenured, correct?

19      A.    Best of my knowledge, yes.

20      Q.    And did -- one had more experience than

21   Miss deLeon, one had less experience in the matter of years

22   than Miss deLeon --

23      A.    Correct.

24      Q.    -- correct?  Were either of those other two

25   individuals Hispanic?

75

1    A.    No.

2    Q.    Did you target Miss deLeon for disciplinary

3    purposes because she was Hispanic?

4    A.    Absolutely not.

5    Q.    Did you ever target Miss deLeon for disciplinary

6    purposes because you believed that she was disabled or

7    because of her perceived disability concerning her mental

8    condition?

9    A.    No, I did not.

10    Q.    What was the purpose of the action plan that we

11    had discussed and has been marked as part of the record?

12    A.    The purpose of the action plan was to improve her

13    classroom performance so that we -- so that overall the

14    Spanish the students were learning, the disciplinary

15    referrals that we had seen, the lack of classroom

16    management.

17    Q.    Were these issues something that continued to

18    recur over a period of time?

19    A.    Yes, they have occurred repeatedly during

20    Mrs. deLeon's time at Meadville High School.

21    Q.    Was Miss deLeon amenable to the efforts of the

22    administration relative to assisting her in improving her

23    performance?

24    A.    No, she was not.

25    Q.    How did she react to constructive criticism?

1    A.    She did not accept it well.  She became defiant.

2    She could become verbal herself.  She would not open

3    documents you were trying to go over with her.  She would

4    look away and not listen to what you were saying.  This was

5    a repeated theme throughout different meetings that I had

6    had with her since as early as the early '90s.

7    Q.    Did you have similar situations with other

8    teachers?

9    A.    Yes.

10   Q.    And did you treat them in accordance with the same

11   objective criteria depending upon what their situations or

12   what their issues were?

13   A.    Right, the same, yes.

14   Q.    And relative to the action plans that we have been

15   talking about, these action plans are specifically designed

16   for an individual; is that accurate?

17   A.    That is correct.

18   Q.    To address their specific issues, correct?

19   A.    Right.

20   Q.    So I would assume that everybody's action plan is

21   different.

22   A.    Is different and some could be more in depth than

23   others depending upon the number of items that need to

24   addressed or the specific thing that you were trying to show

25   some improvement in performance on.

77

1    Q.   You said that you had recommended or agreed with

2   the recommendation that Miss deLeon be terminated.

3        A.   Yes.

4        Q.   What was your primary concern relative to her

5   continuing as a teacher?

6        A.   My primary concern was that the students, number

7   one, were not getting the education that they should be in

8   the Spanish language.  The conditions that existed in the

9   classroom as experienced in my one observation here of May

10  25th, 2001.

11            We were not seeing any improvement based on the

12  action plan that we had put together.  And the defiance,

13  inability to work with the administration in trying to

14  improve the situation.

15       Q.   There was a question that was posed to you

16  relative to a memorandum of April 7, 2003 which you

17  indicated that essentially Miss deLeon was insubordinate or

18  negatively saying things about the district, being

19  sarcastic, and that Mr. Nichols was asking about academic

20  freedom.  Isn't it accurate that the Crawford Central School

21  District is a governmental body; is that correct?

22       A.   Yes.

23       Q.   And in that regard, it is a union employer?

24       A.   Correct.

25       Q.   And there is a professional employees' union that

78

1    negotiated the contract that would be then acceptable to the

2    school district; is that correct?

3        A.    That's correct.

4        Q.    And the employees are to act in accordance with

5    that contract; is that right?

6        A.    Yes.

7        Q.    Is there also something called school code which

8    relates to the professional conduct expected of teachers,

9    tenured teachers specifically?

10        A.    Yes, there is.

11        Q.    And is there a specific detailed outline of how

12    and when teachers are to be appropriately disciplined

13    concerning their performance?

14        A.    Yes, there is.

15        Q.    And would those -- was the Collective Bargaining

16    Agreement followed concerning her termination?

17        A.    It was.

18        Q.    And was the code -- the school code followed

19    relative to her discipline and termination?

20        A.    Yes, it was.

21        Q.    And is insubordination a reason to be disciplined?

22        A.    It's a reason to be disciplined.  It's also a

23    reason for immediate dismissal.

24        Q.    Is willful neglect of duty also a reason for

25    dismissal?

79

1    A.    Yes, it is.

2    Q.    Is intemperance also a reason?

3    A.    Yes, it is.

4

5    MS. HEATH:  I have no further questions.

6    MR. NICHOLS:  Okay.  I have no further questions.

7

8    (Examination concluded at 3:50 p.m.)

9

10

11

12

13

14    *  *  *

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2                     C E R T I F I C A T I O N

 3

 4              I, Linda K. Rogers, Shorthand Reporter and

 5    Commissioner of Deeds in and for the Commonwealth of

 6    Pennsylvania, do hereby certify that I recorded

 7    stenographically the proceedings herein at the time and

 8    place noted in the heading hereof, and that the foregoing is

 9    an accurate and complete transcript of same to the best of

10    my knowledge and belief.

11

12

13

14

15

16

17

18

19

20                                    _____

21                                    Linda K. Rogers

22    Dated:  March 14, 2006

23

24

25
```

Linda K. Rogers
Commonwealth Of Pennsylvania
Commissioner Of Deeds
My Commission Expires