Multi-Page™

U.S. DISTRICT COURT

FOR THE WESTERN DISTRICT

OF PENNSYLVANIA

* * * * * * * *

CLAUDETTE DE LEON, *

Plaintiff *

vs. *   Case No.

*   05-126E

CRAWFORD CENTRAL *

SCHOOL DISTRICT *

CRAWFORD CENTRAL *

SCHOOL BOARD, *

Defendants *

MICHAEL E. DOLECKI, *

Superintendent, *

Defendant *

CHARLES E. HELLER, *

III, Assistant *

Superintendent *

Defendant *



DEPOSITION OF

CAROL A. TEMPLETON

April 25, 2006

Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.

EXHIBIT

4



Multi-Page™

## Page 2

```
 1            DEPOSITION
 2              OF
 3   CAROL A. TEMPLETON, taken on behalf of
 4   the Defendants herein, pursuant to the
 5   Rules of Civil Procedure, taken before
 6   me, the undersigned, Jacqueline L.
 7   Hazlett, a Court Reporter and Notary
 8   Public in and for the Commonwealth of
 9   Pennsylvania, at Crawford Central
10   School District Administrative Offices,
11   11280 Mercer Pike, Meadville,
12   Pennsylvania, on Tuesday, April 25,
13   2006, beginning at 10:01 a.m.
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1         A P P E A R A N C E S
 2
 3   CALEB NICHOLS, ESQUIRE
 4   P.O. Box 1585
 5   Erie, PA  16507
 6        COUNSEL FOR PLAINTIFF
 7
 8   ROBERTA BINDER HEATH, ESQUIRE
 9   Andrews & Beard
10   3366 Lynwood Drive
11   P.O. Box 1311
12   Altoona, PA  16603
13        COUNSEL FOR DEFENDANTS
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1               I N D E X
 2
 3   WITNESS:  CAROL A. TEMPLETON
 4   EXAMINATION
 5     By Attorney Heath           7 - 56
 6   EXAMINATION
 7     By Attorney Nichols        56 - 109
 8   RE-EXAMINATION
 9     By Attorney Heath         110 - 112
10   CERTIFICATE                     113
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1            EXHIBIT PAGE
 2
 3
 4   NUMBER  DESCRIPTION        PAGE
                            IDENTIFIED
 5    1  1/18/94 Letter to
 6       LaScola                 12
 7    2  1/5/94 Tardiness
 8       Letter                  19
 9    3  9/18/97 McCall Letter   27
10    4  10/10/97 Memo           24
11    5  10/3/97 Letter          25
12    6  Questionnaire           43
13    7  2/29/96 Tape Recording
         Memo                    75
14
15    8  3/19/96 Videotape Memo  82
16   10  10/1/97 Letter -
17       Detentions              89
18   11  Satisfactory
19       Evaluations            102
20
21
22
23
24
25
```

Multi-Page™

**Page 6**

```
 1   OBJECTION PAGE
 2
 3   ATTORNEY          PAGE
 4   Heath     72, 82, 84, 89, 93,
 5             95, 97, 101, 106
```

**Page 7**

```
     P R O C E E D I N G S

     CAROL A. TEMPLETON, HAVING FIRST BEEN
     DULY SWORN, TESTIFIED AS FOLLOWS:
     ---------------------------------
     EXAMINATION
     BY ATTORNEY HEATH:
     Q. Could you state and spell your
     name for the record, please?
     A. My name is Carol Ann Templeton,
     C-A-R-O-L, A-N-N, T-E-M-P-L-E-T-O-N.
     Q. Mrs. Templeton, my name is Robin
     Binder Heath and I represent the
     Crawford Central School District
     concerning an action brought by Ms. de
     Leon in Federal Court against the
     District and Mr. Dolecki and Mr. Heller
     in their capacities individually and
     also in their capacities as
     superintendent and assistant
     superintendent. And essentially, this
     case involves claims that Ms. de Leon
     was subjected to an ongoing pattern of
     harassment due to her national origin,
     her gender, and a perceived mental
```

**Page 8**

```
 1   disability. And we are here today to
 2   get your best recollection of your
 3   interactions with Ms. de Leon and some
 4   of your background information and your
 5   recollection and your take on the
 6   issues involved.
 7     As you can see, we have a
 8   Court Reporter here taking down
 9   everything that anyone in this room
10   would say. Therefore, it's important
11   that only one person speak at a time.
12   So I would ask that when I'm asking a
13   question, you wait and let me finish my
14   question before you answer the
15   question, similarly with Mr. Nichols.
16   Wait until he finishes asking you the
17   question before you answer. Also,
18   there may be an objection posed by an
19   attorney. If either side poses an
20   objection, please stop speaking until
21   we have taken care of that aspect.
22   Again, because there is a Court
23   Reporter, I would ask that you keep
24   your responses verbal as she cannot
25   take down a gesture such as a nod or a
```

**Page 9**

```
 1   shrug or things like uh-uh or uh-huh.
 2   Please say yes or no. If you don't
 3   understand my question, please let me
 4   know and I'll be happy to repeat or
 5   rephrase it for you. If you need to
 6   take a break at any time, let me know
 7   and we can accommodate you. Any
 8   questions?
 9   A. No.
10   Q. Are you currently employed?
11   A. No.
12   Q. And are you retired from the
13   School District?
14   A. Yes, I am.
15   Q. When did you retire?
16   A. I retired in 1999.
17   Q. And what was the last position
18   you held with the School District?
19   A. I was the assistant principal
20   for ten years.
21   Q. So approximately 1989 to 1999?
22   A. Correct.
23   Q. Could you just give us a brief
24   synopsis of your educational background
25   beginning with your college?
```

Multi-Page™

**Page 10**

1 A Okay. I didn't have college
2 prep when I was in high school. I had
3 no intention of coming to college. And
4 then my husband had a heart attack, so
5 I started college as an adult student.
6 I went to Seton Hill College, which is
7 an excellent college. I was on the
8 honor roll several times. After I
9 graduated from Seton Hill College, I
10 got a job with Norvin High School in
11 the Norvin School System. I worked
12 there as a home economics teacher and
13 department chairman for 18 years.
14 During that time, I got my
15 Master's Degree in Home Economics
16 Education. Then I started on another
17 program at Edinboro University to get
18 my certificate for administration. I
19 think it was about 1988, I believe. I
20 had that. I did my internship under
21 George Deshner. And the following
22 Fall, I was hired. After that I went
23 back to school again and received
24 another certificate in elementary
25 administration.

**Page 11**

1 Q So you have a certificate for
2 both secondary administration and
3 elementary?
4 A Yes. And while I was teaching,
5 toward the last year that I was
6 teaching, I was chosen as teacher of
7 the year from Seton Hill College. And
8 I was the only one there who was
9 selected by two students, not one. It
10 probably was the highlight of my
11 career.
12 Q And as an assistant principal,
13 would you describe your duties
14 generally, and also as they related to
15 personnel or supervisory issues over
16 professional staff?
17 A Okay. At the very beginning, we
18 were given student discipline mostly,
19 and observations, teacher observations,
20 teacher conferences. That was the ---
21 primarily the crew of my work.
22 Absenteeism.
23 Q Of students or teachers?
24 A Both.
25 Q Do you recall dealing with

**Page 12**

1 Claudette de Leon?
2 A Yes, I do.
3 Q And at the time, what was her
4 last name? Do you remember?
5 A Mitchell, I think.
6 Q Okay. It may have been
7 McCracken, also?
8 A Yes.
9 Q Let me just try to focus your
10 attention, if I may, and I know it's
11 quite some time ago, on the 1993 to
12 1994 school year. Do you recall any
13 issues concerning tardiness or a
14 failure to follow proper call-off
15 procedure being an issue with Ms. de
16 Leon?
17 A I don't recall anything
18 specific. Apparently, there was
19 something written in the handouts that
20 you gave me regarding ---.
21 Q I'm going to mark this letter as
22 Templeton One.
23 (Templeton Exhibit One
24 marked for
25 identification.)

**Page 13**

1 A And what page would that be?
2 Oh, is this where it starts out, Mr.
3 LaScola? '94?
4 BY ATTORNEY HEATH:
5 Q Yes. Let's take a look at this
6 January 18th, 1994 letter, please, ---
7 A Yes.
8 Q --- from Claudette Mitchell to
9 Mr. LaScola.
10 A All right. In the second
11 paragraph, my name is mentioned about
12 telling her that I wouldn't be able to
13 find a substitute and that I made her
14 come into school sick. I don't recall
15 that ever happening. That wasn't the
16 normal procedure at the time. When the
17 teachers called in sick, they called
18 into the office and/or the --- what's
19 it called, a service that provided
20 substitute teachers for them. If there
21 wasn't a substitute available, the
22 school secretaries alerted me. And I
23 never told a teacher that she had to
24 come into work if she was sick. I
25 never even asked them what was wrong

Case 1:05-cv-00126-SJM   Document 50-9   Filed 06/26/2006   Page 1 of 9

## Page 14

1 with them because I thought that was
2 their business. I was a teacher for 18
3 years. And teachers get sick a lot, so
4 I never --- I felt if they were sick
5 enough that they had to call in, then
6 we would do the best we could to find a
7 substitute for them. And I was the one
8 that was in charge of filling in the
9 blocks and the class periods for them
10 if we couldn't find a sub. And what we
11 would do, we'd get teachers who had
12 other duties and kind of jockey them
13 around to fill her schedule. And
14 sometimes we had up to three or four
15 teachers that out without subs. And if
16 we had to, the administrators led the
17 classrooms. But I never, ever told a
18 teacher to come in if they were sick.
19 Q.In looking at the same letter,
20 Exhibit One, on the second page, top
21 paragraph, Ms. de Leon is indicating
22 that you had talked to her about
23 student discipline and Mr. Destiner had
24 talked to her about the way she handled
25 student discipline. And do you recall

## Page 15

1 any discussion at or about that time
2 concerning Ms. de Leon's issues with
3 student discipline?
4 A.I don't know whether it was that
5 time or not, but our general handling
6 of that situation was that teachers had
7 to handle as much discipline as they
8 could in their classrooms. And then if
9 it was over and beyond what they could
10 do, they were to send them to the
11 office. And that was what we generally
12 did.
13 At that time, I think,
14 around the school, around the building,
15 the different teachers were having a
16 point system where they were giving
17 points to each student for different
18 problems in the classroom. The
19 students helped to create that list of
20 disciplines.
21 Q.You mean different infractions?
22 A.Yes. It was like a
23 student/teacher interaction thing where
24 they would spend a whole period setting
25 up their consequences and they would

## Page 16

1 get points for them. And then whenever
2 they reached a number of points, then
3 they would get some kind of penalty, a
4 consequence.
5 Q.And was that an issue or a
6 problem that Ms. de Leon had?
7 A.Well, I suggested it to her that
8 she would do that.
9 Q.What had she been doing
10 previously?
11 A.They were coming to the office
12 constantly for minor infractions, for
13 things, I don't know, even time-outs.
14 We had more people coming from her
15 class than any other class, and more
16 than one. Sometimes there was like a
17 quarter of her class that would come
18 into my office about something that was
19 happening in her classroom. So we had
20 a real problem there.
21 Q.Did you ever say --- if you look
22 at the top of the last paragraph on
23 page two of Exhibit One, Mrs. Templeton
24 told me that I should be able to handle
25 my discipline problems within my

