04/24/2006  11:23     9438855     ANDREWS & BEARD



# Meadville Senior High School

North Street Extension
MEADVILLE, PENNSYLVANIA 16335-2199
Telephone: (814) 336-1121

George H. Deshner,
Principal
Michael P. Fiorilo,
Assistant Principal
Carol A. Templeton,
Assistant Principal
I. David Bowser,
Guidance Director
Marlene M. Gourley,
Athletic Director



tabbies
EXHIBIT
5

EXHIBIT
a
C. Templeton

TO: CLAUDETTE MITCHELL

FROM: GEORGE H. DESHNER

RE: TARDINESS TO SCHOOL

DATE: 1/5/94

**********************************************************

As you should recall, we had a discussion in early December about
arriving to school on time. The normal workday for professional
staff at Meadville Area Senior High School is 7:50 A.M. until
3:20 P.M. In order that the school day commence as it should, it
is imperative that all staff be on time and at their assigned
places at 7:50 A.M.

Since this discussion, you have continued to arrive late to
school on a consistent basis. Some of the dates and times of your
arrival are as follows:

| December 8, 1993 | 7:56 A.M. |
| December 9, 1993 | 8:03 A.M. |
| December 10, 1993 | 8:04 A.M. |
| December 14, 1993 | 8:00 A.M. |
| December 21, 1993 | 8:08 A.M. |
| January 3, 1994 | 8:07 A.M. |
| January 5, 1994 | 8:14 A.M. |

Attached please find the guidelines for A.M. hall supervision and
the area to which you are assigned. Also attached is Board Policy
No. 418 relating to tardiness. Please review these materials as
they relate to this situation.

I anticipate that you will make every effort to correct the
problem of tardiness and that it will not be necessary to take
any other administrative action.

If you have any questions concerning this matter or wish to
discuss it with me, please feel free to make an appointment to do
so.

Thank you for your attention to this matter.

cc: Mr. James C. LaScola, Superintendent

# I.  A.M. HALL SUPERVISION GUIDELINES

In order to establish continuity of our morning procedures please adhere to the following.

1. Be at your assigned classroom or hallway at 7:55 each day of the school year unless specifically excused.

2. Become alert to those students who travel in your vicinity as to their locker habits and other patterns of behavior they establish.

3. Observe individuals for general conduct. Correct where necessary.

4. Keep all traffic moving, confusion to a minimum and actively clear halls at 8:00 A.M.

5. If unusual circumstances arise that you cannot handle, report immediately to the principals.

## A.M. Duty Assignments:

1.  J. Straub:        Intersection of main entrance and guidance wing.

2.  M. Maruska:       Glass Corridor

3.  C. Rappa:         Intersection of "A" wing near A34 and back hallway.

4.  J. Bossard &      Intersection of "B" wing near
    C. O'Shea:        cafeteria entrance and back
                      hallway. Lounge area.

5.  R. Inman &        Intersection of "B" wing
    D. Martin:        and the glass corridor.

6.  R. McAtee:        Intersection of "A" wing and rear corridor.

7.  M. Gourley &      Gym lobby area.
    J. Ende:

8.  T. Zakovitch:     End of "C" wing near room C18.

9.  C. Rees:          End of "C" wing near room C6 and stairwell.

10. C. Mitchell:      Breezeway between A43 & A46.

11. J. Higgins:       Roaming "B" wing

- 4 -

04/24/2005   11:23   9430855   MEADVILLE HS LIBRARY   ANDREWS & BEARD   PAGE   09
FAX NO. 8143375180   P.02
MAR-29-94 TUE   8:26

EXHIBIT 6

RECEIVE
MAR 29 1994
CRAWFORD CENTRAL SCHOOL DISTRICT
SUPERINTENDENT'S OFFICE

1.- What do you like the most & about the class?

2.- What do you like the least?.

3.- What would you change?

4.- How class participation should be graded?

5.- Should class participation be part of your grade?

6.- Is class participation important?

7.- How discipline should be handle?

8.- Number the reasons for which a student with disruptive behavior get detention.

9.- Number the reasons for which a student with disruptive behavior be removed from class.

10.- Why should you learn a foreign language?

11.- Should Hall passes be giving freely to any one during classes?

12.- Would you be willing to ask that in writing or personally to the administration so you can have freely use of hall passes? If the administration agrees?

04/24/2006    9438865
MAR-29-94 TUE  9:26    MEADVILLE HS LIBRARY    ANDREWS & BEARD
FAX NO. 8143375180    PAGE 10
P.03

please give it to me in writing and
you will be allowed to use hall passes freely.)

13.- How would you handle Hall passes to
minimize interruptions during class?

14.- Should you be encouraged to use
Useful Classroom Expresions in Sp?
Why yes?
Why no?

15.- What do you like the most about
classroom rules?

16.- What do you like the least?

17.- What should be changed?

18.- should H give oral quizzes? why

19.- Should H give written quizzes or
tests? Why yes Why not

20.- What would be the best method
to evaluate you on an individual
basis?

21.- Do you like homework?

22.- What would be the best method
to reinforce the Grammar
aspect or culture of the subject.

23.- In Spanish class should you Speak
English or spanish?

04/24/2005
MAR-28-94 TUE 9:27    9438056    MEADVILLE HS LIBRARY    ANDREWS & BEARD    FAX NO. 8143375160    PAGE 11
P.04

- 2 -

24.- What is the purpose of getting a report card?

27.- How grades should be giving to each student in each class?

26.- Have you been encouraged to discussed personal matter on a confidential basis?

27.- Have H ever discussed with the class about a personal student? What did H say

Do you like cultureday?

28.- What do you like the leasti

29.- What do you like the most?

30.- What would you change?

31.- Have H discussed with the class about Parent Conference

What did H say?

33.- How should H hand out pape

34.- How often did H make PHS jokes? What did H say?

35.- How often do H bring my personal like into the sub

Did H say something irrele to the subject? What did H s

04/24/2006 11:23    9430856    MEADVILLE HS LIBRARY

MAR-29-04 TUE 8:27    ANDREWS & BEARD    FAX NO. 8143375180

PAGE 12

P. 05

36.— How often do I talk about
my daughter?
What did H say?
37.— How often have H
within the class?
What did H say?
why?

used profanity

+814-332-6009    THOMAS LAW FIRM                                                     550 P.02   FEB 22 '95 11:09

Richard T. Gray
R. D. #5 Box 226
Meadville, PA 16335
337-2575

March 17, 1994

George Deshner, Principal
Meadville Senior High School
North Street Extension
Meadville, PA 16335

Dear Mr. Deshner,

Thank you for meeting with Mrs. Mitchell, my wife and myself concerning Mrs. Mitchell and her classroom procedures.

So that all concerns are addressed, I'll outline them below:

1. How can Mrs. Mitchell give a "D" for misconduct? Misconduct should not affect grades. Her response was to suggest she does it because she grades on class participation.

2. She told a classmate of Brian's to tell her if Brian, C. J. McBride, or Dave Mercatoris should bring a gun to school. She expressed concern that they would harm her and to let her know! Her defense was "I was just kidding". I consider this a grave violation.

3. She also discussed with a fellow student that she would like to get Brian out of her class.

4. Questionable dress on "inside out day". Students have told me Mrs. Mitchell was wearing a bra on the outside of her dress partially covered by a 'cardigan' sweater.

5. Brian needed to use the mens room and was told it would require a nurses pass. That only girls could have "emergency" restroom needs. Even though Brian, as she agreed, is not an abuser of the situation.

Please call me if I can answer any questions. I'll be patiently waiting a response.

Sincerely,

*[signature]*

Richard T. Gray

cc: James LaScola

+814 332 6009                                             92%                                          P.02

FEB-22-1995 11:11 +814-332-6009 THOMAS LAW FIRM 550 P.01 FEB 22 '95 11:09

**THOMAS, TRUAX, SPADAFORE,
WALKER & KEENAN**

Attorneys at Law
296 Chestnut Street
Meadville, Pennsylvania 16335
Office (814) 332-6000
Fax (814) 332-6009

# Fax Transmittal Cover Sheet

Date _Feb 22-95_    Number of Pages Including Cover Sheet _____

To: _John P. Jones_

From: _Emil M. Spadafore Jr_

Re: _Claudette Mitchell_

Fax Number: _332-6009_

Comments/Instructions: _Enclosed is a letter from parents to
Mr. Desmer. We will call Desmer, Lasola,
Richard Curril, Pat Benford & Claudette Mitchell._

FEB-22-1995 11:11 +814 332 6009 93% P.01

CRAWFORD CENTRAL SCHOOL DISTRICT

Instructional Support Center
RR 9, Box 462, Route 102
Meadville, Pennsylvania 16335-9504
Telephone (814) 724-3960
FAX (814) 333-8731

James C. LaScola, Superintendent

Lary L. Williams
Director of Curriculum & Instruction
Nicholas J. Cherepovich
Director of Special Services
Thomas E. Beers
Director of Support Services
William E. Shervey
Business Manager/Board Secretary

OFFICE OF THE SUPERINTENDENT

April 21, 1994



Claudette G. Mitchell
11983 Eureka Road
Edinboro, PA 16412

Dear Mrs. Mitchell:

This letter is written to address the continual problem that has been brought to our attention by Spanish students and their parents. You have indicated that only a few boys are causing the problems in eighth period. Complaints are more widespread and not limited to only a "few boys". Mr. Deshner has instructed you to not discuss or refer to previous problems with Brian Gray or other students in eighth period class, but you continue to present situations which cause problems due to past experiences. (Brian Gray's test paper with a statement, "Did you copy?").

I am insisting that you refrain from all references to previous problems in your classes, specifically eighth period class. Failure to follow this directive may result in appropriate legal action. I have recently received a communication from Meadville Senior High School indicating that you issued eight of eleven students in Spanish III poor work notices for this six weeks, while twenty-nine of forty-three Spanish I students received poor work notices. If these numbers are correct, I will not accept the fact that 69% of students in your classes are possibly failing for this six weeks. I would certainly hope that this is not some form of retribution against students because we are having the problems described previously.

I will be talking with each of the students in eighth period class and I will contact you for an appointment within the next few weeks.

Claudette G. Mitchell
April 21, 1994
Page 2
_____

This letter will be placed in your permanent file until
such time that the Administration decides that the problems
that exist today (04/21/94) are professionally and adequately
dealt with in your classroom.

Thank you.

Sincerely,

James C. LaScola
Superintendent of Schools

JCL/cak

pc: George H. Deshner, Principal
    William E. Shelvey, Business Manager
    Personnel File

# Meadville Area Senior High School

North Street Extension
MEADVILLE, PENNSYLVANIA 16335-2199
Telephone: 336-1121



To: Claudette Mitchell, MASH Spanish Teacher

From: George H. Destner, Principal

RE: Parent Conference on 4/22/94

Date: 4/27/94

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Thank you for attending the parent conference with Mr. Curtis McBride and his son, Christopher, on April 22, 1994.

I would like to review the concerns that Mr. McBride presented to us and ask that you make every effort to address these concerns and take appropriate action to correct them.

**(1) The timeliness of notifying parents that a problem exists with a student.**

The date that the administration gives to submit progress reports is only a guideline. You may send a progress report at any time you see a student is falling off in their work. It is also advisable that parents be contacted by phone to apprise them of student progress or discipline situations.

**(2) Offering appropriate suggestions to parents for improvement.**

The progress report has many items that can be checked to offer suggestions for parents to help their students. You may also offer any written comments to parents to help the parent and student. It is important that you give professional advice concerning correcting the situation to the parents about their son/daughter's situation.

**(3) Discussing student situations in front of the class or to other students.**

As we have previously discussed, it is not appropriate to go to other students or to say things in front of the class about another students situation. An example was to begin discussing the letter Heath Strasser wrote and then handing it to Mr. McBride to read. You did not bring the letter to the attention of the administration, guidance or Heath's parents at the time it was confiscated in October. It should not be brought up for other parents to read.

AN EQUAL RIGHTS AND OPPORTUNITIES SCHOOL DISTRICT

EXHIBIT
9

**(4) Make sure that all students have the required materials.**

Mr. McBride was concerned that Chris had not received handouts in class and then on two occasions when he asked for them was told there were no more available or was ignored. Chris indicated that on two different days, this had happened to him concerning the current class assignment. This could be avoided by making extra copies of worksheets and keeping them with you for the duration of the class periods the students are working on them.

**(5) Use of films in class.**

During the conference the question arose concerning the use of the films El Norte and Naked Gun 2 1/2 in class. Chris indicated you had shown both to the class. You had indicated that you had not used this film but instead, Naked Gun. Chris reiterated that El Norte was shown to the class. It was established that in either situation the language used in the films is not appropriate. I would suggest that better judgment be used in selecting materials for use to teach Spanish. There are other films available in Spanish that do not use offensive language or sexual innuendos.

**(6) Use of the work folders for ten percent of the students final grade.**

At the conference you indicated that students were to keep all of their work from the year in a folder. This folder would be collected at the end of the year and would count for ten percent of their final grade. This came as a surprise to the student, parent and myself. We have had several discussions concerning the folders over the past several weeks and at no time was this ever stated. As per our conference of 4/27/94 at 9:45 a.m., I am suggesting that this not be used this current school year. If the folders are to be collected, they should be used as extra credit for the student and not a part of their final grade for this year. Students and parents should be notified of this requirement in writing at the start of the school year. You agreed to doing this. Please inform those classes where this was to be used of how it will be handled for this year.

cc: Mr. James C LaScola, Superintendent
Personnel File

Multi-Page™

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF PENNSYLVANIA

CLAUDETTE DELEON,                    *  *  *  *  *  *  *  *  *  *  *  *

      Plaintiff,                          *

     vs.                                      *  Case No:

CRAWFORD CENTRAL SCHOOL     *  05-126E

DISTRICT, CRAWFORD             *

CENTRAL SCHOOL BOARD,         *

      Defendants,                         *

MICHAEL E. DOLECKI,            *

SUPERINTENDENT,                    *

      Defendant,                           *

CHARLES E. HELLER, III,       *

ASSISTANT SUPERINTENDENT, *

      Defendant                            *

*  *  *  *  *  *  *  *  *  *  *

DEPOSITION OF

CLAUDETTE DELEON

March 6, 2006

Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.

