Case 1:05-cv-00126-SJM   Document 50-8   Filed 06/26/2006   Page 1 of 14

## Page 182

```
 1        a student records policy that was
 2   passed by the School Board for the
 3   Crawford Central School District?
 4   A. Maybe to them, but not to me.
 5   However, I never disclosed any student
 6   records, only when I felt it was
 7   extremely necessary to defend my job
 8   and my rights.
 9   Q. And in that regard, we already
10   discussed the phone call you made to
11   Robin Stockton during class. And you
12   specifically told me what you
13   said ---
14   Q. --- in that phone call; correct?
15   A. Oh, yeah. Poor thing. Yeah.
16   Q. Who's the poor thing?
17   A. Johnny, that poor little kid.
18   My gosh. I told his mother he was
19   sleeping when everybody could see that
20   he was sleeping.
21   Q. And you also said that you
22   said ---
23   A. That's the only thing.
24   Q. --- that he didn't get a grade
```

## Page 183

```
 1   Q. So this is something that you
 2   did receive; correct?
 3   A. And I did comply with every
 4   sentence of the request.
 5   Q. And I asked you, did you receive
 6   this? Yes or no?
 7   A. Yes, I did.
 8   Q. And in fact, this is Mr.
 9   Roznowski's signature. So he was your
10   union representative that was present
11   when this was discussed with you;
12   correct?
13   A. Yes, he was.
14   Q. And who else was present when
15   this was discussed with you?
16   A. I believe it was Mr. Desiner, of
17   course, because he gave it to me, and
18   Mrs. Deardoff, and I believe maybe Mr.
19   Higgins. I'm not sure. But I know
20   Mrs. Deardoff, Roznowski, Desiner,
21   myself. I don't know if Mr. Higgins
22   was present or not.
23   Q. And as I said, this is something
24   that was discussed with you in detail;
25   is that accurate?
```

## Page 184

```
 1        question.
 2   A. Okay. Move on.
 3   BY ATTORNEY HEATH:
 4   Q. Okay. So the --- you were put
 5   on two action plans; is that correct?
 6   A. Why don't we call them
 7   harassment plan to get rid of me? A
 8   plan to get rid of me.
 9   Q. They were called action plans;
10   is that correct?
11   A. I was attaining a Master's at
12   Mercyhurst College taking management
13   classes. They were helping me.
14   Q. And let me ask you this.
15   ATTORNEY HEATH:
16   This'll be Exhibit --- 18
17   or 17?
18   (de Leon Exhibit Number
19   17 marked for
20   identification.)
21   BY ATTORNEY HEATH:
22   Q. And there is a date on the
23   bottom here that's 6/8/01. And is that
24   D-E-L, is that your signature?
25   A. Yes.
```

## Page 185

```
 1        for the prior period.
 2   A. And?
 3   Q. And if I may call your attention
 4   to the fact that your testimony ---
 5   A. He didn't have that.
 6   Q. --- also contradicts your
 7   testimony under oath at the last
 8   arbitration proceeding.
 9   A. He didn't have a grade ---. No,
10   because there is a memo. You can read
11   the memo.
12   Q. You can read your arbitration
13   testimony, too.
14   BY ATTORNEY NICHOLS:
15   because I never said that --- I never
16   gave any information confidential.
17   They said, and you can read
18   information ---
19   ATTORNEY NICHOLS:
20   You've answered her.
21   You've answered.
22   A. --- in the arbitration, because
23   I never gave ---.
24   ATTORNEY NICHOLS:
25   You've answered the
```

**Multi-Page™**

Page 186

```
1  A.Yes.  And in detail I followed
2  every single directive, which I proved
3  with documentation.  And the
4  arbitrations speak for themselves.
5  QAnd there are areas of concern
6  that are listed on the first two pages;
7  correct?
8  A.For the last 15 years, I've had
9  areas of concern, actually.
10 QThat the administration listed
11 on the first two pages; is that
12 correct?  One through nine?
13 A.Correct.  Yeah.
14 QAnd then the third page deals
15 with back to school, discipline and
16 action plan.  And it discusses things
17 such as room arrangement, rules and
18 routines, and then goes on —.
19 A.But I didn't have a classroom.
20 How could they do that?
21 QAnd then it goes on to give you
22 management tips; correct?
23 A.Let me ask you something.
24 QI'm asking you, is that what
25 this action plan —?
```

Page 187

```
1  ATTORNEY NICHOLS:
2       What are you asking her,
3  Counsel?
4  A.The room arrangement, I didn't
5  even have a classroom, remember?  I
6  came back and they took my classroom
7  away.
8  BY ATTORNEY HEATH:
9  QBack to school discipline
10 management action plan, it discusses
11 room arrangement, rules and routines,
12 management tips, —
13 AI think they brought that up.
14 Q.— survival tips on classroom
15 management, and more tips and tricks of
16 the trade?
17 AHe crossed that out, the room
18 arrangement.
19 QDid you find any of this
20 information helpful?
21 AOf course not.  That was a
22 harassment plan.  What was very helpful
23 was —
24 QNone of this information was
25 belpful?
```

