Multi-Page™

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT

OF PENNSYLVANIA

* * * * * * * *

CLAUDETTE DELEON,        *

    Plaintiff            *

    vs.                  *

CRAWFORD CENTRAL         *

SCHOOL DISTRICT,         *

CRAWFORD CENTRAL         *   Case No.

SCHOOL BORAD,            *   05-126E

MICHAEL E. DOLECKI*

SUPERINTENDENT,          *

CHARLES E. HELLER,*

III, ASSISTANT           *

SUPERINTENDENT,          *

    Defendants           *

* * * * * * * *

DEPOSITION OF

CLAUDETTE DELEON

April 24, 2006

Any reproduction of this transcript

is prohibited without authorization

by the certifying agency.


EXHIBIT
12
tabbies®

Multi-Page™

**Page 2**

```
 1
 2               DEPOSITION
                     OF
 3   CLAUDETTE DELROW, taken on behalf of
 4   the plaintiff herein, pursuant to the
 5   Rules of Civil Procedure, taken
 6   before me, the undersigned, Jackie
 7   Skelic, a Court Reporter and Notary
 8   Public in and for the Commonwealth of
 9   Pennsylvania, at the Days Inn, 18360
10   Conneaut Lake Road, Meadville,
11   Pennsylvania, on Monday, April 24,
12   2 06, beginning at 11:33 a.m.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1
 2               A P P E A R A N C E S
 3   CALEB NICHOLS, ESQUIRE
 4   P.O. Box 1585
 5   Erie, PA 16507
 6      COUNSEL FOR PLAINTIFF
 7
 8   ROBERTA BIEMER HEATH, ESQUIRE
 9   Andrews & Beard
10   3366 Lynwood Drive
11   P.O. Box 1311
12   Altoona, PA  16603
13      COUNSEL FOR DEFENDANT
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1                  I N D E X
 2
 3   WITNESS:  CLAUDETTE DELROW
 4   EXAMINATION
 5      by Attorney Nichols        7 - 67
 6   EXAMINATION
 7      by Attorney Heath         68 - 73
 8   CERTIFICATE                      74
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1              EXHIBIT PAGE
 2
 3                              PAGE
 4   NUMBER DESCRIPTION      IDENTIFIED
 5   One    Maziarz Letter          7
 6   Two    Bauer Deposition       12
 7   Three  Agreement Memo         25
 8   Four   Continuing Education
 9          Certs                  27
10   Five   Grievances & Opinions  38
11
12
13
14
15
16
17
18
19
20
21
22
23
24  -
25
```

Multi-Page™

**Page 6**

```
    OBJECTION PAGE

    ATTORNEY          PAGE
    ATTORNEY
    Heath             19, 21, 40,
                      42, 43, 48,
                      51, 57, 64,
                      71, 73
```

**Page 7**

```
 1    PROCEEDINGS
 2
 3    CLAUDETTE DELEON, HAVING FIRST BEEN
 4    DULY SWORN, TESTIFIED AS FOLLOWS:
 5    ----------------------
 6    EXAMINATION
 7    BY ATTORNEY NICHOLS:
 8    Q.Okay. Ms. deLeon, there are
 9    four documents I would like to have
10    you identify for background purposes.
11    The first is an Affidavit prepared by
12    Janine Maziarz, and I would ask that
13    this be marked Plaintiff Exhibit
14    Three (sic).
15    (deLeon Exhibit Number
16    One marked for
17    identification.)
18    ATTORNEY HEATH:
19    Has this been
20    previously produced?
21    ATTORNEY NICHOLS:
22    No, Counsel. No, it
23    has not. No.
24    BY ATTORNEY NICHOLS:
25    Q.Ms. deLeon, do you know Ms.
```

**Page 8**

```
 1    Maziarz?
 2    A.Yes. I met --- yes. I've
 3    known her since I've been working at
 4    Meadville High School.
 5    Q.And the circumstances under
 6    which you know her?
 7    A.She's my colleague and she was
 8    the president of the Spanish
 9    department and we taught together in
10    the same classroom.
11    Q.How long have you taught with
12    her?
13    A.We have known each other for
14    --- since I start working there in
15    1991 until the present. Fifteen (15)
16    years, 16, 17.
17    Q.Okay. She had submitted ---
18    prepared and submitted an Affidavit
19    and speaks to her relationship with
20    you in the workplace and also the
21    abuse that you have undergone since
22    you served as a faculty member there;
23    okay?
24    A.She was my crying shoulder.
25    Q.Okay. Exhibit Three.
```

**Page 9**

```
 1    A.A great deal of the harassment
 2    and suspensions and abuse that I
 3    suffered from this school district, I
 4    cry on her shoulder consistently. I
 5    had no other place to go. She's like
 6    my big sister. So I just cry and cry
 7    and cry and I explain it to her I
 8    have been reprimanded, I had been
 9    suspended, they have send me for a
10    psychological evaluation, they
11    harassed me, they watched me, they
12    spy on me, Destiner screamed, yelled
13    at me, Templeton --- it was a living
14    hell.
15    And I went and talked to her
16    about everything about what's going
17    on since she was the first hand I
18    would say experience of what had
19    happened or what was going on. And
20    she felt so sorry for me, but she
21    could not help me. Unfortunately,
22    she could just listen and feel sorry
23    for me and there was nothing else she
24    could do. But it was a great deal of
25    help in a way that I had a person
```

Multi-Page™

**Page 10**

1 that I could go cry on.
2 Q Okay. I have another document
3 here I've asked to be marked.
4 ATTORNEY HEATH:
5 May I just ask a
6 question, just because — for
7 housekeeping purposes? What
8 are you marking — are we
9 continuing with deLeon and the
10 numbering or are you —
11 because you're marking the
12 witness is Plaintiff. We
13 already have several Plaintiff
14 Exhibits marked already. So
15 if you — I don't know if you
16 wanted to mark it Englebaugh
17 One and Two and then go back
18 to the Plaintiff
19 OFF RECORD DISCUSSION
20 ATTORNEY HEATH:
21 And this is going to be
22 then, what, Plaintiff —
23 we're just going to start all
24 over again with the numbering?
25 ATTORNEY NICHOLS:

**Page 11**

1 Well, what do you
2 suggest in terms of numbering
3 sequence?
4 ATTORNEY HEATH:
5 Well, I guess deLeon at
6 this point.
7 ATTORNEY NICHOLS:
8 So this will be — you
9 have these Englebaugh. Okay.
10 deLeon One, Two and Three.
11 Okay. Like that. Okay. All
12 right.
13 BY ATTORNEY NICHOLS:
14 Q Next, deLeon Four, that's just
15 about —
16 ATTORNEY HEATH:
17 I didn't see Two and
18 Three yet though.
19 ATTORNEY NICHOLS:
20 You have Three.
21 ATTORNEY HEATH:
22 No. This will be
23 deLeon One which I think
24 you're thinking is Three.
25 ATTORNEY NICHOLS:

**Page 12**

1 Oh, deLeon One.
2 ATTORNEY HEATH:
3 Okay.
4 ATTORNEY NICHOLS:
5 Well, this will be
6 deLeon Two then.
7 (deLeon Exhibit Number
8 Two marked for
9 identification.)
10 ATTORNEY HEATH:
11 Yes.
12 ATTORNEY NICHOLS:
13 This is another copy of
14 a deposition given by Kathleen
15 Bauer. Okay.
16 ATTORNEY HEATH:
17 Was this previously
18 produced?
19 ATTORNEY NICHOLS:
20 Previously.
21 ATTORNEY HEATH:
22 Did you submit this to
23 me before?
24 ATTORNEY NICHOLS:
25 No. No. This is

**Page 13**

1 different.
2 ATTORNEY HEATH:
3 Okay.
4 BY ATTORNEY NICHOLS:
5 Q Now, I show you this. You've
6 seen this document before?
7 A Uh-huh (yes). Yes.
8 ATTORNEY HEATH:
9 Mr. Nichols, may I see
10 it first?
11 ATTORNEY NICHOLS:
12 Yes. Sure. Sure.
13 ATTORNEY HEATH:
14 Thank you.
15 ATTORNEY NICHOLS:
16 I don't have extra
17 copies.
18 ATTORNEY HEATH:
19 All right. I'll read
20 it in full. If we can get a
21 copy before — or after we
22 break —
23 ATTORNEY NICHOLS:
24 Yes. Okay.
25 ATTORNEY HEATH:

Multi-Page™

**Page 14**

```
 1    --- so I can read it.
 2    I'll appreciate it.
 3    ATTORNEY NICHOLS:
 4    Yes. All right.
 5    BY ATTORNEY NICHOLS:
 6    QDo you know the basis of this
 7    deposition rendered by Ms. Bauer?
 8    A Yes. Yes, I know. I
 9    explained to them again in which we
10    had parent night conference. We all
11    were to have them. We were scheduled
12    for that night, when there was
13    parents, Mr. and Mrs. Hogan that came
14    into the office, and he started
15    yelling and screaming and Deshner
16    came out of his office and the start
17    screaming and yelling and me.
18    And then I have the parents
19    here and the principal and they were
20    --- she was saying that we were
21    scheduled to have that meeting there.
22    I asked for the presentation. She
23    refused to have union representation.
24    The father was extremely rude,
25    screaming that he was tired of me,
```

**Page 15**

```
 1    swearing and Deshner yelling at
 2    me. Why are you not prepared? We're
 3    supposed to have --- and I told him,
 4    this meeting was scheduled to be in
 5    the classroom like everybody else.
 6    All the teachers and they were
 7    supposed to be here at a later time.
 8    I was never told that they had moved
 9    that meeting over there. And he
10    screamed and yelled, you should be
11    prepared, you should be ready, go out
12    and get your grade book. I asked
13    him, I would like to have --- I was
14    shaking and crying and saying,
15    please, I would like to have union
16    representation.
17    And he was yelling and
18    screaming, he got all red and
19    spitting in my face like he always
20    did whenever he's screaming and
21    yelling and said, you should be
22    prepared and you should be --- go and
23    get your grade book and get all your
24    files. And I'm thinking, what is
25    going on? I was in shock. What I
```

**Page 16**

```
 1    didn't know is that these parents,
 2    they were outraged because somebody
 3    had submitted a drug and alcoholic
 4    referral for their son. Which wasn't
 5    I. I never did.
 6    ATTORNEY HEATH:
 7    Can I just say for the
 8    record, if you don't mind, can
 9    you just calm down? Slow down
10    so I can hear you.
11    A Okay. I'm very sorry. I
12    don't want to get emotional, which
13    I've been trying not to cry because
14    I'm just so tired of crying.
15    Needless to say, there was another
16    teacher who had submitted a drug and
17    alcoholic referral and he never
18    called us for that parent night
19    conference. I was the only one. And
20    they claimed when we went into the
21    meeting and our union representation,
22    my son has no problem with any other
23    teacher, but you
24    And I'm thinking, oh, my gosh,
25    but then who turned in that drug and
```

**Page 17**

```
 1    alcoholic referral. I was totally
 2    confused until later on, and they
 3    kept saying, they have no problem
 4    with anybody, but you. And I'm
 5    thinking, what is going on. I just
 6    received the abuse and then I have
 7    the principal here siding with the
 8    parents and saying how terrible of a
 9    teacher I was.
10    BY ATTORNEY NICHOLS:
11    QThat's Mr. Hogan?
12    A Mr. and Mrs. Hogan.
13    QAnd did Mr. Hogan or Mrs.
14    Hogan verbally attack you?
15    A Yes. They were screaming and
16    yelling on how unprofessional I was.
17    I was the worst teacher they ever
18    had, their son was allowed to be
19    there and say I'm not learning
20    anything from this class.
21    QNow, was it made known then
22    subsequent when it came down that you
23    did not turn their son in for drug
24    and alcoholic abuse, someone else may
25    have done it? Was that made known to
```

