Crawford Central School District

EXHIBIT
19

PROFESSIONAL EVALUATION INSTRUMENT
719 N. MAIN STREET
MEADVILLE, PENNSYLVANIA 16335-1995
TELEPHONE: (814) 724-3960

The following section should be used in conjection with Appendix A.

## PHILOSOPHY AND RATIONALE OF THE
## CRAWFORD CENTRAL EVALUATION INSTRUMENT

Continued improvement in the performance of educational responsibilities in the Crawford Central School District can be achieved through evaluation with the proper use of an evaluation instrument. While several objectives for such an instrument may exist, the primary object must certainly be to foster dedication and positive attitudes in order to improve instruction. The use of this instrument should not be the sole means for improving instruction, nor should this method be considered impeccable. However, with humanism, this can be a vitable force with which to form the basis for refinement of the student's educational experience.

The awareness of the instrument will serve as a constant reminder of goals and obligations to the students of the Crawford Central School District. Exposure to the criteria should result in self evaluation. This, with short and long range evaluations by certified personnel, should provide impetus for an endeavor toward excellence.

Finally, the philosophy of this instrument correlates with the philosophy of the Crawford Central Schools, and ultimately the youth of the community will benefit.

NOTE: The professional staff is comprised of teachers, librarians, counselors and nurses and in this document, the word "teacher" is synonymous with "professional staff".

-2-

## A. OBJECTIVES

1. To strive for continued improvement of instructional programs in the Crawford Central School District.
2. To foster dedication and positive attitudes in order to improve instruction.
3. To encourage the establishment of appropriate staff development programs that will lend themselves to increased professional growth.
4. To provide an organized system for the collection of data relative to retention, promotion, dismissal and assignment of responsibilities.
5. To encourage the cooperation of teachers and administrators in the evaluation process.
6. To encourage the use of the evaluation instrument as a means of self evaluation.
7. To continually strive to achieve district-wide educational objectives.

## B. PROCEDURES USED TO DEVELOP THE EVALUATION PLAN

The administration of the Crawford Central School District Central Office contacted representatives of the Crawford Central Educational Association and collectively a plan was formulated to develop an instrument for evaluating teachers. A task force was formed consisting of teachers, principals and administrators from the Central Office and a representative from Intermediate Unit #5.

-3-

A series of meetings were held during the 1974-1975 school year to develop the evaluation plan. Numerous observation instruments were critically studied. The task force of thirteen was divided into sub-committees whose efforts were reviewed, revised and approved by the task force as a whole. Once agreement was reached, materials were presented to the district's total staff for review and recommenda-tions.

C. INVOLVEMENT OF PROFESSIONAL PERSONNEL

The task force consisted of three elementary teachers, three secondary teachers and six administrators from different buildings in the Crawford Central School District. A consultant from Intermediate Unit #5 was also involved.

All professional personnel were given a copy of the evalu-ation instrument for review and comment prior to its adoption by the Board.

An inservice program was held in order to explain the instrument and to invite response from the professional personnel. Building meetings were held by the principals in the interest of developing a clear understanding of the plan and a whole-some attitude toward the evaluation process.

After one full year's experience with the evaluation plan a committee composed of administrative and teaching personnel will be established to measure its effectiveness and to report to the Superintendent concerning its findings. Assessment of the plan

will be made by the original task force at least every three years
based on input from the professional staff, administrators and the
Board in order to provide a means of improving the plan. Representa-
tional ratio should remain the same as the original task force.

D: DESCRIPTION OF THE CRITERIA TO BE USED IN THE EVALUATION

The evaluation instrument is included as Appendix A.  The
primary intent of having an evaluative instrument is to provide a
consistent form which can be used in order to improve instruction.
This evaluation instrument consists of two basic parts:  Professional
Competencies and Personal Characteristics.  Each major section is then
divided into specific subsections for further clarification of terms.
In addition, each major category of the instrument has a specific
objective to which it relates.  Guidelines for observations are
included.  These guidelines are only suggestions and are in no way
comprehensive.  The administrator is urged to conduct evaluations in
a positive, open-minded fashion.  The administrator must recognize
that extenuating circumstances may necessitate the postponement of an
observation.  He may use his own professional judgement as to what
criteria are appropriate for each individual situation.  It is urged
that evaluators include specific and measurable suggestions for
improvement as well as commendations in the comment section.

One of the most important parts of this evaluation lies in
the evaluator-teacher conference which must follow within five (5)
days after each observation.  The evaluator should encourage the
teacher to do self-evaluations (using this form) so that mutual feed-
back may be provided for discussion and study.

Written evaluations, based on a minimum of three (3) observations per semester, will be prepared semi-annually for all members of the professional staff who have not yet attained tenure status.

Written evaluations, based on a minimum of one (1) observation per semester, will be prepared annually for all other professional staff members.

To help clarify the above terminology the following terms are defined:

Observation: An observation is the gathering of data collected from classroom visits, informal discussions, and overall school performances.

Evaluation: An evaluation is a written accumulation of the data obtained from previous observations.

It will be the responsibility of the evaluator to document his information after each observation and use this information in completing the evaluative report.

The evaluator will prepare three (3) copies of evaluation instrument. The evaluator retains one (1) copy in his respective school office. The teacher will be given one (1) copy. The Superintendent's Office will be given one (1) copy to be retained in employee's personnel file.

E. PERSONS IN THE SCHOOL DISTRICT WHO WILL CONDUCT THE EVALUATION AND RATING

Certified personnel are responsible for evaluating all pro-
fessional staff in their building(s). Evaluations and ratings shall
be conducted by any of the following certified personnel:

Superintendent

Assistant Superintendent

Principals

Assistant Principals

F. PROVISION FOR SIGNING EVALUATION REPORTS

Provision has been made for those professionals evaluated
to sign the evaluation report and to make comments. It should also
be noted that the employee's signature only indicates that he/she has
read the report, but not necessarily does it mean that he/she agrees
or disagrees with it. If the employee refuses to sign in the space
provided, such refusal shall be recorded and dated. The employee
shall be notified in writing of this notation within ten (10) days.

G. SUPPORTIVE, ANECDOTAL INFORMATION

Anecdotal records will be used to record specific incidents
as they occur. These records should be positive as well as negative.
The evaluator should retain this information to support recommenda-
tions for tenure or dismissal under provisions of Section 1122, 1123,
1126, 1127, 1128 of the School Code.

There are eleven (11) categories to be rated Satisfactory
or Unsatisfactory in the Evaluation Instrument.

Suspensions and reinstatements will be made in accord

with provisions of Section 1125 of the School Code.

H.  DESCRIPTION OF THE PROCEDURES USED FOR APPEALING THE EVALUATION

Teachers who have received a rating may appeal by any or all

of the following:

A.  Indicate in writing his/her disagreement

or dissatisfaction to the Superintendent.

