October 15, 1997

I arrived in the trailer in Mr. Jim Morgan's room at 9:07 a.m. We had so many problems with students on Tuesday, October 14, that I had decided to observe this classroom. I heard laughter coming from Mrs. McCracken's classroom, so I just stood there. She was talking about coming to this country; how she had no family; she had to make it on her own, and what a struggle it's been. She talked about the incident and was joking about it. Statements were made about the police and their handling of the situation. Jokes were made about drinking and the students were laughing. She said, "If I lose my job you know what I can be? I can be a bartender." She stated that the school district was out to get her, that the three principals were conspiring against her and trying to get rid of her. She was alluding to the fact that this may have been part of our plan. I was then handed a note from Jane Gable of something Mrs. McCracken had said earlier -- she was accusing the school board of setting this whole thing up. She was making comments about her personal life and about her daughter. Students sat and constantly laughed. This went on until 9:20 a.m.. No Spanish was being taught. At that point I opened the door to the back of the classroom and walked into the room. I noted the look on her face and the students' faces. She looked at me and said, "Yes?" I said I was there to make an informal observation. When I walked in she immediately opened the Spanish book and told the students to open their books. This was at approximately 9:21 - 9:22 a.m. The period started at 8:57 a.m.



EXHIBIT
25

Wednesday, October 15, 1997

11:20 a.m.

Present:      George Deshner, Michael Dolecki, Carl Rozonowski,
              Claudette DeLeon-McCracken

**MR. DOLECKI:**      We're here because it was recently brought to my attention
that there were concerns about things that were going on in your classroom.

**MRS. MCCRACKEN:**      The kids were asking me questions -- I'm sorry to
interrupt.

**MR. DOLECKI:**      There are concerns about comments you made in your
classroom. I will let Mr. Deshner take over. He is the one who called me this
morning.

**MR. DESHNER:**      I went out to see Mr. Morgan second period. Mr. Morgan
was not there. Mrs. Gable explained to me that Mr. Morgan was in an I.E.P.
While I was standing there, I heard laughing coming from your classroom. That
was at approximately 9:07 a.m. I walked over to the door and heard you
discussing the incident. You came to the United States with no clothes on your
back, you talked about having no family, no brothers or sisters. There were
questions being asked about the incident. There was joking about the incident.
You said people were out to get you. The three principals conspired against you
and were trying to get rid of you. You had to contend with or you had been
battling -- those might not have been your exact words. You made statements
alluding to the fact that we might be part of this situation. You were laughing
about the police handling this situation, about drinking, about drinking and driving.

You said, "Oh well, if I get fired I can always become a bartender." Then everyone laughed. You accused the police of mishandling the situation. You made jokes about that, your personal life, comments were made about your daughter. I don't remember what was said about her. I walked into Mr. Morgan's classroom at about 9:07 a.m. At 9:20 a.m. I walked into your classroom. No Spanish had been taught. This was totally unacceptable. When I walked in you looked surprised and said "Yes?" I said I was there to do an informal observation and I stayed the rest of the period. When I walked in you immediately opened your book and the students opened their books and Spanish was taught until the bell rang. I left and called Mr. Dolecki. I was concerned about what was going on in the classroom involved.

**MR. DOLECKI:**     Claudette, would you like to comment?

**MRS. MCCRACKEN:**     I had a problem on Saturday. I wasn't laughing. Mr. Deshner said that I said I would be a bartender. Mr. Deshner must not have been listening very well because I said that I would be everything but a bartender. This has been very upsetting. The kids wanted to know. I said I think I should just go home. They said no you shouldn't go home you should stay here and tell what happened. I told them that you cannot break the rules and get away with it. I had an emotional crises -- I was talking to my mother-in-law. My husband left me. I was with friends and I had one drink -- a marguerita. I never heard the police follow me -- they surprised me when they punched holes in my tires. I told the police, "I did not hear you follow me. I very seldom drink -- I had one drink --

but due to circumstances involved -- and the students laughed -- I didn't hear the

police." I did not hear them. I saw other drivers, not very many because it was

late. I told the kids the police did not give me a breathalyzer. How can they do

that? Mr. Deshner, you said you heard me talk about coming to this country. I

have been in this country for 20 years. I had $1000.00 that I got when I sold my

car. I had few clothes. I have no family, no brothers, no sisters. I substituted in

Saegertown before I came to Crawford Central.

I have good rapport with the kids. When I had problems with students,

Mrs. Templeton said, "Stop sending kids to the office." I am under a lot of stress.

I have to take two doses of medicine to be able to come to work.

Dr. Berkebile blamed me -- to allow kids early release 8th period. I told

Dr. Berkebile I don't even have a class 8th period. I have a study hall.

I asked for 2 black and 2 red pens and Mr. Deshner said if you want to

know how to order supplies, talk to Dr. Berkebile. He accused me of giving

students pens. Students take them. I am under a lot of stress. I take double

medication. You can ask my doctor. I am under a lot of stress. This is my third

marriage. I was having a drink with friends. I had not eaten all day. I never heard

the police. I am probably in a lot of trouble.

If I get fired, the students said they knew teachers that drink and who come

to school drunk and never get in trouble.

**MR. DOLECKI:**     Who told you --

**MRS. MCCRACKEN:**     They told me who but I won't tell you who they are. The

students said they would testify that there are teachers who come to school drunk

every day and do not get in trouble. And I told them that you cannot break the

rules and you cannot get away with it. Learn from me. I seldom drink. You can

ask Ron Maziarz, the Stanfords and Dan Hootman. I go out with them. I do not

have a drinking problem. I told the students I was not drunk. The police didn't

give me a breathalyzer test. I'm going to see Mr. Lewis today. The students have

a right. I had to give them an explanation.

MR. DOLECKI:        I didn't call you here to talk to you about that. What we're

concerned about are your comments in the classroom. There are times -- and

when students ask questions not related to the subject, it's the teacher's

responsibility to get them back on track.

MRS. MCCRACKEN:        I need to give an explanation if they ask for it. They said

are they going to fire you? I said I don't know.

MR. DOLECKI:        I repeat, we --

MRS. MCCRACKEN:        Can I interrupt you? The whole school listens to talks here

about drinking and driving. They take away class time don't they?

MR. DOLECKI:        Yes.

MRS. MCCRACKEN:        They can also learn from personal experience. Kids have to

learn. They cannot judge me as an alcoholic. I do not have an alcohol problem.

Everyone in the classroom was asking questions. One student brought this in and I

have a couple more that students brought in to me. (Held up article cut out of the

newspaper.)

MR. DOLECKI:        Are you receiving any help?

**MRS. McCRACKEN:**  Medical?

**MR. DOLECKI:**  Legal.

**MRS. McCRACKEN:**  Don Lewis, I'm sorry, Mr. Deshner. I was not joking about this. I said I would be anything but a bartender. I came to this country with nothing. Didn't you have ancestors who came to this country with nothing and survived?

**MR. DESHNER:**  Yes.

**MRS. McCRACKEN:**  I'm struggling. I'm teaching --

**MR. DOLECKI:**  Excuse me. What we're going to do --

**MRS. McCRACKEN:**  Are you going to fire me?

**MR. DOLECKI:**  We're not going to fire you. What we're going to do is suspend you with pay --

**MRS. McCRACKEN:**  Can I call my doctor?

**MR. DOLECKI:**  May I finish? We are going to suspend you with pay for 3 and 1/2 days starting right now through Monday. I have a letter I'll give to you right now explaining this.

**Matt Simon:** She wanted to tell the students --

**Mr. Deshner:** Did she initiate the conversation?

**Matt Simon:** Yes, she wanted to tell us. She started out by telling the students about it. Her story seemed a little far-fetched. She started the conversation at 9:00. She said she was very ashamed and did not want students to hear it from the paper because it would be better that way. No students asked questions. She initiated the entire thing. Said she was out late Saturday evening at a bar. Said she was stressed out because of a lot of stuff going on. She had one margarita and that it was only one. Made mistake of drinking it because she was also on medication. She was driving back about 2 - 2:30. Saw a policeman behind her but there were no sirens or lights. She thought he was chasing someone else when he went around her. She was finally stopped when her tires were blown out.

A student asked her how her tires were blown out. She discussed the tool they used. Said policeman said he had been following her for 13 miles and she was evading him. Asked why she didn't hear a siren or no lights. Officer said they had been in pursuit for 13 miles. Police also said she was driving under the influence. Student asked if they gave her a breathalyzer. She said no and didn't ask for one because she thought they would do it. She explained to police that she only had one drink but was also on medication.

She said many times that you ask anybody that knows me, they'll tell you I am not a drinker. Only a social drinker. Ask my brother-in-law, he's a cop.

After telling her side, she started rambling on about what happened if she got fired. She came to this country with nothing and if she gets fired, she'll know what its like to have nothing. Started about the administrators and how they were out to get her and have her fired. They have been trying to get me for four years. Then she started making jokes about it. I play favors for you but not for you -- pointing at different students.

Explained that if administration wanted her so bad they will definitely try to fire me. "What am I going to do if I lose my job? Oh, I could be a maid or a bartender. Oh, wouldn't that look good. I'll have to sell my car that I have already paid for. Can I come stay with you if I lose my job? I'd be a really good maid. Was jumping around about losing her job and the school. At end she said, I'm the one that doesn't have a drinking problem. There are other teachers at this school that are alcoholics and teachers that come to school drunk and nothing happens to them.

At that point, Mr. Deshner walked in. A look of astonishment was on her face. You said, I'm in here for an informal observation. She immediately started the lesson and taught to the end of the lesson. She was not her usual self. I was following in the book and students were giving wrong answers. She did not correct them. She made mistakes and students had to correct her.

**Katherine Wilkinson:** She initiated discussion. Said she didn't give a breath test. She only had one marguerita. Also on medication. She did not hear sirens. She said she was trying to fire her. She said she was a music teacher. Lived with sister. Taught at Mercyhurst, Maplewood. School board would have an excuse to fire her. Students started working when Mr. Deshner walked in. She said she saw her lawyer yesterday. She mentioned there were a lot of teachers who were alcoholics but never got into trouble. Katherine said she hasn't learned very much this year.

**Donna Wilkinson (parent):** Class is a joke. Teacher doesn't seem professional. Isn't spending time on subject. Katy doesn't respect her.

**Lea Mariani:** She sat on desk and began telling her side of the situation. She said the administration was out to get her. School board was meeting tonight. Always been a survivor. She would be a bartender - kidding. She had to work hard, lived with sister, had to work for everything. Students were asking a lot of questions (10 - 15 minutes on this)

**Cindy O'Day:** She brought it up. She thought administration was trying to fire her. She said she would become a bartender if she lost her job. She talked about her struggle coming to America. Hasn't seen parents in 13 years. She said if she lost her job she wouldn't be able to support her daughter. She was joking and laughing. She spent 10 - 15 minutes on her explanation.

**Brent Godfrey:** Heard on way to class that she had been arrested for D.U.I. and students were laughing about it. Went on to class and when class started she began discussing the newspaper articles. She started the discussion.

Talked all the time until Mr. Deshner walked in and then she started teaching from 9:20 - 9:39. Started out serious but she was joking about it at the end. Said the school board was going to have a special meeting to discuss what happened. Said all three principals hated her and described how she doesn't drink a lot for friends would know she didn't.

Said she knew about other teachers in the school that had alcohol problems but had never been caught. She said other teachers came to school drunk but they never get caught. And she didn't do anything and got arrested.

Other students said she mentioned names in other classes. Mr. Hootman was one of the names she gave.

Said everyone is trying to get her fired. Oh well, if I get fired, Ill have to get another job and I guess Ill be a bartender. That is when the joking started.

She said she didn't know the police were following her for 13-1/2 miles. You smiled and she said to Brent, "Do you think it's funny? I'm going to lose my job?"

Students said police had to make so many arrests per day. She said yes they weren't doing their job and made up things about her. Said she would be fired because everyone was out to get her.

Said police didn't give her a breathalyzer and were wrong for what they did.

Said she wished she had never come to this country. It was supposed to be the land of opportunity but was not for her.

Said four times that they popped the tires on her car and she did not have the money to get them fixed. Said if she lost her job she would have to sell her house.

She said she only had one marguerita. Kids were holding out their hands saying it was a big one. A lot of joking going on.

