U.S. DISTRICT COURT
FOR THE WESTERN DISTRICT
OF PENNSYLVANIA

* * * * * * * *

CLAUDETTE DE LEON,          *

    Plaintiff          *     Case No.

    vs.          *     05-126E

CRAWFORD CENTRAL          *
SCHOOL DISTRICT          *
CRAWFORD CENTRAL          *
SCHOOL BOARD,          *
    Defendants          *
MICHAEL E. DOLECKI,*
    Superintendent,          *
    Defendant          *
CHARLES E. HELLER,          *
    III, Assistant          *
    Superintendent          *
    Defendant          *

DEPOSITION OF
JOHN C. HIGGINS
April 25, 2006

Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.





EXHIBIT 3C

DEPOSITION
OF
JOHN C. HIGGINS, taken on behalf of the Defendants herein, pursuant to the Rules of Civil Procedure, taken before me, the undersigned, Jacqueline L. Hazlett, a Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania, at Crawford Central School District Administrative Offices, 11280 Mercer Pike, Meadville, Pennsylvania, on Tuesday, April 25, 2006, beginning at 12:52 p.m.

A P P E A R A N C E S

CALEB NICHOLS, ESQUIRE
P.O. Box 1585
Erie, PA 16507
COUNSEL FOR PLAINTIFF

ROBERTA BINDER HEATH, ESQUIRE
Andrews & Beard
3366 Lynwood Drive
P.O. Box 1311
Altoona, PA 16603
COUNSEL FOR DEFENDANTS

I N D E X

WITNESS: JOHN C. HIGGINS
EXAMINATION
By Attorney Heath 10 - 162
EXAMINATION
By Attorney Nichols 162 - 230
CERTIFICATE 231

CERTIFIED QUESTION: Page 94

EXHIBIT PAGE

| NUMBER | DESCRIPTION | PAGE IDENTIFIED |
|---|---|---|
| 1 | Policy 412 | 19 |
| 2 | Job Description | 19 |
| 3 | Philosophy & Rationale | 19 |
| 4 | 1/18/01 Classroom Observation | 25 |
| 5 | 2/2/01 Letter re: Leaving Without Notice | 29 |
| 6 | Satisfactory Evaluation and Corrective Action Plan | 33 |
| 7 | 9/20/01 Observation | 39 |
| 8 | 9/20/01 Letter with Schedules re: Observing Other Teachers | 43 |
| 9 | 12/3/01 Class Evaluation | 45 |
| 10 | 3/7/02 Class Evaluation | 46 |
| 11 | 3/18/02 Unsatisfactory Rating | 61 |
| 12 | 2002/2003 Professional Competency Plan | 70 |

**Page 9**

OBJECTION PAGE

| Line | ATTORNEY | PAGE |
|---|---|---|
| 1 | OBJECTION PAGE | |
| 2 | | |
| 3 | ATTORNEY | PAGE |
| 4 | Nichols | 95 |
| 5 | Heath | 180, 182, 185, 188, 186, 191, |
| 6 | | 194, 195, 204, 206, 207, 212, |
| 7 | | 217, 218, 220, 223, 224, 226 |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

**Page 7**

EXHIBIT PAGE (CONT'D)

| Line | PAGE NUMBER | DESCRIPTION | IDENTIFIED |
|---|---|---|---|
| 1 | EXHIBIT PAGE (CONT'D) | | |
| 2 | | | |
| 3 | PAGE | | |
| 4 | NUMBER | DESCRIPTION | IDENTIFIED |
| 5 | 22 | 11/6/02 Informal | 105 |
| 6 | | Observation Report | 105 |
| 7 | 22 | 1/3/03 Memo with | 105 |
| 8 | | Recommendation | 105 |
| 9 | 26 | 2/3/03 Memo re: Antecc | |
| 10 | | Mosley | 119 |
| 11 | 25 | 2/03 Revised | |
| 12 | | Improvement Plan | 124 |
| 13 | 26 | 2/28/03 Letter re: | |
| 14 | | 2/11/03 Memo | 128 |
| 15 | 27 | 2/8/03 Response from | |
| 16 | | de Leon Breach of | |
| 17 | | Confidentiality | 132 |
| 18 | 28 | 2/8/03 Memo | |
| 19 | | Requesting Information | 135 |
| 20 | 29 | 2/28/03 de Leon | |
| 21 | | Response | 138 |
| 22 | 30 | Discipline Logs | |
| 23 | | Received 2/27/03 | 140 |
| 24 | 31 | Discipline Logs | |
| 25 | | Received 2/28/03 | 140 |

**Page 8**

EXHIBIT PAGE (CONT'D)

| Line | PAGE NUMBER | DESCRIPTION | IDENTIFIED |
|---|---|---|---|
| 1 | EXHIBIT PAGE (CONT'D) | | |
| 2 | | | |
| 3 | PAGE | | |
| 4 | NUMBER | DESCRIPTION | IDENTIFIED |
| 5 | 32 | 3/6/03 Copied on | |
| 6 | | Letter re: Suspension | |
| 7 | | with Pay | 144 |
| 8 | 33 | 4/2/03 Meeting re: | |
| 9 | | Assigning Reading | 147 |
| 10 | 34 | 4/7/03 Letter from | |
| 11 | | Cheryl Albaugh | 149 |
| 12 | 35 | 4/7/03 Deshner Memo re: | |
| 13 | | April 4 Meeting | 153 |
| 14 | 36 | Notes re: Student | |
| 15 | | Issues | 156 |
| 16 | 37 | 4/11/03 Unsatisfactory | |
| 17 | | Evaluation | 158 |
| 18 | 38 | Mr. Higgins' Notes | 159 |
| 19 | 39 | Compilation of Policies | 161 |
| 20 | 40 | 2001/2002 Class | |
| 21 | | Observations | 164 |
| 22 | 41 | 2002/2003 Teacher | |
| 23 | | Observations | 164 |
| 24 | 42 | Chapters Summary | 165 |
| 25 | | | |

**Page 6**

EXHIBIT PAGE (CONT'D)

| Line | PAGE NUMBER | DESCRIPTION | IDENTIFIED |
|---|---|---|---|
| 1 | EXHIBIT PAGE (CONT'D) | | |
| 2 | | | |
| 3 | PAGE | | |
| 4 | NUMBER | DESCRIPTION | IDENTIFIED |
| 5 | 13 | 8/30/02 Letter with | |
| 6 | | Attachment Regarding | |
| 7 | | Observations | 78 |
| 8 | 14 | 9/1/02 Observation with | |
| 9 | | Detailed Attachment | |
| 10 | | Regarding Areas of | |
| 11 | | Improvement Needed | 81 |
| 12 | 15 | Memo to Follow Up on | |
| 13 | | 9/11/02 | 83 |
| 14 | 16 | 9/23/02 Memo re: | |
| 15 | | Being Late for Class | 87 |
| 16 | 17 | 9/24/02 de Leon Response | |
| 17 | | to 9/23/02 Memo | 88 |
| 18 | 18 | 10/2/02 Memo | 92 |
| 19 | 19 | 10/15/02 Memo from Debra | |
| 20 | | Carman re: Ashley | |
| 21 | | Carman | 99 |
| 22 | 20 | 11/13/02 Letter from | |
| 23 | | Robin Stockton re: | |
| 24 | | Philip | 101 |
| 25 | 21 | 12/19/02 Observation | 103 |

**Page 10**

```
 1          P R O C E E D I N G S
 2    - - - - - - - - - - - - - - -
 3 JOHN C. HIGGINS, HAVING FIRST BEEN DULY
 4    SWORN, TESTIFIED AS FOLLOWS:
 5    - - - - - - - - - - - - - - -
 6          EXAMINATION
 7 BY ATTORNEY HEATH:
 8 Q Mr. Higgins, have you ever had
 9   your deposition taken before?
10 A Yes.
11 Q How long ago was that?
12 A In regard to this situation?
13 Q Anytime.
14 A Two to three years ago.
15 Q And I just wanted --- the reason
16 I'm asking is I simply want to go over
17 some ground rules for you. Obviously,
18 you're under oath. And because we have
19 a Court Reporter here, there's going to
20 be a transcript of the proceedings here
21 today. And she's going to take down
22 everything that anyone in this room
23 says. Because we want a clear record,
24 it is important that only one person
25 speak at a time, so I would ask that
```

**Page 11**

```
 1 when I ask you a question, please make
 2 sure that I'm finished with my question
 3 before you answer me. Similarly with
 4 Mr. Nichols. Make sure he's finished
 5 asking the question before you answer
 6 the question.
 7        If you take a pause, it gives
 8 either attorney an opportunity to
 9 object if that is the case, or it also
10 gives you an opportunity to make sure
11 you understand the question before you
12 answer it. If you don't understand the
13 question, please let me know or let Mr.
14 Nichols know, and it can be rephrased
15 or repeated, depending upon the
16 circumstances.
17        Also, if at any time you
18 want to take a break either to speak
19 with me, or to stretch your legs, get a
20 drink, whatever you need, let me know
21 and we can accommodate that.
22 A Okay.
23 Q Okay. For the record, would you
24 briefly explain your educational
25 background?
```

**Page 12**

```
 1 A Yes. I hold a Bachelor's of
 2 Education in Art Education, and a
 3 Master's of Education in Secondary
 4 Administration.
 5 Q When did you receive your
 6 college degree?
 7 A I think I received the
 8 Bachelor's in '93, my undergraduate.
 9 Q From where?
10 A From Edinboro University.
11 Q And what about your Master's?
12 A I received my Master's in
13 December of '99.
14 Q And I'm assuming you have a
15 certification for secondary education
16 or administration?
17 A Yes, I do.
18 Q Do you have any other
19 certifications or other degrees?
20 A No, I do not.
21 Q When did you receive your
22 certification for secondary
23 administration?
24 A It would have been December of
25 '99.
```

**Page 13**

```
 1 Q And when were you hired as the
 2 assistant principal with the Crawford
 3 Central School District?
 4 A I did an interim position
 5 starting April of 2000, and I was hired
 6 permanently that summer. It would have
 7 been the beginning of my contract, July
 8 1st, 2000.
 9 Q For the 2000 to 2001 school
10 year?
11 A Yes.
12 Q And prior to April of 2000, what
13 was your position?
14 A I taught art education,
15 specifically ceramics, to seventh,
16 eighth and ninth graders until the
17 buildings were combined, then I went to
18 seventh and eighth grade. I briefly
19 taught at the high school in '93 for a
20 semester.
21 Q Did you have any teaching
22 experience prior to that time?
23 A Before '93?
24 Q Yes.
25 A No, I did not.
```

**Page 14**

```
1  Q. And 1993 ---
2  A. I had a student teaching.
3  experience, but I did not have any
4  professional teaching experience.
5  Q. Okay. And in 1993, you came
6  right to this District?
7  A. Yes.
8  Q. And does your administrative
9  certification permit you to observe and
10 evaluate teachers?
11 responsibility as an assistant
12 Q. And is that part of your
13 responsibility as an assistant
14 principal?
15 A. Yes, it is.
16 Q. And was that part of your
17 responsibility for the 2000 to 2001,
18 2001 to 2002 school years?
19 A. Yes, it was.
20 Q. Were you given any supervisory
21 responsibility over Ms. de Leon after
22 you came on board?
23 A. Yeah, I was to observe her. I
24 guess they wanted someone that, you
25 know, was new coming in that did not
```

**Page 15**

```
1  --- come in, you know, with a fresh set
2  of eyes and was unbiased in any way.
3  Q. Will you excuse me for one
4  moment? I'm sorry.
5  A. Absolutely.
6     ATTORNEY HEATH:
7        Off the record.
8        OFF RECORD DISCUSSION
9  BY ATTORNEY HEATH:
10 Q. Okay. I was asking when you
11 came on board if you had any
12 supervisory responsibility over Ms. de
13 Leon.
14 A. Yes. I was one of the people
15 that observed her throughout the school
16 year.
17 Q. And prior to that time, had you
18 met her? Had you had any dealings with
19 her?
20 A. No. I was at what we call the
21 old junior high. And then when I did
22 come to the high school, I was in the
23 middle school, and they're basically
24 the attached buildings, but they're
25 separate. And I really didn't have any
```

**Page 16**

```
1  dealings with her at all.
2  Q. And so you did you have any
3  preconceived notions about her when you
4  started to observe her?
5  A. No.
6  Q. Was there ever any discussion
7  about you observing her in place of Mr.
8  Deshner?
9  A. I think the discussion was in
10 place of the other assistant principal
11 at the time was Mr. Morgan. He was
12 there about a year before me. And
13 since I was new, I mean, I would not
14 have been the primary observer. I was
15 kind of the primary observer, but I was
16 observing in conjunction with Mr.
17 Deshner.
18 Q. Okay. And that would be --- was
19 that true for all the teachers that you
20 had responsibility for eventually?
21 A. Yes, yes. They were divvied up
22 equally.
23 Q. And were you aware at some
24 point, or did you become aware, that
25 there was some tension between Ms. de
```

**Page 17**

```
1  Leon and Mr. Deshner?
2  A. Yes.
3  Q. And what do you recall about
4  that? Do you recall when you knew,
5  first of all?
6  A. Sometime in that year, that
7  first year I was there, that, you know,
8  there was a tension. I had heard of
9  the past, and there was a past there.
10 There were problems, there were
11 grievances filed, along those lines. I
12 mean, working in the same office, you
13 know, you would hear that.
14 Q. Was there any discussion with
15 you that they wanted to have someone
16 who had had a clean slate step in ---
17 A. Yeah.
18 Q. --- taking observation?
19 A. Take an unbiased look and to
20 work with Ms. de Leon. And that's what
21 I did.
22 Q. Just in general, what is the
23 purpose of evaluating a teacher? What
24 typically ---?
25 A. Improving. I'm sorry.
```

**Multi-Page™**

**Page 18**

```
1  go ahead.
2  A 're you finished?
3  Q Yes.
4  A To improve the educational
5  delivery in the classroom. If, you
6  know, there are weaknesses, then we can
7  work proactively with the teacher on a
8  professional level to improve what
9  needs to be improved. For evaluation
10 purposes.
11 Q And there's specific criteria
12 that you rely upon in your evaluation
13 form relative to observing and
14 evaluating a teacher's performance?
15 A Yes.
16 Q And are those criteria listed in
17 your evaluation form?
18 A Yes. They are on the evaluation
19 form and on the observation form.
20 Q And are there also --- are the
21 criteria essentially referenced in any
22 policies?
23 A Yes. They can be found in the
24 rationale for the philosophy and
25 rationale of Crawford Central.
```

**Page 19**

```
1  evaluation instrument.
2  Q And is there also a policy 412
3  concerning the evaluation of
4  professional employees?
5  A Yes, there is. It's a template.
6  The development of an evaluation plan
7  or assessment for professional staff,
8  Q And what about a teacher's job
9  description? Is that taken into
10 consideration, as well?
11 A Yes. There are components in
12 there that correlate with the
13 professional evaluation instrument,
14 specifically with the performance
15 responsibilities. It also states
16 qualifications that a teacher must have
17 in order to be a teacher.
18 (Higgins Exhibits 1, 2,
19 and 3 marked for
20 identification.)
21 BY ATTORNEY HEATH:
22 Q I'm going to direct your
23 attention to exhibits that have been
24 previously marked as Higgins 1, 2 and
25 3. One is the evaluation of
```

**Page 20**

```
1  professional employees.  The second is
2  a job description.  And that would be
3  --- it indicates Claudette McCracken,
4  and it is the 1998 school year.  And
5  then also Number Three would be the
6  philosophy and rationale of the
7  Crawford Central evaluation instrument.
8  Essentially, with regard to Exhibits 1
9  and 2, which would be the policy itself
10 and the job description, are those
11 interrelated and taken into
12 consideration in an evaluation/
13 observation of a teacher?
14 A Yes.
15 Q And does the policy then
16 identify any objectives of a district
17 evaluation?
18 A Could you please repeat the
19 question?
20 Q Does the policy identify the
21 objectives of the District evaluation?
22 A Yes, it does.
23 Q And that would be on what page?
24 A 're you talking about the
25 evaluation of professional employees,
```

**Page 21**

```
1  policy 412?
2  Q Yes.
3  A Right down, it says the
4  objective of the District evaluation is
5  to identify and improve, suggest ways
6  to improve and what the evaluation plan
7  should be.  It should be uniform
8  throughout the District, a minimum
9  number of times a teacher should be
10 evaluated.  There should be procedures
11 in place for identifying and commencing
12 effective performance, assessing duties
13 and responsibilities, along those
14 lines.
15 Q And then with regard to Exhibit
16 3, which is the philosophy and
17 rationale of the Crawford Central
18 School District.  Does this also
19 address --- or what does this address,
20 I should ask you?
21 A This addresses, you know,
22 basically, in a nutshell, the reasoning
23 for having an evaluation plan for
24 teachers or, you know, procedures in
25 place.  And the bottom line is for the
```

**Page 22**

```
1  students.  We want the best education
2  for the students of Crawford Central
3  School District.  And in order to do
4  that, we need to have things in place
5  to ensure that they receive that
6  education.
7        Q And looking at the last page,
8  which is page eight of Exhibit 3, it
9  indicates that it was revised 10/22/79
10 and reviewed February of 1983.  And is
11 this still utilized today, this
12 philosophy and rationale?
13       A Yes.
14       Q So it's fair to say that this
15 has been in use for some time.  And you
16 believe that this a valuable tool in
17 evaluating teachers?
18       A Yes.  It was used in conjunction
19 in development of an action plan.
20       Q And is this what you relied upon
21 in preparing Ms. de Leon's action plan?
22       A Actually, I was assisted by Mr.
23 Deshner at the time.
24       Q But this rationale sets forth
25 procedures, the process on how to
```

**Page 23**

```
1  improve professional employee
2  performance at pages seven and eight.
3  So even in this rationale that was
4  adopted some time prior to 1979, it
5  takes into account utilizing an action
6  plan as a tool for improving
7  performance; correct?
8        A Yes.
9        Q And since you have been the
10 assistant principal at the District,
11 have you utilized these three tools in
12 order to do your teacher observations
13 and evaluations?
14       A Yes, I have.
15       Q And do you believe that you have
16 done this uniformly and applied the
17 procedures fairly across the board?
18       A Yes, I have.
19       Q And that would include your
20 observations and evaluations of Ms. de
21 Leon?
22       A Yes.
23       Q You indicated that the primary
24 purpose or goal to be achieved would be
25 the highest quality of student
```

**Page 24**

```
1  education; is that correct?
2        A Yes.
3        Q And how does the administration
4  --- what is the philosophy that you are
5  aware of concerning improvement plans?
6  How is that an effective tool, in your
7  opinion, in assisting a teacher?
8        A It improves instruction in the
9  classroom.  If there are weaknesses,
10 you know, present, you know, you can
11 work proactively with the teacher to
12 improve those weaknesses.
13       Q And have you implemented
14 performance plans with other teachers
15 other than Ms. de Leon?
16       A Yes, I have.
17       Q And have you found those tools
18 to be effective in improving their
19 performance?
20       A Yes.
21       Q And how does the system work?
22 You have the plan, and is there some
23 sort of a monitoring system in place?
24       A Yeah.  It's constructed, you
25 know, for the teacher and then worked
```

**Page 25**

```
1  on with the teacher.  And certain
2  points are agreed upon and met and
3  I followed through with.
4        Q And I'm going to ask you just an
5  overall question.  The improvement plan
6  under which Ms. de Leon operated, did
7  she meet those objectives that were
8  outlined in those plans?
9        A No, all of them, no.
10       Q And in your experience with
11 regard to other teachers that you've
12 worked to under improvement plans,
13 have they typically met those goals and
14 objectives?
15       A Yes, they have.
16       Q Did you find your interaction or
17 your experience with Ms. de Leon to be
18 unusual?
19       A Very much so.
20       (Higgins Exhibit 4 marked
21 for identification.)
22       BY ATTORNEY HEATH:
23       Q And we're going to get into the
24 specifics a little bit.  What I have
25 done relative to your exhibits is gone
```

Page 26

1 through the file and tried to put
2 things as best I could in chronological
3 order. And then we'll go through the
4 series of exhibits and go from there.
5 The first would be Exhibit 4, which is
6 a January 18, 2001 classroom
7 observation. And I believe this was
8 the first classroom observation that
9 you did. It would have been your first
10 year there. And I don't know if you
11 gave aware if there's anything earlier
12 in time, but this was the first one
13 that I found.
14 A Okay
15 Q Is this consistent with your
16 recollection of when you first observed
17 Ms. de Leon?
18 A Yes.
19 Q And can you just tell us briefly
20 for the record what information is
21 contained here?
22 A Yes. This is an observation of
23 one of Ms. de Leon's Spanish III
24 classes during fifth period. I have it
25 on there marked, it was the first visit

Page 27

1 by myself to the classroom. It appears
2 to me it would have been first
3 semester. And during this observation,
4 it was a pretty good class. I had a
5 few recommendations. I cite that, you
6 know --- I tell her or suggest to her
7 to be sure to maintain consistency in
8 dealing with students. If there insist
9 that a student have a pass due to
10 tardiness, then all students should
11 have passes. Another recommendation,
12 be sure to call on students to actively
13 participate, and you can call randomly
14 choose students to answer questions, or
15 offer participation points as
16 incentives. I also put a commendation.
17 I felt her record keeping at that time
18 and her documentation of student work
19 was commendable.
20 Q So under the comments and
21 recommendations section, R then would
22 be recommendations, C would be
23 commendation?
24 A Yes.
25 Q In looking at the body of the

Page 28

1 instrument, I see within the
2 parentheses to the left there are
3 mostly S's, which would be
4 satisfactory; is that right?
5 A Yes.
6 Q And then there is one not
7 applicable. And then the asterisks,
8 that would be then see the written
9 comments?
10 A Yes.
11 Q And that's what you've read into
12 the record so far?
13 A Right.
14 Q Now, after you did this
15 observation, did you speak with Ms. de
16 Leon ---
17 A Yes.
18 Q --- about the observation?
19 A Yes. We met ---
20 Q And would that be your first
21 meeting with her, or would there have
22 been --- do you recall anything prior?
23 I'm not trying to trick you. I am ---
24 A No.
25 Q --- just going through the

Page 29

1 records that I have.
2 A This is what I see in front of
3 me and this is what I recall at this
4 point in time.
5 Q That you did have a meeting, as
6 is required, with her after this
7 observation ---
8 A Yes.
9 Q --- to review it?
10 A Uh-huh (yes).
11 Q And do you recall anything in
12 particular about that meeting? Did she
13 accept your recommendations at that
14 time, or ---?
15 A Yes, she did.
16 (Higgins Exhibit 5 marked
17 for identification.)
18 BY ATTORNEY HEATH:
19 Q Okay. The next exhibit is
20 Higgins Exhibit 5, which is a February
21 2nd, 2001 letter written by you to Ms.
22 de Leon. Do you recall this letter?
23 A Yes, I do.
24 Q What were the circumstances that
25 prompted you to write this letter?