## Page 17

1 classroom. She also said that every
2 time I sent a student to the office, it
3 required a lot of paperwork and that
4 she didn't have time to handle it for
5 me. Do you recall telling her that the
6 paperwork was the issue?
7 A.No. It was all computerized at
8 that point. We did have several pieces
9 of paper that we had to send out if we
10 gave them a detention, but I don't
11 recall that that was something that I
12 would have discussed with a teacher.
13 Q.And it is accurate though that
14 teachers were supposed to handle most
15 of the discipline in their classroom?
16 A.Absolutely.
17 Q.And other teachers ---
18 A.Did.
19 Q.--- did?
20 A.Yes.
21 Q.The next paragraph indicates
22 that there was a meeting with Mrs.
23 Templeton, Mrs. Dixon, Mr. Fiorillo,
24 Mr. Bowser and Mr. Larry Williams. And
25 I think what she's trying to say there

Multi-Page™

Page 18

1 is she was mortified. And then she
2 said, five minutes before the meeting
3 took place, Mrs. Templeton was very
4 argumentative and said that she had
5 called for such a meeting because she
6 was very concerned about the parents
7 who had come to school for conferences.
8 Mrs. Templeton wrote on several
9 misconduct records that I should call
10 the parents, so that is what I did. Do
11 you recall anything at or about this
12 time of January 1994?
13 A. I don't remember that meeting at
14 all. I'm sorry. It may have happened.
15 But another procedure, she's correct in
16 my telling them for --- if the
17 teacher's having a problem in a
18 classroom --- I made the statement in a
19 general meeting. I said, if you're
20 having a problem with students in the
21 classroom, then call the parent and let
22 them know what's happening if it's a
23 consistent problem. But, I also added,
24 if the student has improved and has
25 done something special, call them again

Page 19

1 and tell them. You know, Johnny did a
2 wonderful job. He made an A on his
3 test. It may have been the first A he
4 made all year. You know, don't just
5 keep barraging that parent with mean,
6 negative phone calls.
7 Q. Let me just ask you this. With
8 regard to those phone calls, would
9 those phone calls to the parent
10 concerning a student be made in front
11 of the classroom of all the other
12 students?
13 A. Absolutely not. They would be
14 made in the office in private.
15 Q. Okay. Let me show you what
16 we'll mark as Exhibit Two. And this is
17 a two-page letter --- or, memo, I
18 should say, to Claudette Mitchell from
19 George Deshner dated January 5th, 1994,
20 concerning tardiness to school.
21 (Templeton Exhibit Two
22 marked for
23 identification.)
24 A. Uh-huh (yes).
25 BY ATTORNEY HEATH:

Page 20

1 Q. Do you recall any issue
2 concerning Ms. de Leon and being tardy
3 to school? And I believe this was also
4 addressed in the prior exhibit, as
5 well.
6 A. Yes. I remember vaguely that we
7 were --- the principals and the
8 administration is mostly out in the
9 outer office or out in the halls early
10 in the morning until after the bell
11 rings. And we noticed that she was
12 coming in late often.
13 Q. Now, how was her classroom at
14 the time? How was it situated in
15 relation to the office?
16 A. Well, most of the time, since
17 she was low man on the totem pole in
18 the school, in other words, she was the
19 newest member of our faculty for a
20 while, she was given --- I think she
21 was a traveling teacher for a while.
22 She was given a trailer once, and then
23 we finally got enough room in our
24 building, I think after the
25 construction, to give her a classroom.

Page 21

1 I'm not real sure about that, but I
2 know she had a classroom. The
3 classroom was next to the guidance
4 office, the guidance wing. And that's
5 the only classroom that's actually
6 close to the office area so that if we
7 saw students come out early or --- it
8 was much more visible to us at that
9 time.
10 Q. So when you say that you would
11 notice her coming in late, or you would
12 notice students coming out of her
13 classroom early, did you have any type
14 of plan to pick on her specifically or
15 was it a matter of location?
16 A. I think it was a matter of
17 location.
18 Q. And I say that because
19 essentially, what the Plaintiff --- one
20 of her allegations in her amended
21 complaint in Federal Court is that she
22 was singled out and treated differently
23 based on her national origin and her
24 gender.
25 A. No.

Case: 05-cv-00126-SJM   Document 60-5   Filed 06/26/2006   Page 7 of 29

Page 22

1 Q. Was her national origin ever an
2 issue with you?
3 A. No. Not with me. I have
4 Mexican relatives, so it's never been
5 an issue with me.
6 Q. Did any one from the
7 administration direct you to single out
8 Ms. de León?
9 A. Never.
10 Q. Did Mr. Bestner ever tell you
11 that he had problems with her because
12 of her national origin?
13 A. Never.
14 Q. How long did you work with Mr.
15 Bestner, ¿la years?
16 A. I've worked with Mr. Bestner for
17 over ten years because I did my
18 assistanceship with him.
19 Q. In your experience, did you find
20 him to be biased towards women?
21 A. Never. In fact, he was very
22 pro-women. He treated me right along
23 with a lot of respect. And I was the
24 first woman administrator in that
25 building, and we worked wonderful

Page 23

together.
1 Q. Let me ask you to take a look at
2 what we'll mark as Exhibit Three, which
3
4 is a memorandum from you to Claudette
de Leon McCracken, dated September 18,
1997, concerning a student named Brian
McCall.
A. Okay. I had forgotten about
that until I actually read this.
Q. Okay. Hang on a second. She's
got to mark it.
(Templeton Exhibit Three
marked for
identification.)
BY ATTORNEY HEATH:
Q. Does this memo refresh your
recollection concerning an instance
regarding Brian McCall in 1997?
A. A little bit. Brian wanted out
of the class and he was sent to the
library. And I had to inform Mrs. de
Leon that we didn't do that. We had to
keep the child in the classroom. You
didn't use the library. And I did that
with several teachers who would send

Page 24

1 behavior problems or something like
2 that to the library because the library
3 was just getting overloaded. And she
4 wasn't the only one that I had talked
5 to or sent a letter to regarding
6 something like this.
7 Q. And we're going to go through
8 several more documents, and I'll ask
9 you specific questions about those
10 documents and I'll ask you some more
11 general questions.
12 A. Okay.
13 Q. The next document I'd like to
14 show you is a handwritten notation
15 signed by you dated October 10th, 1997.
16 (Templeton Exhibit Four
17 marked for
18 identification.)
19 A. Yes. And that's when she had
20 her classroom. And she was situated
21 next to the guidance counselor. The
22 guidance suite is just down the hall
23 from us.
24 BY ATTORNEY HEATH:
25 Q. And you had indicated earlier

Page 25

1 that because of where her classroom was
2 located in relation to the office, to
3 you, it was very visible when the
4 students would come out?
5 A. Yes. It was very visible, yeah.
6 Q. And do you recall anything more
7 specifically about any response to this
8 note or any discussion with Ms. de Leon
9 concerning this issue?
10 A. I don't recall. I don't recall
11 that.
12 Q. Okay. The next document I'd
13 like to show you is a three-page
14 document to Claudette McCracken from
15 you dated October 3rd, 1997, concerning
16 a meeting.
17 A. Yes.
18 Q. And I'm going to ask you to take
19 a minute and take a look at that.
20 (Templeton Exhibit Five
21 marked for
22 identification.)
23 BY ATTORNEY HEATH:
24 Q. Did you have an opportunity to
25 took at that document?

Multi-Page™

Page 26

1 A.Yes. This is the second time I
2 read it, and I remember it quite well.
3 Q.Let's start with the first
4 paragraph and work our way through it.
5 It indicates that on September 30th,
6 four students came into my office
7 upset. What do you recall about that?
8 A.Okay. They came out of her room
9 and they were really upset because they
10 said that her discipline was unfair.
11 So I asked them to write down their
12 complaints or the specific problems
13 that they had with the classroom,
14 together as a group.
15 Q.Now, before this actually
16 occurred in September of 1997, had you
17 had any issues with Ms. de Leon and her
18 classroom discipline before? I know in
19 looking at Exhibit One there was some
20 mention made about that in 1994. Do
21 you recall there being any kind of
22 pattern concerning disciplinary
23 problems?
24 A.Only vaguely that there were and
25 that it's something that we had to

Page 27

1 continue to work on.
2 Q.With her ---
3 A.Yes.
4 Q.--- over the years?
5 A.Yes.
6 Q.Okay. Go ahead. Around
7 September 30th, you asked them to
8 compile their complaints?
9 A.Yes. And they compiled their
10 complaints. Then I had asked Claudette
11 to sit down with me and we'd go over
12 those complaints. Now, at that
13 meeting, she did bring in Mrs. Gourley,
14 which is okay. They had a right to
15 have a teacher representative. In
16 fact, I was once at one time. However,
17 at that point in time, I was involved
18 with a student mediation, peer
19 mediation program that was ---
20 actually, it started in factories in
21 Japan where they started to use this
22 mediation plan where they involved a
23 lot of input from all the parties that
24 were involved. And the procedure was
25 that nobody was allowed to speak until

Page 28

1 another person had finished speaking,
2 and you gave everybody equal time,
3 quiet time to talk, and then they came
4 together and came to some conclusions.
5 We got about halfway through ---
6 Q.Were you trying to implement
7 this strategy at this meeting?
8 A.Yeah. It worked very well with
9 other teachers and in meetings with
10 parents and so on. So what you do is
11 you set up the guidelines right at the
12 very beginning. And I recall telling
13 Mrs. Gourley that she is not to speak
14 until the end, until she's given the
15 opportunity to speak, that she would be
16 given that opportunity, and that Mrs.
17 de Leon was not to speak until I
18 finished going through the list. And
19 then after that, she would be able to
20 address the items on the list.
21 Well, I think we got about
22 halfway through that list and she just
23 was very accusatory. She said I'm
24 listening to the kids and not her. And
25 all kinds of things came down, and I

Page 29

1 ended up having to conclude the overall
2 meeting. She started to get personal.
3 Q.With you?
4 A.Yes.
5 Q.Meaning what?
6 A.Well, like I was picking on her
7 and that kind of thing.
8 Q.Now, looking at page two, is
9 this what you're talking about?
10 A.Yeah.
11 Q.If you look at the top of page
12 two, you say, Ms. de Leon McCracken
13 continued to interrupt me with personal
14 interjections regarding the students.
15 A.Yes.
16 Q.And then those are listed?
17 A.Uh-huh (yes).
18 Q.Is that accurate?
19 A.Yes.
20 Q.And did she take any
21 responsibility or any direction from
22 you at this meeting in order to improve
23 or ---?
24 A.I felt that she felt that this
25 was not supposed to be a constructive