EXHIBIT

10

**Multi-Page**™

Page 2

```
 1              DEPOSITION
 2                 OF
 3  CLAUDETTE DELEON, taken on behalf of
 4  the Defendants herein, pursuant to the
 5  Rules of Civil Procedure, taken before
 6  me, the undersigned, Wendy Blair, a
 7  Court Reporter and Commissioner of
 8  Deeds in and for the Commonwealth of
 9  Pennsylvania, at the administrative
10  offices of Crawford Central School
11  District, 11280 Mercer Pike, Meadville,
12  Pennsylvania, on Monday, March 6, 2006,
13  beginning at 10:07 a.m.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2        A P P E A R A N C E S
 3  CALEB L. NICHOLS, ESQUIRE
 4  P.O. Box 1585
 5  Erie, PA  16507
 6    COUNSEL FOR PLAINTIFF
 7
 8  ROBERTA BINDER HEATH, ESQUIRE
 9  Andrews and Beard
10  3366 Lynnwood Drive
11  Altoona, PA  16603-1311
12    COUNSEL FOR DEFENDANTS
13
14  ALSO PRESENT:
15  MICHAEL E. DOLECKI
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              I N D E X
 2
 3  WITNESS:  CLAUDETTE DELEON
 4  EXAMINATION
 5    By Attorney Heath                  7 - 144
 6  CERTIFICATE                             145
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1
 2
 3      EXHIBIT PAGE
 4  NUMBER  DESCRIPTION        PAGE
 5  One     Plaintiff's First       IDENTIFIED
 6          Amended Complaint    31
 7  Two     Comparative Data on
 8          Minority Hirings     100
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Multi-Page™

**Page 6**

```
1  OBJECTION PAGE
2
3  ATTORNEY          PAGE
4  Nichols      35, 49
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 7**

```
1         P R O C E E D I N G S
2
3
4  CLAUDETTE DELEON, HAVING FIRST BEEN
5  DULY SWORN, TESTIFIED AS FOLLOWS:
6                EXAMINATION
7  BY ATTORNEY HEATH:
8  Q Good morning, Ms. deLeon, my
9  name is Roberta Binder Heath, and I'm
10 here today to take your deposition. As
11 you know, I represent the Crawford
12 Central School District, as well as Mr.
13 Michael Dolecki, the Superintendent,
14 and Charles Heller, the Assistant
15 Superintendent, who have been sued by
16 you in Federal Court in their
17 individual and professional capacities.
18 In this regard, we're here today to
19 take your deposition, and primarily
20 I'll be asking you specific facts
21 concerning your background, and also
22 facts that underlie the Complaint that
23 is the subject of this lawsuit.
24 You have Counsel with you today.
25 You may speak to him at any time or
```

**Page 8**

```
1  take a break at any time as necessary.
2  If you do not understand the questions
3  that I ask you, please let me know and
4  I'll be happy to repeat or rephrase the
5  question for you. If you do answer my
6  question, I will assume that you
7  understood that; is that clear?
8  A That's clear.
9  Q And you are under oath today, so
10 it's very important that you understand
11 what I'm asking you. Also, please wait
12 until I've finished asking the question
13 prior to your answering the questions.
14 That is important for a couple of
15 reasons, the first of which we have a
16 Court Reporter here taking down
17 everything that anyone says in the this
18 room so we will have a record of this
19 proceeding.
20 Secondly, if you try to
21 anticipate what I'm going to be asking
22 prior to my finishing a question, you
23 may run the risk of having overlapping
24 testimony, which again, will not make a
25 very clear record.
```

**Page 9**

```
1  Are you taking any medication
2  today that would impair your ability to
3  answer my questions?
4  A No, ma'am. I'm just taking my
5  regular antidepressant, which I take on
6  a daily basis.
7  Q And what is that?
8  A Effexor.
9  Q Have you been taking that since
10 2003?
11 A Well, before that. Since
12 probably 1997.
13 Q We'll get to this in a little
14 bit more detail later, but weren't you
15 also taking other things, such as
16 Zoloft and Paxil during those time
17 frames?
18 A Other medications, but since
19 they did not work, then I started
20 taking Effexor. And probably the best
21 time I could say that was from 2000,
22 that it worked for me better.
23 Q So 2000 on, approximately,
24 you've been taking Effexor on a daily
25 basis?
```

Multi-Page™

Page 10

1 A.Correct.
2 Q.And how many milligrams a day do
3 you take?
4 A.Twice a day.
5 Q.Do you know how many milligrams?
6 A.I'm trying to think, probably 30
7 milligrams --- no, 75 each. It's 150
8 milligrams a day.
9 Q.Does that amount remain steady?
10 A.Correct.
11 Q.And does it affect your ability
12 to remember anything or ---?
13 A.It hasn't so far. That's why I
14 continue taking it.
15 Q.For the record, the way that you
16 appear as a Plaintiff in this case is
17 Claudette deLeon. And I know from
18 reviewing your records that because of
19 various marriages, you've had other
20 names that you've been known by. Would
21 you please state for the record all of
22 the other names by which you have been
23 known, throughout your lifetime?
24 A.Before I answer that, can I make
25 something clear here? I'm looking at .

Page 11

1 you, but I am not glaring at you. I
2 want to clarify that, because I have
3 been accused so many times of glare.
4 Q.If you can answer my questions,
5 I certainly ---
6 A.If you do mind that I'm looking
7 at you too much, please let me know,
8 okay? Because I don't want you to
9 think I'm trying to intimidate you.
10 Q.That's fine.
11 A.Okay. I would like you to
12 please repeat the question.
13 Q.What I'm wanting to know is what
14 various names have you been known by
15 throughout your life. Is deLeon your
16 maiden name, for example?
17 A.Yes. Before I got married,
18 Claudette Giabata (phonetic) deLeon.
19 That's my real name. When I got
20 married the first time, then I became
21 Mahoney for many years, for 16 years I
22 was married to Mr. Mahoney.
23 Q.What year was that?
24 A.That was in 1980 --- the year
25 that I got married?

Page 12

1 Q.Yes.
2 A.That was in 1976 in Mexico City.
3 Q.Okay.
4 A.I met my husband in my living
5 room, Mexico City, that was definitely.
6 Q.So then you were Claudette
7 Mahoney?
8 A.And then in 1992 when we got a
9 divorce, it was not until 1993, a year
10 and a half later that I became
11 Mitchell.
12 Q.And how long do you ---?
13 A.Three and a half years.
14 Q.You were married to Mr. Mitchell
15 three and a half years?
16 A.Uh-huh (yes). And after that in
17 1996, I became Mrs. McCracken. And I
18 adopted deLeon McCracken. I didn't
19 want to be MMM anymore, so I became
20 Claudette deLeon McCracken.
21 Q.And how long were you married to
22 Mr. McCracken?
23 A.Only less than a year.
24 Q.Have you been married
25 subsequently?

Page 13

1 A.Well, I had a marriage annulled
2 after that, but I married to the last
3 name, the only reason because the last
4 person I got married, he was married in
5 Mexico City. And when I find out, the
6 judge annulled the marriage.
7 Q.What was his name?
8 A.It was Jose Luis --- I can't
9 remember his last name, Hernandez,
10 H-E-R-N-A-N-D-E-Z.
11 Q.And you never took his name?
12 A.I never did, no. I just
13 remained Claudette deLeon since then.
14 Q.When were you married to him
15 before you had it annulled? What time
16 frame is that?
17 A.After I got a divorce with Mr.
18 --- in 2001, no, 2002 or 2000. Gosh, I
19 don't remember.
20 Q.And that was annulled when?
21 A.In 2002.
22 Q.Since that time, have you been
23 married?
24 A.I have been --- no, by myself.
25 I have a divorce --- well, annulled,

Multi-Page™

**Page 14**

```
 1   whatever you want to call single.
 2   Q  Have you ever been known by any
 3   other name other than what we've talked
 4   about?
 5   A  No, just Claudette deLeon,
 6   Claudette deLeon.
 7   Q  Where do you currently reside?
 8   A  In Edinboro, 11983 Eureka Road,
 9   Edinboro.  I have been living there for
10   the last 2 1/2 years.
11   Q  And is that a single home?
12   A  It's a single home, correct.
13   Q  Do you own that home?
14   A  APNC does.
15   Q  So you pay a mortgage?
16   A  Yes, $1,000.50 --- no, $1,050.
17   Q  And you say you've been there
18   for 20 years?
19   A  Twenty-four (24 ).
20   Q  Twenty-four (24) years?
21   A  That's when my son was born,
22   1982.
23   Q  Do you live there alone
24   currently?
25   A  Yes, I do.
```

**Page 15**

```
 1   Q  And your daughter does not live
 2   with you any longer?
 3   A  No, she moved to Pittsburgh
 4   three weeks ago.
 5   Q  What's her age?
 6   A  Her age, 27.
 7   Q  What's the date of your birth?
 8   A  July 3rd, 1953.
 9   Q  And where were you born?
10   A  Mexico City.
11   Q  And when did you move to the
12   United States?
13   A  In 1977, at the beginning of
14   1977.  I got married in 1976.
15   Q  You said you met your husband in
16   Mexico?
17   A  In my living room, yes, talking
18   about definitely.
19   Q  But he was an American citizen;
20   is that correct?
21   A  Yes, he was visiting Mexico.  He
22   stayed one year in Mexico City.
23   Q  And in 1977 when you came to the
24   United States, did you have any ---
25   what was your highest educational
```

**Page 16**

```
 1   level?
 2   A  I went to a conservatory of
 3   music.  I was working as a music
 4   teacher.  I played the piano and I
 5   played the organ.  I was working for
 6   Jemalio (phonetic), Mexico.
 7   Q  Where, sorry?
 8   A  Jemalio, Mexico.  I worked, too,
 9   and also for the Palace of Fine Arts,
10   I like that music.
11   Q  I'm sorry.  You're going to have
12   to --- what fine arts?
13   A  Palace of Fine Arts.  The music
14   section belonged to the Palace of Fine
15   Arts.  And what they did, they sent us
16   to different high schools to teach
17   music.  And then I worked for Jemalio,
18   Mexico, for three years teaching organ
19   for the Japanese.
20   Q  When you came to the United
21   States, where did you move?
22   A  I moved to Erie first.
23   Q  And what did you do at that
24   time?
25   A  I began to study English.  I
```

**Page 17**

```
 1   attended Gannon University to learn how
 2   to speak English.
 3   Q  Can you say the university
 4   again?
 5   A  Gannon University.  It used to
 6   be a college.
 7   Q  Okay.  And how long did you
 8   attend there?
 9   A  For probably about a year.
10   Q  And what was your first job in
11   the United States?
12   A  I was a VISA, VISA volunteer,
13   Volunteer In Service to America.  I had
14   to ---.
15   Q  When was that?
16   A  That was in --- I think it was
17   '78.
18   Q  How long did you do that?
19   A  For a year.  We got a stipend of
20   only $200 a month.
21   Q  And what did you do after that?
22   A  Oh, after that VISA volunteer, I
23   continued going to school.  I
24   transferred to Behrend College.  I was
25   accepted in Behrend College.  I took
```

**Multi-Page™**

1 their initial test. I thought of
2 becoming a Spanish teacher because I
3 felt that then there wouldn't be people
4 who would be fighting for my job, and I
5 didn't want to become a music teacher.
6 I had all my music. I challenged all
7 these courses in just one semester,
8 Piano I, II, III and IV.
9 Q So you went to school to get
10 your teaching certification?
11 A Well, after Behrend College, I
12 transferred to Edinboro University
13 because I heard it was state college
14 and it was cheaper. I was borrowing
15 money from the bank, and then I moved
16 to Edinboro in 1982, so I could attend
17 Edinboro full time because I was going
18 only part time since I had my daughter.
19 Q When was your daughter born?
20 A She was born in 1979, January
21 1979, in Saint Vincent's in Erie, Pa.
22 Q I'm sorry. What Erie, Pa?
23 A Oh, Saint Vincent's Hospital.
24 Q Okay. So you went to Edinboro,
25 and then were you working at all during

1 this time?
2 A No, I wasn't.
3 Q And when did you complete your
4 courses at Edinboro?
5 A In Edinboro University, I
6 graduated from Edinboro University in
7 1986.
8 Q And what was your first job
9 there?
10 A Intermediate unit for a year and
11 a half. I taught English as a second
12 language.
13 Q And thereafter, did you then
14 become involved with the Crawford ---?
15 A No, not yet. I had several
16 opportunities to substitute at
17 different schools, so I worked for one
18 semester in Mercyhurst Prep, and I
19 worked for another semester in
20 Penncrest Saegertown High School. And
21 for three weeks in East High in Erie.
22 They have killed their Spanish teacher,
23 the students, so I substituted for
24 three weeks.
25 Q And that would have been in

1 approximately what? 1988, 1989?
2 A 1988. The last semester of
3 1988, the first semester I taught in
4 Saegertown High School, and then I
5 started to work for Crawford Central in
6 1989, only as a permanent substitute,
7 because the teacher had moved to
8 Massachusetts, I believe. And I
9 started teaching in Carbondale High
10 School, where the kids were beautiful,
11 wonderful, I should have stayed there.
12 But it was a long drive from Edinboro.
13 Q And then you came to Meadville;
14 is that correct?
15 A In 1991, when --- as soon as
16 Mrs. Condey (phonetic) retired because
17 --- only because I wanted to be closer
18 to Edinboro. It was difficult to drive
19 that far.
20 Q Now, during the time that you
21 worked for the Crawford Central School
22 District, did you ever hold any other
23 employment as well, supplemental
24 employment?
25 A No.

1 Q Either in the summer or ---?
2 A No, I was not a stripper. I was
3 never a stripper.
4 Q That wasn't my question. I
5 asked if you had any other jobs?
6 A No. I attended full time to my
7 church. I'm one of Jehovah's
8 Witnesses. My full time it was preach
9 to people.
10 Q Okay. Since your termination in
11 April of 2003, have you held any other
12 job?
13 A Not for a while I couldn't find
14 a job, so I had to survive with my
15 unemployment. And then when my son
16 died, the only money I got was $12,000.
17 When all the money was gone, then I was
18 able, thanks God, to find job in
19 telemarketing company right now.
20 Q Before we get there, let me just
21 stop you. You indicated that when you
22 first were terminated, you couldn't
23 find a job?
24 A I couldn't for a year and a half
25 nowhere.

Page 22

1 Q What did you do in order to try
2 to find a job?
3 A Place applications everywhere.
4 Q Do you have copies of those
5 applications?
6 A Yes, including the civil service
7 test that I took. I have copies of
8 that, if you would like, and all the
9 denials ---
10   ATTORNEY HEATH:
11     I'd like for the record
12 to request any applications that
13 she submitted since 2003 to the
14 present.
15 A Yeah, I apply in at least ---
16   BY ATTORNEY HEATH:
17 Q Or any other documentation that
18 you have that would be some sort of a
19 record of what jobs you applied for,
20 what interviews you went on and whether
21 or not you had any acceptances.
22 A Mainly civil service tests
23 especially, because they were looking
24 for a special ed teacher at Albion
25 prison, and also in Cambridge Springs

Page 23

1 in another teacher position in a prison
2 and another teacher position in a
3 private school. Gannon University was
4 looking for a teacher, but they say I
5 needed a Master's. Although I did, but
6 they said no we need a Spanish
7 Master's. So all those jobs were
8 turned down.
9 Q And you have all that
10 information?
11 A I have copies.
12   ATTORNEY HEATH:
13     You have all that
14 information?
15   ATTORNEY NICHOLS:
16     Wait. You said from what
17 date? Since what date?
18   ATTORNEY HEATH:
19     From her termination,
20 date of her termination.
21   ATTORNEY NICHOLS:
22     April of 2003?
23   ATTORNEY HEATH:
24     Right.
25   BY ATTORNEY HEATH:

Page 24

1 Q Now, the information that I have
2 also indicates that after your
3 termination you went back to school; is
4 that correct?
5 A Yes, I did. I went back to
6 Mercyhurst since I had already started.
7 Since after my nervous breakdown when I
8 start feeling better in 1999, I sign up
9 for a Master program. Although at the
10 end of 2001, they say I didn't show any
11 professional improvement and they asked
12 me to do all this research, I was
13 already attending Mercyhurst College.
14 I had 27 ---
15 Q You're saying they, you're
16 talking about ---?
17 A The administrators. They said I
18 did not show professional improvement.
19 I had already 27 credits in a special
20 education course, because they gave me
21 an assistantship in Mercyhurst. I was
22 not paying for my education. They gave
23 me an assistantship. But the last
24 courses in order to graduate, then I
25 had to pay, and I still owe that money.