Page 188

```
1  A.— what I did.  The classes I
2  was taking at Mercyhurst, classroom
3  management, how to deal with learning
4  disability students.  I was always
5  educating myself professionally.
6  That's what had helped me.  All the
7  books I read, not this harassment plan,
8  because I already knew.  What are you
9  talking about, this action plan?  It
10 was a harassment plan to get rid of me.
11 QSo none of these management tips
12 or rules and routines or survival
13 tips —?
14 AI read the whole book.  I don't
15 need little piece of paper saying about
16 it.
17 QNone of them helped you?
18 AI had a whole entire book.  I
19 showed them my book that I was taking
20 at Mercyhurst.  I was attending
21 Mercyhurst, I was enrolled in
22 Mercyhurst, and they had it written
23 that I didn't show any professionalism.
24 Just to show you the extent of the
25 harassment, they said, she does not
```

Page 189

```
1  show any professionalism.
2  QAnd did you speak to your
3  superiors the way you're speaking to me
4  now?
5  AOf course I did.
6  QOf course you did?
7  AOf course I told them what I was
8  doing.
9  QSo you're raising your voice,
10 you are not listening to the questions
11 that I'm asking you, you're not
12 responding in a professional
13 manner —.
14 ALet me tell you what I did.  I'm
15 telling you what I did.
16 ATTORNEY NICHOLS:
17      Counsel, please don't
18 provoke the client.  She's
19 trying to cooperate.
20 ATTORNEY HEATH:
21      I think she's already
22 provoked.
23 ATTORNEY NICHOLS:
24      I mean, we're trying to
25 be reasonable.
```

Case #:05-cv-00126-SJM   Document 59-8   Filed 06/26/2006   Page

## Page 190

1  A TORNEY HEATH:
2  I don't believe that.
3  A TORNEY NICHOLS:
4  You asked that she be
5  deposed. We've been trying to
6  cooperate. But please don't
7  provoke her.
8  A And I think you have my
9  transcript. I was taking professional
10 classes
11 A TORNEY NICHOLS:
12 And we do demand some
13 level of respect from you, okay?
14 A You don't have to put ---
15 A TORNEY HEATH:
16 And I have not stood up
17 and raised my voice and pounded
18 on the table.
19 A You did. You were screaming,
20 too.
21 A TORNEY NICHOLS:
22 Well, I'm emphatic, and I
23 don't take that back because we
24 had reason to; okay?
25 A I was taking professional

## Page 191

1  courses. That's what I was telling
2  them.
3  BY ATTORNEY HEATH:
4  Q So none of that helped you?
5  A Of course not.
6  ATTORNEY HEATH:
7  Let's mark another
8  exhibit.
9  A I told them that none of it
10 helped.
11 ATTORNEY NICHOLS:
12 Just answer the question
13 you're asked.
14 ATTORNEY HEATH:
15 This will be 18 now, or
16 19?
17 A That was 17.
18 (de Leon Exhibit Number
19 18 marked for
20 identification.)
21 BY ATTORNEY HEATH:
22 Q This exhibit is an action plan
23 for the 2002 to 2003 school year, and
24 this document is three pages. Is this
25 something that you received?

## Page 192

1  A Yes, I did.
2  Q Did you review it?
3  A Of course I did.
4  Q Did you find this in any way
5  helpful?
6  A Of course not.
7  Q And that would be why?
8  A I did comply with every
9  directive. I did everything they did.
10 But what had helped me, again, I was
11 enrolled in a Master program. And I
12 think that you have a copy of my
13 transcript. I was attending classes
14 without them telling me --- you advised
15 already that I have to repeat that,
16 that I was not showing professional
17 improvement. I was attending
18 Mercyhurst College.
19 Q So you already know everything
20 and they couldn't tell you anything?
21 A Of course not. There is always
22 room for improvement. They didn't have
23 to tell me. I did it on my own. I
24 went and signed up as soon as I was
25 feeling better mentally. Because the

## Page 193

1  vocation was pounded in my head by my
2  mother. She was a teacher. And you
3  know how many credits I have in all
4  courses in education, when there are
5  teachers in middle high school, that in
6  the last ten years, they never took a
7  class, but they were never reprimanded
8  or put in an action plan until they
9  were ready to retire, of course.
10 ATTORNEY HEATH:
11 The next exhibit, I
12 believe, is 19.
13 (de Leon Exhibit Number
14 19 marked for
15 identification.)
16 BY ATTORNEY HEATH:
17 Q This is a revised action plan
18 for the ---
19 A It was a March ---
20 Q Excuse me. I'm not finished
21 with my question. This is a revised
22 action plan for the 2002 to 2003 school
23 year, and it says revised February
24 2003.
25 A It was March 19. I have it. I

## Multi-Page™

**Page 194**

1  I have the real copy of this one. They
2  changed the date. And they fired me on
3  April 11th. They gave me a revised
4  after my suspension. After I came back
5  off the ten days suspension because of
6  immorality, they gave me a revised
7  version on March 19. That's the date I
8  have written in here. This is another
9  date. And they fired me on April 11th.
10  Q Is there anything other than the
11  date that you believe is different in
12  the content of the revised action plan?
13  A I was the same thing over and
14  over and over.
15  Q You did receive this?
16  A Of course I do. I told you I
17  have the actual -- they have March
18  19th. My lawyer has it. I gave it to
19  him. March 19th.
20  Q So what you're saying is that
21  you did receive this action plan, but
22  not --
23  A After I came back from being
24  suspended.
25  Q -- until March 19th?