Multi-Page™

Page 18

1 Mr. Desmer?
2 A No. It was never made known
3 to the parents either. They just
4 screamed, my son has no problem with
5 anybody but you, and I was so
6 confused at that point. I couldn't
7 put the things together because I
8 thought that maybe they otherwise had
9 requested the drug and alcoholic
10 referral. That's why all the
11 referrals were being asked.
12 But they brought up what these
13 referrals said, look all the
14 referrals of all the teachers, they
15 have no problem with anybody, because
16 the only one that called in from
17 parent night conference only because
18 of the performance and the disruptive
19 behavior.
20 Q My question is here though,
21 Ms. deLeon, so I'm understanding it,
22 I thought there was some confusion
23 that concerned Mr. and Mrs. Hogan's
24 son. And that's why they appeared
25 there that evening at the

Page 19

1 parent-teacher conference with you.
2 And the record will show that they
3 were very vocal to say the least
4 toward you. Now, my question is, you
5 said, it was a mistake, that you
6 yourself did not make the referral on
7 their son.
8 ATTORNEY HEATH:
9 Let me just object.
10 A Okay.
11 ATTORNEY HEATH:
12 Wait. Let me just
13 object for the record.
14 ATTORNEY NICHOLS:
15 Yes.
16 ATTORNEY HEATH:
17 First of all, I'm
18 objecting to the form of the
19 question. I'm objecting to
20 your testifying for the
21 witness. And thirdly, I'm
22 objecting to your misstating
23 what I believe the witness
24 testified to where she's not
25 even sure --- didn't even know

Page 20

1 at the time about the --- that
2 didn't put it together about
3 the drug and alcohol referral
4 and it didn't come up at the
5 meeting.
6 BY ATTORNEY NICHOLS:
7 Q Did it come up?
8 A All -- they had all these
9 referrals.
10 Q Take your time. Take your
11 time. One thing at a time. All
12 right. Did that issue come up at the
13 meeting, that parent-teacher
14 conference?
15 A Of course not, because they
16 were blaming me that the parents
17 said.
18 Q So it came up at the
19 meeting ---
20 A The only thing they said ---
21 Q --- and they blamed you ---?
22 A --- they blamed me that their
23 son had problems with anybody but me.
24 Q Okay.
25 A They had no problems with.

Page 21

1 anybody but me. And they showed all
2 of these referrals that they were ---
3 according to the mother and the
4 father, that they were positive
5 referrals from other teachers. My
6 son has no problems, but you are the
7 only one.
8 Q All right. Now, did you have
9 an opportunity, did you make clear to
10 them that that was a mistake, that
11 you did not make the referral?
12 A Oh, no. no. I asked them and
13 I said why ---
14 ATTORNEY HEATH:
15 Wait, wait, wait. I'm
16 going to object. I think
17 there's confusion as to what
18 referral we're talking about.
19 I think you're talking about
20 that you were saying he was
21 disruptive in class and had
22 a problem with his academic
23 performance.
24 A That's the only thing ---
25 ATTORNEY HEATH:

Case 1:05-cv-00126-SJM    Document 50-9    Filed 06/26/2006    Page 7 of 35

Page 22

1 Q Did he provide to you the
2 representation?
3 A No. He refused.
4 Q He refused?
5 A He said no.
6 Q All right. And did you agree
7 that ---?
8 A I did. I called the union
9 right away and I told him, and we
10 were supposed to go for a hearing.
11 But then later on when he was
12 scheduled, they counseled and then
13 they said, the union, that their
14 district refused to go.
15 Q Okay. Who at the union
16 represented you?
17 A Nobody represented me.
18 Q Okay. Was Mr. Jones involved?
19 A Mr. Jones filed a grievance
20 because of their refusal to have a
21 union representative ---.
22 Q Mr. Jones was a union lawyer
23 at that time; right?
24 A He was a union lawyer. And
25 then he said, we don't want to be in

Page 23

1 an antagonistic relationship with
2 this school district. They refused
3 to go. We are not going to go.
4 Q Okay. All right. Now, I ask
5 that you mark this deLeon Three,
6 please.
7 (deLeon Exhibit Number
8 Three marked for
9 identification.)
10 ATTORNEY HEATH:
11 May I see it, too? And
12 I'm assuming I didn't receive
13 this earlier on?
14 ATTORNEY NICHOLS:
15 No. No.
16 BY ATTORNEY NICHOLS:
17 Q Okay. You've seen what's been
18 marked as deLeon Three before?
19 A Uh-huh (yes). I do not agree
20 to withdraw, you see, because my
21 signature is not here.
22 Q But you understand?
23 A Yes. Right. The association
24 did it. I didn't.
25 Q But you understand the terms

Page 24

1 Q And then the drug and
2 alcohol is a totally separate
3 issue?
4 A Right. But they thought I
5 submitted it.
6 BY ATTORNEY NICHOLS:
7 Q How do you know they thought
8 you submitted it?
9 A Because they said that they
10 have all these positive referrals of
11 all the teachers that he was in such
12 a good standing. However, they did
13 not tell me that the teacher that
14 turned the drug and alcoholic
15 referral, it wasn't there. They did
16 not put it there, because they had
17 not received it, because he's the one
18 who turned it in.
19 But since they --- since he
20 did not call them for the parent
21 night conference to talk to them
22 about their son's behavior, there
23 wasn't any other teacher but me. I
24 was just --- was the only one who was
25 scheduled at that parent conference.

Page 25

1 Those drug and alcoholic are
2 confidential and there wasn't any
3 other teacher who called him but me.
4 They probably felt that I turned it
5 in. When I asked, why do you ask for
6 all of these referrals, they say,
7 well --- and they didn't know what to
8 say. But you did, you are the one
9 who said that our son had academic
10 problems.
11 Q Well, another question. You
12 asked for union representation at the
13 parent-teacher conference?
14 A I did. I begged them to ---.
15 Q And who did you ask?
16 A Mr. Deshner.
17 Q Okay. Mr. Deshner was at
18 the ---?
19 A He did my ---.
20 Q Was there present on that
21 occasion?
22 A Right. He came into the
23 office where he was screaming and
24 yelling that he was tired of me of
25 being a terrible teacher.

Multi-Page™

Page 26

```
 1 of the agreement, don't you, that was
 2 struck between the school district
 3 and the association?
 4 ARight. But against me. This
 5 was done against me. I wanted to go
 6 to a hearing.
 7 QRight. I understand. You've
 8 stated that for the record. I'm
 9 simply saying with respect to this
10 document.
11 ARight.
12 QYou understand the terms?
13 AAnd I told Mr. Jones I wanted
14 to go to the hearing. It's not
15 right.
16 QWell, we understand what this
17 is. This speaks for itself, but I
18 just want to make sure of the
19 document; okay?
20 ABut that's why they
21 discontinued because ---
22 QI understand. I understand.
23 But I just wanted to identify this
24 document and what it is. All right.
25 ATTORNEY NICHOLS:
```

Page 27

```
 1 Now, I have a batch of
 2 documents here which I would
 3 ask to be marked together
 4 collectively as deLeon Four.
 5 And they're a batch of oral
 6 and assortment of documents
 7 and evidence in continuing
 8 education completion, success
 9 with completion of continuing
10 education courses by Ms.
11 deLeon.
12 (deLeon Exhibit Number
13 Four marked for
14 identification.
15 ATTORNEY HEATH:
16 Do you want to identify
17 them for the record or no,
18 each of them?
19 ATTORNEY NICHOLS:
20 Well, ---
21 ATTORNEY HEATH:
22 Just so we know what's
23 supposed to be attached.
24 ATTORNEY NICHOLS:
25 Well, I can do that.
```

Page 28

```
 1 ATTORNEY HEATH:
 2 I would ask that you do
 3 that.
 4 ATTORNEY NICHOLS:
 5 Okay.
 6 ATTORNEY HEATH:
 7 Thanks.
 8 ATTORNEY NICHOLS:
 9 All right.
10 BY ATTORNEY NICHOLS:
11 QThe collective contents of
12 what has been marked Exhibit Four,
13 deLeon Exhibit Four as follows. A
14 copy of her resume, Vista. A copy of
15 five professional references. A copy
16 of --- certificate of degree, Master
17 of Science earned at Mercyhurst
18 College. A copy of an honors
19 convocation certificate for academic
20 excellence, issued by Edinboro
21 University of Pennsylvania, Claudette
22 Mahorey 1986. A professional
23 certificate reflecting that Ms.
24 deLeon has earned a Master's
25 equivalency. This is granted by the
```

Page 29

```
 1 Pennsylvania Department of Education.
 2 And then I have a copy of her
 3 transcript of her academic work from
 4 which she earned a Master's degree
 5 granted by Mercyhurst College. A
 6 Certificate of Appreciation issued to
 7 Ms. deLeon in recognition of her
 8 outstanding services and action
 9 volunteer in Vista. A Raving Fan
10 congratulating her for a job well
11 done dated February 16th, '06.
12 Certificate of Attendance by Ms.
13 deLeon, Crawford Central School
14 --- issued by the Crawford Central
15 School District.
16 And she completed a pursuant
17 to Act 48 continuing professional
18 education courses and particular here
19 Excel Pre-Basics on March 8th, 2002,
20 CCSD from which she accrued 2.5 hours
21 credit signed by Mr. Heller. Another
22 certificate, Keys to Motivation is
23 entitled certified to Ms. deLeon
24 successfully completed. A course
```

## Page 30

1 entitled Keys to Motivation dated
2 January (sic) 26th, 1992. Next
3 certificate, Peer Coaching certified
4 to Ms. deLeon, or Ms. Mahoney at that
5 time, 1992, August '92, successfully
6 completed Peer Coaching. Another
7 diploma, a diploma which is issued
8 1971.
9 A Uh-huh (yes).
10 Q And this is from ---.
11 A A musical seminar I do.
12 Q In Mexico?
13 A Uh-huh (yes).
14 Q And then another certificate,
15 Expression of Appreciation, the
16 Rotary Club of Corry, Pennsylvania,
17 expresses appreciation to Ms.
18 Mahoney, Ms. Claudette Mahoney,
19 having served as a guest speaker, and
20 this was the date. It's not showing
21 the date.
22 A It's not on there.
23 Q Computer course papers at
24 March 8th, 2002, successfully which
25 she receive 2.5 hours continuing

## Page 31

1 professional education. Erie County
2 Technical School, certification that
3 she has satisfactory completed,
4 course and introductory to computers,
5 30 --- earned 30 instructional hours,
6 March 10th, 1999. Another
7 certificate from Erie County
8 Technical School, Claudette
9 deLeon-McCracken, satisfactory
10 completed course of Microsoft Words,
11 April 29th, 1999, 30 instructional
12 hours. Okay.
13 Ms. deLeon successfully
14 completed a course working
15 successfully with difficult students
16 on March 28th, 2003. That was under
17 the auspices of the Crawford Central
18 School District, cost at $155. Did
19 you pay for that personally?
20 ATTORNEY HEATH:
21 You have to say no.
22 A The school district did. No.
23 BY ATTORNEY NICHOLS:
24 Q Okay. Another part of her
25 transcript, of her --- your work, or

## Page 32

1 academic work at Edinboro University.
2 A No, Mercyhurst.
3 Q Oh, Mercyhurst. I see ---
4 Gannon.
5 A Right. I signed up for --- in
6 1999 I signed up for Mercyhurst for
7 my Master's, which is the beginning
8 giving credit for the couple of
9 courses I have taken at Gannon
10 University.
11 Q Okay. This is the same.
12 A That's classes I took there.
13 Q What is it?
14 A The workshop I took was --- I
15 took Discipline Strategies that Work
16 and this is their feedback of the
17 workshop I took which also provided
18 this. I have to give a feedback.
19 ATTORNEY HEATH:
20 Are you marking that?
21 I mean, is it going to be a
22 part of the ---?
23 ATTORNEY NICHOLS:
24 It's going to be a part
25 of ---.