A copy shall be sent to the evaluator.

B.  Request further conferences. This request

must be honored.

1.  A conference may be requested for

clarification purposes with the

evaluator.

2.  A conference may be requested with

the administrator next in authority

present.

3.  Each party may have additional persons

present. This number will not exceed

two (2) persons representing each

individual.

I.  THE PROCESS TO IMPROVE PROFESSIONAL EMPLOYEE PERFORMANCE

As previously stated the overriding rationale for the evalu-

ation of professional employees is that improved instructional ser-

vices to children might be realized in the Crawford Central School

District. The process through which the evaluation instrument was developed will lend itself toward establishing a cooperative atmo-sphere conducive to improved teacher performance.

Follow-up conferences between administrator and teachers are required which will set the stage initially for recommended steps toward self-improvement.

It is anticipated that suggestions for staff development activities might take the form of:

1. Approved Pennsylvania Department of Education Inservice courses designed specifically to meet individual teacher needs or college courses.

2. Recommended readings derived from educational periodicals, journals, etc.

3. Supportive personnel to provide assistance to the teacher.

4. Visitations.

5. Other appropriate activities mutually arrived at by the evaluator and the evaluatee that will lead to increasing professional skills.

J.   UNSATISFACTORY RATING

Two consecutive unsatisfactory ratings of a professional employee shall be necessary to dismiss on the grounds of incompetency. This requirement insures that dismissal is not based on the first instance of unsatisfactory performance, but that dismissal follows notice and an opportunity for the professional employee to improve.

1   IN THE UNITED STATES DISTRICT COURT
    FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2   CLAUDETTE deLEON,
                                        (
3                    Plaintiff,         (
                                        (
4        vs.                            (  (CIV.-DKT. 05-126-Erie
                                        (
5   CRAWFORD CENTRAL SCHOOL             (
    DISTRICT, CRAWFORD CENTRAL          (
6   SCHOOL BOARD,                       (
    MICHAEL E. DOLECKI,                 (
7   SUPERINTENDENT                      (
    (Suable and liable in              (
8   Personal Capacity)                  (
    CHARLES E. HEILER, III,            (
9   ASSISTANT SUPERINTENDENT,           (
    (Suable and liable in              (
10  Personal Capacity)                  (
                                        (
11                   Defendants         (

12

13

14

15          Deposition of MICHAEL E. DOLECKI, taken on

16     Tuesday, March 7, 2006, at Crawford Central School

17   District, Meadville, Pennsylvania commencing at 10:14

18   a.m., before Linda K. Rogers, Shorthand Reporter and

19        Commissioner of Deeds in the Commonwealth of

20   Pennsylvania.

21

22

23

24

25                        *   *   *

A P P E A R A N C E S

For the Plaintiff:

Caleb L. Nichols, Esquire
P.O. Box 1585
Erie, Pennsylvania 16507

For the Defendant:

Roberta Binder Heath, Esquire
Andrews & Beard
3366 Lynwood Drive
Altoona, Pennsylvania 16603-1311

* * *

1    MICHAEL D O L E C K I, first

2    having been duly sworn, testified as follows:

3

4    DIRECT EXAMINATION

5    BY MR. NICHOLS:

6

7    Q.   Mr. Dolecki, Caleb Nichols, of course, I represent

8    Miss deLeon in this proceeding. Deleon versus Crawford

9    Central School District and others. Just for the record,

10    sir, preliminary instructions in terms of how we basically

11    proceed this morning.

12    As you know it's important that you verbalize all

13    of your responses in the interest of making sure that the

14    record is legible and intelligible and as possible.

15    Second, if at any time you wish to go off the

16    record, please say so and we'll certainly will oblige you.

17    Third, if you don't understand any question I

18    might pose to you, please feel free to ask me to rephrase

19    it. I will be glad to accommodate you.

20    In terms of instructions, preliminary

21    instructions, those are pretty much all. Do you have any

22    questions before we proceed this morning?

23    A.   No, I don't. No.

24    Q.   I'd like to proceed this morning in terms of four

25    different areas. The first has a question, serious

1  question, dealing with your management responsibilities as a

2  supervisor of Crawford Central School District. And then

3  your staff and then your responsibilities as a supervisor

4  and as a chief executive officer of the school district.

5  And then following, I have questions relating to

6  medical records that have been compiled in connection with

7  this case. Of course, you know, as you know, Miss deLeon

8  has been under a doctor's care for some time. She has a

9  long-standing illness. And I would like to march through

10  some of the medical records with you in connection with the

11  ADA claim that we are asserting in the Amended Complaint.

12  And then following that would be penalties, I call

13  penalties and sanctions that have been issued by you since

14  you assumed the responsibility as the superintendent. I

15  believe in 1997 you came with the school district; is that

16  correct?

17  A.  That is incorrect.

18  Q.  What year would that be?

19  A.  I took over the superintendency 2001. I have been

20  in the school district prior to that as assistant

21  superintendent in 1994, November of '94. When then in June

22  of 2001 I was the assistant -- I was the acting

23  superintendent. And then in November of 2001 I was the

24  superintendent of schools.

25  Q.  Okay. All right. So you actually came assistant

5

```
 1   superintendent serving under Mr. LaScola?
 2          A.   That's correct.
 3          Q.   Is that correct?
 4          A.   Yes.
 5          Q.   You came in 1994 in that capacity?
 6          A.   As an assistant superintendent.
 7          Q.   And then you subsequently assumed the
 8   superintendent following Mr. LaScola in 2000; is that
 9   correct?
10          A.   2001.
11          Q.   2001.
12          A.   November of 2001.
13          Q.   Okay.  Fine.  All right.  And I would like to walk
14   through what I call sanctions in terms of the law, you may
15   call them the suspensions, the reprimands that were issued
16   to Miss deLeon by you and also lead up to in culminating in
17   her termination of I believe April 2003.  That's how I would
18   like to proceed this morning.
19          A.   Okay.
20          Q.   All right.  First, for the record, if you would
21   briefly state your professional background.  You might start
22   upon leaving college and bring us current briefly.
23          A.   Background, my credentials, is that what you're
24   asking, Mr. --
25          Q.   Please.
```

1   A.    -- Nicholas?

2        Q.    Yeah.

3   A.    At 19 I graduated from high school in Oil City,

4   Pennsylvania, high school called Venango Christian.  In 1974

5   graduated with a bachelor's degree from Slippery Rock

6   University.  '75 master's from Slippery Rock University.

7   '81, I received my principal certification from West --

8   elementary and secondary -- from West Minster College.  And

9   it was approximately 19 -- oh, not 1981, it was 1984.  In

10  1989 I received my superintendent certification from West --

11  from Penn State, West Minister College.  Combination

12  program.