Told students she had taught at these other schools before coming here. No one mentioned anything. She initiated the whole discussion. The students were really quiet.

Said there was going to be a big fight over this and she would have to fight the police and the school. She had a brother in the State Police and she would call him to take care of this.

# NORTH

## McCANDLESS

### Rusnak to head special school

Timothy Rusnak has been named president of Vincentian Academy-Duquesne University.

An education professor at Duquesne University, Rusnak had been special assistant to the dean of Duquesne's school of education.

Vincentian Academy-Duquesne University is the only university-affiliated secondary school in the world that has its curriculum based solely on the international baccalaureate. The program offers students accelerated academic courses to prepare them for exams that could enable them to jump ahead in college, depending on how they score.

## CRAWFORD COUNTY

### Stop Sticks end chase on I-79

State police had to resort to a new weapon in their arsenal to stop a woman who led them on a 13½-mile chase northbound along Interstate 79 yesterday.

Claudette Deleon-McCracken, 44, of Edinboro was stopped when police from the Meadville barracks laid tire-deflation devices across the highway at the 161-mile marker in Vernon, Crawford County.

Called Stop Sticks, each three-sectioned device covers a traffic lane with hollow tubes intended to puncture tires and cause a slow leak but no sudden blowout or accident.

The Stop Sticks were issued to state police this year.

Police said charges of driving under the influence, fleeing an officer, speeding, and other traffic offenses are pending against Deleon-McCracken.

## NORTH HILLS SCHOOLS

### Board sets work session tonight

The school board will hold a work session at 7:30 this evening in the administration center on Sixth Avenue. The special meeting was called to complete review of the agenda for the board's Oct. 20 meeting.

## FOX CHAPEL

### Teacher among 12 finalists

Christine Czapleski, a mathematics teacher at Shady Side Academy, has been named one of 12 state finalists for the National Science Foundation's 1998 Presidential Awards for Excellence in Mathematics and Science Teaching.

Other winners in Western Pennsylvania were Megan Melucci, a science teacher at Heritage Elementary School in Franklin Regional School District; and Carol Borkovich, a science teacher at Dickson Intermediate School in the Woodland Hills School District.

Each statewide award winner will be considered for the national award, which is cosponsored by the White House.

EXHIBIT 26

SAINT VINCENT

**EDINBORO MEDICAL CENTER**
Affiliate of Saint Vincent Health System
450 Erie Street
Edinboro, Pennsylvania 16412
814/734-1618

| | |
|---|---|
| John Streiff, MD<br>MD-039312-E | William Getson, MD<br>MD-057615-L |
| Gretchen Bybel, MD<br>MD-042190-L | Julia Roussos, CRNP |

For Claudette Deleu-McCracken Age
Address Date 11/10/97

Please excuse
Claudette from
work due to medical
Reasons X 33 day until 1-12-98

SUBSTITUTION PERMISSIBLE DR. [signature] M.D.
REFILL ____ TIMES DEA# ____

IN ORDER FOR A BRAND NAME PRODUCT TO BE DISPENSED, THE PRESCRIBER MUST WRITE "BRAND NECESSARY" OR "BRAND MEDICALLY NECESSARY" IN THE SPACE BELOW.

9430-14 0397 CPI

faxed, mailed HB

c/o Mr. Jim LaScola
Superintendent

EXHIBIT
37

March 19, 1998

Mr. Rob Smith, President
Crawford Central School Board
c/o Crawford Central School District
11280 Mercer Pike
Meadville, Pa 16335

Dear Mr. Smith:

The purpose of this letter is to request a Sabbatical Leave with half pay for the 1998-1999 work year, as specified in the Collective Bargaining Agreement. The purpose of this leave is for restoration of health.

I understand that I am not eligible for a true Sabbatical since I will not complete my tenth year of service until after the end of next year. However, I am hopeful that the District will grant this request in light of the fact that I did serve the District as a substitute prior to my normal service. This request is made under Section 1166 of the Pennsylvania School Code which permits granting of leaves for reasons other than those enumerated in the Code.

Naturally, I am requesting that the District make normal payments to PSERS for my retirement just as it would were I taking a normal Sabbatical Leave.

Please submit this request to the Board for its approval at the next Board meeting.

Respectfully yours,

Claudette deLeon-McCracken

pc: Jim LaScola, Superintendent

P.D.: I would like to apologize to Mr. LaScola because I wasn't sure whether I should have

Medical Rights and Operational Witness Document



# CRAWFORD CENTRAL SCHOOL DISTRICT

Instructional Support Center
11280 Mercer Pike
Meadville, Pennsylvania 16335-9504
Telephone: (814) 724-3960
FAX: (814) 333-8731

James C. LaScola, Superintendent

Michael E. Dolecki
Assistant Superintendent
Lary L. Williams
Director of Curriculum & Instruction
Nicholas J. Charpovich
Director of Special Services
Thomas E. Beers
Director of Support Services
William E. Shelvey
Business Management/Board Secretary

## OFFICE OF THE SUPERINTENDENT

April 28, 1998

Claudette de-Leon McCracken
11983 Eureka Road
Edinboro, PA 16412-9626

Dear Mrs. de-Leon McCracken:

Your request for a Sabbatical leave for Medical purposes, for the 1998-99 school year was presented to, and approved by, the Crawford Central Board of School Directors at its Regular Meeting of Monday, April 27, 1998. You understand, of course, that this sabbatical carries with it the obligation of returning to your teaching position for the full school term following your leave. Should you not return, you would have the obligation of returning to the Board the salary which you were paid while on leave.

Please be advised that this sabbatical leave is granted under the present Pennsylvania School Code, Sections 1166-1171. If the legislature decides to change the sabbatical leave regulations in the future, the School District will review each sabbatical leave request on an individual basis.

We hope that your leave will prove beneficial to restoring you to better health. We will look forward to having you back with us at the beginning of the 1999-2000 school year.

Sincerely,

James C. LaScola
Superintendent of Schools

JCL/cak

Enclosures

pc:   Payroll Department
      Personnel File
      Mr. George Deshner, Principal



EXHIBIT

38

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CLAUDETTE de LEON          (
                (
       Plaintiff         (
                (
  vs.            (     (NO. 05-126E)
                (
CRAWFORD CENTRAL SCHOOL DISTRICT  (
CRAWFORD CENTRAL SCHOOL BOARD  (
                (
      Defendants     (
                (
MICHAEL E. DOLECKI, SUPERINTENDENT  (
                (
      Defendant      (
                (
CHARLES E. HELLER, III, ASSISTANT  (
SUPERINTENDENT         (
                (
      Defendant      (

**Response of Defendants to Plaintiff's Second Set of Interrogatories**

AND NOW, come Defendants and Response to Plaintiff's Supplemental Interrogatories as follows and with a general objection that these Interrogatories are in excess of what is permitted by the Local Rules, are redundant, vexatious and overly burdensome.

1.    Defendants object to Interrogatory No. 1 on the grounds that it is arduous to assume facts not in evidence. The School District had determined to discipline Ms. DeLeon relative to her substandard work performance and her disruptive and unprofessional outbursts, wherein she refused to continue a meeting and indicated that she could no longer continue her teaching duties at that time, *prior to* receiving any information from Dr. Mercatoris, with whom Ms. DeLeon

consulted after she walked out the meeting on March 12, 2002. The District did not have permission from Plaintiff to consult with Dr. Mercatoris and therefore exercises the legal right to seek an IME for a full evaluation.

2.    Crawford Central School District has no policy mandating suspending teachers with pay for simply requesting a medical leave. However, the circumstances surrounding the suspension of Ms. DeLeon for the timeframe in question are completely unique. Her suspension at that time was not related to her request for medical leave, but rather the unprofessional behavior exhibited prior to said request.

3.    Defendants object to Interrogatory No. 3 because this topic was discussed in depth at depositions and has been addressed at length by testimony under oath. Thus, further inquiry is unduly burdensome.

4.    Defendants object to Interrogatory No. 4 as this topic was discussed in depth at depositions and has been addressed at length by testimony under oath. Thus, further inquiry is unduly burdensome. By way of further answer, and not derogation of the foregoing, the Defendants deny that Ms. DeLeon's resignation was requested. As explained during depositions, Plaintiff's potential resignation with pay through the end of the 2001-2002 school year, was provided as an option to Ms. DeLeon should she choose to accept it, given her unprofessional behavior and contention she could not continue teaching.

5.    Defendants object to Interrogatory No. 5 as it assumes facts not in evidence. By way of further answer, Dr. McFadden's release speaks for itself and indicates that she was fit to return to full duty without restrictions essentially

by releasing her to return to work as a teacher. No restrictions are indicated whatsoever. Consequently, there was no need to consult with Dr. McFadden about restrictions that were not applicable or necessary.

6.    Defendants object to Interrogatory No. 6 because this topic was the subject of discussion at deposition and testimony was provided at length and under oath concerning this issue. Thus, any further inquiry is unduly burdensome.

Respectfully submitted,

ANDREWS & BEARD

Roberta Binder Heath, Esquire
Pa.Id. No. 50798
[rbheath@andrewsbeard.com]

3366 Lynnwood Drive
P.O. Box 1311
Altoona, PA 16603

Phone: 814-943-3304
Fax: 814-943-0856

Attorneys for Crawford Central School District, Crawford Central School Board, Michael E. Dolecki, Superintendent and Charles E. Heller, III, Assistant Superintendent, Defendants

## CERTIFICATE OF SERVICE

The undersigned attorney does hereby certify that a true and correct copy of Defendant's First Set of Interrogatories Directed to Plaintiff was served on the following counsel of record by U.S. Mail, postage prepaid on this ____ day of May 2006:

Caleb L. Nichols, Esquire
P.O. Box 1585
Erie, PA 16507

Respectfully submitted,

**ANDREWS & BEARD**

Roberta Binder Heath, Esquire
Pa.Id. No. 50798
[rbheath@andrewsbeard.com]

3366 Lynnwood Drive
P.O. Box 1311
Altoona, PA 16603

Phone: 814-943-3304
Fax: 814-943-0856

Attorneys for Crawford Central School
District, Crawford Central School Board,
Michael E. Dolecki, Superintendent and
Charles E. Heller, III, Assistant
Superintendent, Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CLAUDETTE de LEON                        (
                    Plaintiff            (
                                         (
            vs.                          (        (NO. 05-126E)
                                         (
CRAWFORD CENTRAL SCHOOL DISTRICT         (
CRAWFORD CENTRAL SCHOOL BOARD            (
                    Defendants           (
                                         (
MICHAEL E. DOLECKI, SUPERINTENDENT       (
                    Defendant            (
                                         (
CHARLES E. HELLER, III, ASSISTANT        (
SUPERINTENDENT                           (
                    Defendant            (

## Response of Defendants to Supplemental Interrogatories[1]

AND NOW, come Defendants and Response to Plaintiff's Supplemental Interrogatories as follows and with a general objection that these Interrogatories are in excess of what is permitted by the Local Rules, are redundant, vexatious and overly burdensome.

7.      Defendants object to Interrogatory No. 7 on the grounds that it is vague, ambiguous and misleading. By way of further answer, and not in derogation of the foregoing, in accordance with the law, School Districts typically maintain separate investigative files relative to particular disciplinary procedures. In addition, administrators often keep their own files relative School District personnel. There is no obligation of notifying the Plaintiff any separate file was kept. Plaintiff's office personnel

[1] Numbers one (1) through six (6) are not Interrogatories. The actual Interrogatories start at Number 7.

file was purged in accordance with the arbitrator's directive so that any negative information contained therein would not be utilized to establish progressive discipline for subsequent proceedings. The arbitrator's decision in this regard does not mandate that all records must be destroyed, but simply that the personnel file be purged so that the negative information cannot be utilized as a basis for disciplinary actions in the future. Thus, the District by purging the personnel file complied with the arbitrator's directive.

8.      The School District did purge Plaintiff's personnel file as directed.  See also, response to No. 7 above.  However, at this point, twelve (12) years later, it is difficult to specify the precise method of how and who complied with Arbitrator Stohlenberg's directive.

9.      The School District purged Plaintiff's personnel file relative to the negative evaluation for the 1995/1996 performance evaluation she received.  As specified in response No. 8, at this point, it is difficult to determine who complied with Arbitrator Talanco's directive over ten (10) years ago.  Nonetheless, the personnel file was purged as directed.