## Page 30

1 A.Let me read it real quick just
2 to ---
3 Q.Sure.
4 A--- check through it. What had
5 happened, Mrs. de Leon had taken ill
6 that day and she left due to an illness
7 or something along those lines. In
8 most cases, being my first year, as
9 teachers became ill during the day,
10 they would call the office and let the
11 administration know so we can assure
12 that their students were covered. To
13 this day, I mean, teachers do get sick,
14 but they always call the administrative
15 office. Mrs. de Leon did not.
16 Q.What happened? What did she do?
17 A.She told the teacher, I think
18 across the hall that she had to leave.
19 She stopped in to see my secretary
20 briefly, none of us. She said she was
21 leaving and ---
22 Q.None of the administration?
23 A.None of the administration. And
24 she left, and I did not know now that
25 until I went up --- I think I went up

## Page 31

1 to her room to get a student, or I
2 called up. I can't remember what the
3 reason was for me arriving at the room.
4 When I got there, there was no teacher.
5 Q.But the students were in the
6 class?
7 A.Students were in the class.
8 They weren't being disruptive. They
9 were sitting on desks. The TV was on.
10 Q.And there was no teacher?
11 A.There was no supervision. And
12 Mrs. Maziarz from across the hall came
13 over and said, oh, I'm watching the
14 class. And I said, well, where's Mrs.
15 de Leon? And she informed me that she
16 had to leave. She didn't inform
17 anybody. Mrs. Maziarz informed me
18 that, you know --- she said, I was
19 taking care of the class. But from my
20 reasoning, you know, we must be aware
21 so we can get supervision for the
22 students. I mean, if we need to, we'll
23 call the sub service. I mean, I've
24 done it before. I've done it for Mrs.
25 de Leon before, after this fact. And

## Page 32

1 it's not a problem. And no one knew
2 where Mrs. de Leon was except for Mrs.
3 Maziarz.
4 Q.And did the District have
5 concerns, too, about potential
6 liability for unsupervised students?
7 A.Yes. There is a chance there.
8 I mean, it's a safety issue. I know
9 the kids were behaving themselves, but
10 you know, what if something did happen,
11 you know, and there is no supervision?
12 So we do have ---
13 Q.The kids could have left?
14 A.Kids could have left. They
15 could have been anywhere in the
16 building, I mean, they weren't,
17 I supervised the entire time.
18 Q.And was this something that you
19 --- in your teaching experience, would
20 you have just left without telling an
21 administrator?
22 A.No, I would have stopped in and
23 told an administrator that I had to
24 leave, or made a phone call.
25 Q.And since this time, which would

## Page 33

1 he February 22nd, 2001, has any other
2 teacher acted in a similar manner?
3 A.Not that I'm aware of, no.
4 Q.And other teachers would follow
5 the protocol and notify an
6 administrator ---
7 A.Yes.
8 Q--- if they were leaving the
9 building?
10 A.Yes. Always.
11 Q.Were you aware that the
12 Plaintiff received a satisfactory
13 evaluation for the 2000/2001 school
14 year accompanied by a corrective action
15 plan?
16 A.Yes, I was aware of that.
17 (Higgins Exhibit 6 marked
18 for identification.)
19 BY ATTORNEY HEATH:
20 Q.And I'll show you now what's
21 been marked as Higgins Exhibit 6. And
22 for the record, it is an evaluation for
23 the 2000/2001 school year dated May
24 7th, 2001, and attached thereto is a
25 corrective action plan with areas of

Multi-Page™

Page 34

```
 1  concern and then, essentially, other
 2  information on tricks of the trade, so
 3  to speak, as to how to improve, and
 4  routines, managing tips, guidelines,
 5  and other information.  Were you at all
 6  involved in preparing the corrective
 7  action plan?
 8  A  Yes.  I worked with George
 9  Deshner in regard to creating the
10  action plan.  I had some points, you
11  know, I felt that needed to be improved
12  upon that would improve the classroom
13  management.  And I felt there was an
14  issue of consistency in the classroom
15  at that point in time.
16  Q  And I just wanted to direct your
17  attention, although the overall
18  evaluation is satisfactory, I note that
19  there are three areas out of the
20  criteria where she's received an
21  unsatisfactory for that particular
22  portion.  Did you have any input at all
23  in this evaluation?
24  A  Yes, I did.
25  Q  And what was that input?
```

Page 35

```
 1  A  Probably in teacher/student
 2  interaction, student relationship.  You
 3  know, there was some discipline
 4  problems I was seeing in the classroom
 5  that were out of the normal, I mean,
 6  that kind of blew up to where they
 7  didn't need to be, you know, at a
 8  disruptive level, students that weren't
 9  necessarily discipline problems that
10  were being problems for Mrs. de Leon in
11  the classroom, parent phone calls.
12  Q  To you?
13  A  Yes.
14  Q  About?
15  A  Lost homework.  Mrs. de Leon has
16  including my son detention, you know.  Just
17  things that yes, I've heard in the
18  past, but moreso with Mrs. de Leon than
19  other teachers in the building.
20  Q  And that caused you some
21  concern?
22  A  Yes.
23  Q  Anything else that you recall?
24  A  At this time, no.
25  Q  And you said you helped Mr.
```

Page 36

```
 1  Deshner prepare this action plan?
 2  A  Yes.
 3  Q  And what was the purpose of this
 4  action plan?
 5  A  To improve some of the problems
 6  we were seeing in Mrs. de Leon's
 7  classroom in order for her, you know, be a
 8  better educator in order for the
 9  students to receive better education.
10  Q  And I note even under areas of
11  concern, there are proposed tools for
12  her to do, things to, I guess, improve,
13  her performance, such as observe.  She
14  I should observe different teachers who
15  have well-established classroom
16  procedures and effective discipline.
17  Was that something that you believed
18  would be helpful to her?
19  A  Yes.  I felt, you know, some of
20  these teachers that we felt had solid
21  classroom management skills, you know,
22  solid plans in place that worked with
23  kids, the class went really smoothly,
24  and we felt that Mrs. de Leon could
25  benefit from observing those teachers
```

Page 37

```
 1  or having them observe her.
 2  Q  And looking at the second page,
 3  number eight, you're talking about a
 4  Mrs. Tunno?
 5  A  Tunno (corrects pronunciation),
 6  Q  Tunno.
 7  A  Mrs. Tunno.
 8  Q  Who is she?
 9  A  Mrs. Tunno is the school
10  librarian and she is an excellent
11  resource for information, teaching, you
12  know, websites.  She kind of does it
13  all.  She's a great resource for the
14  building.
15  Q  And what was the purpose of
16  including that information in this
17  action plan?
18  A  Basically, if you follow along
19  with the rationale, that's also in
20  there, you know, what resources and
21  what support personnel you can use,
22  And we were kind of thinking along
23  those lines.  It was Mr. Deshner's
24  idea, and I thought it was a good idea.
25  Q  So it would help her what?
```

## Page 38

1 Build and utilize resources to
2 her benefit in the classroom.
3 Q Relative to what, the classroom
4 management techniques?
5 A Yes, relative to classroom
6 management techniques, discipline,
7 dealing with parents, staff,
8 administration.
9 Q And then the subsequent pages,
10 these contain a lot of information with
11 guidelines and suggestions. And were
12 you aware of all of this information at
13 the time?
14 A Yes. I came up with some of
15 this information, actually, and I felt
16 it would be, you know, beneficial to
17 her at the start of the next school
18 year. Some of the things were meant,
19 you know, for classroom management.
20 Some of the things we were seeing kind
21 of related to some of the, you know,
22 ideas that were related here. Just
23 kind of little tips, management tips,
24 for the classroom to start off on the
25 right foot.

## Page 39

1 Q And was this ---?
2 A We were addressing discipline,
3 too.
4 Q Was this corrective action plan,
5 was it meant to be any kind of a
6 punishment to her?
7 A Absolutely not.
8 Q And did you feel that this was a
9 positive tool?
10 A Yes.
11 Q And did you utilize this
12 corrective action plan in supervising
13 Ms. de Leon in the 2001 to 2002 school
14 year?
15 A Yes.
16 (Higgins Exhibit 7 marked
17 for identification.)
18 BY ATTORNEY HEATH:
19 Q Let me show you what's been
20 marked as Higgins Exhibit 7, which is
21 an observation report signed by you on
22 September 24th --- or, I'm sorry,
23 actually, it's ---
24 A September 20th,
25 Q--- September 20th of 2001. Can

## Page 40

1 you summarize for us what we observed
2 on this date?
3 A Yes. That would have been my
4 first visit to Mrs. de Leon in the
5 '01/'02 school year, a fourth period
6 Spanish II class I sat in on. All
7 areas I found to be satisfactory. I
8 did have a commendation. And I was
9 happy because it was a good lesson.
10 The classroom presentation reflects
11 good planning in regards to your
12 introduction, objectives and closure,
13 and used a variety of activities and
14 methods that were used to stimulate
15 interaction among all her students.
16 Q And was it a better observation
17 than you had had previously in January
18 of 2001?
19 A Yes, it was.
20 Q And when you had given Ms. de
21 Leon the evaluation and the corrective
22 action plans prior to the start of the
23 2001/2000 school year, did you speak
24 with her about the corrective action
25 plan and implementing it ---

## Page 41

1 A Yes.
2 Q--- and what it was meant to do?
3 A We sat down with her and met
4 with her and I believe two union reps.
5 Q I see that the corrective action
6 plan, although it's cut off, looks to
7 be signed by Mr. Rozanowski?
8 A Right.
9 Q And I can't see the other --- if
10 there's another signature there. And
11 were you pleased with this first
12 observation? Did you think that she
13 was following some of the directives in
14 there?
15 A Yes. Yes, I was very
16 pleased with it.
17 Q And did you have a conference
18 with Ms. de Leon about the observation?
19 A Yes. We met on September 24th,
20 four days later, to discuss the
21 observation.
22 Q And that was her signature at
23 the bottom there?
24 A Yes, it was.
25 Q And how did she react? Was she

Page 42

```
 1  pleased that you were pleased?
 2  A   Yeah.  Yeah, she was, you know,
 3  she was great.
 4  Q   And then was Mr. Deshner
 5  continuing to do observations that
 6  Year?
 7  A   Yes, he was.
 8  Q   And was Mr. Dolecki also doing
 9  observations?
10  A   I believe he was in to do an
11  observation, yes.
12  Q   And was this sort of a team
13  approach?
14  A   Yeah, it was a team approach.
15  We kind of, you know, see some of the
16  issues from different angles, see if we
17  were seeing the same things to see if
18  things were improving.
19  Q   And what were you trying to
20  achieve by this team approach?
21  A   We were trying to get the
22  classroom management where it needed to
23  be, to improve relations between
24  students, parents and administration.
25          (Higgins Exhibit 8 marked
```

Page 43

```
 1          for identification.)
 2  BY ATTORNEY HEATH:
 3  Q   I'll show you now what's been
 4  marked as Higgins Exhibit 8, which is a
 5  September 20th, 2001 letter, and then
 6  there's an attachment, as well, of
 7  several pages.  And I'll ask you to
 8  identify that for the record, please.
 9  A   Yes.  Oh.  The September 20th,
10  01?
11  Q   Yes.
12  A   Okay.  It was part of the action
13  plan that Mrs. de Leon was required to
14  do.  This is something I put together
15  to help her meet that requirement, make
16  it a little easier.  What I did --- and
17  would you like me to go on to explain?
18  Q   Yes, please.
19  A   What I did here is I put this
20  packet together for Mrs. de Leon.  In
21  her action plan, she was required to
22  observe some teachers, three different
23  teachers.  And I felt it would be
24  easier for her if I gave her a list of
25  teachers that we had talked to, that
```

Page 44

```
 1  Mr. Deshner had talked to, and they
 2  agreed to open up their rooms to Mrs.
 3  de Leon.  And along with that, I sent
 4  their schedules to Mrs. de Leon to see
 5  so she could --- easier for her to set
 6  up the observation, make it easier for
 7  her to set up an observation with the
 8  teacher.
 9  Q   And at the time when you'd
10  initially gone over the corrective
11  action plan, was Ms. de Leon --- did
12  she agree to do this?
13  A   Yes.
14  Q   And I see on the second page of
15  this exhibit, you had talked to certain
16  teachers and they had all agreed to
17  observe their classrooms?
18  A   Yes, they did.
19  Q   And I see many of these were
20  union representatives, correct?
21  A   Yes.
22  Q   So in that regard, they had some
23  sort of a relationship with Ms. de
24  Leon ---
25  A   Right.
```

Page 45

```
 1  Q   --- from the past?
 2  A   Right.
 3          (Higgins Exhibit 9 marked
 4          for identification.)
 5  BY ATTORNEY HEATH:
 6  Q   Exhibit 9 is a classroom
 7  evaluation dated December 3rd of 2001
 8  that is signed by you.  And I
 9  apologize for the quality of the copy.
10  It may be a little bit hard to read.
11  But if you could try to read it, the
12  commendations and recommendations
13  section into the record, I'd appreciate
14  it.
15  A   Okay.  This is an observation
16  I'd done on December 3rd.  This would have
17  been my second visit to Mrs. de Leon's
18  classroom.
19  Q   That year?
20  A   Yeah, for the '01 to '02, school
21  year.  I believe all areas were
22  satisfactory.  They appear to be.  I'll
23  attest to that.  I did have a
24  commendation and I did have a
25  recommendation.  And I write, having
```

Multi-Page™

**Page 46**

1 students write sentences on the board
2 is an effective teaching technique.
3 You do a very good job covering the
4 students' sentences on the board and
5 making the necessary corrections
6 followed by an explanation of the
7 correct usage. This technique could be
8 made more effective in bringing the
9 student to the board to make the
10 necessary corrections and verbally
11 prompting the student needed. And I
12 met with Mrs. de Leon on December 6th
13 of 2001 to discuss the observation.
14 Q.And was she receptive to what
15 you were saying?
16 A.Yes, she was.
17 (Higgins Exhibit 10
18 marked for
19 identification.)
20 BY ATTORNEY HEATH:
21 Q.Exhibit 10 is another report of
22 a classroom visitation or observation
23 summary from March 7th of 2002. And
24 that is --- essentially, I don't see
25 anything in my records between the

**Page 47**

1 December visit and the March visit, and
2 I don't know off the top of my head if
3 anybody else visited her classroom.
4 But this would be your third visit that
5 year; is that correct?
6 A.Correct.
7 Q.And can you summarize the
8 information contained in this
9 observation?
10 A.This is the March 7th, 2002
11 observation. This would have been my
12 third visit in Mrs. de Leon's classroom
13 in '01/'02 school year.
14 Q.I note at the bottom here it
15 says she refused to sign.
16 A.Correct.
17 Q.And that would be Ms. de Leon
18 refused to sign it?
19 A.Yeah. And that's my
20 handwriting.
21 Q.The two pages that are attached
22 to this observation, did you prepare
23 these two pages?
24 A.Yes, I did.
25 Q.And I see that there are eight

**Page 48**

1 points on these two pages attached to
2 the observation?
3 A.Yes.
4 Q.Do those points then correspond
5 to the number on the first page?
6 A.Yes, they do.
7 Q.Can you please, for the record,
8 explain what is contained in this
9 observation?
10 A.Okay. On the observation, I
11 have numbered one through eight, one
12 being the first point, planning
13 reflects lesson objectives and
14 activities. And that's where I started
15 with Mrs. de Leon to go over the
16 observation. I wrote, show
17 consistency with the presentation of
18 your objectives. You always write the
19 objectives of the day's lesson on the
20 board and briefly cover the planned
21 activities.
22 Q.That was a positive comment?
23 A.And I saw that consistently all
24 three times I was in the classroom.
25 Second is a positive. I really liked

**Page 49**

1 the approach you used to help one
2 student remember the Spanish terms on
3 the board. You suggested that he
4 create a rap song incorporating the
5 terms. I thought that was excellent.
6 And putting the Spanish terms to music
7 is an effective mnemonic device, which
8 is basically a memory device. Three --
9 -.
10 Q.And then three is under
11 instructional technique and
12 effectiveness?
13 A.Yes.
14 Q.And it would be under
15 introduction and motivation?
16 A.Yes.
17 Q.And IN is improvement needed?
18 Is that what that means?
19 A.Yes. Correct. Improvement
20 needed.
21 Q.Well, what was that point on
22 number three?
23 A.What happened was, when I came
24 into the class, the students were
25 noticeably upset. Well, I noticed that

**Page 50**

1 Mrs. de Leon, when I came into the
2 classroom, changed her entire agenda
3 for the day because I was in the
4 classroom to observe. The students
5 were noticeably upset by, you know, the
6 change. And one student even asked if
7 it was because of myself that Mrs. de
8 Leon had changed, and she told the
9 students yes. She then started the
10 day's lesson. And I made a suggestion,
11 by changing your agenda, many students
12 become unmotivated to learn right from
13 the start of the day's lesson.
14 Further, some students came unprepared
15 in anticipation of watching a movie,
16 which was the initial agenda for the
17 day. And I don't have a problem with
18 that. I mean, I've even gone into
19 classrooms before where the teachers
20 say, look, we're going to test today,
21 or we're going to go a little bit off,
22 basically if you'd like to come back
23 tomorrow. And I've done that. I mean,
24 ---
25 Q In other words, she could have

**Page 51**

1 watched the movie if --- ?
2 A Could have watched the movie,
3 I said, Mr. Higgins, we're watching a
4 movie today. Maybe this is a reward.
5 Maybe this is, you know, something
6 else. And I would have come back the
7 next day, you know. But it kind of
8 threw things off for the kids right off
9 the bat.
10 And four, I observed many
11 students throughout the lesson not
12 paying attention to Mrs. de Leon. Some
13 were drawing, others were writing notes
14 or just sitting there doing nothing at
15 all. And I felt that she needed to be
16 more aware of these students and
17 include them in the class.
18 Q What was she doing, ignoring
19 them?
20 A I think she was trying to teach,
21 but not really paying attention to what
22 they were doing. She was teaching but
23 not, you know, focusing on these
24 students that weren't participating,
25 Q And then number five would be

**Page 52**

1 improvement needed relative to summary
2 and closure.
3 A Let me read this real quick. A
4 student attempts to interrupt Ms. de
5 Leon by asking aloud, are you going to
6 check homework today? I write, you
7 ignored him and you continued teaching,
8 which is fine. He then raises his hand
9 and you call on him. He asks again and
10 you say yes, but five minutes later,
11 some students started closing their
12 books while others get up to throw
13 paper and gum away without permission.
14 Mrs. de Leon stops teaching and begins
15 checking homework. The bell rings.
16 The students leave while she is still
17 checking the homework of a few
18 students.
19 I make some suggestions for
20 closing the lesson. First, make sure
21 students are aware of your classroom
22 rules. Students must raise hands
23 before being called on, come prepared,
24 et cetera. If you need to spend some
25 time reviewing rules of the class, then

**Page 53**

1 do so. You know, take a few minutes
2 out and go over the rules with the
3 kids. Check homework at the beginning
4 of the period and tell students it will
5 be checked first thing the next class
6 period. Basically, what I meant by
7 that is keep an eye on the clock. You
8 know, if you're running out of time,
9 I'm saying to check and say, look, I'm
10 not going to get to it today. Let's go
11 ahead and bring it tomorrow. We'll do
12 it first at the beginning of the
13 period.
14 And finally, you know, I felt
15 the students got up on their own and
16 just left the classroom. The bell did
17 ring, but they weren't dismissed by the
18 teacher. And that's a form of control.
19 That's some of the things we were
20 looking at in her action plan, and I
21 felt that needed to be addressed.
22 Q And then moving along to number
23 six, where you say needs improvement
24 under teacher/student interaction, and
25 again, the consistency issue comes up?