1 meeting, that this was just a let's
2 pick on Claudette meeting. I was
3 really hoping to get something out of
4 this where the kids could go back into
5 the classroom and be more comfortable
6 in the atmosphere and be able to learn.
7 These students that came into my office
8 were not bottom-level students. They
9 were quite bright kids.
10 Q.And their concerns were
11 essentially ---?
12 A.And they were very concerned
13 about their grades and the classroom
14 and the way they were treated. And I
15 found through the years that the kids
16 --- when you discipline a kid, and if
17 it's fair treatment, they take it very
18 easily because they know what's coming
19 if they've done an infraction of a
20 discipline. However, if they're being
21 treated unkindly or unfairly, they will
22 retaliate. And I was trying to defuse
23 that.
24 Q.And was Ms. de Leon at all
25 receptive to your ---

1 A.No, she wasn't.
2 Q--- information?
3 A.Not at all.
4 Q.And if you go down towards the
5 bottom of the page ---. Well,
6 actually, you were discussing with her,
7 on the first page over to the second
8 page, the point system ---
9 A.Yes.
10 Q--- regarding the discipline and
11 particular rules?
12 A.Uh-huh (yes).
13 Q.And what was her response when
14 you were discussing specific guidelines
15 that were to be implemented on a
16 consistent basis?
17 A.Well, she was --- you see,
18 education has gone from one end --- or
19 it has changed as far as discipline.
20 When I was in school, the teacher was
21 the ruler, period. But it has
22 progressed. And also, the principal
23 was the ruler, and teachers never
24 questioned the principals, okay? But
25 since, over the years, anyone who has

1 any input on the process has a right to
2 some input in the process. Are you
3 following me?
4 Q.Yes.
5 A.Okay. So therefore, now it's
6 more of a democratic situation. The
7 classroom is a democratic situation
8 rather than a dictatorship. And she
9 said, it's my classroom. I'll run it
10 the way I want. That's the way her
11 attitude was right down the line.
12 Q.And did you point out that you
13 had concerns relative to her rules that
14 were not being implemented?
15 A.They weren't flexible enough.
16 And some of them were just outrageous.
17 Q.And they weren't implemented
18 with consistency?
19 A.Right. Favoritism was one of
20 the things the kids were really upset
21 about.
22 Q.Meaning what?
23 A.Well, she would favor one group
24 over another group.
25 Q.And implement different rules

1 or ---?
2 A.And different consequences for
3 the same infraction. And they
4 just ---.
5 Q.And if you look at your last
6 page of this three-page document, at
7 the bottom, what are those? Are those
8 conclusions?
9 A.Yes.
10 Q.What do they indicate?
11 A.Well, that she shows open
12 favoritism, and she does. She assigns
13 different consequences to the same
14 offense. That's exactly what I just
15 said. And she has her students working
16 on other students. They were to report
17 disruptive students if they saw them
18 misbehaving. But she had the students
19 doing things that she should have been
20 doing in her classroom. You don't do
21 that.
22 Q.You mean to have students turn
23 in each other?
24 A.Yes.
25 Q.Now, I don't mean to jump around

**Multi-Page™**

Page 34

1 here, but going back to the second page
2 of this document, towards the bottom it
3 says, I concluded the meeting when Ms.
4 de Leon McCracken began pointing her
5 finger at me and making accusatory
6 statements such as, you are
7 unprofessional You are always siding
8 with the students. Mrs. Templeton,
9 you, in caps, knows that we have this
10 thing between us. I said, no, would
11 you explain? And she says, because of
12 what has happened in the past, I know
13 you were trying to get rid of me. She
14 was pointing and raising her voice.
15 And I again denied her accusations. Do
16 you recall that outburst?
17 A.I remember her saying that, but
18 I still to this day don't know what she
19 means, this thing between us, because I
20 treat all teachers the same.
21 Q.In looking at her complaint that
22 she had filed with the Federal Court,
23 one of the allegations is that she was
24 retaliated against by the
25 administration because she had filed

Page 35

1 grievances and/or contacted the
2 Pennsylvania Human Relations Commission
3 relative to her complaints. Was that
4 an issue with you?
5 A.Never.
6 Q.Did you target her after you
7 know that she had --- and I know you
8 were aware of the grievances that had
9 been filed and were involved ---
10 A.Sure.
11 Q--- in some of those hearings.
12 A.Yes.
13 Q.Did you target her specifically
14 after that?
15 A.Never.
16 Q.Did you have a plan to get rid
17 of her?
18 A.No.
19 Q.Relative to what you were trying
20 to discuss with her concerning student
21 discipline, were your expectations
22 essentially the same as they were for
23 other teachers?
24 A.Absolutely.
25 Q.Did other teachers with whom you

Page 36

1 worked during this time frame give you
2 the same amount of --- or have the same
3 issues that she had?
4 A.No.
5 Q.You indicated that students
6 would come to the office relative to
7 disciplinary problems from her
8 classroom all the time?
9 A.Uh-huh (yes).
10 Q.Was that more than other
11 teachers?
12 A.Oh, yes. It was constant.
13 Q.And other teachers were not
14 having this problem?
15 A.No.
16 Q.At this time, at this meeting,
17 was Ms. de Leon raising her voice?
18 A.Yes. She was yelling. She was
19 out of control.
20 Q.And what did you conclude at
21 that time?
22 A.Well, I couldn't get through to
23 her. I felt that the meeting wasn't
24 successful. I wasn't able to have any
25 kind of conclusion. I thought she

Page 37

1 looked at that list that the students
2 had written as a threat to her
3 position. And meetings with teachers,
4 whether it's on something like this or
5 whether it's sitting down and talking
6 to her about her evaluation, are always
7 supposed to be productive. That's the
8 tool that we use to better teachers,
9 make teachers better. It was for me.
10 Q.The evaluation and the
11 observations?
12 A.Sure. You always improve.
13 Q.You're constantly improving. And
14 you're not expected to know everything
15 Is there is about everything. And if
16 somebody else can give you more insight
17 as to a better way of doing something,
18 then it's supposed to be used in that
19 vein.
20 Q.And as an administrator, were
21 you coming from --- relative to your
22 interactions with teachers, were you
23 coming from --- or did you rely on the
24 fact, or your experience, that you had
25 been a teacher yourself?

Case 1:05-cv-00126-SJM   Document 50-9   Filed 06/26/2006   Page 11 of 29

Page 38

1 A.I don't understand what you're
2 saying.
3 Q.I'm not articulating my question
4 very clearly. When you became an
5 assistant principal, did you utilize
6 the tools that you had learned when you
7 were a teacher in your interactions
8 with teachers?
9 A.Some of them. Some of them I
10 learned from the other teachers. I
11 think my best resource was with the
12 special ed department. They had
13 there, I was gleaning things from them,
14 wonderful -- when I did observations
15 as well as my making recommendations as
16 we went along. The English department,
17 some of the procedures they used that
18 they got from workshops and brought,
19 you know, to the floor, I would use and
20 suggest to other teachers. So it was
21 like a sharing of different methods and
22 procedures. Like the point system, I
23 didn't think that up. That was
24 something that the special ed
25 department had been using. And I'll

Page 39

1 say they have probably the hardest
2 problem with discipline. And they've
3 been using it, and very successfully.
4 Q.And in suggesting those kinds of
5 tools to Ms. de Leon, were you trying
6 to criticize her, or put her on the
7 defensive in any way, or threaten her
8 job?
9 A.Not in any way, no.
10 Q.What was your purpose?
11 A.My purpose was to make her a
12 better teacher, to take suggestions and
13 apply them to her classroom. And if it
14 didn't work, then come back to the
15 drawing board and we'll rehash it and
16 maybe find out something --- I'm very
17 creative. We could find out a
18 different way of doing something.
19 Q.Did she ever cooperate with you
20 and work with you in that regard?
21 A.I don't recall that she ever
22 did.
23 Q.And how did she react?
24 A.Oh, excuse me. Yes, she did.

Page 40

1 I'm sorry. And that would be jumping
2 to another thing. I suggested one time
3 that --- this is what I did because I
4 picked it up in college classes, to
5 evaluate my class at the end of the
6 year. And as they evaluated --- you
7 had a very general format. And I think
8 I gave her a copy of it. I think I dug
9 it out and gave her a copy of it. And
10 it was what do you like best about my
11 class? What do you like the least
12 about my class? What would you suggest
13 I could improve? But it wasn't --
14 specific. It was just kind of a
15 generality. And then there was always
16 a statement. And I gave those to each
17 one of my students at the end of every
18 year that I taught. I read through
19 them and then I would take them into
20 consideration. And I think that by the
21 end of my teaching career, like I said,
22 I became very good in my classroom.
23 Q.And you think she did that?
24 A.I don't think she ---. She was
25 very interested in it, but she made up

Page 41

1 her own and it was a lot of different
2 questions that I would never have put
3 in an evaluation form.
4 Q.Meaning what? Were they
5 inappropriate questions?
6 A.Yeah, I felt that they were. I
7 mean, they weren't general. They were
8 too specific.
9 Q.While I'm looking for my
10 exhibit, relative to Ms. de Leon and in
11 working with her over the years, did
12 you have any --- did you see any issues
13 that continued to recur over the years
14 that you addressed with her?
15 A.I didn't see any improvement.
16 Q.And what kind of issues are we
17 talking about?
18 BRIEF INTERRUPTION
19 BY ATTORNEY HEATH:
20 Q.What kind of issues are we
21 talking about? I'm sorry. Do you
22 recall?
23 A.Her classroom discipline didn't
24 seem to improve at all. I think the
25 last year that I was there, I did an

Multi-Page™

Page 42

```
 1 observation in her class.  And after
 2 the observation, students came to me
 3 and said that it was not a normal
 4 classroom, that that was one of the
 5 better classes that I had observed,
 6 that they weren't normally like that.
 7 They were mostly just given handouts or
 8 --- they weren't learning anything.
 9 But that was from the students coming
10 to me.  And I don't think they were bad
11 students.  I think they were about C or
12 B students.
13 Q.Did they ever come to you
14 concerning losing assignments?
15 A.Something comes to my mind ---
16 Q.Or notebooks?  Missing
17 notebooks, anything like that?  Do you
18 recall anything like that?
19 A.I don't recall any --- I
20 recall something, but I'm not sure if
21 it's with her or not.  I remember one
22 time a bunch of kids came to me and
23 said that their papers were all lost
24 because they flew out the back window
25 of a car.  But I don't remember whether
```

Page 43

```
 1 it was her car or another teacher's,
 2 you know, so I can't be specific there.
 3 Q.Let me mark this as Exhibit Six.
 4 And I'll ask you to take a look at
 5 that, please.
 6 (Templeton Exhibit Six
 7 marked for
 8 identification.)
 9 A.Yes.  This is what I was
10 referring to.
11 BY ATTORNEY HEATH:
12 Q.And is this, when you had
13 indicated to her about the self
14 evaluation process being a tool ---?
15 A.Yes.  See, first of all, there's
16 37 items.
17 Q.Yes.  It shouldn't be that in
18 general items.  She did use the first
19 two.  What do you like most about my
20 class?  What would you change?  Those
21 it?  What would you change?
22 things I kept on mine.  I didn't go
23 into grading because we have a school
24 policy on grading.  Should class
25 participation be part of your grade?
```