Page 25

1   OFF RECORD DISCUSSION
2   BY ATTORNEY HEATH:
3 Q So you do have your Master's
4 degree now; is that correct?
5 A In 2004, yeah. I have to stop
6 school after my son died. I couldn't
7 finish it, for about three months. And
8 they gave me the opportunity to go
9 ahead and turn in my thesis --- they
10 gave me an extension of three months.
11 Q And is your Master's degree in
12 special education?
13 A Special education and bilingual
14 education, special education and
15 bilingual.
16 Q So you could teach ---?
17 A Bicultural.
18 Q You could teach special
19 education or you could teach English as
20 a second language, or you could teach
21 Spanish; is that correct?
22 A I would rather teach Spanish.
23 Q You would be able to teach all
24 of those though?
25 A I don't know. I didn't apply

Multi-Page™

Page 26

```
 1  for —
 2  Q.You did not get a certification
 3  for special education?
 4  A.I didn't want to go back to ESL
 5  and special ed. I didn't know if I
 6  would qualify. I would have to be
 7  certified, but my Master's is in
 8  special education. And ESL, they used
 9  to pay me very little.
10  Q.I'm sorry, who?
11  A.Only a few dollars an hour
12  Q.You've got to like slow down.
13  I'm sorry.
14  A.ESL.
15  Q.ESL? Okay. I apologize. And
16  if you could slow down a little bit,
17  that would be helpful for the Court
18  Reporter.
19  A.Sure. I will.
20  Q.So you do have your Master's in
21  special education and bilingual?
22  A.And bicultural. Uh-huh (yes).
23  Q.But you just have not gotten the
24  certification; is that correct?
25  A.I don't know if I need to get a
```

Page 27

```
 1  certification. All I did, the program
 2  was just for a special education.
 3  bilingual, bicultural. That was the
 4  title of the Master's.
 5  Q.With regard to any of the
 6  positions that you applied to from the
 7  time of your termination until the
 8  present that were teaching positions,
 9  did you have any interviews?
10  A.Yes, I did.
11  Q.Where did you interview?
12  A.At Albion prison. Albion,
13  A-L-B-I-O-N. Albion. And the same
14  with Cambridge Spring at the women's
15  jail.
16  Q.Okay.
17  A.And I had another interview in a
18  private school. I believe the name was
19  Saint Andrew. I can't remember the
20  name, but it's 11th Street. It's a
21  private school. I have to find out the
22  letter. And Gannon University, they
23  never called me for an interview. And
24  I went for an interview in Eric School
25  District.
```

Page 28

```
 1  Q.And did you receive any job
 2  offers from these places you mentioned?
 3  A.No, I did not.
 4  Q.Anywhere else that you
 5  interviewed?
 6  A.I went to Career Unemployment
 7  Office. I was interviewed by the
 8  intake application people. They helped
 9  me to go ahead and search through the
10  Internet. What is the name — it's on
11  Holland Street, the unemployment
12  office. I went there several times to
13  take the test, and the first time to
14  take the interview, and to place an
15  application for all the civil service
16  tests.
17  Q.And did you ever have any
18  interviews for any civil service
19  positions?
20  A.Yes, in Albion and Cambridge
21  Spring.
22  Q.Those were the two?
23  A.Uh-huh (yes).
24  Q.Any others?
25  A.No, that's all. That's the only
```

Page 29

```
 1  places they called me. And Eric School
 2  District. Of course, I didn't get the
 3  job.
 4  Q.And you said of course. Why of
 5  course?
 6  A.Of course?
 7  Q.You said, of course, I didn't
 8  get the job.
 9  A.Oh, that was for Strong Vincent.
10  Q.Pardon me?
11  A.That was for Strong Vincent, an
12  inner-city school.
13  Q.Right.
14  A.And it was something for Spanish
15  I, and they said that they needed
16  somebody more specialized because the
17  kids were extremely rough. And the
18  first day I went there to interview
19  with the teacher, the students were
20  horrible, very rough inner-city kids
21  that they swear and talk with dirty
22  words all the time.
23      The Spanish teacher said that
24  she was totally sick of all, that's why
25  she was retiring. That she was burned
```

Case 1:05-cv-00126-SJM    Document 50-6    Filed 06/26/2006    Page 21 of 50

**Page 30**

1 out. She couldn't straighten the kids
2 up. No control whatsoever, and she
3 thought that maybe I could do a better
4 job. But the principal said that he
5 wanted somebody more specialized, maybe
6 like a big gorilla or something to be
7 able to control those kids. There were
8 about 30 of them, horrible.
9 Q And so you wouldn't have taken
10 the job if you would have gotten
11 offered the job?
12 A I would have, yes.
13 Q Pardon me?
14 A I would have. If they would
15 have given me the job, I wouldn't mind
16 because I love discipline, and I
17 discipline. That's my problem. I do
18 discipline, and I keep control in my
19 classes.
20 Q Did you have any other
21 interviews other than the private
22 school that you can think of with a
23 school district?
24 A No, because they didn't call me
25 from Gannon University. I wish they

**Page 31**

1 would have.
2 Q Did you follow up at all and
3 keep abreast of the school districts
4 that were advertising for positions?
5 A Yes, I send also a letter of
6 interest to Pittsburgh around Butler.
7 They were asking for Spanish teacher.
8 And I sent a letter of interest and my
9 resume, and I never heard from them.
10 That was another one.
11 Q I'm going to have you start
12 looking at the documents. This copy is
13 going to be for the Court Reporter, but
14 you may use after she marks them, if you
15 want to use them as references, that's
16 fine.
17 ATTORNEY NICHOLS:
18 Okay.
19 ATTORNEY HEATH:
20 I'd like to mark this as
21 deLeon One, and it is a copy of
22 the First Amended Complaint.
23 (deLeon Exhibit Number
24 One marked for
25 identification.)

**Page 32**

1 A Yeah, I already read it this
2 morning.
3 BY ATTORNEY HEATH:
4 Q In reviewing the First Amended
5 Complaint you already reviewed this
6 morning, had you reviewed it also prior
7 to filing?
8 A Oh, yes, of course. I read
9 everything myself.
10 Q And as you sit here today, do
11 you believe the information contained
12 in this Complaint is complete and
13 accurate information?
14 A Of course, 100 percent.
15 Q Okay. Relative to the
16 complaints that have been brought
17 against Mr. Dolecki, the
18 superintendent, and Mr. Heller, the
19 assistant superintendent, in their
20 personal capacity, what is your
21 understanding of the basis of the
22 reason that Mr. Dolecki was sued in his
23 personal capacity? I'm not asking for
24 a legal conclusion, but what is your
25 understanding of why?

**Page 33**

1 A He asked me to resign. As soon
2 as I turned in a medical excuse, he
3 tells Mr. Heller to ask me to resign
4 because of the medical excuse I have
5 submitted. And even if I hadn't
6 resigned, they had already taken my
7 Spanish I, my Spanish II students two
8 years before for a test without even
9 telling me. They were already
10 planning ---
11 Q And what's the point? What's
12 wrong with that?
13 A Only my students, nobody else's
14 students.
15 Q Is that in violation of the
16 collective bargaining agreement?
17 A Not to my knowledge.
18 Q Please just wait until I finish
19 my question. Wait until I finish my
20 question before you answer my question.
21 The fact that they gave a proficiency
22 test to your classroom, what does that
23 mean to you?
24 A Different treatment.
25 Q Is that in violation of the

Page 34

```
 1 collective bargaining agreement?
 2 AThey were planning ahead to fire
 3 me.
 4 QIs that in violation of the
 5 collective bargaining agreement?
 6 AIn retaliation.
 7 QYou're not answering my
 8 question. Is that in violation of the
 9 collective bargaining agreement? Is
10 there something that says ---?
11 AIt doesn't say that they were
12 allowed to.
13 QIs there anything in the
14 collective bargaining agreement that
15 indicates that the administration is
16 not permitted to test a class in their
17 proficiency?
18 ATreatment.
19     ATTORNEY NICHOLS:
20          Counsel, I think she
21     answered your question.
22     ATTORNEY HEATH:
23          She didn't answer my
24     question.
25     ATTORNEY NICHOLS:
```

Page 35

```
 1          Well, like she said ---
 2     basis she said in violation of civil
 3     rights laws. That's what she's
 4     saying.
 5     ATTORNEY HEATH:
 6          That wasn't my question.
 7     ATTORNEY NICHOLS:
 8          Well, I mean --- please,
 9     Miss, you asked her ---. What
10     you're asking here is a legal
11     conclusion. You've prefaced
12     your remarks that you would not
13     ask her to draw a legal
14     conclusion, which you should
15     not. You should inquire only.
16     and you should know, only ask
17     the factual matters.
18          Now, you're asking her,
19     did anything violate the
20     collective bargaining agreement,
21     which obviously means she has to
22     reach a conclusion, make a legal
23     conclusion, as to whether it
24     violated the collective
25     bargaining agreement. She's
```

Page 36

```
 1     answering you on the basis of
 2     what we allege is a violation of
 3     civil rights and the theories.
 4     That's what she's saying. And
 5     you continue to badger her.
 6     ATTORNEY HEATH:
 7          I understand your
 8     objection. You can make it for
 9     the record, but my question
10     stands.
11     BY ATTORNEY HEATH:
12 QIs there anything about that
13 testing that you believe is in
14 violation of the collective bargaining
15 agreement?
16 AMy answer stands. Different
17 treatment. They did not take any other
18 teacher's students, but mine.
19 QI caution you to please for the
20 record to watch your tongue.
21 AThat's my answer.
22 QI'm simply asking you to answer
23 my questions.
24 AI already did so, ma'am
25 QNow, relative to then getting
```

Page 37

```
 1 back to what you were saying about the
 2 basis for the charges against Mr.
 3 Dolecki and Mr. Heller in their
 4 personal capacity, you're referring to
 5 a medical excuse and something about a
 6 request to resign. Are you referring
 7 to what occurred in the spring of 2002?
 8 A.Correct.
 9 QIsn't that true that during a
10 meeting, essentially you had virtually
11 a mental meltdown, and you said you
12 could not go on any further, you
13 couldn't teach anymore in the presence
14 of union representatives?
15 AI never said that I started
16 crying, and I said you already started
17 harassing me again. You already
18 started retaliating me again. I said,
19 this cannot go on. And I went ahead
20 and brought another complaint to Human
21 Relations, because they started all
22 over again. And I ---
23 QIs that when you walked out of
24 the meeting?
25 AI didn't walk out on that
```

**Multi-Page™**

Page 38

1  meeting.
2  Q And it took Mrs. Deardorff 45
3  minutes then to calm you down, to bring
4  you back in?
5  A That was not that meeting.  That
6  was maybe another meeting.  There were
7  several meetings that I had to cry and
8  cry and cry.  I couldn't stand the
9  harassment.  Eventually, they pushed me
10  to the end.
11  Q So the basis for the charges
12  against Mr. Dolecki and Mr. Heller, as
13  you understand them, relates back to
14  this request for resignation?
15  A No, I didn't cry in that
16  particular meeting.  On the contrary,
17  if you read the documentation, I say I
18  will comply with your request.  They
19  asked me to resign, and they send me to
20  have a psychiatric evaluation.  And
21  they say if you don't do it, you will
22  be accused of insubordination.
23  So that moment on it didn't
24  matter whether I took that evaluation
25  or not, because that day they claimed

Page 40

1  of the claims against Mr. Dolecki and
2  Mr. Heller that form the basis for
3  suing them in their personal capacity
4  as opposed to their professional
5  capacity?  Does it all revolve around
6  that resignation request and the
7  independent medical examination of
8  2002?
9  A And all the suspension and all
10  the harassment and all the unfair
11  accusations, immorality, because I gave
12  information to Human Relations and my
13  lawyer --- and immorality is gay ---
14  Q Well ---.
15  A --- and the whole entire school
16  knows about it.  They say, hey, look
17  out for the principal because he's
18  going to get you.  That's immorality
19  and God condemns that.  That's
20  immorality and they allow that to
21  happen.
22  Q If you could calm down and slow
23  down ---
24  A I'm sorry.
25  Q --- so the Court Reporter can

Page 39

1  they were already giving me an
2  unsatisfactory for that year.  Although
3  I took the evaluation, the psychiatric
4  evaluation, they had already decided
5  that they were giving me the final ---
6  the unsatisfactory.  From that day on,
7  and not because I cry, because of the
8  medical excuse I submitted.  That's
9  why.
10  So since I did not resign, so
11  medically, they were going to fire me
12  if I did both, and they were going to
13  do everything they could, and you could
14  see it, all their suspicions, all the
15  reprimands for things that I didn't
16  even do.  Other teachers did allow the
17  students to leave early.  They blame it
18  on me.  Others submitted drug and
19  alcoholic referral.  They blame it on
20  me, everything.  I control.  I
21  discipline.  That was my mistake.  Dam
22  if I did, darn if I didn't.
23  Q We're going to get to that, but
24  what I'm trying to understand from you
25  is what exactly is your understanding

Page 41

1  I take down what you're saying, it will
2  make a much cleaner record.
3  A I want to take a little break
4  because I don't want to be rude to you
5  like you said I was raising my voice.
6  I have to apologize 100 percent because
7  that's not a gracious thing to do.  I
8  just get very emotional.
9  ATTORNEY HEATH:
10  Do you want to take a
11  break and calm down?  That would
12  be great.
13  ATTORNEY NICHOLS:
14  Do you want to take a
15  break?
16  A I'm going to take my medication,
17  but it's not going to impair me to
18  forget things, just to calm down my
19  nerves.
20  ATTORNEY NICHOLS:
21  Can we go off the record?
22  OFF RECORD DISCUSSION
23  BY ATTORNEY HEATH:
24  Q When we stopped, what I was
25  trying to ask you is your understanding

Multi-Page™

1 of the basis of the allegations against
2 Mr. Dolecki and Mr. Heller personally.
3 A.Correct.
4 Q.Now, is there a distinction in
5 your mind between these allegations
6 between Mr. Dolecki and Mr. Heller, or
7 are they one in the same?
8 A.They are the same.
9 Q.And to paraphrase, is it
10 basically your testimony that all these
11 allegations stem from the spring of
12 2002, when you were asked to get an
13 independent medical examination from a
14 psychiatrist, and then leading up to
15 your termination?
16 A.Correct.
17 Q.Is that correct?
18 A.Correct.
19 Q.So we're starting at 2002 and
20 going forward to 2003; is that
21 accurate?
22 A.Correct.
23 Q.You were in court when Mr.
24 Nichols and I had to appear before
25 Judge McLaughlin concerning the initial

1 motion to dismiss and then a subsequent
2 motion to dismiss that I filed?
3 A.Uh-huh (yes).
4 Q.If you will recall, part of what
5 my position was or the defense position
6 was concerning your PHRC complaint that
7 you had not filed an amended complaint
8 to incorporate your termination; do you
9 recall that issue?
10 A.Correct, correct.
11 Q.Can you please explain to me for
12 the record what you did after you were
13 terminated relative to approaching the
14 PHRC about your termination to try to
15 amend your complaint?
16 ATTORNEY HEATH:
17 Before you do, let me
18 just say for the record that
19 it's come to my attention that
20 today I received a box of
21 documents from the Pennsylvania
22 Human Relations Commission that
23 was produced pursuant to a
24 subpoena that I had sent. I
25 have --- obviously because I'm

1 out of town, I've not had an
2 opportunity to review those
3 documents, and so at this time,
4 depending upon how we do today,
5 I also want to reserve the right
6 to recall the Plaintiff if I
7 need to after reviewing those
8 documents.
9 And also I have not
10 received all of her medical
11 records that I have requested by
12 virtue of the HIPAA releases.
13 And if necessary, I would like
14 to reserve the right to recall
15 her. And we can discuss the
16 issues that will be ---
17 obviously, I wouldn't want to
18 repeat anything we've already
19 done.
20 ATTORNEY NICHOLS:
21 On behalf of the
22 Plaintiff, I want to know also
23 that these issues have been
24 brought before Judge McLaughlin,
25 and the issue regarding the

1 exhaustive administrative
2 remedy's report which I received
3 otherwise including EOC having
4 photographs by Judge McLaughlin.
5 And therefore, as Plaintiff's
6 Counsel, I would strongly oppose
7 to revisiting those issues.
8 ATTORNEY HEATH:
9 Well, I don't want to
10 take the time today to argue
11 about this too specifically, but
12 it's my recollection of what
13 Judge McLaughlin said at the
14 hearing specifically on the
15 exhaustion of the administrative
16 remedy's issue, he wasn't going
17 to dismiss it outright and it
18 would be a subject of discovery,
19 which could be brought up then
20 in a motion for summary judgment
21 if we feel necessary.
22 ATTORNEY NICHOLS:
23 Was that stated on the
24 record, Counsel?
25 ATTORNEY HEATH:

Multi-Page™

**Page 46**

1 I believe so. If not, it
2 was stated beforehand, but I'll
3 be --- you know, if we have
4 to ---.
5 ATTORNEY NICHOLS:
6 Because I recall ---.
7 ATTORNEY HEATH:
8 My recalling your client
9 may be necessary on a variety of
10 issues, not just this issue.
11 We'll see how far we get today,
12 and I don't really want to take
13 the time today to argue about
14 it. If you want to go in front
15 of the Court, we can do it there
16 if we need to.
17 ATTORNEY HEATH:
18 Okay.
19 ATTORNEY HEATH:
20 But I have the right to
21 ask her today what she did in
22 pursuing her administrative
23 remedies, because as you are
24 aware, there is no complaint
25 that was ever served upon the