**Page 195**

1  A March 19th. And they fired me
2  April 11th.
3  Q And again, did you review this
4  action plan?
5  A Of course I did.
6  Q And is it your testimony that
7  this, too, did not serve in any way to
8  help you or give you any enlightenment?
9  A Well, it didn't help me in two
10  weeks. After that, they fired me.
11  They gave me two weeks to try it.
12  Q Were you required, as part of
13  your action plan, to keep a daily log
14  of all disciplinary actions?
15  A I did, and you have it, too.
16  Q I'm going to show you what we'll
17  mark as Exhibits 20 and 21.
18  (de Leon Exhibits 20 and
19  21 marked for
20  identification.)
21  A In addition to having this
22  discipline log, I went farther than
23  they did because I did that for 15
24  years. I had a discipline folder for
25  each student, each detention, each

**Page 196**

1  phone call. It went on each
2  disciplining student, which they were
3  also -- I was accused of
4  insubordination if I was not to turn
5  them in by the end of the day, which I
6  did. I handed them my discipline file,
7  my discipline folders and this.
8  BY ATTORNEY HEATH:
9  Q Well, And this first exhibit, which
10  is Exhibit 20, this says discipline log,
11  and then it says two, and then there's
12  a crossed out '02 and then '03. Then
13  there's handwriting up top from Mr.
14  Higgins. It says received 2/27. And
15  was this the discipline log that you
16  turned in to Mr. Higgins on 2/27?
17  A I did.
18  Q And then Exhibit 21 indicates
19  it's received 2/28, and it's been
20  signed John Higgins. And is this a
21  second log?
22  A I did. I gave him my revised
23  version.
24  Q What was the purpose of you
25  revising the first discipline log? If

**Page 197**

1  you kept such meticulous records, why
2  did you have to revise it?
3  A Because I have to make sure that
4  every entry was in there, to make sure.
5  Because sometimes, if I didn't put it
6  -- I put it in a main folder, and then
7  I have to file in each folder. And if
8  there was something missing, I have to
9  make sure that it was totally accurate.
10  That's what I told him. And there was
11  one class that I had to review, and I
12  said, I just need one class to review
13  it to make sure I put all the entries
14  there. And I gave it back to him.
15  Q Did Mr. Higgins ever discuss
16  with you that the information that you
17  provided to him in the folders that you
18  kept on your students relative to their
19  discipline also didn't match up in some
20  cases with the information on your
21  discipline log?
22  A But nothing did.
23  Q Pardon me?
24  A He was so meticulous to see how
25  many mistakes I had. I'm very, very

Case 1:05-cv-00126-SJM    Document 50-8    Filed 06/26/2006    Page 5 of 14

Page 198

1 sorry. What didn't match? I asked
2 him, what is wrong? I have him
3 detention. There is the slip. What,
4 did I make it up? Is he trying to say
5 that I made this up? I gave him my
6 files. I did. And if there was
7 something I didn't know put in this
8 that I overlooked, I'm very sorry.
9 That is what I told him. I needed more
10 time to review.
11 But I did not make up my
12 discipline problems. They were there.
13 And many pink slips, he signed them.
14 They are there. If I made a mistake
15 --- that's what I told him. I need to
16 review and see if there is something
17 missing.
18 **Q. So what would be the accurate**
19 **record, your folders or the second**
20 **discipline log?**
21 A. I would imagine the second
22 discipline log to be a little bit more
23 accurate. But my folders, as well.
24 And I gave them to him so he can
25 compare.

Page 199

1 **Q. And would I be fair to say that**
2 **you utilized the information in your**
3 **folders to create the discipline log?**
4 **Is that where you got the information**
5 **from?**
6 A. Well, of course.
7 **Q. I mean, was there any other**
8 **record you kept?**
9 A. I kept this in my computer, and
10 I had to bring my folders consistently
11 to my house to keep updating because I
12 couldn't do it at school. I have
13 enough schoolwork as it is typing all
14 my lesson plans, all the testing that
15 he wanted me to do, and observing all
16 the classes. I stayed until four
17 o'clock trying to keep up with all the
18 homework after suspension. There was
19 just so much I could do. So I did
20 everything I could, but I complied with
21 every directive. Although with all my
22 depression, I still was able to come to
23 work.
24 **Q. So despite the fact that you**
25 **didn't believe that the action plans**

Page 200

1 contained any good or helpful
2 information, it's your testimony you
3 complied with all of the directives; is
4 that correct?
5 A. I did comply with all the
6 directives, and I was taking classes at
7 Mercyhurst. That's what helped me, my
8 classes at Mercyhurst, classroom
9 management, dealing with students with
10 disabilities, learning disabilities.
11 See all the classes that I took.
12 **Q. And when was it your finished**
13 **your classes at Mercyhurst?**
14 A. I did it a little while ago, but
15 I'm going to go through it again
16 because I know, poor thing, you have so
17 much information. But I know it's your
18 job. My son died on November --- and I
19 was already taking Mercyhurst because
20 when I came back from school, I was
21 attending Mercyhurst one week --- one
22 might a week, when I came back to work.
23 Then after they went ahead and put me
24 in the action plan and all this stress
25 again, I had to stop.