## Page 33

1 ATTORNEY HEATH:
2 I need you to identify
3 what it is.
4 ATTORNEY NICHOLS:
5 Yes, she just ---.
6 BY ATTORNEY NICHOLS:
7 Q Identify it?
8 A The title of the workshop,
9 Discipline and Strategies that Work,
10 given by Mark Boynton, principal of a
11 high school, and it was the workshop
12 that I attended and I have to give
13 the feedback to the school district.
14 Q Okay. Power Library?
15 A Another course I took given by
16 the school district, Power Library,
17 Power Library in-service. And they
18 --- it was according to the Act,
19 Continuing Professionally Education
20 record.
21 Q And there?
22 A And this, in-service August
23 26th --- it wasn't in-service. They
24 awarded me 9.5 hours for attending
25 the in-service. Allegheny Aesthetic

**Multi-Page™**

Page 34

1 Education Symposium, Creating
2 Landscapes I took at the Intermediate
3 Unit. It was in 1996, and it was to
4 in-service credit. Another workshop
5 I took given by the school district,
6 Sfety Awareness Program, Awareness
7 Fogram, March 16, '95. Microsoft
8 Works, MS-DOS Version taken at the
9 Northwest Tri-County.
10 Introduction to Word Perfect,
11 Northwest Tri-County, Intermediate
12 Unit 1991. Oh, it was the
13 continuation of the Microsoft. There
14 has to be another one because word
15 processor --- I think it's the same.
16 I took another course to Millersville
17 University and I earned two points.
18 It was entitled, Corporative
19 Laming.
20 ATTORNEY HEATH:
21 When was that?
22 A. that was 1991, summer of 1991.
23 Cooperative Learning, another class I
24 took. It was in June 21st, 1996.
25 Discipline Strategies that Work. I

Page 35

1 already mentioned this. I attended
2 this workshop Avalon Hotel in Erie.
3 Teacher Effectiveness Training. It
4 was in 1992. And the second part of
5 Teacher Effectiveness which I
6 attended into Carlon College on April
7 3rd to 5 and April 24th through 26th.
8 And another workshop I took
9 from Cooperative Learning, it was
10 another week from the 17th to the
11 21st of 1996. And Project T.E.A.C.H,
12 another course I took from Gannon
13 University and that's in 1992.
14 Something that I would like to
15 state for the record is in 2001 when
16 they gave me an unsatisfactory they
17 stated that I did not show any
18 professional growth. Which was a
19 totally, totally lie, because I had
20 already been enrolled in Mercyhurst
21 in 1999. And I had --- they had
22 already given me 27 credits, which
23 the record is here, including
24 classroom management.
25 BY ATTORNEY NICHOLS:

Page 36

1 Q.All right. Well, that's ---
2 we offered this to receive that,
3 because I noticed for the record that
4 was stated.
5 A.In 2001.
6 Q.Yes. Okay.
7 A.That's the one, 2002.
8 Q.Also, while we're on this
9 point last inquiry here, or
10 deposition here, your competence as
11 an individual was called into
12 question by Counsel. I just want to
13 ask you now for the record, Ms.
14 deLeon, you were hired during all
15 relevant times with the school
16 district to teach Spanish; right?
17 A.Spanish. Correct.
18 Q.You were never hired to teach
19 English?
20 A.No. I was never hired to
21 teach English.
22 Q.Okay. One final document I
23 would ask that you identify. And I
24 provided opposing Counsel with copies
25 of these. These are the copies ---

Page 37

1 four copies of the arbitration awards
2 rendered. It stated with the one
3 first rendered by Arbitrator
4 Stollenberg then followed by
5 Arbitrator Talarico and then
6 Arbitrator Duff and then finally
7 Arbitrator Amis.
8 ATTORNEY HEATH:
9 And again, may I just
10 make a note for the record?
11 We have had an extensive
12 decision that will be the
13 subject of a motion coming in
14 May before Judge McGlaughlin
15 relative to whether or not the
16 Judge will determine within
17 his discretion to entertain
18 these arbitration awards into
19 evidence, and if so, what
20 weight he will give these
21 decisions. And also there
22 will be an issue that will be
23 raised before the Judge too,
24 concerning his position of
25 whether or not these

**Page 38**

1 decisions, a fact, have any
2 collateral stopped or res
3 judicata effects on the claims
4 that have been brought in this
5 federal litigation.
6 A Uh-huh (yes).
7 Okay. Well, that's
8 been provided. And I offered
9 them --- I guess I can offer
10 them collectively as deLeon
11 Five. Okay. deLeon Five.
12 You have copies of these?
13 (deLeon Exhibit Number
14 Five marked for
15 identification.
16 ATTORNEY HEATH:
17 Yes, I do.
18 ATTORNEY NICHOLS:
19 Okay. Let me see now.
20 BY ATTORNEY NICHOLS:
21 Q A few questions concerning
22 these documents, Ms. deLeon, with
23 respect to the arbitration proceeding
24 over which Arbitrator Stollenberg
25 presided, did you testify at that

**Page 39**

1 proceeding?
2 A Yes, I did. That whole entire
3 arbitration. Yes.
4 Q And are you aware of the
5 nature of the issues that were
6 involved there?
7 A Yes. They have given me an
8 unsatisfactory in '93-'94 and we went
9 into grievance and, of course, the
10 grievance was sustained.
11 Q In your favor?
12 A In my favor.
13 Q You were represented by
14 Counsel?
15 A Yes. It was by Mr. Jones.
16 Q Okay. And Mr. Jones
17 represents the union, is a lawyer for
18 the union?
19 A Represent --- correct.
20 Q And I noticed on the facing
21 page of the Arbitration decision as
22 shown appearing for the district, Mr.
23 Spadafore, Solicitor to the school
24 district, Mr. LeScola,
25 Superintendent, Mr. Dolecki and Mr.

**Page 40**

1 Desbner and Mr. Curry. As best as
2 you can recall, did these people
3 participate for --- Mr. Spadafore
4 represents the school district as the
5 lawyer?
6 A Uh-huh (yes).
7 Q But these are other people,
8 Mr. LaScola, Mr. Dolecki, Mr.
9 Desbner, did they also testify, if
10 you recall?
11 A Yes. Mr. LaScola testified.
12 Mr. Dolecki was just present since he
13 was there as assistant
14 superintendent. Mr. Desbner
15 testified. Richard Curry, his
16 boyfriend, testified against me.
17 ATTORNEY HEATH:
18 Objection.
19 ATTORNEY NICHOLS:
20 Okay.
21 BY ATTORNEY NICHOLS:
22 Q All right. Moving to the
23 second proceeding, arbitration
24 proceeding. And this was under the
25 --- Mr. Talarico, Arbitrator

**Page 41**

1 Talarico. Do remember this
2 proceeding?
3 A Yes, I do.
4 Q You testified in this
5 proceeding also?
6 A Yes, I did. For my second
7 unsatisfactory, which I certainly
8 would like to say for the record that
9 it was a retaliation from the first
10 one, since it was given on my behalf,
11 they had to retaliate and they had to
12 do everything they wanted to in order
13 to prove themselves right. They were
14 not happy that I had won the first
15 grievance. So it was started,
16 retaliation events and I think it is
17 very important that Mr. ---.
18 Q Now, this was in 1996?
19 A 1995-1996.
20 Q And the first arbitration
21 proceeding was what year?
22 A 1993-1994.
23 Q Okay. And Mr. Spadafore, the
24 second --- referred to the second
25 arbitration before Arbitrator

**Multi-Page™**

Page 42

```
 1     Talarico, Mr. Spadafore also
 2 represented the school district, —
 3     A. Correct.
 4     Q.-- is that correct?
 5     A. Correct.
 6     Q. Okay. Did anybody else
 7 testify as best that you can recall?
 8 Did anybody else testify along these
 9 proceedings other than yourself?
10     A. Oh, definitely.
11     Q. Do you recall who?
12     A. Yes. Mr. LaScola, Ms.
13 Templeton, Mr. Berkebile and another
14 union rep who stabbed me in the back,
15 Scott the music teacher. Which he
16 had been on the hot seat for stealing
17 funds, but I think they came to an
18 agreement that if he will testify
19 against me they will reinstate —.
20     Q. All these people?
21     ATTORNEY HEATH:
22     Objection.
23     A. Which they did.
24     BY ATTORNEY NICHOLS:
25     Q. All these people testified?
```

Page 43

```
 1     A. -against me.
 2     Q. Against you?
 3     A. -against me.
 4     ATTORNEY HEATH:
 5     What's the union rep's
 6 name?
 7     A. Scott.
 8     ATTORNEY HEATH:
 9     Is it his first or last
10 name?
11     A. I can't remember his first
12 name, but they should know. They had
13 removed him from the decision because
14 of the funds that he stole —.
15     ATTORNEY HEATH:
16     Okay.
17     ATTORNEY NICHOLS:
18     Ms. Heath, you asked
19 for the transcripts of these
20 proceedings, these earlier
21 proceedings?
22     ATTORNEY HEATH:
23     Yes.
24     ATTORNEY NICHOLS:
25     And I rummaged my files
```

Page 44

```
 1 and I don't have the
 2 transcripts of these. I
 3 suppose they can be available
 4 through Mr. — through the
 5 union PSEA, but I — you
 6 know, I did rummage through
 7 and I don't have those
 8 transcripts.
 9     ATTORNEY HEATH:
10     Okay. And again, my
11 point for the record is this
12 I believe Judge McGlaughlin
13 and his past practice and what
14 he has said to us initially
15 has made it clear that he will
16 not entertain these decisions
17 in the record. And so if he
18 does put them in the record,
19 as persuasive before a jury,
20 he will not utilize them as
21 collateral estoppel or res
22 judicata purposes. And that
23 would be particularly
24 underscored if, in fact, there
25 is no transcript to mark the
```

Page 45

```
 1 proceedings. But again, this
 2 is something that we will be
 3 arguing about —.
 4     ATTORNEY NICHOLS:
 5     Did he rule on — I
 6 don't think I —.
 7     ATTORNEY HEATH:
 8     I didn't file my motion
 9 yet, but I will.
10     ATTORNEY NICHOLS:
11     Yes. Because I don't
12 think — I don't recall, you
13 know —.
14     ATTORNEY HEATH:
15     It wasn't the subject
16 of the motion.
17     ATTORNEY NICHOLS:
18     Yes
19     ATTORNEY HEATH:
20     But I will tell you in
21 other proceedings that he has
22 been involved in he barely
23 even lets the Arbitration
24 decision into evidence,
25 period.
```

Case 1:05-cv-00126-SJM   Document 50-94   Filed 06/26/2006   Page 13 of 35

Page 46

```
 1 ATTORNEY NICHOLS:
 2   The only thing I can
 3 say --- yes. We can get
 4 those.
 5 ATTORNEY HEATH:
 6   And certainly we can
 7 argue this fully in front of
 8 the Judge.
 9 ATTORNEY NICHOLS:
10   Yes. I just wanted to
11 say the various case law which
12 said that they're admissible
13 for probative purposes, I
14 think.
15 BY ATTORNEY NICHOLS:
16 Q All right. Moving forward to
17 the third arbitration proceeding and
18 Arbitrator Duff. Likewise, Ms.
19 deLeon, did you testify in this
20 proceedings?
21 A Yes, I did.
22 Q And you were represented by
23 the union lawyers?
24 A Mr. --- it was Mr. McEwen.
25 Q Okay. And on the other
```

Page 47

```
 1 opposition, do you recall who
 2 testified, if anybody, or for the
 3 district --- school district?
 4 A Mr. Delecki and Mr. Higgins,
 5 Mr. Deshner that I can remember.
 6 ATTORNEY HEATH:
 7   That's in --- for Duff?
 8 A Yes.
 9 ATTORNEY NICHOLS:
10   Yes.
11 BY ATTORNEY NICHOLS:
12 Q All right. And that was in
13 your favor?
14 A On my behalf, yes.
15 Q On your behalf.
16 A They had asked me to
17 respond ---
18 Q Right.
19 A --- given a medical excuse.
20 Q Now, in reviewing the
21 arbitration award, Arbitrator Duff
22 concluded that there was no basis for
23 the school district to have --- no,
24 no, no. Based on your medical
25 records, for them to have asked for
```