13       Q.    And then upon completion of your college and

14  graduate work, you then started employment in the academic

15  community?

16  A.    Yes.  I have been a teacher in the same areas in

17  Clarion.  Also from there went to Franklin as an assistant

18  principal, Franklin School District, Franklin.  I went to

19  Union School District as an elementary principal.  From

20  Union School District went to a place called Turkeyfoot Area

21  School District as a superintendent.  And then to here at

22  Crawford Central as an assistant superintendent and

23  superintendent of schools.

24       Q.    Okay.  And now in terms of a description of your

25  staff and the hierarchy of the management of the Crawford

1  Central School District, in the course of reviewing the
2  records I came across different names; Mr. Heller, Mrs.
3  Templeton, is it Dr. Berkebile?
4      A.  Yes.
5      Q.  Dr. Berkebile, Mr. Higgins.  All of these people
6  served at one time or another as your staff, right?  The
7  people whose names I mentioned?
8      A.  They are administrators in our school district.
9      Q.  Administrators in the school district?
10     A.  In our school district, in Crawford Central.
11     Q.  Okay.  All right.  But they do report to you?
12  Right?
13     A.  Well, as a superintendent, in some way, indirectly
14  or directly, all the employees report to me.
15     Q.  I have had the opportunity to depose Mr. Heller
16  and he serves as the assistant superintendent.
17          (Brief interruption.)
18     A.  Sorry, Mr. Nichols.
19     Q.  Sure.  Continuing still on the record.  Mr. Heller
20  I'm familiar with as the assistant superintendent, correct?
21     A.  That's correct.
22     Q.  He currently serves in that position.
23     A.  That is right.
24     Q.  In that position, would you describe his
25  responsibilities, his day-to-day responsibilities?

8

1    A.   Well, chief responsibility is, again, I do not

2    have his job description in front of me.  If you so would

3    like one, I can get you a job description, but --

4    Q.   Not as --

5    A.   But his chief responsibility is personnel but he

6    has his hands in on everything from transportation to

7    curriculum to buildings and grounds to finance to

8    facilities.

9    Q.   So as the head of personnel, being involved in

10    personnel, he would be involved in the hiring and also the

11    termination of teaching staff, would that be correct?

12    A.   That's correct.

13    Q.   Okay.  And he would -- also be involved in

14    the implementation of the anti-discrimination laws as they

15    relate to the district?

16    A.   That's correct.

17    Q.   And Miss Templeton, is she currently on the staff?

18    A.   No, she is not.

19    Q.   In what period did she serve?

20    A.   Well, she came before I did.  But I'll give you a

21    rough estimate it's probably from -- she was an assistant

22    principal from probably the late '80s until the mid to late

23    '90s.

24    Q.   Assistant principal?

25    A.   Assistant principal at the Meadville Area Senior

6

```
 1   High School.
 2        Q.   All right.  And did she serve -- and subsequent to
 3   that, in what capacity did she serve the school district, if
 4   any?
 5        A.   Assistant principal at the high school.
 6        Q.   Oh, assistant principal.
 7        A.   Yes.
 8        Q.   Okay.  All right.  And when did you she retire, do
 9   you know?
10        A.   Late '90s sometime.
11        Q.   Late '90s.  And she is no longer --
12        A.   She is no longer --
13        Q.   -- associated with the school district?
14        A.   That is correct.  She retired.
15        Q.   Dr. Berkebile?
16        A.   He is retired, and he was here from probably same,
17   at least from sometime in the '80s and he retired in the
18   late '90s.
19        Q.   And his position?
20        A.   Assistant principal at Meadville Area Senior High
21   School.
22        Q.   And Mr. Higgins?
23        A.   He is presently the assistant principal at
24   Meadville Area Senior High School.
25        Q.   Okay.  And Mr. Deshner?
```

1    A.   Mr. Deshner is retired.

2    Q.   He was --

3    A.   He was the principal at Meadville Area Senior High

4    School for, I would say since I think he retired in 2002 or

5    2003.  And he was the principal for probably for about 20

6    years.

7    Q.   Okay.

8    A.   At the high school.

9    Q.   All right.  And the dates of his tenure, could you

10   recount those?  The dates of his tenure as the principal of

11   the Meadville --

12   A.   You're probably looking from around 1983, '84

13   until about 2002, 2003 as principal.

14   Q.   So he was the principal during Miss deLeon's

15   tenure there as a teacher?

16   A.   Yeah, they coordinate that way, yes.

17   Q.   Okay.  And the same would be true with respect to

18   Miss Templeton, Dr. Berkebile, Mr. Higgins as I understand

19   it from the record?

20   A.   Yes.

21   Q.   Now, could you delineate the chain of command in

22   terms of reporting from the principal and his staff up to

23   you as the superintendent.  And what I'm asking

24   specifically, what types of things a principal is required

25   to report to you for purposes of accountability?

11

1     A.  For purposes of accountability, principals --

2    assistant principals report to their principals.  Principals

3    report to -- are evaluated by the assistant superintendent

4    and the superintendent of schools.

5    Q.  Okay.  So that would be you and Mr. Heller?

6    A.  That is correct.

7    Q.  Okay.  All right.  For evaluations?

8    A.  That is correct.

9    Q.  How often are they evaluated?

10    A.  They are evaluated on a yearly basis.

11    Q.  On an annual basis?

12    A.  Yes.

13    Q.  May I ask the method by which you evaluate them?

14    A.  Yes.  We meet at the beginning of the year and we

15    set up a series of goals, a discussion about the school,

16    about the district.  They establish goals at that time.  At

17    that time then we have also a mid-year meeting to get a

18    progress report on basically or just to get a temperature --

19    to test the temperature on how they're doing with that

20    goals.  And at the end of the year they are evaluated and

21    given a --

22    Q.  Is it a written evaluation?

23    A.  A written eval -- I give them a written paragraph,

24    evaluation of their performance based on their goals and how

25    they did at the year.  Mr. Heller evaluates the secondary

1  principals, I evaluate the elementary principals and the
2  central office staff.
3  Q.  Is any component of their salaries tied to
4  performance?
5  A.  The way the plan is worked right now, there's an
6  agreement, an Act 93 Agreement.  The Act 93 Agreement is an
7  administrative plan.  It's somewhat different from the
8  teachers negotiated contract in that this is not an -- it's
9  an agreement and not a contract and there is, for example,
10  there are no strike provisions.  But there is a salary
11  structure in place.  It's based on satisfactory and
12  unsatisfactory performance.
13  Q.  All right.  Continuing to maintenance of personnel
14  records of teaching staff.  Is that -- who has the principal
15  responsibility for that.  Is that --
16  A.  Assistant superintendent.
17  Q.  Assistant superintendent?
18  A.  Right.
19  Q.  And so the maintenance of personnel records of
20  teaching staff is a function of your office?
21  A.  No, I just said assistant superintendent.
22  Q.  Right.  Well, to the extent the superintendent is
23  your staff.  It's not the principal, not the principal
24  level.  It's the --
25  A.  The district files are kept in our offices.