10.     No other teacher presented similar concerns, such as displaying inappropriate emotional outbursts, being unable to complete meetings with administrators, or claiming she could no longer continue teaching, and could not "just go on".  Further, approximately ten (10) years ago, the District instituted an Employee Assistance Program, whereby employees can seek assistance in arranging and obtaining counseling and medical

assistance for drug and alcohol problems, marriage counseling, financial counseling, and for other problem areas. Participation in the program is highly confidential and this information will not be provided as it is overly-intrusive and does not seek discovery of information that is relevant to this case.

11.    Defendants object to Interrogatory No. 11 on the grounds that it seeks evidence not reasonable calculated to lead to the discovery of relevant evidence. By way of further answer, and not in derogation of the foregoing, Defendant never requested any teacher, including the Plaintiff, to resign due to a psychiatric disability.

12.    The Defendants object to this Interrogatory as it assumes facts not in evidence. As specified by both Mr. Heller and Mr. Dolecki at their depositions, Ms. DeLeon's resignation was not requested upon the submission of a medical excuse. Essentially, because of Ms. DeLeon's unprofessional performance and bizarre outburst at the meeting in March of 2002, in which she indicated that "she could not go on" and could no longer teach," resignation was broached as an option wherein Plaintiff could choose full pay until the end of the school year. This option was offered to Plaintiff as a potential solution to her assertion she could not longer teach. This option was not a request or a demand for a resignation.

13.    The Defendants object to Interrogatory No. 13 as a mischaracterization of the information that has been provided in the discovery process to date. Plaintiff was not suspended for submitting a medical excuse, but rather because of her behavior at the

March 12, 2002 meeting, which has been testified to at length, under oath at the depositions of various administrators.

14.    Defendants object to interrogatory No. 14 on the grounds that it attempts to use inflammatory language to mischaracterize facts in evidence. The details concerning the 2001/2002 and the 2003/2004 evaluations have been addressed at length at the depositions taken in this case. Plaintiff, at this point, is relying on the arbitration proceedings to establish evidence on a variety of issues, such as the School District's position concerning the unsatisfactory evaluations. This reliance is misplaced. The reasons underlying the merits and timing of the evaluations in question were fully explained at the depositions by various administrators. Essentially, the unsatisfactory evaluations were provided because of unacceptable work performance on the part of the Plaintiff.

15.    Defendants object to interrogatory No. 15 on the grounds that it uses inflammatory language to mischaracterize facts in evidence and because it fails to seek information reasonably calculated to lead to the discovery of relevant evidence. By way of further answer, and not in derogation of the foregoing, Parent-teacher conferences as typically not meetings that would have the potential for resulting in the discipline of an employee. Consequently, union representation as a matter of due process is not required by law.

16. This information was discussed at length in the depositions of the administrators. Consequently, any further questioning is redundant and may be deemed harassment on the part of the Plaintiff as these matters were fully discussed at depositions.

17. This information was discussed at length in the depositions of the administrators. Consequently, any further questioning is redundant and may be deemed harassment on the part of the Plaintiff as these matters were fully discussed at deposition.

18. This information was discussed at length in the depositions of the administrators. Consequently, any further questioning is redundant and may be deemed harassment on the part of the Plaintiff as these matters were fully discussed at deposition.

19. This information was discussed at length in the depositions of the administrators. Consequently, any further questioning is redundant and may be deemed harassment on the part of the Plaintiff as these matters were fully discussed at deposition.

20. The Defendants object to Interrogatory No. 20 on the grounds that it is vague, overly broad and unduly burdensome particularly because it does not specify any timeframes as to other teachers being put on an action plan. Mr. Higgins indicated that since his starting as an assistant principal with the District, three (3) other teachers that were male were placed on action plans. These individuals were Caucasian. In other years, four (4) Caucasian male principals were put in action plans. Three (3) other Caucasian female teachers were placed on action plans.

21.     Defendants object to Interrogatory No. 21 on the grounds that it is vague and ambiguous so as to render the question unintelligible. By way of further answer and not in derogation of foregoing, some discussion occurred between the Union and the District concerning an ESL position as an option prior to Plaintiff's last unsatisfactory evaluation and ultimate termination. Also, a difference exists between bidding into a position and "applying" for a position as defined and dictated by the Collective Bargaining Agreement.

22.     Yes. This information is contained in all the documents that have been provided and has been addressed at length in the depositions of District administrators.

23.     Defendants object to Interrogatory No. 23 on the grounds that it is vague so as to be unintelligible. By way of further answer, and not in derogations of the foregoing objection, this information was addressed at length in the documents that were provided to the Plaintiff and also through the depositions of the school administrators. Nonetheless, it precisely because Plaintiff failed to meet the criteria set forth in the action plan that she was terminated, which details have been explained and constitute legitimate business reasons in no way associated with Plaintiff's national origin, gender or perceived disability.

24.     The Defendants object to Interrogatory No. 24 on the grounds that it assumes facts not in evidence relative to disabled students not being reasonably and adequately accommodated. As touched upon at depositions, the School District was very well

aware of its responsibilities to students primarily under the IDEA, the Rehabilitation Act, and the ADA. In this regard, student accommodation plans and methods are specified in the individual education plans (IEP's) pursuant to the IDEA and students were accommodated in accordance with the law.

25.    Defendants object to Interrogatory No. 25 on the grounds that it is so vague so as to be essentially unintelligible. By way of further answer, and not in derogation of the foregoing, the procedure relative to investigating student violations was addressed specifically by administrators during their depositions.

26.    This information was already addressed in deposition in that not all teachers are required to maintain student discipline logs, but many teachers do as a matter of course and prudent professional conduct. Plaintiff was subject to an action plan, which is a wholly different matter than the general policy. Plaintiff specifically was subject to an action plan due to her substandard performance, in part relating to continuing disciplinary problems.

27.    Defendant objects to Interrogatory No. 27 on the grounds that it is vague, ambiguous, and assumes facts not in evidence. By way of further answer, and not in derogation of the foregoing, the District has all of these policies and administrators have been and continue to be trained on these policies and underlying procedures. Finally, no teacher, including Plaintiff, has ever made and internal complaint relative to any claim for harassment of any kind.

## CERTIFICATE OF SERVICE

The undersigned attorney does hereby certify that a true and correct copy of Defendant's First Set of Interrogatories Directed to Plaintiff was served on the following counsel of record by U.S. Mail, postage prepaid on this 2nd day of May 2006:

Caleb L. Nichols, Esquire
P.O. Box 1585
Erie, PA 16507

Respectfully submitted,

**ANDREWS & BEARD**

Roberta Binder Heath, Esquire
Pa.Id. NO. 50798
[rbheath@andrewsbeard.com]

3366 Lynnwood Drive
P.O. Box 1311
Altoona, PA 16603

Phone: 814-943-3304
Fax: 814-943-0856

Attorneys for Crawford Central School District,
Crawford Central School Board, Michael E.
Dolecki, Superintendent and Charles E. Heller,
III, Assistant Superintendent, Defendants

Respectfully submitted,

**ANDREWS & BEARD**

Roberta Binder Heath, Esquire
Pa.Id. No. 50798
[rbheath@andrewsbeard.com]

3366 Lynnwood Drive
P.O. Box 1311
Altoona, PA 16603

Phone: 814-943-3304
Fax: 814-943-0856

Attorneys for Crawford Central School District,
Crawford Central School Board, Michael E.
Dolecki, Superintendent and Charles E. Heller,
III, Assistant Superintendent, Defendants

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF PENNSYLVANIA

* * * * * * * *

CLAUDETTE DELEON,        *

Plaintiff,        *

vs.        *  Case No:

CRAWFORD CENTRAL SCHOOL  *  05-126E

DISTRICT, CRAWFORD       *

CENTRAL SCHOOL BOARD,    *

Defendants,       *

MICHAEL E. DOLECKI,      *

SUPERINTENDENT,          *

Defendant,        *

CHARLES E. HELLER, III,  *

ASSISTANT SUPERINTENDENT, *

Defendant        *

* * * * * * * *

DEPOSITION OF

CARL ROZNOWSKI

March 6, 2006

Any reproduction of this transcript

is prohibited without authorization

by the certifying agency.

EXHIBIT
29

## Page 2

```
1                     DEPOSITION
2                         OF
3        CARL ROZNOWSKI, taken on behalf of the
4        Defendants herein, pursuant to the
5        Rules of Civil Procedure, taken before
6        inc, the undersigned, Wendy Blair, a
7        Court Reporter and Commissioner of
8        Deeds in and for the Commonwealth of
9        Pennsylvania, at the administrative
10       offices of Crawford Central School
11       District, 11280 Mercer Pike, Meadville,
12       Pennsylvania, on Monday, March 6, 2006,
13       beginning at 2:30 p.m.
```

## Page 3

```
1                 A P P E A R A N C E S
2
3        CALEB L. NICHOLS, ESQUIRE
4        P.O. Box 1585
5        Erie, PA 16507
6        COUNSEL FOR PLAINTIFF
7
8        ROBERTA BINDER HEATH, ESQUIRE
9        Andrews and Beard
10       3366 Lynnwood Drive
11       P.O. Box 1311
12       Altoona, PA 16603-1311
13       COUNSEL FOR DEFENDANTS
14
15       RICHARD S. MCEWEN, ESQUIRE
16       Pennsylvania State Education
17       Association
18       4250 Rt. 6N
19       Edinboro, PA 16412
20       COUNSEL FOR CARL ROZNOWSKI
21
22       ALSO PRESENT:
23       MICHAEL E. DOLECKI
24
25
```

## Page 4

```
1                      I N D E X
2
3        WITNESS: CARL ROZNOWSKI
4        EXAMINATION
5        By Attorney Heath          7    62
6
7        By Attorney Nichols       63    80
8        RE-EXAMINATION
9        By Attorney Heath         80 - 82
10       CERTIFICATE               83
```

## Page 5

```
1        EXHIBIT PAGE
2
3                                           PAGE
4        NUMBER     DESCRIPTION           IDENTIFIED
```

| NUMBER | DESCRIPTION | PAGE IDENTIFIED |
|---|---|---|
| One | Mr. Mehok's Notes | 19 |
| Two | Mr. Roznowski's Notes | 24 |
| Three | Ms. Willison's Notes | 41 |
| Four | 3/18/03 Letter | 57 |

**Page 6**

```
 1         OBJECTION PAGE
 2
 3   ATTORNEY                    PAGE
 4   Heath        69, 70, 70, 72,
 5                73, 75, 76, 79
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25 .
```

**Page 7**

```
 1            PROCEEDINGS
 2  ------------------------------------
 3   CARL ROZNOWSKI, HAVING FIRST BEEN DULY
 4   SWORN, TESTIFIED AS FOLLOWS:
 5  ------------------------------------
 6               EXAMINATION
 7   BY ATTORNEY HEATH:
 8        Q Mr. Roznowski, am I saying that
 9   correctly?
10        A That is correct.
11        Q Okay. My name's Robin Binder
12   Heath, and I have been retained to
13   represent the School District and Mr.
14   Dolecki and Mr. Heller in a lawsuit
15   that has been brought in the Federal
16   Court by Ms. deLeon in which she is
17   alleging various legal violations
18   concerning her civil rights, and has
19   sued the District and Mr. Dolecki and
20   Mr. Heller individually as well as
21   their professional capacities relative
22   to her employment with the District and
23   her ultimate termination in April of
24   2003.
25        The reason that I subpoenaed you
```

**Page 8**

```
 1   today is to try to get your
 2   recollection of some of the facts about
 3   what you are aware concerning some of
 4   the issues the administration had on an
 5   ongoing basis concerning Ms. deLeon's
 6   performance and what you may or may not
 7   know about that.
 8        First, I'm going to ask you some
 9   general background questions, and then
10   we'll get to the specifics. And I'll
11   try to be as brief as possible.
12        Okay.
13        Q Also, you have Counsel here.
14   representing your interests, so that if
15   you want to take a break at any time to
16   speak with Counsel for any reason, you
17   may do so. I would ask that you keep
18   all your responses verbal so the Court
19   Reporter can take them down. I will
20   remind you that you are under oath, and
21   even though this is an informal
22   setting, a Court Reporter is taking
23   down anything that anyone in this room
24   says so that a formal record will be
25   made.
```

**Page 9**

```
 1        If I ask you a question that you
 2   don't understand, please let me know
 3   and I'll be happy to repeat or rephrase
 4   the question for you. If you do
 5   understand the question, then I expect
 6   you to answer that question truthfully.
 7   A truthful answer may very well be I
 8   don't recall.
 9        If, in fact, there are notes or
10   some other documentation that you can
11   refer to refresh your recollection, let
12   me know. I know you brought a copy of
13   notes with you today. This is the
14   first time that I've seen these notes,
15   and I will tell you that I have not
16   looked at them in detail. But if when
17   I'm asking you general questions, if
18   you'd like to refer to these notes, let
19   me know and I'll be happy to let you
20   look at them. I will be attaching them
21   to your transcript as well.
22        Also, I would ask that you keep
23   your responses verbal, as the Court
24   Reporter cannot take down any gestures
25   or any vague responses such as uh-uh or
```

Multi-Page™

**Page 10**

1 uh-huh.  So I would ask you to say yes
2 or no.
3 A Yes.
4 Q Or no shrugging of your
5 shoulders or nodding of your head or
6 anything of that nature.  Also, please
7 wait until I finish my question prior
8 to your answering my question so that
9 there's not two people talking at once
10 and we can keep the record clear, okay?
11 A Okay.
12 Q Okay.  You're currently employed
13 with the Crawford Central School
14 District is correct.
15 A That is correct.
16 Q And what building do you work
17 in?
18 A Meadville Senior High.
19 Q And how long have you been
20 working in the high school, Meadville
21 High School?
22 A That I don't recall.  I'm going
23 to say it was a couple years before the
24 addition, and that I don't remember
25 when the new addition was put on.