Page 54

1 A. Yes. I observed her
2 disciplinary reprimand of a student at
3 the front of the room for not following
4 the lesson. The student angrily showed
5 Mrs. de Leon her paper, that she had
6 been writing notes from the board.
7 Another student at the back of the room
8 sat almost the entire period I observed
9 with no book or pencil, and his feet
10 propped up on a chair. I am like, you
11 know, she's not yelling at the kid, but
12 she reprimands them for not paying
13 attention. The kid actually was taking
14 notes and shows her the paper while
15 another kid was at the back not doing
16 anything.
17 Q. And visibly not doing anything?
18 A. They're visibly not doing
19 anything. When she finally did speak
20 to him, she mentioned that he needed to
21 be prepared, but in effect, rewarding
22 him by pairing him up with the student
23 sitting next to him. I observed that
24 he borrowed a pencil and began drawing
25 on his Trapper Keeper. And I make the

Page 55

1 suggestion that I feel consistency in
2 working with students is key in good
3 classroom management. Students are
4 aware of what other students are doing
5 in the classroom and what the teacher
6 is doing in regard to how they are
7 disciplined.
8 Number seven would fall under
9 management and organization of the
10 classroom. And I felt improvement
11 needed, control and discipline for a
12 fairness sympathetic. I observed a
13 female student being very rude to Mrs.
14 de Leon and told her, you know, you're
15 blocking my view. Move out of the way.
16 Very harsh. I felt Mrs. de Leon, she
17 did not address the way the student
18 spoke to her, but instead, told her to
19 see her after class for being
20 unprepared. When the period was over,
21 the student left without meeting with
22 Mrs. de Leon. Mrs. de Leon failed to
23 remind the student to stay after.
24 Again, I cite consistency. I
25 feel consistency is key. First, make

Page 56

1 sure to address the immediate problem.
2 In this case, the student should have
3 been made aware immediately that they
4 way she addressed you was unacceptable.
5 Second, you gave her a directive to
6 stay after class for being unprepared.
7 And I felt the other kids saw this
8 student leave without so much as a, you
9 know, sound, and they saw that she did
10 not follow Mrs. de Leon's directives.
11 I felt that was undermining Mrs. de
12 Leon's position as the authority in the
13 classroom.
14 Number eight falls under
15 management and organization, and
16 establishes and follows classroom
17 routines and procedures. I observed
18 that your lesson was interrupted on
19 three occasions by students wanting to
20 use the restroom. And basically, here,
21 I give a suggestion of establishing a
22 hall pass procedure where students are
23 limited to when they can ask for a hall
24 pass, for example, the first five
25 minutes of class when you're checking

Page 57

1 homework or doing an activity. I would
2 make it very clear that no passes will
3 be given during a lesson.
4 Q. Okay. And you spoke with her
5 about those, I'm assuming, because
6 there's a conference date of March 12th
7 of '02 on the front page.
8 A. Yes.
9 Q. And then she refused to sign it.
10 Do you recall anything specifically
11 about this meeting of March 12th of
12 '02?
13 A. You have to understand the
14 things that were going on, you know,
15 between the lessons. This wasn't the
16 only thing that, you know, was
17 happening. There was an increase in
18 parent phone calls. There was an
19 increase of kids coming into the office
20 stating that there was lost homework
21 or, you know, being treated unfairly.
22 And it was just starting to deteriorate
23 was my observation.
24 Q. So the first visit had been
25 pretty good and then ---?

**Page 58**

1  A  Second visit was pretty good,
2  too. Not great, but you know, it was
3  pretty good, no problems. And then I
4  go in March 7th and, you know, it just
5  was a change. It was 180.
6  Q  And this observation was done,
7  you said, in conjunction with the
8  increase of parent phone calls and
9  student complaints about losing
10  homework and that kind of thing?
11  A  Correct.
12  Q  And did you keep Mr. Deshner
13  apprised of all this other information,
14  as well?
15  A  Yes, I did.
16  Q  And so then relative to the
17  conference that was going to occur ---
18  or that did occur on March 12th, 2002,
19  do you recall who was present at that
20  conference or meeting?
21  A  I believe it was Mr. Heller, Mr.
22  Mehok, Mrs. de Leon and myself.
23  Q  What was the purpose of the
24  conference?
25  A  The purpose of the conference

**Page 59**

1  was to cover my observation.
2  Q  And were you going to address
3  the other issues as well?
4  A  Yes.
5  Q  And what's your recollection of
6  what occurred on that date? Let me ask
7  you this. Did the meeting ever finish?
8  A  No, it did not. Mrs.
9  once I reached --- I thought it was
10  four or five but it might have been
11  more like question three or four, you
12  know, as soon as Mrs. de Leon started
13  to hear some negative aspects of what
14  was going on in the classroom, she
15  couldn't go on. She became very
16  negative, very upset, emotionally
17  distraught, and the meeting could not
18  continue and it was --- I mean, Mr.
19  Mehok was aware, Mr. Heller was aware
20  so that, you know, it couldn't go on. She
21  said, I can't teach, I can't do this
22  anymore. I can't take this anymore,
23  you know, can't go on. And the meeting
24  ended right there.
25  Q  Did she then walk out?

**Page 60**

1  A  Yes. Her and Mr. Mehok left,
2  and I think they went up to her
3  classroom.
4  Q  And at that point, what did you
5  do? What happened? I mean, how did
6  you react to Ms. de Leon's demeanor and
7  her behavior? Were you surprised or
8  did you ---?
9  A  I don't think, you know, it was
10  totally a surprise. I mean, it was
11  unusual. I mean, it was bizarre. You
12  know, I've only been there a year or
13  two now, and I've never dealt with a
14  teacher that, you know, responded that
15  way to supervision. So yeah, I guess
16  it was kind of a shock.
17  Q  And did you then discuss it with
18  Mr. Deshner and Mr. Heller about what
19  to do at that point?
20  A  Yes. It was discussed, you
21  know, about what to do. You know, the
22  suggestions in the action plan, they
23  weren't being met and weren't being
24  followed. And I felt at the time that
25  an unsatisfactory rating was warranted

**Page 61**

1  at that point in time.
2  (Higgins Exhibit 11
3  marked for
4  identification.)
5  BY ATTORNEY HEATH:
6  Q  And I'll show you what's been
7  marked as Exhibit 11, which is the
8  unsatisfactory rating dated March 18th,
9  2002. Before we talk about this
10  specifically, I want to ask you, are
11  you aware that this was the subject of
12  a grievance before Arbitrator Duff?
13  A  Yes.
14  Q  And that this was actually
15  overturned on procedural grounds; are
16  you aware of that?
17  A  Yes.
18  Q  Do you believe that the
19  unsatisfactory --- despite that
20  Decision, do you believe that it was
21  warranted?
22  A  Yes, I do.
23  Q  And can you address the areas in
24  which she received an unsatisfactory on
25  this instrument, please?

**Page 62**

1 A.Yes. She received an
2 unsatisfactory mark under professional
3 competency. And I so note, lack of
4 classroom control has affected the
5 learning process. Students are
6 sleeping in class, drawing pictures,
7 you know, walking around while
8 instruction is going on. And Mrs. de
9 Leon has been unable to implement
10 effective classroom management.
11 Also under professional
12 competency, she received an
13 unsatisfactory mark for teacher/student
14 interaction. Mrs. de Leon, I felt,
15 lacked consistency when dealing with
16 matters of discipline in her classroom.
17 And some students were reprimanded for
18 specific behaviors in the class while
19 others exhibiting the same behaviors go
20 unattended.
21 She received an unsatisfactory
22 mark under personal characteristics and
23 traits. And I so noted that Mrs. de
24 Leon became argumentative and
25 derogatory when meeting with

**Page 63**

1 administration regarding education
2 improvements. She continuously looks
3 down, looks away or down at the floor
4 when suggestions for improvement are
5 being made.
6 Attitude, unsatisfactory. I felt
7 poor attitude, you know, had been
8 consistently shown when meeting with
9 her on specific points.
10 Q.You said that she argues, glares
11 at the administration, has emotional
12 outbursts?
13 A.Correct.
14 Q.And relative to other
15 observations, the first two that you
16 had had with her, you had indicated
17 that she seemed to be fairly receptive
18 because your evaluations were positive
19 in nature?
20 A.Right.
21 Q.So relative to this part of the
22 evaluation, you said that she's shown
23 poor attitude during meetings. Was
24 this something that you were referring
25 to the March 12th meeting specifically,

**Page 64**

1 Q.Or is there anything else that you were
2 referring to?
3 A.Yes. In the section of the
4 action plan, I felt her demeanor or her
5 feelings towards the administration, or
6 her demeanor towards the administration
7 I was not professional. I mean, she
8 questioned it. She felt it wasn't,
9 necessary, felt that we were picking on
10 her.
11 Q.The action plan?
12 A.In the action plan. So I mean,
13 from portal to portal, I mean, it
14 really hadn't improved, and it showed
15 in that final meeting with her.
16 Q.So it's fair to say that
17 essentially, as long as you weren't
18 giving her any suggestions for
19 improvement, she was okay?
20 A.Yeah, it appeared that way.
21 Q.But as soon as any criticism or
22 any improvement was suggested, areas
23 that she can improve in were suggested,
24 she reacted negatively?
25 A.She became very defensive, yes.

**Page 65**

1 Q.Looking at the second page of
2 this evaluation, at the top, there is
3 an unsatisfactory in the first
4 category. What is that about?
5 A.Okay. Here I stated, Mrs. de
6 Leon has continually ignored the action
7 plan given to her on June 8th, ---
8 plan given to her on June 8th, 2001. She agreed to this action
9 plan and all points found within. But
10 when we met with her about the plan,
11 she'd continually cite the harassment
12 concerning the observations she agreed
13 to.
14 Basically, some of the
15 statements made as quoted by Mr.
16 Deshner, why am I on an action plan?
17 No one in the District is on one
18 and no one else is observed as much as
19 I am. And I was also there when she
20 made those statements.
21 Q.And just so the record is clear
22 in this regard, relative to the
23 observations, you were not the only one
24 doing the observations; were you?
25 A.No, I was not. It was ---

Page 66

1 Q Other administrators were also
2 doing observations and having meetings
3 with her?
4 A Correct.
5 Q Okay. Go ahead.
6 A Under D, maturity, all
7 professional staff should display
8 maturity. And it was felt Mrs. de Leon
9 was antagonistic to parents, students
10 and administration, and that this
11 behavior surfaces in the classroom, in
12 parent conferences, and administrative
13 meetings. And I felt, you know --- the
14 parents would see it and there would be
15 frustration on the parents' part in
16 dealing with the parents.
17 Dependability, Mrs. de Leon has
18 not sufficiently met areas of concern
19 outlined in her action plan.
20 Communication, I felt Mrs. de
21 Leon builds walls when communicating
22 with administration and parents. She
23 pays no attention to what an
24 administrator's saying by looking away,
25 looking at the floor and arguing. She

Page 67

1 glares at parents during parent
2 conferences, which caused parent
3 conferences to deteriorate rapidly.
4 Finally, professionalism, there
5 had been no evidence of professional
6 development or growth opportunity at
7 this time. And this was done by myself
8 and Mr. Deshner, and I have signed the
9 unsatisfactory mark.
10 Q In reviewing that today, do you
11 believe that those comments were fair
12 and merited?
13 A Yes.
14 Q Were you aware that Ms. de Leon
15 was under a psychologist's care in
16 March of 2002?
17 A I believe it was mentioned to me
18 either by Mrs. de Leon or somebody,
19 yes. I'd have to say that's valid.
20 Q Do you remember if it was before
21 or after the March 12th meeting that
22 you became aware of that, if you
23 remember?
24 A Possibly before. I can't really
25 say for sure. I can say I was aware.

Page 68

1 Q At any point after you became
2 aware that she was under a
3 psychologist's care, did you seek to
4 harass or discriminate against her on
5 that basis?
6 A Absolutely not.
7 Q Did you ever seek to harass or
8 discriminate against Mrs. de Leon, or
9 retaliate against her because she filed
10 grievances, or filed with the
11 Pennsylvania Human Relations
12 Commission?
13 A Absolutely not.
14 Q Did you ever seek to harass or
15 discriminate against Mrs. de Leon based
16 on her gender?
17 A No.
18 Q Did you ever seek to harass or
19 discriminate against Mrs. de Leon based
20 on her national origin?
21 A No.
22 Q Prior to the school year
23 resuming --- just so the record is
24 clear, I'm not getting into a lot of
25 the information, but Ms. de Leon was

Page 69

1 off for a period of time at the end of
2 that year. Were you aware of why?
3 A Yes.
4 Q Why was that?
5 A Her doctor signed her out. And
6 what I recollect is she called in or
7 sent a note in with somebody stating
8 that a doctor recommended because of
9 depression that she take the time off.
10 I remember seeing the note. I think it
11 was between the 12th and 18th. But
12 after that, I believe the District
13 moved for their own evaluation for Mrs.
14 de Leon before she was able to come
15 back to work.
16 Q And then as far as you know, she
17 was cleared to return to work?
18 A Correct.
19 Q And she came back to work
20 approximately May 23rd of that year?
21 A Okay.
22 Q Prior to the year resuming then
23 --- the next school year would be the
24 2002/2003 school year. And prior to
25 the year resuming, did you assist in

**Page 70**

1 developing another school improvement plan for
2 the Plaintiff?
3 A Yes.
4 (Higgins Exhibit 12
5 marked for
6 identification.)
7 BY ATTORNEY HEATH:
8 Q And I'll show you what's marked
9 as Exhibit 12 and ask you to identify
10 if it for the record, please.
11 A This is the action plan that I
12 assisted in developing for the upcoming
13 '02 to '03 school year.
14 Q And are there areas of
15 differences between this action plan
16 and the one we talked about earlier for
17 the 2001 to 2002 school year?
18 A Yes. I think this follows along
19 the points that were pointed out in the
20 evaluation, unsatisfactory evaluation,
21 the areas that we really wanted her to
22 work on. And so we focused on those,
23 and we actually, you know, had the
24 professional competency and personal
25 characteristics and traits. And we

**Page 71**

1 focused on those specifics, the
2 comments we made. We wanted to put
3 something in place that would improve
4 her classroom management, consistency
5 in the classroom, discipline.
6 Q And contained in this corrective
7 action plan, I mean, were there still
8 some recurring themes that had been
9 addressed in prior years with her?
10 A Yes.
11 Q For example, classroom
12 discipline, consistency?
13 A Yeah. Management in the
14 classroom, consistency, some behavioral
15 problems, dealing with parents, yes.
16 Q And on the third page, and
17 basically, these have points that she
18 --- this whole plan, three pages,
19 contains points that she's expected to
20 follow, correct?
21 A Yes.
22 Q And at the bottom of page two,
23 it says that the goal of these first
24 objectives, which would be one through
25 four, and then four would be A through

**Page 72**

1 I, would be creating an environment in
2 which students know and follow the
3 rules is challenging but not
4 impossible. With a little patience and
5 perseverance, you can lay a foundation
6 for respect and positive behavior in
7 your classroom that lasts all year. Do
8 you see where I am?
9 A Under number four?
10 Q At the bottom of the page, page
11 two.
12 A Creating an environment in which
13 students ---
14 Q Yes.
15 A --- know and follow the rules?
16 Yes.
17 Q And looking at Roman numeral II
18 on the last page, page three, personal
19 characteristics and traits, can you
20 summarize what's contained in here?
21 A Basically, in meetings with Mrs.
22 de Leon, she would be argumentative,
23 get very emotional, and we felt that
24 she wouldn't listen. And one of the
25 personal characteristics we felt was

**Page 73**

1 necessary in order for her to be, you
2 know, more successful in the classroom
3 was Mrs. de Leon must be willing to
4 listen to suggestions administrators
5 are making without becoming
6 confrontational.
7 In two, we felt Mrs. de Leon
8 must remain professional at all times
9 when meeting with administration and
10 staff. This would be evidenced by her
11 willingness to concentrate on
12 information being presented, not
13 working on other materials, looking
14 away, having emotional outbursts, and
15 staring at the floor. What it means by
16 not working on other materials, you
17 know, Mrs. de Leon would tend to take
18 notes of what was being said, and we
19 felt not focusing on what was being
20 said. Three, Mrs. de Leon must follow
21 every step of the action plan ---
22 Q Before you get to number
23 three ---
24 A Sure.
25 Q --- look at number two. Did you

**Page 74**

1 actually personally observe her doing
2 things such as having emotional
3 outbursts, looking at the floor,
4 looking away?
5 A.Yes, I have seen the emotional
6 outbursts, you know, dealt with the
7 confrontation, and I watched her stare
8 at the floor. I mean, --- and not look
9 at the administrator. I saw it in a
10 meeting with Mr. Deshner. She wouldn't,
11 look at him.
12 Q.And back to that meeting on
13 March 12th of 2002, do you recall that
14 being an issue there, as well, with Mr.
15 Heller saying, are you aware of what
16 --- before the outburst part that Mr.
17 the administration is saying to you, or
18 words to that effect?
19 A.Yes, yes. I remember him saying
20 that. She was being confrontational
21 with me once I started getting into
22 some the more negative comments or
23 aspects of the observation, and wanted
24 to argue. And Mr. Heller did remind
25 her that, you know, Mrs. de Leon, you

**Page 75**

1 need to listen to what Mr. Higgins is
2 trying to tell you. So he had to kind
3 of redirect her back, but that was kind
4 of --- after that, it just went
5 downhill. She became very emotional,
6 and that's when the meeting ended. So
7 that's why that's in there, or part of
8 the reason.
9 Q.And then is she directed to
10 follow every step of the action plan in
11 number three?
12 A.Yes.
13 Q.And told up front that she would
14 be required to document her progress
15 and that she would be re-evaluated
16 within two weeks of the second marking
17 period?
18 A.Yes. This was covered with Mrs.
19 de Leon.
20 Q.And all of this information was
21 covered with her and gone over --- did
22 you go over it with her in a meeting?
23 A.Yes. It was read to her. And I
24 believe one of the union reps was Mr.
25 Koznowski. Also, number four on the

**Page 76**

1 personal characteristics and traits, we
2 felt, you know, some of the things that
3 would help Mrs. de Leon, communicate
4 either verbally or in writing to
5 parents of students exhibiting routine
6 behavioral problems in the classroom.
7 I mean, I felt this was
8 important because I felt sometimes ---
9 or felt maybe one of the reasons that,
10 you know, there were so many discipline
11 problems in that classroom was because
12 the parent wasn't being included or,
13 you know, the procedures weren't being
14 followed that she had in place. So we
15 felt that she should keep a log of the
16 date and time, contact made or a letter
17 sent to parents. We felt students who
18 continue to misbehave after classroom
19 management plan has been followed and
20 the parental contacts has been made are
21 to be referred to the administration.
22 I mean, there is a point where, once a
23 teacher reaches that with a student
24 that it should be in the ballpark, the
25 administrators' ballpark.