Page 44

```
 1 That should be the option of the
 2 teacher.
 3 Q.Let me just direct your
 4 attention to ---
 5 A.And it didn't cover discipline.
 6 Q--- the third page.  It has
 7 number two at the top, but it's
 8 actually the third page.  It starts
 9 with number 24 and it talks about
10 grading.
11 A.Uh-huh (yes).  What is the
12 purpose of getting a report card?
13 Q.Yes.  Then it says --- look at
14 number 26.  Can you read that?
15 A.Have you been encouraged to
16 discuss personal matters on a
17 confidential basis?  That's
18 inappropriate.
19 Q.And looking down towards the
20 bottom there, look at number 34.  What
21 does that say?
22 A.How often did I make PMS jokes?
23 What did I say?  Again, that's
24 inappropriate.
25 Q.Look at the last page, number
```

Page 45

```
 1 36.
 2 A.Thirty-six (36)?  How often do I
 3 talk about my daughter and what did I
 4 say?  Again ---
 5 Q.And that would be inappropriate?
 6 A.Uh-huh (yes)
 7 Q.Now, in reviewing this material,
 8 does it refresh your recollection at
 9 all as to some of the issues that had
10 come up in the past with her concerning
11 inappropriate discussions she may have
12 had in her classroom?
13 A.From what we were told from
14 other students, yes.
15 Q.And what do you recall?
16 A.Well, I recall that --- and this
17 is hearsay from the students and things
18 and what they would say, that she'd
19 badmouth the administration quite a
20 bit, which, you know, it's her right to
21 do that, but not in front of the
22 students.  That she talked --- I really
23 --- it would be very ---
24 Q.Did you hear about the PMS
25 comments?
```

**Page 46**

```
 1  A.Yeah, I' 've heard about those
 2  and ---.
 3  Q.And about her daughter?
 4  A.I've heard about her talking
 5  about her daughter, but I don't
 6  remember what exactly she was talking
 7  about.
 8  Q.Was it something about her
 9  dress?
10  A.I don't know.
11  Q.Do you recall student
12  confidentiality, a breach of student
13  confidentiality, being an issue with
14  her, talking about students'
15  grades ---?
16  A.No, I don't remember that.
17  Q.Accusing kids of being cheaters,
18  anything along those lines?
19  A.Yes. That. She was very
20  ...
21  Q.Did you ever recall something
22  about her, during spirit week, wearing
23  a bra outside of her shirt?
24  A.Yes. Spirit week was a week
```

**Page 47**

```
 1  where every day, they're assigned a
 2  certain thing. The kids made them up.
 3  One day they all wear all black. One
 4  day they wear all whatever color or
 5  whatever they'd make up, a pajama day
 6  or something like that. This one
 7  particular day was inside-out day,
 8  which is a common one. And we just
 9  turn our shirts and our sweatshirts and
10  clothes inside-out. Claudette came
11  into school with her bra on the outside
12  of her dress. I didn't see it. None
13  of the administration had seen it. But
14  the students started to come into the
15  office after about the first period,
16  and we went down, and at that point,
17  somebody had already told her that that
18  was inappropriate.
19  Q.Was it disruptive?
20  A.Well, certainly it was
21  disruptive. The kids were ---.
22  Q.In your opinion, did that show
23  good professional judgment?
24  A.No. Very poor professional
25  judgment. I think she probably thought
```

**Page 48**

```
 1  that she was going to come into school
 2  and see all the teachers dressed like
 3  that, but apparently somebody told her
 4  that it wasn't appropriate.
 5  Q.Do you recall anything else, as
 6  you sit here today, about your
 7  interactions with Ms. de Leon other
 8  than what we've already talked about?
 9  A.Only that my overall feeling was
10  that she was always very hostile during
11  any kind of a conference or meeting.
12  She took everything very personally and
13  did not apply any suggestions to her
14  classroom or her professionalism.
15  Q.We had a woman come in yesterday
16  for a deposition who used to be a
17  teacher with the School District named
18  Debra Englebaugh. And she taught a
19  couple of years in the early 1990s at
20  the Meadville High School. It was her
21  contention that she was singled out and
22  discriminated against because she was a
23  woman, and she mentioned specifically
24  Mr. Deshner and she did mention you, as
25  well. Do you recall Mrs. Englebaugh?
```

**Page 49**

```
 1  A.I vaguely recall. She wasn't
 2  there at the high school for very long.
 3  And again, she was on the other --- she
 4  was, again, in one of the classrooms
 5  that was closest to the office. She
 6  was in the art department and she
 7  taught photography. I can't recall her
 8  face right now, but I remember some
 9  things. I remember that when she came
10  into school, she looked like she fell
11  out of bed. I mean, her clothes were
12  wrinkled. Not dirty, but very
13  unprofessional. And I remember very
14  clearly she liked having the students
15  like her rather than being a teacher
16  and a leader. She wanted to be one of
17  them. She seemed to --- that's where
18  she was going. And I remember that she
19  talked a lot about the administration.
20  She was very anti-administration for
21  some reason.
22  Q.Talked to the students about it?
23  A.Yes. And at one point, there
24  was a poster on her hall board where
25  she put her displays that was very
```

**Multi-Page™**

Page 50

1 anti-administration. And that happened
2 a couple of times.
3 Q.And do you recall an issue where
4 she was accusing the administration of
5 listening into her classroom ---
6 A.Right.
7 Q.-- on an intercom?
8 A.Yeah. I don't know where she
9 got that. If she would have come to
10 the administration and talked to us
11 about it or something, maybe we could
12 have found out why she thought that
13 way. We were never allowed to, nor did
14 we want to, listen into a classroom. I
15 mean, we didn't ---
16 Q.And specifically, was that
17 something with an actual directive?
18 A.That was never a directive. In
19 fact ---
20 Q.I mean that you would not do it?
21 A.Oh, absolutely. That was just
22 something we just never would do, never
23 listened in on a --- she may have heard
24 some clicking. Maybe they were going
25 to make an announcement and there was

Page 51

1 some clicking on it, you know, on the
2 loudspeaker. And sometimes the
3 loudspeakers weren't working right.
4 You know, she may have heard that. She
5 may have heard this hollow sound.
6 Sometimes maybe it was left on after an
7 announcement. You know, I don't know
8 because she never came to us about
9 that. But we never actually --- we
10 never did that. She used to cover up
11 her windows. I mean, she used to do
12 things. She'd cover up -- we'd do ---
13
14 Q.Windows meaning what, to the
15 hallway?
16 A.The hallway, yeah. Well, she
17 needed dark in her room, but she
18 covered up the windows all the time.
19 And I remember we had to tell her a
20 number of times to keep that open.
21 Even our office window --- we have a
22 little window in our office. Even the
23 office windows for my office, that
24 window's supposed to be kept open and
25 clear. If something happens in that

Page 52

1 classroom and we're walking by, we have
2 the right to go into that classroom.
3 Q.But you couldn't see in,
4 obviously?
5 A.We couldn't see in, no. It's
6 more of a safety thing than anything
7 else.
8 Q.Do you recall any issues with
9 regard to hall passes and students?
10 A.Oh, she used to give hall
11 passes. Kids were walking around the
12 halls with these passes like the whole
13 period.
14 Q.And you did discuss these issues
15 with her?
16 A.Oh, sure. They were routine
17 questions and routine things. That's
18 what we would do with any teacher.
19 Q.And did you single her out
20 because she was a woman?
21 A.No. I'm a woman.
22 Q.And percentage-wise, would you
23 say that there was a higher percentage
24 of women within the District than men,
25 teacher-wise?

Page 53

1 A.In the high school --- oh,
2 within the District, yes, of course.
3 In the high school level, the ratio is
4 a little bit more evened out.
5 Q.Mrs. Englebaugh was indicating
6 that she believed that she was a victim
7 of the old boys club. And I asked how
8 you fit into that scenario. Were you
9 ever directed that your job was on the
10 line to try to --- that you had to
11 harass her?
12 A.Never.
13 Q.Or intimidate her?
14 A.Absolutely not.
15 Q.Did Mr. Deshner ever indicate to
16 you that he had some issue when he
17 wanted his friend, Mr. Gettys, in that
18 photography position?
19 A.Absolutely not. Mr. Deshner had
20 friends because he was a teacher in the
21 building for years and years and
22 and had friends. But when he became a
23 principal, he was a principal --- and I
24 maintained this, too. You can have
25 friends as well as --- but if that

Page 54

1  friend screwed up, you have the right -
2  -- I'm sorry. If the friend fouled up,
3  that you were the principal and you had
4  to go to that friend, which is a hard
5  thing to do, but you have to go to that
6  friend and tell them, you know. And if
7  he wasn't the right person for the job,
8  or he was the better person for the
9  job, either way, you're acting as a
10  principal, not as a friend.
11  Q And relative to Mr. Gettys, in
12  fact, Mr. Deshner had you do his
13  observations?
14  A J was in charge of the
15  observations for the entire art
16  department. And his observations
17  always were unsatisfactory,
18  consistently unsatisfactory. He was an
19  excellent teacher in the classroom. He
20  had a great rapport. He was very
21  artistic. He had a lot of really great
22  things happening in the classroom.
23  However, he never wrote his lesson
24  plans, and that's a procedure that we
25  require, mostly for substitute

Page 55

1  teachers, but for our own sake, too.
2  And he never had his lesson plans.
3  And after meetings with him ---
4  and I'm talking about this in front of
5  other teachers, this isn't professional
6  on my part.
7  Q No, no, because it's a lawsuit
8  and it is permissible.
9  A Okay. But even after I had
10  meetings with him --- we had very
11  congenial meetings. He knew what he
12  was doing wrong. I knew what he was
13  doing wrong. And he continued to do it
14  wrong. It's nothing that he would be
15  fired about, you know, or we would
16  never --- because it wasn't --- it
17  didn't involve the actual students.
18  Because he was really good with
19  students. He had a rapport with the
20  students that was outstanding.
21  However, he wasn't one of the kids. He
22  always maintained that he was the
23  teacher in the classroom.
24  Q And even though he was Mr.
25  Deshner's friend, you were still taking

Page 56

1  him to task about issues that he ---?
2  A He was a friend of Mr.
3  Deshner's, I think, in college. That
4  goes back a way long time. And I don't
5  remember him ever being in his office
6  for any length of time.
7  Q What I'm asking is, did Mr.
8  Deshner give him preferential treatment
9  because he'd known him for a long time?
10  A No, no. George never did that
11  to anyone.
12  Q That being what?
13  A Preferential treatment. He
14  treated everybody the same.
15  Q Regardless of gender?
16  A Regardless of gender.
17  Q Regardless of friendship?
18  A Regardless of friendship.
19  Q Regardless of national origin?
20  A Absolutely.
21    ATTORNEY HEATH:
22    I have no further
23    questions.
24    EXAMINATION
25  BY ATTORNEY NICHOLS:

Page 57

1  Q Ms. Templeton, I'm Caleb
2  Nichols. I'm representing Ms. de Leon
3  ---
4  A Okay.
5  Q --- in this proceeding, this
6  lawsuit that's been referred to. I
7  have a few questions I'd like to ask
8  you.
9  A Certainly.
10  Q Your tenure with the School
11  District was from 1989 to 1999?
12  A Correct.
13  Q Okay. And you haven't been
14  associated, affiliated or worked with
15  the School District since 1999; is that
16  correct?
17  A That's with this school
18  district.
19  Q Right. With this school
20  district.
21  A Right. I've been a substitute
22  at Lee County in Florida.
23  Q Okay.
24  A And I'm still on their records
25  as a substitute.