**Page 47**

1 District, and we have no
2 formalized complaint from the
3 PHRC. Now, I don't know if it's
4 in that box of documents, but
5 the District never was served
6 with that complaint. When you
7 brought it up in front of the
8 Judge, you couldn't give me a
9 complaint that was amended. So
10 I have every right to pursue
11 this avenue of question with her
12 today.
13 ATTORNEY NICHOLS:
14 Well, the only thing I
15 can say, I thought these issues
16 were fully discussed before the
17 Judge.
18 ATTORNEY HEATH:
19 They were discussed, and
20 that was through the subject of
21 discovery.
22 ATTORNEY NICHOLS:
23 And the Judge ruled. As
24 I remember Judge McLaughlin, he
25 had ruled on these issues. I

**Page 48**

1 I don't think he left the door
2 open. Now, I don't think it
3 would be proper to --- and you
4 can ask him, to ask him if it's
5 reopened and to revisit these.
6 issues. I thought this was long
7 behind us.
8 ATTORNEY HEATH:
9 I disagree, and in the
10 interest of time, what I would
11 suggest you do is subject to
12 your record --- being put onto
13 the record, your objection, I
14 can ask her what she did, and
15 then we'll go from there as to
16 going before the Judge to
17 determine if this is going to be
18 a subject that's proper for a
19 motion for summary judgment.
20 My reservation of my
21 right to recall her also relates
22 to the medical records issue,
23 and also relates to the fact
24 that I'm still in the process of
25 trying to get full documentation

**Page 49**

1 from the PSEA. Depending upon
2 what I receive, it may be
3 necessary to recall her. If may
4 not be. I'm simply reserving
5 the right on the record, and if
6 you want to object, go in front
7 of the Judge about that, too.
8 ATTORNEY NICHOLS:
9 Well, I will object to
10 revisiting this issue dealing
11 with things, the PHRC and the
12 exhaustion of remedies, because
13 I thought we had discussed that
14 fully in front of the Judge and
15 the Judge ruled. That's the
16 first thing, okay? So I note my
17 objection for the record on
18 that.
19 On the medical records,
20 you alluded to them, but you
21 were not specific.
22 ATTORNEY HEATH:
23 The HIPAA releases that
24 you provided to me.
25 ATTORNEY NICHOLS:

Multi-Page™

Page 50

```
 1   Right.
 2   ATTORNEY HEATH:
 3       I have sent them to the
 4   health care providers.  I only
 5   ever heard from the Edinboro
 6   Women's Health Center.  Never
 7   heard from anybody else.  Don't
 8   have those medical records.
 9   ATTORNEY NICHOLS:
10       Okay.
11   ATTORNEY HEATH:
12       So I don't know what they
13   say.
14   ATTORNEY NICHOLS:
15       Well, we provided the
16   release to you.
17   ATTORNEY HEATH:
18       I understand that, but I
19   still don't have the records.
20   ATTORNEY NICHOLS:
21       So what are we saying?
22   ATTORNEY HEATH:
23       All I'm saying is --- and
24   I really don't want to spend the
25   time arguing about this now on
```

Page 51

```
 1   the record when I'm trying to
 2   take her deposition.
 3   ATTORNEY NICHOLS:
 4       Right.
 5   ATTORNEY HEATH:
 6       I'm just reserving the
 7   right to recall her if
 8   necessary.  If at that time you
 9   want to object, we can go before
10   the Judge about it.
11   ATTORNEY NICHOLS:
12       Well, I think the
13   record ---
14   ATTORNEY HEATH:
15       I don't know what I'm
16   going to have.  I may not even
17   finish today.
18   ATTORNEY NICHOLS:
19       Right.  I would think the
20   record --- let the record
21   reflect this was a vantage point
22   of the Plaintiff is that in
23   terms of the HIPAA release, we
24   have provided that in accordance
25   with the Court's Order.  Whether
```

Page 52

```
 1   or not the parties, the medical
 2   institutions or the medical
 3   providers that you requested
 4   these documents from will
 5   comply, I don't know.  But we
 6   have discharged our obligation.
 7   All right?  That should be
 8   reflected.
 9       As to recalling the
10   Plaintiff for further inquiry
11   into the medical records and so
12   forth, I think one of the Judges
13   ruled that he's not going to
14   allow you to submit the
15   Plaintiff to a psychiatric exam.
16   ATTORNEY HEATH:
17       No.  I don't know if you
18   were in the same courtroom I was
19   in.  What the Judge said was
20   today I'm not going to say you
21   have the opportunity to give her
22   another IME.
23   ATTORNEY NICHOLS:
24       Right.
25   ATTORNEY HEATH:
```

Page 53

```
 1       You have to wait until
 2   you get the medical records.
 3   After you have an opportunity to
 4   review the medical records and
 5   we get a time frame down
 6   concerning her psychiatric
 7   conditions, that's when we'll
 8   see if an IME is merited or not
 9   and it's something that could be
10   revisited.
11   ATTORNEY NICHOLS:
12       Well, I think his ruling
13   was ---
14   ATTORNEY HEATH:
15       Mr. Nichols, can we go
16   off the record?
17   OFF RECORD DISCUSSION
18   ATTORNEY NICHOLS:
19       With respect to the last
20   matter, the HIPAA release, I
21   just stated that what we have
22   done.  As to further subjecting
23   the Plaintiff to IMEs, the
24   Judge, I think, has definitively
25   ruled that he's not going to
```

Multi-Page™

## Page 54

1 allow that. And the reason for
2 the rationale we advanced and I
3 think he accepted is it went
4 beyond 2003, the date of her
5 termination. There is no
6 reason, no rational reason, to
7 allow the Defendants to further
8 pry into the Plaintiff's mental
9 health conditions.
10 BY ATTORNEY HEATH:
11 Q.Let me just ask the Plaintiff
12 this and for the record. Are you —
13 is it your testimony that you could
14 have returned to work after the release
15 to return to work as per the
16 independent medical examination that
17 was requested by the District; is that
18 right? That your mental health has not
19 been a factor since that time going
20 forward, since 2002 going forward; is
21 that what you're saying?
22 A.I'm very sorry, but I don't
23 quite understand the question.
24 Q.What I think your Counsel is
25 indicating is once the psychiatrist

## Page 55

1 that was retained by the School
2 District, be gave you an independent
3 medical examination in 2002. Once that
4 psychiatrist indicated that you could
5 return to work, that you were not
6 impaired by your psychiatric condition.
7 Is it your testimony that your
8 psychiatric condition has not been at
9 issue from that time forward?
10 A.It is an issue. It is, because
11 I find that he said I'm not impaired
12 I can function. I can teach. However,
13 my mental condition is extremely
14 fragile, and that's what they were
15 using against me because they knew I
16 suffer recurrent severe depression
17 because of all this harassment. I
18 already had a nervous breakdown. And
19 when I go back, instead of making
20 things easier for me, they pushed me to
21 the end.
22 What they're doing now, they're
23 trying to get away my certification,
24 talking about evil. They're trying to
25 do everything to drive me to have

## Page 56

1 another nervous breakdown. Well, my
2 God, Jehovah God, He is stronger than
3 their God, which is Satan, because they
4 are working behind them, the evil. And
5 Jehovah talks about all this. They are
6 trying to push me to the end to have
7 another nervous breakdown. But even if
8 I lose my certification, that said, if
9 they are successful —
10 Q.Okay. Let me just stop you
11 there.
12 ATTORNEY HEATH:
13 What I'm going to say for
14 the record is because I don't
15 have all of the records, and
16 given what she just said on the
17 record, this might have to be an
18 issue that comes before Judge
19 McLaughlin. I don't want to
20 debate it today. I don't have
21 the records. I don't know
22 what's going to be in the
23 records, and I really don't want
24 to debate it today.
25 ATTORNEY NICHOLS:

## Page 57

1 I understand, Counsel.
2 I'm not going to debate it
3 today, but I don't think my
4 client fully understands your
5 question. And let me — in the
6 clarification purposes, I think
7 you asked her two questions.
8 One, you're asking her is that
9 since she has returned to work
10 in 2002 per the order of Doctor
11 Mercatories, is her condition
12 — is that a condition any
13 longer in question? All right.
14 Now, one, the Doctor
15 Mercatories' order to return her
16 to work in May 2002 will speak
17 for itself.
18 A.McFadden.
19 A.McFadden.
20 McFadden, correct. It's
21 McFadden.
22 A.That was their own doctor.
23 ATTORNEY NICHOLS:
24 All right. It's on the
25 record. It will speak for

**Page 58**

```
 1 itself, what the doctor said. He
 2 returned her to work. Now, as
 3 to what she went on to say about
 4 when she returned to work, the
 5 harassment, the conditions when
 6 she returned exacerbated her
 7 condition, that's what she's
 8 saying.
 9 ATTORNEY HEATH:
10 So therefore ---.
11 ATTORNEY NICHOLS:
12 But she is not changing
13 what --- she can't change what
14 the doctor said. That's what
15 that doctor said. That medical
16 opinion's going to speak for
17 itself.
18 ATTORNEY HEATH:
19 All right.
20 A I'm not crazy. I'm mentally
21 healthy. I can work.
22 ATTORNEY NICHOLS:
23 Well, that's what the
24 doctor said. That's what the
25 doctor said.
```

**Page 59**

```
 1 A.Even with the aggravation, I can
 2 work.
 3 ATTORNEY HEATH:
 4 But what the doctor said
 5 in 2002 doesn't necessarily
 6 address maybe how her condition
 7 may have affected her in 2003.
 8 What I'm asking her is if she
 9 felt that she was capable of
10 working from 2002 to the time of
11 her termination.
12 BY ATTORNEY HEATH:
13 Q.Were you mentally able to work,
14 or did your condition affect your
15 ability to perform your job duties?
16 A.No, I was able to work. But
17 unfortunately, the mental stability ---
18 I did everything they asked me,
19 everything. I complied with every
20 single request, including taking the
21 psychological evaluation so they
22 wouldn't fire me. It didn't matter.
23 They had already asked me for my
24 resignation. They were going to fire
25 me no matter what I did.
```

**Page 60**

```
 1 Q.You're saying that you were
 2 capable of performing your job ---
 3 A.Even with my depression.
 4 Q--- but you still suffered from
 5 depression?
 6 A.It was exaggerated by all the
 7 horrible treatment, different
 8 treatment, all the harassment. Damned
 9 if I disciplined, damned if I didn't.
10 It started with the parents.
11 Q.Let me just ask you this. So
12 relative to your Complaint that's
13 pending before the Federal Court, you
14 do have a claim in there for emotional
15 distress. Is your mental state from
16 that time frame going to be at issue in
17 your claim for damages? Are you going
18 to claim I am entitled to monetary
19 compensation because of the alleged
20 harassment that I received at the hands
21 of the District?
22 ATTORNEY NICHOLS:
23 What period are you
24 talking about? This is
25 important.
```

**Page 61**

```
 1 ATTORNEY NICHOLS:
 2 2002.
 3 ATTORNEY NICHOLS:
 4 What period are you
 5 talking ---?
 6 ATTORNEY HEATH:
 7 Until the time she was
 8 terminated.
 9 ATTORNEY NICHOLS:
10 Okay. Let's speak
11 because it's very important ---
12 ATTORNEY HEATH:
13 I understand.
14 ATTORNEY NICHOLS:
15 --- that we speak with
16 specificity in terms of periods
17 here because the allegations
18 that were put forth ---.
19 ATTORNEY HEATH:
20 And that's what I was
21 unclear about in the Complaint.
22 ATTORNEY NICHOLS:
23 Right, right. And it's
24 very important you remember when
25 I think our last meeting before
```

**Multi-Page™**

```
 1  Judge McLaughlin, the dates ---
 2  ATTORNEY HEATH:
 3      I just want to hear
 4  that ---
 5  ATTORNEY NICHOLS:
 6      --- that came up, the
 7  dates came up as to ---
 8  ATTORNEY HEATH:
 9      I know. That's why I'm
10  asking her questions
11  ATTORNEY HEATH:
12      And also to what extent
13  possibly we will hold the
14  District liable for these
15  damages, emotional pain and
16  suffering, okay? What period?
17  ATTORNEY HEATH:
18      I really don't want your
19  testimony. I just want to ask
20  her what --- she said that she
21  ATTORNEY NICHOLS:
22  ATTORNEY NICHOLS:
23      Yeah, but the date's
24  important.
25  ATTORNEY HEATH:
```

```
 1      That's why I'm asking her
 2  the dates. I don't want your
 3      clarifying. Don't confuse the
 4  testimony. I want her
 5  ATTORNEY NICHOLS:
 6      Yeah, but it's
 7  clarifying. Don't confuse the
 8  dates, because she doesn't, I
 9  don't think --- I understand it.
10  Take your time. You know, if
11  you don't understand because
12  this is important as to the
13  periods within which we are
14  holding the District liable for,
15  as you have raised, for pain and
16  suffering, possibly pain and
17  suffering claim, okay? Now, I
18  thought we covered this before
19  Judge McLaughlin in our last
20  submission.
21  ATTORNEY HEATH:
22      What was covered before
23  Judge McLaughlin was different
24  than --- the point was, because
25  I didn't have the records I
```

```
 1  I didn't know what I was looking
 2  for. I wasn't clear on the time
 3  frame. Because there wasn't a
 4  time frame that was specified in
 5  the Complaint, that's why I
 6  wanted to get the records.
 7      After I got the records,
 8  Judge McLaughlin said depending
 9  upon what the records show you
10  and what her testimony was that
11  you can make a decision if you
12  want to come back to me and ask
13  for an IME. I'm just trying to
14  figure out what her claim is
15  concerning her mental state and
16  at what time.
17  ATTORNEY NICHOLS:
18      Okay. Well, you ask what
19  time. Time is critical.
20  ATTORNEY HEATH:
21      I know. That's why I'm
22  asking her questions.
23  ATTORNEY NICHOLS:
24      What period are you
25  talking about? Now, you're
```

```
 1  talking about pain and
 2  suffering; right? Those
 3  damages; right?
 4  ATTORNEY HEATH:
 5      I'm trying to see if
 6  there's a distinction between
 7  her claims concerning her
 8  alleged discrimination on the
 9  basis of her perceived
10  disability, and actual
11  disability, and then the claims
12  for emotional distress. I'm
13  trying to determine what time
14  frames we're talking about, when
15  she's claiming these periods
16  existed.
17  ATTORNEY NICHOLS:
18      Well, I think we have
19  already answered your first two
20  time frames. In the Complaint,
21  we answered one in terms of the
22  failure to accommodate.
23  ATTORNEY HEATH:
24      Mr. Nichols, I don't ---
25  what the Complaint says is one
```

**Multi-Page™**

1 filing. I have every right to
2 &. her about the basis
3 underlying what's alleged in the
4 complaint.
5 ATTORNEY NICHOLS:
6 True, but I'm very
7 concerned about ---
8 ATTORNEY HEATH:
9 I don't want your
10 testimony.
11 ATTORNEY NICHOLS:
12 I understand. I'm not
13 going to testify, but what I'm
14 insisting is that she not be
15 confused with the dates here of
16 possible liability, when it
17 starts and when it stops
18 relative to the different
19 theories under the ADA law. Do
20 you see what I'm saying? That's
21 what. If you could specify,
22 that would be helpful.
23 ATTORNEY HEATH:
24 Okay. I'm trying to.
25 ATTORNEY NICHOLS:

1 Okay.
2 BY ATTORNEY HEATH:
3 Q Relative to your claim for
4 emotional distress, what I'm asking
5 about, not all inclusively a time
6 frame, but the time between Doctor
7 McFadden's indication that you were
8 able to return to work until your
9 termination in 2003. At that time, I
10 believe what you're saying is although
11 you were capable of returning to work,
12 you believed that the District's
13 treatment of you caused you some
14 emotional distress; is that correct?
15 A Well, my mental distress, it was
16 caused by them. From the very first
17 arbitration, second arbitration which
18 led me to my nervous breakdown, the
19 horrible nightmares, psychotic dreams I
20 had about Mr. Destiner. Horrible things
21 that he was doing to me in my psychic
22 dreams. They were so horrible and then
23 Templeton and Berkebile --- about these
24 horrible demons and aliens. And then
25 when I'm beginning to feel a little bit

Page 66

1 better, right, I come back to work ---
2 Q What time frame are you talking
3 about now?
4 A I'm talking about from the very
5 beginning. I'm talking about the first
6 arbitration. The second arbitration,
7 third arbitration, ---
8 Q So in 1993 forward?
9 A --- fourth arbitration.
10 Q You say you had a nervous
11 breakdown. When was that?
12 A That was in 1998, after Mr.
13 Dolecki suspended me ---
14 Q Okay.
15 A --- because of what Mr. Destiner
16 said.
17 Q So you're saying that you had
18 these psychotic dreams. When was that?
19 A As soon as Mr. Dolecki suspended
20 me, after that.
21 Q So it was 1998?
22 A 1998.
23 ATTORNEY NICHOLS:
24 No, it was '97, you
25 went ---

Page 67

1 A In '97 I was suspended. And I
2 survived on medical leave since 1997.
3 You have all the medical records ---
4 oh, you don't have them.
5 ATTORNEY NICHOLS:
6 On through to '98.
7 ATTORNEY HEATH:
8 I'm going through --- Mr.
9 Nichols, please. If you're
10 going to continue to do this,
11 I'm going to stop the
12 deposition. I'm going to call
13 the judge. I do not want you to
14 be testifying.
15 ATTORNEY NICHOLS:
16 No, the only thing I know
17 is this.
18 ATTORNEY HEATH:
19 You can object. That's
20 what you can do.
21 ATTORNEY NICHOLS:
22 No, no. All I'm trying
23 to do is clarification. There's
24 a need for clarification. It's
25 not right for me to stay as a

Multi-Page™

**Page 70**

1 potted plant and let my client
2 go on the record and make --- if
3 she doesn't understand. I mean,
4 otherwise, I will simply say ---
5 I excuse myself as Counsel and
6 let her get another Counsel,
7 because it's not right for me to
8 sit here like a potted plant.
9 What is my role? Let's be
10 serious. What is my role as
11 Counsel? What is my role?
12 ATTORNEY HEATH:
13 This is not a trial.
14 It's a deposition.
15 ATTORNEY NICHOLS:
16 Yeah, even a deposition,
17 do I sit here and allow possibly
18 misunderstandings? I'm not
19 ascribing bad motives to
20 anybody.
21 ATTORNEY HEATH:
22 That's why you do have
23 a ---.
24 ATTORNEY NICHOLS:
25 I do, I say look here.