Page 201

1 Although I took many classes,
2 there were only nine classes I needed
3 to take. Only nine out of 36. So
4 after they fired me, in September, I
5 enrolled for the last nine classes I
6 had to take. Again, I had to stop
7 because my son died. For three months,
8 I couldn't do anything. I was mentally
9 dead.
10 However, the last month, which
11 they gave me a due date, which is
12 February 2004, that was the deadline
13 for me to turn in my thesis and all the
14 rest of the work with the other two
15 classes. So actually, they gave me my
16 degree in the summer of 2004, but I had
17 to turn in my material in February
18 2004. But they gave me my diploma in
19 2004 when I went to the ceremony.
20 That's when I graduated.
21 **Q. And what was your degree in?**
22 A. Bilinguals, Bicultural and
23 Special Education. A Master's,
24 **Q. The next exhibit I'd like to**
25 **show you would be 22.**

Multi-Page™

Page 202

1   (de Leon Exhibit Number
2   22 marked for
3   identification.)
4   BY ATTORNEY HEATH:
5   Q And this is a March 20th, 2003
6   memorandum from you to Mr. Flipping,
7   re; and it reads, quote, relentless
8   negative criticism and intensified
9   harassment, end quote. With regard to
10  this document, you had mentioned
11  before, when I had asked you about
12  copying Mr. Flipping on information
13  that had students' identifications in
14  there, and you had mentioned that there
15  was one particular memo that you could
16  think of offhand, was that the memo you
17  were talking about?
18  A No, no. There was Thomas
19  something and Megan something. Aniece
20  was something else. And Pam, she had
21  said something in front of the whole
22  class, but I can't remember. So there
23  are two.
24  Q So there are at least two.
25  Would you agree with me?

Page 203

1   A Probably at least two, maybe
2   more. I'm not sure because I sent him,
3   like, regular information.
4   Q Who is Jeff Lewis?
5   A That's the director of PSEA.
6   Q And I think that there is a
7   second page, and quite frankly, it
8   could be my fault for not having it
9   copied.
10  A He is something in PSEA.
11  Q But let's mark this as Exhibit
12  23.
13  (de Leon Exhibit Number
14  23 marked for
15  identification.
16  BY ATTORNEY HEATH:
17  Q And as I said, it looks like
18  there should be a second page to that,
19  and I'll have to double check my
20  original files to see.
21  A Probably.
22  Q But this is a memo that you had
23  written to him, and you believe he is
24  the PSEA representative?
25  A He is, I think he's the

Page 204

1   director, the general director.
2   Q Is this the same student that we
3   were talking about that you called
4   Robin Stockton about?
5   A Yes. Phil Sverd. This is the
6   memo that I had sent.
7   Q And do you know if that was sent
8   to Mr. Flipping?
9   A I'm not sure, but I could have
10  because I told him about my suspension
11  and I told him I was going to grieve
12  it. But I'm not sure if I did. I sent
13  him all the information that was
14  pertaining to my complaint, everything
15  that I happened during '02.
16  ATTORNEY HEATH:
17  I'd like to mark this as
18  Exhibit 24.
19  (de Leon Exhibit Number
20  24 marked for
21  identification.)
22  BY ATTORNEY HEATH:
23  Q This is an April 30th, 2003
24  letter that was sent certified mail.
25  And was this something that you

Page 205

1   received? And I'll direct your
2   attention to the back page, where it
3   looks like you signed off on the
4   receipt.
5   A Yes, I did. And I sent a copy
6   twice to Mr. Flipping along with my
7   portfolio, which included this, of
8   course.
9   Q And what occurred after you
10  received this letter? What did you do?
11  A I sent right away a copy to Mr.
12  Flipping, first thing. I even called
13  him to give him — right away, as soon
14  as I was fired. And I sent him a copy
15  right away. And I sent copies to Mr.
16  Jones and I sent copies to Mr. Lewis
17  and I sent copies to my lawyer. I put
18  a file together. I sent it to all the
19  legal counsel I could, especially Mr.
20  Flipping the first one. And I have
21  the receipts from the post office.
22  Q Now, in this letter on page
23  three, it indicates at the bottom that
24  hearing has been scheduled for
25  Wednesday, May 14th, 2003. And then it

Page 206

1 gives you the rights that you have and
2 the opportunity at this hearing to be
3 heard by the Board of School Directors.
4 Did you take this opportunity?
5 A.Of course not. They fired me in
6 the first plac.
7 Q.And so did you choose then to go
8 to arbitration?
9 A.Of course.
10 Q.And as part of that arbitration
11 --- and I understand that this is a
12 notice of hearing and statement of
13 charges, and the statement of charges
14 are listed. But also in April of 2003,
15 did you receive an unsatisfactory
16 evaluation?
17 A.Prior to everybody else on
18 September --- what is that, April 11th,
19 three months before everybody else?
20 Q.Correct.
21 A.Because I tried to, what, hit
22 Desitner when I told him I was going to
23 fight him in court? Yes.
24 Q.And I'll mark this as Exhibit 25
25 and ask you to take a look at it.