Page 48

```
 1 your resignation. Was that an issue
 2 during the proceeding?
 3 ATTORNEY HEATH:
 4   Objection. The record
 5 speaks ---.
 6 A Of course they came and asked
 7 me to resign.
 8 ATTORNEY HEATH:
 9   Excuse me, there's an
10 objection. You must stop
11 speaking when I object.
12 ATTORNEY NICHOLS:
13   What were you saying?
14 ATTORNEY HEATH?
15   Objection to form. The
16 record speaks for itself
17 ATTORNEY NICHOLS:
18   No. Now, the record is
19 not complete yet, because I
20 don't have a transcript.
21 ATTORNEY HEATH:
22   The decision.
23 states ---.
24 ATTORNEY NICHOLS:
25   Yes, but I don't have a
```

Page 49

```
 1 transcript.
 2 ATTORNEY HEATH:
 3   That's what the
 4 decision said.
 5 ATTORNEY NICHOLS:
 6   Yes. You're absolutely
 7 right. I agree with you. I'm
 8 not asking should she testify,
 9 What was the issue concerning
10 that, because Arbitrator Duff
11 --- if I may.
12 ATTORNEY HEATH:
13   Go ahead.
14 BY ATTORNEY NICHOLS:
15 Q On page 17 of Arbitrator
16 Duff's decision dated January 26th,
17 2004, he said this. In this case it
18 appears to be quite clear that none
19 of the general comments entered on
20 Claudette deLeon's professional
21 evaluation instrument dated March
22 18th, 2002 had anything to do with
23 her performance, prior to the month
24 of March 2002. Her emotional
25 distress exhibited on March 12th,
```

## Page 50

1 2002 simply did not, so far as the
2 available information indicates,
3 warrant a premature unsatisfactory
4 rating for the entire 2001-2002
5 school year without more supportive
6 anecdotal records than the district
7 ever produced.
8 ATTORNEY HEATH:
9 Thank you.
10 BY ATTORNEY NICHOLS:
11 Q. Now, that question --- and
12 since, you know, this is on the
13 record, and that's true, that speaks
14 for itself. But you participated;
15 did you not?
16 A. Yes, I did.
17 Q. Okay. Now, you were a
18 witness?
19 A. Yes, I did.
20 Q. Okay. Now, I'm asking you
21 now, was the issue dealing with your
22 mental health raised during the
23 proceedings, the arbitration
24 proceeding?
25 A. Yes.

## Page 51

1 Q. And what did you testify to
2 concerning that?
3 A. That as soon as I turned in my
4 medical excuse for three days they
5 asked me to resign. They asked me
6 for my resignation and they also ---.
7 Q. Who? When you say they ---?
8 A. Dr. --- Mr. Heller and Mr.
9 Higgins was present.
10 ATTORNEY HEATH:
11 I'm just going to
12 object for the record. This
13 has already been addressed in
14 previous depositions.
15 BY ATTORNEY NICHOLS:
16 Q. I want you to be clear. You
17 fully answered my question? You said
18 --- I asked you based upon what the
19 Arbitrator concluded --- now, you
20 testified and I'm asking you what did
21 you testify to? Because I don't have
22 access to the transcript.
23 A. Mr. Heller gave me a letter of
24 suspension for two months. Well,
25 actually I was suspended and they

## Page 52

1 I didn't say for how long. They said,
2 based on the medical excuse that you
3 provided, that's what it says, based
4 on the medical excuse that you
5 provided, you are suspended. And he
6 ordered me to go for a psychological
7 evaluation and until done they will
8 let me know what they would decide it
9 and that Mr. Dolecki wants me to
10 resign. He said that Mr. Dolecki wants your
11 resignation and you can take the rest
12 of the year off in exchange of your
13 resignation.
14 Q. Okay. All right. Now, I have
15 documentation as to that, but I was
16 talking specifically during this
17 arbitration proceeding before
18 Arbitrator Duff on that particular
19 issue dealing with your mental
20 health, what would you testify to?
21 A. I was extremely upset. I was
22 extremely depressed after three
23 grievances, after the harassment, the
24 abuse that I have experienced
25 Eventually --- although I have

## Page 53

1 I suffered already a nervous breakdown,
2 that's why I had already taken a
3 whole entire year off. And what I
4 realized that the worst started all
5 over again I had to take three days
6 off.
7 I went in to see my psychology
8 and I told him what --- they were
9 starting doing it again, all over
10 again. And I told him my mental
11 state is extremely delicate. I need
12 some time off. My doctor even told
13 him that particular day when they
14 suspended me that I was not mentally
15 able to go into the ---.
16 Q. Let me ask you this now. Did
17 your doctor testify during this
18 Arbitration hearing?
19 A. He sent a letter, faxed them a
20 letter that I was not in a mental
21 position to attend that meeting,
22 because I knew they were going to do
23 something ---.
24 ATTORNEY HEATH:
25 I don't think she's

Multi-Page™

## Page 54

```
 1 hearing you. She didn't ---
 2 you asked for if he testified.
 3 I don't think she's hearing
 4 you.
 5 A. No. No. My doctor did not
 6 testify.
 7 BY ATTORNEY NICHOLS:
 8 Q. But you say he sent a letter.
 9 A. He faxed a letter to them, to
10 the school.
11 Q. Okay. All right. To the
12 school.
13 A. To the school.
14 Q. To the school district. Okay.
15 I have a copy of that. Now, one last
16 question concerning your testimony,
17 this arbitration proceeding before
18 Mr. Duff, and that is when you say
19 they were harassing. You testified
20 that they were harassing you, who
21 were you talking about when you said
22 they?
23 A. I'm talking about Deshner.
24 Q. And who else?
25 A. Heller. He had just been
```

## Page 55

```
 1 hired. He didn't know ---.
 2 Q. And who else? That's alright,
 3 who else?
 4 A. Mr. Higgins.
 5 Q. And Higgins. Okay. Deshner,
 6 Heller, Higgins, Dolecki?
 7 A. Dolecki, eventually he came to
 8 observe me and all he found was ---
 9 Q. Was he named in the
10 transcript? Did you identify him in
11 the transcript?
12 A. Yes, he was. Yes, he was.
13 Q. Yes, he was.
14 Q. Okay. All right.
15 A. He wanted to just find fault
16 with me.
17 Q. All right. Well, that's fine.
18 A. I did. All right. You
19 answered the question. All right.
20 Now, one last arbitration opinion.
21 And that is before Mr. Amis, rather
22 Lewis Amis, did you also
23 testify ---?
24 A. Yes, I did.
25 Q. Did anybody testify for you?
```

## Page 56

```
 1 A. Yes. There was a student.
 2 One of my students that said that
 3 whatever this other student had said
 4 it was a lie.
 5 Q. And you were represented by
 6 Mr. Jones, a union lawyer?
 7 A. Yes. I think all the evidence
 8 I think were provided to the
 9 Arbitrator because otherwise he would
10 have ruled on my behalf. And the
11 other girl said that whatever the
12 students were saying it was a lie.
13 He told them.
14 Q. Let me ask you one question.
15 In the transcript --- no. In the
16 opinion, one of the issues --- one of
17 the --- you were charged with school
18 district for immorality. And that is
19 for having disclosed to the PHRC, in
20 particular Mr. Flippin, PHRC
21 representative and disclosed student
22 records. That issue of Mr. Amis
23 raised that issued in preparing his
24 opinion, and he concluded that the
25 school district had not proven that
```

## Page 57

```
 1 charge. And therefore ---
 2 ATTORNEY HEATH:
 3 Immorality.
 4 BY ATTORNEY NICHOLS:
 5 Q --- he made adjustments,
 6 excuse me.
 7 ATTORNEY HEATH:
 8 Again, I'm going to
 9 object. The decision speaks
10 for itself.
11 ATTORNEY NICHOLS:
12 Yes.
13 ATTORNEY HEATH:
14 And there is simply, I
15 believe, my reading of the
16 decision. As he said, they
17 did not prove it was
18 immorality.
19 ATTORNEY NICHOLS:
20 Right. Did not prove
21 immorality, that was the
22 charge, but it did not prove.
23 ATTORNEY HEATH:
24 Not that it didn't
25 happen, but it wasn't
```

Multi-Page™

Page 58

1 immorality under the code.
2 ATTORNEY NICHOLS:
3 No, no. We're not
4 disagreeing, Counsel. You're
5 saying that that — I said,
6 he was charged with immorality
7 and you agreed.
8 ATTORNEY HEATH:
9 Right.
10 ATTORNEY NICHOLS:
11 And we both said that
12 there was no proof. There's
13 no —
14 ATTORNEY HEATH:
15 It's not proven
16 immorality?
17 ATTORNEY NICHOLS:
18 Right. That's right.
19 That's all I said; didn't I?
20 ATTORNEY HEATH:
21 Okay. That's fine.
22 ATTORNEY NICHOLS:
23 That's all I said.
24 BY ATTORNEY NICHOLS:
25 QAll right. And there was

Page 59

1 adjustments made in terms of the
2 penalty it says. In terms of
3 reduction for five-day suspension to
4 a three-day suspension?
5 A.Correct.
6 QAll right. Okay.
7 A.Which I have never been
8 reimbursed for it.
9 QOkay. Now, is there — you
10 gave testimony regarding that
11 particular charge?
12 A.Yes. I told them, and I told
13 them. I gave information that I felt
14 it was pertinent to continue the
15 investigation. That's all I did.
16 Provide information as much as I
17 could in order to support my case of
18 discrimination, hostility, abuse,
19 retaliation, everything that I
20 had —
21 QAll right. That's fine. I
22 just want to say in closing. You
23 specifically said in the record, I
24 think it's important that there was
25 no dishonesty shown on your part. No

Page 60

1 dishonesty was shown?
2 AI was just being truthful.
3 Q.Yes. There was nothing to be
4 dishonest and you tried to — no
5 deceit shown, no dishonesty.
6 A.And actually they brought it
7 up on themselves because calling
8 students to testify —
9 Q.Okay. That's fine. That's
10 fine.
11 A— and talk against me and
12 then the students come and openly say
13 those comments in front of the
14 classroom, saying, because of you I
15 have been called to the office and
16 say what you want me to say and
17 they're consistently trying to find
18 out information behind my back. And
19 the students love me now.
20 Q.deLeon Five. Okay.
21 A.They are the ones that give
22 information telling the entire class
23 that I'm going to be fired.
24 ATTORNEY HEATH:
25 Council, can you

Page 61

1 please —?
2 ATTORNEY NICHOLS:
3 Yes.
4 ATTORNEY HEATH:
5 I don't believe there's
6 a question pending.
7 ATTORNEY NICHOLS:
8 Yes. All right. Okay.
9 Now, that's all the documents
10 I offered. Just one thing
11 in terms that I would ask that
12 you can make Mr. Dolecki
13 available. Not today, perhaps
14 tomorrow, —
15 ATTORNEY HEATH:
16 I've accepted all
17 proof.
18 ATTORNEY NICHOLS:
19 — in question to
20 offer of proof is this.
21 BY ATTORNEY NICHOLS:
22 QMy question relating to the
23 ADA.
24 ATTORNEY HEATH:
25 Why couldn't you ask in

**Multi-Page™**

Page 62

```
 1 the last deposition?
 2       ATTORNEY NICHOLS:
 3 Well, ---.
 4       ATTORNEY HEATH:
 5 Was there new
 6 information that was
 7 presented?
 8       ATTORNEY NICHOLS:
 9 It's not --- well, not
10 necessarily new information,
11 information which questions
12 that one related to when I say
13 the ADA suspension of Ms.
14 deLeon per March 18th, 2002
15 letter he issued to her. Then
16 a subsequent letter ---
17       ATTORNEY HEATH:
18 That was Mr. Heller's
19 letter actually.
20       ATTORNEY NICHOLS:
21 Excuse me.
22       ATTORNEY HEATH:
23 I believe the
24 suspension, March 18th, 2002
25 is Mr. Heller's letter.
```