1       Q.  Okay.  Now, as the superintendent, is it correct

2  to say that the implementation of the anti-discrimination

3  laws include the ADA laws your chief officer responsibility?

4       A.  They're one of my responsibilities.

5       Q.  Okay.  One of your responsibilities.  Are you also

6  the contracting officer for the school district?

7       MS. HEATH:  Objection to form.

8       A.  Could you elaborate?  I don't know what you're

9  talking about.

10       Q.  Well, what I'm asking you is in terms of any kind

11  of contractual arrangement in which the district entered

12  into where there's a purchase arrangement or purchase

13  disbursement or whatever in terms of a contractual

14  undertaking, are you the person who signs off for the

15  district or has the authority to commit the district to a

16  contract?

17       A.  Some agreements, yes; some agreements, no.

18       Q.  Could you specify those you don't?

19       A.  The teacher contracts are signed by the Board

20  president.  If I have an agreement with say maybe an agency

21  in town, I would sign the agreement.  Agency from Children

22  and Youth to Human Services, something like that, I would

23  sign off.

24       Basically most agreements that you have that deals

25  with money usually any agreement has to be agreed to,

1    especially when it has to deal with money, finances, is done

2    the Board usually signs off on that.  The Board president.

3        Q.  Now, in the course of reviewing the record,

4    particularly as it relates to Miss deLeon, I noticed you

5    signed off on, one, suspensions; two, reprimands and, of

6    course, the final letter of termination.  At least

7    recommending her termination, you signed off.  So obviously

8    you do have authority in that area.

9        A.  State has given me that authority.

10       Q.  Okay.  All right.  Now, help me here understand

11   this.  The roles that you play.  Or if you will, hats that

12   you wear.  You are an employee of the school district?

13       A.  Yes.

14       Q.  So the school district pays you, right?  You are

15   paid by the school district; is that correct?

16       A.  That is correct.

17       Q.  You are also, though, an agent of the Board,

18   right?  The Board, the school board.

19       A.  Can you explain that more, an agent of the Board?

20       Q.  Yes.  In the sense that you act for them, the

21   Board -- is it fair to say that the Board formulates policy,

22   promulgates or formulates policy.  And you in turn as a

23   school supervisor are responsible for implementing that

24   policy?

25       A.  I receive my direction from the Board; that's

1   correct.

2   Q.   Okay.  And they look to you to implement their

3   policy, right?

4   A.   To enforce, to implement, yes.

5   Q.   And in that role, you view yourself -- is it fair

6   to say you view yourself as their agent?

7   MS. HEATH:  Objection to form.

8   A.   I already answered the question.  To implement, to

9   enforce the policy.

10   Q.   Okay.  To enforce the policy.  Another area.  I

11   reviewed some aspects of the Collective Bargaining Agreement

12   and --

13   MS. HEATH:  I am just going to object if you don't

14   give him a time frame.  There's a variety of

15   Collective Bargaining Agreements.

16   MR. NICHOLS:  Yes, the one that is in place which

17   would be effective -- relative to Miss daLeon's

18   tenure.  And that would be the one I think

19   stretches back.  I think it's renewable, and you

20   can correct me, renewable, I don't know when.  But

21   at least she started in 1999 and I am speaking of

22   each successive one which would include up to and

23   including the present one.  Okay?

24   MS. HEATH:  I am just going to object because

25   depending upon what terms you're going to be

    1   referencing, they may have changed over the

    2   years --

    3           MR. NICHOLS: Right.

    4           MS. HEATH: -- with the new agreement.

    5           MR. NICHOLS: Right. But the question I'm posing

    6   to him is more of a generic one. Not so much a

    7   specific term.

    8       BY MR. NICHOLS

    9       Q. Well, the question is this: Now, under the

   10   Collective Bargaining Agreement, there is a grievance

   11   procedure for teachers. Teachers being a member of the

   12   union. If they have a grievance, there is a procedure in

   13   place by which they can grieve. And could you illuminate

   14   here, shed some light on this procedure, that is; once a

   15   teacher who has grieved chooses to go through the grievance

   16   procedure, whatever the steps are, and then at what point

   17   you, as the administrator of the school district has

   18   authority to impose sanctions, be they reprimands or

   19   suspensions or even firing. Could you amplify on that

   20   process?

   21       A. I think the best thing to do is to get a contract

   22   and I can go point by point with the grievance procedure

   23   with you.

   24       Q. Well, I mean, generally. I don't want to belabor

   25   it, you know, but to the extent --

1   A.    Well, you want an accurate answer, right?

2   Q.    Well, yes, to the extent that you are able to.

3   A.    We would need a contract.  It is very detailed.

4         It's a couple pages long.  The grievance procedure is

5         probably a page and a half to two pages long.  It's a

6         step-by-step procedure.  So if you have the contract here,

7         we can go through it and I'll explain it.

8   Q.    That's not such a consequential point right now.

9         Okay?  I just wanted to, you know, more or less, have a

10        general overview of the intersection between what you play

11        vis-a-vis the Union Collective Bargaining.

12  A.    I really don't want to answer it unless I can go

13        over that with you step-by-step.

14  Q.    Okay.  Well, perhaps we may come back to that.

15  A.    Okay.

16  Q.    I want to now turn to the medical records.  And I

17        have a batch of medical records here and I would just simply

18        for the sake of economy ask the court reporter if she would

19        just mark this batch here, Plaintiff's Exhibit 1.  Mark all of

20        them Plaintiff's Exhibit 1.  They're medical records.

21        (DOLECKI'S PLAINTIFF'S EX. 1 - MEDICAL RECORDS,

22         marked for identification.)

23  MS. HEATH:  Do you have copies?

24  MR. NICHOLS:  I don't have copies.

25  Q.    I will show you copies, not all of them, and you

1   can take time, if you like, but there are a couple I would

2   like to show you, Mr. Dolecki. And I have questions on

3   some. They actually -- the first one starts off in November

4   '97. It's a note.

5   Note one is from the Edinboro Medical Center, and

6   it's asking that Miss deLeon be excused for medical reasons.