**Page 11**

1 Q Did you work for the District
2 prior to going to Meadville Senior High
3 School?
4 A Yes, I started with the District
5 in 1978.
6 Q And what do you teach?
7 A At the present time, I'm
8 teaching academic chemistry and
9 practical chemistry.
10 Q In 1978, what were you teaching?
11 A At that time I was teaching
12 academic chemistry and general science,
13 or it was called junior science.
14 Q And where was that?  Where did
15 you teach?
16 A That was also at the high
17 school.
18 Q So throughout the time frame
19 that you worked for the District, did
20 you always work at the high school
21 level?
22 A No.
23 Q And when did you not work at the
24 high school level?
25 A The following year, 1979, I

**Page 12**

1 worked at the junior high, in which I
2 taught ninth grade physical science for
3 a number of years until I made that
4 switch to the high school.
5 Q Which was a couple of years
6 before the addition, which you don't
7 know when that was?
8 A I don't recall.
9 Q Can you give me a decade?
10 A Oh, it can have been in the
11 '90s, late '90s.
12 Q And prior to being employed with
13 the Crawford Central School District,
14 did you work for any other school
15 district?
16 A No, I did not.  I came upon this
17 District directly from college.
18 Q Where did you go to college?
19 A Indiana University of PA.
20 Q When did you graduate?
21 A 1978.
22 Q And what was your major?
23 A Chemistry and education.
24 Q What's your certification in?
25 A Chemistry.

**Page 13**

1 Q Currently, what union positions
2 do you hold?
3 A I am the co-grievance
4 chairperson dealing with secondary.  I
5 am also the computer resource person.
6 Q Now, is that a union position,
7 or is that a supplemental position?
8 A Well, it's part of our budget,
9 I deal with the seniority of the
10 District.
11 Q What does that mean?
12 A We make sure that both the
13 District and the union agree on the
14 same starting date of all the employees
15 so that if there's any furlough in the
16 future that the correct individual is
17 furloughed.
18 Q And how long have you held that
19 position?
20 A That would be --- boy, that's a
21 long one, probably the middle '90s.
22 Q And when did you become
23 co-grievance chairperson?
24 A Let's see, I believe that would
25 have been probably either 2002 or 2003

Page 14

1 at the time. There was another
2 individual in front of me that was a
3 grievance chairperson, so I can't
4 remember when he ---
5 Q And who was that?
6 Allen Hile (phonetic).
7 Q Prior to being the co-grievance
8 chairperson, were you a building rep?
9 A Yes.
10 Q How long were you a building
11 rep?
12 A Boy, this is taking me back. I
13 do remember I've been a building rep
14 for for the high school probably five
15 years, and a building rep for the
16 junior high probably 10 or 12 years.
17 The exact time dates I couldn't tell
18 you.
19 Q So that the high school would
20 have been around 2001, 2000?
21 A I would say probably late '90s.
22 to the time at which I became a
23 co-grievance chairperson.
24 Q Okay. So at the time that
25 Claudette deLeon was terminated in

Page 15

1 April of 2003, what were you, or you
2 don't remember?
3 A That I don't remember. I
4 couldn't tell you.
5 Q Sitting at her meetings, though,
6 you would have probably been a building
7 representative; is that correct?
8 A Yes, that would have been
9 correct.
10 Q Have you held any other union
11 positions?
12 A Yes. I was the vice president
13 and president.
14 Q When were you vice president?
15 A I'm going to say early '80s.
16 Q And when were you president?
17 A It would be the following year.
18 Q So sometime in the early '80s?
19 A Yes.
20 Q Any other positions or any other
21 times?
22 A No.
23 Q Now, coming here today, as I
24 indicated, you provided me with some
25 records. Before the deposition today,

Page 16

1 did you look at the PSEA file on
2 Claudette deLeon?
3 A I looked at my notes, which are
4 there next to you.
5 Q Now, when you're saying your
6 notes, this is what you brought with
7 you today?
8 A Yes.
9 Q Is that correct? Where did you
10 have these notes?
11 A Those notes were in a blue
12 binder, which was with Kristen Hope,
13 who was the co-grievance chairperson
14 elementary, which was in a box that was
15 given back to her by Jeff Lewis.
16 Q And who's Jeff Lewis?
17 A He is our field representative
18 for PSEA.
19 Q And how did you find them?
20 A When I was looking for my notes,
21 I could not find them where they
22 normally should have been. So I
23 thought they were in one file cabinet,
24 which was at school, which was locked,
25 which the key was lost. And I asked

Page 17

1 the principal if he could send down a
2 janitor to open up the file cabinet,
3 which he did, which it was not in
4 there. Then at that time, I was
5 probably in a panic because I did not
6 know where they were located at.
7 So I did give a call to PSEA to
8 see if they had it, and in talking with
9 their secretary, they were indicating
10 they didn't have it. And I contacted
11 Kristin Hope, who's the co-chairperson,
12 and she looked through some other
13 materials that were given back to her,
14 and it was in a box, and then I found
15 my notebook. And I just got it back
16 probably last Thursday.
17 Q And with regard to when you were
18 a building representative, would you
19 keep similar notes on every individual
20 that you attended meetings for?
21 A Yes.
22 Q And these were never given to
23 PSEA; is that correct?
24 A Those were given, but they were
25 returned to us. And the date at which

## Page 18

1 they were returned, I do not know.
2 Q.But that would have been
3 sometime around the arbitrations
4 concerning her termination? I know you
5 testified ---
6 A.I'm saying ---.
7 Q.--- at the arbitrations?
8 A.Yes. I'm thinking probably at
9 that time, some later date on which
10 they were given to Kristen Hope.
11 Q.Okay. Let me ask you before I
12 mark this as an exhibit. Are these
13 your notes, these two pages? It
14 doesn't necessarily look like your
15 writing, but I can't really tell.
16 A.No. They're not my handwriting.
17 No.
18 Q.Do you have any idea whose
19 writing they are? And I will just tell
20 you, I got them from the PSEA file
21 along with notes that I'll show you in
22 a little bit that are Joann Williams's
23 notes.
24 A.Yes. The only person that I may
25 think that this may be, and I'm not

## Page 19

1 absolutely sure because he did sit in
2 on some of the meetings, is Doug Melok
3 (phonetic).
4 Q.Okay.
5 ATTORNEY HEATH:
6 Just because I don't want
7 to lose these, I am going to
8 identify them as Exhibit One,
9 and just with the notation that
10 these are probably Mr. Melok's
11 notes, but I'll attach them to
12 your deposition, just so I don't
13 lose them.
14 (Rozmowski Exhibit Number
15 One marked for
16 identification.)
17 A.Sure. If I may have some water?
18 ATTORNEY HEATH:
19 Sure.
20 BY ATTORNEY HEATH:
21 Q.The notes that you gave me
22 today, and as I said, I admit that I
23 have not looked at them in any great
24 detail, but it looks like they start
25 --- well, it does say last day of

## Page 20

1 school at the top of one page, but then
2 it says April 14th of 2001. And it
3 might be because it's a continuation
4 from the second to last page, which is
5 June 7th, 2002, so it probably is
6 there. But the way that the notes were
7 presented to me was the last pages of
8 these notes would be the first in time?
9 A.Uh-huh (yes).
10 Q.And then the first page is the
11 last in time, which is April 10th of
12 2003. My question to you is as a
13 building representative prior to April
14 14th of 2001, were you ever involved in
15 any meetings concerning Claudette
16 deLeon?
17 A.No.
18 Q.Was the first involvement you
19 had with the start of these notes?
20 A.Yes.
21 Q.And these notes were not purged
22 in any way, thrown out, prior years, or
23 anything of that nature?
24 A.No.
25 Q.And how was it that you became

## Page 21

1 involved with Claudette deLeon, do you
2 remember?
3 A.I would think at that time, at
4 the earliest time, I was probably a
5 floating rep, and if I remember, Dan
6 at the meeting and Pat was at the
7 meeting. That was a time in which Pat
8 was --- she gave up being president of
9 the Association. I think Dan was
10 becoming president. I'm not sure. I
11 could be off by a year. And I moved
12 from the junior high to the senior
13 high, so they probably got my
14 involvement at the time.
15 Q.And you think that was somewhere
16 around that late '90s, that you thought
17 that that was when you moved up;
18 correct?
19 A.Uh-huh (yes).
20 Q.Now, prior to coming here today,
21 did you review these notes that you
22 provided to me?
23 A.Yes. I did look over them.
24 Q.And did that help refresh your
25 recollection as to some of the issues

Multi-Page™

**Page 22**

```
 1  I that were discussed with Ms. deLeon?
 2  A  I think. I don't know for sure.
 3  Q  Meaning?
 4  A  I reviewed. I do recall some of
 5  the incidents as I look through the
 6  notes of what occurred. Without the
 7  notes, I do not think I could recall
 8  any date, if something particular
 9  occurred.
10  Q  But in reviewing them, did it
11  give you a general idea of some of the
12  issues that were discussed on an
13  ongoing basis?
14  A  I think so.
15  Q  Such as student discipline?
16  A  Yes.
17  Q  Such as issues with student
18  confidentiality?
19  A  Yes.
20  Q  Issues with missing
21  assignments ---
22  A  Yes.
23  Q  --- or lost assignments?
24  issues with classroom management?
25  A  Yes.
```

**Page 23**

```
 1  Q  Were you aware that Ms. deLeon
 2  was subject to a corrective action plan
 3  for the 2002 --- actually 2001/2002
 4  school year? Were you aware of that?
 5  A  Yes.
 6  Q  And were you aware that then
 7  there was another corrective action
 8  plan that was implemented with the
 9  2002/2003 school year?
10  A  Yes.
11  Q  That plan then was subsequently
12  revised, were you aware of that?
13  A  Yes.
14  Q  Did you ever see any of the
15  action plans, review them, while you
16  were acting in the capacity of a
17  building representative?
18  A  I believe in my folder I may
19  have a copy of that action plan. I
20  can't say for sure, but I think I may
21  have a copy. If not, then probably the
22  grievance chairperson's file would
23  probably have it there.
24  Q  Okay. Prior to today, have you
25  ever spoken with Ms. deLeon's attorney,
```

**Page 24**

```
 1  Mr. Nichols?
 2  A  No.
 3  Q  Did you ever speak with a Robert
 4  Flipping or anyone else from the
 5  Pennsylvania Human Relations Commission
 6  concerning Ms. deLeon's case?
 7  A  No.
 8  Q  And this might be hard to do
 9  without making a copy, and I'm going to
10  try not to do it --- to take the time
11  to do it now, but let me just ask you
12  to take a look at the first page.
13  ATTORNEY HEATH:
14  And I'm going to mark
15  this entire exhibit collectively
16  as Roznowski Two.
17  (Rozowski Exhibit Number
18  Two marked for
19  identification.)
20  BY ATTORNEY HEATH:
21  Q  Looking at the first page, which
22  is actually the last page of the
23  exhibit or the packet of notes I was
24  handed, which is the April 14th, 2001
25  notation, in reviewing those materials,
```