**Page 77**

1 Q.But you're saying essentially
2 she's got to take care of it in her
3 classroom as the first measure?
4 A.She's the first line of defense.
5 We felt more serious behavioral
6 offenses are to be reported directly to
7 administration. Just for example, you
8 know, fighting, profanity towards
9 staff, possession and use of tobacco
10 products, you know, et cetera.
11 Five, Mrs. de Leon should seek
12 out workshops, seminars and conferences
13 to address the areas of improvement
14 cited in the action plan and appendix
15 A.I think this one was by Mr.
16 Deshner. He felt that these would, you
17 know, be helpful if she were to get
18 involved with discipline in the
19 classroom, some of the conferences that
20 were available through the IU.
21 Administration would be available at any
22 time with reasonable notice to assist
23 her in all areas, professional
24 development, classroom management, and
25 effective communication.

**Page 78**

1 Q During this time frame, did Ms.
2 de Leon come to you and ask you for
3 your assistance concerning professional
4 development or classroom management?
5 Did she seek you out and try to have
6 you help her, if you recall?
7 A You know, I do recall Mrs. de
8 Leon stopping in to speak about some
9 discipline problems in the classroom
10 and asking about it, but I can't
11 remember specific dates. But I do
12 remember her stopping in.
13 (Higgins Exhibit 13
14 marked for
15 identification.)
16 BY ATTORNEY HEATH:
17 Q With regard to parent
18 interaction and student discipline, the
19 next exhibit I want to show you was a
20 letter dated October (sic) 30th, 2002.
21 And I'm assuming this is at the very
22 beginning of the 2002 to 2003 school
23 year; is that correct?
24 A Yes.
25 Q And can you identify this for

**Page 79**

1 the record?
2 A This is part of the action plan.
3 Q Is this similar to what we
4 looked at for the year before?
5 A Yes, very similar.
6 Q And this is relative to what
7 issue?
8 A The action plan.
9 Q And doing what? What is she
10 supposed to be doing?
11 A Under professional competency,
12 she's supposed to be observing teacher
13 classrooms every two weeks for the
14 first six-week marking periods for a
15 total of six observations that would be
16 required at the end of the second
17 marking period. And again, this is,
18 you know, observe classroom management
19 and strategies utilized in other
20 classrooms. And we felt her doing the
21 personal reflection of the class
22 observed was something she could use as
23 a reference.
24 Q And again, did you seek out
25 teachers to open their classrooms to

**Page 80**

1 her and agree to allow themselves to be
2 observed by her in order to help her in
3 her performance?
4 A Yes, we did that, Mr. Deshner
5 and myself called teachers to see if
6 they'd open up their rooms to Mrs. de
7 Leon. And the ones we called did. And
8 again, I attached their schedules so it
9 would make it easier for Mrs. de Leon
10 to set up those appointments.
11 Q Towards the beginning of the
12 2002/2003 school year, did you observe
13 Mrs. de Leon?
14 A Yes.
15 Q And let me just ask you this,
16 before we get into the observation that
17 was done in September, relative to this
18 corrective action plan, was its purpose
19 to intimidate or harass Ms. de Leon in
20 any way?
21 A No.
22 Q Was its purpose designed to trap
23 her so that she would fail in her
24 performance?
25 A Absolutely not.

**Page 81**

1 Q What was the purpose of this
2 corrective action plan?
3 A The purpose was to help her with
4 those things that we felt that weren't
5 working in her classroom in regards to
6 discipline, classroom management,
7 dealings with parents, student
8 interaction ---
9 Q And was this ---
10 A --- to help her improve in the
11 classroom.
12 Q --- corrective action plan
13 implemented as a punishment relative to
14 her filing a grievance concerning the
15 unsatisfactory evaluation?
16 A Absolutely not.
17 (Higgins Exhibit 14
18 marked for
19 identification.)
20 BY ATTORNEY HEATH:
21 Q Looking at Exhibit 14, which is
22 a classroom visitation observation
23 summary dated September 11th, 2002, I
24 note again this is signed by you, and
25 there's a conference date of September

**Multi-Page™**

## Page 82

```
 1   13th, 2002?
 2   A Correct.
 3   Q Basically, under comments here,
 4   it says, see attachment. Looks like
 5   she got all satisfactory on the left,
 6   but then it said, see attachment. Do
 7   you recall ---
 8   A I can tell you right now I don't,
 9   --- whoever stapled this ---
10   Q Yes?
11   A This part is not part of this.
12   Q Okay.
13   A This is. It's actually ---
14   here's the observation. It would be
15   this one.
16   Q Which would be the attachment,
17   then?
18   A This would be the attachment for
19   the observation on September 11th.
20   Q It says 9/13?
21   A Yeah. It says date met, 9/13,
22   September 13th.
23   Q Okay.
24   A And there's a commendation and
25   recommendation.
```

## Page 83

```
 1   (Higgins Exhibit 15
 2   marked for
 3   identification.)
 4   BY ATTORNEY HEATH:
 5   Q So taking these apart then, ---
 6   A And there's a ---
 7   Q --- it would be Exhibit 15. The
 8   first page of Exhibit 15 goes with 14;
 9   is that what you're saying?
10   A Actually, it's just a one-page
11   attachment is all it was.
12   Q Okay.
13   A That doesn't go with it, either.
14   So it would just be these two. They go
15   to something.
16   Q Yes, and I wish I knew what it
17   was. Okay. Before we get to the ---
18   Also you want to take a break?
19   Q --- observation ---. Yes, let's
20   take a break for a second.
21   SHORT BREAK TAKEN
22   ATTORNEY HEATH:
23   Okay. Back on the
24   record.
25   BY ATTORNEY HEATH:
```

## Page 84

```
 1   Q At the top of Exhibit 14, there
 2   was some confusion as to the attachment
 3   that went with the observation of
 4   9/11/02. And the attachment that we
 5   have now on there is dated 9/13/02.
 6   And that's correct, Mr. Higgins?
 7   A Yes.
 8   Q And you have a commendation and
 9   a recommendation here. You said at the
10   beginning, you felt it was a very good
11   class?
12   A Yes. I was very happy with it,
13   a very good class. I state that Mrs.
14   de Leon is meeting all areas defined in
15   her action plan at this time. And I
16   felt that she showed good consistency
17   in regard to classroom management. For
18   example, a student was unprepared for
19   class. She gave them a warning and
20   reviewed the classroom rule with them.
21   And I felt that not only reinforced
22   what was to be expected of the student,
23   but also let other students know that
24   she was not going to tolerate that type
25   of behavior.
```

## Page 85

```
 1   I had a recommendation, a quite
 2   simple one. One of the posted rules
 3   stated, stay awake, sit up nice and
 4   straight. I thought the rule could be
 5   difficult to enforce consistently and
 6   open up the teacher for debate with the
 7   student if it were used. I suggested
 8   changing the rule to be attentive.
 9   This would be easier to define and not
10   give the student room to argue the
11   rule, which I'd seen in a previous
12   year's ---
13   Q Be attentive?
14   A Be attentive, that you know,
15   students would argue with the teacher.
16   The overall observation was
17   satisfactory.
18   Q And just because I had the court
19   reporter pre-number the exhibits, the
20   ones that were incorrectly attached to
21   these three pages and see at least if
22   14, I just want you to take a look at
23   you can identify who they came from or
24   where they came from.
25   A I believe the one with the first
```

**Page 86**

1 sentence reading, Mrs. de Leon was
2 observed during eighth period Spanish I
3 class, there were 12 students present
4 in the class. I believe that this
5 would be an attachment to one of Mr.
6 Deshner's observations, but I can't
7 tell you what school year.
8 Q Okay. And then the one that
9 says, you need to work on the following
10 areas to improve your performance,
11 preparation planning?
12 A I believe this was either Mr.
13 Dolecki's or Mr. Heller's, but I'm not
14 quite sure.
15 Q And then the part that says, we
16 believe positive classroom behavior
17 begins with a solid foundation?
18 A It's ---
19 Q Is that what actually ends up
20 being 4(a) through (i) on her
21 professional improvement plan for that
22 year?
23 A Yes, yes.
24 (Higgins Exhibit 16
25 marked for

**Page 87**

1 identification.)
2 BY ATTORNEY HEATH:
3 Q Okay. Moving on to Exhibit 16,
4 it's a memo dated 9/23/02 to Ms. de
5 Leon from you concerning being late to
6 class. Do you recall the circumstances
7 that prompted you to draft this memo?
8 A Yes. I was walking down the
9 hall, and fourth period began at 10:31.
10 I saw Mrs. de Leon coming through the
11 hallway doors to classroom at 10:35. I
12 just felt that she needed to be to
13 class on time. One of the reasons, if
14 you remember correctly, she did leave
15 and not tell anyone, the class was
16 unsupervised. So I felt it was
17 important to address this issue, which
18 was addressed in the action plan about
19 being consistent. I understand
20 occasionally extenuating circumstances
21 arise that may delay a teacher from
22 arriving on time, but discussing a
23 student cannot be a cause for
24 tardiness. And I gave her some
25 suggestions that, you know, she could

**Page 88**

1 do it on ---
2 Q Plan time?
3 A You know, to discuss with other
4 teachers, you can meet with the teacher
5 after school the first few minutes, and
6 I felt that would also be beneficial.
7 Q And was this meant as a written
8 reprimand of some kind, or what was the
9 purpose of this memo?
10 A No, just to give her notice
11 that, you know, she needs to be to
12 class on time. I was, you know,
13 working the action plan. That was a
14 tool we were using to improve, you
15 know, classroom management skills and
16 everything else that was cited.
17 Q This was a reminder?
18 A It was just a reminder.
19 Q And did Ms. de Leon then prepare
20 a response to you about this memo?
21 A Yeah.
22 (Higgins Exhibit 17
23 marked for
24 identification.)
25 BY ATTORNEY HEATH:

**Page 89**

1 Q And is that what's been marked
2 as Higgins Exhibit 17, which is a
3 response to memo 9/23 to Mr. John
4 Higgins from Claudette de Leon dated
5 9/24/02?
6 A Yes.
7 Q And could you summarize what's
8 contained in this memo that was a
9 response from Ms. de Leon to your prior
10 memo?
11 A She gave me a reason for her
12 lateness to class. She was speaking
13 with teacher Meg Daniels about student
14 Pam Glegone. And you know, Pam was
15 having a hard time in her class, and
16 that's what they were speaking about.
17 And the problem I had with this
18 correspondence or memo from Ms. de Leon
19 was near the end where she states, in
20 your memo, referring to my memo, you
21 also mention that I arrived at 10:35 at
22 my study hall, I believe I arrived at
23 my study hall at 10:33. She's
24 disputing the time that I had in there,
25 And I was looking at the clock. I had

**Multi-Page™**

---

**Page 90**

1 a watch on. You know, according to my
2 study hall class roster, and she cites
3 her study hall pass roster, that my
4 first student left at 10:34 to the
5 restroom. Please see copy attached. I
6 also asked Mrs. Daniels to write you a
7 memo about her casual conference on the
8 stairs before fourth period study hall,
9 Needless to say, I'll definitely
10 follow your directives.
11 Q And why did you have trouble
12 with that part at the end?
13 A She was disputing the time I put
14 in there. I felt that she, you know,
15 was trying to show that I was being
16 harassing towards her, I was, you know,
17 trying to harass her. She'd used, you
18 know, those statements before, that the
19 administration was harassing her. And
20 I were concerned because ---
21 Q Did you feel she was questioning
22 your veracity?
23 A My truthfulness? Yes. I felt
24 she was questioning me being truthful,
25 and that was upsetting.

---

**Page 91**

1 Q So did it prompt you to take any
2 other actions?
3 A Yes. I wanted to, you know,
4 check the times, possibly for my own
5 sanity. I wanted to check to make sure
6 I was right. So I got Mrs. de Leon's
7 hall pass roster for that day. And I
8 also went to the library and got their
9 hall pass --- ten-minute pass sign-in
10 sheet for fourth period. And what I
11 found was this --- I found two things.
12 One, I looked at Jonas Goldstein. And
13 if you look at Jonas Goldstein, the
14 time in the library's 10:45. Now, you
15 turn back to her hall pass roster, and
16 if you see Jonas Goldstein the
17 dates that are written in here, 9/18
18 and 9/19, look at the time above,
19 11:05, and the time below, I don't
20 know what time it is, but if you can go
21 below that, you look at 10:33. But
22 you've got Jonas sandwiched in there
23 between the 18th and the 19th. He is
24 nowhere else because the 20th starts
25 down the page. Then you look at his

---

**Page 92**

1 time.
2 I'm going to have to ask you to
3 take the library pass and add it to
4 this exhibit because there seems to be
5 a missing page.
6 A The next page.
7 Q Of next exhibit, Exhibit 18?
8 Higgins Exhibit 18
9 marked for
10 identification.)
11 A Yes, there is.
12 BY ATTORNEY HEATH:
13 Q Okay. Go ahead. I'm sorry to
14 interrupt.
15 A That's okay. So for the 19th in
16 the library, it shows Jonas Goldstein
17 signing in from Mrs. de Leon's class on
18 a ten-minute pass at 10:45.
19 Q And just so the record is clear,
20 we were looking at Exhibit 17, which is
21 Ms. de Leon's response to your original
22 memo with her hall pass roster. And
23 then you're comparing that with the
24 information attached to Exhibit 18,
25 which is then a follow-up memorandum

---

**Page 93**

1 from you to Ms. de Leon, which attaches
2 the library hall pass roster ---
3 A Correct.
4 Q --- and her hall pass roster to
5 show the differences?
6 A Correct.
7 Q Okay. Keep going. Do you see
8 any other discrepancies?
9 A Yes. There were two
10 discrepancies. One was Jonas Goldstein
11 on the 19th. He signed in at 10:45.
12 Jonas is about one of the top two
13 or ten students in his entire class,
14 not a discipline problem, great
15 attendance. So at 10:45 on the 19th,
16 he signed in. If you look between the
17 roster, the times for those two
18 students above and below is 11:05 and
19 10:33. Now, it's impossible for a
20 student to sign in if they're going in
21 order, and all these are in order, at
22 10:45, or even 10:40, given it takes
23 five minutes to walk to the library.
24 It probably only takes two. But if you
25 down the page. Then you look at his

**Page 94**

1  I look down the page under 2/20 (sic),
2  you see Jonas Goldstein sandwiched
3  between Justin Fraker and Eric Hughes,
4  you got 10:38 and 10:56. And I refer
5  back to the 19th to show Mrs. de Leon's
6  class, Goldstein, 10:45. If it fits.
7  Q.So what was your conclusion?
8  A.The conclusion was that Mrs. de
9  Leon wasn't being totally truthful
10  about the time. I felt she was trying
11  to show that I was just trying this to
12  harass her, was my opinion.
13  Q.Do you believe she doctored the
14  records?
15  A.Yes, I do.
16  Q.Did that cause you concern?
17  A.Yeah, because, you know, I'm
18  working with this person on an action
19  plan, I'm, you know, doing discipline,
20  I mean, sent to the office, you know,
21  dealing with parents. And you know,
22  there has to be a certain level of
23  professionalism and trust. And that
24  kind of hurt my trust at that point in
25  time. So I had to be even more

**Page 95**

1  meticulous in my documentation.
2  ATTORNEY NICHOLS:
3  I object. Let the record
4  reflect that I object to the
5  term doctored as has been used
6  by opposition Counsel.
7  ATTORNEY HEATH:
8  Fine.
9  ATTORNEY NICHOLS:
10  There is nothing in the
11  record to suggest that ---
12  ATTORNEY HEATH:
13  Mr. Nichols, ---
14  ATTORNEY NICHOLS:
15  --- the Plaintiff
16  has ---
17  ATTORNEY HEATH:
18  Wait. This is a
19  deposition.
20  ATTORNEY NICHOLS:
21  I'm allowed to go on the
22  record, I have not interrupted.
23  ATTORNEY HEATH:
24  I understand, but I'm
25  saying your objection's noted.

**Page 96**

1  ATTORNEY NICHOLS:
2  Yes.
3  ATTORNEY HEATH:
4  Let's move on.
5  ATTORNEY NICHOLS:
6  Let me finish, please.
7  Let me finish. I say I object
8  and I have to reiterate this, I
9  objected to the term that
10  opposition Counsel used and
11  she has doctored to my client
12  that my client has doctored the
13  record. That particular term is
14  freighted with implications that
15  my client has somehow done
16  something that is wrong and that
17  is bordered on --- doctored, as
18  I ---
19  ATTORNEY HEATH:
20  Could you please certify
21  this portion for the record,
22  please?
23  ATTORNEY NICHOLS:
24  That is totally ---
25  ATTORNEY HEATH:

**Page 97**

1  It's going to go before
2  the Judge.
3  ATTORNEY NICHOLS:
4  --- totally unfair, okay?
5  ATTORNEY HEATH:
6  Your objection's noted.
7  ATTORNEY NICHOLS:
8  I want to note for the
9  record.
10  BY ATTORNEY HEATH:
11  Q.Do you believe that Ms. de Leon
12  changed the record in any way?
13  A.Yes, I believe she changed the
14  record to reflect ---
15  Q.And did that cause you concern?
16  Was it something that you felt was a
17  common practice among your teachers?
18  A.No, it was not.
19  Q.And was that something that, in
20  and of itself, could be subject to
21  disciplinary action?
22  A.Yes, it could. Absolutely.
23  Q.You said that because you came
24  to that conclusion, your scrutiny
25  essentially heightened?

Multi-Page™

Page 98

1 A Right.
2 Q Did you believe that that was
3 warranted?
4 A Yes, I did. Yes, I did.
5 Q And was that one of the specific
6 reasons that you believe that, was
7 because of this credibility issue?
8 A Yes.
9 Q Was there any issue that you
10 found, other than --- we discussed the
11 credibility, but was there any other
12 type of issue that you thought was an
13 ongoing concern of yours relative to
14 discussing points of recommendation
15 with Ms. de Leon regarding --- and
16 accepting responsibility, accepting
17 criticism and moving forward?
18 A Yes. That was part of the
19 action plan that, you know, when we
20 spoke with Mrs. de Leon that she act in
21 a professional manner, she be accepting
22 of administrative strategies, opinions
23 and directives so as to improve in the
24 classroom.
25 Q And was that happening?