Multi-Page™

Page 58

1 Q During the course of your
2 previous testimony, you referred to
3 --- you said that Ms. de Leon was a,
4 quote, traveling teacher.
5 A Uh-huh (yes).
6 Q What does that mean?
7 A Well, we had not enough rooms
8 for the teachers. So what we did with
9 Mrs. de Leon is she had a little cart
10 that she pushed around with all her
11 things, and she had to be assigned ---
12 we tried to give her one room in other
13 times as we could, you know, in other
14 words, lump at least two periods in a
15 row or three periods in a row in one
16 class. But sometimes we couldn't. It
17 was a matter of scheduling.
18 Q A traveling teacher does not
19 have a homeroom, so to speak?
20 A Not at that point, no. We
21 didn't have homerooms for traveling
22 teachers.
23 Q So they necessarily move from
24 one classroom to another; is that
25 correct?

Page 59

1 A Correct. That's a tough job.
2 Q Right. And it's tough because
3 partly for the logistics of it,
4 physical logistics, having to move,
5 travel?
6 A Uh-huh (yes).
7 Q Why is it tough?
8 A Well, it's tough because for one
9 reason --- one of the reasons it's
10 tough is just the physical thing of
11 moving that cart around.
12 Q Right.
13 A She had to leave as soon as the
14 bell rang. She didn't have any
15 downtime, like that three minutes
16 between class periods where other
17 teachers --- if the student wanted to
18 stop and talk, she didn't have that
19 luxury unless they walked with her, you
20 know, through the hall. Those little
21 things.
22 Q What period are we talking about
23 she functioned as a traveling teacher?
24 What period are we talking about?
25 A I can't really tell. It seemed

Page 60

1 to me it was a good while. We had
2 trailers. We had a shortage before our
3 building was built. We had ---
4 Q It would have been, of course,
5 during your tenure there; right?
6 A Yes.
7 Q So it would have been prior to
8 1999; is that correct?
9 A Yes. No --- yes, it would be.
10 Probably ---
11 Q Prior to 1999?
12 A I'm not sure what year she came
13 to us. She came from Cochranton. And
14 I'm not sure what year she came to us,
15 but I think she was a traveling teacher
16 --- maybe she can help us out, for at
17 least three years --- two years, three
18 years. Claudette, do you remember?
19 ATTORNEY HEATH:
20 Just whatever you recall
21 is fine. Don't guess. If you
22 don't remember, you don't
23 remember.
24 A Okay.
25 BY ATTORNEY NICHOLS:

Page 61

1 Q Okay. And you do recall that
2 prior to 1999, Ms. de Leon went out on
3 sabbatical leave? You were aware of
4 that? On medical leave.
5 A I'm not sure she did or not.
6 She may have that year. See, I retired
7 December of '99. She may have been
8 that semester, but I was not actively
9 in the office during that fall
10 semester. I was using up my sick leave
11 and so on, because my husband was ill.
12 Q Okay. The reason I asked, in
13 terms of time, she functioned as a
14 traveling teacher?
15 A That was before that.
16 Q Before that?
17 A It was before that, yes.
18 Q Okay.
19 A She had a classroom for about at
20 least two years, three years before I
21 left.
22 Q All right.
23 A I'm pretty sure.
24 Q Now, under the existing policy,
25 I understand in terms of high schools,

**Page 62**

1 the Meadville Area High School, ---
2 A. Correct.
3 Q. --- the principal assigned
4 office space to teachers; is that
5 correct?
6 A. No.
7 Q. Who would make the assignments
8 of office space?
9 A. Office space?
10 ATTORNEY HEATH:
11 Office space or
12 classroom?
13 BY ATTORNEY NICHOLS:
14 Q. Classroom, I should say.
15 Classroom space.
16 A. Oh, we did. We did to teachers,
17 yes. Yes, we gave the room
18 assignments
19 Q. That would be the office of the
20 principal; right?
21 A. Correct. Yes.
22 Q. Mr. Deshner's office?
23 A. Yes.
24 Q. Of course, you were part of his
25 office?

**Page 63**

1 A. Other factors, yes.
2 Q. And some of those other factors
3 would be based on the need to have
4 access to ---
5 A. To equipment.
6 Q. --- equipment?
7 A. Yes.
8 Q. Okay. Would there be other
9 reasons?
10 A. No.
11 Q. No other reason sticks in your
12 mind ---
13 A. Not that I can think of.
14 Q. --- that would be a basis for
15 assigning classroom facilities to
16 teachers?
17 A. No. I can't think of anything.
18 Q. Okay. You also mentioned in
19 your testimony that students came to
20 you, I take it from time to time with
21 complaints or with comments --- or
22 complaints, I suppose you could call
23 it, concerning Ms. de Leon; is that
24 correct?
25 A. That's correct.

**Page 64**

1 BY ATTORNEY NICHOLS:
2 Q. With the assignment of office
3 space to teachers, that policy was
4 followed?
5 A. Yes.
6 Q. On the basis of seniority,
7 you're saying?
8 A. Not just on ---. Yes, pretty
9 much so. And the consequences of their
10 job, you know.
11 Q. When you say the consequences of
12 their job, what do you mean?
13 A. Well, for instance, if she was
14 able, there are some teachers --- like
15 I'm a home economist. I couldn't have
16 been a traveling teacher. I had to
17 have a workroom and I had to have ---
18 this is what I said about the science
19 department. If the science teacher was
20 the last man on the totem pole and he
21 needed a lab, we couldn't very well
22 assign him as a traveling teacher.
23 Q. I see. So it was based not only
24 on seniority, but there were other
25 factors?

**Page 65**

1 A. Yeah. Well, we worked on it as
2 a group.
3 Q. And in making such assignments,
4 in this case, Ms. de Leon being a
5 traveling teacher, what criteria would
6 you use, or did you use, to determine
7 who would function as a traveling
8 teacher as opposed to other teachers, I
9 take it, who had a facility?
10 A. She was the youngest member of
11 the faculty.
12 Q. So it was based on seniority,
13 you're saying?
14 A. Pretty much so. However, if it
15 were a science teacher and they needed
16 the equipment in a particular lab, or
17 something like that, it would be
18 different.
19 Q. Was that policy followed
20 consistently?
21 A. We had more than one.
22 Q. With respect to the assignment
23 of ---
24 ATTORNEY HEATH:
25 More than one?

**Multi-Page™**

1 Q.And when students approached you
2 from time to time with these
3 complaints, what was the --- did the
4 school, the principal's office have a
5 standard operating policy or procedure
6 by which it handles student complaints?
7 A.We addressed all student
8 complaints because the principals are
9 in custody of those students while
10 they're away from their parents.
11 Q.What was the standard policy,
12 though, I mean, as to any student who
13 would come with a complaint to the
14 principal's office?
15 A.Okay.
16 Q.Not necessarily meaning
17 that ---.
18 A.Yeah. Well, they would come to
19 the outside office first. Okay.
20 They'd come into the outside office
21 first. And whoever was available,
22 whatever principal, there's three of
23 us, that was available at the time, the
24 secretary would come in and say there's
25 a group of students from this class, or

1 that class, or whatever, do you have
2 time to see them? And we would say
3 yes. So it just so happened that these
4 kids from Mrs. de Leon's class got me
5 that day.
6 Q.Okay.
7 A.And that was our procedure.
8 Q.All right. And as to how you
9 would mechanically handle any complaint
10 from a student, tell us, what would you
11 do? How would you proceed from point
12 one to two, three, four? Was there a .
13 standard procedure by which you would
14 have addressed the concerns of the
15 student?
16 A.Well, the procedure that I used
17 in the documentation is the procedure I
18 normally used. Different situations
19 are different. But I have them list
20 them so that I have them in writing.
21 you know. If I could bring the teacher
22 and the student together, that would be
23 fine. Sometimes it wasn't good, wasn't
24 a good situation. If it was a volatile
25 situation, you handle the students and

1 then you handle the teachers and then
2 try to bring them together. There are
3 many ways that you can handle that type
4 of situation.
5 Q.So it varied from ---
6 A.It varied.
7 Q.--- one situation to another?
8 A.Yes. If it was one student,
9 maybe it was the student's problem and
10 we could, you know, kind of weed that
11 out. Maybe the student had a problem,
12 you know. But if it was the classroom
13 situation --- like I said, there's
14 different reasons and different ways
15 you ---.
16 Q.Did you typically conduct an
17 investigation?
18 A.Yes, we did.
19 Q.You mentioned groups of students
20 would come to you?
21 A.Yeah.
22 Q.And how would you go about
23 conducting an investigation?
24 A.Well, for instance, if it was a
25 study hall situation, we would go down

1 and find out where the student was
2 sitting, who sat around them, question
3 the students that were sitting around
4 them and try to find similarities in
5 the problem.
6 Q.Okay. And then you would
7 proceed to ---?
8 A.Then we would proceed to address
9 it.
10 Q.I see. Okay. Well, would you
11 usually involve the teacher?
12 A.Almost always. And often the
13 parent.
14 Q.I see. Was the teacher given an
15 opportunity to state his or her
16 position?
17 A.Always.
18 Q.I see. What if the student came
19 to you, members of the staff of --- the
20 principal staff, without first taking
21 the problem to the teacher? Would you
22 receive the complaint ---
23 A.Yes.
24 Q.--- if the student went around
25 the teacher in the first instance and

Page 70

1 I came directly to the principal's
2 office ---
3 A.Yes.
4 Q--- for relief?
5 A.Either way.
6 Q.You would receive the student?
7 A.Uh-huh (yes). And sometimes the
8 teacher would come to us regarding a
9 student without going to the principal
10 first.
11 Q.And in the event where the
12 teacher would come to you in the first
13 instance, what would be your reception
14 to the teachers?
15 A.The same as it would be for the
16 students.
17 Q.You would receive it?
18 A.I would receive it. We'd
19 investigate it. We'd see if we could
20 solve it. And ---
21 Q.Now, this standard procedure
22 that you had followed in handling the
23 student complaints, would that also be
24 followed by other assistant principals
25 ---