**Page 71**

1 ATTORNEY HEATH:
2 That's why you'll have a
3 chance to ask her questions when
4 I'm finished.
5 ATTORNEY NICHOLS:
6 I'm asking her to tell me.
7 But I thought it would be
8 helpful as we go along. That's
9 all. And I would ask the Judge
10 on the same thing. What is my
11 role? Do I sit here as a potted
12 plant and say nothing? I will
13 ask the Judge that. What is my
14 role? Let's be honest.
15 ATTORNEY HEATH:
16 Okay. Now, can you
17 please keep your voice down?
18 ATTORNEY NICHOLS:
19 Yeah.
20 ATTORNEY HEATH:
21 I mean, this is a ---
22 ATTORNEY NICHOLS:
23 I mean, because we came
24 here honest. I agree to stop.
25 Let's stop it right now. Let's

**Page 72**

1 bring the curtain down right now
2 if we can't be honest. I don't
3 deal with anything that I don't
4 believe in.
5 ATTORNEY HEATH:
6 I am trying to get her
7 testimony as to what's the basis
8 for her allegations are as per
9 the Complaint.
10 ATTORNEY NICHOLS:
11 All right. Take your
12 time.
13 ATTORNEY HEATH:
14 Because I don't have ---
15 I have some documentation
16 concerning her mental condition.
17 But as I said, I have not
18 received all of the information
19 specifically from her
20 psychiatrist or from the
21 hospital where she went in, was
22 hospitalized for a psychiatric
23 evaluation and visitation.
24 So I'm at a bit of a
25 loss, and I'm asking her to

**Page 73**

1 clarify for me the series of
2 events, when they occurred, and
3 what led to her hospitalization,
4 and how her mental state was
5 after that fact. That's what
6 I'm asking her to tell me.
7 ATTORNEY NICHOLS:
8 Okay. All right.
9 BY ATTORNEY HEATH:
10 Q.So you indicated, I know that
11 you went out on leave in 1997 and
12 didn't return until the end of the year
13 1999, October 1997, so the 1997-1998
14 school year, you were out on medical
15 leave. And then the 1998 to almost the
16 end of 1999, you were out as well?
17 A.Uh-huh (yes).
18 Q.Is that correct?
19 A.I survive on medical leave.
20 Q.Okay. But you were out at that
21 time. Now, prior to that time, those
22 were the --- that was the time frame
23 when you received an unsatisfactory
24 evaluation for the 1993-1994 school
25 year, and then I believe for the

Multi-Page™

1 1994-1995 school year?
2 A.'95-'96.
3 Q.'95-'96 school year.
4 A.Uh-huh (yes).
5 Q.Now, when you were talking about
6 having these psychotic dreams and all
7 things of that nature, what time frame
8 are you talking about?
9 A.Well, I started feeling sick,
10 extremely sick, as soon as Mr. Dolecki
11 suspended me.
12 Q.And you're talking 1997?
13 A.1997, the first suspension.
14 because of what Mr. Destner said, which
15 I never knew. But then later on, ten
16 years later, nine years, they found
17 something he put in my file. Then from
18 that moment on, my psychological mental
19 well-being began to deteriorate to the
20 point that in March 6th, I had a
21 nervous breakdown.
22 Q.Of what year?
23 A.1998.
24 Q.And when you say nervous
25 breakdown, what does that mean?

1 A.That's when I start suffering
2 the psychotic, horrible dreams. And
3 then I have to be hospitalized.
4 Q.Were you ever hospitalized prior
5 to that time?
6 A.No, never.
7 Q.I mean, for depression?
8 A.No, never. Never. Only when I
9 had my baby girl.
10 Q.And did you suffer from
11 post-partum depression at that time?
12 A.No, no. I just went in to have
13 my baby, in Saint Vincent's, just to
14 give birth.
15 Q.Oh, okay. So what you're saying
16 is the only time you were in the
17 hospital was to have your child?
18 A.Yes, and not for mental reasons.
19 no, no. That was the first time until
20 1998. And on 1997, unfortunately when
21 I started being depressed, I cry and
22 cry and cry consistently, I couldn't
23 stop crying. I tried different
24 medications. That's when I was in
25 Zoloft, Prozac, and nothing would work

1 for me because my depression just
2 deteriorated. I just panicked, what I
3 was going to do, I'm losing my job.
4 Q.Let me stop you there.
5 A.I'm not going to be able to go
6 back to work.
7 Q.In 1995 in August, do you recall
8 going to the Edinboro Medical Center
9 with some complaints of depression?
10 A.Edinboro Medical Center, that
11 was after the first arbitration?
12 Q.I don't know. It's August of
13 1995.
14 A.Yeah, probably, because in
15 '93/'94, I went through so much
16 harassment at school, it was horrible.
17 Q.And then you also got divorced
18 in 1996; is that right?
19 A.In 1997, I think it was. I
20 believe it was 1997. No, I've been
21 married in 1996.
22 Q.When were you divorced from Mr.
23 Mahoney?
24 A.That was in 1992.
25 Q.In '92?

1 A.Yes.
2 Q.So in August of 1995, the only
3 records that I have so far are from the
4 Edinboro Medical Center, and it said
5 that you started to complain about
6 depression, and that you had indicated you
7 were not suicidal. But then it
8 indicates you're going through a
9 divorce with Mr. Mitchell?
10 A.Well, yes, I did go through a
11 divorce after three and a half years,
12 yes.
13 Q.And that was in 1995 as well?
14 A.I think it was in 1995.
15 Q.The notation I have here
16 indicates that in August 1995, you were
17 complaining of depression and anxiety,
18 was going through a divorce with Mr.
19 Mitchell. You complained of poor
20 appetite, lack of sleep, no energy,
21 crying a lot and trouble getting
22 motivated?
23 A.Right, but it was not just
24 because of the divorce. It was not the
25 main reason. It was because I had

Page 78

1 already gone through the first
2 arbitration.
3 Q. And you indicated here that
4 sometimes ---
5 A. I cried a lot.
6 Q. --- you think that you would
7 rather be dead, but you didn't have any
8 actual plans to kill yourself; do you
9 recall that?
10 A. No.
11 Q. Then you began taking Prozac in
12 September of 1995, and Ativan to help
13 you sleep. And you were at that time
14 advised to talk to a psychologist; do
15 you recall that?
16 A. No. In 1995, no, it wasn't. If
17 that's from Edinboro Medical Center?
18 Q. Yes, it is.
19 A. Is that what you said? No, I
20 don't recall that.
21 Q. When was the first time you ever
22 --- or did you ever talk to a
23 psychologist?
24 A. The first time I talked to a
25 psychologist, it was when I went into

Page 79

1 --- when I suffer my nervous breakdown
2 in 1998, Doctor Torres sent me to him
3 in Saint Vincent's. And then I start
4 having therapy with Doctor Luis Torres.
5 Q. With Doctor who?
6 A. Luis Torres, T-O-R-R-E-S. Luis
7 Torres.
8 Q. Was he a psychiatrist or a
9 psychologist?
10 A. He was a psychologist. He's the
11 one who admitted me into Saint
12 Vincent's.
13 Q. And that was in 1998?
14 A. In 1998, when I had my nervous
15 breakdown, yes. But prior to that,
16 I remember I had the first arbitration,
17 which was a mistake for me, which was
18 probably in a way influenced my second
19 marriage with Mr. Mitchell because he
20 couldn't understand why I cry so much.
21 He couldn't understand the struggle
22 that I was going through and the pain,
23 because after I had worked so hard to
24 re-educate myself to learn English,
25 then because I had disciplined the

Page 80

1 wrong kid, then they start all this
2 series of harassment. He couldn't
3 understand, and that was a great deal
4 of influence in the breakup of our
5 marriage, because I cry ---
6 Q. Because you disciplined the
7 wrong kid, are you talking about Brian
8 Gray?
9 A. Brian Gray.
10 Q. We're going to talk about that
11 in a little more detail later.
12 A. Yeah.
13 Q. But right now I'm just trying to
14 get some time frame down about your
15 treatment.
16 A. So not because of --- okay, I
17 want to just clarify that you think
18 that it was because of the divorce that
19 I went through that depression. No,
20 during '93, '94, which it was in '94
21 when I had called Brian Gray's parents,
22 it was after that it was stated the
23 accusations that they did to me, that I
24 had been showing my bra.
25 Q. Well, we're going to get to all

Page 81

1 of that.
2 A. It was mentally devastating.
3 Mr. Mitchell couldn't understand
4 eventually after he saw me crying,
5 depressed, sorry, we have to end out
6 the marriage. He couldn't understand
7 the fear I had constantly in losing my
8 job.
9 Q. It looks like there was a time
10 frame where you didn't go to this
11 particular medical center between 1995
12 and and all in 1996. And then in 1997,
13 you once again were given Prozac. Did
14 you go somewhere else in 1996?
15 A. Well, no, I did not. I was just
16 going there, but in 1995, 1996, the
17 second arbitration came up.
18 Q. Well, it looks like you didn't
19 treat at all at this particular medical
20 center in 1996 at all?
21 A. Uh-huh (yes). I was just taking
22 medication for a while, but then I
23 decided that maybe I shouldn't because
24 I didn't want to be on medication, and
25 I wanted to fight the depression by

Multi-Page™

**Page 82**

1 I myself, maybe exercising, doing
2 something positive.
3 I attended my meeting, my
4 religious meeting consistently, because
5 that is stressing me even now. That's
6 what keeps me alive, my religious
7 beliefs. I have been one of Jehovah's
8 Witnesses for 28 years, for 28 years.
9 So that is the only thing that is
10 strengthening me, when I go to the
11 meetings.
12 Q There wasn't any other place you
13 treated at that time that you remember?
14 A Well, not that I recall. Not
15 that I recall, during times when I went
16 to review my medical records, not that
17 I recall, but maybe something that I
18 cannot recall that precise treatment.
19 But I just remembered in 1995, 1996,
20 after the second arbitration, I went
21 back to the same thing I had to start
22 taking medication again.
23 Q It looks like you started taking
24 Effexor March 17th of 1997, at least
25 here, is what it's saying. And then

**Page 83**

1 you requested Zoloft, but then you also
2 were taking Paxil at that same time.
3 Do you recall taking ---?
4 A Yes, the doctor gave me several
5 --- since I told her the Prozac, what
6 it had done to me, what it was
7 happening with Prozac, I was unable to
8 talk. I would say pen. I would say
9 pencil. I would say fork. Things were
10 coming out of my mind without me
11 wanting to say them, very seldom.
12 Q And you were teaching this whole
13 time; correct?
14 A Well, no. I was teaching, but
15 this thing that it was happening to me,
16 it was so sporadic, and only in a
17 conversation. It never happened to me
18 while I was teaching, because I was
19 able to read my book and follow it,
20 see. But sometimes when I had a
21 conversation at work, it would come up
22 every now and then. So I told him I
23 don't want to take that Prozac, and
24 then we started trying other, different
25 medications.

**Page 84**

1 But then finally I came out with
2 the conclusion that the only thing that
3 makes me feel better and it keeps me at
4 ease and mentally healthy is the
5 Effexor, which eventually I would like
6 to stop it also because I don't want to
7 spend my whole entire life taking that
8 medication.
9 Q In October 20th, I have a
10 notation here of 1997, you went again,
11 a complaint of ongoing depression and
12 having trouble at work, and then you
13 were given Paxil. And then you
14 indicated that essentially you were
15 experiencing the same symptoms that you
16 had in the spring of '97 and the summer
17 of '97. You also then complained that
18 Zoloft gave you a problem during that
19 time frame. It made you a, quote, wild
20 and angry woman. Do you remember that?
21 A Oh, yeah. It made me feel
22 terrible, angry. And I said I'm not
23 that kind of person. I mean, I can get
24 upset. I'm only human, but I'm very at
25 ease, very easy-going person. But it

**Page 85**

1 made me angry, so I stopped.
2 Q Do you remember the time frame?
3 A Probably it was about two weeks.
4 Q Summer of 1997, or is that right
5 around there?
6 A No, it was only two weeks.
7 I cannot recall, but it was only a couple
8 weeks. I try every medication a couple
9 weeks, couple weeks, couple weeks. It
10 was not working. Eventually Paxil, I
11 was able to take it for quite a while.
12 It just made me tired.
13 Q And then you came back
14 approximately a week later and
15 indicated you had been charged with a
16 DUI and was avoiding arrest?
17 A Yeah, unfortunately that's how
18 the thing came up about me being a
19 stripper, the man. I was not even
20 married to him. It was a pedophile.
21 He came after my daughter.
22 Q What man is that?
23 A My third husband, Mr. McCracken.
24 Q Mr. McCracken?
25 A Mr. McCracken.