Page 207

1 (de Leon Exhibit Number
2 25 marked for
3 identification.)
4 BY ATTORNEY HEATH:
5 Q.And the last two exhibits I'll
6 show you, we'll mark as 26 and 27.
7 (de Leon Exhibits 26 and
8 27 marked for
9 identification.)
10 WITNESS REVIEWS DOCUMENTS
11 A.You see, they did not comply.
12 They're supposed to, if they were going
13 to fire me, five days after this
14 observation. They gave me the
15 observation ten days later just to
16 criticize me and to fire me. They did
17 not even comply within five days, which
18 is what I tried to tell ---.
19 BY ATTORNEY HEATH:
20 Q.Which observation are you
21 talking about?
22 ATTORNEY NICHOLS:
23 Exhibit 26.
24 Exhibit 27, which I tried to
25 tell Mr. Johnson that they did not

Page 208

1 comply. They gave me that after ten
2 days, but they said, oh, no, we did.
3 No, no, they did not. They did not.
4 They did not comply with those five
5 days. It was ten days later. But the
6 arbitrator already looked at this.
7 Q.And since we're speaking of what
8 the arbitrator upheld, didn't he uphold
9 your termination?
10 A.Probably because they pay him.
11 I'm sure they did. If he would have
12 read all the information and seen all
13 the true harassment I went through, all
14 the suffering and all the heartache, my
15 gosh. Anyway, he was paid for that.
16 I'm sure.
17 Q.But you want to rely on some of
18 what he said, but not all of what he
19 said?
20 A.Of course. Wouldn't you?
21 Q.Just so the record is clear,
22 Exhibit 26 is policy 412, which is the
23 evaluation of professional employees.
24 A.Which they did not follow.
25 Q.And the school code is ---.

Page 209

1 A.Only when it is convenient to
2 them. The same. They do the same
3 thing, but worse. They got rid of me.
4 Now they're happy. That's why we are
5 here.
6 Q.And relative to the last
7 arbitration, wasn't this information
8 that was before Arbitrator Amis, policy
9 4127
10 A.I don't think he read it. I
11 don't think he read it.
12 Q.And also, Exhibit 27 is the
13 professional evaluation instrument,
14 which includes the philosophy and
15 rationale of the Crawford Central
16 evaluation.
17 A.Which they did not follow.
18 Q.Does it say in the first
19 paragraph here that the primary
20 objective must certainly be to foster
21 dedication and positive attitudes in
22 order to improve instruction?
23 A.Well, shouldn't that be from the
24 supervisors, as well?
25 Q.Doesn't that say that in the

**Multi-Page™**

1 first paragraph?
2 A.Do as your --- what is that? Do
3 as I do?
4 ATTORNEY NICHOLS:
5 Which exhibit are you
6 referring to?
7 ATTORNEY HEATH:
8 Twenty-seven (27), the
9 professional evaluation
10 instrument.
11 A.This should be examples of
12 professionalism.
13 ATTORNEY NICHOLS:
14 Do we have 27? Oh, you
15 have it?
16 A.It is here. It is good for
17 their convenience, but not to apply on
18 me. Because remember, they wanted to
19 fire me by the book.
20 BY ATTORNEY HEATH:
21 Q.And that was ultimately upheld
22 by the arbitrator, correct?
23 A.After my lawsuit was admitted in
24 court, then he remembered, oh, by the
25 way --- what is the word that he used?

1 I can't remember the word. But he
2 remembered after. He couldn't rule
3 that before, but he said he was willing
4 to wait for my appeal. And when the
5 appeal went through, and it was denied
6 for them, and then my lawsuit was
7 accepted by law, then he remembered
8 that, oh, by the way, wasn't she rude?
9 Didn't she try to beat Desiree? Poor
10 man. Oh, yeah. That poor little
11 thing.
12 Q.So everybody's in the
13 conspiracy, the state police, the
14 arbitrators, the administrators, ---?
15 A.Not the state police. What does
16 the state police have to do with it?
17 Q.Well, you said that they thought
18 you were Hispanic and that's why they
19 pulled you over for a DUI.
20 A.I don't really know what they
21 did. To tell you the truth, I think it
22 was to try their tires. I think that
23 they just got them, they were brand
24 new. I don't really know because I
25 don't even think that you could see if

1 I'm Hispanic or not. I don't really
2 know what the circumstances were. But
3 that happened in one incident. I'm
4 talking about here, years and years and
5 years of harassment, of retaliation, of
6 discrimination, different treatment,
7 double standards. Look at the
8 records ---.
9 Q.And everybody's involved,
10 including the union representatives and
11 the administrators and the arbitrators?
12 A.Well, they have their job.
13 They're getting a paycheck.
14 Q.You didn't take any issue with
15 the prior arbitrators' Decisions,
16 however, ---
17 A.Of course not.
18 Q--- that were favorable to you.
19 A.Of course. Because they were
20 fair and they were not paid.
21 Q.And they were not in the
22 conspiracy?
23 A.They were honest. They had
24 integrity. They were professional.
25 They were ethical. So we'll see what