Page 64

```
 1 medical reasons and there certainly
 2 was a letter that was --- came to
 3 him, just prior to --- came to him
 4 from Dr. Megataurus just prior to the
 5 issuance of the --- now, that's the
 6 first day.
 7       ATTORNEY HEATH:
 8 Okay. And let me
 9 respond. I'm going to object
10 and I'm going to make you file
11 a motion. Because I'll tell
12 you why. This was discussed
13 in Mr. Dolecki's deposition.
14 We discussed the suspension,
15 we discussed the letter. This
16 is not simply if you forgot to
17 ask him something and you get
18 to depose him again and
19 disrupt everyone's schedules.
20 I don't think that's fair.
21 So on that basis, I
22 don't believe that you
23 sustained an offer of proof to
24 recall him. Now, if you want
25 to try to subpoena him again
```

Page 63

```
 1       ATTORNEY NICHOLS:
 2 He delivered it, but he
 3 didn't sign it.
 4       ATTORNEY HEATH:
 5 I believe he did.
 6       ATTORNEY NICHOLS:
 7 I don't think so. I
 8 have a copy ---
 9       ATTORNEY HEATH:
10 And anyway, we can get
11 into it this afternoon.
12       ATTORNEY NICHOLS:
13 Yes. Right. Right.
14 But what I'm saying is I
15 believe that letter was
16 issued. It was a suspension,
17 and it was issued by Mr.
18 Dolecki, first of all.
19 BY ATTORNEY NICHOLS:
20 Q.Right. And in questioning is
21 prior to issuing the letter, whether
22 be consulted with Dr. Megataurus
23 (phonetic), because he did
24 acknowledge in the letter that was
25 the basis for the suspension, was the
```

Page 65

```
 1 you can go that, but I don't
 2 think it's fair for you to
 3 recall him because you forgot
 4 to ask him a question. And I
 5 believe that an area was
 6 already discussed at his
 7 deposition which is shown in
 8 the transcript.
 9       ATTORNEY NICHOLS:
10 Well, I did have more
11 than one question. And
12 they're pertinent and relevant
13 issues because they focus on
14 the ADA --- completes the ADA
15 Compliance responsibility.
16 Certainly this particular
17 issue, critical issue, as it
18 relates to Mr. Dolecki's
19 responsibility on the ADA is
20 important. And that's why I
21 ask that he be made available.
22 Of course, if not, then I'll
23 just have to issue another
24 subpoena for his presence.
25 Okay.
```

Multi-Page™

Page 66

1 ATTORNEY HEATH:
2 But is that the extent
3 of your offer of proof?
4 ATTORNEY NICHOLS:
5 That and ---
6 ATTORNEY HEATH:
7 There's no new
8 information that has come to
9 light between the time you
10 deposed him and now?
11 ATTORNEY NICHOLS:
12 The question was new
13 information, Counsel, is a
14 question of trying to find all
15 the relevant facts as to the
16 discharge and his compliance
17 responsibility on the ADA.
18 ATTORNEY HEATH:
19 But there's nothing
20 that stopped you from asking
21 him about that when he was
22 before you to depose him.
23 ATTORNEY NICHOLS:
24 But I want to ask him
25 more questions. I have more

Page 67

1 --- I think I have a right to
2 that.
3 ATTORNEY HEATH:
4 Okay.
5 ATTORNEY NICHOLS:
6 I think I have a right
7 to do that.
8 ATTORNEY HEATH:
9 That's your opinion.
10 That's fine.
11 ATTORNEY NICHOLS:
12 Okay. I'm just asking
13 now will you voluntarily make
14 him available?
15 ATTORNEY HEATH:
16 No, I will not.
17 ATTORNEY NICHOLS:
18 You will not?
19 ATTORNEY HEATH:
20 No, I will not.
21 ATTORNEY NICHOLS:
22 Okay. I'll issue him
23 another subpoena for him.
24 Okay.
25 ATTORNEY HEATH:

Page 68

1 Okay. Are you finished
2 with her. I was going to ask
3 her some questions.
4 EXAMINATION
5 BY ATTORNEY HEATH:
6 Q Simply, Ms. deLeon, relative
7 to the certifications that were made
8 as part of deLeon Exhibit Four that
9 you addressed, isn't it true that all
10 teachers are required to have Act 48
11 credits in a certain amount in order
12 to continue teaching?
13 A All just has been recently
14 approved, but before that there were
15 many teachers that they didn't take
16 --- I know particular didn't even take
17 take any class for the last ten years
18 and she would never approve of that.
19 Q What I'm asking you is, the
20 fact that you took these credits,
21 that's not unusual?
22 A No. Because I've been taking
23 it since '93 --- '92, '93, '91.
24 Q Other teachers take them too?
25 A No. Many teachers have a

Page 69

1 Master's which I signed on my own
2 since 1989.
3 Q My question is about your
4 in-service training and your Act 48
5 credits. The certificates that you
6 have marked here for the most part,
7 when it comes to your in-service
8 training, it shows that you attended
9 the class. It has nothing to do with
10 how well you performed in the class;
11 isn't that correct?
12 A Yes, it has to do, because I
13 sat for the Master's in 1999.
14 Q No. I'm not talking about
15 your Master's. I'm not talking about
16 --- please listen to my question.
17 Please listen to my question. We'll
18 get through this much quicker.
19 Relative to some of the in-service
20 training and the certificates that
21 you had as part of your Exhibit Four,
22 there were certificates indicating
23 that you completed a class. For
24 example, on computer skills or
25 in-service training, those

**Multi-Page™**

1  certificates show you attended;
2  correct?
3  A. Correct.
4  Q. It does not necessarily say
5  that you --- that there was no test
6  involved. You didn't successfully
7  complete the class. It's simply in
8  attending a seminar or an in-service
9  credit or a training?
10  A. There's a transcript with all
11  the courses I took from Mercyhurst.
12  Q. I'm not talking about ---.
13  A. I can take tests.
14  Q. I'm not talking about what you
15  took for your Master's. I'm talking
16  about credits that you took, there
17  were many of them mentioned. For
18  example, discipline strategies that
19  work or the power library in-service
20  or the IU-8 in-service that shows
21  that you went and attended classes
22  for credit?
23  A. Correct. But also ---.
24  Q. I understand that. That is
25  not my question. Would you please

1  --- Other that she attended,
2  if it doesn't say, it just
3  doesn't say. The documents
4  speak for themselves. I don't
5  want to argue. I don't want
6  to argue.
7  ATTORNEY HEATH:
8  Okay. Then again, I
9  just would like the record to
10  reflect that again the witness
11  is refusing to respond to my
12  question. This is an ongoing
13  issue, it will be part of the
14  subject of motion regarding
15  the witness' seeming inability
16  to actually successfully try
17  to get through a deposition
18  without arguing or without
19  testifying and simply
20  answering the question.
21  ATTORNEY NICHOLS:
22  Yes. Right. The only
23  thing she can offer is what we
24  can produce.
25  A. I would like to be more

1  answer my question?
2  A. Because you're not listening.
3  ATTORNEY HEATH:
4  Objection. Objection.
5  If you have a follow-up
6  question, you can ask her,
7  please. I would like one ---
8  one record to be clear, just
9  one.
10  ATTORNEY NICHOLS:
11  Yes. The only
12  thing ---.
13  A. What does my transcript mean?
14  ATTORNEY NICHOLS:
15  Claudette, I don't see
16  any reason for --- I don't see
17  what is in dispute.
18  ATTORNEY HEATH:
19  I'm not asking about a
20  transcript.
21  ATTORNEY NICHOLS:
22  One is and some of the
23  documents, those that she
24  attended say that she
25  successfully completed through

1  specific in explaining to the ---
2  BY ATTORNEY HEATH:
3  Q. I understand you have a
4  Master's. It speaks for itself.
5  A. But I was implying ---.
6  ATTORNEY HEATH:
7  Objection. We're off
8  the record.
9  OFF RECORD DISCUSSION, WHEREUPON

10

11                  * * * * * * * *

12  DEPOSITION CONCLUDED AT 12:29 P.M.

13                  * * * * * * * * *

14

15

16

17

18

19

20

21

22

23

24

25

COMMONWEALTH OF PENNSYLVANIA )
                              )
COUNTY OF VENANGO             )

C E R T I F I C A T E

1
2
3
4
5
6

    I, Jacqueline L. Hazlett, a Notary Public in

7   and for the Commonwealth of Pennsylvania, do

8   hereby certify:

9       That the witness whose testimony appears in

10  the foregoing deposition, was duly sworn by me on

11  said date and that the transcribed deposition of

12  said witness is a true record of the testimony

13  given by said witness;

14      That the proceeding is herein recorded fully

15  and accurately;

16      That I am neither attorney nor counsel for,

17  nor related to any of the parties to the action in

18  which these depositions were taken, and further

19  that I am not a relative of any attorney or

20  counsel employed by the parties hereto, or

21  financially interested in this action.

22
23
24
25

_Jacqueline L. Hazlett_
Jacqueline L. Hazlett, Reporter

NOTARIAL SEAL
JACQUELINE L. HAZLETT, Notary Public
Johnstown, Cambria County, PA
My Commission Expires Nov. 4, 2008

SARGENT'S
COURT REPORTING
SERVICE, INC.
210 Main Street

·PITTSBURGH, PA
·CLEARFIELD, PA                  ·ERIE, PA              ·INDIANA, PA        ·PHILADELPHIA, PA
·STATE COLLEGE, PA               ·OIL CITY, PA          ·GREENSBURG, PA     ·SOMERSET, PA
                                                                            ·WILKES-BARRE, PA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF PENNSYLVANIA

CLAUDETTE DELEON,                    *
                                     *
        Plaintiff,                   *
                                     *
        vs.                          *    Case No:
                                     *
CRAWFORD CENTRAL SCHOOL              *    05-126E
DISTRICT, CRAWFORD                   *
CENTRAL SCHOOL BOARD,                *
                                     *
        Defendants,                  *
                                     *
MICHAEL E. DOLECKI,                  *
SUPERINTENDENT,                      *
                                     *
        Defendant,                   *
                                     *
CHARLES E. HELLER, III,              *
ASSISTANT SUPERINTENDENT,            *
                                     *
        Defendant                    *
                              * * * * * * * * *

DEPOSITION OF

PATRICIA DEARDORFF

March 6, 2006

Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.