7   That's dated November 10, 1997.

8   The next one is November 11, 1997, is signed by

9   you, Mr. Dolecki. And it is to Miss deLeon acknowledging

10   her request from her physician Dr. Gretchen Bybel. Then

11   there are two sick leave bank requests. There are three,

12   matter of fact. They are dated December 29, '97. The next

13   one is no date -- oh, January 8, '97, and the next one is

14   January 8, '98.

15   MS. HEATH: 1/8/97 or '98?

16   MR. NICHOLS: '98, uh-huh.

17   Q. Then there is a letter dated January 9, 1998 from

18   Mr. LaScola, who is the superintendent, to Miss deLeon

19   acknowledging the receipt of her request for 90 days from

20   the sick leave bank. There is a letter dated March 19,

21   1998, Mr. LaScola to Mr. Smith. And this makes reference to

22   Robert Smith. It makes a reference to a request for

23   sabbatical leave with pay. And this is put forward by Miss

24   deLeon.

25   And then there is a medical report. It's dated

1    April 29, 1998 by Dr. Luis Torres who then served as a

2    medical doctor for Miss deLeon in the area of psychotherapy.

3    Another letter, April 30, 1998. Miss deLeon to

4    Mr. LaScola thanking him that the Board had approved the

5    sabbatical leave for the 1999 school year. November 13th

6    there's another letter in 1998 from you to Miss deLeon. And

7    there is a second letter here that I want to focus on. I

8    would like to focus on. March 12, letter dated March 12th,

9    2002 from Dr. Mercatoris to Miss deLeon. And what it --

10   relative to Miss deLeon. He sends copies to whomever it may

11   concern. I want to ask you: Did you receive a copy of this

12   letter?

13        MS. HEATH: What are you asking about? Which

14   letter now?

15        MR. NICHOLS: This is the letter here. About the

16        Mercatoris addresses it to whomever it may

17        concern. It is regarding Miss deLeon, her

18        condition and he requests a medical excuse for

19        her.

20   A.   Without her file right here I could not confirm

21   for sure. There was correspondence, but I don't know if

22   this is the letter.

23   Q.   Do you recall --

24   A.   I would have to look at her file and see if it's

25   there.

1  Q.  Do you recall having seen that letter before?
2  A.  I just answered that.  That without confirming and
3  seeing her file, I couldn't say that for sure.  I know there
4  was correspondence but I can't say this was actually the
5  letter.
6  Q.  Um-hum.  Okay.
7  A.  I don't have her file here.
8  Q.  All right, all right, all right.  Then there's a
9  letter from Miss deLeon dated March 13, 2002 stating that
10  she would comply with a request made by Mr. Higgins.  And,
11  of course, contents speaks for itself, classroooom
12  evaluation.
13  Another letter here, and I will ask you also with
14  respect to this particular document dated March 18, 2002,
15  which you signed to Miss deLeon suspending her with pay.
16  And the letter states that this action is based on the
17  medical excuse that you presented to the administration of
18  Meadville Area High School March 14th.  Do you recall
19  having -- you signed it.  I take it that, of course, you
20  will remember.
21  MS. HEATH:  Objection to form.  You may answer.
22  A.  Yeah, this was signed by me and it's in her file.
23  Q.  Okay.  And also on March 26 there's another letter
24  from you to Miss deLeon and, of course, this has to do with
25  the appointment you're setting up for her to undergo a

1    psychiatric examination. And, of course, with that is a

2    letter April 25 respective --

3        A. Can I read this first?

4        Q. Sure, sure. Go right ahead.

5        (Brief pause.)

6        A. Okay. Yes, that's my signature and it's in the

7    file.

8        Q. Okay. And this one, of course, is dated April 25,

9    it's a letter from you to her specifying directions to her

10    place of appointment for the psychiatric examination.

11        A. Okay.

12        Q. Another letter here, a note from I think it's

13    Dr. McFadden, dated May 17, 2002, stating that Miss deLeon

14    was able to return to work.

15        A. Right.

16        Q. Okay. May 20th, a letter from you to Miss deLeon

17    saying that Dr. McFadden had stated that she could return to

18    work.

19        A. Okay.

20        Q. And let me ask you one question. Another question

21    in relation to this. When -- as I understand the sequence,

22    having read the record, somewhere on or about March 12

23    Miss deLeon --

24        MS. HEATH: Of what year?

25        Q. -- got a medical excuse. March 12, 2002. Got a

1    medical excuse from the doctor saying that she should be

2    excused for either two or three days.  That letter -- when

3    you received that letter, you then suspended her.  I think

4    it was that letter -- one of the letters I've just shown

5    here.  And ordered her to undergo a psychiatric exam.

6         During that same time, and we are talking about

7    the time frame sometime between March 12th and the letter

8    part of March that she was given an evaluation, and it was a

9    negative evaluation.  Do you recall that?

10   A.   What kind of evaluation are you talking about?

11   Q.   It was a --

12   A.   A teaching evaluation or --

13   Q.   Yes, it was a teaching evaluation but it was given

14   on about that period and what drew my attention was that it

15   was out of sequence.  It was not at the conclusion of that

16   school year.  It was given in March.  Does that refresh your

17   memory?

18   A.   Does not.  I don't have her file here.  It's hard

19   to --

20   Q.   I see.

21   A.   -- all these things you're talking about.

22   Q.   Right.  Well, anyway, I will show you the

23   evaluation.

24   A.   Okay.

25   Q.   Shortly.  Because I've got these other evaluations

1    in connection that I want to show you --

2         A.    Sure.

3         Q.    -- in sequence.  But I do want to put this before

4    you.  You take a moment and read this document.  And this

5    document is the arbitration award rendered by Arbitrator

6    Duff.  And do you remember, do you recall that Miss deLeon

7    did undergo four arbitrations in the course of her tenure?

8    One in which Arbitrator Stoltenberg (phonetic) presided and

9    rendered an award.  Second, the next is rendered by

10   Arbitrator Talarico.  And both of them invalidated negative

11   evaluations that Miss deLeon had received for the school

12   year for performance.  They invalidated.

13        Okay, this is the third one.

14        MS. HEATH:  Are you going to ask him a question?

15        MR. NICHOLS:  Yes, I am trying to get the

16        foundation.  I want to just -- I want him to

17        understand the timetable in which --

18        MS. HEATH:  And I'll object for the record

19        concerning your characterization of the

20        arbitrations but go ahead.

21        MR. NICHOLS:  Okay.  All right.

22        BY MR. NICHOLS:

23        Q.    Well, this is the third arbitration.  And it is

24   rendered by Arbitrator Duff.  What is relevant here, and I

25   would like to have you comment on, if you will, is take a

1    moment, read this statement here, if you will, please.

2         A.   Can I read the whole thing?

3         Q.   Oh, sure.  But this is the relevant -- the part

4    which I would like to have your response or comment.

5         MS. HEATH:  Well, certainly he would be permitted

6    to --

7         MR. NICHOLS:  Sure.

8         MS. HEATH:  -- make sure that what the statement

9    says in context.  I mean, you're looking at Page

10   17 which I believe is the last page of the 17-page

11   decision.