**Page 25**

```
 1  Q  Do you recall how it was that you
 2  became involved with Ms. deLeon at the
 3  time, what the circumstances were that
 4  prompted this meeting?
 5  A  You're saying April 14th. This
 6  is August.
 7  Q  Is that August?
 8  A  Yes, that's August.
 9  Q  Okay.
10  A  Okay, if you can repeat your
11  question. I was looking at the date.
12  Q  There's a notation which looks
13  like the first meeting that you went
14  to, ---
15  A  Yes.
16  Q  --- which is August 14th of
17  2001. Do you recall what the
18  circumstances were that prompted that
19  meeting?
20  A  From looking at my notes, part
21  of it was on her room or not having a
22  room. They were looking to --- she was
23  in the trailer when we had trailers in
24  front of the school while we were
25  remodeling or starting to remodel. And
```

Page 26

```
1  they were looking to somehow revise the
2  schedule so that she can be more
3  stationary on a particular floor, which
4  was the second floor, rather than
5  travel up and down. And they were able
6  to make some changes.
7        Q So the administration then
8  basically was understanding her
9  complaints and tried to make some
10 changes concerning them?
11       A At this time, yes.
12       Q If you can give me that back,
13 please?
14       A Sure.
15       Q Thank you.
16       ATTORNEY NICHOLS:
17            Excuse me. What is the
18       number of that exhibit?
19       ATTORNEY HEATH:
20            It's going to be
21       Roznowski Two collectively. But
22       I'm going to keep it in the same
23       order that it was handed to me,
24       which is again, that the last
25       page is first in time.
```

Page 27

```
1  ATTORNEY NICHOLS:
2       Okay. And that's the
3  August 14th meeting you're
4  referencing of 2001. August
5  14th, 2001.
6  BY ATTORNEY HEATH:
7       Q Now, the next notation on the
8  next page is June 7th of 2002, so it's
9  almost an entire year later. So you
10 were not --- from these notes, is it
11 correct to assume that you were not
12 involved in any meetings concerning
13 Claudette deLeon from the 2001-2002
14 school year until the end of the year?
15      A Correct.
16      Q Okay. Do you know if any
17 meetings did occur with her and the
18 administration during that school year?
19      A Offhand, I do not know. I was
20 not involved, so I could not say.
21      Q This second to the last page
22 here, there's --- and I'm looking at
23 this part of the page which is the top
24 portion. It says review of --- does
25 that say past action plan?
```

Page 28

```
1       A Yes.
2       Q Do you have any independent
3  recollection of what occurred at that
4  meeting on June 7th of 2002, concerning
5  reviewing of the action plan?
6       A Again, this meeting on June 7th,
7  we went over the action --- or review
8  of the past action plan. Claudette
9  indicated that she needed more support
10 from the administration, felt the
11 action plan was effective, and she was
12 going to get her own room at the time.
13 She was traveling, and then she was
14 going to get another language teacher's
15 room when she retires. And they
16 indicated that to her. And they were
17 also indicating the action plan follows
18 the Appendix A.
19      Q What is Appendix A?
20      A Appendix A is our evaluation of
21 teachers at the end of the school year,
22 which has now changed. We have a
23 different end-of-year evaluation.
24      Q But at the time when you were
25 saying they followed Appendix A, they
```

Page 29

```
1  followed School District policy; is
2  that what you're saying? Or with all
3  the instruments that was used by the
4  District in the evaluations?
5       A It's the instrument used by the
6  District which was agreed upon between
7  the District and the Association.
8       Q Do you want to hand me that back
9  again?
10      A Sure.
11      Q In looking at another part of
12 your notes ---
13      ATTORNEY HEATH:
14           Can I just go off the
15      record for a second?
16      OFF RECORD DISCUSSION
17      ATTORNEY HEATH:
18           Okay. Back on the
19      record.
20 BY ATTORNEY HEATH:
21      Q There's an indication here about
22 a meeting. It says 11/13/02,
23 Wednesday, 7:00 p.m., Nosker's house?
24      A Nosker's (corrects
25 pronunciation).
```

Page 26 - Page 29

**Page 33**

1  A. Yes, that would be other
2  individuals, yes.
3  Q. Okay. Now, I want to draw your
4  attention for the moment to the spring
5  of 2003. In reviewing your notes, it
6  looks like you attended quite a few
7  meetings concerning Claudette during
8  that time frame. And some of these, I
9  don't know if they are dated or if
10  they're just simply --- I assume some
11  are voluminous notes. Let me just give
12  you some of these pages here.
13  A. Okay.
14  Q. And actually, let me start with
15  January 3rd of 2003. It looks like
16  there was a meeting on January 3rd,
17  2003, concerning students issues and
18  lesson plans, and an observation that
19  occurred on December 19th, 2002. Then,
20  and I more or less want to get a
21  chronology of the meetings that
22  occurred in that term.
23  The meeting on 1/10/03, in which
24  you were involved concerning Claudette
25  relative to an observation that

**Page 31**

1  administrator. I can only assume that
2  it was probably John Higgins since he
3  was most of the time the administrator
4  that we were dealing with. And this
5  was talking about a grade not being in
6  for the six weeks and a possible
7  conference, parent/teacher conference
8  would be the mother, perhaps.
9  Q. Do you recall at any time having
10  a discussion with the administration
11  about Ms. deLeon speaking to Robin
12  Stockten about her son while in class
13  in front of other students concerning
14  his performance and his grade not being
15  in and sleeping in class? Do you
16  recall anything along those lines?
17  A. I remember they were talking
18  about it at a meeting. Whether it was
19  at this meeting, I don't recall if it
20  was this meeting. But I do remember
21  administration talking to Claudette
22  about that, yes.
23  Q. And what did Claudette have to
24  say about that issue?
25  A. I remember she indicated that

**Page 32**

1  she did it privately or out in the
2  hallway, I'm not sure.
3  Q. And if, in fact, it were the
4  case that this phone call did occur in
5  the classroom in front of other
6  students, was it your understanding
7  that would be a violation of school
8  policy due to student confidentiality,
9  if it were, in fact ---
10  A. If it were ---
11  Q. --- in front of other students?
12  A. --- in front of other students,
13  yes.
14  Q. All right. What is your
15  understanding of the School District's
16  policy concerning student
17  confidentiality?
18  A. That information concerning a
19  student is not to be expressed
20  verbally, written, to other individuals
21  if they're not one of their teachers.
22  Q. Of a parent?
23  A. Or a parent.
24  Q. And certainly not to other
25  students, correct?

**Page 30**

1  Q. What does that mean?
2  A. That probably was something I
3  should have done off that was done with
4  negotiations.
5  Q. Okay. And then the next day
6  there's 11/14/02, and there's
7  information here that talked to mom
8  about student. Claudette told mom to
9  set up appointment, and then Claudette
10  telling the mom kid was sleeping. Do
11  you recall if this is about the
12  Stockten boy?
13  A. I can't remember. Usually I
14  would put a couple letters off on the
15  side as an initial.
16  Q. Do you mention here Robin
17  Stockten here as the mother?
18  A. I'm sorry. That would be ---
19  we're referring to that.
20  Q. What do you recall about that
21  incident?
22  A. Not too much. Just that we had
23  a conference at the time, and in that
24  meeting with Claudette, and apparently
25  I did not write down the other

**Page 34**

1 occurred, and then two pages of notes
2 concerning a February 25th, 2003
3 meeting. And this was to discuss
4 student discipline issues again, and
5 really basically just student
6 discipline issues.
7 Just independently and after
8 your reviewing these notes, do you
9 recall that in or about January of 2003
10 and February of 2003, there were
11 several meetings concerning student
12 discipline issues in Ms. deLeon's
13 class?
14 A.Yes.
15 Q.Do you have any independent
16 recollection of some of those issues
17 and what was discussed at these early
18 meetings that I mentioned?
19 A.I don't recall. I'd have to
20 look at the notes to see.
21 Q.Here you go.
22 A.Thank you. On my notes from
23 February 25th, 2003, looking at it, we
24 have a student that supposedly called
25 Claudette a whore, and also did swear

**Page 35**

1 at her, as I have in my notes.
2 Q.Do you recall if that time, that
3 pursuant to an investigation conducted
4 by Mr. Deshner, that --- or I'm not
5 sure if it was only Mr. Deshner, but
6 the administration, that the student
7 that was supposed to have observed the
8 other student calling Ms. deLeon a
9 whore denied that that ever happened?
10 A.Yes.
11 Q.And do you know anything else
12 about that?
13 A.I'm not sure if I have notes on
14 it, but I do remember where the student
15 that supposedly heard the
16 information ---
17 Q.Those initials will be P.B., if
18 that refreshes your recollection at
19 all.
20 A.I think so. We sat in Mr.
21 Higgins' office. Claudette was there,
22 myself, John Higgins and the student.
23 And the question was asked if he did
24 hear it, and he said he did not.
25 Q.If you want to give them back to

**Page 36**

1 me again. Looking at them, there's a
2 March 3rd, 2003 meeting where John
3 Higgins was present, George Deshner,
4 Charles Heller, Dan H., which would be
5 Dan Hootman; is that correct?
6 A.That is correct.
7 Q.Claudette, and it looks like
8 yourself. And the issues that are
9 being discussed here are certain
10 questions relative to missing work of a
11 certain student, Evan, and also issues
12 as to whether or not Ms. deLeon was
13 discussing confidential student
14 information with people that had no
15 right to know anything, and would be in
16 violation of School District policy
17 concerning student confidentiality.
18 And it was brought up about her
19 sharing student discipline issues with
20 people outside of the District.
21 There's two pages of those notes. Can
22 I ask you to take a look at that?
23 WITNESS COMPLIES.
24 BY ATTORNEY HEATH:
25 Q.And those are dated March 3rd.

**Page 37**

1 2003; is that right?
2 A.Yes.
3 Q.Now, it looks like on different
4 paper there's another note that's dated
5 March 3rd of 2003. Is this --- can you
6 explain that? I don't know if it's
7 just a ---
8 A.I believe I ran out of paper.
9 And not putting a time on this, my only
10 guess would be I either ran out of
11 paper or it was a second meeting. But
12 I'm not sure.
13 Q.But looking at that, you can't
14 tell if there are two meetings in one
15 day or --- ?
16 A.It is possible to have two
17 meetings in one day, because at the
18 time I was building coordinator in
19 science, and part of that was that I
20 had a second plan time for science
21 coordination. So it is possible that
22 we met during my plan time, and then
23 also met during my science coordination
24 period.
25 Q.And looking at those notes, as I

## Page 38

1 I said, and I did it quickly, correct me
2 if I'm wrong, ---
3 A Okay.
4 Q --- but it seems that the same
5 issues are being discussed, which is
6 whether or not Ms. deLeon, in fact,
7 copied people or discussed student
8 discipline issues and student issues
9 with people outside the District?
10 A Yes.
11 Q Other than her lawyer, such as
12 the PHRC investigator, and other
13 individuals. Do you recall that being
14 discussed?
15 A It was being discussed. George
16 was asking the question if this
17 information was said to her lawyer, to
18 PSEA lawyer. And she indicated only
19 being the files that she had for herself were
20 being sent to her lawyer.
21 Q Do you recall whether or not at
22 these meetings any information, such as
23 correspondence or student discipline
24 logs or other information, was given to
25 you or to Claudette to look at that

## Page 39

1 Q I said cc, Robert Flipping, PIRC? Did
2 you ever see anything where Mr.
3 Flipping was copied on it?
4 A I don't have with me, but I do
5 remember seeing that at the bottom it
6 was carbon copied to somebody that I
7 did not know. I think it was her
8 lawyer, but I do remember seeing it.
9 But I don't know that for a fact.
10 Q But it could have been a PH ---
11 if it said Flipping, then it could have
12 been --- did you definitely see that?
13 A I remember seeing other names
14 besides administration.
15 Q School District personnel?
16 A Yes.
17 Q Okay. Do you want to give that
18 back to me then?
19 A Sure.
20 Q Thank you. That meeting was in
21 March 3rd of 2003, and it looks as if
22 there was another meeting, March 4th,
23 2003, and this was concerning issues of
24 student grades. That was the next day,
25 in reviewing these documents, is it

## Page 40

1 making your memory any clearer that
2 there was quite a few meetings in the
3 spring of 2003?
4 A Yes, there were a number of
5 meetings that we had in the spring
6 during March, as I can see. This one
7 being two in the same day. It would be
8 at 7:30 in the morning and then later
9 in the day, 1:40.
10 Q Now, there's notations here that
11 then there's a meeting 3/19 of '03.
12 And I don't know, some of these don't
13 necessarily seem to be dated. And then
14 there's a meeting 3/24 of '03. Then
15 there's little notes, and I don't think
16 these are dated either.
17 A Yes, sometimes I was called,
18 asked to come down, and therefore
19 whatever I had in hand.
20 Q There's 3/28/03, April 4th of
21 '03 and then April 10th of '03. That's
22 what I have for the remainder of the
23 meetings for that time frame. If you
24 can hand me that now.
25 A Sure.