Page 99

1 A No. You know, there were
2 continual phone calls, and misconducts
3 were continuing. The discipline, you
4 know, was continuing. It was just an
5 ongoing situation.
6 (Higgins Exhibit 19
7 marked for
8 identification.)
9 BY ATTORNEY HEATH:
10 Q I'm going to direct your
11 attention to Exhibit 19, which is an
12 October 15th, 2002 memorandum to you
13 from a Debra Carman. I'll give you a
14 moment to take a look at that.
15 WITNESS REVIEWS DOCUMENT.
16 A Yes.
17 BY ATTORNEY HEATH:
18 Q Did you receive this memorandum
19 at or about that time?
20 A Uh-huh (yes).
21 Q And what is this about?
22 A A parent requested a meeting
23 with Ms. de Leon because her daughter
24 was having trouble in Mrs. de Leon's
25 classroom, felt there were moments of

Page 100

1 --- let me get down through here. A
2 particular incident in this case was a
3 concern where Ashley turned in her
4 homework and Mrs. de Leon claims she
5 never got it. She made Ashley do it
6 over and then accused her of turning it
7 in late. When Ashley tried to explain
8 in the meeting what had happened, she
9 tried to act like she was confused, and
10 the whole thing, to this parent, seemed
11 like a cover-up. She's also had
12 previous children that Mrs. de Leon has
13 had, and she found Mrs. de Leon to be
14 reactive and difficult. And this is
15 just her summation of that meeting.
16 Q Was that something that you
17 discussed then with Ms. de Leon, this
18 information from Mrs. Carman?
19 A That I don't recall.
20 Q And essentially here, was she
21 questioning Ms. de Leon's truthfulness?
22 A Yes. She was also questioning
23 Ms. de Leon's truthfulness and
24 accuracy.
25 (Higgins Exhibit 20

Page 101

1 marked for
2 identification.)
3 BY ATTORNEY HEATH:
4 Q And let me show you what's been
5 marked as Exhibit 20. And this is a
6 November 13th, 2002 letter from Robin
7 Stockton to Mr. Deshnet, and you're
8 copied on the bottom there.
9 A Okay.
10 Q Do you recall this particular
11 issue concerning student
12 confidentiality?
13 A Yes, I do.
14 Q And in a nutshell, what do you
15 recall?
16 A That a student had his head down
17 and was sleeping in class, and Mrs. de
18 Leon said, I'm going to call your
19 parent, got on the phone in front of
20 the class, discussed the student's
21 behavior and discussed the student's
22 grades.
23 Q Was that something that was in
24 line with either the law or school
25 district policy concerning student

**Page 102**

```
 1 confidentiality?
 2 A. No. It was out of line.
 3 Q. Do you recall whether you
 4 personally spoke to Ms. de Leon
 5 concerning this situation?
 6 A. Uh-huh (yes).
 7 Q. Yes, you did?
 8 A. Yes. Mr. Deshner was also
 9 involved.
10 Q. What do you recall about that
11 conversation?
12 A. I think Mr. Deshner headed that
13 meeting. He was talking about her, you
14 know, breaching confidentiality, you
15 know, with the parent discussing the
16 student in front of the class.
17 discussing sensitive issues like
18 grades, behavior and that, you know,
19 which are of a personal nature or
20 confidential nature.
21 Q. Did Ms. de Leon accept
22 responsibility and admit she was wrong?
23 A. No, she did not. She said she
24 wasn't --- she didn't discuss grades.
25 She was discussing an incomplete, which
```

**Page 103**

```
 1 she said was not a grade.
 2 Q. Which would be a grade?
 3 A. Which would be a grade. But
 4 that was disputed. Also, it was
 5 disputed that she had mentioned his
 6 behavior in front of the class. I
 7 believe she said she stepped outside.
 8 But you know, the parent says, you
 9 know, I was on the phone, I asked you
10 these questions. And she said yes to
11 both questions. Are you in the
12 classroom discussing my son? Yes, yes.
13 And didn't, in fact, the mother
14 hear the students?
15 A. Yes, she heard the students in
16 the background.
17 Q. Which is what prompted her
18 question, are you in the classroom?
19 A. Correct. Laughing.
20 Q. Did you continue to informally
21 observe Ms. de Leon that school year?
22 A. Yes, I did.
23      (Higgins Exhibit 21
24       marked for
25       identification.)
```

**Page 104**

```
 1 BY ATTORNEY HEATH:
 2 Q. Let me show you what's been
 3 marked as Exhibit 21, which is a
 4 classroom observation report dated
 5 December 19th of 2002. Now, this one
 6 again says, see attachment. And I
 7 don't know ---
 8 A. If it's the right one.
 9 Q. --- if it was part of Exhibit
10 15, is it my concern. Is this your
11 printing?
12 A. Yes, it is. This is my
13 observation, but this is ---
14 Q. And you don't believe that any
15 of the exhibits that we identified
16 those three pages for Exhibit 15 went
17 with this?
18 A. Here's the problem. The one
19 underneath this one goes with the
20 observation. This is an informal
21 observation. This was done separately.
22 Q. And that would be Exhibit 21
23 that's dated 11/19/02?
24 A. Yes.
25 Q. Okay.
```

**Page 105**

```
 1 A. 11/19/02 was done before ---
 2 Q. Oh. Actually, I think there's a
 3 mistake and it should be dated
 4 12/20/02. I believe that's what I
 5 determined when I was reviewing the
 6 information.
 7 A. No. ---
 8 Q. Or --- no.
 9 A. --- that's not correct.
10 Q. Okay.
11 A. I do recall that when I did an
12 attachment regarding observation, I'd
13 state it was an observation. And this
14 is the observation.
15 Q. So this ---?
16 A. This goes with this. This was
17 an informal observation that I did of
18 Mrs. de Leon to assist her in the
19 classroom and with the classroom
20 management.
21      (Higgins Exhibits 22 and
22       23 marked for
23       identification.)
24 BY ATTORNEY HEATH:
25 Q. Okay. I see. So Exhibit 23 is
```

**Multi-Page™**

---

Page 106

1 really the attachment for Exhibit 21,
2 is what it amounts to. And then
3 Exhibit 22 is your informal
4 observation?
5 A Mine aren't numbered, so I'll
6 take your word for it.
7 Q Yes, that's what it is.
8 A ATTORNEY NICHOLS:
9 Excuse me; I'm looking
10 at it. I have a copy of the
11 informal observation dated
12 November 19th, and the
13 accompanying document you
14 referred to, Counsel, is what?
15 ATTORNEY HEATH:
16 Exhibit 23, which is the
17 next document down, which is ---
18 It says, regarding observation
19 dated on 12/19/02, and it's dated
20 on 1/3/03, It's Exhibit 23. It's
21 the next one in order.
22 ATTORNEY NICHOLS:
23 12/19/02. And that's
24 from Mr. Higgins to Ms. de Leon?
25 ATTORNEY HEATH.

---

Page 107

1 Right.
2 BY ATTORNEY HEATH:
3 Q Okay. And looking at the
4 observation then, we've established
5 that Exhibit 23 is the attachment. Can
6 you please summarize that attachment?
7 A Are we on the observation of
8 12/19/97 I'm not numbered again. I
9 don't know.
10 Q Your attachment.
11 A Absolutely. Okay. This is an
12 observation that was done on December
13 19th of '02. This would've been my
14 second observation for the '02/'03
15 school year. I have two improvements
16 needed. One is the teacher/student
17 interactions, the first improvement
18 needed, maintain consistency when
19 working with students. And I write sec
20 attachment. And under that I have
21 control and discipline, and I write,
22 you had trouble with Anita on 12/18
23 because she asked for a pass to the
24 nurse and slammed the door when
25 leaving. When she returned, she did

---

Page 108

1 not have the pass you had given her, so
2 you told her she needed a pass from the
3 nurse, and again she left, slamming the
4 door behind her. You called me
5 regarding the situation and then wrote
6 her up on a misconduct slip that you
7 sent to the office.
8 The next day, I went into Mrs.
9 de Leon's classroom to do the
10 observation and I write, the day I was
11 observing, Anita again asked for a pass
12 to see the nurse. The time was 8:22.
13 You write her a pass and she leaves.
14 She does not return until 8:37. When
15 she returns, she does have a pass from
16 the nurse. The problem with what I
17 observed is that this student is being
18 enabled. She was being allowed to
19 leave whenever she wanted to. When I
20 checked with the nurse's office roster,
21 I discovered that Anita was there
22 during the first period class on 12/17
23 and 12/18 from Mrs. de Leon's room, and
24 again today on the 19th.
25 Q That's three days in a row?

---

Page 109

1 A Three days in a row. When
2 checked the times today in the nurse's,
3 I discovered the times she was there from
4 8:33 to 8:36. So she was in the
5 nurse's office approximately three
6 minutes. She was in the hall
7 approximately 11 minutes, which means
8 she was somewhere else for 11 minutes,
9 Further, she also
10 arrived at class that day without her
11 Spanish book.
12 So I write a suggestion. The
13 first step to getting this student back
14 in line with your expected classroom
15 behavior is to take away her pass
16 privileges. She has proven that she is
17 not capable of being truthful about
18 where she has been while using the hall
19 pass. You had mentioned in your
20 misconduct write-up on December 18th
21 that she told your boyfriend her
22 took the pass you gave her to the
23 nurse. This should have told you right
24 away that she was probably meeting her
25 boyfriend in the hallway and only going

**Page 110**

1 to the nurse afterwards to secure an
2 alibi. The second part of this
3 observation, under management and
4 organization, I have an improvement
5 needed, control and discipline.
6 Maintain consistency when working with
7 students.
8 Another girl, Amber, was given a
9 pass to the nurse for a Band-Aid. When
10 she returned at 8:24, she sat down and
11 began writing a personal note. You
12 noticed that she was not following
13 along with the rest of the class. You
14 tell her to stop what she is doing and
15 pay attention. She tells you she has
16 no book. You remind her that she needs
17 to come prepared. You give her a book
18 and a warning for breaking the rule.
19 When Anita returns at 8:37, she gives
20 you her pass and sits down. She has no
21 book and does not attempt to
22 participate in class. You do not
23 address Anita for being unprepared and
24 she is not given a book. And I write,
25 I understand that she may continue to

**Page 111**

1 refuse to participate, but you need to
2 treat her the same way as you treat
3 everyone else to show the other
4 students that you are being consistent
5 and will not tolerate inappropriate
6 classroom behavior.
7 QAnd you're saying that
8 essentially other students that were
9 not prepared were treated differently?
10 AYes. I mean, you know, again,
11 that that falls to consistency, and that was
12 my biggest thing with both action
13 plans, that I felt that problems with
14 Mrs. de Leon's classroom, a big part of
15 it was a lack of classroom consistency,
16 classroom management.
17 QAnd then the third area on your
18 attachment is maintains accurate
19 records. Can you just summarize what
20 your issue was there?
21 AYeah. At 8:14, she asked her
22 students to get out activity eight that
23 was assigned from the previous day.
24 There was some confusion. Students
25 were kind of looking at each other. A

**Page 112**

1 student informed her that they only
2 were on activity seven, and then she
3 tells them to get out activity seven so
4 they can check their homework.
5 Basically, further in the lesson plan,
6 you write that you will be giving a
7 quiz today on the unit three lesson
8 four worksheet. At 8:39, a student,
9 Ray, asks about the quiz for today.
10 You tell him it will be tomorrow. At
11 8:44, you give him the unit three
12 level four worksheet to work on at
13 home. Your lesson plans indicate this
14 worksheet was to be assigned on
15 Wednesday. Not a major thing, but it
16 is is an important thing.
17 I write that I understand it is
18 difficult to cover absolutely
19 everything you have planned for the
20 week due to time limitations. You
21 might have more than one section for
22 the same class. She had four Spanish I
23 classes that year, and they probably
24 were all working at different speeds.
25 I suggested having a copy of the lesson

**Page 113**

1 plans in front of her for each Spanish
2 class, and either check off or
3 highlight completed procedures and
4 assignments for that day to enable her
5 to accurately gauge where each
6 particular class was.
7 QNow, I note that the date of
8 this memo is 1/3/03, but the
9 observation was conducted on 12/19/02.
10 What was the gap there?
11 AThe gap appears to be --- or
12 would have been Christmas break.
13 QAnd when you came back from
14 break, then you spoke with Ms. de Leon
15 pretty much right away about this
16 observation?
17 AYes. We probably returned on
18 the 2nd or the 3rd of that year. I
19 don't recall, but it was either/or.
20 And we met that day, and it was within
21 five days.
22 QFive actual school days?
23 AFive actual school days.
24 QNow, going back in time a little
25 bit, we're going to go to Exhibit 22,

**Multi-Page™**

---

**Page 114**

1 which is actually the November 19th,
2 2002 memorandum that you said was an
3 informal observation. And I note it is
4 an informal observation, but yet you
5 put this in writing.
6 A Right. And I go on to explain
7 the reason I did this. I spoke to her
8 on Monday regarding some students who
9 had been giving her discipline problems
10 in the third period Spanish II class.
11 I suggested that I sit in, I do in
12 an informal observation, and I felt it
13 might be helpful. And Mrs. de Leon
14 agreed to that. So I just stopped in.
15 And it's not written on a formal
16 observation form, just kind of written
17 out for Mrs. de Leon.
18 One of my observations was at
19 9:42, the class bell rang and the doors
20 open. She is at the board completing
21 the daily agenda. As her back is
22 turned, a student slips in after the
23 bell and takes a seat at the back of
24 the room. Mrs. de Leon turned around
25 just as another student arrives late.

---

**Page 115**

1 You tell her she is late and explain
2 your tardy rule to her. She then
3 receives a tardy warning from you. You
4 notice that Tyler is in the second seat.
5 You tell him to please move to his
6 correct seat, which he does without
7 argument.
8 The suggestion I made here, the
9 written reflection you gave to the
10 administration regarding classroom
11 observations on October 23rd of '02,
12 stated that you observed a couple of
13 teachers standing at the door waiting
14 for the students before the bell rang.
15 You further stated you had been
16 standing at the door waiting for
17 students to arrive before the bell
18 rings, which caused the students to
19 arrive on time. And today she was not
20 at the door and two students arrived
21 late. I believe that if she had been
22 consistent in greeting her students at
23 the door, students wouldn't be
24 attempting to sneak into the classroom
25 unnoticed. Further, you did give Erica

---

**Page 116**

1 a warning for being tardy, but the
2 other student, Tyler, got away with it.
3 The problem is that, you know, the
4 class was aware that Tyler did not
5 receive a warning. Students will use
6 this as an opportunity to argue that
7 Tyler didn't receive a warning for
8 being late the next time they are.
9 Also, I would suggest being at
10 the door every day to meet your
11 students and then close the door after
12 the bell has sounded. This will show
13 the students that you will not tolerate
14 tardiness and are being consistent in
15 the application of the tardy rule.
16 Observation 9:43 ---
17 Q And I was going to say I don't
18 want you to necessarily read all of
19 these observations, but ---
20 A Yeah.
21 Q --- essentially, generally, they
22 all relate to the same student that was
23 late, Erica?
24 A Right.
25 Q And you can just summarize what

---

**Page 117**

1 these issues are here with her?
2 A Let me read it real quick. Just
3 that escalating behavior, on this one
4 with Erica, the escalating problem in
5 the classroom. And I wanted the times
6 that she was testing Mrs. de Leon and
7 just see how much she could get away
8 with so her she reacted.
9 Q Including a comment at 10:14
10 that says ---?
11 A That said, you know --- which I
12 never had in any observation where the
13 student turns around and says directly
14 to me, why are you --- in reference to
15 Mrs. de Leon, why are you acting like a
16 real teacher when Mr. Higgins is
17 present? And then she turns to me to
18 say I should come to class more often.
19 BRIEF INTERRUPTION
20 ATTORNEY HEATH.
21 Okay. Sorry.
22 BY ATTORNEY HEATH.
23 Q So then you give her a
24 suggestion?
25 A Correct. And we move on.

Page 118

1 Q. Then the next observation
2 concerns another student who seems to
3 be sleeping.
4 A. Yes. You see that Greg appears
5 to be sleeping as his head is on the
6 desk. She tells Greg to sit up nice
7 and straight. Greg had his head on the
8 desk. You ask Greg if he was sleeping.
9 Another student tells you Greg is
10 paying attention because he can see his
11 eyes are open. You then tell Greg to
12 sit up nice and straight. You want him
13 to stay awake and pay attention. And I
14 think one of the rules I did cite
15 previously in one of my observations
16 was be attentive, you know, don't stay
17 awake, just please be attentive. If
18 you tell them what that is, it's easier
19 to define.
20 Q. And so then relative to your
21 suggestions --- and you're talking
22 again about consistency?
23 A. Yes. And this is all about ---
24 the underlying tone here is consistency
25 in the classroom.

Page 119

1 Q. And keeping students,
2 essentially on task?
3 A. On task.
4 Q. Okay. Now, were you aware,
5 after this observation occurred, that
6 Ms. de Leon was put on suspension on
7 November 20th, 2002, concerning
8 breaching student confidentiality we
9 had already talked about with Robin
10 Stockton?
11 A. Yes, I was aware of it.
12 Q. So there's a period of time when
13 she was out of the classroom; is that
14 correct?
15 A. Yes.
16 (Higgins Exhibit 24
17 marked for
18 identification.)
19 BY ATTORNEY HEATH:
20 Q. Let me show you what's been
21 marked as Exhibit --- and I believe
22 it's 24. And prior to that time, I
23 believe that Mr. Heller observed the
24 Plaintiff in January of 2003. And then
25 looking at Exhibit 24, it's to

Page 120

1 Claudette de Leon from George Deshner
2 concerning a classroom incident on
3 January 31st of 2003. And just take a
4 quick moment to review this information
5 concerning the gum in the hair. Do you
6 recall there being a student issue
7 concerning that?
8 A. Yes.
9 Q. And you're mentioned, actually,
10 in the third paragraph on the first
11 page of this memo ---
12 A. Yes.
13 Q. --- concerning a meeting. Can
14 you just summarize what your
15 recollection is about the bubblegum
16 incident, and Aniece Mosley?
17 A. Yes. In a nutshell, or you
18 know, to summarize, a student, Aniece,
19 was accused of throwing gum, or putting
20 gum, in Mrs. de Leon's hair. And after
21 an investigation that was conducted by
22 Mr. Deshner, and I believe Mr. Morgan
23 at the time, it was found that another
24 student put the gum in the hair and
25 Mrs. de Leon had, you know, chosen the

Page 121

1 wrong student --- or, you know, accused
2 the wrong student of throwing the gum.
3 The student became angry and asked to
4 go to the office, and she did.
5 Q. Was there an issue about another
6 student then admitting they had ---?
7 A. Yeah. The other student, after
8 the investigation, the student who
9 threw the gum in Mrs. de Leon's hair
10 admitted to throwing the gum and was
11 disciplined for the incident. And then
12 --- Go ahead.
13 Q. And throughout the course of the
14 investigation, was Ms. de Leon kept
15 apprised of what was going on?
16 A. Yes, yes.
17 Q. Was she aware there was an
18 investigation? Was she unhappy about
19 that fact?
20 A. Yes.
21 Q. And what do you recall about
22 that?
23 A. She felt we didn't get the
24 right student. There's a misconduct
25 that I have. Where is that?

**Page 122**

1 Q Put it this way. Look at the
2 bottom of the first page and the top
3 paragraph of the second page.
4 A Oh, okay. Second page?
5 Q Top paragraph.
6 A Okay. Let me start over. It's
7 been a while, three years.
8 Q My question was, was Ms. de Leon
9 unhappy that you were investigating
10 this incident?
11 A Yes, because she felt we were
12 taking the student's word over hers.
13 Q And as it turned out, it wasn't
14 the person that she had disciplined
15 that did it anyway; correct?
16 A She got the wrong person.
17 Q And when she was informed that
18 she got the wrong person, how did ---?
19 A She wanted to argue the point.
20 Q So even though another kid
21 admitted that they did it, Ms. de Leon
22 argued with you anyway?
23 A Yes. She was not accepting of
24 our investigation.
25 Q The last paragraph then, is

**Page 123**

1 there a suggestion about how to more
2 appropriately monitor her classroom and
3 be aware of what's going on ---
4 A Yes.
5 Q --- about moving her computer?
6 A Yes. Mr. Desimer made a
7 suggestion --- or, I think Mrs.
8 Willison suggested that she move the
9 computer to a place by the desk where
10 she would be facing the students and
11 not facing away from them. Also, if
12 you choose to send a student to the
13 office and we conduct an investigation
14 and find that the accused is, indeed,
15 innocent, and we also have determined
16 who the guilty party is, she needs to
17 be more accepting of, you know, what
18 has been discovered and not continue to
19 berate the innocent student. That was
20 done by Mr. Desimer.
21 Q Therefore in February of 2003,
22 did the administration determine that
23 it would be an appropriate measure to
24 revise Ms. de Leon's corrective action
25 plan for the year?