Page 71

1 A.Not necessarily.
2 Q--- like Mr. Berkebile, I
3 believe, also Mr. Heekins? Was there
4 some standard procedure ---
5 A.No, no.
6 Q--- followed by all
7 administrators?
8 A.Not necessarily. Only that we
9 often conferred with each other. If we
10 had a problem with how to go about it,
11 you know, we would confer with other
12 principals and get some input, some
13 ideas. Sometimes two of us would go
14 in, you know, on a problem and work
15 with the student or the teacher or the
16 student and the teacher, and ---
17 Q.Okay. Now, you're an
18 experienced educator. You told us you
19 taught ---
20 A.Yes.
21 Q--- and that you have served as
22 an administrator, assistant principal.
23 A.Uh-huh (yes).
24 Q.Now, based upon that experience,
25 the question I'm posing to you now is

Page 72

1 this --- and you also touched upon
2 another thing, I think obliquely, is
3 the authority of the teacher in the
4 classroom. You mentioned under the old
5 rules --- I think you referred --- to
6 use your words, the old ---
7 A.Right.
8 ATTORNEY HEATH:
9 Objection. There's not a
10 question pending, so I don't
11 want to get into --- this is not
12 a discussion. Just let him ask
13 his question.
14 A.Okay.
15 BY ATTORNEY NICHOLS:
16 Q.My question is this. Is it not
17 generally the view, in terms of --- is
18 it not generally the view of Crawford
19 Central that the teacher is the primary
20 disciplinarian in the classroom? Is
21 that correct? Is that a correct view?
22 A.That would be the first line of
23 discipline.
24 Q.All right. And is it correct
25 also that the teacher's authority to

Page 73

1 manage and discipline her class, or his
2 class, runs through the building? I
3 think I read something in the
4 guidelines.
5 A.I don't understand the question.
6 Q.In other words, the teacher has
7 primary authority to discipline and
8 manage his or her class, isn't that
9 correct?
10 A.I still don't understand your
11 question. Can I tell you how I
12 interpret it?
13 Q.Please do.
14 A.That the teacher has the primary
15 authority to discipline her class,
16 okay?
17 Q.Right.
18 A.However, if the teacher is not
19 effective in disciplining, or the
20 discipline is not fair, unfair, or
21 there's something wrong with the
22 discipline, then the principal has the
23 authority over the teacher to
24 interject, or at least try to get some
25 form of discipline in that classroom.

Multi-Page™

Page 74

1 Q Okay. Now, may I direct you to
2 a couple of specific instances as it
3 relates to the exercise of authority by
4 Ms. de Leon?
5 A Yes.
6 Q I have a letter here from you
7 dated February 29th, 1996, to Ms. de
8 Leon.
9 ATTORNEY HEATH:
10 May I see that?
11 ATTORNEY NICHOLS:
12 Yes.
13 BY ATTORNEY NICHOLS:
14 Q You say, it has been brought to
15 my attention that you are tape
16 recording classes. After discussing
17 this matter with George Desimer, I'm
18 instructing you to cease this practice.
19 Do you recall that letter?
20 A Yes, I remember that.
21 Q You recall that letter?
22 A Yes, yes.
23 Q Okay.
24 ATTORNEY HEATH:
25 Are you marking that?

Page 75

1 ATTORNEY NICHOLS:
2 Yes. I would ask that it
3 be marked, please. I guess ---
4 what is it, de Leon ---?
5 ATTORNEY HEATH:
6 Templeton Seven.
7 (Templeton Exhibit Seven
8 marked for
9 identification.)
10 BY ATTORNEY NICHOLS:
11 Q And then following on the heels
12 of that is another letter from you to
13 Ms. de Leon, dated March 19th, 1996.
14 And you said, writing to Ms. de Leon,
15 Ms. Mitchell, you may begin to
16 videotape the class that Eric Osborne
17 is attending. That will be period one.
18 All the necessary permission forms
19 have been turned in. Do you recall
20 having written that?
21 A Uh-huh (yes). I think before
22 that happened though, before this
23 letter went out --- I'm trying to
24 think. I vaguely remember this. She
25 was taping her classes, I think for

Page 76

1 discipline reasons. And you can't do
2 that without parent permission. And we
3 had her send out parent permission
4 slips, and she was only allowed to do
5 it for this class that we gave
6 permission to.
7 Q But my question is, because you
8 directed her to discontinue in the
9 first instance, did you inquire why she
10 was taping? This student is physically
11 challenged, in fact, a blind student.
12 Did you inquire with respect to Mr.
13 Osborne being a blind student that she
14 had to accommodate, did she not, under
15 the ADA law?
16 A I don't recall ---
17 ATTORNEY HEATH:
18 It would be special
19 education. It would be the
20 IDEA, not necessarily the ADA.
21 A But that would be in his IEP,
22 too.
23 ATTORNEY HEATH:
24 That's correct.
25 BY ATTORNEY NICHOLS:

Page 77

1 Q Yes, but what I'm saying is,
2 before you sent this directive to her
3 instructing her to cease ---
4 A Yes.
5 Q --- taping, did you inquire that
6 it was necessary for her to accommodate
7 this blind student or maybe other
8 physically challenged students?
9 A Well, ---
10 Q Did you inquire into that?
11 A --- at that point, we didn't
12 know ---. She was just taping, and
13 that's not a policy in our building to
14 tape a classroom. So ---.
15 Q How do you accommodate a
16 student ---?
17 ATTORNEY HEATH:
18 Would you please let her
19 finish?
20 A It's not a policy for us to tape
21 anybody without permission from
22 parents. And if Eric was in ---. Just
23 now, since you brought it up, Eric was
24 a blind student. He was really a nice
25 little kid. And he needed ---

Case 1:05-cv-00126-SJM   Document 59-8   Filed 06/26/2006   Page 21 of 29

Page 78

```
1 apparently, she felt that he needed
2 that to be videotaped for his class for
3 some reason or other.  But I also
4 observe and attend all of the IEPs for
5 special ed.  That was not in his IEP
6 unless we had to rewrite it into his
7 IEP or make an addendum to his IEP.
8 BY ATTORNEY NICHOLS:
9 Q.When you say IEP, what are you
10 referring to?
11 A.That's his individual
12 instruction --- IE ---.
13 ATTORNEY HEATH:
14 Individual education
15 plan ---
16 A.Education plan.
17 ATTORNEY HEATH:
18 --- under the IDEA law,
19 which is what is applicable to
20 special education students.
21 ATTORNEY NICHOLS:
22 Q.Let me ask you this then,
23 though.  Is not the school district
24 bound by the ADA law and the other laws
25 which mandate that you reasonably
```

Page 79

```
1 accommodate students who are physically
2 challenged?
3 A.If we do it, it has to be in
4 their IEP.
5 ATTORNEY HEATH:
6 I think you're confusing
7 the ADA, Mr. Nichols, and what
8 the School District's
9 obligations are under federal
10 law concerning a student's
11 education.  There's the
12 Rehabilitation Act that applies
13 to education, ---
14 ATTORNEY NICHOLS:
15 Yes, that's ---
16 ATTORNEY HEATH:
17 --- and there's also the
18 IDEA.
19 ATTORNEY NICHOLS:
20 That's true, but also
21 there is the ADA, which also
22 mandates reasonable
23 accommodation in the cases of
24 schools, accommodating students
25 who are physically challenged.
```

Page 80

```
1 I don't think that the School
2 District is exempt from ---.
3 ATTORNEY HEATH:
4 I don't want to get into
5 a legal disagreement.
6 ATTORNEY NICHOLS:
7 Right.
8 ATTORNEY HEATH:
9 But I'm just putting on
10 the record that you should be
11 aware of the differentiation.
12 And when she's talking about an
13 IEP, that is how any, quote,
14 unquote, accommodations are
15 implemented in the District ---
16 ATTORNEY NICHOLS:
17 Yes, but my ---.
18 ATTORNEY HEATH:
19 --- according to federal
20 law.
21 ATTORNEY NICHOLS:
22 Yes, but my query still
23 stands that I posed to Ms.
24 Templeton.
25 BY ATTORNEY NICHOLS:
```

Page 81

```
1 Q.And that is --- well, whether
2 we're talking about IDEA, whether we're
3 talking about ADA or some other federal
4 mandate which requires that the school
5 district accommodate students who are
6 physically challenged, in this case,
7 the student being blind, I was asking
8 before you directed the teacher to
9 cease taping, did you make an inquiry
10 to find out why she was taping this
11 class?  That's my question.
12 A.Okay.  My response to that was
13 we noted that she was tape recording,
14 and since we don't tape record for any
15 reason in the District, we asked her to
16 cease it until we investigated it,
17 which we investigated it.  And it
18 happened to be involving Eric, who is a
19 blind student.  And since it is ---
20 and I will reiterate, unless it's in
21 his IEP that we make that concession,
22 then it would have been no.  But we
23 adjusted --- we probably --- I don't
24 know ---.
25 Q.Are all students screened when
```

Multi-Page™

**Page 82**

1  they come in for the IEP?
2  A No. Just special needs
3  students.
4  Q I see. Well, how do you
5  determine who are the special needs
6  students?
7  A Well, they go ---
8  ATTORNEY HEATH:
9  I'm going to object
10  because I think you're getting
11  far afield. But go ahead and
12  answer the question.
13  A Well, they're defined through a
14  series, or a battery, of psychological
15  tests. But the mainstream student
16  usually is not earmarked.
17  ATTORNEY NICHOLS:
18  Okay. I would ask that
19  you mark these also, please.
20  (Templeton Exhibit Eight
21  marked for
22  identification.)
23  BY ATTORNEY NICHOLS:
24  Q Now, you went on to testify ---
25  continuing on the students bringing

**Page 83**

1  complaints to you and to other
2  administrators, I take it --- and I was
3  inquiring about the standard operating
4  procedure you would use to verify
5  whether these allegations would be true
6  or whether they had any substance to
7  them. And you said that you would
8  routinely conduct the investigations;
9  is that correct?
10  A Correct.
11  Q You mentioned also that a group
12  of students would bring complains to
13  you in the first instance, having gone
14  around the teacher and come directly,
15  that you would receive the complaint?
16  A Uh-huh (yes).
17  Q Let me ask you, in that case,
18  were you concerned that that would send
19  a message to students that they could
20  ignore, disregard the authority of a
21  teacher ---
22  A No.
23  Q --- by going around the
24  teacher ---?
25  A No.