Multi-Page ™

Page 86

1 Q-Are you remarried to him now?
2 A-Not even a year. That was in
3 1996, 1996. So what it happened that
4 as soon as -- everything happening in
5 this period of a week that I got all
6 these reprimands from the School
7 District. If you see the Complaint,
8 first, second, third, fifth, tenth
9 suspension. And then that's when my
10 daughter told me what Mr. McCracken had
11 done, that he posed to her masturbating
12 himself.
13 And then when I was arrested, I
14 went to talk to his mother, and I said,
15 I want the man out of my house. I want
16 the man out of my house, and I don't
17 very seldom drink, but I had a schedule
18 to meet with a girlfriend, and I had
19 two drinks. Right? But when I came
20 back --.
21 Q-Were you also taking medication?
22 A-And I was taking my medication,
23 so those two drinks with my medication,
24 and since I don't drink, I have zero
25 tolerance, then that's when it

Page 87

1 happened. But that's what had caused
2 the divorce, that particular situation.
3 But it was everything together. First
4 reprimand. As soon as they overturned
5 the unsatisfactory -- as soon as they
6 heard that it was done, it was on my
7 behalf, then all together, Desmer,
8 Templeton, Berkebile, Dolecki,
9 reprimand, reprimand, reprimand,
10 suspension, all in just a period.
11 Then I encounter with Templeton,
12 and she was scolding me because I had
13 given detention. Sent me a paper
14 saying you're picking on the kids. We
15 already sent a letter to the parents
16 saying you are picking on the kids.
17 They were horrible, those kids. And
18 then when the substitute was
19 substituting, she sent the same kids to
20 her, but they did not reprimand her.
21 They reprimand me.
22 And then Desmer accused me of
23 all these things that I have said
24 against the School District, and I said
25 what did I say? The only thing is that

Page 88

i when the kids approach me and they say,
2 oh, you had a DUI, I said don't listen
3 to me. Don't see me as a role model.
4 You break the rules, you pay for it.
5 Q-So with regard to -- and I've
6 read some of the documentation
7 concerning that. This is when you were
8 teaching in October of 1997 in the
9 modular classroom; correct?
10 A-Correct.
11 Q-And is it accurate to say that
12 the walls and the doors were fairly
13 thin so it's easy to hear in and out;
14 is that true?
15 A-Yes, but there was another
16 teacher teaching in the classroom
17 behind me, beside me, and she said that
18 Desmer was never there, standing
19 there.
20 Q-Well, with regard to what Mr.
21 -- what teachers understand Mr.
22 Desmer said, and you do admit he came
23 into your classroom?
24 A-He walk in, just right into my
25 classroom. That's what she said. She

Page 89

1 said, oh, no, he was never standing
2 there. He just walked straight.
3 Q-And you do admit that you were
4 discussing the DUI in front of the
5 class?
6 A-I wasn't. I was answering
7 questions that they asked me, and I
8 wanted to give a short answer. It was
9 extremely embarrassing. It was
10 extremely painful, but I was able to
11 address it to the students. And I told
12 them I very seldom drink. It is true,
13 I don't have an alcohol problem or drug
14 problem.
15 Q-Did you say it to your class at
16 that time that there was a conspiracy
17 between the police and the School
18 District administration to take your
19 job away?
20 A-That's not true. Mr. Desmer
21 made it up, as he made up many other
22 things.
23 Q-Now, with regard to the --
24 A-That's inaccurate information.
25 Q-- arrest that night, you did

Page 90

1 allude the police; isn't that correct?
2 A No, I did not. I did not. I
3 didn't even know they were following
4 me. I never heard them. I never saw
5 any lights, I never heard any sirens.
6 I didn't even know --- on the contrary,
7 when they punched my tires, it was so
8 happy to see one of them, and I said,
9 Sir, something happened to my car. And
10 then he said because we've been
11 following you.
12 I was totally, totally
13 astonished and amazed. I couldn't
14 understand what was going on. I
15 couldn't understand, because why would
16 I do that? I was going to Edinboro
17 where I lived. I don't have a drinking
18 problem. I wasn't even legally drunk.
19 Q Do you know what the results of
20 the test were?
21 A Yes.
22 Q What were they?
23 A And I have a copy. I was under
24 the limit, and it says that I was under
25 the legal limit.

Page 91

1 Q And relative to your alluding
2 the police, you just didn't see them?
3 A No, the judge threw it out. He
4 would never think that after been
5 living in Edinboro for 20 years. Why
6 would I allude police when I have no
7 record of anything?
8 Q So the police just made it up?
9 A Of course they did.
10 Q Why would they do that?
11 A It's not that they made it up
12 I'm sure that probably they follow me,
13 because I saw them going in front of me
14 with no lights and no sirens. I saw
15 them when they were in front of me
16 going to 79. I was driving slow, and
17 when I went to the police station, I
18 say why did they --- are they charging
19 me with over the speed limit when I
20 wasn't even driving fast?
21 And the policeman said it's not.
22 because you were driving fast. You
23 were not. You were driving under the
24 limit. It's because you refused to
25 stop. And I said, well, how did I

Page 92

1 I refuse to stop when they never asked me
2 to stop? I saw no lights. I saw them
3 going in front of me. There was no
4 lights, to siren, no nothing. How am I
5 going to know? It's obvious they went
6 ahead of me, because they threw the
7 strips; right? They had to be way, way
8 ahead of me to put the strips.  So when
9 were they following me?
10 Q Did you indicate it was foggy
11 that night and you may not have seen
12 their lights?
13 A It maybe was. I don't know. I
14 just remember that I saw them going in
15 front of me with no lights, no nothing.
16 And by the time they stopped me, I'm
17 telling you, I was so happy that they
18 were there because I thought they were
19 going to help me to see what was wrong
20 with my car.
21 So when I wanted to go to Court
22 and told Mr. Lewis I want to fight
23 it, especially because of the result
24 was under the legal limit, I wasn't
25 even drunk. I don't want to insult

Page 93

1 anybody, but I'm going to share with
2 you what he told me, why he didn't want
3 to go back to fight.
4 Q Who's that?
5 A Mr. Lewis.
6 Q And who's he?
7 A My lawyer.
8 Q Okay.
9 A Here's what he told me. He
10 said, Claudette, he say, you don't want
11 to fight this bunch of rednecks,
12 because we feel it's nothing but a
13 bunch of rednecks' prejudice, and only
14 because you're Hispanic, they're going
15 to find you guilty, doesn't matter
16 what. So you say that you're guilty,
17 take the ARD, don't fight it. It's
18 going to cost you a great deal of
19 money, and move on with your life.
20 Q So they wouldn't have known you
21 were Hispanic when they came out in
22 front of you and put the strips down
23 though; right?
24 A Of course, they saw me. They
25 had to see me when I was driving. Why

Multi-Page™

---

**Page 94**

```
 1 did they stop me?
 2 Q.Was it nighttime?
 3 A.Yeah, but they had to see me.
 4 Q.And your last name was McCracken
 5 on your license?
 6 A.I had long — yeah, but they
 7 hadn't asked me for my background yet.
 8 I have very long, curly hair. They had
 9 to see me when I drove by them. I
10 don't know when. For they passed me,
11 and I saw them going in front of me.
12 Q.So it's your inclination then in
13 that time frame they determined you
14 were Hispanic, and because you were
15 Hispanic they put the strips down?
16 A.Well, probably. They had just
17 received them in May, and one of those
18 times I was the very first one. They
19 used them with me.
20 Q.And you think that's because
21 you're Hispanic?
22 A.Well, I'm just sharing that
23 Lewis. He thinks that because they saw
24 me coming and alone, and it was three
25 o'clock in the morning, or 2:30, that
```

---

**Page 95**

```
 1 they did. I was just going there at
 2 the wrong time.
 3 Q.But you deny saying in front of
 4 your class that —
 5 A.Of course, I didn't say that.
 6 Q.— there was a conspiracy?
 7 A.Why would I even say that?
 8 Q.And do you deny saying to your
 9 class that, oh well, if they fire me I
10 can always be a bartender?
11 A.No, no, no, no. I never
12 said that. No. I don't know who made
13 it up. Why would I say that? I don't
14 even drink. Think. I don't even drink.
15 Q.Why would I even be a bartender?
16 Q.And after this, Mr. Destner came
17 into your classroom and then you were
18 called in to discuss the situation, and
19 what was discussed in your class; is
20 that right, prior to you then getting
21 suspended?
22 A.Okay. Say that again.
23 Q.When Mr. Destner walked into
24 your classroom when you were discussing
25 the DUI, and I understand your opinion
```

---

**Page 96**

```
 1 of what was said is different than what
 2 Mr. Destner recalls, then after that
 3 time is when you were called in for the
 4 suspension; is that right?
 5 A.Right. No questions asked. I
 6 didn't even know that that's what he
 7 had said. All these things that you
 8 are saying right now, they are not
 9 written on my suspension. They just
10 say for criticizing the School
11 District. That's what it says, nothing
12 else. I never knew what I had said or
13 what they were accusing me or what they
14 said I was saying. I never knew.
15 First he said that some of these things
16 when I tell him, then he said that, no,
17 that he was behind the door listening.
18 For some reason, it seems like
19 also a disparity of how he gave his
20 argument, right then. Who is to
21 believe? He also accused me of trying
22 to attack him. When I say you have
23 abused me consistently, that is not
24 right after all of the years you have
25 screamed and you have yelled at me, you
```

---

**Page 97**

```
 1 I have spit on my face. And then I say
 2 — but in the last meeting, and I said
 3 but I will go ahead and find you in
 4 Court.
 5 Now, he accused me here before
 6 arbitration that I tried to attack him.
 7 And you see how big he is. And I'm not
 8 even 100 pounds. Do you think I would
 9 do that? I'm a Christian. I'm one of
10 Jehovah's Witnesses. We don't even
11 vote. We don't even go to war. That
12 would go against my principles trying
13 to be violent like that. I fight for
14 my rights though.
15 Q.And at the time that you're
16 talking now about 2003, the last
17 meeting? Is that what you're talking
18 about?
19 A.I was talking about the whole
20 thing. I'm going to have to write a
21 book and then clarify it.
22 Q.Well, I have a chronology of
23 events that we're going to share that
24 you prepared.
25 A.Yeah, I do have that. Uh-huh
```

Multi-Page™

**Page 98**

1 (yes).
2 Q But I think that you're talking
3 about the meeting of 2003, when Joann
4 Willison was present and Carl Roznowski
5 was present; is that correct?
6 A Right. I tell them that they
7 have abused me, they have harassed me,
8 he spit on my face. He got me in the
9 hallway. He screamed, he yelled,
10 always the threats would fire me, all
11 the suspensions. I said, you have been
12 abusing me, and how do you think you
13 can get away with all this? How? It's
14 not fair. It's not right. This is the
15 year 2000. I comply with every
16 request, and they gave all this
17 inaccurate information.
18 I could have kissed their feet.
19 just like the Indian people tried to do
20 to the white man. They were mad
21 because they wanted to commit genocide
22 and get rid of them. It didn't matter.
23 I'm Hispanic. I could have kissed
24 their feet. It didn't matter. They
25 were going to get rid of me. They were

**Page 99**

1 already planning as soon as they took
2 my kids for those tests. They didn't
3 take anybody else. But they wanted to
4 say she's incompetent, although I was
5 one of the best teachers because I did
6 control my classes.
7 Q Weren't there other Hispanic
8 teachers in the District that were not
9 subject to any discipline?
10 A No, in my school, there are not
11 any other Hispanics, not in my school.
12 Mrs. Maziarz, she's Arab, from Europe.
13 And she was married to --- she is
14 married to Mr. Ron Maziarz, and he was
15 the school board president, the
16 president of the school board for many
17 years.
18 Q So were there any other
19 Hispanics with whom you taught?
20 A Not in my school. Are you
21 talking about colleagues?
22 Q Yes.
23 A No, not in my school.
24 Q So what about other minorities?
25 Do you believe there was an issue in

**Page 100**

1 this School District with other
2 minorities as well?
3 A There is not a single black
4 teacher in my school, not even one, not
5 even one.
6 Q Let me show you what we'll mark
7 as deLeon Exhibit Two.
8 (deLeon Exhibit Number
9 Two marked for
10 identification.
11 BY ATTORNEY HEATH:
12 Q This is a one-page document
13 which indicates minority hiring in the
14 Crawford Central School District, and
15 it gives race and also national origin
16 with place of birth in some cases. And
17 I'd ask you to take a look at it.
18 A Uh-huh (yes). Are you talking
19 about here, the people that they don't,
20 even work there anymore; right?
21 Q Well, some do and some don't.
22 A Okay. Tell me who do.
23 Q But some of these individuals,
24 you would have worked with at --- that
25 would have been employed the same time

**Page 101**

1 that you were employed.
2 A I never met them. I know Maria,
3 but she's in Crawford Central --- but
4 she's in Cochranton High School. I
5 know her. I don't even know who's the
6 other lady there. She doesn't work in
7 my school. Another Hispanic though,
8 that's me. Then another Hispanic,
9 A Lea, Manuel. I don't know who he or
10 she is. Is that a boy or a girl?
11 Q It's Manuel, I'm assuming it's a
12 boy. It says male gender.
13 A Okay. Oh, Hispanic, Cuban, but
14 he doesn't teach there. You're talking
15 about people who used to work there;
16 right? Gloria Conda, I met her. She
17 used to work there. She's retired.
18 And Roberta Martinez, I don't know any
19 of these, Rosa. I don't know if they
20 worked there before I ---
21 Q But he would have been employed
22 when --- Roberta Martinez would have
23 been employed when you were employed?
24 A No, but not when I worked there,
25 not in my school. Maybe some other

Multi-Page™

## Page 102

```
 1 place, but not in my school.
 2 Q.So when you say your school,
 3 what's your differential?
 4 A.Meadville High School.
 5 Q.As opposed to other high schools
 6 around the district or other schools?
 7 A.I only know Meadville High
 8 School. And the people that teaches at
 9 Meadville High School, and the only
10 Hispanic I met, no Hispanic --- it was
11 Arab, that was Mrs. Maziarz, nothing
12 else and any other black. And if there
13 are all these black people, maybe in
14 other schools or maybe prior to me
15 teaching there, because there is not a
16 single person in my school black.
17    Well, in my school, high school,
18 their school. Armedia Dixon, she
19 doesn't teach there. I met her,
20 Janine, she's Morocan. I don't know
21 --- the other ones, I don't know any of
22 them. All these other black people,
23 they don't teach there. They don't
24 teach in Meadville High School.
25 Q.But then they teach in another
```

## Page 103

```
 1 school!?
 2 A.Many of them are retired, so I
 3 don't know.
 4 Q.You said you knew Maria McGee?
 5 A.Yes, I know her.
 6 Q.And how do you know her?
 7 A.Because whenever we have
 8 meetings, the department held meetings,
 9 she was there. That's how I met her,
10 one time only at one of the meetings.
11 Q.And do you know whether she is
12 --- you did not know Vera Campbell?
13 A.No.
14 Q.And you don't know ---?
15 A.Only Maria.
16 Q.And you don't know whether or
17 not they had any disciplinary problems
18 within the District?
19 A.I have no idea. I know of one
20 girl that they got rid of her, and they
21 harassed her so much, and she's willing
22 to testify on my behalf.
23 Q.And who is that?
24 A.Mr. Deshner drove her crazy.
25 They asked her to resign. They moved
```

## Page 104

```
 1 her. It was horrible the way that she
 2 was treated.
 3 Q.What's her name?
 4 A.It's on your witness list.
 5 Q.Do you remember what it is?
 6 A.Debbie something, maybe Alkomac
 7 (phonetic), something like that. She
 8 was an art teacher.
 9 Q.You said art teacher?
10 A.She was the art teacher. They
11 gave her a great deal of grief and
12 wouldn't let up.
13 Q.Okay.
14 A.Oh, you asked that's all I can
15 tell you.
16 Q.And you're saying this is Carol
17 Templeton? Is that the name?
18 A.No, Carol Templeton and Deshner,
19 they are the ones who drove her crazy.
20 Q.Wait, I understand that. When
21 you're saying Templeton, that's who you
22 mean? Carol Templeton used to be what,
23 the principal?
24 A.Yes, assistant principal.
25 Q.Assistant principal. You also
```

## Page 105

```
 1 mentioned Berkehle?
 2 A.Yes, he had involuntary tracked
 3 her until eventually she had to resign.
 4 Q.Debby Alkomac.
 5 Q.Debbie Alkomac is the name of
 6 the teacher?
 7 A.Is the teacher. Uh-huh (yes).
 8 But she went through a great deal of
 9 grief.
10 Q.And do you know why?
11 A.Why don't you ask Mr. Deshner?
12 Q.But you don't know why, do you?
13 A.Well, she told me.
14 Q.But all you know is what she
15 told you, is that correct?
16 A.Right, right.
17 Q.You didn't observe her teaching
18 or anything along those lines?
19 A.I met her very few times. I
20 wasn't sure what was going on.
21 Q.So from your own independent
22 personal knowledge of what kind of
23 teacher ---?
24 A.After later that we started
25 talking. Then we just exchanged ---
```

**Page 106**

1 she was already gone.
2 Q But would it be fair to say that
3 you don't have any independent personal
4 knowledge of what kind of teacher she
5 was?
6 A Well, she won her arbitration.
7 Q But you don't know? You didn't
8 ever see her?
9 A And by winning the arbitration,
10 then I believe what the arbitration
11 says. It happened, the same thing that
12 happened to me.
13 Q But do you have any independent
14 knowledge?
15 A I only know that she won her
16 arbitration.
17 Q Okay. Going back to your
18 complaint, we never --- because your
19 Counsel objected and subject to his
20 objections being on record concerning
21 the PHRC, did you deal with anyone at
22 the PHRC other than Mr. Flipping?
23 A Only Mr. Flipping.
24 Q And after you were terminated,
25 what did you do? Did you call him?