1 happens with that man.
2 ATTORNEY HEATH:
3 I'm going to reserve the
4 right to recall her. And I
5 indicated I was going to be
6 filing a motion on Thursday, but
7 given the fact that the
8 transcript won't be finished by
9 then, I will be filing a motion
10 that will be three-fold. The
11 first will involve the tax
12 issue.
13 The second will involve
14 the way in which these
15 proceedings are being handled.
16 And the fact that I believe that
17 the Plaintiff is in violation of
18 the directive of the Court
19 relative to fair discovery
20 proceedings, and also with the
21 Federal Rules of Civil
22 Procedure.
23 And third, I'm going to
24 encompass a motion to dismiss
25 under Rule 41(b) that in fact,

Page 214

1 there is a flagrant disregard to
2 the Court's order and request
3 that either the case be
4 dismissed or the Plaintiff be
5 directed to comply properly, as
6 she should, in accordance with
7 the law. Now you have the
8 opportunity to question your
9 client.
10 ATTORNEY NICHOLS:
11 Okay. I'm Caleb Nichols.
12 I'm representing Ms. de Leon in
13 this proceeding, the Plaintiff
14 in this proceeding. And first
15 of all, there is an item I'm
16 going to put in --- it's to the
17 School District. It's a claim
18 for unpaid wages. And this
19 arose out of the Opinion award
20 rendered by Arbitrator Amis.
21 Arbitrator Amis, on the
22 particular charge, leveled and
23 lodged against my client by Mr.
24 Dolecki that she committed
25 immorality by submitting student

Page 215

1 records to Mr. Flipping and
2 other members of the PHRC. He
3 specifically ruled that the
4 School District did not prove
5 that particular claim.
6 Therefore, he set it aside and
7 validated it and cordially made
8 adjustments with respect to the
9 number of days of suspension.
10 She had been suspended
11 for five days. He reduced that
12 to three days. And accordingly,
13 he also ruled that she should be
14 made whole for those two days.
15 We filed a written claim. I
16 would ask --- now, how should we
17 mark this?
18 ATTORNEY HEATH:
19 Just for the record,
20 again, not to mix apples and
21 oranges here, I understand what
22 you're saying. But this really
23 is not part and parcel to the
24 federal suit. What this is, is
25 a separate issue.

Page 216

1 ATTORNEY NICHOLS:
2 It's a claim for wages.
3 ATTORNEY HEATH:
4 Now that this appeal of
5 the termination relative to the
6 arbitration Decision has been
7 put into litigation, and I
8 believe you had tried to have
9 standing to appeal the matter,
10 and it was ruled that you didn't
11 have standing to appeal the
12 matter. But this is something
13 that, again --- and I will
14 certainly be happy to take it to
15 Mr. Beard, but this is a
16 separate issue and is not
17 involved with the federal issue.
18 But I will ---
19 ATTORNEY NICHOLS:
20 It's a state claim issue.
21 ATTORNEY HEATH:
22 --- certainly bring it to
23 his attention.
24 ATTORNEY NICHOLS:
25 Right. Okay.

Page 217

1 ATTORNEY HEATH:
2 But I don't necessarily
3 think it should be part of this
4 record.
5 ATTORNEY NICHOLS:
6 Well, since it grows out
7 of the issues that have been
8 discussed here today, and I
9 don't think you refute that,
10 that issue as put forward today,
11 and since it, as a matter of
12 fact, has been discussed today,
13 I think it would be proper to
14 mark it. Since it is a state
15 law based claim, I would ask
16 that if Counsel, as you say, you
17 would take it to Mr. Beard
18 because he was more intimately
19 involved in this than you
20 were ---.
21 ATTORNEY HEATH:
22 Well, what I'm saying is
23 I don't necessarily want the
24 Court --- but I need to have
25 that ---

Multi-Page™

Page 218

1 ATTORNEY NICHOLS:
2 Yes.
3 ATTORNEY HEATH:
4 --- as opposed to having
5 her mark it as an exhibit and
6 take it and put it with the ---
7 ATTORNEY NICHOLS:
8 Well, I would just simply
9 ask that it be marked since it
10 grows out of the factual issues
11 that have already been on the
12 record and been discussed here.
13 ATTORNEY HEATH:
14 That his Decision by
15 marked?
16 ATTORNEY NICHOLS:
17 It's very copious here
18 today.
19 ATTORNEY HEATH:
20 That his Decision be
21 marked?
22 ATTORNEY NICHOLS:
23 What it is, it's on
24 behalf of my client, my written
25 statement for a claim of unpaid

Page 219

1 wages, and then together with
2 that, referencing a copy of
3 Arbitrator Amis' Decision, the
4 pages where he made such a
5 ruling. That's all.
6 ATTORNEY HEATH:
7 Okay. May we just get a
8 quick copy of it so that I can
9 have it, and she can mark it?
10 SHORT BREAK TAKEN
11 (Plaintiff's Exhibit
12 Number One marked for
13 identification.)
14 EXAMINATION
15 BY ATTORNEY NICHOLS:
16 Q I do have a few more questions.
17 Ms. de Leon, during the course of
18 questions posed by Ms. Heath, there was
19 a discussion regarding tardies which
20 had been assessed to you by Mr.
21 Destiner. And I'm not clear from the
22 record that these various tardies ---
23 there are more than one; right? The
24 tardies that were issued to you by Mr.
25 Destiner, were they written or verbal?