EXHIBIT
13

Multi-Page ™

1

Multi-Page™

**Page 2**

```
 1          DEPOSITION
 2             OF
 3  PATRICIA DEARDORFF, taken on behalf of
 4  the Defendants herein, pursuant to the
 5  Rules of Civil Procedure, taken before
 6  me, the undersigned, Wendy Blair, a
 7  Court Reporter and Commissioner of
 8  Deeds in and for the Commonwealth of
 9  Pennsylvania, at the administrative
10  offices of Crawford Central School
11  District, 11280 Mercer Pike, Meadville,
12  Pennsylvania, on Monday, March 6, 2006,
13  beginning at 4:00 p.m.
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1
 2          A P P E A R A N C E S
 3  CALEB L. NICHOLS, ESQUIRE
 4  P.O. Box 1585
 5  Erie, PA 16507
 6  COUNSEL FOR PLAINTIFF
 7
 8  ROBERTA BINDER HEATH, ESQUIRE
 9  Andrews and Beard
10  3366 Lynwood Drive
11  P.O. Box 1311
12  Altoona, PA 16603-1311
13  COUNSEL FOR DEFENDANTS
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1               I N D E X
 2
 3  WITNESS: PATRICIA DEARDORFF
 4  EXAMINATION
 5   By Attorney Heath          7   33
 6  EXAMINATION
 7   By Attorney Nichols       33 -49
 8  CERTIFICATE                  50
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1               EXHIBIT PAGE
 2
 3
 4  NUMBER  DESCRIPTION   PAGE   IDENTIFIED
 5  One     Survey        17
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

```
1    OBJECTION PAGE
2
3    ATTORNEY                    PAGE
4    Heath        36, 40, 44, 45, 45, 48
5                          .
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
1    PROCEEDINGS
2
3    -------------------
4    DULY SWORN, TESTIFIED AS FOLLOWS:
5    -------------------
6    EXAMINATION
7    BY ATTORNEY HEATH:
8    Q Can you please and spell your
9    name for the record?
10   A Sure.  Patricia Ann Deardorff,
11   I D-E-A-R-D-O-R-F-F.
12   Q Ms. Deardorff, I've been
13   retained to represent the Crawford
14   Central School District and Misters
15   Dolecki and Heller in a lawsuit that's
16   been brought in the Federal Court by
17   Claudette deLeon concerning her
18   employment with the District and her
19   subsequent or ultimate termination from
20   that employment.  And the reason I'm
21   here today is just to get some general
22   information from you concerning your
23   knowledge that you had about Ms.
24   deLeon, particularly when you were in a
25   position of being a union
```

Page 8

```
1    representative in some capacity and as
2    to what you may recall about some of
3    the issues that have been brought up to
4    Ms. deLeon by the administration.
5    And this deposition, even though
6    it is an informal setting, you are
7    under oath, as you've been sworn in,
8    and there is going to be a record, and
9    that's why we have a Court Reporter
10   here who's going to be taking down
11   everything that anybody in this room
12   says.  Therefore, it's important that
13   you're clear with regard to my
14   questions or Mr. Nichol's questions.
15   If you don't understand a question that
16   I may ask you, please let me know and
17   I'll be happy to repeat or rephrase the
18   question for you.  If you do answer the
19   question, I will assume you understood
20   the question.  Is that clear?
21   A Yes.
22   Q Now, hopefully we won't be too
23   long today.  I know you've been waiting
24   a long time, and I apologize for that,
25   but if you need to take a break at any
```

Page 9

```
1    time, that's fine.  You are here
2    pursuant to a subpoena; is that
3    correct?
4    A That's correct.
5    Q And I would also ask one more
6    thing of you, that you keep your
7    responses verbal because the Court
8    Reporter cannot take down a gesture or
9    a nod or something of that nature, a
10   shrug of the shoulders, or an uh-huh or
11   an uh-uh.  So if it's yes or no, please
12   let me know.  Are we ready to go?
13   A Yes.
14   Q You're currently employed with
15   the Crawford Central School District;
16   is that correct?
17   A That's correct.
18   Q How long have you been employed
19   by the District?
20   A Thirty-two (32) years.
21   Q What is your current position?
22   A Principal at Cochranton
23   Elementary School.
24   And how long have you had that
25   position?
```

Multi-Page™

Page 10

```
 1  A.One year.
 2  Q.Which would be --- is it ---
 3  A.This year.
 4  Q.--- the 2005/2006 school year?
 5  A.That's correct.
 6  Q.When did you become part of the
 7  administration, or an administrator, I
 8  should say?
 9  A.The year 2003/2004, I was
10  assistant principal at Meadville Area
11  Senior High School for that year and
12  tie following year.
13  Q.So 2003/2004, 2004/2005, you
14  were the assistant principal for
15  Meadville?
16  A.Yes.
17  Q.Prior to that time, what did you
18  do for the District, prior to 2003?
19  A.I was a classroom teacher.
20  elementary classroom teacher.
21  Q.What did you teach, what grade?
22  A.I taught kindergarten, first,
23  second, third, fourth, sixth, and
24  reading.
25  Q.Not all at once, I wouldn't.
```

Page 11

```
 1  imagine ---.
 2  A.No.
 3  Q.Prior to working for the
 4  Crawford Central School District, did
 5  you work at any other school districts?
 6  A.No, I did not.
 7  Q.Was this your first job coming
 8  out of college, or did you have other
 9  employment?
10  A.That's my first job.
11  Q.Where did you go to college?
12  A.Edinboro University.
13  Q.And when did you graduate?
14  A.1972.
15  Q.What was your major?
16  A.Elementary education, and area
17  of concentration in early childhood.
18  Q.Have you taken any subsequent
19  courses relative to your education
20  after that?
21  A.Yes.  Yes, I have a Master's in
22  reading, and I have a certificate in
23  elementary and secondary principal,
24  administration.
25  Q.When did you receive that
```

Page 12

```
 1  certification for the elementary and
 2  secondary principal?
 3  A.I first received my elementary
 4  certificate, I think, in May of 2002.
 5  I received my secondary in May of 2003.
 6  Q.And what did you have to do to
 7  pursue those certifications?  What
 8  other courses did you have to take?
 9  A.For each one of those, I took
10  probably a total of five courses
11  apiece, each of those dealing with
12  administration budget, personnel.
13  Q.Where did you take those
14  classes?
15  A.Edinboro.
16  Q.When did you receive your
17  Master's degree?
18  A.1975.
19  Q.And where was that from?
20  A.Edinboro.
21  Q.Any other education?
22  A.I've taken various classes in
23  classroom management, and reading and
24  math, but they were graduate courses
25  just to better myself professionally.
```

Page 13