12        A.   (Witness reads document.)

13        MS. HEATH:  And also for the record, I would like

14   to object that the decision of the arbitrators as

15   to what Judge McLaughlin has already indicated to

16   us, have no bearing on and may not even be

17   admissable into evidence in the federal case.

18        MR. NICHOLS:  I would just state that there is

19   case law which says arbitration awards are

20   admissable to establish -- for probative purposes

21   in discrimination.  There are case laws for that.

22        A.   What is your question, six?

23        Q.   That specific, the last page, what doctor or what

24   rather Arbitrator Duff said.  And he made this statement

25   relative to the evaluation.  It was a negative evaluation

1    which Miss deLeon received on about March 12, 2002.

2    A.  Okay.

3    Q.  He makes this statement, you had opportunity to

4    read; do you agree or disagree with the statement?

5    A.  This is an arbitrator's opinion.

6    Q.  Uh-huh.  Uh-huh.  I would just like to have your

7    opinion.

8    A.  My opinion --

9    MS. HEATH:  Just for the record statement,

10    objection that you're asking him to render an

11    opinion also, first of all, on an arbitrator's

12    decision that was rendered concerning an

13    evaluation that you haven't showed him to refresh

14    his recollection as to what --

15    Q.  Well, I did read what it says here in the record.

16    It says, "In this case, it appears to be quite clear that

17    none of the comments entered on Claudette deLeon's

18    professional evaluation instrument dated 3/18, 2002 had

19    anything to do with her performance prior to the month of

20    March 2002.  Her emotional distress exhibited on March 12,

21    2002 simply did not so far as the available information

22    indicates warrant a premature unsatisfactory rating for the

23    entire 2001-2002 school year without more supportive

24    anecdotal records than the district ever produced."

25    And my question is this:  One, why was

1  Miss deLeon prematurely evaluated that year on that

2  occasion? As he said, Mr. Duff said, evaluated negatively

3  in March rather than June?

4      A.  I can't tell you why an arbitrator makes the

5  decisions they make.  We can go back to a lot of

6  arbitrations, decisions and look at decisions they make and

7  we can agree or disagree.  This was his decision.

8      Q.  And he was referring to a negative evaluation that

9  had been rendered by Mr. Deshner -- oh, no, I believe you

10  rendered it, didn't you?

11      A.  Excuse me?

12      Q.  A negative evaluation.  You remember that, the

13  evaluation he was referring to?

14      MS. HEATH:  Again, objection without showing the

15  document.

16      A.  I don't have the documentation here.  And I did

17  not, on the record, I observed Mrs. deLeon one time but she

18  was not given by me an unsatisfactory rating.

19  Superintendents basically do not go into the classroom and

20  observe.  That's the job of the principals.

21      Q.  Okay.  All right.  Then let's just hold this right

22  there as quote/unquote Plaintiff's Exhibit 1.  All right?

23  And we will move to the -- I have a whole batch of

24  evaluations we will move to later.

25      Some general questions.  You came and you said as

1   assistant superintendent in 1994 and, of course, you assumed

2   the superintendency in 2001. So you were very familiar with

3   Miss deLeon's health condition; is that correct?

4         MS. HEATH: Objection to form.

5         A. When?

6         Q. Well, starting in 1997 because I saw documentation

7   which you signed on for a medical leave. For her to take

8   medical leave, medical excuses and other kind of documents

9   starting in 1997. So --

10        MS. HEATH: And, again, I object. Because you

11       have that folder that's going to be attached to

12       the deposition as an exhibit, and although you

13       mentioned the first excuse that was provided in

14       1997 from the Edinboro Medical Center relative to

15       a gynecological excuse, you're asking about a

16       medical condition but I think you're mixing apples

17       and oranges. Are you talking about some sort of a

18       gynecological excuse for a medical condition

19       versus a mental condition?

20       And without showing him the records that

21       you're going to attach and asking specific

22       questions, I don't think that that's a fair line

23       of questioning.

24       MR. NICHOLS: Okay. Well --

25       MS. HEATH: They're sitting right there.

| | |
|---|---|
| 1 | Q. Okay. Yes, but I just wanted to know, for the |
| 2 | record, though, to be more specific, moving forward, up to |
| 3 | 2002. Specifically, where one, you did receive notice from |
| 4 | a doctor and you acted on that by suspending her. That's in |
| 5 | the record. But based upon that, is it fair to say, you |
| 6 | wrote, "Very well conversed and knowledgeable of her |
| 7 | condition. Certainly as of 2002." Would that be a fair |
| 8 | statement? |
| 9 | A. I couldn't say very well. Your terminology -- |
| 10 | Q. How would you describe in terms of your being |
| 11 | conversant in knowledge of her condition? |
| 12 | A. From a professional basis we were aware of |
| 13 | concerns. |
| 14 | Q. And may I ask you, what prompted you to suspend |
| 15 | her then? |
| 16 | MS. HEATH: When? |
| 17 | MR. NICHOLS: In 2002, and that was March 2002. |
| 18 | A. Let's go -- give me the paper you're talking |
| 19 | about. |
| 20 | Q. Oh, it's right here. |
| 21 | A. Can I see it? |
| 22 | Q. The letters I just showed you. That was the |
| 23 | letter you suspended her, I think March 18th. I'm just |
| 24 | asking now what prompted you to suspend her at that point? |
| 25 | MS. HEATH: You're looking at March 18? |

1    A.  This is March 19.  Is that the letter?  Is it
2    March 19 or 18?
3    Q.  March 18, I believe.
4    A.  March 19 is here.  That's not a suspension letter,
5    though.  January 19th.
6    Q.  2002.
7    A.  Okay.  I would have to get back to her files and
8    look to the reasons for this because I don't have the files
9    here to go to that.  There was something that happened
10   before this and that's the reason why this letter was given.
11   Q.  I note, though, in that same letter you did
12   reference, you did state expressly that this action, and by
13   that I understand you're saying the suspension, is based on
14   the medical excuse.  So it did have some relation to the
15   medical excuse you had received --
16   A.  Again --
17   Q.  -- from the doctor, did it not?
18   A.  I would have to go back and look at the file.
19   Q.  It did have, though, some correlation?
20   A.  I'll agree to -- I'll agree this is what is here.
21   Q.  Right.
22   A.  But there is some prior things that occurred
23   before that.  Again, I would have to look at the file to
24   identify that.
25   Q.  Now, I would like to revisit the First Amended

```
 1                                                   Complaint.
 2           MR. NICHOLS:  And I would ask that this be marked
 3      as exhibit, Plaintiff's Exhibit 2.
 4           (DOLECKI PLAINTIFF'S EX. 2 - FIRST AMENDED
 5      COMPLAINT, marked for identification.)
 6      Q.   Mr. Dolecki, if I may, I would like to show you
 7      what has been marked as Exhibit 2 and particular Page 10
 8      there are -- the fourth claim for relief and, of course, it
 9      is the First Amended Complaint.
10           And I would just like for you to take a moment and
11      just review that fourth claim.
12      A.   What number are you looking at, Mr. Nichols?
13      Q.   Excuse me?  Right here, starting right here.
14      A.   No. 23?
15      Q.   Right.  And continuing through the end of that
16      fourth claim for relief.
17      A.   And just these two right here, 23, 24?
18      Q.   And I would like you to continue through 32.
19      A.   So you want this whole page?
20      Q.   Yes, and 30 -- the next page, through paragraph
21      32.
22      A.   (Witness complies.)  Okay.
23      Q.   Okay.  I just got a few questions I would like to
24      ask you about that.  You have seen this document before, of
25      course?
```