## Page 41

1 Q What I'm going to do now is show
2 you a document we'll mark as Kozorowski
3 Three, which are the notes of Joann
4 Willison.
5 (Kozrowski Exhibit Number
6 Three marked for
7 identification.)
8 BY ATTORNEY HEATH:
9 Q She has already testified about
10 them, and it looks to me as if you were
11 present for the 3/19 meeting. And if
12 you look to where that is, that's the
13 third and fourth page of this exhibit.
14 It also appears that you were present
15 at the April 10th meeting, which
16 follows that March 19th, '03 meeting,
17 And I don't think her notes have you
18 were present at any of the other
19 meetings together, although --- I take
20 that back. It could be that you were
21 at the 3/24/03 meeting as well. You're
22 just not noted on there.
23 A Looking at this, maybe it's
24 stapled out of ---
25 Q Again, the order is how it was

**Page 42**

1 given to me. And it actually looks
2 from --- looking at your notes, that
3 you were, in fact, present at the March
4 24th, 2003 meeting. And that would be
5 --- just say how many pages in it is on
6 the exhibit.
7 A I have it.
8 Q You have it?
9 A I'm at that meeting.
10 Q Okay. And at this meeting, it
11 looks as though the action plan is
12 being discussed or the classroom
13 management is being discussed, and
14 certain reading assignments are being
15 provided. Do you have any independent
16 recollection of that meeting?
17 A I do remember Mr. Higgins going
18 over the action plan of what she needs
19 to follow through on reading of
20 indicated chapters and pages. I have
21 that in my notes. As I look at it, I
22 don't know the exact pages there, but I
23 do remember, him illustrating certain
24 pages that he wanted Claudette to read.
25 And how did that meeting go, if

**Page 43**

1 you recall?
2 A That ---
  ||
3 Q Was it confrontational, was it
4 fine, was it positive? How'd it go?
5 A I could not remember.
6 Q Okay. Looking at Joan's notes,
7 the next meeting, where I believe you
8 were in attendance, ---?
9 A The 19th.
10 Q Yeah. Actually, that's a
11 previous meeting, 3/19/03. At that
12 time the action plan was discussed.
13 You're noted at the top as being
14 present at that meeting?
15 A Yes.
16 Q And I think in looking at your
17 notes, these were the ones I don't.
18 think are necessarily dated, but I
19 think it pretty much follows what Ms.
20 Willison's notes say. And I'm just
21 going to show you several pages and see
22 if you can determine --- well, let's
23 see here, if you can determine what
24 notes go with what dates and what
25 meetings ---

**Page 44**

1 Okay.
2 A --- compared with Ms. Willison's
3 notes? I'm going to show you several
4 pages here. And remember, first in
5 time's closer to the bottom. It looks
6 like these are the 3/19 and 3/24 notes
7 that you took, those series of pages I
8 just gave you; is that correct, do you
9 believe? Are they 3/24 and 3/19?
10 A Yes, they would be two, looking
11 at this last page, which would probably
12 be 3/19, because it indicates at the
13 end that our next meeting is on the
14 24th. In looking at the information
15 here, I'm not sure what date these two
16 pages are. It may be an earlier date.
17 It may be part of 19, so I place two
18 pages of the 24th, two pages for the
19 19th, and --- pus
20 Q Two pages you don't know?
21 A I'm not sure of, because I do
22 have at the top all those in
23 attendance, but I didn't write a date
24 on it. So it may be part of that and
25 it may not.

**Page 45**

1 Q Thank you.
2 A Uh-huh (yes).
3 Q The next page that I have from
4 what you produced today, there are
5 three small notebook papers saying from
6 the desk of Carl Koznowski. And
7 there's no date on there. And
8 similarly, it looks --- when you're,
9 talking about Mike, are you meaning
10 Mike Dolecki typically, or are you
11 meaning Mike someone else? Do you want
12 to take a look at it?
13 A Yes, this was with --- it is
14 Mike Dolecki, and this is the meeting
15 in which Claudette, myself, Mike
16 Dolecki and John Higgins had in Mike's
17 office. He did an observation, and I'm
18 not sure, probably Mike has it on his
19 calendar what day it was, but I don't,
20 remember.
21 Q Just for your own information,
22 it was produced in between the 3/24/03
23 notes and the 3/28/03 notes, and I'm
24 going to show you. You already looked
25 at the 3/24/03 notes. Let me show you

Multi-Page™

**Page 46**

1 the one page of the 3/28/03 notes. Do
2 you believe it was a separate meeting?
3 A Oh, yes. This meeting, we did
4 come up to Mike's office. It was a
5 separate meeting, yes.
6 Q And then the 3/28/03 meeting
7 that you have in your hand, what was
8 discussed at that meeting?
9 A We were going through the
10 guidelines for punishment effectively.
11 Q Punishment of whom?
12 A This would have been, I would
13 assume, students. It's guideline five
14 and guideline one. My own assumption
15 would be it's from the textbooks she
16 was instructed to read.
17 Q If you can hand me that back,
18 please? The next meeting that I have,
19 and it looks like, again, that Joann
20 Willison was not present at that
21 meeting. It just says John, George,
22 seventh period, April 4th, 2003. On
23 the first page, it's a two-page
24 document, it says on time, be in your
25 seat, respectful, no derogatory

**Page 47**

1 remarks, ask only questions relevant to
2 the class. Do you recall what that
3 references?
4 A That she is referring, if I recall,
5 is what she is to express to the
6 students, for the students to be on
7 time and ask questions which are
8 relevant to the class, and not to
9 something else.
10 Q Okay. What else was discussed
11 at that meeting?
12 A Claudette gave her discipline
13 log, and George Deshner did an
14 observation, and he did not have a
15 chance to write it up, which was two
16 days prior, and indicated he will do
17 that very shortly. He also indicated
18 that for another reason, he checked
19 Chris Fisher, I believe it was, his
20 locker and found five notebooks for
21 Spanish and five Spanish textbooks.
22 Q Who's Chris Fisher?
23 A A student, that's all I know.
24 Q And they were just --- ?
25 A I have no idea.

**Page 48**

1 Q You don't remember whose
2 notebooks, why they'd be in there?
3 A No.
4 Q And was this during the
5 discussion of missing work assignments
6 of other students that was an issue
7 with Ms. deLeon?
8 A This was brought out by Mr.
9 Deshner, and he just brought it out at
10 the time that he found this, and he was
11 informing all of us at the meeting.
12 Q Do you recall if Ms. deLeon had
13 any response to this?
14 A No.
15 Q No, you don't recall?
16 A I don't recall, no. And the
17 other things which we've mentioned,
18 another student about turning his work
19 in slowly, Mr. Deshner gave his
20 opinion about additional notebooks.
21 Then we got into classroom management.
22 Q And do you have any recollection
23 of anything that was specifically
24 discussed concerning classroom
25 management issues?

**Page 49**

1 A No, I don't.
2 Q Don't remember. I'm going to
3 ask you to take a look at Joann
4 Willison's notes for April 10th of
5 2003, which notes that you were
6 present. And prior to discussing this
7 specifically, do you have any
8 recollection of any meetings with the
9 administration where Claudette was
10 looking down at the ground, and the
11 administration asked her to be more
12 engaged in the conversation?
13 A I do recall that. At what
14 particular meeting, I could not tell
15 you.
16 Q What do you recall?
17 A They did ask her to look at her
18 while we're having a conversation?
19 Q Look at them, you mean?
20 A Look at or look at least in
21 their direction.
22 Q In looking at the bottom of the
23 first page of Joann Willison's notes on
24 the April 10th, 2003 meeting, it says
25 at the beginning, C-1, which is

**Page 50**

1 Claudette, was handed a sealed envelope
2 which contained her most recent
3 classroom observation. She let it lay
4 without opening it until told. Once
5 opened, she refused to read it after
6 Q And who prompted her to open the
7 recall that occurring?
8 A Yes.
9 Q And who prompted her to open the
10 envelope?
11 A I'm not sure if it was myself or
12 Joann, to have her open it up at the
13 time because administration was hoping
14 that she would open it up. So I'm not
15 sure if it was both of us at the same
16 time to have her open the letter up.
17 Q And do you have any recollection
18 of how that meeting ended up going that
19 day? I'll let you take a look at your
20 notes from that day.
21 A All right.
22 Q Which is about a half a page.
23 A Yeah. There's some --- respond
24 to my notes here. Usually I am the
25 individual who is making sure for the

**Page 51**

1 Association that the meeting is moving
2 forward and questions are being prompt
3 correctly. When I say prompt is to
4 make sure everything was flowing and
5 making sure procedure is being
6 followed. And probably my notes were
7 probably not as extensive as Joann, who
8 has been designated as more of the note
9 taker.
10 Q When did that designation occur? She
11 A We kind of fell into it. She
12 being --- I'd probably say she's
13 probably a better note taker for
14 writing quickly. And I was doing more
15 responding to whatever was in the
16 meeting.
17 Q Whose decision was it to have
18 two building representatives present
19 for some of these meetings, especially
20 in the spring of 2003?
21 A I think probably at the time Pat
22 Deardorff was our president, and she
23 resigned or I should say did not seek
24 election. And she felt it would be
25 better to have another female in the

**Page 52**

1 meetings rather than just have all
2 males. So Joann was asked to become
3 part of the process.
4 Q And could if have been someone
5 other than Pat Deardorff that suggested
6 that?
7 A It could be, could be, because
8 if it was ---
9 Q I don't believe that at that
10 time she was ---
11 A She wasn't president.
12 Q --- president.
13 A She was --- when you leave
14 in our constitution that
15 the past president becomes the second
16 vice president, so she still had a
17 position.
18 Q Okay. Now, looking at Joann's
19 notes, second page of that date of
20 April 10th of 2003, here it says C-L.
21 got belligerent. Was told by building
22 reps to calm down and not threaten
23 administration. She didn't listen. Do
24 you recall anything about that?
25 A I'm trying to --- oh, okay.

**Page 53**

1 Here I am. I see that in Joann's
2 notes. From what I do remember is that
3 both parties were becoming, I'll say,
4 heated. And at that time, if I
5 remember correctly, Claudette did stand
6 up and --- I'm trying to remember
7 because this is back two and a half
8 years ago. I did grab hold of her, I
9 think, by the arms. I think Joann had
10 her by the hand, arm, wrist. And at
11 that point in time, we dismissed
12 ourselves from the meeting. I thought
13 the meeting was over at the time.
14 Q Why did you grab her by the arm?
15 A She was moving from her seat to
16 Mr. Deshner, in which they were in a
17 heated discussion.
18 Q We see towards the bottom of
19 that page, it says building reps
20 couldn't stop her, administration
21 couldn't stop her. Building reps
22 finally took her out as one squeezed
23 her wrist, the other was telling her to
24 stop. Do you recall that?
25 A I recall, yes.