**Page 124**

1 A Yes.
2 (Higgins Exhibit 25
3 marked for
4 identification.)
5 BY ATTORNEY HEATH:
6 Q And I'll show you what's been
7 marked as Exhibit 25, which is the
8 revised corrective action plan. It
9 indicates revised February 2003. Take
10 a moment to review this to determine
11 what you believe are the significant
12 differences or points of concentration
13 that were not in the previous plan.
14 A Probably near the end of the
15 plan. It appears that we have a
16 numbered list here. Comply with
17 requirements of your revised action
18 plan. Keep a daily log of all
19 disciplinary actions and return it to
20 the office on Fridays. It's, again,
21 more specific. As I got more specific,
22 more detail-oriented, this became also
23 more oriented because we were trying to
24 focus Mrs. de Leon on what needed to be
25 done.

**Page 125**

1 Q So essentially it's basically
2 the same things but more directives and
3 more detail; is that fair to say?
4 A Yes.
5 Q Okay. Looking at the last two
6 pages at the bottom, directives that
7 you must complete during the remainder
8 of the 2002 to 2003 school year; do you
9 see where I am?
10 A On the last page?
11 Q Bottom of the second to the last
12 page, top of the last page. There are
13 six items listed.
14 A Right. And I kind of went
15 through the first two. Again, comply
16 with requirements of the revised action
17 plan. Keep a daily log of disciplinary
18 actions, which is to be turned into the
19 office on Fridays or the last day of
20 the workweek before you leave. Be
21 prepared to provide a written
22 explanation of how you arrived at a
23 student's grade if requested. We had,
24 you know, problems with student grades
25 and then ---

Page 126

1 Q And isn't it fair to say that
2 that directive is basically all
3 teachers have to be prepared to explain
4 how they arrived at a grade if
5 requested?
6 A Yes.
7 Q So that's not unusual?
8 A No.
9 Q It's expected, correct?
10 A Right.
11 Q And number four?
12 A Keep a log of all parent
13 exchanges, which includes the date,
14 method of discussion and a short
15 anecdotal summary which includes who
16 initiates the interaction and why.
17 along with the final outcome.
18 Q So essentially this is the same
19 as before, but a little more detail
20 requiring ---
21 A Right.
22 Q --- more information ---
23 A Right.
24 Q --- and an outcome report?
25 A Right. Due every two weeks.

Page 127

1 Q Number five?
2 A Meet every two weeks for the
3 purpose of reviewing and discussing
4 student disciplines and misconduct
5 referrals in an effort to improve
6 classroom management and discipline.
7 And six, to demonstrate significant and
8 sustained improvements, performance in
9 the areas identified.
10 Q Now, this was reviewed with Ms.
11 de Leon at some point; is that correct?
12 A Yes.
13 Q And was she receptive to this
14 revised action plan?
15 A You know, I don't recall,
16 Q Okay. Your answer is that you
17 don't recall?
18 A Yes.
19 Q In February of 2003, were there
20 a variety of student issues wherein an
21 investigation showed Ms. de Leon's
22 assumptions to be inaccurate?
23 A Yes.
24 Q And we have already talked about
25 Aniece Mosley, for example. That was

Page 128

1 January 31st of 2003.
2 A Right.
3 (Higgins Exhibit 26
4 marked for
5 identification.)
6 BY ATTORNEY HEATH:
7 Q And I'm showing you now what's
8 Exhibit 26, which is a letter from you
9 to her dated 2/28/03 about a student
10 apparently calling her a whore?
11 A Uh-huh (yes).
12 Q Can you just summarize? And I
13 don't necessarily want you to read the
14 letter. Just summarize what you recall
15 occurred in this incident.
16 A I received a misconduct from
17 Mrs. de Leon that a student, Anita, had
18 called her a whore as she was leaving
19 the classroom. And I received this
20 misconduct, so I called the student
21 down when I received it and I talked to
22 the student. She said, no, I did not
23 call Mrs. de Leon a whore. And so she
24 was adamant that she didn't. So I
25 conducted an investigation. What I

Page 129

1 did, I called probably the best
2 students in the class out. And what I
3 mean by best students, had good
4 academic records, had no discipline
5 problems to speak of, and were good
6 kids, good attendance.
7 Q Is it Patrick Booth?
8 A Patrick Booth.
9 Q And I believe if you look at the
10 misconduct form that Ms. de Leon
11 prepared, which is not part of the
12 exhibit, I think she indicated that
13 Patrick Booth heard Anita call her a
14 whore?
15 A Yes. On the misconduct, which I
16 don't see here, but ---
17 Q It's not here.
18 A Okay. The misconduct stated
19 that --- or Mrs. de Leon writes,
20 Patrick said, did you hear what she
21 called you --- or, that she called Leon
22 a whore? And Mrs. de Leon said, I did,
23 but I just ignored it. I remember that
24 was on the misconduct. So she's saying
25 Patrick heard this. When I brought

Page 130

1 Patrick down to talk to him, he had
2 never heard that statement. He said
3 the student made a general comment,
4 something to the effect, this is bull
5 crap or bullshit, you know, as she was
6 leaving. I don't know if Ms. de Leon
7 kicked her out or asked her to leave or
8 if she left on her own accord. But
9 that was his statement. I called two
10 other students down. They also
11 verified --- good students, good
12 academics, not discipline problems,
13 that they were there when it happened
14 and know this student did not call Mrs.
15 de Leon a whore.
16 Q So was the purpose of this
17 letter clarifying that she needs to be
18 accurate when sending misconduct
19 reports to the office?
20 AAbsolutely.
21 Q And again, this is something
22 that was an ongoing theme; is that
23 correct?
24 ACorrect.
25 Q And then you assign her chapters

Page 131

1 to read, ---
2 ARight.
3 Q--- which essentially in
4 accordance with her improvement plan to
5 show effective measures for
6 implementing discipline effectively?
7 ACorrect. And that falls back,
8 you know, to the action plan, and also
9 that falls back to the District's
10 philosophy and rationale, along those
11 lines. And I felt --- in here what I
12 was trying to do with the discipline in
13 the classroom is solving discipline
14 problems, strategy for classroom
15 teachers. There's some interesting
16 things in there of being able to
17 understand what a student is saying to
18 you. Are they, you know, talking to us
19 from a child standpoint, or, you know,
20 parent, you know, adult? And are
21 they trying to pull you off task?
22 are they speaking to you? Along those
23 lines.
24 And I felt some of the problems
25 in the class was miscommunication. I

Page 132

1 I felt the students would say things or
2 do things to get Mrs. de Leon off task.
3 She'd answer honestly, and it would be
4 something possibly that students knew
5 was inappropriate but maybe Mrs. de
6 Leon didn't understand, and the way the
7 class was off and running. And what
8 this information, I felt, had in it was
9 a way to approach that and to see it.
10 So that's why that was assigned.
11 Q So it was assigned to assist
12 her; is that accurate?
13 AExcuse me?
14 Q Was it assigned to assist her or
15 to punish her?
16 A To assist her.
17 (Higgins Exhibit 27
18 marked for
19 identification.)
20 BY ATTORNEY HEATH:
21 Q In looking at Exhibit 27, this
22 is a response to your memo dated
23 2/28/03 concerning Anita, the student.
24 And on this letter, she copies her PSEA
25 attorney and Mr. Flippin of the Human

Page 133

1 Relations Commission; do you see that?
2 AYes.
3 Q--- essentially, when you
4 received this memorandum, what did you
5 think? And also I note it says
6 February 28th, 2003, but then there's a
7 stamp there that said received March
8 10th, ---
9 ARight.
10 Q--- 2003. Do you believe that
11 you received it around March 10th of
12 2003?
13 AYes.
14 Q And I wonder, did anyone ever
15 explain the lag time there?
16 ANot that I'm aware of. I'm not
17 sure why there was lag time there.
18 Q And what did you take from this
19 memo?
20 AAgain, her, you know, not
21 agreeing with my findings. Basically
22 feeling that, you know, I take the
23 student's word over hers and accusing
24 me of supporting students, defiant and
25 hostile behavior towards her, that you

Page 134

1 know, I'm responsible for the hostile
2 environment --- she uses hostile
3 environment in her classroom. She
4 cites another teacher, that this
5 teacher got called a name, again,
6 placing blame.
7 Q Doesn't she even mention the
8 fact-finding conference with the PHRC?
9 A Yes.
10 Q And what was your feeling after
11 you reviewed this letter?
12 A Just, you know, frustrated. I
13 mean, again, this is sort of failing to
14 accept, you know, the investigation.
15 And it's not a vendetta against her. I
16 mean, again, questioned the
17 truthfulness of what she's hearing, you
18 know, exactly why she'd write down
19 something, and even cite a student in
20 this write-up. You know, the student
21 heard it, too. The student admitted to
22 hearing it. When I bring the student
23 down, the student says, no, it didn't
24 happen.
25 Q And that what they heard was

Page 135

1 something else?
2 A Right.
3 Q And you're not saying that ---?
4 if Anita had said this is bull crap or
5 bullshit, that would be subject to
6 discipline, too?
7 A Yes, it would be.
8 Q So it's not saying that
9 --- it didn't necessarily make light of
10 that statement. It was the accuracy of
11 the statement?
12 A Yeah. And also, you know, with
13 the District, profanity, bull crap,
14 bullshit, you know, it's directed to
15 --- you know, you hear it in the hall.
16 You know, you do hear the language.
17 But when it's directed to a staff
18 member, administrator, you know, any
19 school personnel, then it changes
20 scenario. The discipline's much
21 higher. She subsequently --- if she
22 would have confirmed that she had
23 called Mrs. de Leon that, would have
24 been suspended three to five days from
25 school.

Page 136

1 (Higgins Exhibit 28
2 marked for
3 identification.)
4 BY ATTORNEY HEATH:
5 Q Now, looking at Exhibit 28, it's
6 a February 28th, 2003 memorandum from
7 you to Ms. de Leon requesting
8 information. Is this in accordance
9 with the revised corrective action plan
10 ---
11 A Yes.
12 Q --- relative to the log?
13 A Yes.
14 Q And you're requesting that the
15 log be submitted?
16 A Uh-huh (yes). Yeah. I'm
17 requesting that, you know --- to take a
18 look at the log, the reason being,
19 again, I'm seeing some
20 inconsistencies in the discipline is
21 continuing. I want to see what's in
22 the log, to see where I can, you know,
23 assist Mrs. de Leon in improving her
24 classroom management.
25 Q You say here, on Tuesday,

Page 137

1 February 5th, you and Mr. Heller met
2 with Ms. de Leon to discuss her work
3 performance issues. You spoke about
4 the improvement plan ---
5 A Yes.
6 Q --- which would be the revised
7 plan; is that correct?
8 A Yes.
9 Q And the requirement to maintain
10 a log. And at that time, she had
11 indicated she did not have the required
12 log, but did have the information. And
13 so that was a Tuesday. So on Thursday,
14 she submitted a log, the 27th?
15 A Right.
16 Q And then you said --- what did
17 you say to her?
18 A I indicated that I wanted the
19 student files that were being
20 maintained, the maintenance of this
21 log. She had informed us that the
22 information was being maintained at her
23 residence and that she had those files
24 at home except for first period
25 students, which were in her room. And

**Page 138**

1 I wanted to, you know, see the
2 inconsistencies if there were some, and
3 you know, work with Mrs. de Leon in
4 regard to the log.
5 Q So then you gave her until
6 Monday, March 3rd to turn it over; is
7 that right?
8 A Correct.
9 Q Also, is it appropriate to keep
10 student discipline records in your
11 house?
12 A I don't feel it is.
13 Q And again, isn't that a
14 confidentiality issue?
15 A Yes, it could be.
16 Q Student records are to be
17 maintained on premises so there's some
18 control?
19 A Yes.
20 (Higgins Exhibit 29
21 marked for
22 identification.)
23 BY ATTORNEY HEATH:
24 Q Exhibit 29 is a response to the
25 memo that you wrote on February 28th,

**Page 139**

1 2003 from Ms. de Leon to you. And
2 again, Mr. Flippin of the Human
3 Relations Commission is CC'ed on that.
4 A Uh-huh (yes).
5 Q And again, the issue of Patrick
6 Booth and Anita comes up in this memo.
7 Do you see this two-page document?
8 A Yes, I do.
9 Q And can you just summarize
10 what's contained in here and how you
11 felt about this?
12 A Well, I mean, as I'm reading
13 through it, you know, she cites
14 students and it's not a big point until
15 the end. She goes on, you know. I
16 asked for a log and she indicated, it
17 was in my computer. I told you I keep
18 the log in my computer because it needs
19 to be updated at all times. But she
20 had the hard files at home, so that
21 also mentioned, you keep a file for
22 each student for each class. This is
23 not part of the action plan. This is
24 my personal documentation.
25

**Page 140**

1 So I show Mr. Deshner, and he
2 looks it, and he says, well, she's
3 citing Mr. Robert Flippin in Human
4 Relations and she carbon copied him.
5 Well, on here, you know, it cites
6 student names, and, you know, again, we
7 have a confidentiality issue.
8 Q And there's various students'
9 names in here?
10 A Throughout, yes.
11 Q Did you at some point receive
12 the discipline log as you had
13 requested?
14 A I received the first log on
15 February 27th.
16 (Higgins Exhibits 30 and
17 31 marked for
18 identification.)
19 BY ATTORNEY HEATH:
20 Q That's Exhibit 30; is that
21 correct?
22 A Yes.
23 Q And then the second log you
24 received on what date?
25 A February 28th.

**Page 141**

1 Q So the next day?
2 A Yes. A second log.
3 Q A second log was received. Now,
4 did you have an opportunity to compare
5 or contrast these two logs that were
6 received a day apart?
7 A Yes.
8 Q And what did you determine?
9 A That she didn't follow the
10 classroom management plan, the
11 behavioral plan that was in place. I
12 mean, the action plan was not followed,
13 bottom line. There was inconsistencies
14 in how these students were dealt with.
15 She had told one of the parents, Mrs.
16 Siverd, Robin Stockton's mother, that,
17 you know, you've had a discipline
18 problem all year. If you look in here,
19 you see him cited once on the first for
20 detention and that, you know, he was
21 spoken to on October 11th. Phil Siverd
22 was the one if he could go back to his
23 original seat. He said he won't talk
24 and he will stay right there. I
25 agreed. I mean, it's just like this

**Page 142**

1  stuff was thrown in here. It's not
2  consistent.
3  Q  Did you find any differences
4  between the two logs?
5  A  Yes. And ---
6  Q  I'm not going to ask you
7  specifically, but this is something
8  that ---
9  A  But yeah, there were differences
10  between the two logs.
11  Q  You had ---
12  A  And the student files.
13  Q  You had testified at the
14  arbitration concerning Ms. de Leon's
15  termination; do you recall that?
16  A  Yes.
17  Q  And at that time, you were asked
18  that same question of what you had
19  indicated, that you saw something along
20  the lines of 20 to 30 differences
21  between the logs and the student files?
22  A  Correct.
23  Q  Is that what you believe?
24  A  Yes.
25  ATTORNEY NICHOLS:

**Page 143**

1  Counsel, a question --- a
2  notation, rather. Please stop
3  testifying for the witness.
4  BY ATTORNEY HEATH:
5  Q  The student logs, you said there
6  also was inconsistencies between the
7  logs and the files. What do you mean
8  by files?
9  A  Some information --- when I went
10  through the files, some of the
11  information wasn't contained in the
12  computer version of the discipline log.
13  I had many examples cited, but
14  they're, you know, not here, of those
15  inconsistencies. And I do wish they
16  were because then I could show or
17  explain how I came about the
18  differences and why I had a problem
19  with those. But they are not in here,
20  so ---
21  Q  Was that in a memo form or
22  something?
23  A  Yes.
24  Q  And relative to those
25  differences, was that something that

**Page 144**

1  you discussed with Ms. de Leon?
2  A  I believe so, yes. You know,
3  where I felt the consistency was
4  lacking, where the action plan wasn't
5  followed, and why I felt the discipline
6  wasn't working in the classroom.
7  (Higgins Exhibit 32
8  marked for
9  identification.)
10  BY ATTORNEY HEATH:
11  Q  Do you recall having a meeting
12  with her then --- I believe that the
13  meeting was either March 3rd or March
14  4th. And then I'm going to show you
15  what's been marked as Exhibit 32 and
16  ask you to take a look at this. And
17  you are copied on this letter from Mr.
18  Heller to Ms. de Leon. It's a letter
19  dated March 6th concerning a suspension
20  with pay. And it says, the purpose of
21  this letter is to confirm your
22  suspension with pay communicated to you
23  by me at the conclusion of our meeting
24  Tuesday, March 4th, 2003, in the
25  presence of your association

**Page 145**

1  representative. Do you see that?
2  A  Yes.
3  Q  Do you believe that you were at
4  the meeting on the 4th?
5  A  Yes. Hold on. Yes.
6  Q  And if you look at the bottom
7  paragraph, on the first page, it
8  indicates that Mr. Dolecki was there,
9  Mr. Deshner was there, you were there,
10  Mr. Heller was there?
11  A  Correct.
12  Q  Or actually, I'm sorry. I
13  misspoke. The bottom paragraph of the
14  first page talks about scheduling
15  another meeting Tuesday, March 11th,
16  2003. And then it tells her who will
17  be present from the administration, and
18  notes that she's entitled to bring a
19  representative. Do you see that?
20  A  Yes.
21  Q  Now, just from your recollection
22  as you sit here today, relative to the
23  meeting that occurred on March 4th,
24  concerning the discipline log, was that
25  a second meeting? Did you meet with

**Page 146**

```
 1  her yourself before that, or were the
 2  discipline log and the inconsistencies
 3  all discussed at the same meeting on
 4  the 4th, if you remember?
 5  A  Again, I don't remember.
 6  Q  And this is a suspension with
 7  pay, and issues that are going to be
 8  investigated are essentially what?
 9  A  Issues that were outlined here
10  for the suspension?
11  Q  Yes.
12  A  No through four.  Failure to
13  adequately maintain the log that was
14  required, the breach of student
15  confidentiality, inaccurate reporting
16  of students conducts on several
17  occasions, not properly following
18  through on student discipline issues as
19  previously directed to do by Mr.
20  Deshner and myself.
21  Q  Are you aware that she was
22  ultimately suspended without pay in
23  March of 2003 because of those issues?
24  A  Yes.
25  Q  And were you present at the
```

**Page 147**

```
 1  meeting that occurred on March 11th
 2  then when she was suspended without
 3  pay?
 4  A  Yes.
 5  Q  And what do you recall, if
 6  anything, about that meeting?
 7  A  I think Mr. Heller did most of
 8  the speaking, just briefly outlined the
 9  points and the problems that were
10  present, and that there would be a
11  further investigation.
12  Q  Did Ms. de Leon have any
13  response?
14  A  Not that I recall.
15          (Higgins Exhibit 33
16           marked for
17           identification.)
18  BY ATTORNEY HEATH:
19  Q  Let me show you what's been
20  marked as Exhibit 33, which is an April
21  2nd, 2003 memorandum to Ms. de Leon
22  from you concerning assigned reading.
23  And just summarize the purpose of this
24  memorandum.  We have already talked
25  about ---
```

**Page 148**

```
 1  A  Yes.
 2  Q  --- the assignment that had been
 3  made.
 4  Q  I made the assignment to Mrs. de
 5  Leon.  I felt it would be helpful in
 6  the classroom.  And during the meeting,
 7  I even provided more suggestions to
 8  Mrs. de Leon.  I also offered a list of
 9  suggestions I had made.  I felt that,
10  you know, when I was going over this, I
11  wanted to point out that, you know, Mr.
12  Heller has reminded you about being
13  confrontational working with
14  administration.
15      When I got her response, you
16  know, for her doing those chapters, I
17  felt, you know, she didn't really focus
18  on what I wanted her to focus on.  She
19  wanted to focus on, you know, passing
20  the blame and was very sarcastic in he
21  writing, negative to the point of being
22  confrontational in her response to me.
23  And I felt that, you know, there's too
24  wide of a distance, that, you know, she
25  lacked buying with the action plan all
```

**Page 149**

```
 1  along.  And I mean, how can something
 2  work when you're not going to buy into
 3  it?  And I think, you know, it just
 4  team downhill.
 5  Q  And you say at the end, I feel
 6  we need to work together if we are to
 7  make the needed improvements in your
 8  classroom?
 9  A  Yes.
10  Q  And at the end of the meeting,
11  did you feel that it went well or not
12  well?
13  A  No, I don't feel it went well at
14  all.  I felt we got nowhere with that
15  particular meeting.
16          (Higgins Exhibit 34
17           marked for
18           identification.)
19  BY ATTORNEY HEATH:
20  Q  The next exhibit, 34, which is a
21  letter from Cheryl Albaugh dated April
22  7th, 2003.
23  A  Yes.
24  Q  And it references you that she's
25  writing in response from having talked
```

**Page 150**

1 with Mrs. VanTuil?
2 A.VanTuil (corrects)
3 pronunciation).
4 Q.VanTuil, Mr. Higgins, Mr. Heller
5 and Mr. Deshner. My concern is Mrs. de
6 Leon, Adam Albaugh, second period
7 Spanish 1 class. I'll give you a
8 moment to take a look at that and I'll
9 just ask you if you recall any issues
10 concerning this particular student and
11 the parent complaint.
12 WITNESS REVIEWS DOCUMENT
13 BY ATTORNEY HEATH:
14 Q.This essentially concerns a
15 missing notebook?
16 A.Yes. I believe Mr. Deshner
17 dealt with this parent situation. I
18 was present because I did know Adam
19 personally --- not personally as,
20 you know, a student, well-known
21 student. The problem was that I
22 believe there was a sub in for Mrs. de
23 Leon when she was initially suspended,
24 and this notebook came up missing. He
25 had asked for the assignments. He'd

**Page 151**

1 redone them. And the notebook got
2 lost. And I think the gist of it, he
3 felt he'd given it to Mrs. de Leon.
4 Mrs. de Leon said the sub had lost it,
5 something along those lines. And there
6 was ---
7 Q.And it was eventually recovered,
8 but then she wouldn't give it back; is
9 that right?
10 A.Yeah. And I'm trying to recall
11 why. She wanted a meeting.
12 Q.Then if you look at the third
13 paragraph from the bottom on the second
14 page, ---
15 A.Yes.
16 Q.---Mrs. Albaugh says, let me
17 make it very clear, after all this and
18 what other parents are saying, we will
19 not have a conference with this
20 teacher ---
21 A.Right.
22 Q.--- unless Mr. Higgins or Mr.
23 Deshner are present. I am sorry to
24 bring them in on this, but this would
25 be for our protection.