**Page 84**

1  Q You were never concerned about
2  the message it would send to the
3  students?
4  A No.
5  Q That was never a concern to you?
6  A No. We had an obligation to the
7  students, on behalf of their parents,
8  to investigate it.
9  Q Understood. I understand the
10  pecking order. Teachers, as you
11  described, are the first line in the
12  classroom in terms of authority figure.
13  A Well, you're talking about ---
14  ATTORNEY HEATH:
15  Objection. There's no
16  question pending. Wait until he
17  asks you a question.
18  A Okay.
19  BY ATTORNEY NICHOLS:
20  Q And of course, the principal
21  would being in the mix of the pecking
22  order, so to speak, in terms of
23  authority in the school. I understand
24  that. But I was concerned about the
25  message that would be sent ---

**Page 85**

1  ATTORNEY HEATH:
2  She answered your
3  question already.
4  A Can we shut this off for a
5  minute?
6  ATTORNEY HEATH:
7  No.
8  A Okay. Because I think there's a
9  discrepancy here.
10  ATTORNEY HEATH:
11  Well, I'll have an
12  opportunity when he's finished
13  to ask you to clarify.
14  A Okay.
15  BY ATTORNEY NICHOLS:
16  Q What would you like to clarify.
17  the discrepancy, what you perceive to
18  be a discrepancy?
19  A I think you're confusing one
20  thing over another. There's a
21  difference between a complaint
22  regarding a teacher and discipline in
23  the classroom.
24  Q Okay.
25  A And you're talking about a

## Page 86

```
 1   complaint of a group of students coming
 2   to me regarding issues that they had
 3   with the teacher in general.  So I
 4   would be the most appropriate person
 5   for those students to come to see to
 6   mediate it.
 7      Q.Okay.  I have read the record of
 8   some of the complaints that were
 9   brought by students, but it's not clear
10   to me.  Would you care to specify the
11   nature of the complaints that the
12   students lodged against Ms. de Leon?
13      A.It's been a long time.
14         ATTORNEY HEATH:
15            Are you talking
16         specifically about what we've
17         already marked as an exhibit
18         that's a detailed memorandum
19         about these complaints?  Are you
20         talking complaints over ten
21         years?  What are you talking
22         about?
23   BY ATTORNEY NICHOLS:
24      Q.Well, as best as you can
25   remember.  You said that they brought
```

## Page 87

```
     complaints ---
        ATTORNEY HEATH:
           You mean this one
 4      particular group or others?
     BY ATTORNEY NICHOLS:
        Q.Well, were there others, I
     mean, ---.
        A.Yes, there were others.
        Q.There were others?
        A.I don't see them documented, but
     I remember vaguely.  I've been out of
     the District for five years now.
        Q.Would you care to just briefly
     state the nature of the complaints ---?
        A.Mostly unfairness.  Just things
     regarding unfairness and unfair
     practices, favoritism, those kinds of
     generalities.  And I can only be
     general.  I'm sorry.
        Q.You say unfairness and
     favoritism.  I mean, can you be more
     specific how she was unfair to a
     student or students?
        A.We've talked about this before.
     Students being told to tell on other
```

## Page 88

```
 1   students, the unfairness of her
 2   discipline, her giving out --- she had
 3   an awful lot of disciplines, in-school
 4   suspensions, those kind of --- not
 5   in-school suspensions --- whatever they
 6   call it.  I forget.  But anyway,
 7   disciplines where the kids had to stay
 8   after school.
 9      Q.Detention?
10      A.Detention.  Excuse me.  She had
11   an extraordinarily large number of
12   detentions.
13      Q.Let me ask you this.  Did she
14   give out any sanctions or disciplinary
15   measures that were beyond her authority
16   to give out?  Was she not authorized or
17   empowered to give out the sanctions
18   that she gave out?
19      A.She was empowered to discipline
20   her classroom and to give out those
21   detentions.  However, the students were
22   upset because they felt that the nature
23   of the detention --- the crime didn't
24   fit the punishment.
25      Q.Well, that is not unusual. ]
```

## Page 89

```
 1   I mean most people on the receiving end
 2   of a sanction always feel that way.
 3   That's not uncommon; is it?
 4         ATTORNEY HEATH:
 5            Objection to form.
 6      A.Yes, it is.
 7   BY ATTORNEY NICHOLS:
 8      Q.Oh, okay.  I have a letter here
 9   from you to Ms. de Leon and Ms.
10   McCracken, and it's dated October 1st,
11   '97.  And you direct her --- in other
12   words, you direct her to --- that
13   detentions that she has imposed on a
14   student will be postponed.
15         ATTORNEY NICHOLS:
16            I would ask that that be
17         marked
18      A.Can I read that, please?
19         ATTORNEY HEATH:
20            Can I see it first?
21      A.Sure.
22         ATTORNEY HEATH:
23            Thank you.
24            (Templeton Exhibit Ten
25         marked for
```

Multi-Page™

Page 90

```
1   identification.)
2   BY ATTORNEY NICHOLS:
3   Q Do you recognize that letter?
4   A Yes.
5   Q Okay.  What's been marked as
6   Exhibit Ten?
7   A Okay.
8   Q Right.  Were there other
9   occasions in which you directed that
10  sanctions that had been imposed by Ms.
11  de Leon to be nullified, or withdrawn,
12  or countermanded?
13  A They weren't countermanded and
14  they weren't withdrawn.  This letter
15  states that until I was able to look
16  into it, because there was such a large
17  number of students involved, until I
18  meet with you and we discuss this
19  matter, these teacher detentions would
20  be postponed.  They're just postponed.
21  Q All right.
22  A They weren't countermanded or
23  anything else.  But the top paragraph,
24  she was in violation of the procedure.
25  Q All right.  So you said they
```

Page 91

```
1   were postponed.  May I ask then, what
2   happened subsequent in terms of your
3   order, your directive, I should say?
4   A This was the same group of
5   students that we had talked about
6   earlier where we had them list their
7   complaints and I tried to mediate it
8   with her in a meeting.
9   Q And you said the meeting
10  concluded ---
11  A Yes.
12  Q --- without resolution?
13  A Without resolution.
14  Q Does that mean the students then
15  were exonerated from any --- went free
16  with impunity?
17  A I don't recall what happened
18  after that.  But like I said, I've been
19  out of the system for a long time and I
20  don't remember what happened after
21  that.
22  Q So we have a situation ---?
23  A I may have said to the students
24  that you have to serve that detention.
25  I may not have.  I don't recall.
```

Page 92

```
1   Q But we have a situation, based
2   upon your communication, which revoked
3   or at least calls into question or
4   stops --- postpones a directive ---
5   ATTORNEY HEATH:
6   Objection.
7   BY ATTORNEY NICHOLS:
8   Q --- issued by a teacher.  And
9   then you and Ms. de Leon meet in an
10  effort to resolve the matter, and then
11  unfortunately, the meeting is concluded
12  without resolution, and therefore ---
13  ATTORNEY HEATH:
14  Objection.  This is not
15  testimony.  Could you ask the
16  question?
17  BY ATTORNEY NICHOLS:
18  Q What I'm asking you, and I just
19  want to be clear on this, the sanction
20  that Ms. de Leon has imposed had been
21  called into question.  What happened
22  --- and you say you don't remember.
23  The students went free then, I guess.
24  A I don't know.
25  ATTORNEY HEATH:
```

Page 93

```
1   Objection.  She answered
2   the question.  She doesn't
3   remember.
4   A I don't recall.
5   ATTORNEY HEATH:
6   Don't badger her to get
7   an answer you want to have out
8   of her.
9   ATTORNEY NICHOLS:
10  All right.  Okay.
11  BY ATTORNEY NICHOLS:
12  Q I just want to be clear as to
13  where we are in terms of the way a
14  situation was handled by the
15  administration vis- -vis a teacher who
16  sought to do her duty.  All right.
17  Let's move on.  Earlier you
18  acknowledged that you knew Ms.
19  Englebaugh, who taught at the School
20  District early on, I believe in the
21  early '90s.
22  A Very vaguely.
23  Q And you were assistant principal
24  then?
25  A I was the assistant principal
```

Case 1:05-cv-00126-SJM Document 50-9 Filed 06/26/2006 Page 25 of 29

Page 94

1 I, then, yes.
2 Q.And therefore, you knew her in
3 connection with your supervisory
4 responsibilities?
5 A.Yes.
6 Q.And your Counsel has alluded to
7 this point. Yesterday she testified on
8 the record that her experience as a
9 teacher with MASH was, quote, a
10 horrifying, close quote, experience. I
11 asked her what accounted for that. She
12 attributed that in part, at least in
13 part, to her gender.
14 A.I don't know where she came from
15 there.
16 Q.Do you agree with that?
17 A.No, not at all.
18 Q.And she also said that you were
19 instrumental in that and the carrying
20 out of that horrifying experience ---
21 ATTORNEY HEATH:
22 Objection.
23 A.In what way?
24 BY ATTORNEY NICHOLS:
25 Q.As I remember, if my memory

Page 95

1 serves me correctly ---.
2 ATTORNEY HEATH:
3 Just ask the question.
4 BY ATTORNEY NICHOLS:
5 Q.If my memory serves me ---.
6 ATTORNEY HEATH:
7 Don't testify. Ask her a
8 question.
9 ATTORNEY NICHOLS:
10 I understand, Counsel
11 Allow me.
12 BY ATTORNEY NICHOLS:
13 Q.Is that you being also a female,
14 why would that be the case? And she
15 said that she understood you were doing
16 really the bidding of the
17 administration. Were you doing the
18 bidding ---?
19 ATTORNEY HEATH:
20 Objection. Asked and
21 answered. I already went over
22 this on Direct.
23 ATTORNEY NICHOLS:
24 Okay.
25 BY ATTORNEY NICHOLS:

Page 96

1 Q.You also said that, when
2 referring to the complaints you
3 received from students, you referred to
4 --- you acknowledge, you said that they
5 were hearsay. It as always hearsay;
6 right? That was your testimony; wasn't
7 it? That what you received from the
8 students, you had no direct knowledge
9 of these --- it was hearsay, secondhand
10 information; is that correct?
11 A.Much of it was, yes.
12 Q.Much of it. And you relied on
13 pretty much that ---
14 A.No.
15 Q.--- what the students told you?
16 A.No.
17 Q.Well, what independent sources
18 would you rely upon, other than this
19 hearsay the students would bring to
20 you, concerning ---?
21 A.I'm a little confused as to what
22 he wants from me.
23 Q.I'm asking a question.
24 ATTORNEY HEATH:
25 Do you understand the

Page 97

1 question? Are you asking
2 about ---
3 ATTORNEY NICHOLS:
4 All right. Let me pose
5 that question again.
6 ATTORNEY HEATH:
7 --- what she does in the
8 investigation that she's already
9 talked about?
10 ATTORNEY NICHOLS:
11 No, no. It's a specific
12 question. Allow me to
13 reiterate.
14 BY ATTORNEY NICHOLS:
15 Q.I asked you specifically, what
16 independent sources, apart from the
17 hearsay information and allegations
18 that the students were bringing to you
19 concerning Ms. de Leon, that you relied
20 upon in making your decision as to how
21 to handle student complaints?
22 ATTORNEY HEATH:
23 Objection. It's not
24 specific. Are you specifically
25 talking about this incident

**Multi-Page ™**

1 in --
2 ATTORNEY NICHOLS:
3 Any student complaints.
4 ATTORNEY HEATH:
5 -- 1997?
6 ATTORNEY NICHOLS:
7 Student complaints in
8 general.
9 A As I stated before, when
10 students from any teacher came to us,
11 we investigated them. We handled them
12 in different ways. Different
13 principals had different methods,
14 different tools of the trade, as did I.
15 I didn't handle everything exactly the
16 same way every time.
17 BY ATTORNEY NICHOLS:
18 Q I see. Okay. Now, there were
19 at least two arbitration proceedings
20 where Ms. de Leon grieved during the
21 '90s. And I think at least those two
22 would have occurred prior to your
23 retirement in 1999.
24 A Correct.
25 Q Did you participate in any of

1 those arbitration proceedings?
2 A Yes.
3 Q And the first one, there was
4 Arbitrator Stollenberg. He presided as
5 the arbitrator. Did you participate in
6 that one?
7 A I did, but I recall very little
8 of it.
9 Q Did you testify? Do you recall
10 if you testified?
11 A I may have. I don't remember
12 whether I did or not.
13 Q I see.
14 A I was there.
15 Q You don't recall the specifics?
16 A No. No, I don't.
17 Q Okay. And the second one was
18 presided over by Arbitrator Talarico.
19 Do you recall that one, also?
20 A I was there, as well, but again,
21 I don't recall --- I don't even recall
22 what it involved.
23 Q But as to the second one, you
24 also participated; correct?
25 A Yes, I did.