**Page 107**

1 A Ali was Mr. Hernandez' idea. I
2 called him and I sent him a copy as
3 soon as I received a copy, which they
4 sent it certified.
5 Q What, your statement of charges
6 letter?
7 A I went to pick it up, and I sent
8 him a copy right away. And then I
9 prepared a folder about that thick with
10 all the papers, the arbitrations, which
11 he has a copy, too, with everything
12 And I went in person, and I handed to
13 him in front of his supervisor.
14 Q And who is that? Do you know?
15 A This lady. She didn't even want
16 to talk to me.
17     ATTORNEY NICHOLS:
18     Ms. Wilkes?
19 A I don't remember what the name
20 was.
21     ATTORNEY NICHOLS:
22     Was her name Wilkes?
23 A She said you already made too
24 many enemies in that school district.
25 I said, well, then there are many other

**Page 108**

1 ones, too, because they have another
2 lawsuit, from what I understand. And
3 she said here? And I say, yes.
4     BY ATTORNEY HEATH:
5 Q You're saying that you went
6 personally to the PHRC, and this is
7 who?
8 A I send it by mail.
9 Q Right. But who are you talking
10 about that said that to you, that
11 you've made too many enemies?
12 A She's a supervisor.
13 Q Mr. Flipping's supervisor at the
14 PHRC?
15 A When I went to turn in my ---
16 Q And you went to what office to
17 turn it in?
18 A Just right there at HRC, 11th
19 floor.
20 Q But what city?
21 A Pittsburgh.
22 Q In Pittsburgh. So you actually
23 went to Pittsburgh, to the PHRC office,
24 and this supervisor said to you, you've
25 already made too many enemies at the

**Page 109**

1 school district?
2 A Yeah, because I wanted to talk
3 to her, because I wanted to see why
4 they were not doing anything to help
5 me. So she said that this is not time
6 for civil cases, so I brought a letter
7 to this --- whatever higher you have to
8 go to compliance. And I said, when I
9 sent a complaint in 1994, they did
10 nothing. When I went to '95, '96,
11 their investigator read it very nicely,
12 their lawyer. They did nothing.
13 And now that I've submitted
14 these information in 2002 for my very
15 first suspension, they haven't done
16 anything after all these years. And
17 she said that this is no time for civil
18 cases. And I asked her supervisor, and
19 after 11 years, when will be the right
20 time for me to do something, to deal
21 with a civil case, because in 11 years,
22 it's obvious they couldn't do anything.
23 And I suffer 11 years of
24 harassment and --- at first they were
25 practice in all this abuse, and they

Multi-Page™

Page 110

1 still said that I couldn't do anything.
2 This is no time for civil cases. And I
3 asked her, when do you think it will be
4 time? I already spent many years of my
5 life complaining and telling you, look,
6 look what they're doing. Look. Now
7 they suspended me. Now they fired me.
8 Look. And I sent every single copy.
9 They have a file like that.
10 Q And they never found probable
11 cause, did they, the PHRC?
12 A They are still investigating
13 Q Relative to the termination, did
14 you ever see a complaint that was
15 amended to include that termination?
16 A He should have done that,
17 because I look that.
18 Q Did you ever see a probable
19 A I don't know if he turned it in
20 or not. That's his job.
21 Q Didn't you typically get
22 copies —
23 A I did my job.
24 Q — of the other complaints?
25 Didn't you have to sign a verification?

Page 111

1 A He's supposed to send me all
2 these copies, and I got some, and I
3 didn't get any other ones, so I don't
4 know. You'll have to ask him. He was
5 working under her direction, and he's
6 supervisor, and he told me. He said
7 Claudette, one thing I'm going to tell
8 you. Here they don't want us to find
9 discrimination.
10 Q Do you know if Mr. Flipping
11 still works at the PHRC?
12 A I don't know, but I do know he
13 was there. And just cushy job, just to
14 say that they do help, but they don't
15 help anybody, just bureaucracy.
16 They're lazy.
17 Q With regard to this though, you
18 said you did receive copies of some
19 things, but then you didn't receive
20 anything else?
21 A He said he sent them to
22 Harrisburg. That's what he said. I'm
23 not responsible.
24 Q I'm just asking if you got a
25 copy.

Page 112

1 A I sent in my complaint. I sent
2 all my paperwork. That was their job,
3 okay?
4 Q But you didn't get a copy of any
5 amended complaint to include the
6 termination?
7 A I have few things, so you have
8 to ask him to please send a copy if he
9 submitted that, because he should have.
10 Q You didn't get a copy?
11 A Unfortunately, whatever
12 documents, you know, I should review
13 that, to tell you the truth. Maybe he
14 did. I'm going to review.
15 Q Well, I'd like you to do that
16 because we've already gone before Judge
17 McLaughlin and indicated that you
18 didn't have a copy.
19 ATTORNEY NICHOLS:
20 Yes, and we email this
21 ground as far as the Judge, even
22 the Judge —
23 ATTORNEY HEATH:
24 Yes, I'm just trying to
25 find out.

Page 113

1 ATTORNEY NICHOLS:
2 Well, you asked her ten
3 times, Counsel.
4 ATTORNEY HEATH:
5 Yes, and there was no
6 record in front of Judge
7 McLaughlin, and I have every
8 right to ask her today.
9 ATTORNEY NICHOLS:
10 Yes, but you remember
11 expressly the Judge said, and
12 when you kept probing the same
13 ground, what did she submit to
14 PHRC, what did Mr. Flipping do.
15 And we went over — the Judge
16 reminded you —
17 ATTORNEY NICHOLS:
18 Now, she's telling me
19 today she might have a copy.
20 ATTORNEY NICHOLS:
21 He admonished you. He
22 told you, Counsel, —
23 ATTORNEY HEATH:
24 He did not.
25 ATTORNEY NICHOLS:

**Multi-Page™**

Page 114

1 --- I'm not going to till
2 this ground again.
3 A.But why do you need my copy?
4 Let me ask you something. I'm sorry to
5 interrupt. Why don't you contact Mr.
6 Flipping and bring him ---?
7 BY ATTORNEY HEATH:
8 Q.I'm going to depose Mr.
9 Flipping. This is not your opportunity
10 to ask me questions.
11 A.Okay. I'm sorry.
12 Q.This is my opportunity to ask
13 you questions.
14 A.I thought I'd make a suggestion.
15 ATTORNEY NICHOLS:
16 She's trying to be
17 helpful, please.
18 ATTORNEY HEATH:
19 Counsel, please, enough
20 already. Okay? I have enough
21 to go in front of Judge
22 McLaughlin already with your
23 behavior today.
24 ATTORNEY NICHOLS:
25 Well, please go ahead.

Page 115

1 Please go ahead.
2 ATTORNEY HEATH:
3 It's ridiculous. I'm
4 trying to find out, and as I
5 have every right to do ---.
6 ATTORNEY NICHOLS:
7 Yeah, but I'm not going
8 to allow you to continue to
9 badger her, asking her the same
10 question. I'm not going to
11 allow you.
12 ATTORNEY HEATH:
13 If you would let me
14 finish, I'm going to move on.
15 ATTORNEY NICHOLS:
16 All right then. Let's
17 move on. All right.
18 ATTORNEY HEATH:
19 I have every right on the
20 record to see what she said
21 occurred under oath. Now she's
22 telling me she might have a
23 copy, and I'm asking her to look
24 for it. I'm going to move on
25 now.

Page 116

1 ATTORNEY NICHOLS:
2 All right. Okay.
3 BY ATTORNEY HEATH:
4 Q.All right. Going back to your
5 Complaint, which you should have in
6 front of you.
7 A.Uh-huh (yes).
8 Q.You indicate here when we were
9 talking about your mental health
10 condition, that you had your --- you
11 were hospitalized in 1998. But then in
12 paragraph ten, it says there are two
13 previous psychiatric hospitalizations
14 at Saint Vincent's. Since I don't have
15 their records, I don't have any
16 information on that. When were you
17 hospitalized at Saint Vincent's?
18 A.That was '98.
19 Q.Both times?
20 A.Both times.
21 Q.Do you recall the dates?
22 A.Yes. The first one --- not
23 exactly the date but the month. The
24 first one was in March. The second one
25 was in July. The third time, I was in

Page 117

1 a suicidal crisis center for the third
2 time.
3 Q.And here it indicates that you
4 had two previous hospitalizations prior
5 to 2001. When was the third time?
6 A.In August.
7 Q.Of 1998 also?
8 A.But it was not a hospital. It
9 was a center, suicidal crisis center.
10 Q.What center was that?
11 A.That's what it says. Suicidal,
12 probably.
13 Q.Pardon me?
14 A.I just remember the letters says
15 Crisis Suicidal Center.
16 Q.And that was ---?
17 A.After the two hospitalizations.
18 Q.In the same year?
19 A.In July, I went to Saint
20 Vincent's. In August, I was at that
21 center for one week.
22 Q.Okay. How long were your
23 hospitalizations?
24 A.The first time it was 11 days. The
25 second time it was a week. The

Page 118

1 third time at this crisis center, it
2 was a week.
3 Q.Now, born in paragraph ten of
4 your Complaint, it says in 2001, her
5 physician stated that she had classic
6 panic attacks, getting anxious,
7 experiences shortness of breath?
8 A.Yes, Doctor Mercatories.
9 Q.And what were you taking for
10 that? That was Doctor Mercatories?
11 A.Yes. I was already under Doctor
12 Mercatories.
13 Q.And were you taking under Doctor
14 medication for the panic attacks other
15 than what you were taking for
16 depression, such as Buspar, any anxiety
17 medications?
18 A.No, no. The only thing that is
19 like --- what I take now, lorazepam
20 only when I need it, only when I need
21 it. And then it makes me feel better.
22 And it doesn't cause any kind of
23 infirmament, it just calms me down,
24 lorazepam.
25 Q.Now, we had talked about the

Page 119

1 fact that you, according to Doctor
2 McFadden, you could return to work in
3 2002, but this next sentence then says
4 during 2003 and 2004, her condition was
5 diagnosed as severe recurrent
6 depression and panic disorder. So what
7 were you doing in order to treat that
8 condition?
9 A.I was still going to Doctor
10 Mercatories more often, and I was
11 telling him what was happening at the
12 school. And then it was even worse
13 because I knew they were going to --- I
14 knew what they were going to do, and he
15 told me, Claudette, if they're going to
16 fire you, they're going to fire you.
17 It doesn't matter what you do. He
18 says, they will.
19 So I went into severe
20 depression, especially around April,
21 just right before they fired me, and I
22 start panicking because I told him they
23 are going to fire me. They're going to
24 fire me. Look what they're doing. I
25 was having those panic attacks. And

Page 120

1 they did, on the 11th. They did. And
2 something else that I don't hold them
3 responsible for that, that what
4 happened in March.
5 My son had been deployed, and
6 they didn't want to tell us where
7 because he was a Ranger in the Army,
8 and the only thing that we received was
9 a letter that he had been deployed.
10 And we didn't know where. Now, that's
11 around the time that the war had
12 started in Iraq. And I knew, a mother
13 feeling, that he had been sent to Iraq.
14 And it was extremely ---
15 Q.When was that?
16 A.When the war started in Iraq, in
17 March, he was deployed in March. So I
18 was not having the attacks, the panic
19 attacks, for my son being there. I was
20 very upset in a way that I was thinking
21 that maybe something will happen. I
22 was certainly against it because he
23 grew up as one of Jehovah's Witnesses,
24 but then when his daddy was gone he
25 became, quote, atheist, and when he

Page 121

1 joined the Army, he knew that I did not
2 support war. I was totally against it.
3 ATTORNEY NICHOLS:
4 Do you want to take a
5 break?
6 A.No. After that then --- no, no.
7 I cannot take a break. That's fine.
8 Then later on we had heard that he had
9 been assigned to Operation Freedom. He
10 was looking for Asama Bin Laden, and he
11 spent about six months in Iraq. But
12 after three months, then he got killed.
13 BY ATTORNEY HEATH:
14 Q.And he was not killed in Iraq?
15 A.No. But he came back.
16 Q.Was it in an automobile
17 accident?
18 A.Motorcycle accident, yes.
19 Q.And that was when?
20 A.2003. As soon as he came back
21 from Iraq. He was in por about six
22 months or so, which I have told Mrs.
23 Willison that that's what I couldn't
24 understand how much they were harassing
25 me and abusing me when my son was out

Multi-Page™

Page 122

1 there on their operation and duties for
2 freedom for their freedom to take my
3 job away, strip me of my dignity.
4 ATTORNEY NICHOLS:
5 Counsel, I want to take a
6 break.
7 ATTORNEY HEATH:
8 Go ahead.
9 A And my son fought for their
10 freedom to harass, discriminate against
11 me, take my job away.
12 BY ATTORNEY HEATH:
13 Q You shouldn't probably say
14 **anything with your Counsel out of the**
15 room.
16 A Okay.
17 SHORT BREAK TAKEN
18 ATTORNEY HEATH:
19 I'm just asking Mr.
20 Dolecki to call these witnesses
21 for this afternoon because we're
22 moving a lot more slowly than I
23 had anticipated. So he's going
24 to bump them an hour to an hour
25 and a half.

Page 123

1 ATTORNEY NICHOLS:
2 Okay.
3 ATTORNEY HEATH:
4 Is that okay?
5 ATTORNEY NICHOLS:
6 Yes.
7 ATTORNEY HEATH:
8 And I figure we'll try to
9 get done as much as we can
10 possibly get done today.
11 ATTORNEY NICHOLS:
12 Okay.
13 ATTORNEY HEATH:
14 All right?
15 ATTORNEY NICHOLS:
16 All right.
17 BY ATTORNEY HEATH:
18 Q Looking at paragraph 16 of the
19 Amended Complaint, ---
20 A Okay.
21 **Q --- you mention in October 9th,**
22 **'93, the Defendant School District was**
23 **successfully sued for sexual and racial**
24 **discrimination involving the employment**
25 **of its administrative and managerial**

Page 124

1 staff. What are you referring to?
2 ATTORNEY NICHOLS:
3 She wouldn't necessarily
4 know about that. That's about
5 that Amedia Dixon case, Amanda
6 Dixon case, who sued the School
7 District for discrimination.
8 She applied for --- I think it
9 was assistant or principalship
10 in the School District.
11 ATTORNEY HEATH:
12 What was her race?
13 ATTORNEY NICHOLS:
14 Mrs. deLeon, --- she's
15 black, a black female.
16 ATTORNEY HEATH:
17 Were you representing
18 her?
19 ATTORNEY NICHOLS:
20 I didn't represent her.
21 no. I didn't represent her.
22 BY ATTORNEY HEATH:
23 **Q Do you have any knowledge of**
24 **that suit?**
25 ATTORNEY NICHOLS:

Page 125

1 She wouldn't necessarily
2 know.
3 A I know her, though.
4 ATTORNEY NICHOLS:
5 You know her.
6 A She's an acquaintance of me.
7 BY ATTORNEY HEATH:
8 Q Okay. And do you know anything
9 else that you know about this? I mean,
10 it's part of your Complaint, so ---
11 A I only knew that, that she had
12 been unfairly discriminated. I knew
13 that from talking to her. I went to
14 one of her innovations on probation.
15 Q What was that?
16 A Which there were --- she was
17 being praised for all her
18 accomplishments.
19 Q And what is she doing now, do
20 you know?
21 A I think she's retired.
22 ATTORNEY NICHOLS:
23 No, no, she teaches.
24 A Oh, Edinboro University.
25 ATTORNEY NICHOLS:

## Multi-Page™

Page 126

```
 1     Edinboro, she's at
 2     Edinboro.
 3  A.Okay.  I thought that she
 4     retired from the School District?
 5     ATTORNEY NICHOLS:
 6     Oh, yeah, but since then
 7     she's teaching now on staff at
 8     Edinboro.
 9  A.I knew she went to Edinboro.
10  BY ATTORNEY HEATH:
11  Q.Okay.
12     ATTORNEY NICHOLS:
13     There's a record of her
14     case in the District Court in
15     Eric, Judge Mentzer (phonetic)
16     presiding.
17  BY ATTORNEY HEATH:
18  Q.Okay.  At the end of the next
19     page, paragraph 17, you were referring
20     to data concerning the number of
21     students in the Crawford Central School
22     District, and you say at least 300 of
23     whom are minorities, but there are few
24     if any teachers, counselors or
25     administrators of color.  Where did you
```

Page 128

```
 1     demographics from the State
 2     Education Department.
 3  BY ATTORNEY HEATH:
 4  Q.Just for curiosity, when you're
 5     talking about these students, at least
 6     300 of whom are minorities, did you
 7     incorporate those students who had any
 8     percentage of, say, African-American or
 9     American Indian or Native American?
10     ATTORNEY NICHOLS:
11     No, no, it was not broken
12     down in the article.  The
13     gentleman who wrote the article,
14     he didn't break it down.  He
15     just simply --- and I took it
16     directly from that newspaper
17     article.
18     ATTORNEY HEATH:
19     Okay.
20     ATTORNEY NICHOLS:
21     Yeah.
22  BY ATTORNEY HEATH:
23  Q.Looking at paragraph 18, it
24     indicates from 1995 to 1999, a member
25     of the Defendant Board brought to the
```

Page 127

```
 1     get this information from?
 2     ATTORNEY NICHOLS:
 3     One, we got it from a
 4     newspaper article.  That was a
 5     newspaper article.
 6     ATTORNEY HEATH:
 7     In what paper?
 8     ATTORNEY NICHOLS:
 9     A local paper here
10     written by a gentleman.
11     ATTORNEY HEATH:
12     Called, the paper?
13     ATTORNEY NICHOLS:
14     Oh, it's the local.  I
15     forgot.  I don't know the name
16     of the local paper.  I know it
17     was the local paper I read.
18  A.Is The Meadville Tribune?
19     ATTORNEY NICHOLS:
20     Yeah, The Meadville
21     Tribune.  Okay.  That's where I
22     got that.  Others I got from ---
23     these numbers would be from the
24     demographics, the State
25     Education Department
```

Page 129

```
 1     attention of members of the Board on at
 2     least three occasions the persistent
 3     discrimination problems and failure in
 4     refusing to hire minority teaching
 5     staff.  Do you know who the Defendant
 6     Board member is?
 7     ATTORNEY NICHOLS:
 8     Yeah, Sam Byrd, who
 9     previously served from 1996 to
10     2000 as a member of the School
11     Board.
12     ATTORNEY HEATH:
13     B-Y-R-D or B-I-R-D?
14     ATTORNEY NICHOLS:
15     B-Y-R-D.
16     ATTORNEY HEATH:
17     And was he a minority?
18     ATTORNEY NICHOLS:
19     Yeah, he's black.
20     ATTORNEY HEATH:
21     Now, this information,
22     did you obtain it from the
23     minutes of the Board or is this
24     just something that you
25     discussed with Mr. Byrd?
```

Page 130

```
 1    ATTORNEY NICHOLS:
 2    We, deposed him.  We
 3    deposed him.
 4    ATTORNEY HEATH:
 5    Is that in the Wagner
 6    case?
 7    ATTORNEY NICHOLS:
 8    Yeah, the Wagner case.
 9    BY ATTORNEY HEATH:
10  Q Now, I know your Counsel is
11    going to object to this question, but
12    I'm going to ask you anyway.  Looking
13    at paragraph 21, and I believe in
14    looking at some of the other
15    documentation, you were indicating that
16    you believed you were stripped of your
17    seniority by becoming a traveling
18    teacher; is that right?  Meaning you
19    may move from one class to another
20    class.  Are you aware of any other
21    teachers that had to perform similar
22    duties to this?
23  A I'm sure that there are.  But
24    what I'm talking about is I already had
25    a classroom in '94.
```

Page 131

```
 1    I strongly believe in discipline.  That
 2    was the problem.  They wanted me to be
 3    consistent though.
 4  Q You're not teaching now; is that
 5    right?
 6  A In a way, I am.  In a way.
 7  Q What is your current job?
 8  A Because what I'm doing right
 9    now, testimony --
10  Q What is your current job now?
11  A I'm manager/trainee for the
12    telemarketing place.  And being a
13    telemarketing place.  And being a
14    manager/trainee, I'm responsible for
15    the evaluations, for the coaching,
16    monitor.  And I have to make sure that
17    when they take every call, I monitor
18    the call.  And any problem, I take
19    supervisor call.
20    And there is a format, there is
21    a script that they have to follow, and
22    they have to deal with the clients,
23    because we deal with so many banks and
24    take applications for so many banks.
25    And it's marketing.  Everything has to
```

Page 132

```
 1    back in a very delicate mental state,
 2    but I still function.  I'm not crazy.
 3    I just suffer recurrent depression for
 4    all this stripping of my dignity, my
 5    self-esteem, all the negative
 6    criticism.  Instead of giving me a pat
 7    on the back when they see my class is
 8    very well behaved and how much Spanish
 9    they know using all the classroom
10    expressions, they wait for just one
11    discipline problem, turned this thing
12    against me.
13    The parents, they're going to
14    testify against me because I gave one
15    detention.  My daughter say it is crap.
16    My daughter and I say this is crap.
17    homework.  You're lying.  My daughter
18    never did, and she's testifying against
19    me in my lawsuit.
20    Needless to say after all this,
21    eventually it's going to be detrimental
22    for everybody.  And they continue
23    saying she's incompetent.  She's not a
24    good teacher.  I know who I am.  I'm a.
25    very good teacher.  I like discipline.
```

Page 133

Multi-Page™

Page 134

1 be according to the format and the
2 proper introduction, the greeting, the
3 quality ending. And then I have to
4 evaluate it on a weekly basis to make
5 sure they are complying with their
6 performance, their conversions:
7  They need to produce, they need
8 to bring business, because that's how
9 our job stems from their business,
10 their sales. And the service to the
11 customers, you want to keep the best
12 service to the customer. So I have
13 to ---.
14 Q.What is the name of the company?
15 A.Marketing, Telatron Marketing.
16 Q.I'm sorry?
17 A.Telatron Marketing.
18 Q.Where is that located?
19 A.It's in 1548 East 38th Street.
20 Q.Where?
21 A.In Erie. Erie, PA.
22 Q.And what do they pay?
23 A.$9.50 an hour.
24 Q.Are you full time?
25 A.I'm full time.

Page 135

1 Q.Do you have benefits?
2 A.Forty (40) hours, no. No
3 benefits, no insurance unless I pay for
4 my own.
5 Q.And how long ---?
6 A.No pension.
7 Q.How long have you been working
8 there?
9 A.Well, I've been almost six
10 months because when we went to Court in
11 around August, I had just been
12 interviewed a week. And it wasn't
13 until a week after that I started, got
14 the training. And we are constantly
15 being trained because we're always
16 getting many new programs for U.S. Bank
17 and like the New York Bank of America,
18 State Farm. We are consistently being
19 trained and taking tests constantly to
20 keep updated to all the different
21 programs that we deal with.
22 Q.So was it in approximately
23 September?
24 A.Around September.
25 Q.Of 2005?

Page 136

1 A.That I started.
2 Q.Is that the first job that you
3 held between April 2003, up until that
4 time, the first job you held, or were
5 you employed anywhere else?
6 A.Well, I was employed, but not
7 employed really. I did it only just to
8 try to make a living out of the money
9 since I was not making any other money.
10 Latinos Restaurant is a very uppity,
11 uppity kind of class of restaurant.
12 It's upper Eighth Street. It's in the
13 bad part of town, but it's very pretty,
14 very nice, and very excellent food.
15 So the owner of the restaurant
16 allowed me to go ahead and play for two
17 hours every week the piano, and I play
18 only some Mexican songs. And then I
19 did that every Wednesday. And then on
20 Friday night, they were getting
21 together with a swing group in
22 Meadville, they are the swing. They
23 learn how to dance swing. And they
24 start coming up to Latinos because it's
25 a pretty big place for dancing.

Page 137

1  Then he asked me if I could go
2 ahead and maybe teach them some salsa
3 steps or some maringa steps, some of
4 the Hispanic dancing that we do. And I
5 said, well, if they want to just as a
6 beginner because I don't know too much
7 about ballroom dancing. But I can
8 share with them, and he will give me
9 just $1, maybe $10 an hour. But that
10 was only two hours every Friday that we
11 danced with the swing group.
12 And then I taught them some of
13 the many Spanish dances. It was very
14 little. That's all I did. So it was
15 not really formal job, it was just like
16 a part-time, just to make a little bit
17 of extra money.
18 Q.And then that was cash, I
19 assume?
20 A.Right. It was only for about
21 four hours a week.
22 Q.And do you still do that now?
23 A.No, I can't, because here
24 sometimes they need me in the morning,
25 Sometimes they need me in the evenings,

**Multi-Page™**

---

Page 138

```
 1   like last night I worked from 3:00 to
 2   11:00 because I'm making up my hours
 3   for today.  Soliciting marketing and
 4   when we are called in, I can switch my
 5   schedule sometimes.
 6       But my schedule should be I'm
 7   supervisor in the morning, morning
 8   supervisor from 9:00 to five o'clock.
 9   Then in the afternoon they have another
10   supervisor.  We are the only two, and
11   there are about 14 bilingual people.
12   Q.And then once you complete the
13   managerial program, will you get more
14   money?
15   A.No.  Well, I asked the
16   supervisor that if I become a
17   supervisor, and I think they make maybe
18   $12 an hour.  I'm not sure.  But I'm
19   making only $9.50 right now.
20   Q.And going back to paragraph 21,
21   you had mentioned about teachers having
22   less seniority that were not
23   minorities, did not have to be a
24   traveling teacher.  And you're talking
25   about your seniority, and I'm assuming
```

Page 139

```
 1   that you're talking about it in the
 2   context of you being a member of the
 3   union?
 4   A.No, in the context that I've
 5   been teacher for Crawford Central,
 6   way before this new teacher arrived and
 7   gave her my classroom.  They did not
 8   comply with the ADA in which they
 9   should have put me back with my
10   classroom and my students, my Spanish
11   IV and V, because if the other teacher
12   is so great in discipline, if she's
13   doing a wonderful job, she could have
14   taught the Spanish I or the special
15   education kids that they're rebellious.
16   And you know that there are going to be
17   discipline problems.
18   Q.But you teach IV and V?
19   A.IV is Spanish I.  The students
20   that they would have to send into
21   alternative education.  And then when
22   one of them beat me up, Mr. Destner
23   said, oh, she didn't really hurt you.
24   And then they put her back in the
25   classroom, and then the guidance
```

Page 140

```
 1   counselor said she wasn't sleeping in
 2   your class.
 3       And I woke her up and I say,
 4   please sit up straight.  So when the
 5   students want to complain to him that
 6   I cause them to sit up nice and
 7   straight, he said I never told her
 8   that.  You don't have to sit up nice
 9   and straight.
10   Q.What student are you talking
11   about?
12   A.Stephanie Morack (phonetic).
13   And then eventually when they suspended
14   me on my two months for being
15   depressed, the other teacher that was
16   substituting for me couldn't handle
17   her.  They sent her to alternative
18   education.  But after she attacked me,
19   beat me up, hit me, instead of
20   following my directives, I told her
21   turn around and go to the office.  Turn
22   around and go to the office.
23   She did not listen to me.  This
24   other girl pushed me so hard against
25   her, and her, instead of turning around
```

Page 141

```
 1   and going to the office, she did not
 2   follow directives, pushed me back
 3   against the other one, and they cut me
 4   like a sandwich.  And when they were
 5   pulling each other's hair --- listen to
 6   me, when they were pulling my hair and
 7   hitting me.
 8   Q.What did you say was the other
 9   girl's name?
10   A.Sarah Yount (phonetic).
11   Q.I'm sorry.  What was the girl's
12   name?
13   A.Sarah Yount.  And she was
14   suspended for fighting, not because she
15   attacked me, not because she decided
16   not to follow my directives and disobey
17   me.  No, because she was fighting.  And
18   then they put her back in my classroom.
19   And then Mr. Heller says Stephanie
20   Morack was in your classroom.  By the
21   way, look what she was doing.
22   Q.Okay.  I'm going back to this
23   traveling teacher issue.  And you have
24   never filed a grievance; is that
25   correct?
```

Multi-Page™

**Page 142**

1 A I complained with the HRC.
2 Q But you did nothing internally;
3 is that right?
4 A And I told them. I told them.
5 And I told Mr. Jones what they were
6 doing.
7 Q But you had never filed a
8 grievance?
9 A And he said there's nothing we
10 can do. When they write it up to Mr.
11 Deshner, he said, well, the computer
12 decides and because you left. You
13 left. That's why you lost your
14 classroom.
15 Q So no grievance was ever filed
16 relative to the collective bargaining
17 agreement; correct?
18 A No, and I told them, but they
19 are going to do whatever they're going
20 to do.
21 OFF RECORD DISCUSSION
22 BY ATTORNEY HEATH:
23 Q Looking at 21(c), is this what
24 you're referring to, that Mr. Sanford's
25 (phonetic) going to be testifying

**Page 143**

1 about, this particular situation; is
2 that correct?
3 A Uh-huh (yes).
4 Q And this was when Mr. Deshner
5 came up to you in the hallway; is that
6 right? Okay.
7 A Yes.
8 Q In looking at 22(d), when you're
9 saying that you are reduced to a
10 position inferior, to the teaching
11 position that you had held prior to
12 taking a medical sabbatical, is that
13 because you didn't have your own
14 classroom and you were teaching lower
15 level Spanish classes? Is that what
16 you mean by that?
17 A Uh-huh (yes).
18 Q Is that a yes?
19 A Yes.
20 Q I'm sorry. Can you keep your
21 voice up?
22 A Yes.
23 Q Looking at paragraph 42, I'm
24 going to ask you to look at that
25 paragraph. I think that there may be

**Page 144**

1 some confusion.
2 ATTORNEY NICHOLS:
3 There's a typo there.
4 Obtain should be retain.
5 ATTORNEY HEATH:
6 So obtain should be
7 retain?
8 ATTORNEY NICHOLS:
9 Yeah.
10 ATTORNEY HEATH:
11 Okay. I am finished with
12 this exhibit. Do you want to
13 take a break now? Is that what
14 you want to do?
15 ATTORNEY NICHOLS:
16 Yeah, I think we better.
17 LUNCH BREAK TAKEN
18 *********
19 *********
20 WHEREUPON THE
21 DEPOSITION WAS CONTINUED AT 12:07 P.M.
22 *********

COMMONWEALTH OF PENNSYLVANIA )

                             )

COMMISSIONER OF DEEDS        )

C E R T I F I C A T E

I, Wendy Blair, a Commissioner of Deeds in and for the Commonwealth of Pennsylvania, do hereby certify:

That the witness whose testimony appears in the foregoing deposition, was duly sworn by me on said date and that the transcribed deposition of said witness is a true record of the testimony given by said witness;

That the proceeding is herein recorded fully and accurately;

That I am neither attorney nor counsel for, nor related to any of the parties to the action in which these depositions were taken, and further that I am not a relative of any attorney or counsel employed by the parties hereto, or financially interested in this action.

Wendy Blair, Reporter

WENDY S. BLAIR
Commonwealth of Pennsylvania
Commissioner of Deeds
My Commission Expires June 5, 2006

SARGENT'S
COURT REPORTING
SERVICE, INC.
210 Main Street

·PITTSBURGH, PA        ·ERIE, PA          ·INDIANA, PA          ·PHILADELPHIA, PA
·CLEARFIELD, PA        ·OIL CITY, PA       ·GREENSBURG, PA        ·SOMERSET, PA
·STATE COLLEGE, PA                                                ·WILKES-BARRE, PA