Page 220

1 A. They were written.
2 Q All of them were written?
3 A I have them.
4 Q. Okay.
5 A Do you want a copy of that?
6 Q No, no. I just wanted --- you
7 answered my question.
8 A After he denied me union
9 representation, he came up with this
10 story and a piece of paper. April 1st.
11 Q. Okay. And on all occasions,
12 they were reduced to writing, the
13 tardies?
14 ATTORNEY HEATH:
15 Can you give the year?
16 You're saying April 1st.
17 A 1996, 1995. I want to say '95
18 or '96.
19 BY ATTORNEY NICHOLS:
20 Q Could it have been '97 as well?
21 A No. The one that Higgins gave
22 me, that was in 2002.
23 Q Okay. All right.
24 A The one that Higgins gave me.
25 But Destiner, it was after he denied me

Page 221

1 union representation. He gave me a
2 whole list. Perhaps '95, '96, I don't
3 want to be inaccurate.
4 Q Okay. Also during the course of
5 the deposition today, Ms. Heath has
6 called your competence into question by
7 way of giving you a spelling test. For
8 the record, since your competence has
9 been called in question, one, when were
10 you first employed with the School
11 District?
12 A I was employed in several school
13 districts as a substitute and I worked
14 for an intermediate unit for one year
15 and a half.
16 Q Okay. And that was prior to
17 --- what years are we talking about?
18 A I graduated in 1986, at Edinboro
19 University. And in 1987 ---
20 Q What was your degree in?
21 A It was a Bachelor of Science
22 with an emphasis in Spanish to teach, a
23 certification to teach Spanish 1
24 through 12, K through 12.
25 Q And then subsequently,

Page 222

1 immediately subsequent to your
2 completion of Edinboro University, you
3 started teaching?
4 A.I placed several applications in
5 several school districts to be a
6 substitute. In an intermediate unit, I
7 had ESL, English as a second language.
8 Q.All right. How long did you
9 teach English as a second language?
10 A.One year and a half. Eighteen
11 (18) months. Well, at the same time, I
12 was substituting a few days whenever
13 they called me.
14 Q.In the end, you were employed
15 with the district ---?
16 A.Not yet. Not yet. I also
17 taught one semester at Mercyhurst Prep,
18 and I taught one semester ---,
19 Q.What did you teach there?
20 A.Spanish.
21 Q.Okay.
22 A.And I taught one semester in
23 Saegertown High School while the
24 teachers were on sabbatical.
25 Q.Also Spanish?

Page 223

1 A.Spanish. And then I worked for
2 Erie School District, only for three
3 weeks because they killed their Spanish
4 teacher. They actually killed him. I
5 found his diary. They found him dead
6 in his house.
7 And then since I had already
8 signed a contract to substitute for a
9 teacher in Saegertown High School,
10 that's why I couldn't stay in this one.
11 Then I went to Saegertown High School.
12 Then I heard that there was a position
13 in Cochranton High School. That was in
14 1989, for September 1989. So in the
15 summer, I came and applied. And then
16 Mr. Lescola ---.
17 Q.You were there full time?
18 A.It wasn't full time.
19 Q.Starting in 1989?
20 A.Substituting on a permanent
21 basis.
22 Q.Okay.
23 A.In 1989.
24 Q.In 1993, you were tenured?
25 A.I was tenured. Correct.

Page 224

1 Q.As a Spanish teacher?
2 A.Uh-huh (yes). Correct.
3 Q.And that was at Crawford
4 School District?
5 A.Crawford Central School
6 District.
7 Q.And just briefly, in terms of
8 your professional degrees, state them
9 for the record.
10 A.Well, I have a minor in music
11 because that's what I did in Mexico
12 City. I was a music teacher for
13 Jamahal (phonetic), Mexico, and the
14 music education of the Palace of Fine
15 Arts. That was supposed to be my
16 major, music teacher. When I came
17 here, I decided just to get my minor.
18 I didn't want to go into music because
19 I knew that it was going to be very
20 difficult for me to find a job. And I
21 thought, maybe if I go into Spanish,
22 then I won't be fighting for my job.
23 And since I'm a native of the
24 country, I have a lot more to offer to
25 my students in addition to my cultural

Page 225

1 background. So I decided to go for
2 Spanish and minor in music. Then when
3 I want back to Mercyhurst --- actually,
4 before that, I continued taking
5 courses. I had 40 courses, which
6 qualified me to get a Master's
7 equivalency from the State in
8 Harrisburg because I took that many
9 courses in different universities.
10 And then finally, when they told
11 me that there was an assistance that
12 was offered only to people --- there
13 were six of us. They were paying me to
14 go to Mercyhurst and they would give me
15 stipend. And that was in 1999 before I
16 came back to work. So they paid for my
17 courses and they were giving me
18 stipend, and then I began the Master's,
19 Bilingual, Bicultural and Special
20 Education.
21 Q.Okay. So you've got the
22 B.A./B.S. Bachelor's degree from
23 Edinboro in what year?
24 A.1986.
25 Q.And then you got a Master's