```
 1  Q.And where did you take them,
 2  Edinboro?
 3  A.Gannon.
 4  Q.Gannon.  You previously had held
 5  union positions; is that correct?
 6  A.That's correct.
 7  Q.What positions did you hold, and
 8  can you also provide me with the dates,
 9  or the general dates?
10  A.I was union president from 1998
11  through the school year of 2002.  And I
12  was grievance chairperson from
13  approximately 1983 to 1998.
14  Q.Now, it's my understanding from
15  some of the previous testimony that
16  we've had that after you are no longer
17  union president, you become second
18  vice-president, so you're still
19  involved in the upper hierarchy of the
20  union; is that correct?
21  A.That's correct.
22  Q.And in this particular case,
23  were you consulted about Ms. deLeon
24  after you had stopped being union
25  president, which would be in 2002?
```

Multi-Page™

**Page 14**

1 A.Yes.
2 Q.And in what capacity were you
3 consulted after that time?
4 A.It's usually for background
5 information to update them as to what
6 had happened previously and maybe some
7 concerns that they might have, just in
8 the general maintenance of a grievance
9 or whatever.
10 Q.Is it fair to say that you have
11 been involved with Ms. deLeon since the
12 mid-1990s relative to grievances or
13 other proceedings that may have
14 occurred while you were the grievance
15 chairperson?
16 A.Yes.
17 Q.And then when you were union
18 president from 1998 to 2002, did you
19 have any interactions with Ms. deLeon?
20 A.Yes, I did.
21 Q.And what do you recall?
22 A.There were various occasions in
23 which the administration would call and
24 ask me to attend a meeting that they
25 were going to have with Ms. deLeon, and

**Page 15**

1 I would --- my main concern even at
2 that point was to make sure that her
3 rights were not violated and that
4 things were met, information was passed
5 onto PSEA so that decisions could be
6 made.
7 Q.Were you aware of any corrective
8 action plan that Ms. deLeon was subject
9 to in the year 2000/2001?
10 A.Yes, I was.
11 Q.And did you ever have an
12 opportunity to review that corrective
13 action plan?
14 A.Yes, I did.
15 Q.And did you believe that that
16 corrective action plan was fair at the
17 time?
18 A.Based on?
19 Q.What you reviewed.  Based on
20 what you understood the
21 administration's concerns to be.
22 A.Yes.
23 Q.And did you ever have an
24 opportunity then to review any latter
25 corrective action plans which would

**Page 16**

1 I have been for the year 2001/2002 ---
2 I'm sorry, 2002/2003?
3 A.Yes.
4 Q.And given what you knew about
5 the administration's concerns at that
6 time, did you believe that corrective
7 action plan was warranted?
8 A.Yes.
9 Q.Going back to your being the
10 grievance chairperson in the 1990s,
11 were you aware of any parental
12 complaints concerning Ms. deLeon
13 dealing with a student by the name of
14 Brian Gray?
15 A.Yes.
16 Q.What do you recall?
17 A.I was called by the union
18 president at that time to attend the
19 meeting that was being held with Mr.
20 Desimer and Ms. deLeon concerning a
21 survey that she had given her students,
22 and that's all I knew at that point.
23 So I went into the meeting with Ms.
24 deLeon, and Mr. Desimer informed her at
25 that time that that survey could no

**Page 17**

1 longer be passed out to her students,
2 And I sat through that meeting with
3 her.
4 Q.Was there a copy of the survey
5 provided to you at that time, or did
6 you at some point see a copy of the
7 survey?
8 A.Yes.
9    ATTORNEY HEATH:
10    Excuse me one second.  I
11 have other copies.
12    (Deardorff Exhibit Number
13 One marked for
14 identification.)
15 BY ATTORNEY HEATH:
16 Q.I'll show you what I'd like to
17 mark as Deardorff One, and ask you to
18 take a look at it, please.
19    MS. DELEON:
20    This shouldn't be in my
21 file.
22    ATTORNEY NICHOLS:
23    What do you mean?
24    MS. DELEON:
25    All of these were

Multi-Page ™

Page 18

1 supposed to be thrown out. They
2 shouldn't be in my file.
3 BY ATTORNEY HEATH:
4 Q Is this a copy of the survey
5 that ---
6 MS. DeLEON:
7 It shouldn't be allowed.
8 BY ATTORNEY HEATH:
9 Q --- you reviewed?
10 A Yes, it is.
11 Q And was this something that was
12 addressed at a specific meeting wherein
13 the administration had directed Ms.
14 deLeon specifically not to pass out
15 this survey?
16 A Yes.
17 Q And did you become aware at any
18 point that this was passed out to
19 subsequent classes?
20 A Mrs. deLeon said that it was
21 passed out to one of her classes.
22 Q And in reviewing the survey, do
23 you believe that the questions that are
24 asked in the survey are appropriate?
25 A No.

Page 19

1 Q And can you point to anything
2 specifically that you believe is
3 inappropriate?
4 A I think number 34, talking about
5 personal matters.
6 Q Which says how often did I make
7 PMS jokes? What did I say?
8 A Right. And number 36.
9 Q How often did I talk about my
10 daughter? What did I say?
11 A And probably 27.
12 Q Have I ever discussed with this
13 class about a personal student's
14 behavior? What did I say? Were you
15 aware of --- and how did this come to
16 your attention in relation to Brian
17 Gray? Was there any correlation?
18 A At the time of the conference,
19 Mr. Destiner talked with her, with Mrs.
20 deLeon, concerning this and brought his
21 name up at that time.
22 Q And brought his name up in what
23 context?
24 A That she was referring to him
25 when she asked specific questions.

Page 20

1 Q Were you involved in any kind of
2 conference wherein the parents of Brian
3 Gray attended?
4 A No, I was not.
5 Q Did you become aware at any time
6 that there was a parent conference with
7 the Grays concerning the issue?
8 A Only after this meeting with Ms.
9 deLeon.
10 Q So is it your testimony that
11 this survey then was circulated after
12 Ms. deLeon had specifically been
13 directed by the administration not to
14 pass it to any additional classes?
15 A No. She passed it out to one.
16 She had the meeting with Mr. Destiner
17 and myself, and then to the best of my
18 knowledge, she did not pass it out
19 after that.
20 Q And if, in fact, she had passed
21 it out, would that have been a direct,
22 indirect, violation of a directive she
23 was given at the meeting by the
24 administration?
25 A Yes.

Page 21

1 Q And would that constitute
2 insubordination as far as you're aware?
3 A Yes.
4 Q At any time, did Ms. deLeon ever
5 discuss her mental health with you?
6 Let me just give you a time frame.
7 Were you aware that she took a
8 sabbatical in 1997 ---
9 A Yes.
10 Q --- until 1999?
11 A Yes.
12 Q Did you know the reason why?
13 A Well, because she had to take
14 not only a sabbatical but use some days
15 from the sick bank. I was involved in
16 that. At that time, there was a
17 doctor's excuse required for that, and
18 that's why I became aware of the fact
19 that it was gynecological problem.
20 That's all I knew.
21 Q Did you have any understanding
22 of whether or not any mental health
23 issues were involved in that time?
24 A No.
25 Q And that's all that the doctor's

Case 1:05-cv-00126-SJM    Document 50    Filed 06/26/2006    Page 28 of 35

Page 22

1 excuse said that you were relying on;
2 correct?
3 A.That's all from what I remember.
4 Q.And being in charge of the sick
5 bank, what does that mean? What did
6 you do that?
7 A.Well, there's a committee that
8 is made up of the superintendents and
9 three or four union personnel. And
10 basically what it is to make sure that
11 the request is legitimate. There are
12 certain rules that go along with the
13 sick bank, and one of the requests that
14 has to be met was that she had to have,
15 or anyone has to have, a doctor's
16 excuse. So she was complying with
17 that.
18 Q.Upon her return from the
19 sabbatical, Ms. deLeon was scheduled to
20 travel between classes; do you recall
21 that?
22 A.Yes.
23 Q.And was she the only teacher
24 that had to travel between classes at
25 that time?

Page 23

1 A.Not that I know of.
2 Q.And what circumstances dictated
3 the schedule, I mean, of who traveled
4 and who didn't travel? I mean, was
5 there a space issue?
6 A.It was space. There was just
7 the scheduling itself, how many
8 classes, how many teachers, how many
9 students. There are a lot of things
10 that were taken into account.
11 Q.And was traveling, whether or
12 not a person had to travel, was that
13 based on seniority in any way, or any
14 part of the collective bargaining
15 agreement?
16 A.Not to my knowledge, no.
17 Q.And whether or not a teacher had
18 to travel, was that something that was
19 a grievable issue?
20 A.No.
21 Q.No, it was not grievable?
22 A.No, it was not grievable.
23 Q.With regard to the corrective
24 action plan that I had mentioned for
25 the 2000/2001 school year, do you

Page 24

1 I recall being in a meeting where it was
2 signed by Ms. deLeon in June and you
3 worked on it through the summer with
4 her, or was that the 2001/2002, do I
5 have my years wrong?
6 A.I think the first one is where
7 she received it in June and was going
8 to --- she said she was going to work
9 on it over the summer.
10 Q.And were you in the meeting when
11 she received that plan?
12 A.Yes.
13 Q.And did you observe Ms. deLeon
14 signing that corrective action plan?
15 A.To the best of my knowledge,
16 yes.
17 Q.And in signing the corrective
18 action plan, does that have any
19 significance as far as the union is
20 concerned, if a teacher signs it?
21 A.I think she understands it and
22 she needs to comply with it.
23 Q.Relative to your involvement
24 with Ms. deLeon over the years, did you
25 notice any pattern of issues recurring

Page 25

1 again and again, concerning her
2 teaching performance?
3 A.I think the classroom discipline
4 was one area that the administration
5 continually brought up to our
6 attention.
7 Q.Anything else that you recall?
8 A.Sometimes her tardiness in class
9 and coming to school on time.
10 Q.In your opinion, do you believe
11 that the administration was targeting
12 her because she was Hispanic?
13 A.No.
14 Q.Did you ever have any
15 involvement with recommending --- after
16 you stepped out as union president, did
17 you ever have any involvement with
18 recommending to the building
19 representatives or the grievance
20 chairpeople that you suggested that two
21 people be in a meeting with Ms. deLeon?
22 A.Yes.
23 Q.What involvement did you have in
24 that respect?
25 A.I think from past experience, I

**Multi-Page™**

Page 26

1 Q.And what did you do?
2 A.I just kind of sat beside her
3 and took my hand on the paper and tried
4 to get her to refocus on the paper that
5 they were going over with her.
6 Q.Were you ever involved in any
7 meetings with Ms. deLeon when student
8 confidentiality was raised, or the
9 issue of breaching student
10 confidentiality was raised?
11 A.Yes.
12 Q.What do you recall about that?
13 A.Well, the one meeting for sure
14 that I remember was the meeting with
15 discuss with her — he said it was
16 discuss with her — he said it was
17 very important that information,
18 personal information, was kept just
19 that, personal, and that the
20 confidentiality of students' behaviors
21 in the classroom and outside the
22 classroom was not to be discussed with
23 anyone in the classroom.
24 Q.And subsequent to that time, and
25 I believe the Brian Gray situation was

Page 28

1 Q.And what is your understanding
2 any subsequent times when the issue of
3 student confidentiality was discussed
4 relative to Ms. deLeon?
5 A.I think with her —
6 Q.Was it ever raised again?
7 A.I think with her
8 unsatisfactories, yes, it was raised.
9 Q.Do you have an understanding of
10 the school policy concerning student
11 confidentiality?
12 A.Yes.
13 Q.And what is your understanding
14 relative to its being discussed outside
15 of School District personnel?
16 A.It should not be discussed
17 outside of need-to-know basis.
18 Q.And with regard to the need-to-
19 know basis, would that also apply in
20 the school relative to discussing
21 student information in front of other
22 students?
23 A.Yes.
24 Q.Would that be considered a
25 violation of School District policy?

Page 27

1 Q.Was there any time that you ever
2 became aware that she, with regard to
3 her focusing issue — where she didn't
4 seem to be making eye contact with the
5 administrators during the meetings,
6 where she'd be looking at the floor and
7 not looking at the papers or drifting
8 off elsewhere? Do you ever recall
9 that?
10 A.Yes, yes.
11 Q.Can you recall anything
12 specifically about that?
13 A.Without a date or an incident,
14 probably I can't, I mean, I remember
15 times especially with the action plan,
16 you know, where she was not focused.
17 That was one time I can remember.
18 Q.And what was she doing?
19 A.She was looking at the floor,
20 and had at one point turned her back to
21 the administration as they were
22 talking.
23 Q.In the meeting, she turned her
24 back to them?
25 A.Yes.

Page 29

1 I found that Ms. deLeon needed — and
2 the Association also needed two people
3 available, one to help keep Ms. deLeon
4 focused on what was going on at the
5 meeting. The other one was to take
6 accurate notes. So I recommended that
7 two people go in. From past
8 experience, I recommended that two
9 people go into the meetings with her.
10 Q.And when you say it was because
11 of past experience you wanted to have
12 one person in there to keep Ms. deLeon
13 focused, what do you mean by that? Why
14 did you think that was necessary?
15 A.There were times when I think
16 that Ms. deLeon had difficulty
17 focusing, keeping track of what they
18 were trying to say to her,
19 understanding what they were trying to
20 say to her. There were times when I
21 would have to use my hand and we would
22 go over the action plan, and I was
23 trying to get her to focus back on the
24 words, on the paper, so I did that. I
25 think she needs some comforting.

Multi-Page™

Page 30

1 A.Yes.
2 Q.What about discussing a
3 student's behavioral problems in the
4 hallway with another teacher so that
5 other people could overhear that?
6 A.I guess it goes back to the
7 need-to-know basis, and it should not
8 be discussed if other people can
9 overhear it.
10 Q.Did the School District ever
11 provide in-services or other trainings
12 on confidentiality issues, such as
13 FERPA or school policy?
14 A.I'm sure we've had --- I can't
15 name one specifically, but I'm sure we
16 have had many discussions on
17 confidentiality in various ways.
18 Q.But do you specifically recall
19 Mr. Dezhor stressing student
20 confidentiality with Ms. deLeon
21 concerning the Brian Gray issue?
22 A.Yes.
23 Q.Were you involved in any
24 meetings in the spring of 2002, wherein
25 an independent medical examination was

Page 31

1 specified that Ms. deLeon should have a
2 psychiatric examination at that time?
3 A.Yes.
4 Q.What do you recall about that
5 time frame?
6 A.The central administration, Mr.
7 Dolecki's office, called and said that
8 they wanted me at a meeting, I want to
9 say three o'clock, that I needed to be
10 there representing Ms. deLeon. So I
11 did go. And at that time, the
12 administration, if I remember
13 correctly, it was the time when they
14 asked her for --- they were giving her
15 a leave with pay, and that she ---
16 pending a psychiatric of which they
17 would pay for.
18 Q.What was Ms. deLeon's demeanor
19 at that time?
20 A.She was quite upset, and did
21 walk out of the meeting.
22 Q.And did you at that time try to
23 calm her down?
24 A.Yes, I did.
25 Q.And how long did it take you to

Page 32

1 calm her down?
2 A.I think we talked maybe for a
3 half hour.
4 Q.And do you recall anything else
5 specifically about that time, and Ms.
6 deLeon's demeanor?
7 A.She did calm down, and we did go
8 back to the meeting and finish the
9 meeting. I did tell her that she would
10 be insubordinate if she didn't go, and
11 so we did. We did go back in.
12 Q.At that time, what was she
13 expressing to the administration that
14 you recall concerning her mental
15 health?
16 A.She was saying that she had
17 mental health problems and they
18 requested that she have a doctor's
19 excuse or a doctor's statement saying
20 that she could go no further with this
21 conference, and she was attempting to
22 get that from her doctors.
23 Q.And prior to that time, did you
24 have any awareness concerning her
25 mental state, or that she had mental

Page 33

1 health issues?
2 A.No, I did not.
3 ATTORNEY HEATH:
4 Can we go off the record
5 for a moment?
6 SHORT BREAK TAKEN
7 ATTORNEY HEATH:
8 Nothing further.
9 EXAMINATION
10 BY ATTORNEY NICHOLS:
11 Q.Ms. Deardorff, I have a few
12 questions. I'm Caleb Nichols
13 representing Ms. deLeon. I have a few
14 questions on matters you have testified
15 to under oath here. You have been
16 involved with the union in a
17 consequential position. I bear you
18 were president, you say, 1998 through
19 2002?
20 A.That's correct.
21 Q.And more recently you were
22 second vice-president; is that correct?
23 A.For one year.
24 Q.Okay. And currently your
25 affiliation with the union?

**Multi-Page ™**

```
 1   A.I am not.
 2   Q.You have no affiliation.  Okay.
 3   Now, with respect to the action plan
 4   that was brought up in which I believe
 5   Ms. deLeon was assigned first in the
 6   school year 2001/02, and then
 7   subsequent school years, okay?  What is
 8   your understanding --- if you do know,
 9   what would be the reasons why a teacher
10   would be assigned to a formal action
11   plan?
12   A.Are you asking specifically why
13   Ms. deLeon was?
14   Q.Well, I'm asking generally.
15   It's a more generic question.  You have
16   been involved in unions, you've been a
17   teacher, you've been, you know, I take
18   it --- I'm not sure how many years
19   you've been involved in the school
20   system, but if you know, what generally
21   are the reasons that a teacher is
22   assigned to perform according to an
23   action plan?
24   A.A teacher is assigned an action
25   plan when the administration has
```

```
 1   observed and deemed appropriate or the
 2   behavior or the demeanor in the
 3   classroom or outside the classroom is
 4   not appropriate, and can specifically
 5   give data to support that action plan.
 6   Q.And basically ---?
 7   A.It's to improve.  It's to help
 8   the teacher improve.
 9   Q.Improve.  And based upon your
10   experience, is it more likely that
11   relatively new teachers are assigned
12   action plans, not more senior teachers
13   would be assigned?  That has been your
14   experience?
15   A.No, not really.
16   Q.Oh, it has not?
17   A.No.
18   Q.Well, tell me, please, based
19   upon your experience in terms of if we
20   were to give percentages, would it be
21   perhaps the number of teachers you
22   observed were assigned to perform under
23   action plan would be --- what
24   percentage would be senior, and by
25   senior I mean let's say tenured
```