1   A.   Yes.

2   Q.   Okay.  And --

3   A.   Do you have a copy of that?

4   Q.   Yes.  As an administrator of the school district,

5   and, of course, as you have just stated, as administrator of

6   the school district one of functions -- and you are charged

7   with implementing practical laws including ADA being one of

8   them; that's correct, isn't it?

9   A.   Can you say that again.  I'm not following you.

10  Q.   All right.  As an administrator of the school, as

11  the supervisor of the Crawford Central School District, you

12  are charged with administrating or implementing a series of

13  laws, state and federal, right?  And ADA is one of them.

14  A.   Okay.

15  Q.   Right.  And in the ADA law there is a provision

16  that refers to, quote, reasonable accommodation, close

17  quote.  You have heard of that before?

18  A.   Yes, I have.

19  Q.   I am not broaching anything new to you or novel,

20  right?

21  A.   Sure.

22  Q.   What is your understanding of that concept?

23  A.   If someone has a disability and someone is in need

24  of some accommodations with regards to that disability so

25  they can perform that work, that employed work, then it's

1    up to the employer to try to make those accommodations.

2    Q.  Okay.  The disability which Miss deLeon has was

3    diagnosed by the doctors as severe depression, recurrent,

4    severe depression.  Okay.  That has been recognized by case

5    law in court as falling within the ADA.  What -- do you have

6    an opposing thinking to that?

7    MS. HEATH:  I'm going to object because it calls

8    for a legal conclusion.  Relative to what the case

9    laws specifies concerning mental conditions is

10    reviewed on a case-by-case basis.  We've already

11    made the objection and a motion to dismiss and

12    we'll continue to make the objection that

13    Miss deLeon's mental condition rose to the level

14    of a disability.  And also there is an issue as to

15    what time frame we are talking about as to whether

16    or not she was, in fact, disabled as time

17    progressed particularly up to and including the

18    time that she was terminated.

19    Q.  Okay.  Let me focus more precisely, Mr. Dolecki,

20    on your counsel has referred to time frame.  And the record

21    reflects that Miss deLeon's medical condition is well

22    documented reaching back to at least 1997, perhaps before

23    then as well, medically documented.  Coming forward to 2002

24    and the -- what I just focused on and your suspension of her

25    and that suspension you state in your letter was obviously

1    relating to her medical excuse.  And that medical excuse

2    obviously was tied to her depression.  Under the doctor's

3    care, Dr. Marcatoris.

4        A.   When you say suspension, suspension with pay too.

5        Q.   Understand that.  I understand that.  Now, so it's

6    well documented there and I won't belabor it.  The documents

7    will speak for themselves.

8             I do have another question, though.  And that is

9        my understanding and whether this is also your

10   understanding, my understanding is that an employer is under

11   an obligation to return an employee who goes off on

12   sabbatical medical leave to the same position or something

13   comparable to that position that she or he held prior to

14   going on leave.

15        MS. HEATH:  I am going to object because there is

16        a distinction to be made here between simply going

17        on a medical sabbatical leave under the school

18        code versus the Family Medical Leave Act, which

19        she did not go out under, and versus a question

20        concerning whether or not she actually has a

21        disability that would rise to a level of an ADA

22        disability.

23        So I will object to the question as it calls

24        for a legal conclusion which is really beyond the

25        kin of a layperson to answer that question.

1   MR. NICHOLS: All right.
2       Q.  Well, let me ask you this: With respect to the
3   period from 1997 -- or I should say after Miss deleon
4   returned from a sabbatical that year that was 1998-'99
5   school year.
6       MISS deLEON: I returned in 2000.
7       Q.  All right. 2000 you returned. After that
8   sabbatical leave. From that period upon her return up to
9   the time -- up to the date in which she was suspended, what
10  did the school district do to accommodate her condition?
11  Now, Miss deLeon stated -- we'll then state for the record
12  and will state for the record when called upon, is that when
13  she returned to the school district upon her sabbatical,
14  medical sabbatical, in the year 2000, is --
15      MS. HEATH: Wasn't it 1999? Excuse me, wasn't it
16  1999 she returned?
17      MR. NICHOLS: Yes, it was 1999.
18      Q.  When she returned, one, her classroom was taken
19  away from her. Two, her classes, Spanish speaking classes
20  she taught was taken away from her and given to some other
21  teacher. She was reduced to what is called a traveling
22  teacher having to go to and from seven different classes.
23  Three, is that because of the unruly nature of the students
24  that she was assumed taught to teach, classes involving a
25  lot of at-risk kids, that necessarily exacerbated her

1  condition because it created more stressful environment, if

2  not a hostile environment, certainly more stressful.  And

3  there was the imposition of the action plan concomitant with

4  that.  All of that when she returned.  And, of course,

5  returning in a delicate situation.  I'm asking you, what did

6  the school district -- did it do anything to accommodate

7  her?

8  MS. HEATH:  Object to the form.  I don't even

9  know -- And, again, I'm I will object to form.

10  going to object that you are drawing a legal

11  conclusion, first of all, that she had a condition

12  that the school district was aware of, number one,

13  as being a quote/unquote "disability pursuant to

14  the ADA."  And, secondly, that she ever was

15  disabled enough at that time frame to be

16  considered disabled under the ADA.  And whether or

17  not she ever requested any accommodation.  So

18  subject to that objection, I'll let you answer the

19  question.

20  A.  There are quite a few questions there.  Why don't

21  you -- You gave us six or seven questions.