Multi-Page™

**Page 54**

```
1  Q That she had to be escorted out
2  of the room; is that right?
3  A Yes.
4  Q Then it says on the next page,
5  third page there, tried to calm her,
6  couldn't.  She wanted to go home.  Were
7  you also trying to calm her down?
8  A Yes.  We went to the closet
9  room out of Mr. Deshner's, and I'm not
10  sure if it was anybody's room then.  It
11  could have been a principal's room, I'm
12  not sure.
13  Q Mr. Morgan?
14  A It could have been his office.
15  And we went in there to calm her down
16  Claudette.  And I'm not sure who came
17  in at the time, and we did ask
18  permission to allow her to go home.
19  Q When you were trying to calm her
20  down, what was she doing?  What was she
21  doing?
22  A I could see her nerves, she was
23  upset.
24  Q Had she been yelling?  Was she
25  crying?
```

**Page 55**

```
1  A That I can't say for sure.  I
2  think so.  I did not mark it down in my
3  notes if she was.  But knowing the
4  situation, I would almost say yes, but
5  I can't swear by it.
6  Q Looking at your notes and Ms.
7  Willison's notes for February --- I'm
8  sorry, April 11th, 2003, which is the
9  next day.
10  A Uh-huh (yes).
11  Q And looking at the second page
12  of Ms. Willison's notes, there is an
13  indication to --- and that's the first
14  page of the exhibit, first and second
15  pages of the exhibit.
16  A Okay.
17  Q That she was given an overall
18  unsatisfactory rating, and that she was
19  suspended as of that time without pay,
20  and there was going to be a
21  recommendation to the Board for her
22  termination, do you recall that?
23  A Yes.
24  Q Now, prior to that time, had
25  there been a five-day suspension
```

**Page 56**

```
1  without pay, do you recall?
2  A I recall that, yes.  I can't
3  remember when, but I do remember.
4  ATTORNEY HEATH:
5  We'll mark this --- I'll
6  let you see that first.
7  ATTORNEY NICHOLS:
8  Okay.
9  ATTORNEY HEATH:
10  Let me just do some
11  housekeeping here.  The Joann
12  Willison's notes, the extra copy
13  will be Rozmowski Three; is that
14  right, or is it Two?  It will be
15  all the notes.  Would it be the
16  last page of your notes?
17  A Oh, yes.
18  ATTORNEY HEATH:
19  Well, keep it.  Actually,
20  keep it for a second.
21  A Okay.
22  ATTORNEY HEATH:
23  So the Joann Willison's
24  notes are Three, and this is
25  going to be Four; correct?
```

**Page 57**

```
1  ATTORNEY NICHOLS:
2  Uh-huh (yes).
3  ATTORNEY HEATH:
4  Do you want to mark that
5  as Four, and then give it to the
6  witness?
7  (Rozmowski Exhibit Number
8  Four marked for
9  identification.)
10  BY ATTORNEY HEATH:
11  Q I'm looking at Exhibit Four,
12  which is the March 18th, 2003 letter,
13  which was the five-day suspension
14  without pay signed by Mr. Dolecki, are
15  you copied on this letter?
16  A I have a copy, yes.
17  Q Are you copied on the letter?
18  Are you cc'd on the letter?
19  A Yes.
20  Q Did you receive a copy of this
21  letter?  Did you actually receive it at
22  the time?
23  A Without checking my binder, I
24  can't say for sure.
25  Q There doesn't seem to be any
```

Page 54 - Page 57

**Page 58**

1 specific notations about ever having a
2 discussion with Ms. deLeon about this
3 letter specifically. Do you recall
4 having any discussion with her?
5 A. You mean discussion on this?
6 Q. About this five-day suspension.
7 A. I don't recall offhand.
8 Q. With regard to the notes that
9 you produced today, was it your
10 practice simply to keep notes of the
11 meetings that you had themselves, as
12 opposed to with the administration?
13 A. Just with --- well,
14 administration, yes.
15 Q. Did you ever have meetings just
16 simply with union members ---
17 A. Yes.
18 Q. --- about administrative issues
19 and problems and that kind of thing?
20 A. We had meetings in which ---
21 with the individual.
22 Q. Now, did you keep notes about
23 those meetings?
24 A. I may have some of those notes.
25 Usually ---.

**Page 59**

1 Q. Would they have been kept in a
2 separate binder?
3 A. Sometimes they're continuous in
4 my notes.
5 Q. Could you just take a look for
6 me to see if you have any other notes
7 about meetings you may have had with
8 Ms. deLeon individually as opposed to
9 with the administration? Would you
10 look for those?
11 A. I can.
12 Q. And you can just present them to
13 your Counsel, and he can make the
14 determination if there's any privilege
15 issues.
16 A. Okay.
17 Q. Okay. Looking at your notes for
18 the April 11th meeting, I'm looking ---
19 actually, I'm looking at Ms. Willson's
20 notes. Do you recall there being a
21 discussion also about receiving calls
22 from her doctor, her being Claudette's,
23 doctor, and from a pharmacy?
24 A. Yes.
25 Q. What do you recall specifically

**Page 60**

1 about that being brought up?
2 A. They were asking at the
3 beginning of the meeting on April 11th
4 from what I'm looking at in my notes,
5 asking if she ever made a phone call to
6 --- outside during class, and they also
7 asked about whether or not she ever
8 received a phone call from outside from
9 a pharmacy.
10 Q. And do you recall whether or not
11 she admitted that she took calls from
12 her doctor and pharmacy during class?
13 A. That I do not know. I did not
14 mark that down. I just have the
15 questions there. Joann was there. If
16 she indicated would be the only way
17 that I would know.
18 Q. And if you look at her notes on
19 the front page, it does indicate that
20 it was admitted, the bottom of the
21 first page. After the April 11th, 2003
22 meeting, did you have any other
23 meetings with Ms. deLeon, either in
24 person or by phone or by e-mail,
25 letter?

**Page 61**

1 A. This was the time that she
2 was ---?
3 Q. Suspended without pay and then
4 eventually there was a recommendation
5 for termination.
6 A. There was --- it was supposed to
7 be set up in which Joann was to be with
8 her at a later date for her to collect
9 her personal effects. Joann was unable
10 to make it, and therefore I said I
11 would do it. And I can't remember the
12 date. I didn't log it in because it
13 was after school, and that was the last
14 time I had a meeting with Claudette.
15 That was to pick up her personal
16 effects.
17 Q. Do you recall anything about
18 what was discussed at that time?
19 A. No, we didn't have much of a
20 conversation. She was just collecting
21 her personal effects. That was it.
22 Q. Did you have any discussions
23 with her prior to the arbitration that
24 occurred in 2004, or the arbitrations I
25 should say, wherein you testified? Did

**Page 62**

1 you have any conversations with Ms.
2 deLeon prior to those arbitrations or
3 any contact with her?
4 A No that I remember, no.
5 Q Can you give me back that last
6 page of notes?
7 A This one?
8 Q Your notes.
9 A OK.
10 ATTORNEY HEATH:
11 I'm going to give this to
12 you now, so you can mark it.
13 BY ATTORNEY HEATH:
14 Q During the April 10th meeting,
15 which was the one that got fairly
16 heated where Ms. deLeon had to be
17 escorted out by you and Ms. Willison,
18 do you remember her calling Mr. Deshner
19 a liar?
20 A I don't recall that. I didn't
21 mark it down, so I can't say yes or no
22 to that.
23 ATTORNEY HEATH:
24 Can you excuse me a
25 second? I have nothing further.

**Page 63**

1 Thank you.
2 EXAMINATION
3 BY ATTORNEY NICHOLS:
4 Q Mr. Roznowski, I'm Caleb
5 Nichols. I represent Ms. deLeon. I've
6 just got a few questions I'd like to
7 ask you.
8 A Uh-huh (yes).
9 Q As I recall, you said that your
10 service was in dealing with seniority
11 factors?
12 A Yes.
13 Q Is that correct?
14 A Yes.
15 Q And that's a committee; isn't
16 it? The name of a committee?
17 A It's not a committee, it's a
18 position. The computer resource person
19 is a dual job. One is to have the
20 seniority in the district of the
21 teachers who are permanently, regularly
22 hired by the District, not as I would
23 say, permanent subs. There's no
24 seniority in that. The second part of
25 that position is I'm also the person

**Page 64**

1 that helps develop the salary schedule
2 in negotiations.
3 Q Okay. Now, in the course of
4 performing your duties relating to
5 seniority matters, do issues of tenure
6 ever crop up as seniority rights? And
7 I ask you --- the same question, I'm
8 asking about issues you can speak, if
9 you don't. If you don't, say you don't,
10 know. But a tenured teacher, is it the
11 standard by which a tenured teacher can
12 be discharged, is that more stringent
13 than a non-tenured teacher, do you
14 know?
15 A I don't know. No, I really
16 don't know. Just knowing that tenured
17 teachers, I think it's three years now,
18 I'm not sure, so I can't say if the
19 requirements are any different.
20 Q Does tenured, the concept of
21 tenured as used in the education-wise
22 as Ms. deLeon was a tenured as of 1993;
23 okay? That carries with it certain
24 privileges; right?
25 A I would think

**Page 65**

1 Q Vis- -vis those who are not
2 tenured. Would that be a fair ---
3 A Yes.
4 Q--- assumption or conclusion to
5 reach?
6 A Uh-huh (yes).
7 ATTORNEY HEATH:
8 You have to say yes or
9 no.
10 A Yes.
11 BY ATTORNEY NICHOLS:
12 Q Now, you used the term traveling
13 teacher when you referred to Ms.
14 deLeon, right?
15 A Correct.
16 Q And when you use that term, what
17 is your understanding?
18 A A traveling teacher is a teacher
19 who does not have a room to themselves
20 for the length of the day.
21 Q And was that characteristic of
22 Mr. deLeon's status post-2001?
23 A I know, I have.
24 Q That school year?
25 A I couldn't say yes or no because

Page 66

1  I didn't know the schedule, and I
2  couldn't --- unless I have the schedule
3  in front of me, I can't say yes or no
4  to that.
5  Q.Okay. But you did say, I think
6  I recall you having said, that there
7  was a meeting August 14th, 2001 in
8  which you were in attendance?
9  A.Uh-huh (yes)
10  Q.And that one of the issues dealt
11  with securing a room, I take it a
12  classroom, for Ms. deLeon?
13  A.Yes.
14  Q.And so am I correct in my
15  implicit that you're saying she did not
16  have a classroom at that time; right?
17  A.That is correct.
18  Q.And therefore you're trying to
19  get a classroom for her; right?
20  A.We're not in a position where we
21  request rooms for teachers.
22  Q.Who makes that assignment of
23  class? Whose authority is that to
24  assign classes?
25  A.That would be up to the building

Page 67

1  principal.
2  Q.Okay. And do you know by what
3  methods he or she, the building
4  principal, makes those assignments?
5  A.No, I do not.
6  Q.Is it in terms of tenure? Is it
7  in terms of seniority or what? You
8  don't know?
9  A.That I do not know.
10  Q.You also reference a June 7,
11  2002 meeting involving the reviewing of
12  an action plan?
13  A.Uh-huh (yes).
14  Q.Okay?
15  A.Yes.
16  Q.And you said that on that
17  occasion Ms. deLeon felt that she was
18  going to get her own room, classroom I
19  take it, right?
20  ATTORNEY HEATH:
21  Do you want to look at
22  your notes?
23  A.Yes.
24  ATTORNEY HEATH:
25  Toward the back.