**Page 152**

1 A.Right. There was a breakdown,
2 you know, between the parent and Mrs.
3 de Leon, a communication breakdown. It
4 just wasn't a good situation. They
5 wanted Adam --- or wanted Mrs. de Leon
6 to --- they were afraid that, you know,
7 she's going to, you know, do something.
8 And in that regard ---
9 Q.Was there also a concern about
10 not only just the interaction of the
11 parent/teacher conference, but also how
12 much the kids were actually learning in
13 her class?
14 A.Yes. The parent does question
15 that here.
16 Q.But that was something that you
17 said essentially Mr. Deshner was the
18 point person on that?
19 A.Yes, he was. He could give you
20 better answers to questions in regard
21 to this situation.
22 ATTORNEY NICHOLS:
23 Question, Counsel. How
24 much more you got to go?
25 ATTORNEY HEATH:

**Page 153**

1 You've got the exhibit
2 list in front of you. We're
3 going through the rest of the
4 exhibit list, and I've only got
5 another couple pages of
6 questions here, a page.
7 ATTORNEY NICHOLS:
8 You've got another couple
9 of pages to go?
10 ATTORNEY HEATH:
11 A page.
12 ATTORNEY NICHOLS:
13 A page.
14 (Higgins Exhibit 35
15 marked for
16 identification).
17 BY ATTORNEY HEATH:
18 Q.I'm looking at Exhibit 35, which
19 is a memorandum dated April 7th, 2003,
20 this is from George Deshner to
21 Claudette de Leon, and it indicates,
22 thank you for meeting with Mr. Higgins
23 and myself on Friday, April 4th to
24 discuss issues concerning classroom
25 management.

**Page 154**

1    A    Okay.
2    Q    And part of this relates to Mrs.
3    Albaugh's concern ---
4    A    Right.
5    Q    --- about the missing work?
6    A    Okay. Yeah. There was a
7    student, not Adam, but another student
8    who had five Spanish I notebooks in his
9    locker. So Mr. Deshner wanted to hit
10    on a few points, and again, point out
11    that, you know, she wasn't following
12    the action plan. And we were
13    attempting to assist her, give her
14    suggestions, and she wasn't taking
15    those suggestions. And you know, there
16    was a breakdown with, total breakdown with
17    the classroom, communication with
18    parents.
19    Q    And again, Mr. Deshner, here in
20    the first paragraph towards the bottom
21    mentions the classroom observation you
22    did on April 2nd, where students were
23    questioning their notebooks'
24    whereabouts. And he had mentioned this
25    at this meeting and says, at this

**Page 155**

1    point, you became sarcastic towards the
2    administration and your statements were
3    unacceptable. Do you recall anything
4    like that that occurred at this meeting
5    on April 4th?
6    A    Yes. Yeah, Mr. Kozanowski was
7    there. She just, you know, basically
8    stated that we weren't supportive of
9    her, that we were always believing the
10    kids over her, that we were the reason
11    that there was problems in the
12    classroom and not her.
13    Q    And did her union rep attempt to
14    intervene at this point?
15    A    Not that I recall.
16    Q    It says, Mr. Kozanowski, at
17    several intervals, asked you to refrain
18    from making your comments. You still
19    continued to ---
20    A    Oh.
21    Q    Continued despite his request to
22    refrain from the statements.
23    A    That's written here. I would
24    agree to that. I don't really recall,
25    honestly.

**Page 156**

1    (Higgins Exhibit 36
2    marked for
3    identification.)
4    BY ATTORNEY HEATH:
5    Q    Okay. Looking at Exhibit 36,
6    these are notes concerning student
7    confidentiality issues. And I just
8    wanted to know if you could identify
9    these notes as being your notes or
10    someone else's notes. And I notice
11    that the first two pages are in one
12    kind of type and the next several pages
13    are in a different kind of font.
14    A    They're the same notes,
15    actually, redone, possibly my
16    suggestions, what have you, that's why.
17    But these are the same, if you turn the
18    page, as the end notes.
19    Q    Pardon me?
20    A    As the notes at the end of the
21    third page.
22    Q    Are these your notes?
23    A    Yes, they are.
24    Q    And what was the purpose of you
25    keeping these notes?

**Page 157**

1    A    Just some anecdotal records for
2    myself to, you know --- kind of the
3    situations, you know, in school come
4    fast and furious. Just to try to keep
5    a handle on things and, you know, what
6    was going on, some of the situations I
7    was seeing. Personal notes.
8    Q    And these dates, was this for
9    the 2002/2003 school year?
10    A    Yes.
11    Q    Okay. Essentially, these were
12    related to student discipline issues;
13    correct?
14    A    Correct. And just to make
15    notation of, you know, some parent
16    phone calls, some, you know, student
17    complaints, here and there. And
18    there's a lot more than what was here,
19    but you know, that's when I thought to
20    write stuff down. Again, as the year
21    rolls on, I did become a little bit
22    more detailed in some of the situations
23    I felt that were important.
24    (Higgins Exhibit 37
25    marked for

Multi-Page™

**Page 158**

1 identification.)
2 BY ATTORNEY HEATH:
3 Q And Exhibit 37 is an
4 unsatisfactory evaluation for the
5 2002/2003 school year dated April 11th
6 of 2003 and signed by you?
7 A Yes.
8 Q Do you believe that this
9 unsatisfactory evaluation was merited?
10 A Yes.
11 Q Were you aware that the
12 administration recommended to the Board
13 that Ms. de Leon be terminated?
14 A Yes.
15 Q And ultimately, was she
16 terminated?
17 A Yes.
18 Q Do you believe the termination
19 was warranted for just cause?
20 A Yes.
21 Q In reviewing Exhibit 37 and the
22 unsatisfactory portions, do you believe
23 that this is a fair and accurate
24 representation of some of the issues
25 that you had faced concerning Ms. de

**Page 159**

1 Leon's performance that year?
2 A Yes.
3 Q Okay.
4 ATTORNEY NICHOLS:
5 Counsel, could we take
6 five minutes?
7 ATTORNEY HEATH:
8 Yes, I'm just going to
9 mark something collectively.
10 ATTORNEY NICHOLS:
11 Okay.
12 ATTORNEY HEATH:
13 Then I'm finished.
14 ATTORNEY NICHOLS:
15 Yes, go ahead, please.
16 ATTORNEY HEATH:
17 I want to mark these
18 collectively as Exhibit 38.
19 (Higgins Exhibit 38
20 marked for
21 identification.)
22 SHORT BREAK TAKEN
23 BY ATTORNEY HEATH:
24 Q Mr. Higgins, we took a little
25 break here. And during that time, you

**Page 160**

1 had shown me --- we had been missing
2 some information when I had gone over
3 some exhibits with you. They were the
4 discipline logs that were turned in by
5 Ms. de Leon ---
6 A Yes.
7 Q --- on February 27th, 2002 and
8 February 28th, 2002. And you had
9 indicated to me that you had actually
10 taken the time to put in writing the
11 inconsistencies that you found in those
12 logs?
13 A Yes.
14 Q Now, what's before you is an
15 exhibit that is a compilation of notes
16 marked as Exhibit 38. Is that
17 something that you compiled?
18 A Yes, it is.
19 Q And could you just, for the
20 record, identify what is contained in
21 there, please?
22 A Students that I saw some
23 inconsistencies in discipline that
24 didn't follow the action plan or the
25 behavioral plan that Mrs. de Leon was

**Page 161**

1 supposed to have in place and supposed
2 to be following.
3 Q And is that what you were
4 referring to relative to the notes that
5 you had compiled that specifically
6 related to those inconsistencies?
7 A Yes.
8 (Higgins Exhibit 39
9 marked for
10 identification.)
11 BY ATTORNEY HEATH:
12 Q Thank you. And lastly, I'd
13 like you to look at a compilation of, I
14 believe, six policies, which we've
15 marked as Exhibit 39. Maybe you should
16 show them to Mr. Nichols.
17 WITNESS COMPLIES.
18 BY ATTORNEY HEATH:
19 Q Can you, just for the record,
20 please identify whether or not ---
21 first of all, are these group of
22 policies from the Crawford County
23 Central School District handbook ---
24 A Yes.
25 Q --- or policy book?

Page 162

```
 1  APolicy book, yes.
 2  AAre the policies referenced in
 3  the teacher handbook?
 4  AYes.
 5  QAnd what are the policies that
 6  are before you?
 7  AHazing, unlawful harassment,
 8  intimidation, sexual harassment, and an
 9  updated version of sexual harassment, I
10  believe.  Oh, one's for pupils and
11  one's for administrative and employees.
12  QAnd as you said, those were
13  policies that are in the Crawford
14  Central School District policy book?
15  APolicy book, yes.
16  QAre these something that the
17  administration is aware of?  Are these
18  policies something that you're aware
19  of?
20  AYes.
21  QAnd are they implemented by the
22  District?
23  AYes.
24  ATTORNEY HEATH:
25  That's all the questions
```

Page 163

```
 1  I have.
 2  EXAMINATION
 3  BY ATTORNEY NICHOLS:
 4  QMr. Higgins, I'm Caleb Nichols.
 5  I represent Ms. de Leon in this
 6  proceeding.  I have a few questions I'd
 7  like to ask you.  Starting with the
 8  action plan, that you had testified
 9  concerning the action plan.
10  ATTORNEY HEATH:
11  Which year?
12  BY ATTORNEY NICHOLS:
13  QIt started in 2001.  That was
14  the first action plan, I believe.  You
15  testified that you did have an input in
16  the devising of the creation of the
17  action plan, is that correct?
18  AThat's correct.
19  QAnd you worked with Mr. Deshner
20  in developing that plan?
21  AYes.
22  QAnd did you also participate in
23  the implementation of the plan?
24  AYes.
25  QAnd as for the plan which was
```

Page 164

```
 1  presented to Ms. de Leon to follow, you
 2  were involved in the implementation of
 3  that?
 4  AYes.
 5  QAnd I believe you testified that
 6  Ms. de Leon did not fulfill the action
 7  plan in its entirety; is that correct?
 8  That was your testimony?
 9  AThat was part of my testimony,
10  yes.
11  QI just want to note for the
12  record now that three documents that
13  --- and this is --- the first one
14  represents 2001 to 2002 observations.
15  I would ask that it be marked.
16  (Higgins Exhibit 40
17  marked for
18  identification.)
19  ATTORNEY NICHOLS:
20  And also if you would
21  mark this, 2002 to 2003
22  observations.
23  (Higgins Exhibit 41
24  marked for
25  identification.)
```

Page 165

```
 1  ATTORNEY NICHOLS:
 2  Would you mark this,
 3  please?  It's a summation of the
 4  chapters that Ms. de Leon was
 5  asked to --- required to
 6  summarize under the terms of the
 7  action plan.
 8  (Higgins Exhibit 42
 9  marked for
10  identification.)
11  ATTORNEY HEATH:
12  Can I just ask a
13  question?  Relative to Exhibit
14  40, you said it was 2001 to 2002
15  observations.  It looks like
16  it's handwritten notes that Ms. de Leon
17  prepared?  Ms. de Leon prepared?
18  MS. DE LEON:
19  Well, I was taking notes
20  when I was performing these
21  observations.
22  ATTORNEY HEATH:
23  I see.  Okay.  I was
24  confused there a minute.
25  ATTORNEY NICHOLS:
```

## Page 166

1 I'd like to show these to
2 Mr. Higgins.
3 ATTORNEY HEATH:
4 Let me put a paperclip on
5 them so they don't get lost.
6 May I just look at 41 and 42?
7 also?
8 BY ATTORNEY NICHOLS:
9 Q Mr. Higgins, I now show you
10 what's been marked Exhibit 40 and ask
11 do you recognize having received a
12 copy of that from Ms. de Leon?
13 WITNESS REVIEWS DOCUMENTS
14 A I'll testify that Mrs. de Leon
15 did indeed complete these classroom
16 observations, I don't recall
17 specifically receiving these. I do
18 remember this, and I also remember the
19 note that she gave me, because she had
20 stated she did complete the
21 observation.
22 Q I believe she gave it to Mr.
23 Deshner.
24 A And she may have given it to Mr.
25 Deshner, that is correct. And vaguely

## Page 167

1 I remember her kind of citing the
2 teachers she observed. So if she says
3 that these were done and turned in, I
4 don't see a signature, but I would
5 agree to it.
6 Q Okay. As well, I would also ask
7 you to identify what has been marked
8 Exhibits 41 and 42.
9 A Okay.
10 Q If you would look at those and
11 identify those, please. Forty-one (41)
12 and 42, relative to the action plan.
13 WITNESS REVIEWS DOCUMENTS
14 A Yes. You asked 41?
15 BY ATTORNEY NICHOLS:
16 Q Yes.
17 A I'm familiar with that.
18 Q Right.
19 A Yes, I remember this, also. And
20 this is the reading assignment I'd
21 given him.
22 Q Okay. Now I have a student
23 disciplinary log for you. I will not
24 ask this to be marked. It was already
25 put in the record yesterday. But for

## Page 168

1 expediency purposes, I would just ask
2 that you look at it. Can you identify
3 having received that from Ms. de Leon
4 in satisfaction, partial satisfaction
5 of her obligation of the action plan?
6 A This is everything we just
7 covered, I believe.
8 Q Yes. That's in the record
9 already.
10 A Yeah.
11 Q That's why I'm not asking it to
12 be marked.
13 A That I recognize it?
14 Q Yes.
15 A Yes, I recognize it.
16 Q Okay. Fine. Thank you. And
17 now, in response to inquiries posed by
18 your Counsel, you said that Ms. de Leon
19 --- that you noted discrepancies in the
20 preparation of two logs. You referred
21 to the student discipline logs that she
22 prepared, right?
23 A Well, actually, three things.
24 Q Three things?
25 A Yes.

## Page 169

1 Q Okay. And you have noted those
2 for the record. I'm not asking you to
3 recite those.
4 A Sure.
5 Q What I'm simply saying, I'm
6 asking you, based upon her submissions
7 to you, those logs, is it fair to say
8 that she did make a conscious effort to
9 comply with the action plan? Would you
10 agree with that, that she did make a
11 conscious effort to comply?
12 A Yes, to a point.
13 Q Okay. All right. Continuing,
14 there's a question I have concerning
15 --- regarding ---- Now, you've just
16 shown me --- and you have recited
17 various public policies and public
18 mandates that the School District
19 enforces --- implements, I should say.
20 Harassment, sexual harassment and other
21 policies. Now, I'm going to further
22 inquire as to whether the
23 administration, and when I say
24 administration, I'm talking about, in
25 this case, the principal and assistant

**Page 170**

1 principals, including you; okay? And
2 that would be Mr. Berkebile; right?
3 A I didn't work with Mr.
4 Berkebile.
5 Q Okay. So since you came in
6 1999/2000 ---
7 A '99. The end of '99/2000 in
8 April.
9 Q Okay. And Mr. Deshner, of
10 course, was the principal then?
11 A Correct.
12 Q And you became an assistant
13 principal?
14 A Yes.
15 Q And is there another assistant
16 principal?
17 A Yes.
18 Q Who is that?
19 A Do you want the current one or
20 the one that was when I started? The
21 one I replaced or ---?
22 Q You replaced Ms. --- ?
23 A No. I replaced Larry Gilligan.
24 Larry Gilligan replaced Carol
25 Templeton.

**Page 171**

1 Q Okay. I meant Ms. Templeton.
2 Okay. Is there someone --- do you have
3 another assistant principal now in
4 place who works with you?
5 A When I first started --- I'll go
6 --- there's been a litany. Let me go
7 through them.
8 Q Okay.
9 A The first one I started with,
10 under Mr. Deshner, was James T. Morgan,
11 assistant principal, Mr. Deshner
12 retired. James Morgan took the
13 position of principal of the building
14 approximately two years ago. At that
15 time, there was a position open for
16 assistant principal, in which case Pat
17 Deardorff was hired as the other
18 assistant principal. And when Pat got
19 --- excuse me, Mrs. Deardorff got her
20 own building, she is the Crawford
21 Elementary principal, she was replaced
22 this year by a Tamara Clark from
23 Conneaut Valley, I believe.
24 Q Okay. All right. And so Ms.
25 Clark is now ---

**Page 172**

1 A Yeah, their assistant principal
2 now.
3 Q Okay. And that's the full
4 complement of the principal's office?
5 A Yes.
6 Q Mr. Deshner, you, and Ms. Clark?
7 A It's Mr. Morgan, myself and Mrs.
8 Clark now. Mr. Deshner retired two
9 years ago.
10 Q Oh, yes. That's right. Okay.
11 I stand to be corrected there. All
12 right. The ADA law --- the
13 administration I'm referring to, did
14 the principal's office provide training
15 in ADA law to the teaching staff?
16 A I don't recall.
17 Q You don't know whether you have
18 anybody in the principal's office or
19 the administration --- when I say the
20 administration, I'm also including the
21 superintendent's office, as well.
22 Since you have been there, has there
23 been any instruction given to the
24 teacher staff regarding the ADA
25 mandate? I'm talking the Americans

**Page 173**

1 with ---
2 A Disabilities.
3 Q --- Disabilities Act.
4 A Yes.
5 Q Right.
6 A No that I'm aware of.
7 Q Not that you're aware of?
8 A No that I'm aware of.
9 Q And FERPA?
10 A Yes.
11 Q There has been some discussion
12 in dealing with the confidentiality of
13 student records?
14 A Uh-huh (yes).
15 Q And the rule, as I understand,
16 applies to that. Has there been
17 training given by the administration of
18 the School District relative to FERPA?
19 Training given to the teaching staff.
20 Do you know?
21 A I believe so, sir. I believe,
22 you know, at the very least, the
23 teachers have been informed of FERPA.
24 They have at least some ---
25 Q What was the nature of the

**Page 174**

1 training; do you recall?
2 A I don't recall.
3 Q Would it have been in the nature
4 of a --- would it have been an oral
5 presentation or would it have been a
6 dissemination, something in the form of
7 a written dissemination of policy? You
8 just don't know?
9 A I just don't recall. I mean, I
10 don't.
11 Q And that's true with respect to
12 ADA and FERPA? You're saying you just
13 don't recall any training that would
14 have been given to the teaching staff?
15 A DA I don't recall. FERPA I
16 believe the teachers have been made
17 aware of, whether it be in the
18 teacher's handbook or, you know, made
19 aware of though online or, of course,
20 after school. But I believe the
21 teachers are aware of FERPA. ADA, I
22 can't quite recall.
23 Q But can that be documented, that
24 is the training given for FERPA? You
25 say you think it has been given.