1 Q And that would have been
2 testimony given by you; is that
3 correct?
4 A I don't know whether I gave
5 testimony or not. If I did, it was
6 very brief. I think Mr. Destiner did
7 most of the testimony, the procedure,
8 Q Okay. All right. And you left
9 in '99. Were you aware of Ms. de
10 Leon's emotional condition?
11 A Never.
12 Q You were not?
13 A No, never. Only the last ---
14 toward the very end, I think she did
15 take a sabbatical because of something
16 that happened toward the very end. And
17 she claimed that it was an emotional
18 disability or something or other, but
19 --- and she was gone for a while, and
20 then I left.
21 Q I see. I just got a couple more
22 questions I'd like to ask you on what
23 we have right here. In reviewing the
24 record, Ms. Templeton, I went back to
25 1989 and came forward up to 1999, and I

1 selected evaluations that you had done,
2 prepared for Ms. de Leon.
3 A Okay.
4 Q And I must say, just looking at
5 the face value of --- what is
6 represented in the face, and I wanted
7 to call you as a witness because all of
8 them are laudatory.
9 A All of them are what?
10 Q Laudatory.
11 ATTORNEY HEATH:
12 Objection.
13 BY ATTORNEY NICHOLS:
14 Q Satisfactory.
15 ATTORNEY HEATH:
16 Are you going to ask her
17 a question?
18 BY ATTORNEY NICHOLS:
19 Q And my question is this.
20 ATTORNEY HEATH:
21 Would you let her see
22 them if you're going to refer to
23 them?
24 ATTORNEY NICHOLS:
25 Sure. I have them right

**Page 102**

```
 1 here.
 2 BY ATTORNEY NICHOLS:
 3 Q I'll ask you to take a look at
 4 them.
 5     ATTORNEY NICHOLS:
 6       I would ask that they be
 7 marked for the record. And
 8 sure, take a moment to show her
 9 these.
10     (Templeton Exhibit 11
11     marked for
12     identification.)
13     ATTORNEY HEATH:
14       There's also
15 observations. You said
16 evaluations. There's also
17 observations.
18     ATTORNEY NICHOLS:
19       Yes.
20   WITNESS REVIEWS DOCUMENTS
21 A.These are both the same. Are
22 they just duplicate copies?
23 BY ATTORNEY NICHOLS:
24 Q.Right. These are both the same.
25 Right.
```

**Page 103**

```
 1 A.Okay. I think this is a
 2 duplicate, as well.
 3 Q.My question, and very briefly,
 4 my last question here is, your
 5 evaluations of Ms. de Leon, which speak
 6 for themselves, were very laudatory and
 7 recommendable, are in variance with
 8 what you testified here this morning.
 9 You portrayed her this morning as being
10 sarcastic, not cooperative. But these
11 belie that fact. These speak for
12 themselves.
13     ATTORNEY HEATH:
14       Do you have a question?
15 BY ATTORNEY NICHOLS:
16 Q.My question is, why is that,
17 Ms. ---?
18 A.Because these ---
19 Q I want to account for that
20 discrepancy.
21 A.Right. This teacher evaluation
22 was developed between a cooperation
23 between the teachers' union and the
24 administration. It deals primarily
25 with procedures in the classroom and
```

**Page 104**

```
 1 other things. It does not include
 2 discipline. This doesn't include
 3 discipline. This one ---
 4     ATTORNEY HEATH:
 5       Which is an observation
 6 form?
 7 A.It's not an observation.
 8     ATTORNEY HEATH:
 9       Oh.
10 A.It's the general form at the end
11 of the year we give out. It's
12 appendix A.
13     ATTORNEY HEATH:
14       Okay.
15 A.It deals mostly with
16 professionalism. Although she prepares
17 her lessons according to District
18 guidelines, which I had told her to at
19 the very beginning, because that was
20 one of the problems. And she did. She
21 conformed to that. I had no problem
22 with her lesson plans.
23     ATTORNEY HEATH:
24       What year is it?
25 A.This was '97. Well, she has it
```

**Page 105**

```
 1 crossed out, so I guess it was '96-'97.
 2 On this one, the earlier one was in
 3 '92. So she did do that. But we were
 4 talking primarily about discipline and
 5 professionalism.
 6 BY ATTORNEY NICHOLS:
 7 Q But I mean, ---
 8 A.This doesn't address that.
 9 Q Well, this addresses her job
10 description, that she fulfilled her job
11 description. This is what they sought
12 to do, evaluate; right? Whether she
13 was doing her job?
14 A.This isn't an evaluation. This
15 is ---
16 Q Well, I'm talking about --- some
17 of these are evaluations; are they not?
18 A.Yeah, yeah.
19 Q And that's what you sought to
20 evaluate when you sat and, as you did
21 evaluate her?
22 A.Uh-huh (yes).
23 Q And I'm simply saying what you
24 put down in writing here. That's all
25 I'm simply asking you. That picture's
```

**Multi-Page™**

1 not right. I see here satisfactories
2 consistently. But you're telling us
3 this morning, on this record, no, she
4 was sarcastic and she was always ---
5 ATTORNEY HEATH:
6 Objection.
7 BY ATTORNEY NICHOLS:
8 Q-- all these other negatives.
9 ATTORNEY HEATH:
10 Mr. Nichols, ---
11 BY ATTORNEY NICHOLS:
12 Q.That's all I'm saying.
13 ATTORNEY HEATH:
14 --- this is not your
15 platform. This is a deposition.
16 ATTORNEY NICHOLS:
17 All right. That's all.
18 That's all I have. Leave it
19 right there. Leave it right
20 there. This is for the record.
21 All right?
22 A.Well, as I stated before, under
23 her observation, it covers areas of
24 planning, technique, effectiveness,
25 instructional technique and

1 effectiveness, teacher/student
2 interaction, personal characteristics
3 and management and organization. And
4 it does not include discipline.
5 ATTORNEY HEATH:
6 What you're looking at,
7 can you identify the record
8 you're reading from?
9 A.Okay. This is the report of
10 classroom visitation. It's
11 different ---
12 ATTORNEY HEATH:
13 From the evaluation?
14 A.No. This is the evaluation.
15 ATTORNEY HEATH:
16 Okay.
17 A.Okay. And ---
18 ATTORNEY HEATH:
19 Isn't there an addendum
20 on that document?
21 A.I always wrote the little
22 addendum and taped it to it so that I
23 could clarify it.
24 BY ATTORNEY NICHOLS:
25 Q.Would you be kind enough to read

1 the addendum, Ms. Templeton?
2 A.I commend --- you always do a
3 commendation and then you do a
4 recommendation.
5 Q.Right. Would you be kind enough
6 to read that addendum?
7 A.And this was dated 1997. If I
8 may read the first one?
9 Q.Sure.
10 A.Okay. The first one was in '97
11 as well. This is the third and then
12 this is the fifth, then there was an
13 earlier one. What are these dates
14 marked out on these for? That one's
15 '92.
16 Q.You know, I saw that and I don't
17 know. When I got it, that's the way it
18 was marked.
19 A.It's not my handwriting.
20 Q.I don't know.
21 A.It's not my handwriting. Here,
22 the '92. But I don't have an
23 evaluation for the '92. But on an
24 earlier one, I had stated that she
25 needed to update her lesson plans,

1 writing objectives, the topic,
2 procedure, assignment and so on, which
3 she apparently did.
4 ATTORNEY HEATH:
5 In 1997?
6 A.After our meeting, she did that.
7 And then the last one was, I commend
8 Ms. de Leon McCracken on her lesson
9 plans. She has submitted lesson plans,
10 including the criterion directed by the
11 School District, in the form as I
12 required. I commend Mrs. de Leon
13 McCracken in her record keeping, her
14 attendance, seating charts and grade
15 procedures. Grading procedures are
16 correctly in place after the initial
17 one. Okay.
18 Then I recommend that Mrs. de
19 Leon call on individual students with
20 their hands that are raised during the
21 review process. If students do not
22 respond, I would recommend a quick quiz
23 to determine understanding to be
24 initiated. If the material has not
25 been learned, in your judgment, a

1 re-learning unit should be instituted.
2 One or two students dominated the
3 review portion of the class while I was
4 doing this observation. During my
5 observation of the review, many
6 students did not respond at all or
7 responded very little.
8     ATTORNEY NICHOLS.
9         That's all the questions
10 I have, Ms. Templeton. I thank
11 you for coming.
12     A.Thank you.
13         RE-EXAMINATION
14 BY ATTORNEY HEATH:
15     Q.There's just a couple of
16 follow-ups. You had indicated --- and
17 I believe on Direct we had talked about
18 students accepting or rejecting
19 consequences of particular disciplinary
20 actions. And Mr. Nichols, on Cross
21 Examination, said something to the
22 effect that people are never satisfied
23 with the consequences of their action,
24 and you said no, and I think you didn't
25 have an opportunity to finish your

answer.
A.That's not true. First of all,
my belief is that a student, when they
mess up or they talk out in class, they
know that there's going to be a
consequence and they know that they're
going to have to meet that consequence.
In my experience, dealing with
thousands and thousands of students on
a daily basis and dealing out
consequences, they are not upset over
the consequences of a deed that they
feel is fair. They are very upset if
they feel that something is unfair, and
they will retaliate. They will
misbehave even more. They will do
everything they can.
Q.And was the fairness issue the
crux of why those students came to
you ---
A.Exactly.
Q.--- in September of '97?
A.Exactly.
Q.Relative to Ms. de Leon being a
traveling teacher, throughout your

1 tenure, was she the only one that was a
2 traveling teacher?
3     A.No. We had, I think, up to
4 three.
5     Q.Was she made a traveling teacher
6 as any consequence of filing a
7 grievance, or taking time off, or
8 anything of that nature?
9     A.No. The grievances were
10 something that was set aside after the
11 negotiations. We've had other
12 grievances. They're treated as
13 teachers as a whole.
14     ATTORNEY HEATH:
15         Thank you. I have
16 nothing further.
17         * * * * * * * *
18 DEPOSITION CONCLUDED AT 11:45 A.M.
19         * * * * * * * *