**Multi-Page™**

Page 226

```
 1 degree from Mercyhurst in what year?
 2 A. It was 2004. It should have
 3 been 2003.
 4 Q. Okay. And based upon your
 5 academic work at Mercyhurst, you also
 6 acquired a Master's equivalency by the
 7 State; is that correct?
 8 A. That was before that. That was
 9 before that. I got the Master's
10 equivalency in 1999.
11 Q. Okay. Have you continued to
12 pursue continuing education?
13 A. Not right now.
14 Q. I mean, since you commenced your
15 career with the school district in
16 1989.
17 A. Oh, yes, of course. I
18 continued. Oh, yeah. Throughout the
19 whole ---.
20 Q. You continued?
21 A. Yeah. Taking courses all the
22 time.
23 Q. Okay. Just one other question
24 that I have to ask you. Ms. Heath
25 alluded to your DUI charge. What's the
```

Page 227

```
 1 position of that?
 2 A. It's expunged.
 3 Q. It was expunged.
 4 A. Uh-huh (yes).
 5 Q. And why did the authorities
 6 expunge it?
 7 A. Well, because that incident,
 8 after seven years, you can expunge all
 9 the records, especially if you don't
10 have any alcohol problems or you don't
11 break the rules again. So that's why.
12 ATTORNEY NICHOLS:
13 Okay. All right. Thank
14 you.
15 EXAMINATION
16 BY ATTORNEY HEATH:
17 Q. I just have one quick follow-up.
18 You had indicated that you had gotten
19 part of your education paid for in a
20 stipend?
21 A. Uh-huh (yes).
22 Q. Who paid for that?
23 A. Mercyhurst College did.
24 Q. Through a grant or a
25 scholarship?
```

Page 228

```
 1 A. It was a grant. From what I
 2 understand, Mr. --- I'm having so much
 3 trouble remembering names. But he was
 4 my counselor, and he's the chairman of
 5 the department of education in
 6 Mercyhurst College.
 7 Q. Were those grants given to
 8 minorities?
 9 A. There was a grant that he got,
10 and there were only six of us. No,
11 they were not just minorities. There
12 was another girl from Ecuador and
13 myself. The other four were American.
14 There were six of us.
15 Q. And what was it based on to
16 qualify? Is it academics?
17 A. You needed to have ---.
18 Q. Economic need?
19 A. No. It was not economic. It
20 was according to your QPA, whatever you
21 needed, to have a Bachelor's of Science
22 already, and have a Bachelor's in a
23 foreign language, because it was
24 Bilingual/Bicultural, whether you were
25 in French, whether you were in German.
```

Page 229

```
 1 But you had to be certified in a
 2 foreign language in order to be --- and
 3 of course, you would have to take a
 4 test. It was the Miller's Test I would
 5 have to take in order to be accepted
 6 into the program. And a minimum of, I
 7 believe it was 3.0 on your --- I had
 8 three point something. So whatever, I
 9 filled the requirement in order to be
10 accepted. But then the grant ran out,
11 and when I went back, then I had to
12 pay.
13 Q. And how did you pay?
14 A. I borrowed the money. I still
15 owe them to PHEAA, to one of these
16 loans at Stafford. I have the
17 paperwork. I'm paying just the
18 interest right now.
19 ATTORNEY HEATH:
20 Thank you.
21 ATTORNEY NICHOLS:
22 Okay. That's all.
23 * * * * * * * *
24 EXAMINATION CONCLUDED AT 2:31 P.M.
25 * * * * * * * *
```

COMMONWEALTH OF PENNSYLVANIA )

COUNTY OF ERIE                )

C E R T I F I C A T E

1    I, Shannon C. Fortsch, a Notary Public in and
2 for the Commonwealth of Pennsylvania, do hereby
3 certify:

4    That the witness whose testimony appears in
5 the foregoing deposition, was duly sworn by me on
6 said date and that the transcribed deposition of
7 said witness is a true record of the testimony
8 given by said witness;

9    That the proceeding is herein recorded fully
10 and accurately;

11    That I am neither attorney nor counsel for,
12 nor related to any of the parties to the action in
13 which these depositions were taken, and further
14 that I am not a relative of any attorney or
15 counsel employed by the parties hereto, or
16 financially interested in this action.

Shannon C. Fortsch, Reporter

NOTARIAL SEAL
SHANNON C FORTSCH
Notary Public
CRANESVILLE BOROUGH, ERIE COUNTY
My Commission Expires Feb 9, 2010

SARGENT'S
COURT REPORTING
SERVICE, INC.
210 Main Street

·PITTSBURGH, PA
·CLEARFIELD, PA        ·ERIE, PA        ·INDIANA, PA        ·PHILADELPHIA, PA
·STATE COLLEGE, PA     ·OIL CITY, PA    ·GREENSBURG, PA     ·SOMERSET, PA
                                                            ·WILKES-BARRE, PA