```
 1   teachers, teachers who gained tenure,
 2   vis --vis those who are new, relatively
 3   new and inexperienced?
 4   A.I would say 50/50.
 5   Q.Fifty (50)/50?
 6   A.Yes.
 7   Q.Is it true that the action plan
 8   requires a teacher to do typically more
 9   work and it's a more stringent standard
10   that a teacher must meet; is that fair
11   to say?
12       ATTORNEY HEATH:
13       Objection to form.
14   BY ATTORNEY NICHOLS:
15   Q.You can answer.  Is that a fair
16   characterization of an action plan?
17   A.In the long run, an action plan
18   is supposed to make their job easier
19   because they are then complying with
20   what they need to comply with.
21   Q.Well, in fact, doesn't it
22   constitute more work for a teacher
23   though?
24   A.Sometimes.
25   Q.Usually?
```

```
 1   A.Initially.
 2   Q.Isn't that usually so with the
 3   case?
 4   A.Initially, it would be.
 5   Q.On this document, if I'm moving
 6   from the action plan, on this document
 7   that we're referring here dated March
 8   29, 1994, you say you recall that Ms.
 9   deLeon was ordered to discontinue use
10   of it if it is that correct, the survey?
11   A.That's correct.
12   Q.Is that correct?
13   A.Yes.
14   Q.Approximately what time frame
15   are you talking about?
16   A.During the day.
17   Q.No, no, year, a school year, a
18   school year.
19   A.March.
20   Q.March of which year, ma'am?
21   A.'94.
22   Q.March of '94?
23   A.That's what's on here, so I
24   assume that's the date.
25   Q.Okay.  But this issue rule, was
```

Page 38

```
 1 this issue subsequently raised at some
 2 subsequent school year after March
 3 1994?
 4 A Not to my knowledge.
 5 Q Okay. Are you sure it was not
 6 used as a basis to sanction Ms. deLeon?
 7 A Sanction how?
 8 Q Well, I mean penalize her. You
 9 say she was ordered not to use it.
10 Well, was she sanctioned or penalized
11 for having used it the first time?
12 A Not to my knowledge.
13 Q Not to your knowledge. Are you
14 aware though that arbitrator --- Ms.
15 deLeon went before four arbitrators?
16 At least one of those arbitrators
17 ordered this to be removed, among other
18 documents, removed from her personnel
19 file for reasons that he thought it
20 was, I believe, prejudicial. Are you
21 aware of that order rendered by an
22 arbitrator?
23 A I remember that there was an
24 order, but I don't remember what
25 specific document it was.
```

Page 39

```
 1 Q Yeah. Well, at least one of the
 2 arbitrators, I mean --- I believe it's
 3 the first Arbitrator Stolnberg
 4 (phonetic) or perhaps Arbitrator
 5 Dalaricka (phonetic) ordered that this
 6 document, among others, be removed from
 7 her personnel file for reasons I think
 8 be thought it was an improper and
 9 prejudicial piece of information. I
10 just note that in light of your saying
11 that she was discontinued from using
12 something, which this arbitrator said
13 obviously is valid. I just want to
14 note that for the record. Okay? All
15 right.
16 Now, you were aware of Ms.
17 deLeon's mental health condition;
18 right?
19 A At what point?
20 Q Well, at any point. You've
21 known her for a long time. You've
22 known her record. You've been involved
23 as a union person, and her records,
24 it's no secret; is it, to come to you?
25 You know that she was under doctor's
```

Page 40

```
 1 care. Is that a secret?
 2 ATTORNEY HEATH:
 3 Objection. Asked and
 4 answered. Go ahead and answer.
 5 A I know that from the documents
 6 that I had from the sabbatical and the
 7 sick bank that the document that I saw
 8 was from a gynecologist at that time.
 9 And that was in the '97 time frame,
10 that time frame, I think.
11 BY ATTORNEY NICHOLS:
12 Q And the sabbatical leave, '97
13 and '98, the sabbatical leave she took,
14 you didn't know that was for ---
15 A I would not know that.
16 Q --- a mental health condition?
17 A I would not know that.
18 Q All right. And subsequent to
19 that, when you served as president of
20 the union, 1998 to 2002, there were
21 issues that came to you, your body, the
22 union, concerning Ms. deLeon, some of
23 which involved her taking leave, her
24 mental health condition; right? You
25 were privy to that; right?
```

Page 41

```
 1 A Only toward the end.
 2 Q Well, what end are we talking
 3 about, then? What years are we talking
 4 about?
 5 A Probably 2001/2002.
 6 Q All right. Expound on that
 7 then, Ms. Deardorff. You said only to
 8 the end. To the extent that you know,
 9 please state for the record what did
10 you know about her mental health
11 condition.
12 A All I knew is that she was
13 seeing a psychologist, and that at the
14 time of that meeting, the document that
15 I had in front of me said that she was
16 not able to attend that meeting at that
17 time.
18 Q Okay. All right. And that was
19 the extent of your knowledge of her?
20 A That's correct.
21 Q Okay. And you stepped down in
22 2002?
23 A That's correct.
24 Q And you thereupon became a vice-
25 president; right?
```

**Multi-Page™**

Page 42

1 A.Second vice-president.
2 Q.Second vice-president. In that
3 position, what was your function? Did
4 the issues regarding Ms. deLeon also
5 come to you, to your attention, in that
6 position as well?
7 A.Just for a period of time in
8 which there was a transfer of personnel
9 from my position as president to the
10 next person who was taking over, and I
11 would help him to get organized and
12 give him some background information.
13 Q.Now, while you were a union
14 official, you knew that Ms. deLeon had
15 problems with the administration? That
16 was no secret; was it? You knew that;
17 right?
18 A.What do you mean by problems?
19 Q.Well, I mean you say there were
20 meetings with you as president, that
21 you'd help and assist her, she was
22 visibly angry; those type of problems?
23 A.Yes.
24 Q.Right? You knew that; right?
25 A.Yes.

Page 43

1 Q.And I'm saying, when did this
2 first come to your attention that Ms.
3 deLeon had problems with the
4 administration? When did that first
5 come to your attention?
6 A.I'm not really sure, to tell you
7 the truth.
8 Q.Don't know?
9 A.No, I dealt with her for years
10 Q.Did Ms. deLeon ever bring to
11 your attention that she felt that she
12 was being mistreated, discriminated
13 against by the school administration?
14 Did she ever bring that to your
15 attention?
16 A.Not in those terms.
17 Q.In what terms did she bring it
18 to your attention?
19 A.She felt that maybe they were.
20 unfair.
21 Q.And did she specify? Did you
22 inquire? As a member of the union, she
23 had been a member of the union, wasn't
24 it your job to make some kind of
25 inquiry? To assist, you say you were

Page 44

1 there to assist her, certainly do more
2 than hand holding. You knew she was
3 fighting and she alleged
4 discrimination? What did you do?
5 What did you do to help her?
6 ATTORNEY HEATH:
7 Objection to form. ]
8 don't know. You asked so many
9 questions that I don't know what
10 question he's asking.
11 BY ATTORNEY NICHOLS:
12 Q.Well, I'm going to ask this
13 question. What did the union official
14 do or they should do during this period
15 to help her when she came and said I've
16 been mistreated by the administration?
17 ATTORNEY HEATH:
18 What period?
19 BY ATTORNEY NICHOLS:
20 Q.What did you as a union official
21 do, if anything?
22 A.When, at what time?
23 Q.You tell me. If you didn't do
24 anything, you didn't do it at any time,
25 but tell me for the record. You can

Page 45

1 say so, that I didn't do anything.
2 ATTORNEY HEATH:
3 Objection.
4 BY ATTORNEY NICHOLS:
5 Q.Just say it.
6 A.No, that's not true.
7 Q.All right. Tell us what the
8 union did, if it's not true. If what
9 I'm saying is not true, tell me what is
10 correct.
11 ATTORNEY HEATH:
12 I'm just going to make an
13 objection for the record because
14 I don't think that you
15 understand the difference
16 between what the union does
17 pursuant to upholding the
18 collective bargaining agreement
19 versus what the PHRC does for
20 separate issues that involve
21 alleged discrimination. I'm
22 just making that statement for
23 the record.
24 ATTORNEY NICHOLS:
25 Well, I want to say that

**Page 46**

```
 1    the union certainly has an
 2    obligation to process
 3    grievance s doesn't it?
 4        ATTORNEY HEATH:
 5            Well, you're not asking
 6    me questions.
 7        ATTORNEY NICHOLS:
 8            And doesn't it include
 9    discriminations, grievances;
10    doesn't it?
11        ATTORNEY HEATH:
12            Why don't you ask her the
13    questions?
14        ATTORNEY NICHOLS:
15            Am I wrong?
16    BY ATTORNEY NICHOLS:
17    Q Ms. Deardorff, am I wrong?
18    A What question are you asking me?
19    Q That's the question I'm asking
20    you. Doesn't the union have a duty and
21    obligation to process discrimination
22    complaints on behalf of its membership?
23    She was a dues-paying member. Am I
24    wrong when I say that?
25    A No, we did that.
```

**Page 47**

```
 1    Q Tell us specifically, what did
 2    you do?
 3    A Each time that Ms. deLeon had a
 4    meeting with the administration which
 5    we were included, we called PSEA. PSEA
 6    took over at that point.
 7    Q All right.
 8    A And that's their attorney. They
 9    have an attorney and they took over
10    from there.
11    Q You were not involved in it in
12    any way?
13    A I was basically a data collector
14    and I made sure that the dates were
15    kept intact as far as information that
16    I had to approve it, had to meet a time
17    frame for the grievances.
18    Q As a member of the union and
19    union official, and knowing Ms.
20    deLeon's situation, you said she came
21    to you, they're mistreating. She was
22    mistreated. Do you feel uncomfortable
23    to come here today and testify against
24    her? Do you?
25    A I don't feel I ---
```

**Page 48**

```
 1        ATTORNEY HEATH:
 2            She's here under a
 3    subpoena.
 4    BY ATTORNEY NICHOLS:
 5    Q That's understood you came as a
 6    subpoena, but nonetheless, do you feel
 7    uncomfortable to come here testifying
 8    against her today, and everything you
 9    said today, you testified against her?
10    A I don't feel I did. I just ---
11    Q Your testimony is completely in
12    accord with the administration. Every
13    question she asked you was against her.
14    She's a member of the union and you're
15    a union official. And I'm asking you,
16    in your heart do you feel any
17    compunction of having come here
18    testifying that way? You can say yes
19    or no.
20        ATTORNEY HEATH:
21            Objection to form. You
22    may answer.
23    A I came here under subpoena.
24    They told me that I had to be here, and
25    I had to tell the truth. And that's
```

**Page 49**

```
 1    what I'm doing.
 2    BY ATTORNEY NICHOLS:
 3    Q Okay. Okay.
 4        ATTORNEY NICHOLS:
 5            Well, I have no more
 6    questions, Ms. Deardorff.
 7        ATTORNEY HEATH:
 8            No further questions.
 9    Thank you.
10
11        * * * * * * * *
12    DEPOSITION CONCLUDED AT 4:42 P.M.
13        * * * * * * * *
```

COMMONWEALTH OF PENNSYLVANIA )

COMMISSIONER OF DEEDS )

C E R T I F I C A T E

I, Wendy Blair, a Commissioner of Deeds in

and for the Commonwealth of Pennsylvania, do

hereby certify:

That the witness whose testimony appears in

the foregoing deposition, was duly sworn by me on

said date and that the transcribed deposition of

said witness is a true record of the testimony

given by said witness;

That the proceeding is herein recorded fully

and accurately;

That I am neither attorney nor counsel for,

nor related to any of the parties to the action in

which these depositions were taken, and further

that I am not a relative of any attorney or

counsel employed by the parties hereto, or

financially interested in this action.

Wendy Blair, Reporter

WENDY S. BLAIR
Commonwealth of Pennsylvania
Commissioner of Deeds
My Commission Expires June 5, 2006

SARGENT'S
COURT REPORTING
SERVICE, INC.
210 Main Street

· PITTSBURGH, PA          · ERIE, PA          · INDIANA, PA          · PHILADELPHIA, PA
· CLEARFIELD, PA          · OIL CITY, PA          · GREENSBURG, PA          · SOMERSET, PA
· STATE COLLEGE, PA                         · WILKES-BARRE, PA