22  Q.  All right.

23  A.  Maybe from what, you know, you provided an opinion

24  there.  But the principal treated Mrs. deLeon as she would

25  any other teacher under the contract, is best I could say t

1  that.  I wasn't responsible for the schedule.  I'm not
2  responsible for whether the person would be a travelling
3  teacher or not a travelling teacher.  But if the contract is
4  not enforced --
5  Q.  You didn't assign the classroom, right?
6  A.  No.
7  Q.  That was Mr. Deshnar, right?
8  A.  Yes.  I think it's important, Mr. Nichols, for you
9  to understand the differences between the duties of a
10 principal and a superintendent.
11 Q.  Right, right.
12 A.  Those duties were not assigned by me.
13 Q.  Right.
14 A.  If it were brought to my attention, which it never
15 was brought to my attention, then it is difficult to do
16 something about that.  So, and one of my jobs is to enforce
17 the contract, and there was no contract violations in any of
18 those things you mentioned.
19 Q.  All right.  But you were aware that Mr. LaScola,
20 your predecessor, had authorized her to take a sabbatical
21 leave, were you not?  You were aware of that?
22 A.  Yes, again, I would go back to the file but there
23 was a time and a period, yes.
24 Q.  And you are aware of the reason why she took that
25 sabbatical leave was because of her medical condition,

1    right?

2    A.  There's many reasons why people take sabbaticals.

3    Q.  But I am talking about this case, this case.

4    A.  The expectation is when they come back they are

5    ready to teach.

6    Q.  Right.  But I'm talking about in this case,

7    though, you were aware that she was undergoing psychotherapy

8    and she was taking that sabbatical, the reason she was

9    taking the sabbatical leave, right?

10    MS. HEATH:  Objection.  The records do not reflect

11    that that's what the school district knew --

12    Q.  I'm asking.  You can say yes or no, Mr. --

13    A.  I --

14    Q.  He filed it, Mr. LaScola, I'm sure you read the

15    records.

16    A.  Mrs. deLeon's records, no, I didn't.  I didn't

17    read her records.

18    Q.  I'm talking about Mr. LaScola, though.  He

19    authorized that sabbatical.  Mr. LaScola, your predecessor.

20    A.  Sure.  And there's a lot of things Mr. LaScola did

21    that I'm not aware of.

22    Q.  But you certainly became aware of it in 2002,

23    March 2002, you suspended her?

24    A.  What does that got to do with the traveling

25    classes?  And I don't --

1    Q.    That was a different question.  Let me clarify.  I
2    don't want to -- I want to clarify because I don't want to
3    mislead you.
4    A.    Please do so.
5    Q.    All right.  One is the issue was were you aware of
6    her condition, her mental condition?  And I'm reflecting on
7    the record, what's in the record, only what's in the record
8    and what you signed off and what Mr. LaScola, you being his
9    successor, what you did know or did not know relative to her
10    condition.  That's all I'm saying.  If you say you didn't
11    know what Mr. LaScola did, fine.  And you said no, I didn't
12    know.  All right.
13    But I'm here to bring you files and say all right,
14    I'm pointing to your signature.  You signed off and
15    suspended her in March of 2002.  And you say yes, that's my
16    signature.  You didn't walk away from your signature.  You
17    stood and said yeah, that's my signature.  I suspended her.
18    I'm saying that same letter says that in March 2002 the reason
19    you suspended is because of that medical excuse that you had
20    received from a doctor.  You said that in your own words.
21    MS. HEATH:  Objection.
22    Q.    In that letter.
23    MS. HEATH:  Objection.
24    A.    Well, I'm really not following you, Mr. Nichols.
25    You're talking about Mr. LaScola, you're talking about 1997,

1  you're talking about 2002, and what I was and wasn't aware
2  of during that time.  I really lost you.  I got to be honest
3  with you.
4        Q.  All right.  Okay.  All right.  Well, and those
5  will speak for itself.  And I've asked you for the ADA and
6  we move forward.
7        Now, let's move forward to Dr. McFadden
8  determined --
9        THE WITNESS:  Can we take a break for a second?
10       MR. NICHOLS:  Sure.
11       (Brief recess.)
12       (Back on the record.)
13       MR. NICHOLS:  Back on the record.  11:25 a.m.,
14  March 7, 2006.  Continuing.
15       Q.  Mr. Dolecki, I would like you to look at Paragraph
16  27 and that's also the ADA, the fourth claim for relief,
17  Please.
18       A.  (Witness complies.)
19       Q.  You notice that as I understand it on the 18th you
20  wrote a letter.  That letter I showed you by which you
21  suspended Miss deLeon, that -- as I understand it
22  that letter was delivered, hand-delivered by Mr. Hellar to
23  Miss deLeon.  And Miss deLeon is able to testify that when
24  she met with Mr. Hellar on that occasion, Mr. Hellar not
25  only physically delivered your letter of resignation to her,

1   but he also said that he was authorized by you to ask for

2   her resignation.

3   Now, it may well be that I will get an opportunity

4   to examine Mr. Heller, but is that a correct statement by

5   Mr. Heller, that he was authorized by you to ask for her

6   resignation on that occasion?

7   A.   You would have to ask Mr. Heller. I wasn't there

8   when he --

9   Q.   No, I'm not saying you were there but before he

10  left you he had the letter signed by you. I'm asking you

11  did you authorize him to ask for Ms. deLeon's resignation as

12  I have alleged in Paragraph 27?

13      MS. HEATH: I'm just going to object that

14  Paragraph 27 says a great deal of many things.

15      MR. NICHOLS: Well, it says resignation, though.

16      MS. HEATH: If you're asking --

17      MR. NICHOLS: Requests resignation.

18      MS. HEATH: If that's your only question, and

19  you're not asking whether he agrees with the rest

20  of Paragraph 27 or not --

21      MR. NICHOLS: I haven't asked that, Counsel. I

22  asked a very specific question.

23      MS. HEATH: Okay.

24  A.   There was concern -- it's just not that simple.

25  There was concerns about Mrs. deLeon and her ability to

1 teach. So I do not know and I wasn't there how Mr. Heller
2 termed his discussion with her.
3 Q. Was that based on a medical condition?
4 A. Can I speak, please?
5 Q. Yes, sir.
6 A. I wasn't there to listen how he presented it. But
7 the message I gave Mr. Heller was that if we would
8 discuss -- we were willing to discuss her resignation if she
9 wanted to basically discuss it. We weren't demanding. I
10 don't know if Mr. Heller said it, but I didn't say I want
11 you to demand the resignation from her on the spot. There
12 was a discussion on resignation. That was the message.
13 Q. But at that point she had not offered her
14 resignation, did she?
15 A. No, she did not.
16 Q. Right. So it was really your going to her,
17 Mr. Heller is acting for you, your staff person, and saying
18 we want your resignation.
19 MS. HEATH: Objection. You may answer.
20 A. Again, I answered you the way I do it. You answer
21 it your way. That's how I gave Mr. Heller the message.
22 Q. All right. Now, continuing. You said there was a
23 concern. I take it you shared that concern, right
24 Concerning Miss deLeon's ability to teach, right? Is that a
25 fair characterization of what you just testified to?