Page 68

1  A.What was that date again?
2  BY ATTORNEY NICHOLS:
3  Q June 7, 2002.
4  A.No, I don't. Not on June ---
5  Q It could have been another
6  meeting.
7  A.Yeah, I think that that was
8  towards ---
9  Q.But anyway, the issue was the
10  same?
11  A.Yes, it is.
12  Q.And you're trying to get Ms.
13  deLeon a classroom; right?
14  A.We were trying to have four
15  rooms on the same floor so there would
16  be less traveling, so that she would
17  not need to use the elevator to carry
18  her cars, all of her stuff. So we were
19  trying to be on the same floor as ---
20  trying to get the best condition.
21  Q.Based upon your --- now,
22  have longevity teaching, the school
23  kids; is that right?
24  A.Yes.
25  Q.And you've mentioned so many

Page 69

1  years?
2  A.Yes.
3  Q I forget how many years you
4  said?
5  A.I'm in my 28th year.
6  Q.Ok. 28 years. Now, based upon
7  your observation having been involved
8  in the system that long, your
9  experience, is it common or uncommon
10  that a teacher, a tenured teacher, a
11  teacher having at least ten year's
12  teaching experience would be relegated
13  to a status of a traveling teacher?
14  ATTORNEY HEATH:
15  Objection to form.
16  BY ATTORNEY NICHOLS:
17  Q Is that uncommon or common? Is
18  that common?
19  A.We have teachers who prefer to
20  travel. I have one in mind which is
21  Shawn Brown.
22  Q.What else? What other teachers
23  choose to? It's not a preference that
24  --- you know, do they have a preference
25  they can choose a permanent classroom,

Page 66 - Page 69

## Page 70

```
 1  to vis- -vis having to go to and from
 2  seven different classes?
 3      ATTORNEY HEATH:
 4           Objection to form. And
 5      I'm not sure what the question
 6      was. Go ahead.
 7      BY ATTORNEY NICHOLS:
 8  Q Do you understand my question,
 9  Mr. Rozonowski?
10  A Could you say it over again?
11  Q My question essentially is
12  having such as we're speaking on, being
13  a tenured teacher at that juncture, at
14  that point, I think having at least ten
15  year's experience, is it a common ---
16  isn't it uncommon that she would be
17  relegated to a status of, you know, of
18  being a traveling teacher, quote,
19  traveling teacher, closed quote?
20      ATTORNEY HEATH:
21           Same objection to form.
22      BY ATTORNEY NICHOLS:
23  Q You may answer.
24  A There are a couple teachers who
25  have served the District a long time
```

## Page 71

```
 1  that were traveling teachers when they
 2  moved into the building. Helen Carr
 3  (phonetic) was one of them, and just
 4  recently she got a room.
 5  Q But that was by choice, you
 6  said, right? They chose?
 7  A Not her. When she bid into a
 8  position up at the high school, she was
 9  a traveling teacher.
10  Q And how many years, do you know,
11  was she tenured and how many years she
12  had?
13  A Oh, yes. She had a number of
14  years, yes.
15  Q Can you point to others,
16  I identify others in similar
17  circumstances?
18  A I'm trying to think. I'm not
19  sure, the other individual may or may
20  not be Denny McDonald. These are
21  teachers who bid out, move out from the
22  middle school to the high school, when
23  a position became vacant.
24  Q Is that saying that their status
25  as a traveling teacher was a transfer,
```

## Page 72

```
 1  it was not a permanent, second
 2  condition or permanent status?
 3  A They would get their own room
 4  once somebody retires in that position,
 5  once there was an addition onto the
 6  school.
 7  Q You mentioned that Ms. deLeon
 8  mentioned in one of the meetings that
 9  the action plan was working. Is that a
10  correct statement on your part?
11  A I think that was, yes.
12  Q The reason I raise that question
13  is because Ms. Willison just testified
14  this morning prior to you. And as I
15  understand it, Ms. deLeon had expressed
16  dissatisfaction with the action plan.
17  vis- -vis the case management plan.
18  You know, I just want to be clear.
19  There seems to be an inconsistency
20  of ---
21      ATTORNEY HEATH:
22           I object. Lack of
23      foundation. You're not saying
24      specifically what meeting, and I
25      think he should be able to
```

## Page 73

```
 1  review the notes of Ms. Willison
 2  to make sure that we're talking
 3  about the same meeting as the
 4  action plan was talked about
 5  multiple times.
 6      ATTORNEY NICHOLS:
 7           It may very well have
 8      been just the testimony in terms
 9      of --- I thought that it was
10      consistency on the record that
11      Ms. deLeon had consistently
12      stated her dissatisfaction with
13      the action plan.
14      BY ATTORNEY NICHOLS:
15  Q I hear you say that at least the
16  one meeting you heard Ms. deLeon had
17  expressed approval. And I do recall
18  that Ms. Willison stated the very
19  opposite this morning.
20      ATTORNEY HEATH:
21           I object. I think it's
22      mischaracterizing what the prior
23      witness said, and also there's a
24      lack of Foundation. But you may
25      answer.
```

**Page 74**

1 A The meeting that I am looking
2 at, which is June 7th, that would have
3 been an in-service day. That's the
4 only way in, which we would have met at
5 8:13 in the morning, because that would
6 be first period. I do have --- maybe I
7 had written it wrong, I don't know.
8 But I do have that she indicated
9 she wants more support from the
10 administration, and felt the action
11 plan was effective. So I'm not sure if
12 it was working, but effective. That's
13 what I have written down.
14 ATTORNEY HEATH:
15 What was the date of it?
16 A June 7th, 2002.
17 BY ATTORNEY NICHOLS:
18 Q All right. Now, this particular
19 occasion, the date escapes me, maybe
20 you can jog my memory, refresh my
21 memory, on where a student was reported
22 to have reportedly called Ms. deLeon a
23 derogatory term, quote, a whore? Know
24 what I'm saying?
25 A Okay.

**Page 75**

1 Q And then there was a second
2 student who I'm told vouched for having
3 heard him, then recanted and said he
4 didn't hear such a word, and that was
5 the discussion, that particular
6 discussion of the committee that you
7 met, right, that particular ---?
8 ATTORNEY HEATH:
9 I object. Object to
10 form. You can answer it.
11 A Claudette indicated that this
12 student heard --- overheard the other
13 student calling her a whore. We met
14 the student in Mr. Higgins'
15 office, and asked him at the time.
16 Now, I've never met the student, so
17 this is the first time meeting him.
18 And Claudette --- now, I'm not sure if
19 it was Claudette or John that asked
20 him, that I don't remember, but he was
21 asked, did you hear this?
22 BY ATTORNEY NICHOLS:
23 Uh-huh (yes).
24 And he indicated he did not.
25 Q He did not? Okay. And what was

**Page 76**

1 the disposition of this matter, do you
2 know? The committee took it up. What
3 was the disposition? Did they find ---
4 what was the determination that was
5 made, if any?
6 A If you're saying the committee,
7 investigation committee, I do not know.
8 That's administration.
9 Q Oh, is it now, okay.
10 A I have no control or power over
11 that.
12 Q Now, moving forward here a
13 couple more questions. April 10, 2004,
14 you were in a meeting in which you say
15 you observe Ms. deLeon, she was angry,
16 you say. What did you observe? She
17 was visibly moving from her seat?
18 A Yes.
19 Q Are you sure there was visible
20 movement from her seat?
21 A She did ---
22 Q In which direction? Toward whom
23 or what? To leave the room, exit?
24 ATTORNEY HEATH:
25 Objection. Asked and

**Page 77**

1 answered.
2 A If I remember how the room was
3 set up, we were at a table such as
4 this, it's all one table. Claudette is
5 at this head of the side. Joann is on
6 this side. I am on the opposite side.
7 ATTORNEY HEATH:
8 Just for the record so
9 when we read it again we can
10 indicate a --- but you're saying
11 that Claudette was at the head
12 of the table?
13 A Table.
14 ATTORNEY HEATH:
15 You were to her right as
16 she's facing ---?
17 A I was to her left.
18 ATTORNEY HEATH:
19 To her left, and Joann
20 was to the right?
21 A Joann was to the right.
22 Directly across from her, if I remember
23 correctly, is George Deshner.
24 ATTORNEY HEATH:
25 Across from Claudette?

Page 78

```
 1   Across from Claudette.  Next to
 2   me, which was to the right of George
 3   Destiner, would have been John Higgins.
 4   To the left of George, to the right of
 5   Joann, would have been Charlie Heller,
 6   if I remember.
 7   BY ATTORNEY NICHOLS:
 8   Q  All right.  Let me just cut
 9   right to the chase here, because this
10   particular incident --- did you at any
11   time during this meeting hear Ms.
12   delCeon direct profanity toward anybody
13   at the meeting?
14   A  No.
15   Q  All right.  Did you see her.
16   observe her try to physically accost
17   anybody or physically strike anybody?
18   A  No, she did not physically
19   strike anyone?
20   Q  Now, you did testify that you
21   assisted her, escorted her from the
22   room because she was visibly upset; is
23   that correct
24   A  --- I AV
25   Q  You and Ms. Willison, I believe;
```

Page 79

```
 1   right?
 2   A  Ms. Willison, yes.
 3   Q  Okay.  Ms. Willison did testify
 4   this morning that she did not at any
 5   time observe Ms. delCeon make any
 6   physical movements from her chair.
 7   That's what she testified this morning
 8   on the record.  Is this the same
 9   meeting?
10        ATTORNEY HEATH:
11           Objection.
12           Mischaracterizes what the
13   witness testified to.
14        ATTORNEY NICHOLS:
15           Well, what did the
16   witness say then?
17        ATTORNEY HEATH:
18           The record will reflect
19   what was said, what she doesn't
20   recall.
21        ATTORNEY NICHOLS:
22           I'm just simply pointing
23   out the inconsistencies, what
24   appears as inconsistencies in
25   the testimony.
```

Page 80

```
 1        ATTORNEY HEATH:
 2           There's no inconsistency.
 3        ATTORNEY NICHOLS:
 4           Okay.  Just a minute.
 5           Excuse me.
 6        OFF RECORD DISCUSSION
 7        ATTORNEY NICHOLS:
 8           Okay.  Well, I don't
 9   think I have any more questions,
10   Mr. Kozonowski.  Thank you.
11        RE-EXAMINATION
12   BY ATTORNEY HEATH:
13   Q  Mr. Kozonowski, I just have a
14   couple follow-up questions.  I believe
15   you had testified earlier that Ms.
16   delCeon actually physically got up out
17   of her chair and was going towards Mr.
18   Destiner and that's why she was
19   restrained; is that accurate?  You were
20   explaining how the table was set?
21   A  Yeah, how the table was set up.
22   Now, this part from here to there, I'm
23   not exactly sure what happened, but I
24   can tell you that I did have ---
25   holding her, we were moving out of the
```

Page 81

```
 1   doorway.  It was a very heated
 2   discussion between Claudette and Mr.
 3   Destiner.  Both of them at the time were
 4   raising their voice.  And as a union
 5   representative, I did not think it
 6   would be best to continue the meeting
 7   at that time.
 8   Q  You had talked about the
 9   traveling teacher issue.  The
10   administration's placing someone on a
11   schedule as a traveling teacher is not
12   a violation of the collective
13   bargaining agreement; is that correct?
14   A  That is correct.
15   Q  It's not a grievable issue; in
16   other words?
17   A  That's correct.
18   Q  You mentioned a couple of
19   people.  Helen Carr, is she Hispanic?
20   A  No.
21   Q  Is Denny McDonald Hispanic?
22   A  No.
23   Q  Shawn Brown?
24   A  No.
25   Q  Isn't it a fact that also prior
```

Page 82

1  to and even after the addition on the
2  building, space was an issue, concern,
3  relative to the teachers' classrooms,
4  that unless there was retired teachers,
5  there was an issue concerning space; is
6  that accurate?
7  A Yes. There were not enough
8  rooms for all the teachers.
9  Q Not just Ms. deLeon?
10  A Correct.
11  ATTORNEY HEATH:
12  That's all I have.
13  ATTORNEY NICHOLS:
14  Okay. That's all.
15  ATTORNEY NICHOLS:
16  Thank you.
17
18  * * * * * * * *
19  DEPOSITION CONCLUDED AT 3:52 P.M.
20  * * * * * * * *
21
22
23
24
25

COMMONWEALTH OF PENNSYLVANIA )

COMMISSIONER OF DEEDS )

C E R T I F I C A T E

I, Wendy Blair, a Commissioner of Deeds in
and for the Commonwealth of Pennsylvania, do
hereby certify:

That the witness whose testimony appears in
the foregoing deposition, was duly sworn by me on
said date and that the transcribed deposition of
said witness is a true record of the testimony
given by said witness;

That the proceeding is herein recorded fully
and accurately;

That I am neither attorney nor counsel for,
nor related to any of the parties to the action in
which these depositions were taken, and further
that I am not a relative of any attorney or
counsel employed by the parties hereto, or
financially interested in this action.

_____

Wendy Blair, Reporter

WENDY S. BLAIR
Commonwealth of Pennsylvania
Commissioner of Deeds
My Commission Expires June 5, 2006

SARGENT'S
COURT REPORTING
SERVICE, INC.
(814) 536-8908

·PHILADELPHIA, PA  ·SOMERSET, PA  ·INDIANA, PA  ·ERIE, PA  ·CLEARFIELD, PA  ·PITTSBURGH, PA
·WILKES BARRE, PA  ·GREENSBURG, PA  ·OIL CITY, PA  ·STATE COLLEGE, PA  ·JOHNSTOWN, PA  ·HOLLIDAYSBURG, PA  ·HARRISBURG, PA  ·CLARION, PA  ·CHARLESTON, WV