**Page 175**

1 A I think it has been given.
2 Q Can that be documented in some
3 way?
4 A By someone from central office,
5 possibly?
6 Q Well, either your office or
7 central office that it was given for
8 record keeping purposes, I'm saying?
9 A Probably, yes.
10 Q It can be documented?
11 A Probably.
12 Now, if I may, let
13 me just divert a moment --- digress, I
14 should say, to the action plan, okay?
15 I just wanted to step back to that
16 again. All right, Now, you have
17 explained why the action plan was
18 assigned to Ms. de Leon. What is the
19 typical profile of a teacher in this
20 school district who is assigned to the
21 action plan?
22 A Profile as in what needs
23 improvement?
24 Q Yes, as to what needs
25 improvement.

**Page 176**

1 A For example, something has been
2 --- in regard to discipline and
3 classroom management, they'd be turning
4 in lesson plans even if --- you know,
5 if there's a pattern of something
6 that's not being done and it's affected
7 the classroom or contractual nature,
8 and by verbally addressing it by
9 talking to them, the teacher may need
10 to turn in a lesson plan. And if it's,
11 you know, continuous, as in Ms. de
12 Leon's case, it was --- and I have had
13 other teachers on action plans, so to
14 speak. It doesn't necessarily ---
15 Q How many? How many other
16 teachers during your tenure have you
17 placed ---?
18 A That I know of?
19 Q Right. Been placed on action
20 plans.
21 A Possibly three or four. That I
22 placed personally? Probably two
23 besides Mrs. de Leon in regard to an
24 improvement plan for a specific
25 purpose.

**Page 177**

1 Q Have they been younger teachers,
2 junior in terms of their status, or
3 more senior teachers, or both?
4 A One was a younger teacher, and
5 actually, one is close to retirement.
6 Q I think you mentioned four. You
7 used the number four; right?
8 A Four, yes. I said personally I
9 think I put two --- well, I know I put
10 two on besides Mrs. de Leon, which
11 would be three. But I am aware that
12 there have been other teachers in our
13 building in the District on action
14 plans.
15 Q That was before you came? You
16 said four since you started your tenure
17 with the District?
18 A Yeah, since I've started.
19 Q Right.
20 A Before I came, I wouldn't know.
21 Q You just don't know. Right.
22 Okay. Now, the gender of those four,
23 are they all female or are they male?
24 A Both were male.
25 Q Male and female?

**Multi-Page™**

Page 178

1 A No, just both were male. One
2 younger and one older.
3 Q Oh.
4 A Young teacher, old teacher.
5 Yeah.
6 Q Oh, okay. I thought you said
7 there were four.
8 A Four total. I was involved with
9 three ---
10 Q That includes Ms. de Leon?
11 A Yes.
12 Q The four. Okay. And the third
13 one?
14 A It would be Mrs. de Leon. And
15 then at the high school level, there
16 was a young male teacher and an older
17 male teacher that I put action plans in
18 place, that I wanted things, you know,
19 done.
20 ATTORNEY HEATH:
21 He's asking the fourth
22 one.
23 A The fourth one was --- oh. He
24 started in middle school. He was a
25 younger teacher, too. He probably has

Page 179

1 a few more years than I do, but we
2 consider ourselves younger.
3 BY ATTORNEY NICHOLS:
4 Q And typically, how long is the
5 duration of the ---?
6 A So it would be three males, I'm
7 sorry. To confirm, three males, one
8 female.
9 Q One female. And that's
10 inclusive of Ms. de Leon.
11 A Yes.
12 Q All right. And typically, how
13 long of a duration is a teacher
14 trained, if you will, under the action
15 plan? How long do you require a
16 teacher --- once he or she is assigned,
17 required to stay under the action plan?
18 A If I had to set a time limit,
19 I'd say at the minimum, one semester.
20 Q But Ms. de Leon was on at least
21 two years, right?
22 A Correct. But there wasn't
23 sufficient improvement.
24 Q Right. You revised it the
25 second year?

Page 180

1 A Yes.
2 Q And why did you revise it the
3 second year? You stated you did, but
4 you didn't state the reason why?
5 A Yes, I did. That's because she
6 wasn't meeting the action plan and
7 things weren't improving in the
8 classroom. And that's why it was
9 stated that we had to revise it, to
10 focus her energies in the classroom to
11 improve student discipline and improve
12 classroom management.
13 Q I read somewhere --- it may have
14 been an evaluation, there was a
15 commentary. And I'm not sure whether
16 it was --- in terms of it was someone else
17 who did the evaluation, said that Ms.
18 de Leon had not shown professional
19 growth, that is, taken courses in
20 continuing education; is that correct?
21 A I did ---
22 ATTORNEY HEATH:
23 Objection to form. You
24 may answer.
25 A It may answer? Yes, I am aware

Page 181

1 of that, and ---.
2 BY ATTORNEY NICHOLS:
3 Q Did you make that comment?
4 A That would have been Mr.
5 Deshner.
6 Q Mr. Deshner made the comment?
7 A Yes.
8 Q Okay. I just want to note for
9 the record that yesterday, we placed in
10 the record a whole batch of
11 documentation evidencing continuing
12 education courses that Ms. de Leon had
13 taken. And my further question to you
14 on that, Mr. Higgins, is this. The
15 batch of documents we placed in the
16 record yesterday evidencing the
17 continuing education courses that Ms.
18 de Leon had taken through her career
19 with the School District, that had been
20 done prior to the March 7th, 2002
21 evaluation that you conducted.
22 A Okay.
23 Q Yet it appears that in your
24 evaluation, she received no credit for
25 that.

Page 182

```
 1 ATTORNEY HEATH:
 2     Objection to the form.
 3 BY ATTORNEY NICHOLS:
 4 Q.And the question is why she did
 5 not receive any credit for that. It
 6 was a negative evaluation you gave her
 7 then. But you just testified --- that was
 8 the third evaluation. The first two
 9 were satisfactory, correct?
10 ATTORNEY HEATH:
11     Sure. They're
12 observations versus evaluations.
13 BY ATTORNEY NICHOLS:
14 Q.All right. Observations, the
15 first two were satisfactory; right?
16 A.Yes.
17 Q.Which you testified to; right?
18 A.I'm not saying I didn't. Yes.
19 Q.All right. And then you said
20 that in the interval between the second
21 observation and the third observation,
22 you received complaints from students
23 and parents of students; is that
24 correct?
25 A.Yes.
```

Page 183

```
 1 Q.And what I'm asking you, did the
 2 receipt of those complaints from
 3 students and the parents of students
 4 influence the third observation, which
 5 was negative?
 6 A.No, it did not.
 7 Q.It did not?
 8 A.No.
 9 Q.I see. Well, what did influence
10 the third observation which changed
11 dramatically from the first two, the
12 first two being positive, the third one
13 being negative?
14 A.A lack of control of the student
15 behavior in the classroom. That's what
16 changed.
17 Q.Okay. And that was the one ---
18 The third one was conducted on March
19 7th, 2002?
20 A.Correct.
21 Q.All right. Now, five days
22 later, there was the meeting on March
23 12th of you, Ms. de Leon, Mr. Heller,
24 and I believe another person?
25 A.I believe it was Mr. Mehok,
```

Page 184

```
 1 Q.Mr. Mehok, you say? And he's a
 2 union rep; is that correct?
 3 A.Correct.
 4 Q.Okay. Was he there at the
 5 request of Ms. de Leon, as a union rep
 6 for Ms. de Leon?
 7 A.I don't recall. But I do recall
 8 that meetings we had with Mrs. de Leon,
 9 from the beginning of the first action
10 plan on, she had had representation.
11 Q.All right. On March 12th, you
12 said --- at that particular meeting you
13 say Ms. de Leon was --- I think you say
14 that she was vocal; is that right.
15 A.Yes.
16 Q.But it was not clear why she was
17 vocal. You said an outburst on her
18 part; right?
19 A.Emotional outburst.
20 Q.Emotional.
21 A.You know, the disagreement with
22 the administration --- and myself, the
23 administrator, on what I observed in
24 the classroom. And it just actually
25 broke down from there.
```

Page 185

```
 1 Q.You said that particular meeting
 2 was not concluded; right?
 3 A.No.
 4 Q.You didn't conclude that
 5 meeting; right?
 6 A.I was not able to. Mrs. de Leon
 7 I was not able to continue.
 8 Q.So that means you were not in
 9 compliance with the strict five-day
10 requirement ---
11 ATTORNEY HEATH:
12     Objection.
13 BY ATTORNEY NICHOLS:
14 Q--- as to the rule which
15 required a five-day conference once an
16 evaluation is done --- I mean, the
17 observation and evaluation is done; is
18 that correct?
19 ATTORNEY HEATH:
20     Objection to form. You
21 may answer.
22 A.I feel the conference was done.
23 Mrs. de Leon was not able to continue.
24 BY ATTORNEY NICHOLS:
25 Q.What about the five-day rule?
```

**Page 186**

1 A What about the five-day rule?
2 Q I'm asking you, were you in
3 compliance with that?
4 A I feel we were. I feel we were
5 in compliance with the five-day rule.
6 Q You also testified in this vein.
7 You testified that you were aware that
8 there was a letter received by the
9 administration from Dr. Mercatoris?
10   ATTORNEY HEATH:
11     Objection. He did not
12   testify to that.
13 BY ATTORNEY NICHOLS:
14 Q I thought you said you were
15 aware that there was some type of
16 communication from Ms. de Leon's
17 doctor, who was Dr. Mercatoris on that
18 occasion; right? You were aware of
19 that? You testified to that, didn't
20 you?
21 A I believe my testimony was I
22 believe I was aware. I can't tell you
23 when.
24 Q You were aware that there was
25 some type of written communication

**Page 187**

1 received by someone in administration
2 from Ms. de Leon's doctor, right?
3 A Yes.
4 Q Okay. And that was ---
5 we're talking about the same time
6 frame, somewhere between March 12th and
7 March 18th; are we not?
8 A Yes.
9 Q That time frame?
10 A Sure.
11 Q Now, did you yourself receive
12 the letter, or do you know who received
13 the letter?
14 A I would assume it would be
15 central office.
16 Q So that would have been Mr.
17 Dolecki, right, or Mr. Heller?
18 A Either/or. I'm not sure. The
19 letter would not have come to me.
20 Q Well, I believe you also spoke
21 to the contents of that written
22 communication; did you not?
23 A Spoke to the contents of it?
24 Q Yes. What the letter consisted
25 of, what it was about.

**Page 188**

1 A I mean, I remember it now
2 because I've seen it, ---
3 Q Right.
4 A --- and I can tell you now, but
5 you know, when I actually ---
6 Q When did you first see it?
7 A Like I said when I testified,
8 I believe it was March, but I'm not sure.
9 Q Okay. And I'm asking, under
10 what circumstances did that letter come
11 into your possession where you were
12 able to find out what it was about?
13   ATTORNEY HEATH:
14     Objection. Asked and
15   answered. You may answer.
16 A He rephrased the question. He said
17 he didn't know when he got it.
18 BY ATTORNEY NICHOLS:
19 Q How did the letter come to your
20 attention or come to you?
21 A I don't recall, but I do
22 remember seeing it. And I believe I
23 was aware of the letter or, you know,
24 the condition in March.
25 Q Okay. Now ---

**Page 189**

1 A But specifically, I can't tell
2 you when.
3 Q All right. Now, did you have
4 occasion to discuss the letter with Mr.
5 Dolecki and Mr. Heller or others?
6 A If I did, I don't remember, but
7 if I did, it would have probably been
8 discussed. It would have been gone
9 to Mr. Deshner, who would have
10 discussed it with me. That would be
11 the chain of command.
12 Q Do you recall discussing it with
13 Mr. Deshner?
14 A I said I don't recall, but if I
15 did discuss it with him, it would have
16 been Mr. Deshner first. He would have
17 given me the information. But I don't
18 recall.
19 Q Did you attend a meeting on
20 March 18th with Mr. Heller, Mr. Deshner
21 and Ms. de Leon?
22 A Is there a record I can look at
23 that, you know, would help? I mean,
24 there were a lot of dates. There were
25 a lot of meetings. You're asking for a

Multi-Page™

**Page 190**

1 specific one. Is there ---?
2 Q. Well, let me see if I can jog
3 your memory, if I may. There was a
4 letter authored, prepared by Mr.
5 Dolecki that was hand carried,
6 physically delivered, to Ms. de Leon on
7 March 18th, 2002.
8 A. What did the letter state?
9 Q. The letter said this --- it's in
10 the record.
11 A. Thank you.
12 Q. I can get a copy of it. We can
13 get a copy. It said, essentially ---
14 this is the gist of it. One, Mr.
15 Dolecki was telling Ms. de Leon, I'm
16 suspending you; all right? One,
17 A. Is this the same letter ---
18 Q. Two ---
19 A. --- I testified to earlier?
20 Q. I'm not sure whether you
21 testified to that.
22 A. Mind if I look?
23 Q. Go right ahead.
24 A. Was it the three-day or the
25 five-day suspension letter?

**Page 191**

1 Q. No, no, no. It was not three
2 days. He suspended her for two months,
3 over two months. And he directed
4 her ---
5 ATTORNEY HEATH:
6 Objection to form.
7 BY ATTORNEY NICHOLS:
8 Q. --- to undergo ---
9 ATTORNEY HEATH:
10 She was not suspended for
11 two months. Hearsay,
12 ATTORNEY NICHOLS:
13 Well, how long? Counsel,
14 how long did she suspend her for?
15 ATTORNEY HEATH:
16 Until she was released to
17 return to work by her doctor.
18 ATTORNEY NICHOLS:
19 Right. And that was two
20 months plus. Okay.
21 BY ATTORNEY NICHOLS:
22 Q. Now, the gist of that letter was
23 that be said ---. Here it is.
24 A. Good.
25 Q. That's it. You might take a

**Page 192**

1 moment to review it. And he directed
2 her to undergo an independent medical
3 exam or a psychiatric examination.
4 A. Yes, I have seen this letter.
5 Q. Right. Okay. And also, as you
6 would note there, the reason why she
7 was being suspended is for medical
8 reasons. That's why ---
9 A. Sure.
10 Q. It's a medical reason. That
11 particular letter was delivered by Mr.
12 Heller. Did you attend the meeting in
13 which --- at which, I should say, Mr.
14 Heller delivered that letter to Ms. de
15 Leon?
16 A. Quite possibly, but I don't
17 recall. I'll testify that probably,
18 but I'm not 100 percent sure.
19 Q. Okay. Well, then let me ask you
20 a further question. At that meeting
21 which you say you possibly could have
22 attended ---
23 A. Yeah.
24 Q. Let me ask you another
25 question. At that meeting at which you

**Page 193**

1 say you possibly were in attendance,
2 did you hear Mr. Heller ask for Ms. de
3 Leon's resignation?
4 A. Yes, I did.
5 Q. You heard him say that?
6 A. It was an option. I don't think
7 he asked for it. It was posed as an
8 option
9 Q. Well, as ---
10 ATTORNEY HEATH:
11 Could you just let him
12 answer your questions, please?
13 A. If that's the meeting you were
14 discussing, I was in that meeting with
15 Mr. Heller because I do remember Mr.
16 Heller saying to Mrs. de Leon --- and I
17 don't believe if Mr. Dolecki was there
18 or not. I don't recall because it's
19 three or four years ago now. But I
20 believe he posed it as an option that
21 the District would honor.
22 BY ATTORNEY NICHOLS:
23 Q. As best that you can recall, and
24 as objectively as you can recall, and
25 precisely, what did he say to her?

## Page 194

1 Just what I said. I mean, the
2 best I can recollect, it was posed as
3 an option for Mrs. de Leon. That's
4 about as best as I can recollect.
5 Q But you do recall that he asked
6 for her resignation; right?
7 ATTORNEY HEATH:
8 Objection to form.
9 BY ATTORNEY NICHOLS:
10 Q You do recall that?
11 A He posed her resignation would
12 be accepted as an option. Yes, I do
13 recall that.
14 Q All right. Now, did you not either
15 discuss with Mr. Heller and/or Mr.
16 Delecki whether or not they should
17 consult with Dr. Mercatoris regarding
18 the letter that was sent?
19 A Could your repeat that one more
20 time? I know what you're trying to ---
21
22 Q You testified that you were
23 aware of this letter which came from
24 Dr. Mercatoris. You didn't know the
25 name of her physician, but that was his

## Page 195

1 name.
2 Q Okay.
3 Q But you did testify that you did
4 receive a letter from Ms. de Leon's
5 physician. All right. You testified -
6 ---
7 A No, I testified that I was
8 aware of the letter sometime in March.
9 I can't be specific, but was aware.
10 Q Right. Okay.
11 A Did it affect my opinion or
12 judgment of what was going on? No.
13 Q Now, relative to that letter,
14 did you hear, or did you have an
15 opportunity to speak to Mr. Heller
16 and/or Mr. Delecki regarding their
17 consultation with --- they would
18 consult with Dr. Mercatoris, who sent
19 the letter?
20 ATTORNEY HEATH:
21 Objection to form. You
22 may answer.
23 A I don't remember, I don't.
24 recall.
25 BY ATTORNEY NICHOLS:

## Page 196

1 Q You don't recall?
2 A I don't believe --- You know
3 what? I don't believe so.
4 Q Okay.
5 A That would be a central office
6 thing.
7 Q Now, the observation that you
8 conducted on March 7th is dated March
9 18th. But there is a notation at the
10 bottom of that document saying it was
11 not being apparently executed until Ms.
12 de Leon returned to work, because she
13 had been suspended in the meantime,
14 suspended by Mr. Delecki, as of March
15 18th. The letter you just read; okay?
16 A We are talking about the
17 observation or the unsatisfactory
18 evaluation?
19 Q Right.
20 ATTORNEY HEATH:
21 Which one?
22 BY ATTORNEY NICHOLS:
23 Q That was dated March 18th.
24 A That would be the
25 unsatisfactory?

## Page 197

1 Q Right.
2 Q Okay.
3 Q March 18th.
4 A Sure.
5 Q 2002.
6 A Yes, yes.
7 Q All right. Now, Ms. de Leon,
8 her doctor, Dr. McFadden, determined
9 that she was able to return to work,
10 and that determination was made as of
11 May 3rd, 2002. Have you seen that
12 determination, that letter by which Dr.
13 McFadden made that determination to
14 return Ms. de Leon to work finding that
15 she was able ---?
16 A I would have had to at some
17 point along the line. Do I remember
18 specifically? No. But yeah, I would
19 have been aware of it.
20 Q And that March 28th, 2002, Ms.
21 de Leon did, in fact, receive a signed
22 copy of that negative evaluation?
23 A I'll take your word for it.
24 Q My question is why wasn't an
25 evaluation issued to her before March