Multi-Page™

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT

OF PENNSYLVANIA

CLAUDETTE deLEON,                     *

              Plaintiff              *

       vs.                           *   Case No.

                                     *   05-126E

CRAWFORD CENTRAL SCHOOL              *

DISTRICT,                            *

              Defendant              *

CRAWFORD CENTRAL SCHOOL              *

BOARD,                               *

              Defendants             *

MICHAEL E. DOLECKI,                  *

SUPERINTENDENT                       *

              Defendant              *

CHARLES E. HELLER, III               *

ASSISTANT SUPERINTENDENT,            *

              Defendant              *

              * * * * * * * *

DEPOSITION OF

CHARLES E. HELLER, III

April 24, 2006



Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.



EXHIBIT
48

1

Multi-Page™

**Page 2**

```
 1               DEPOSITION
 2                   OF
 3         CHARLES E. HELLER, III, taken on
 4     behalf of the Defendants hereto,
 5     pursuant to the Rules of Civil
 6     procedure, taken before me, the
 7     undersigned, Jacqueline L. Hallett, a
 8     Court Reporter and Notary Public in
 9     and for the Commonwealth of
10     Pennsylvania, at the Days Inn, 18360
11     Conneaut Lake Road, Meadville,
12     Pennsylvania, on Monday, April 24,
13     2006, beginning at 1:06 p.m.
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1              A P P E A R A N C E S
 2
 3     CARLE NICHOLS, ESQUIRE
 4     P.O. Box 1585
 5     Erie, PA 16507
 6          COUNSEL FOR PLAINTIFF
 7
 8     ROBERTA BINDER-HEATH, ESQUIRE
 9     Andrews & Beard
10     3366 Lynwood Drive
11     P.O. Box 1931
12     Altoona, PA 16603
13          COUNSEL FOR DEFENDANTS
```

**Page 4**

```
 1                    I N D E X
 2
 3     WITNESS: CHARLES E. HELLER, III
 4     EXAMINATION
 5        by Attorney Binder-Heath    7 -103
 6     EXAMINATION
 7        by Attorney Nichols       103 - 198
 8     CERTIFICATE                       199
 9
```

**Page 5**

```
                        EXHIBIT PAGE

 NUMBER   DESCRIPTION              PAGE IDENTIFIED

   4      Philosophy/Rationale              4
   5      Policy 412                       26
   7      Satisfactory rating
          and corrective action
          plan for 2000-2001              30
   9      Unsatisfactory
          rating 2001-2002               35
  11      3/12/02 Letter from
          Dr. Mercatoris                 47
  14      3/18/02 Letter from
          Dolecki Re: IME                50
  16      5/20/02 Letter from
          Dolecki Re: RTW                53
  18      (a) Corrective Action
          Plan 2002/03
  20      (b ) Revised Corrective
          Action Plan 2002/03 56
  22      8/30/02 Letter Re:
          Corrective action
          plan and observation
          of other teachers             61
```

Multi-Page™

Page 6

EXHIBIT PAGE (CONTINUED)

| NUMBER | DESCRIPTION | PAGE IDENTIFIED |
|---|---|---|
| 10 | 11/20/02 3 day suspension | 65 |
| 11 | 1/9/03 Heller classroom observation | 69 |
| 12 | 1/1 4/03 Heller Memo Re: improvements | 72 |
| 13 | 1/1 3/03 deLeon Memo to He ller (not received by Heller) | 73 |
| 14 | 3/6/03 Suspension with pay letter | 79 |
| 15 | 3/18/03 5 day suspension without pay | 84 |
| 16 | 4/1 1/03 Unsatisfactory Evaluation | 93 |
| 17 | 4/3/03 Statement of charges letter | 96 |
| 18 | 2/11/03 deLeon response letter | 197 |

Page 7

OBJECTION PAGE

| ATTORNEY | PAGE |
|---|---|
| Binder-Heath | 107, 109, 115, 121, 124, 128, 135, 140, 142, 143, 144, 145 148, 159, 173, 179 180, 186, 188, 190 |

Page 8

P R O C E E D I N G S

CHARLES E. HELLER, III, HAVING FIRST
BEEN DULY SWORN, TESTIFIED AS
FOLLOWS:

EXAMINATION

BY ATTORNEY BINDER-HEATH:

Q Good afternoon, Mr. Heller, we're here today to take your deposition. Even though you are a named Defendant, the School District is calling you. And as you know, I am Robin Binder-Heath and I represent you, Mr. Dolcek and the School District in an action brought in Federal Court by Ms. deLeon, claiming that she was discriminated against in violation of both Title Seven, The Americans with Disabilities Act, and the Pennsylvania Human Relations Act on the basis of her gender, her national origin --- or her national origin I should say, and her perceived mental disability.

Page 9

And I am here to get your take on the issues that have been addressed in this case. And just as a matter of course, I know you've been deposed before, but I just wanted to run through some preliminaries with you. As you know, we are under oath so it's important that everything you say today is the truth, and that if you don't recall, certainly a truthful answer may be, I do not recall.

If at any time you need to take a break for any reason or to talk to me, please let the court reporter know and you can certainly do that. If you don't understand a question that I ask you, let me know and I'll be happy to repeat or rephrase the question for you. Because there is a record that is being made here, it is important that one person speak at a time. So I would ask that you wait until I finish my question before you answer

**Multi-Page ™**

Page 10

1  ...my question. Similarly, Mr. Nichols,
2  then I am finished today will have an
3  opportunity to follow up and ask you
4  some questions, and I would wait that
5  you finish his --- let Mr. Nichols
6  finish his question before you
7  answer.
8      Also, taking that momentary
9  pause gives other Counsel an
10  opportunity to object. Any objection
11  would be placed on the record.
12  Although the objections that would be
13  placed on the record today are more
14  of an informal nature as to form, it
15  is important that if Counsel objects
16  -- if during my questioning Mr.
17  Nichols objects, that you stop
18  speaking so that the court reporter
19  can take down everything clearly.
20  And similarly when Mr. Nichols is
21  asking you questions, I may want to
22  object and I would also ask, if you
23  hear me say, objection, that you stop
24  speaking.
25      Also, because we have a

Page 11

1  written record today, it's important
2  that you answer verbally, and not
3  with a nod of the head or a gesture,
4  such as a shrug of the shoulders or
5  something, or an uh-huh or an uh-uh
6  because that's very hard to determine
7  what you're trying to say. So are we
8  ready to go?
9  A.Yes, we are.
10  Q.Would you please provide a
11  synopsis of your educational
12  background for the record?
13  A.From college on?
14  Q.Yes, please.
15  A.I was a graduate of Clarion
16  University of Pennsylvania,
17  undergraduate. I graduated from
18  there was a degree in social studies,
19  secondary teaching certificate. I
20  went on to receive my Master's degree
21  in Education from Gannon University.
22  From there, I earned my secondary
23  administrative certificate from
24  Youngstown State University.
25  Q.What year was that?

Page 12

1  A.That'd be tough. I'd say it
2  was pre-1990.
3  Q.Go ahead.
4  A.And then I earned my
5  elementary administrative certificate
6  from Youngstown State University, my
7  superintendent's certificate letter
8  of eligibility from Youngstown State
9  University, in that order, and then I
10  completed all my coursework for my
11  Doctorate at the University of
12  Pittsburgh. I have not completed my
13  doctorate because the dissertation is
14  still -- it may remain in the wings
15  for a long time.
16  Q.But your coursework for your
17  doctorate is complete?
18  A.It's complete, and the comps.
19  Q.And that would be a Doctorate
20  in ---?
21  A.Education. Administrative
22  leadership, University of Pittsburgh.
23  Q.And relative to your
24  employment history in the educational
25  field, would you please state, for

Page 13

1  the record, each position you've
2  held. And I understand that when you
3  graduated from college you had a
4  teaching certification for secondary
5  at that time. Did you begin teaching
6  at that time?
7  A.Not immediately. I was
8  employed at Bucknell University for
9  two years as an assistant wrestling
10  coach at the college level. And from
11  there I went back to Clarion
12  University for a year in the same
13  capacity. And then I spent a year at
14  Ellwood City School District, long-
15  term sub position. And then I was at
16  Titusville Area School District where I
17  was a teacher in the Social Studies
18  department, and I taught seventh
19  grade, primarily, but I had also
20  instructed the tenth grade American
21  History as well. And I ---.
22  Q.How long were you there?
23  A.I was in a teaching position
24  for five years, and then I became
25  assistant principal at Titusville

Case 1:05-cv-00126-SJM Document 50-18 Filed 06/26/2006 Page 5 of 46

Junior High. And then I was
assistant principal with Titusville
Senior High. And then ---.
Q.Can you give me the years?
A.I can't give you the years,
but I can tell you how many years.
It was four years as an assistant
principal at the junior high, one
year as an assistant principal at the
senior high school. Then I moved to
principal of the Junior High School,
Titusville Junior High School for two
years. Then high school principal
for, excuse me, for three years. And
then I've been employed at Crawford
Central School District since
February --- to be exact February
18th of 2002 as the assistant
superintendent.
**Q.When you were acting as a**
**principal and an assistant principal,**
**did you have any duties concerning**
**evaluating teachers' performance?**
A.Yes.
**Q.This is at Titusville.**

A.Yes.
**Q.And what were those duties?**
A.Observations, informal and
formal observations and then we used
--- at the time of the evaluations we
used the state evaluation form, PE
form. And we used that the final
year evaluation for our teachers.
**Q.And is that the same form that**
**is used at the Crawford Central**
**School District that has been amended**
**since that time, I should say. Is it**
**a state form, or do you have your**
**own?**
A.No. It's a district created
form, a district developed form that
was approved by the state many years
ago when that opportunity was given
to each individual school district.
**Q.And in evaluating teachers,**
**was that something that you did on a**
**regular basis when you were acting as**
**a principal and assistant principal**
**at Titusville?**
A.Yes.

**Q.And you were at the Titusville**
**Area School District in an**
**administrative capacity for how many**
**years?**
A.I believe I was ---.
**Q.At least seven --- or ten I**
**should say.**
A.Yes.
**Q.And during those ten years,**
**you had the opportunity to observe**
**and evaluate teachers?**
A.Yes.
**Q.As an assistant superintendent**
**with the Crawford Central School**
**District, could you please describe**
**your duties?**
A.All of my duties or just
duties pertaining to personnel?
**Q.Well, if you could just**
**generally describe your duties and**
**then your --- specifically your**
**duties concerning personnel.**
A.Well, my official title is the
assistant superintendent, but I not
only assist the superintendent, but I

also assist people in the area of
special ed curriculum, building and
grounds. And kind of like whatever
needs done, I'm usually involved in
it with the Central office staff and
also with the building principals.
My primary responsibility is
personnel and I'd like to say that I
perform more as a facilitator.
Meaning that I include many people in
the decision-making process for
personnel-related duties and
responsibilities, such as selecting
and recommending staff to the board
for approval to hire. I get involved
in situations with other supervisors
when there may be a problem
regardless of whether it's
professional staff or whether it's
--- what we refer to as a support
staff position.
**Q.Do you act as a mediator,**
**essentially, in those types of**
**situations?**
A.I can. I act as a mediator.

Multi-Page™

Page 18

```
 1  Sometimes I act as a problem solver.
 2  I'm another set of eyes and ears to
 3  help make recommendations for
 4  improvement.
 5  Q.And if I may, you indicated
 6  that you were quite involved with the
 7  hiring process?
 8  A.Yes.
 9  Q.And has that been true since
10  February 2002?
11  A.Yes.
12  Q.And I'm going to ask you a
13  little bit more about this later on
14  in your deposition, but since you've
15  been hired, do you have any data as
16  to how many minorities have been
17  hired at Crawford Central School
18  District?
19  A.Since I've been in the
20  position as assistant superintendent,
21  we have officially hired, I believe,
22  four minorities.
23  Q.And is that a program that you
24  --- is there any type of program or
25  policy or procedure that the District
```

Page 19

```
 1  engages in any kind of proactive
 2  way to attract minority teachers to
 3  the district?
 4  A.We make every attempt possible
 5  to attract minorities to the School
 6  District, but because of the
 7  geographic location sometimes it's
 8  difficult. We do attend job fairs,
 9  which I'm going to be attending a
10  couple in the very near future.
11  Q.Do you also work with the
12  local universities and colleges to
13  post your position openings?
14  A.We have them posted --- we
15  advertise and we also post them on
16  our website, which many people have
17  access to.
18  Q.Now, getting back to your
19  duties again, you said that your
20  primary duty involved personnel. And
21  you said, essentially, you act as a
22  facilitator in most cases?
23  A.For the selection process,
24  yes, I do.
25  Q.And you help mediate or at
```

Page 20

```
 1  least listen to employee or
 2  supervisor disputes with the staff?
 3  A.Uh-huh (yes).
 4  Q.What else do you do concerning
 5  personnel?
 6  A.I do observations of all the
 7  teachers that are not tenured.
 8  Meaning that people who are in
 9  teaching positions that have taught
10  here for three years, I observe them
11  once a year for three years. And I
12  also make observations with the
13  professional staff when they may be
14  on a Action Plan or a program of
15  improvement, as needed. As you said,
16  I sit in on meetings where there
17  could possibly be or there is
18  potential problem within that
19  building. And sometimes act as a
20  mediator, maybe a consultant.
21  Q.During the 2001 and 2002
22  school year, did you have the
23  opportunity to observe Ms. deLeon?
24  A.Not during the 2001/2002
25  school year I didn't.
```

Page 21

```
 1  Q.And that --- you had just
 2  started in February of 2002?
 3  A.Yes.
 4  Q.Did you observe her on the
 5  2002-2003 school year?
 6  A.Yes.
 7  Q.And was that because she was
 8  on an action plan?
 9  A.Yes.
10  Q.Since you started with the
11  district in February 2002, has any
12  other teacher other than Ms. DeLeon,
13  been on an action plan or an
14  improvement plan?
15  A.Yes.
16  Q.And did you observe those
17  teachers as well?
18  A.Yes.
19  Q.Was there anything that you
20  did to specifically single out or
21  target Ms. deLeon in any way
22  concerning your observations of her
23  in the 2002-2003 school year?
24  A.No.
25  Q.Relative to the evaluation
```

Page 22

1 process of the District, can you just
2 please describe it for the record?
3 Is it a formal or informal process,
4 or is it a combination of both? How
5 would you characterize it?
6 A. Could you say that one more
7 time please?
8 Q. The evaluation process, how
9 would you describe the evaluation
10 process of teachers at the District?
11 A. Okay. I would describe the
12 evaluation process of a teacher
13 within the Crawford Central School
14 District as a process that begins on
15 the first day of school, and ends on
16 the last day of school when most
17 teachers usually sign their final
18 evaluation of the year. And that
19 would include classroom observations,
20 that would include professional
21 development. It could include
22 attendance, tardiness or any
23 timeliness issues. Parent/teacher
24 conferences. Relationships with
25 other professionals, relationships

Page 23

with students. Involvement in
different types of activities within
the school system and also within the
community. I can probably name a lot
more.
4 Q. And if you could just
5 summarize for the record, what does
6 this document mean? What does this
7 embody, the philosophy and rationale
8 of the Crawford Central Evaluation
9 Instrument? What was the purpose of
10 this document?
11 A. This was a document that was
12 agreed upon by the CCEA and the
13 Crawford Central Board of School
14 Directors.
15 Q. CCEA would be the union?
16 A. Yes, it would be the union.
17 Long before I became a member of
18 Crawford Central School District.
19 Q. Are you familiar with this
20 document?
21 A. I have become familiar with
22 this document since then. Even more
23 so, I think, after the fact because
24 it was something that became
25 contractual and I was involved in a

Page 24

1 Q. To have every student receive
2 the best education possible?
3 A. That's the goal.
4 Q. I'm going to show you what has
5 been marked as Heller Exhibit One and
6 ask you to identify it for the
7 record, please.
8 (Heller Exhibit One
9 marked for
10 identification.)
11 BY ATTORNEY BINDER-HEATH:
12 Q. What is this document
13 entitled?
14 A. This is a professional
15 evaluation philosophy and rationale
16 of the Crawford Central Evaluation
17 Instrument, which would be the
18 appendix A.
19 Q. Which is not attached.
20 A. Appendix A is not attacked, I
21 don't believe.
22 Q. But appendix A be would then
23 be the actual instrument that's
24 utilized and the ones that, for
25 example, have been — the same for

Page 25

1 that was utilized for Ms. deLeon; is
2 that correct?
3 A. That's correct.
4 Q. And if you could just
5 summarize for the record, what does
6 this document mean? What does this
7 embody, the philosophy and rationale
8 of the Crawford Central Evaluation
9 Instrument? What was the purpose of
10 this document?
11 A. This was a document that was
12 agreed upon by the CCEA and the
13 Crawford Central Board of School
14 Directors.
15 Q. CCEA would be the union?
16 A. Yes, it would be the union.
17 Long before I became a member of
18 Crawford Central School District.
19 Q. Are you familiar with this
20 document?
21 A. I have become familiar with
22 this document since then. Even more
23 so, I think, after the fact because
24 it was something that became
25 contractual and I was involved in a

Multi-Page™

Page 26

1 commit to to revise this philosophy
2 statement two years ago, which we
3 still -- we still have the same type
4 of philosophy statement in place.
5 A. And in a nutshell, I would say that
6 this is kind of a guide on how to use
7 the evaluation, who can use the
8 evaluation, and then the purposes
9 behind it. And if there is a
10 disagreement between the evaluator
11 and the evaluatee, then there is a
12 procedure that you follow in order to
13 follow this philosophy statement.
14 Q. And is it true that this
15 document was in place at the time of
16 -- since you've arrived at the
17 District in February of 2002 until
18 Ms. deLeon's termination at least,
19 until 2003 -- April 30th, 2003.
20 A. Yes, that's correct.
21 Q. I'll show you now what has
22 been marked as Heller Exhibit Two and
23 I ask you to take a look at it,
24 please. What is this document?
25 (Heller Exhibit Two

Page 27

1 marked for
2 identification.)
3 A. Evaluation of professional
4 employees.
5 BY ATTORNEY BINDER-HEATH:
6 Q. Is this a policy?
7 A. It's a policy.
8 Q. Number 412; is that correct?
9 A. Yes.
10 Q. And is this a policy that was
11 adopted by the School Board; is that
12 correct?
13 A. Yes.
14 Q. And is this part, essentially,
15 all of your policies, are they kept
16 in a particular place?
17 A. Yes.
18 Q. Are your policies also
19 addressed in teacher manuals or
20 handbooks?
21 A. A reference to the policy?
22 Q. Correct.
23 A. Yes.
24 Q. Address. And could you just
25 summarize what this policy outlines?

Page 28

1 A. Yes. Naturally, it states the
2 purpose, that there is a plan in
3 place for the professional staff to
4 be evaluated and the authority would
5 be the Board. And then it also
6 states the guideline, the objective
7 of the evaluation process and what
8 it's supposed to accomplish. And
9 then it talks about different types
10 of procedures for satisfactory and
11 unsatisfactory performances.
12 Q. And let me just direct your
13 attention, if I could, to page two,
14 the last paragraph at the bottom.
15 A. Yes.
16 Q. This says it's provisions for
17 improving unsatisfactory performance
18 by offering a resource aid,
19 recommending how improvement can be
20 effected and scheduling follow-up
21 conferences to assess change.
22 BRIEF INTERRUPTION
23 ATTORNEY BINDER-HEATH:
24 Okay. Sorry about
25 that.

Page 29

1 A. The answer to your question
2 would be that during my time at
3 Crawford Central School District that
4 paragraph has been followed for
5 anybody who is receiving an
6 unsatisfactory performance.
7 BY ATTORNEY BINDER-HEATH:
8 Q. And unsatisfactory performance
9 doesn't necessarily mean an
10 unsatisfactory overall evaluation;
11 correct? Could it be unsatisfactory
12 in one particular category?
13 A. Yes. At the end of the year,
14 are you saying? At the conclusion?
15 Q. I'm saying at the conclusion
16 or, you know, other times.
17 A. We have had people who have
18 been on an action plan that haven't
19 received an overall unsatisfactory
20 rating but have received an
21 unsatisfactory component within that
22 evaluation sheet.
23 Q. That was my question.
24 A. That's correct.
25 Q. The form that you utilize, and

Case 1:05-cv-00126-SJM   Document 50-18   Filed 06/26/2006   Page 9 of 46

1 I understand that Exhibit A is not
2 attached, but the form that you
3 utilize at the Crawford Central
4 School District to evaluate
5 employees; can you just give us the
6 general overview of what that form
7 includes and actually, I can show
8 you.
9 A. The one that we used to use?
10 Q. During the when Ms. deLeon was
11 employed.
12 A. Okay.  Yes, I can give you an
13 overview.  Appendix A, I have a copy
14 of one sitting right here so I can
15 ---
16 A. ATTORNEY BINDER-HEATH:
17   Which would be the Heller
18   Three?
19   (Heller Exhibit Three
20   marked for
21   identification.)
22 A. Yes.
23 BY ATTORNEY BINDER-HEATH:
24 Q. Okay.
25 A. Appendix A is made up of 11

1 different parts and within those
2 parts, it gives you a comprehensive
3 overview of what the expectations,
4 the satisfactory expectations of the
5 teachers should be.  And these cover,
6 I think, all -- I shouldn't say
7 that.  I believe that they cover what
8 I had outlined on what the evaluation
9 process should be from start to
10 finish.  From the first day of school
11 to the second date of school.  What
12 takes place in the classroom, what
13 takes place outside the classroom.
14 Interactions, responsibilities,
15 professionalism, and that kind of
16 thing.
17 Q. And when you indicated before
18 that for example, a teacher may get
19 an overall satisfactory evaluation,
20 such as in Exhibit --- which is
21 Heller Three, which is what you're
22 referring to.
23 A. Uh-huh (yes).
24 Q. For example, Ms. deLeon, that
25 year, which was the 2000-2001 school

1 year, received an overall
2 satisfactory evaluation, but then
3 there were certain areas that were
4 marked unsatisfactory; is that
5 correct?  Is that what you meant,
6 that a Corrective Action Plan can
7 address those areas even though the
8 overall rating may be satisfactory?
9 A. That's correct.
10 Q. And in this particular case
11 there is a Corrective Action Plan for
12 Ms. deLeon; is that correct?
13 A. That's correct.
14 Q. And was this something that
15 you became familiar with in your
16 position as the assistant principal?
17 A. Assistant superintendent.
18 Q. I'm sorry, assistant
19 superintendent.
20 A. Yes.
21 A. Yes.
22 Q. And what is your understanding
23 of the purpose of these Corrective
24 Action plans and how they have been
25 used in your professional experience?

1 A. Are you asking me specifically
2 how ---
3 Q. Generally.  Generally, how are
4 --- what is the purpose ---,
5 A --- how Ms. deLeon, or just
6 the purpose behind it, an action
7 plan?
8 Q. Purpose behind it.
9 A. The purpose of an action plan
10 would be to focus on an observed
11 weakness and, as a team, put together
12 an action plan which would change
13 that weakness into a strength
14 Q. Now, in this particular case,
15 in looking at Heller Exhibit Three,
16 which is Ms. deLeon's evaluation for
17 the 2000-2001 school year, and then
18 the attached Corrective Action Plan,
19 I see that under preparation and
20 planning there is an unsatisfactory.
21 Under technique and teaching
22 effectiveness there is an
23 unsatisfactory.  And under
24 teacher-student interactions there is
25 an unsatisfactory on the first page;

Multi-Page™

Page 34

```
 1   is that correct?
 2   A. Correct.
 3   Q. Now, the areas of concern that
 4   were --- were these particular areas
 5   for which she received an
 6   unsatisfactory in that particular
 7   component addressed in the attached
 8   Collective Action Plan --- Corrective
 9   Action Plan, which is also part of
10   Heller Three?
11   A. Yes.
12   Q. And also contained in the
13   Corrective Action Plan that's part of
14   Heller Exhibit There, were there
15   suggested measures of how to improve
16   suggested strategies, suggested
17   methods that were incorporated in
18   this Corrective Action Plan?
19   A. Yes.
20   Q. When you came on board in
21   February of 2002, or thereafter I
22   should say, were you aware that Ms.
23   deLon received an unsatisfactory
24   rating for the 2001-2002 school year?
25   A. Yes.
```

Page 35

```
 1   Q. And I'm going to show you
 2   this.
 3        ATTORNEY BINDER-HEATH:
 4             We'll mark this as
 5             Heller Exhibit Four.
 6             (Heller Exhibit Four
 7             marked for
 8             identification.)
 9   BY ATTORNEY BINDER-HEATH:
10   Q. It's dated March 18th of 2002
11   and I understand that this
12   unsatisfactory rating by virtue of a
13   grievance arbitration was later
14   overturned, but were you involved in
15   the process of providing Ms. deLon
16   with an unsatisfactory rating for the
17   2001-2002 school year?
18   A. I'm going to have to say that
19   I was involved partially.
20   Q. And how were you involved that
21   you recall?
22   A. I became involved shortly
23   after I became an employee of
24   Crawford Central School District
25   through I guess, some meetings prior
```

Page 36

```
 1   to the unsatisfactory grading.
 2   Q. And do you recall anything
 3   specific about those meetings?
 4   A. Just that the meetings were
 5   emotional, intense and ...
 6   Q. Emotional on whose part?
 7   A. Ms. deLon. Very emotional on
 8   Ms. deLon. And there was very
 9   little accomplished at those
10   meetings.
11   Q. And this was in the spring of
12   2002?
13   A. Yes.
14   Q. I remember you just started
15   February of 2002, I understand that.
16   A. It would've been sometime in
17   March, I believe.
18   Q. And then obviously pre-dating
19   this unsatisfactory evaluation, which
20   is March 18th of 2002; correct?
21   A. Yes.
22   Q. And was there more than one
23   meeting? Were there a couple of
24   meetings that you were involved in if
25   you recall?
```

Page 37

```
 1   A. Yes, I think there were two
 2   meetings if I recall.
 3   Q. And did Ms. deLon have union
 4   representation at that meeting, at
 5   those meetings?
 6   A. Yes. She always has union
 7   representation.
 8   Q. And I understand it's several
 9   years ago, but I just wanted to ask
10   you what your --- other than being
11   emotional, do you recall specifically
12   areas of discussion or areas of
13   concern or other administrators'
14   involvement in these meetings of
15   March of 2002?
16   A. Well, there were always ---
17   when Ms. deLon, when --- let's put
18   it this way. When I was involved in
19   a meeting with Ms. deLon there were
20   always representatives of the CCEA,
21   Ms. deLon herself and Mr. Higgins,
22   who was the assistant principal, at
23   MASH, Meadville Area Senior High
24   School, Mr. George Deshner was the
25   principal. He was at the meetings,
```

Multi-Page™

Page 38

1 and myself. And there may have been
2 some occasions later on where Mr.
3 Dolecki maybe had attended. I don't
4 recall that at this point.
5 Initially, It wasn't involved in the
6 meetings that I was a part of. And I
7 was not --- I was not familiar with
8 Ms. deLeon on a firsthand basis. The
9 first time that we had met,
10 and ---
11 Q Did anything in particular
12 stand out about the first time you
13 met?
14 A She became very emotional. In
15 my eyes she was unprofessional. I
16 never really experienced anything
17 like that. I was shocked.
18 Q In all the years at Titusville,
19 you never ---?
20 A In all the years at Titusville,
21 I never experienced anything like
22 that from a classroom teacher, or any
23 other professional employee.
24 Q In what way did you find it
25 shocking or unprofessional?

Page 39

1 A Personally, I didn't feel that
2 she really was paying attention to
3 what the administrator --- building
4 administrator had to say to her. She
5 was ignoring him. I think that if I
6 remember correctly I had even made a
7 statement that, you do understand
8 what is being told you. Because it
9 was my observation that she was not
10 paying attention or really didn't
11 care to listen. And at that point
12 she had an explosive outburst and had
13 to be ushered from the room. I never
14 experienced anything like that.
15 Q And she was ushered from the
16 room by her own union people?
17 A By her own union people.
18 Q And on or about March --- and
19 I know that the dates may be vague
20 and that's fine, but on or about
21 March 12th, 2002, and this may be the
22 meeting that you were referencing ---
23 A Could be.
24 Q --- was there a meeting that
25 had

Page 40

1 --- where Ms. deLeon had to leave the
2 room and it was not continued at that
3 time? Is that the same meeting?
4 A Yes.
5 Q On or about March 12th, 2002.
6 Do you recall, offhand, who was at
7 that meeting? And this is where she
8 had to be ushered from the room?
9 Now, I don't want you to confuse
10 years. I'm talking 2002, and just,
11 if this helps you, the next exhibit
12 is a letter that came from Ms.
13 deLeon's psychologist for three days
14 off of work. If that gives you any
15 time reference because I know it's
16 confusing because in March of 2003
17 contentious meetings occurred then
18 too, but I'm talking about 2002.
19 A I remember about four CCEA
20 reps. They weren't all in attendance
21 at that particular meeting. Doug
22 Mehok was at a meeting --- more than
23 one meeting. We have Pat Deardorff
24 who possibly was at that meeting, but
25 I'm not sure. Carl Roznowski, Joanne

Page 41

1 Williston later on, Dan Hootman may
2 have attended a meeting or two. I'm
3 not positive about that, but ---
4 Q When you say that she had a
5 emotional outburst and had to be
6 ushered from the room, that meeting
7 then didn't continue that day?
8 A That meeting was over.
9 Q And what do you recall, if
10 anything specifically about that
11 outburst?
12 A Ms. deLeon began to --- she
13 got very emotional, crying. And was
14 saying some things as if she can't
15 take this anymore.
16 Q What was the --- do you
17 remember why she was even called in
18 at the time? Was that to do with a
19 classroom observation? I know that
20 on March 7th of 2002 there is a
21 report of a classroom observation ---
22 A That was it ---
23 Q --- that Mr. Higgins did.
24 A It had to do with Mr. Higgins'
25 observation and he was trying to make

**Multi-Page™**

Page 42

```
 1    some recommendations and it really
 2    wasn't going very well, and it wasn't
 3    -- I didn't feel that she was
 4    listening to what Mr. Higgins had to
 5    say at that time. And I made a
 6    simple statement asking her if she
 7    did understand because maybe my
 8    observation wasn't correct, and at
 9    that point is when she lost her
10    composure, became emotional. I can't
11    say verbatim what she said, but she
12    started crying. She wasn't capable
13    of finishing the meeting. She was
14    saying that she can't take this any
15    more. The pressures, the kids'
16    behavior, those kind of things.
17  Q  And did that cause you to be
18    concerned? You said, in all your
19    years you'd never experienced
20    anything like that. Did that kind of
21    demeanor and behavior cause you some
22    concern at that time?
23  A  I caused me a lot of concern.
24  Q  And what were your concerns at
25    the time?
```

Page 43

```
 1  A. Well, my first concern
 2    would've been that there was -- that
 3    the relationship between the teacher,
 4    Ms. DeLeon, and the administration
 5    was not very strong. It didn't look
 6    like there was a very good working
 7    relationship. And there were some
 8    weaknesses, which I had observed
 9    personally on her end of the year
10    evaluation and her Corrective Action
11    Plan that it would've been extremely
12    difficult to accomplish the goals
13    that were within that action plan.
14    That there was a poor working
15    relationship between the teacher and
16    the building administration. And
17    with this type of volatile fragile
18    behavior, there is not a teacher in a
19    public school building that doesn't
20    encounter a problem from time to time
21    and they have to be able to deal with
22    it rationally and be able to keep
23    their composure. And that was a
24    concern of mine, because what had
25    taken place up to the point of Ms.
```

Page 44

```
 1    deLeon becoming -- just losing it.
 2    It wasn't really anything that should
 3    have made that happen, in my opinion.
 4  Q  In other words, you didn't
 5    believe that the atmosphere preceding
 6    her outburst was contentious?
 7  A  Not at all. Nobody was
 8    talking in a loud voice. I think she
 9    was being talked to, not down to. I
10    believe that everybody was in a
11    professional state. My question that
12    kind of put her over the edge was --
13    I was talking like I'm talking right
14    now.
15  Q  In a calm, normal tone of
16    voice?
17  A  Exactly.
18  Q  And you simply said, do you
19    understand what's being said to you?
20  A  Yes.
21  Q  Do you recall --- and I know
22    that because you're a named Defendant
23    in this lawsuit you have seen the
24    amended complaint?
25  A  Uh-huh (yes).
```

Page 45

```
 1  Q  And there is some allegations
 2    that you basically told her, her
 3    being Ms. deLeon, after this March
 4    12th, 2002 meeting, that she should
 5    resign and attribute it to her mental
 6    state and essentially, if I may sum
 7    it up, the allegation is that you
 8    were trying to target her or harass
 9    her because of her perceived mental
10    disability. Do you recall --- do you
11    recall reviewing allegations to that
12    effect?
13  A  Yes, I do.
14  Q  Did you have a conversation
15    after this meeting with Ms. deLeon
16    concerning her employment status?
17  A  Yes.
18  Q  What do you recall occurred at
19    that meeting?
20  A  When I left the meeting, the
21    first meeting in which I had been
22    party to, I went back to the
23    instructional support center, which
24    is the central office administration
25    building and I talked with Mr.
```

Page 46

1 Dolecki, the superintendent. And I
2 explained to him what I had just
3 observed. I was only in the District
4 for --- I'm just approximating at
5 this time, maybe three weeks. I had
6 never quite experienced anything like
7 this. I was shocked, appalled and I
8 couldn't believe it. And I explained
9 to him what had happened, what Ms.
10 deLeon had said, and so in
11 conversation with Mr. Dolecki he had
12 instructed me to make that offer to
13 Ms. deLeon.
14 And so at the next meeting I
15 went back, and the purpose behind
16 that was because in that meeting, the
17 first meeting, she said, I just can't
18 do this anymore, I can't take it.
19 Her job is to educate children, it
20 was our observation that she more or
21 less was stating that she can't do
22 what's expected of her professionally
23 and so the offer was put on the table
24 that, if you resign effective at the
25 conclusion of the year, then you will

Page 47

1 be paid through the end of the
2 2001/2002 school year.
3 Q. Did you demand her resignation
4 at that time?
5 A. No. Not at all. It was
6 offered.
7 Q. And just if you can try to
8 reconstruct the chronology for me.
9 The next exhibit is a letter dated
10 March 12th, 2002, which was the date,
11 essentially, of the meeting that you
12 had that you said that she had to be
13 ushered out of the room.
14 (Heller Exhibit Five
15 marked for
16 identification.)
17 BY ATTORNEY BINDER-HEATH:
18 Q. So my question to you, did you know
19 that the letter was received at the
20 central office on that date? When
21 did you know, if you knew about it
22 and I guess I should -- my question,
23 did you know at or about the time
24 this letter was drafted that it had
25 come in concerning a three-day or

Page 48

1 four-day excuse from work?
2 A. I'm aware of this letter. It
3 wasn't sent to me. I can't tell you
4 if it was before or after. I really
5 don't have any recollection of the
6 time frame. It says something in ---
7 I don't want to be speculating.
8 Q. Did you --- do you know if
9 you, before the March 12th meeting,
10 when Ms. deLeon had to be ushered
11 from the room, were you aware that
12 she had been out before with any
13 mental health problems or that she
14 had suffered from them?
15 A. No. Prior to that meeting I
16 had very little knowledge of Ms.
17 deLeon, if any really, I didn't know
18 her. I had only been at the district
19 --- we have 4200 students, we have
20 700 people on our payroll, and for
21 somebody to become familiar with
22 anybody specifically, it would've
23 been an impossible task.
24 Q. So is it fair to say that at
25 that time of the meeting March 12th,

Page 49

1 2002, you didn't know that she had
2 taken a sabbatical for mental health
3 reasons?
4 A. I knew nothing about her.
5 Prior to that meeting, I hadn't
6 looked at any of these, hadn't seen
7 any of these documents pre March
8 12th, 2002 meeting
9 Q. Other than her Corrective
10 Action Plan?
11 A. That's it.
12 Q. Now, just so I can get the
13 time frame right, the outburst
14 occurred, the meeting ended, you
15 spoke with Mr. Dolecki and then
16 thereafter you had a conversation
17 with Ms. deLeon?
18 A. Yes.
19 Q. So and essentially, just for
20 purposes of trying to keep the record
21 straight, from looking at the letter
22 from her psychologist, I will tell
23 you that she did take that time off,
24 so it would've been after the 17th of
25 March. And then I'll show you then

Multi-Page™

## Page 50

1 what's — a letter that's dated
2 March 18th, 2002 from Mr. Dolecki to
3 Ms. deLeon, which is dated — as I
4 said, dated March 18th, 2002.
5 (Heller Exhibit Six
6 marked for
7 identification.)
8 BY ATTORNEY BINDER-HEATH:
9 QDo you know if, on or about
10 this date you had a meeting with Ms.
11 deLeon, at which time you made the
12 offer about the resignation?
13 A.Yes.
14 QAnd other than what you've
15 already discussed, is there anything
16 else you recall specifically?
17 A.No, I don't recall anything
18 else.
19 Q.Who was at the meeting — or
20 who was at the — attended the
21 conversation when you said, you know,
22 if you can't basically do this
23 anymore, do you want to resign?
24 A.Mr. Deslmer, building
25 principal, Mr. Higgins the assistant

## Page 51

1 principal. I believe Mrs. Deardorff,
2 who at the time, was the president of
3 CCEA was there. There could've been
4 — I know that there was another
5 person there, but I'm not exactly
6 sure. It could've been Mr.
7 Roznowski, Ms. Williston, Mr. Melok.
8 Q.So you think it was another
9 union rep?
10 A.I believe there was another
11 union rep there, yes.
12 Q.And when you made the offer of
13 the resignation, was that something
14 that you were going to harass Ms.
15 deLeon?
16 A.Not at all?
17 Q.Was it something you were
18 doing to intimidate her?
19 A.No, no, no, no.
20 Q.At this point, were you even
21 aware that she had filed grievances
22 in the past with the District?
23 A.No.
24 Q.And was it fair to say you
25 were not retailing against her for

## Page 52

1 prior actions she had taken; is that
2 fair?
3 A.That's fair.
4 Q.Okay. Relative to the letter
5 of March 18th, 2002 that's marked as
6 Heller Six, were you aware that this
7 letter was sent or going to be sent?
8 A.Yes.
9 Q.And did you have any
10 involvement, essentially, with the
11 determination about the independent
12 medical examination, psychiatric
13 evaluation? Was that something that
14 you were involved with in the
15 decision-making process?
16 A.I was part of the discussion.
17 Q.Do you recall meeting
18 specifically about the discussion?
19 A.Just that the decision was
20 made to do exactly what this letter
21 says.
22 Q.And to your — is it your
23 understanding that the Plaintiff did
24 undergo an independent medical
25 evaluation and was released to return

## Page 53

1 to work by Dr. McFadden on May 17th,
2 2002?
3 A.Yes, I was aware of that.
4 Q.And let me show you what's
5 been marked as Heller Exhibit Two
6 (sic), it's a May 20th, 2002 letter
7 from Dr. Dolecki to Ms. deLeon
8 indicating that she is released to
9 return to work. And to return to
10 work, and you are copied on that
11 letter?
12 (Heller Exhibit Seven
13 marked for
14 identification.)
15 A.Yes.
16 BY ATTORNEY BINDER-HEATH:
17 Q.And so you were made aware
18 that she was going to be returning to
19 work; is that correct?
20 A.Yes.
21 Q.After Ms. deLeon's return to
22 work, did you embark on a campaign to
23 retaliate against the Plaintiff in
24 any way?
25 A.Not at all.

Multi-Page™

Page 54

1 Q Did you discriminate against
2 the Plaintiff in any way?
3 A No.
4 Q Did yo u attempt to harass the
5 Plaintiff i any way based on either
6 her gender, her perceived mental
7 condition or her national origin?
8 A No.
9 Q Did you believe prior to her
10 terminati o in April of 2003 that she
11 was a sa tisfactory teacher?
12 A Could y o repeat that?
13 Q When s h returned through the
14 end of the 2002 school year.
15 A Uh-huh (ys).
16 Q And the n you indicated that
17 you had o bserved her for the
18 2002-200 3 school year?
19 A Yes.
20 Q She was terminated in April of
21 2003?
22 A Yes.
23 Q For the 2002-2003 school year
24 over the time that she was there, do
25 you belie ve that she was a

Page 55

1 satisfactory teacher?
2 A No, I didn't believe that she
3 was satisfactory teacher.
4 Q Did you believe that she was
5 terminated for just cause?
6 A Yes, I do.
7 Q And do you as you sit here
8 today recall any specific concerns
9 that you may have had about her
10 teaching performance?
11 A Without ---
12 Q Did she have a Corrective
13 Action Plan for the 2002-2003 school
14 year?
15 A Yes, she did.
16 Q And during that year did the
17 District, in your opinion, attempt to
18 work with Ms. deLeon to improve her
19 performance?
20 A I believe that the School
21 District made every attempt possible
22 to work with Ms. deLeon to try to
23 improve her performance.
24 Q And was that --- were those
25 attempts successful?

Page 56

1 A No, they weren't,
2 Q And I'll show you now what's
3 been marked as Heller Exhibits A and
4 B.
5 (Heller Exhibit Eight,
6 A and B marked for
7 identification.)
8 BY ATTORNEY BINDER-HEATH:
9 Q And the first is a action plan
10 for the 2002-2003 school year. That
11 would be Eight A and Eight B then is
12 a revised action plan. It says,
13 revised February 2002 for the
14 2002-2003 school year. Did you have
15 any input in preparing these
16 documents?
17 A Very little.
18 Q Were you aware that they
19 existed?
20 A I was aware that they existed.
21 I read through item.
22 Q At the time?
23 A A t the time, yes.
24 Q And you were aware that ---.
25 A Before the ---.

Page 57

1 Q I'm sorry.
2 A When they were in draft form I
3 had a little bit of input, but as far
4 as constructing these, they were
5 constructed by the building
6 principals, particularly Mr. Higgins.
7 And I gave a little input, but I'm
8 going to have to give the
9 responsibility mainly to Mr. Higgins,
10 the assistant principal for putting
11 this together.
12 Q And, essentially, my question
13 is during the 2002-2003 school year,
14 you were however, aware that these
15 documents did exist?
16 A Yep.
17 Q And that they were to be
18 implemented and followed up on;
19 correct?
20 A Correct.
21 Q Now, you indicated to me that
22 you did have an opportunity to
23 observe Ms. deLeon during the
24 2002-2003 school year. Were those
25 formal classroom observations, or

Multi-Page™

Page 58

1 informal observations or both?
2 A.I'd say it was formal
3 observation.
4 Q.And do you — did you ever
5 observe her informally? Simply just
6 by virtue of seeing her interact
7 either in the classroom or in the
8 hallway or anywhere else?
9 A.My only interactions with Ms.
10 deLeon would be in meetings and in
11 her classroom when I had made
12 arrangements to observe her, but
13 otherwise, I had no interactions with
14 Ms. deLeon.
15 Q.And there was a formal
16 classroom observation that you had
17 done for the 2002-2003 school year,
18 which was, essentially, an overall
19 positive observation, although you
20 did have some suggestions. Do you
21 recall having a meeting with her to
22 discuss that observation where Ms.
23 Willison and Mr. Rozmowski were also
24 present?
25 A.Yes.

Page 59

1 Q.And what do you recall about
2 that meeting?
3 A.What I recall specifically is
4 that my first observation with Ms.
5 deLeon was satisfactory, and I had
6 made some — a few recommendations,
7 I believe without looking at it. Is
8 there a copy in there?
9 Q.There is not a copy — I was
10 just looking here and so, there's
11 not.
12 A.I had made some — I believe
13 some positive comments about her
14 performance in the classroom and I
15 remember that she wanted to argue and
16 debate when I was complimenting her,
17 which I couldn't believe. I was
18 trying to use positive reinforcement
19 and she didn't want to hear it —
20 what I had to say.
21 Q.Even though you were trying to
22 be ---?
23 A.I was trying to be nice.
24 Q.And encouraging?
25 A.That's right. I was trying to

Page 60

1 be encouraging. I thought that she
2 did things that I was talking about
3 well, and I was just reinforcing it
4 positively with words of
5 encouragement, which I felt would
6 help to inspire, motivate. Help to
7 strengthen the relations, possibly,
8 between Ms. deLeon and the
9 administration, and if anything it
10 just created more of a gap, my
11 opinion. So it didn't really matter
12 what I had to say to Ms. deLeon, that
13 was the impression I got.
14 Q.And how would you describe her
15 demeanor when she was talking to you
16 at the meeting?
17 A.I would say that since I am
18 — I'm not her direct supervisor,
19 but I'm central office administrator
20 and I do have supervisory powers over
21 her, I think was a bit disrespectful
22 to a certain — you know. And her
23 behaviors in any of the meetings that
24 I've been in she doesn't conduct
25 herself as a professional, for the

Page 61

1 most part. Insubordinate.
2 Q.We had already looked at, as
3 Exhibits A and B, the improvement
4 plan and the revised improvement plan
5 for the 2002-2003 school year. And
6 I'm just going to show you now a
7 letter on which you were copied
8 that's dated August 30th, 2002 from
9 Mr. Higgins the assistant principal,
10 which should be viewed in conjunction
11 with the improvement plans, and ask
12 you to take a look at that.
13 (Heller Exhibit Nine
14 marked for
15 identification.)
16 BY ATTORNEY BINDER-HEATH:
17 Q.Were you aware that part of
18 Ms. deLeon's improvement plans would
19 be to review — I'm sorry, to
20 observe other teachers' classrooms?
21 A.Yes.
22 Q.And this letter was
23 essentially designed to facilitate
24 her ability to do that; correct?
25 A.Uh-huh. (yes)

Multi-Page™

Page 62

1 Q. With a student?
2 A. Yes.
3 Q. And is it another
4 requirement here concerning keeping a
5 log. Do you have any knowledge about
6 what this log was supposed to be used
7 for?
8 A. Yes, it was for discussion
9 purposes. I was for, you know,
10 create a dialogue that people learn.
11 It was to -- documentation, tracking
12 device that he had made every
13 attempt to follow through with that
14 directive.
15 Q. And were these tools something
16 that were designed to harass or
17 intimidate Ms. deLeon?
18 A. These tools were designed to
19 only help her.
20 Q. During the 2002-2003 school
21 year did you become aware of an
22 incident involving a mother by the
23 name of Robin Stockton and the
24 student confidentiality?
25 A. Yes.

Page 63

1 Q. And what do you recall about
2 that?
3 A. I remember that Ms. Stockton's
4 having a problem with Ms. deLeon's
5 son in her Spanish class and that she
6 -- the intervention that she chose
7 to utilize was to call Mrs. Stockton,
8 the mother --
9 Q. On the phone?
10 A. On the phone. In the
11 classroom.
12 Q. From where.
13 A. In her classroom in front of
14 the entire class and talk to Mrs.
15 Stockton about her son's behaviors in
16 front of the entire class
17 Q. And is this something that the
18 School District finds unacceptable?
19 A. We find it unacceptable not to
20 call the parent. We encourage them
21 to call, we encourage all of our
22 teachers, if they're having a
23 problem, or if they want to
24 compliment, to make sure you notify
25 parents through the use of telephone.

Page 64

1 But we discourage them from calling
2 the parent and discussing the
3 student's behavior in front of the
4 rest of the class. in our opinion
5 that would be a breach of
6 confidentiality. It's not good for
7 the student's self-esteem. It could
8 set him up to be -- put in a
9 position to be bullied or teased and
10 harassed or anything else like that.
11 Q. And isn't it also -- is it
12 your understanding that it would be a
13 violation of FERPA?
14 A. That's my understanding.
15 Q. And what is FERPA?
16 A. FERPA is -- it's an acronym.
17 The protection of student files.
18 Q. Federal Education Record
19 Protection Act?
20 A. Thank you.
21 Q. And that also has to do with
22 confidentiality, is that correct?
23 A. That's correct.
24 Q. Are you aware whether or not
25 the students at the Crawford Central

Page 65

1 Schools receive any training
2 concerning student confidentiality,
3 FERPA and other concerns?
4 A. Teachers?
5 Q. Yes.
6 A. They're fully aware that
7 student records and student
8 information is confidential.
9 Q. Relative to the situation
10 involving Mrs. Stockton, did the
11 District take any disciplinary
12 action, do you know? And if it helps
13 you, I'll direct your attention to
14 Heller Exhibit Ten.
15 (Heller Exhibit Ten
16 marked for
17 identification.)
18 A. I believe that it did.
19 BY ATTORNEY BINDER-HEATH:
20 Q. And as I said, please, there
21 is a -- Exhibit Ten is a November
22 20th, 2002 letter from Mr. Dolecki to
23 Ms. deLeon and you are copied on the
24 letter. And certainly, if it'll
25 refresh your recollection take a

Page 63

Page 65

Multi-Page™

Page 66

1 moment and review the letter.
2 WITNESS COMPLIES
3 A.Yes, I'm aware of this.
4 BY ATTORNEY BINDER-HEATH:
5 Q.And do you recall a meeting
6 being held prior to determine --- the
7 District determining to take
8 disciplinary action? And
9 essentially, isn't it ---
10 A.With Mrs. Stockton and Ms.
11 deLeon?
12 Q.Yes.
13 A.Yes, I was there.
14 Q.And essentially, isn't it true
15 that in order for the --- a school
16 district to be in compliance with the
17 law as it pertains to a collective
18 bargaining agreement that prior to
19 taking any disciplinary action the
20 district is required to meet with the
21 employee to discuss it?
22 A.Yes. Conduct some type of
23 investigation, hear their side of the
24 story.
25 Q.Afford them due process?

Page 67

1 A.Exactly.
2 Q.And was that done in this
3 case?
4 A.Yes.
5 Q.What do you recall about the
6 meeting concerning this
7 confidentiality issue?
8 A.With the parent present?
9 Q.Yes.
10 A.Mr. Higgins received a
11 complaint from the parent concerning
12 this incident. And so we felt that
13 the best way to handle it would be to
14 bring in the parent and have like a
15 parent/teacher conference monitored
16 by Mr. Higgins and I was there as
17 well. And the meeting --- I think
18 the potential to solve the problem
19 was there, but Ms. deLeon didn't have
20 anything --- she wasn't willing to do
21 that. She was real snide and
22 disrespectful to the parent. When
23 Ms. deLeon left the meeting, the
24 parent was extremely upset with Ms.
25 deLeon's demeanor.

Page 68

1 Q.And ---
2 A.The meeting didn't go well.
3 Q.And so nothing was
4 accomplished, essentially, from that
5 meeting?
6 A.No. If anything, it just made
7 it worse.
8 Q.And so what then did the
9 District do as the next step?
10 A.And then there was a meeting
11 with ---
12 Q.Was there then a subsequent
13 meeting ---
14 A.Yes.
15 Q--- with Ms. deLeon and her
16 union representative?
17 A.Yes, there was.
18 Q.And what do you recall, if
19 anything about that?
20 A.I don't remember specifically.
21 Q.But would it be fair to say
22 that the issue of confidentiality was
23 discussed?
24 A.Yes.
25 Q.And in reviewing this letter

Page 69

1 of March --- in sorry, November 20th,
2 2002, at the time that it was
3 drafted, did you have an opportunity
4 to review the letter? And I note
5 that you are copied on the bottom?
6 A.Oh, I've read it before.
7 Q.And at the time were you in
8 agreement that three days without pay
9 was merited concerning the issue
10 involved?
11 A.Yes.
12 Q.Do you recall observing Ms.
13 deLeon on January 9th of 2003? And
14 I'll direct your attention to Heller
15 Exhibit 11.
16 (Heller Exhibit 11
17 marked for
18 identification.)
19 A.I do.
20 BY ATTORNEY BINDER-HEATH:
21 Q.And is this --- and looking at
22 the files, it appears that the second
23 and third pages of Heller Exhibit
24 Eleven go with your observation; is
25 that correct? Is this something you

Multi-Page™

## Page 70

1 prepared?
2 A.Yes.
3 Q.And could you please, for the
4 record, summarize the information
5 contained in this observation?
6 A.Well, I felt that there were
7 many strategies that were violated,
8 and I think that, first of all, the
9 classroom management --- the students
10 were not familiar with what the
11 expectations of classroom behavior
12 was. I don't know that they knew
13 what purpose --- the purpose was
14 clear for them to be in that
15 classroom at that particular time.
16 What they were to get out of the
17 Spanish class felt that students were
18 --- she had an agenda, which was a
19 good thing, but I'm not sure that
20 there was a lot of learning taking
21 place, because I remember Ms. deLeon
22 never really checked, kind of
23 assessed class to see if the concepts
24 were mastered before moving on to the
25 next. And she just kept going

## Page 71

1 forward.
2 And in my mind from my
3 observation, I didn't feel that there
4 was a lot of learning taking place.
5 And that's what is supposed to happen
6 in the classroom, learning. And
7 assessment is a very useful tool, and
8 it's something that should be
9 utilized on a regular basis and there
10 is different forms of assessment,
11 informal and formal. The formal is
12 more of a paper-pencil, which I
13 didn't expect to see that day. But I
14 didn't see any informal assessing.
15 There was very little class
16 participation. There were many
17 distractions and I was not nearly
18 impressed with this lesson as I was
19 with the one that I saw in the early
20 fall.
21 Q.And this was later in time?
22 A.This was much later in time.
23 This was just about at the end of the
24 first semester.
25 Q.Relative to the School

## Page 72

1 District's expectations. If a
2 teacher is under a Corrective Action
3 Plan, what do you expect to see from
4 the fall to the winter?
5 A.I expected to see improvement,
6 and what I did see was lack of
7 improvement, a regression, which I
8 was surprised.
9 Q.And in response or after your
10 classroom observation, did you
11 discuss this with Ms. deLeon at all?
12 A.Yes.
13 Q.And the memo that's ---
14 reasons for improvement needed, was
15 that specifically --- and again, it's
16 a part of Exhibit 11 and it's also
17 Exhibit 12. Was that something that
18 was --- did you address these
19 particular areas of concern with Ms.
20 deLeon?
21 (Heller Exhibit 12
22 marked for
23 identification.)
24 A.Yes, I did.
25 BY ATTORNEY BINDER-HEATH:

## Page 73

1 Q.And what was her response?
2 A.Her response was negative. It
3 was very difficult to really have a
4 positive meeting with Ms. deLeon.
5 She did not accept --- I call it
6 constructive criticism, or any
7 suggestions from us gracefully.
8 Q.Let me direct your attention
9 to what's been marked as Heller
10 Exhibit 13.
11 (Heller Exhibit 13
12 marked for
13 identification.)
14 BY ATTORNEY BINDER-HEATH:
15 Q.As you can see up at the top
16 and the handwriting up in the right
17 hand corner it says, association, or
18 ASSN 15. And in reviewing the
19 transcript from the arbitration over
20 which Arbitrator Amis prevailed, you
21 did testify at that arbitration
22 hearing; correct?
23 A.Uh-huh (yes).
24 Q.And I believe that this memo
25 was something that was produced by

**Multi-Page™**

Page 74

```
 1  the union on Ms. deLeon's behalf, but
 2  there is an issue as to whether or
 3  not you had actually ever received
 4  this memo dated January 13th of 2003
 5  at or about the time, or if it was
 6  the first thing --- you first saw it
 7  at the arbitration. Do you recall
 8  anything about this?
 9  A.Yes, I don't remember
10  receiving this. I made that
11  statement at the arbitration and I
12  stick to that.
13  Q.And, essentially, after the
14  fact, at the arbitration was the
15  first time that you saw this
16  responsive memorandum?
17  A.That's correct.
18  Q.And have you had an
19  opportunity to review this memorandum
20  prior to today's deposition?
21  A.A long time ago. I haven't
22  reviewed it lately.
23  Q.But if I could just direct
24  your attention, for example, to ---
25  starting with the middle of page two,
```

Page 75

```
 1  going to page three, essentially page
 2  two, page three. Actually, I will
 3  say towards the --- to the end. Is
 4  the information contained in this
 5  memorandum essentially indicative of
 6  how Ms. deLeon responded to the
 7  administration's observations,
 8  criticisms, comments, that kind of
 9  thing?
10  A.Yes, very much so.
11  Q.And, essentially, how would you
12  characterize the tone of this
13  memorandum? Is it receptive, is it
14  contentious, is it ---?
15  A.It was certainly contentious.
16  It's not something that --- I mean,
17  there is an excuse to --- for
18  everything that I was trying to make
19  clear to her, and or I was wrong in
20  what I was saying. That I saw
21  something differently. I remember in
22  the meeting that she wanted to argue
23  with me about students leaving the
24  room. I had it scripted, I had it
25  documented, what time they left, how
```

Page 76

```
 1  many students left the room and she
 2  argued that it was only one, not two
 3  at the beginning.
 4  Q.Do you feel that she was
 5  questioning your veracity or your
 6  credibility when she was arguing with
 7  you like that?
 8  A.Yes.
 9  Q.And as her superior, how did
10  that make you feel? And I mean
11  superior relative to her position.
12  A.It made me feel as if she
13  didn't really care what I had to say,
14  and that --- that she had a very
15  insubordinate attitude, and was very
16  uncooperative.
17  Q.Let me just direct your
18  attention to the last page of this
19  exhibit. Does a Mr. Robert Flippin
20  Jr. work for the School District?
21  A.No.
22  Q.Do you have any idea who that
23  is?
24  A.Yes, he's a gentleman that was
25  involved in PHRC, PHRC hearing. He
```

Page 77

```
 1  has an office down in Pittsburgh.
 2  Q.He as no affiliation with the
 3  school, correct?
 4  A.None.
 5  Q.Is this memorandum, are there
 6  students' names and confidential
 7  student information contained in this
 8  memorandum?
 9  A.Yes, there is.
10  Q.And would you view that as a
11  breach of student confidentiality?
12  A.I would.
13  Q.As time progressed during the
14  2002-2003 school year, I know that
15  initially you had indicated to me
16  that when you first met with Ms.
17  deLeon in March of 2002 you really
18  had no --- no knowledge of her other
19  than she was under a Corrective
20  Action Plan?
21  A.That's correct.
22  Q.During the next school year,
23  which would be the 2002-2003 school
24  year, where we know you observed her
25  twice formally, did you also have an
```

Multi-Page™

Page 78

```
1 opportunity to review any of her
2 files, her evaluations or other
3 information in her personnel file?
4 A.Yes. I had the opportunity to
5 look at a few.
6 Q.Did you see any patterns or
7 reoccurring issues concerning her
8 performance in your review of those
9 records?
10 A.Yes, I did. What I did see in
11 her observations is that she usually
12 started the year out pretty well.
13 I'm going to use the word
14 satisfactory, as a satisfactory.
15 teacher. And as the year progressed
16 Ms. deLeon's performance regressed to
17 a point where it could be determined
18 that she would be unsatisfactory.
19 Q.And is that what you were
20 observing then, personally in the
21 2002-2003 school year?
22 A.That was my personal
23 observation and experience for the
24 2002-2003 school year.
25 Q.Do you recall in late February
```

Page 79

```
1 or March of 2003, the Plaintiff was
2 addressed by Mr. Higgins concerning
3 her failure to track discipline as
4 required by her Corrective Action
5 Plan?
6 A.Yeah, I remember that.
7 Q.And do you recall anything,
8 specifically about that issue? And
9 I'm going to direct your attention to
10 Heller Exhibit 14, which is a March
11 6th, 2003 letter drafted by you to
12 Ms. deLeon concerning a suspension
13 without pay.
14 (Heller Exhibit 14
15 marked for
16 identification.)
17 A.I remember that basically she
18 wasn't following the Action Plan that
19 we had in place for her.
20 Specifically, we weren't seeing any
21 improvement. We felt that she was
22 being insubordinate and
23 uncooperative. Didn't really
24 particularly care to follow what we
25 want her to follow, as it states in
```

Page 80

```
1 this letter. She didn't maintain a
2 log of student discipline as it was
3 requested. It was a breach of
4 student confidentiality as Mrs.
5 Stockton's son confirmed, and there
6 were a few situations where her
7 reporting for student discipline was
8 not --- was found out to be
9 inaccurate through investigation by
10 the building principals. And the
11 Action Plan had a protocol or process
12 which she was to follow as far as
13 dealing or preventing student
14 discipline from taking place and that
15 was ignored as well.
16 BY ATTORNEY BINDER-HEATH:
17 Q.And going back to the second
18 point in your March 6th, 2003 letter
19 on page one, we had talked about the
20 Stockton situation, the student
21 confidentiality, and, in fact, the
22 memo that I just showed you that was
23 drafted by the Plaintiff dated
24 January 13th, 2003.
25 A.Yes.
```

Page 81

```
1 Q.Where she, for example, cc'd
2 Mr. Flippin.
3 A.Yes.
4 Q.What that also part of your
5 concerns?
6 A.That's part of my concern as
7 well.
8 Q.And it may not be that
9 particular memorandum, but were you
10 aware there are other letters and
11 things of that nature ---?
12 A.Yes.
13 Q.Let me finish my question.
14 Things of that nature where she
15 copied people that were outside the
16 District?
17 A.Yes.
18 Q.And that was all subsumed in
19 this letter of March 6th? Okay.
20 A.Correct.
21 Q.You indicate here, we are
22 scheduling a meeting on Tuesday March
23 11th, 2003 at 3:30 in the
24 administration office to discuss and
25 review these items. Those present on
```

Multi-Page™

Page 82

1 behalf of the administration at the
2 meeting will include, Mr. Dolecki,
3 George. Deshner, John Higgins and
4 myself. Please be aware that you're
5 entitled to bring an association
6 representative with you to the
7 meeting. Did that meeting take
8 place?
9 A.Yes.
10 Q.And do you recall anything
11 specifically about that meeting?
12 A.Just that we held the meeting
13 ---
14 Q.And let me just --- I'm sorry,
15 my fault let me back up first. This
16 letter that you had written her,
17 which was Heller Exhibit 14, She was
18 going to be suspended with pay?
19 A.Correct.
20 Q.I want to make the
21 distinction. Prior to an
22 investigation occurring?
23 A.Right?
24 Q.And then during that time off,
25 did an investigation actually occur

Page 83

1 prior to March 11th?
2 A.Yes, it did.
3 Q.And what do you recall was
4 concluded at that investigation?
5 A.Well, the --- I guess from the
6 first exhibit that investigation
7 supported --- the allegations, I
8 guess were supported through our
9 investigation.
10 Q.Relative to this --- not
11 keeping the student log, not
12 following the Corrective Action Plan,
13 breach of student confidentiality,
14 A.Well, to the document of March
15 18th. That was all supported through
16 the investigation.
17 Q.Now, prior to March 18th, you
18 did have a meeting with Ms. deLeon on
19 March 11th, 2003.
20 A.Yes.
21 Q.Do you recall anything
22 independently about what occurred at
23 that meeting? And then actually,
24 I'll show you what we'll mark as
25 Heller Exhibit 15, which is a March

Page 84

1 18th, 2003 letter from Mr. Dolecki on
2 which you were copied. And a
3 specific reference to the meeting
4 March 11th is made at the bottom of
5 page two, going on to page three, and
6 then throughout. If you want to take
7 a moment and review it that's fine.
8 (Heller Exhibit 15
9 marked for
10 identification.)
11 ATTORNEY NICHOLS:
12 Can we take a
13 five- minute break?
14 ATTORNEY BINDER-HEATH:
15 Sure.
16 ATTORNEY NICHOLS:
17 Okay. Thank you.
18 OFF RECORD DISCUSSION
19 BY ATTORNEY BINDER-HEATH:
20 Q.Relative to the March 11th,
21 2003 meeting, which occurred prior to
22 the suspension of for five days with
23 pay, or without pay, I'm sorry. What
24 do you recall about that meeting?
25 A.Just that Ms. deLeon was ---

Page 85

1 her demeanor was the same as usual.
2 She was very contentious.
3 uncooperative, I can't remember
4 whether it was that meeting or a
5 meeting after where during the
6 meeting her cell phone went off and
7 she received a call from Mr. Flippin,
8 which was really kind of out of
9 character. He was, in my opinion
10 anyway, he was the hearing officer,
11 he wasn't somebody that was
12 representing either party. He was
13 somebody who had been assigned to the
14 case from Pittsburgh. That's just
15 kind of ---
16 Q.They called her on her cell
17 phone?
18 A.Called her on her cell
19 phone ---
20 Q.And did she take it at the
21 meeting with the administration?
22 A.She attempted to and then was
23 discouraged by a representative.
24 They had to strongly encourage her
25 not to take the phone call, if I

Multi-Page™

**Page 86**

1 remember correctly.
2 Q. And do you recall anything
3 else about the meeting?
4 A. No, not really.
5 Q. Did she, at any time say, I
6 understand your position. You're
7 right about this, you're wrong about
8 that, I'll try to improve? I mean,
9 did she indicate that she was willing
10 to work with the administration at
11 this time?
12 A. I don't ever remember Ms.
13 deLeon ever indicating she was
14 willing to work with us. The only
15 thing I ever remember is her
16 unwillingness to work with us.
17 Q. In looking at Exhibit 15,
18 which is the letter dated March 18th,
19 2003 from Mr. Dolecki suspending Ms.
20 deLeon for five days without pay ---
21 A. Yes.
22 Q. --- did you have an
23 opportunity to review this letter?
24 A. Yeah.
25 Q. In your opinion and in your

**Page 87**

1 recollection, is it an accurate
2 representation of what occurred and
3 the reasons the District determined
4 that five days without pay was
5 appropriate?
6 A. Yes.
7 Q. Do you recall issues
8 concerning inconsistency with the
9 Plaintiff's story, stories that she
10 would tell various administrators
11 being an issue?
12 A. Yeah, I remember some
13 inconsistencies. Specifically ---.
14 Q. Was it relating to student
15 discipline, for example?
16 A. Oh, yeah, yeah. And I had
17 stated that earlier about the
18 inaccurate reporting, which would
19 prove to be inconsistencies with
20 student discipline and behaviors.
21 Q. And what do you mean by that?
22 What do you mean by inaccurate
23 reporting?
24 A. What I remember --- what I
25 remember would be that a student

**Page 88**

1 would be accused of doing something
2 that maybe another student really
3 did, would be the most obvious. For
4 example. ---
5 Q. Are you aware of the gum
6 throwing incident? Someone threw gum
7 at her hair?
8 A. Yes, and it was --- I think
9 one student was accused and it
10 happened to be another student.
11 Q. And when Ms. deLeon was made
12 aware that it was really a different
13 student, do you recall her reaction?
14 A. She wasn't happy about it.
15 She didn't believe it or agree with
16 it.
17 Q. Even though ---.
18 A. Even though there was an
19 investigation and there was a person
20 who eventually admitted to doing it.
21 Q. And she still didn't believe
22 it?
23 A. She still didn't believe it.
24 She felt that it was some type of
25 conspiracy against her.

**Page 89**

1 Q. Okay. Let me direct your
2 attention now to after this five-day
3 suspension without pay in April of
4 2003. Do you recall several meetings
5 occurring in a fairly short period of
6 time in early April 2003 with the
7 administration, the Plaintiff and her
8 union representative?
9 A. Uh-huh (yes).
10 Q. And do you recall anything
11 specifically about any of those
12 meetings where you were in
13 attendance?
14 A. Specific to what?
15 Q. And I'll just say, you didn't
16 draft any memorandum concerning these
17 meetings?
18 A. No.
19 Q. There is a memo that Mr.
20 Destner had drafter relative to one
21 of these meetings where, I believe,
22 you had warned Ms. deLeon about being
23 argumentative?
24 A. Yes.
25 Q. Does that refresh your

Multi-Page™

**Page 90**

1 recollection at all?
2 A.Yeah, I remember talking to
3 her about being argumentative and to
4 listen to what the administration has
5 to say.
6 Q.And how did Ms. deLeon react
7 when you warned her about being
8 argumentative?
9 A.I never changed her behavior.
10 Q.She continued to be
11 argumentative?
12 A.Yes.
13 Q.Do you recall a particular
14 meeting that occurred where, again,
15 Ms. deLeon had an emotional outburst
16 and had to be ushered from the room
17 by her union people?
18 A.Yes.
19 Q.And I know we talked about the
20 once a year earlier, but do you recall
21 a second meeting about this in April
22 of 2003 where she had a outburst?
23 A.I remember Ms. deLeon having
24 another outburst which she had to be
25 removed, ushered, encouraged to leave

**Page 91**

1 the room. We were in a ---.
2 Q.Isn't it a fact at her union
3 representative actually physically
4 took her by the arm and removed her?
5 A.Yes.
6 Q.And what do you recall?
7 A.We were at a meeting in Mr.
8 Desiner's office, which he was the
9 principal of Meadville Area Senior high
10 school and I believe that Mr. Desiner
11 went over an observation of some sort
12 and Ms. deLeon just kind of came
13 unglued.
14 Q.Was it at a table?
15 A.It was at a table. He had a
16 conference table in his office.
17 Probably about the size of, you know,
18 one of these about a fourth of this
19 size of one of these tables by
20 itself. And we were sitting there and
21 ---.
22 Q.So how big would you say that
23 is about? How many feet?
24 A.About roughly six foot, six
25 foot by three.

**Page 92**

1 Q.Okay.
2 A.Maybe. And there --- Mr.
3 Higgins was there, myself, Mr.
4 Desiner, Claudette and two CCEA
5 people. Usually when we had meetings
6 there were two CCEA people. Joanne
7 Willson was one. She's the one that
8 escorted Ms. deLeon from the class
9 --- or from the office.
10 Q.And I believe Mr. Rozowski
11 was there also.
12 A.Okay. Mr. Rozowski, the
13 other. Mr. Desiner was going over
14 the observation, Ms. deLeon didn't
15 like --- I believe she didn't like
16 what he was saying and she got
17 extremely upset and kind of
18 confronted --- physically she --- say
19 physically she attempted to confront
20 Mr. Desiner. And she made a move,
21 physically, by standing up and going
22 towards Mr. Desiner and telling him
23 that he was out to get her and didn't
24 like her. And she was yelling and
25 screaming and at that point before

**Page 93**

1 she could do anything, what I thought
2 could potentially turn into something
3 physically, Mrs. Willison grabbed her
4 by the arm and strongly encouraged,
5 let her out of the office, and that
6 kind of concluded that meeting for
7 the day.
8 Q.In your administrative
9 experience was that something that
10 you had seen before?
11 A.No.
12 Q.How did that strike you?
13 A.I was shocked, once again. I
14 just, you know, well, many things
15 that took place over that period of
16 time that was the first time that I
17 experienced or witnessed those types
18 of behavior from someone who is
19 considered to be a professional. And
20 since then I have yet to experience
21 it again.
22 Q.Let me show you what's been
23 marked as Heller Exhibit 16, which is
24 an unsatisfactory evaluation for the
25 2002-2003 school year, dated April

Page 94

```
 1   11th, 200?.
 2   (Heller Exhibit 16
 3   marked for
 4   identification.)
 5   BY ATTORNEY BINDER-HEATH:
 6   Q Did this meeting
 7   evaluation to your knowledge, follow
 8   the meeting and --- that'll be my
 9   first question. The meeting we just
10   discussed?
11   A Yes.
12   Q And did it also incorporate
13   all of the other observations by
14   various administrators both formal
15   and informal throughout the year?
16   A Yes.
17   Q And are you in agreement with
18   this evaluation where she has been
19   deemed unsatisfactory?
20   A I agree with the entire
21   evaluation.
22   Q And from your own personal
23   observations, did you note that there
24   were certain issues with classroom
25   rules being enforced inconsistently?
```

Page 95

```
 1   Such as under number 1, C, is that
 2   something that you were aware of?
 3   A Yes.
 4   Q And would you agree then from
 5   your own personal experience and
 6   observations with Roman numeral II,
 7   A, responds to supervision, Ms.
 8   deLeon has consistently demonstrated
 9   her unwillingness to work with the
10   administration in an effort to
11   improve. She consistently uses the
12   word, quote, fight, end quote, the
13   administration on issues of
14   improvement. She has lately become
15   more verbally and physically
16   aggressive towards the building
17   administration; would you agree with
18   that?
19   A I agree.
20   Q Looking at page two under D,
21   maturity. It says, Ms. deLeon's
22   negativity towards the administration
23   has been extremely unprofessional.
24   Do you agree with that as well?
25   A Yes.
```

Page 96

```
 1   Q Looking at F, communication,
 2   again unsatisfactory. Ms. deLeon
 3   refuses to communicate with the
 4   administration. She refuses to
 5   accept suggestions, the
 6   administrators observations and the
 7   action plan developed to help her in
 8   the classroom. Is that something you
 9   also observed personally?
10   A Yes, I observed that
11   personally.
12   Q Is it your understanding that
13   ultimately there was a recommendation
14   to terminate Ms. deLeon?
15   A Yes.
16   Q And I'll show you --- or
17   direct your attention to Heller
18   Exhibit 17, which is an April 30th,
19   2003 notice of hearing and statement
20   of charges letter. And this
21   ultimately went to an arbitration.
22   And you indicated that you did
23   testify at this arbitration, correct?
24   (Heller Exhibit 17
25   marked for
```

Page 97

```
 1   identification.)
 2   A Yes.
 3   BY ATTORNEY BINDER-HEATH:
 4   Q At these proceedings I believe
 5   you testified on two different days?
 6   A Yes.
 7   Q And at that time, Ms. deLeon
 8   was represented by Counsel; is that
 9   correct?
10   A Yes.
11   Q And are you aware that the
12   arbitrator upheld the termination as
13   being based on Just Cause?
14   A Yes.
15   Q And do you believe that that
16   termination was warranted?
17   A Yes.
18   Q Why do you believe that?
19   A Because I just don't feel that
20   Ms. deLeon first can meet the
21   expectations as a Spanish teacher in
22   the Crawford Central School District,
23   which in turn would benefit students
24   of Crawford Central School District.
25   Ms. deLeon had made a decision a
```

Multi-Page™

Page 98

```
 1  long time ago that she was not ---
 2  six demonstrated an unwillingness to
 3  work as a team member of the Crawford
 4  Central School District team and was
 5  unwilling to try to make the
 6  improvements necessary to make her a
 7  proficient or a competent teacher.
 8      Q.Was she targeted, again,
 9  because of her national origin?
10      A.No.
11      Q.Was she targeted because of
12  her gender?
13      A.No.
14      Q.Relative to gender, can you
15  give me a rough percentage of the
16  percentage of teachers in your
17  District that are women versus men?
18  Would you say there are more women,
19  more men, about equal?
20      A.I would say that there is
21  probably more women. I think that we
22  have many more women at the
23  elementary level than we do at the
24  secondary level. I would have to say
25  that overall we have more female than
```

Page 99

```
 1  males in our professional staff.
 2      Q.And the prior union president
 3  is a female, Patricia Deardorff;
 4  correct?
 5      A.Correct.
 6      Q.And then she now is a member
 7  of the administrative team?
 8      A.That's correct.
 9      Q.Was Ms. deLeon ever a target
10  for any harassment or discrimination
11  based on her perceived mental
12  disability?
13      A.No.
14      Q.Does the School District have
15  an unlawful harassment policy
16  prohibiting discrimination or
17  harassment?
18      A.We have a policy.
19      Q.And was that something that
20  you believe was utilized in this
21  case?
22      A.Yes.
23      Q.Does the District take this
24  policy seriously?
25      A.Yes, we do.
```

Page 100

```
 1      Q.And does the District take any
 2  proactive preventative measures to
 3  ensure that unlawful harassment or
 4  discrimination does not occur?
 5      A.Yes, I believe we do.
 6      Q.Such as what? Training?
 7      A.There's trainings. If we're
 8  made aware of anything that would be
 9  covered under these policies we
10  immediately investigate without any
11  hesitation.
12      Q.And how is it your policy
13  goes, I'm assuming, from student to
14  teacher, teacher to student.
15      A.Administrative to teacher ---.
16      A.Yeah. It covers every ---
17      Q.Student to student?
18      A.--- interaction at the
19  Crawford Central School District.
20      Q.Are there disciplinary
21  procedures outlined and imposed for a
22  violation of the policy?
23      A.Yes.
24      Q.And, in your experience, does
25  the District have a pattern or
```

Page 101

```
 1  practice of discrimination against
 2  minorities?
 3      A.No.
 4      Q.What about against individuals
 5  with disabilities or perceived
 6  disabilities?
 7      A.No.
 8      Q.Does the District have any
 9  pattern or practice of discrimination
10  against women?
11      A.No.
12      Q.You indicated at the beginning
13  of the deposition that since you have
14  been on board, you have hired four
15  minority teachers and I asked about
16  your attempts to try to encourage
17  minorities to apply to the area.
18  You've indicated that there was some
19  issues because of the geographical
20  location of School District. And can
21  you be more specific? Is that
22  relative to just the general
23  population pool?
24      A.I think it's mainly the
25  general population pool. I think
```

Multi-Page™

**Page 102**

1 that, you know, most of our --- many
2 of our applications are from people
3 who are part of Northwest
4 Pennsylvania. They are born and
5 raised and they like to stay close to
6 home, and I believe that would be
7 very similar in other areas.
8 Plus, the minority population
9 within Crawford Central School
10 District and Crawford County in which
11 we're located does not have a very
12 high percentage of minorities. And
13 so you will see a higher
14 concentration of minority applicants
15 in more urban, suburban school
16 districts that you will Crawford
17 Central School District. And we made
18 attempts to recruit with no avail.
19 Q Thank you, I have nothing
20 further.
21 ATTORNEY BINDER-HEATH:
22 Before you start, Mr.
23 Nichols, may I have a minute?
24 ATTORNEY NICHOLS:
25 Uh-huh (yes).

**Page 103**

1 ATTORNEY BINDER-HEATH:
2 Thank you.
3 ATTORNEY NICHOLS:
4 Okay. We're back on
5 the record now. It's
6 approximately almost five
7 minutes to 3:00. Today is
8 April 24th, 2006.
9 OFF RECORD DISCUSSION
10 EXAMINATION
11 BY ATTORNEY NICHOLS:
12 Q Mr. Heller, I have a few
13 questions I'd like to ask you. The
14 first is, if you could help me on the
15 hierarchy of the administration of
16 the School District. You came as
17 assistant superintendent in February
18 2002; is that correct?
19 A Correct.
20 Q Okay. And essentially, one of
21 your responsibilities at that time
22 was dealing with the principals?
23 A I have ---
24 Q You call them the building ---
25 you use another term. Building ---?

**Page 104**

1 A I said, building principals.
2 Q Building principals. Okay.
3 Is that correct?
4 A That's correct.
5 Q Okay. And in that particular
6 role in dealing with building
7 principals, I'll just refer to them
8 as principals, what essentially would
9 be your day-to-day responsibilities?
10 A My day-to-day responsibilities
11 with the principals --- I don't know
12 if I'd say day to day --- I had day
13 to day responsibilities, because
14 sometimes I don't have any
15 interaction with the building
16 principals for weeks. It just
17 depends on the situation. It could
18 be a series of different things that
19 require support from the central
20 office, which would include Mr.
21 Dolecki, superintendent or myself or
22 sometimes both of us depending on
23 who's available. So you know, for me
24 to specifically one thing that would
25 be pretty hard to come up with. It's

**Page 105**

1 a whole litany of things.
2 Q Okay. As assistant
3 superintendent, of course you serve
4 on the staff of Mr. Dolecki, the
5 superintendent; is that correct?
6 A That's correct.
7 Q And you report to Mr. Dolecki
8 for essentially all purposes; is that
9 correct?
10 A That's correct.
11 Q What would be the proper ---
12 how would you characterize your
13 relationship with the principals? I
14 said, day to day, you said no, that's
15 not accurate. How would you describe
16 the relationship? What would be the
17 proper characterization of your
18 relationship with them as assistant
19 superintendent?
20 A I have ---?
21 Q Do you have oversight
22 responsibility?
23 A Excuse me?
24 Q Oversight? Would that be
25 accurate?

Multi-Page ™

1 A.Oversight? I would say it's
2 all inclusive responsibilities.
3 Q.Supervisory?
4 A.Officially, officially I
5 supervise the secondary principals.
6 Q.Secondary principals?
7 A.Yes. Meaning, the high school
8 principals, middle school principals.
9 That's my responsibility.
10 specifically.
11 Q.Okay.
12 A.Mr. Dolecki does the
13 elementary.
14 Q.Elementary?
15 A.Yes.
16 Q.And in this --- let's turn to
17 Mr. Deshner, be is a secondary?
18 A.That's correct.
19 Q.And of course, that
20 relationship would pertain, with
21 respect to him, you would have ---
22 you were a supervisor, supervisory
23 responsibility.
24 A.I would say direct supervisory
25 responsibility of Mr. Deshner at that

1 time, yes.
2 Q.Okay. I've got to see if you
3 can help me now. I have terms over
4 this, there is still folks in the
5 hierarchy and responsibility ---
6 allocation of responsibilities of
7 management and administrative
8 personnel in the School District. If
9 you could help me, first of all, in
10 the terms of delineating areas of
11 authority and responsibility. And
12 what would be helpful as I recite the
13 different areas here --- matters
14 which would we call for the approval.
15 If you could tell me who would have
16 authority to give approval? Okay.
17 And it may well be the Board of
18 Directors, Mr. Dolecki as
19 superintendent, you, yourself, as a
20 superintendent, Mr. Deshner as the
21 principal, or the principal's staff
22 if you know, or teachers. Okay.
23 Let's start if we may? The reprimand
24 of teachers, who has that authority?
25 And I understand what I'm asking is

1 who has the locus of authority with
2 respect to the following list I'm
3 going to recite. The reprimanding
4 the teachers, who has that authority?
5 ATTORNEY BINDER-HEATH:
6 I'm just going to
7 object to form because I think
8 there are various levels of
9 reprimand.
10 ATTORNEY NICHOLS:
11 Well, he can explain.
12 BY ATTORNEY NICHOLS:
13 Q.Please, do.
14 A.How elaborate do you want me
15 to get?
16 Q.Well, I would like you to be
17 responsive into the terms of what the
18 chain of command of administrative
19 managerial authority in the School
20 District. Who has autority to
21 reprimand teachers?
22 A.Well, let me make this clear,
23 first of all, all the administrators
24 have a sense of responsibility, and
25 we have many administrators within

1 the Crawford Central School District.
2 But ultimately, the superintendent,
3 Mr. Dolecki is responsible for the
4 entire district. So what
5 responsibility I have this week, may
6 change to what responsibility I have
7 next week due to the direction of my
8 superior, which is Mr. Dolecki. And
9 that same thing goes with the people,
10 I guess, below me. As principals,
11 assistant principals, we all have a
12 responsibility to reprimand, but it
13 depends on the situation. Unless you
14 get specific to the situation I can't
15 answer that question.
16 Q.I put the same question to Mr.
17 Deshner and he advised me that as a
18 school principal, he had authority to
19 reprimand, but he did not have the
20 authority to suspend. He made a
21 distinction.
22 A.That's correct.
23 Q.So I'm asking specifically
24 with respect to the following
25 actions. I think it's attendant to

Multi-Page™

1 the respective position not the
2 individual who holds it.
3 A. The respective position? Yes.
4 Q. Okay. So if I go back, the
5 reprimand of teachers, the principals
6 normally, would it be correct to say
7 that principals have that authority?
8 ATTORNEY BINDER-HEATH:
9 And again I'm going to
10 object because there is --
11 under the collective
12 bargaining agreement and under
13 the school code, there is the
14 term reprimand, that can be a
15 written reprimand or a memo
16 confirming a verbal reprimand,
17 which is more formal than your
18 typical common English usage
19 of the word reprimand. So I
20 just want to make that
21 distinction. You can answer
22 the question.
23 BY ATTORNEY NICHOLS:
24 Q. Let's say written reprimand,
25 let's take written reprimand. Is

1 normally imposed by principals?
2 A. Principals have the authority
3 to give a written reprimand, yes.
4 Q. And the suspension of
5 teachers?
6 A. I think according to the
7 school code, the only person that has
8 the authority to do that is the
9 superintendent or his designee, is
10 the way it's written.
11 Q. All right. The firing or
12 termination of tenured teachers?
13 A. I believe that's the Board.
14 Q. That's the Board?
15 A. Termination?
16 Q. Correct.
17 A. Board.
18 Q. Okay. Does the
19 superintendent's office play any
20 role?
21 A. Of termination?
22 Q. In the termination process?
23 A. Recommendation.
24 Q. All right. The tape recording
25 of classes by students and then by

1 teachers, who has the authority to
2 authorize a student to tape classes,
3 and then in turn, who has the
4 authority to authorize a teacher to
5 tape classes? Do you know?
6 A. How has the authority to allow
7 the students to tape classes?
8 Q. Uh-huh (yes).
9 A. And who was the authority for
10 teachers to tape classes?
11 Q. That's right.
12 A. We have a policy within our
13 District that provides the authority
14 to tape classes.
15 Q. You have an express authority
16 -- express policy I should say?
17 A. Yes.
18 Q. And as to the circumstances
19 under which taping classes is
20 allowed?
21 A. Yes. It's allowed with
22 authority. Permission.
23 Q. With permission. Okay.
24 A. There is a procedure or
25 protocol that you must follow in

1 order to receive permission to do so.
2 Q. Okay.
3 A. I can't give you -- I'd have
4 to re-look at it. I mean, we have a
5 book with the policy. I don't have
6 them all memorized so I'd have to
7 look at it.
8 Q. Does a teacher normally have
9 authority to tape class, I should
10 say? Do you know? To make a tape
11 recording of classes?
12 A. Do they have permission?
13 Q. Does the teacher have
14 authority under the policy to which
15 you referred?
16 A. Like I told you earlier, I
17 haven't looked at that policy for a
18 long time, and to answer that
19 question I would have to revisit that
20 policy. I'd have to take a look at
21 it to be able to specifically answer
22 that.
23 Q. Who has authority to demand
24 the resignation of a teacher?
25 A. I don't know if anybody has

Page 114

1 the authority to demand the
2 resignation. That's a pretty strong
3 word, demand.
4 Q To ask for?
5 A Superintendent, designee.
6 Q Okay. Who has the authority,
7 or who is charged with the
8 responsibility of implementing the
9 Americans with Disabilities Act?
10 A We all do.
11 Q When you say we all do, who
12 are you referring to?
13 A From the superintendent down,
14 the administration, we all have a
15 responsibility in that.
16 Q And in this particular case,
17 beginning with the superintendent's
18 office, who had the day-to-day
19 responsibility for ensuring
20 compliance with the ADA law
21 throughout the District? I
22 understand that Mr. Dolecki as the
23 chief executive officer, the
24 superintendent of the School District
25 has that authority. That's resident

Page 115

1 with him. Okay? But I mean, in
2 terms of his designee, does he
3 designate someone else, like yourself
4 to ensure compliance with the ADA
5 law?
6 A Now, I think --- as I said, I
7 think we all --- all of us have a
8 responsibility.
9 Q I understand that, but I'm
10 trying to be more specific as to
11 staffing. For example, if a
12 principal or some teacher had an ADA
13 problem or compliance with it and the
14 problem was not resolved at the
15 principal level, to whom would that
16 principal, that teacher go?
17 A It would go to Mr. Dolecki.
18 Q Mr. Dolecki?
19 A Yes.
20 Q Okay. Now, of course as a
21 part of Mr. Dolecki's team, who would
22 have the day-to-day responsibility
23 for addressing or dealing with the
24 ADA problem?
25 ATTORNEY BINDER-HEATH:

Page 116

1 I'm going to object to
2 form, as it assumes there are
3 problems on a daily basis.
4 ATTORNEY NICHOLS:
5 I'm not assuming, I'm
6 just simply asking him, do you
7 have a public policy?
8 BY ATTORNEY NICHOLS:
9 Q Is not the School District
10 bound by the ADA law as it is all
11 federal mandates, Mr. ---?
12 A Yes.
13 Q So it's a fair question isn't
14 it? You're an administrator, you're
15 a manager just as Mr. Dolecki. Who
16 implements these laws that's all I'm
17 asking. It's a fair question isn't
18 it?
19 ATTORNEY BINDER-HEATH:
20 I believe he's answered
21 the question.
22 ATTORNEY NICHOLS:
23 I don't think so. I
24 don't think he answered the
25 questions. I answered another

Page 117

1 question.
2 BY ATTORNEY NICHOLS:
3 Q You said, it was going to come
4 to Mr. Dolecki, and then I say, on a
5 day-to-day basis, does Mr. Dolecki as
6 the superintendent, assign someone on
7 his staff a designee?
8 A He could.
9 Q And what --- do you know who?
10 Did he?
11 A No, he has the ability to do
12 that.
13 Q I understand that, but that's
14 still not my answer --- it's not an
15 answer. The question is did he, and
16 if so could you identify the person?
17 A I can't answer that question
18 because you'd have to give me a
19 specific situation.
20 Q I've said ADA law, you're
21 familiar with the ADA law aren't you?
22 A Yes.
23 Q Okay. Well, it would be any
24 problem which arises under the ADA
25 law.

Multi-Page™

Page 118

1 A And 1 answered the question.
2 The superintendent ....
3 Q Well, you said the
4 superintendent, but I'm trying to be
5 more specific.
6 A Mr. Dolecki may deal with all
7 of them and I ---
8 Q All right. Let me ask you
9 this then ... Has there been occasions
10 where ADA problems have been --- has
11 Mr. Dolecki has assigned you to deal
12 with ADA problems that arise from the
13 school principals or teachers?
14 A I don't think we have too many
15 problems regarding ADA.
16 Q Well, I'm asking you any? In
17 your memory or your experience?
18 A I don't have any memory of it
19 at this point.
20 Q You don't recall any situation
21 since you have come to the School
22 District and serving now as assistant
23 superintendent where you have been
24 assigned to address or deal with ADA
25 problems? No occasion has that

Page 119

happened?
1 A I can't think of one right
2 now.
3 Q Okay. All right. Continuing.
4 The power to assign classrooms and
5 facilities to be used by teachers,
6 whose function or authority is that?
7 A Building principal.
8 Q Building principal, okay.
9 A I'm going to say principals.
10 At the secondary level we have more
11 than one. So it would be principals.
12 But ultimately, it's just like the
13 superintendent, ultimately the
14 principal is responsible for the
15 building. The assistants work under
16 the direction of the principal.
17 Q And that would also be true
18 with respect to the assignment of
19 courses to be taught by the teaching
20 staff?
21 A Yes.
22 Q Okay.
23 A Principals.
24 Q Okay.
25 Q The granting of request for

Page 120

1 sabbatical leave for medical reasons,
2 who's authority is it? Who has
3 authority to do that?
4 A Ultimately?
5 Q To grant request for
6 sabbatical leave?
7 A The School Board.
8 Q The School Board?
9 A Yes.
10 Q Does the superintendent's
11 office play any role when such
12 requests are made to the School Board
13 in terms of recommendation?
14 A For a medical sabbatical?
15 Q Right.
16 A I don't believe so.
17 Everything that goes on the Board
18 agenda goes through the
19 superintendent's office.
20 Q Right. Okay. And if it comes
21 through the superintendent's office,
22 the superintendent's office makes a
23 recommendation on it, right, to the
24 Board? Is that correct? Would that
25 be the operating procedure?

Page 121

1 A Not necessarily. Some of the
2 things go without recommendation.
3 Q Without recommendation?
4 Typically, would a request for
5 sabbatical leaves made typically, in
6 your experience, would the
7 superintendent's office make a
8 recommendation or abstain and send it
9 forward to the Board?
10 A Well, let's put it this way.
11 from my experiences, I don't think
12 the superintendent has abstained from
13 any --- in my experience from medical
14 sabbaticals. They have been
15 requested through the Board and I
16 don't remember if the Board has ever
17 asked for anybody's recommendation or
18 anybody administratively, which would
19 be the superintendent's
20 recommendation or approval for --- to
21 grant this person a medical
22 sabbatical. Usually, the request is
23 in a document form and it explains
24 the purpose behind taking a medical
25 sabbatical, that's good enough for

Multi-Page™

Page 122

```
 1   the Board.
 2   Q.So typically the Board --- I
 3   mean, the superintendent's office
 4   would make a recommendation then?
 5      ATTORNEY BINDER-HEATH:
 6      Objection.
 7   A.No, I just explained what I
 8   thought the process was.  I didn't
 9   say that.
10   BY ATTORNEY NICHOLS:
11   Q.Oh, I thought I understood you
12   saying --- correct me if I'm wrong, I
13   thought I heard you say that in the
14   case of these types of medical
15   requests of a sabbatical requested
16   medical leave, the recommendation
17   would go following to the Board?
18   A.I said, everything goes
19   through --- everything that goes on
20   the Board agendas goes through the
21   superintendent's office.  That's Mr.
22   Dolecki, the superintendent, he's the
23   one that puts together the agenda for
24   the committee meetings and for the
25   regular Board meetings.  And that
```

Page 123

```
 1   would be something that would go to
 2   Mr. Dolecki's office en route to the
 3   Board.  He is recommended by the
 4   superintendent's office.  That's what
 5   I was trying to clarify; okay?
 6   A.Okay.
 7   Q.Continuing.  Annual evaluation
 8   of teachers?  Is that ---?
 9   A.Principal.
10   Q.Principal?  Okay.  And when
11   class observations are to be --- on
12   teachers are conducted, is that also
13   a function of the principal?
14   A.That's a typical function of
15   the principal, but that doesn't mean
16   the principal is the only one that
17   conducts observations.  Mr. Dolecki
18   and myself also do observations.  Or
19   have the ability to do the
20   observations as well.
21   Q.The management of classrooms
22   and students are the teacher's right?
23   Principally?
24   A.Yes.
25   Q.Primarily.  The management of
```

Page 124

```
 1   --- or route to, passes through the
 2   superintendent's office en route to
 3   the Board.  He is recommended by the
 4   superintendent's office.  That's what
 5   I was trying to clarify; okay?
 6   A.Okay.
 7   Q.Continuing.  Annual evaluation
 8   of teachers?  Is that ---?
 9   A.Principal.
10   Q.Principal?  Okay.  And when
11   class observations are to be --- on
12   teachers are conducted, is that also
13   a function of the principal?
14   A.That's a typical function of
15   the principal, but that doesn't mean
16   the principal is the only one that
17   conducts observations.  Mr. Dolecki
18   and myself also do observations.  Or
19   have the ability to do the
20   observations as well.
21   Q.The management of classrooms
22   and students are the teacher's right?
23   Principally?
24   A.Yes.
25   Q.Primarily.  The management of
```

Page 125

```
 1   classrooms and students, that's the
 2   providence of the teacher, right?
 3   A.That's correct.
 4   Q.Okay.  A teacher's request for
 5   union representation, and needed.
 6   Who will authorize that request?  If
 7   a teacher asks, I want a union
 8   representation at this meeting, does
 9   the principal have authority to grant
10   the request?
11      ATTORNEY BINDER-HEATH:
12      And again, I'm just
13      going to object to the term
14      meeting.  Whether it's a
15      meeting that may end up in
16      disciplinary consequences or
17      just a meeting, or a meeting
18      with a parent.  There are
19      different kinds of meetings,
20      but you can answer the
21      question.
22   BY ATTORNEY NICHOLS:
23   Q.Counsel makes a distinction.
24   A.What kind of meeting?
25   Q.Well, let's take the first
```

Page 126

1 which Counsel, the one she made a
2 distinction. The one which could end
3 up in disciplinary consequences?
4 A.My experience has been, and
5 was --- I guess you could say, I
6 learned that from my superior, which
7 is Mr. Dolecki, superintendent, it's
8 in our best interest to make sure
9 that there is a union rep there, and
10 that's what we do. So when it comes
11 to disciplinary meetings there's
12 always a union rep there. We've
13 never conducted one without one in
14 the four plus years I've been here.
15 And I only assume that that's been
16 going for a long time because that
17 came from my boss and he's been here
18 a lot longer than I have.
19 Q.There was a copy of an
20 agreement that was put in the record
21 this morning and as I understand it,
22 it emanated from a parent teacher
23 conference where Ms. deLeon, Mr.
24 Desliner and there was --- as I
25 understand it Ms. deLeon made a

Page 127

1 request to be represented by Counsel
2 --- I mean, represented by a union
3 rep rather. It was not made
4 available, a union rep not made
5 available. She grieved it and there
6 was a settlement, and out of that
7 settlement was an agreement which was
8 made a part of the record that ---
9 apparently manifests as that policy
10 that you mentioned earlier?
11 A.Are we talking about the
12 philosophy on the evaluations
13 instrument?
14 Q.No, no, I don't think it's the
15 evaluation --- no.
16 ATTORNEY BINDER-HEATH:
17 I think you should ---
18 It's just for the record, he's
19 talking about something that
20 occurred on August 13th, 1997.
21 So you were not there.
22 A.I wasn't present.
23 BY ATTORNEY NICHOLS:
24 Q.Okay. Right.
25 A.That was way before my time.

Page 128

1 Q.Way before your time. Okay.
2 Now, Mr. Heller, I'd like to turn
3 your attention to some matters on or
4 about March 2002. Understandably you
5 had just come as assistant
6 superintendent in February 2002?
7 A.Yes.
8 Q.The District. But I do have
9 some questions, and you have --- on
10 Direct inquiry of Counsel, you have
11 now made some responses to these
12 questions --- some of the questions,
13 but I want to plow, I want to plow
14 this ground again to some extent.
15 Once, as I understand it there was a
16 meeting on March 12th, 2002 in which
17 you were in attendance, right? Is
18 that correct?
19 A.Yes.
20 Q.And as well as Ms. deLeon and
21 someone else, Mr. Higgins, I
22 believe, was also in attendance?
23 A.Yes.
24 Q.Now, that particular meeting
25 was called for what purpose?

Page 129

1 ATTORNEY BINDER-HEATH:
2 Objection, asked and
3 answered.
4 BY ATTORNEY NICHOLS:
5 Q.Do you recall the purpose of
6 the meeting? Why that meeting was
7 called?
8 ATTORNEY BINDER-HEATH:
9 He's asking do you
10 recall, what we already
11 discussed?
12 A.Yeah.
13 ATTORNEY BINDER-HEATH:
14 Why it happened.
15 A.Right. Yeah, I already said
16 why it happened.
17 BY ATTORNEY NICHOLS:
18 Q.Yes, if you could just refresh
19 my memory, please? Just briefly, why
20 was the meeting called on March 12th?
21 It was to discuss her evaluation?
22 Was it to discuss her evaluation? My
23 understanding was there was an
24 observation on March 7th?
25 A.Yes.

# Multi-Page™

## Page 130

1 Q. Okay. I'm not sure whether
2 you — who did the evaluation on
3 March 7th, was that Mr. Higgins?
4 A. Yeah, Mr. Higgins did an
5 observation.
6 Q. Okay. And so was it fair to
7 say that five days later the meeting
8 conference on March 12?
9 A. Yes.
10 Q. Which you attended, Mr.
11 Higgins and Ms. deLeon attended to
12 discuss that; right?
13 A. And there were a few other
14 people there.
15 Q. You testified that Ms. deLeon
16 was vocal, that she was upset; is
17 that correct?
18 A. That's correct.
19 Q. And you went on to testify
20 that the particular meeting ended
21 before it was scheduled to end; is
22 that correct?
23 A. It ended abruptly.
24 Q. Was that because of something
25 Mr. Higgins insisted upon or you

## Page 131

1 insisted upon?
2 A. It was something, and I had
3 said this earlier, is that Mr.
4 Higgins was reviewing the observation
5 and he had made some recommendations,
6 or he had made some — a
7 constructive criticism and it was my
8 observation that Ms. deLeon was not
9 giving Mr. Higgins his attention —
10 her attention. It looked as if she
11 wasn't listening, and I felt that if
12 we were going to go forward with this
13 and make any improvement that I
14 needed to at least ask her if she
15 understood, which I felt was
16 completely the right thing to do.
17 Ask her if she understood what Mr.
18 Higgins, her direct supervisor was
19 implying. And at that point she
20 became emotionally charged. Crying,
21 saying some things.
22 Q. Do you recall specifically
23 what she said?
24 A. She said that she can't —
25 specifically, she said that she just

## Page 132

1 can't take this anymore. I can't do
2 this. That sort of comment or
3 statements.
4 Q. Did she direct any profanity
5 at anyone?
6 A. No. I don't remember, I don't
7 recall any profanity.
8 Q. Did she try to physically
9 accost anyone? Did she physically
10 assault anyone?
11 A. No, no, no. But she became
12 loud, crying, emotional. She was —
13 it was not appropriate for a
14 professional setting.
15 Q. That was your opinion? That
16 was your opinion?
17 A. My professional opinion.
18 Q. Now, that was the 12th. Now
19 on the 18th — on the 18th, I have a
20 letter dated the 18th and this is a
21 letter prepared by Mr. Dolecki. I
22 think this has been made a part of
23 the record. I'll show it to you. I
24 will not offer it, this is already a
25 part of the record.

## Page 133

1 ATTORNEY BINDER-HEATH:
2 It's 15.
3 ATTORNEY NICHOLS:
4 Oh, 15, yes.
5 BY ATTORNEY NICHOLS:
6 Q. Earlier you acknowledged
7 having seen that letter before?
8 A. Yes.
9 Q. And you also, upon being
10 questioned by the Counsel, you
11 acknowledged you had some input in
12 the composition of that letter or the
13 making of that letter? Is that
14 correct?
15 A. I said that I was — I
16 believe that I said that I was
17 involved in the discussion regarding
18 this letter.
19 Q. You were involved in the
20 discussions. With whom? Mr.
21 Dolecki?
22 A. Mr. Dolecki for sure. I don't
23 remember specifically who else was
24 there.
25 Q. Did you make a recommendation

Page 134

1  t.o Mr. Deeki? A specific.
2  recommendation regarding the contents
3  of this letter?
4  A. Well, I'll be honest with you,
5  I don't know how strong my
6  recommendation was at that particular
7  time, I hadn't been here for more
8  than 30 days and that includes the
9  weekends.  The only thing I would
10  remember  is sharing my experiences
11  pertaining  to Ms. deLeon regarding
12  the incidents that I was involved in,
13  which weren't only a couple, that's it.
14  Q.As you  have acknowledged at
15  that juncture you knew very little
16  about Ms. deLeon, you had just come
17  aboard, correct?
18  A.Yes.
19  Q.This is on March 18th, you
20  came February 2002?
21  A.February 18th.
22  Q.Yes, okay.
23  A.One month.
24  Q.One month. All right.  Now,
25  the contents of the letter says that

Page 135

Mr. Dolecki, the author of the letter
says, this action — he's referring
to he suspends. This letter he
suspends Ms. deLeon and he directs
her to undergo a psychiatric
evaluation. And he says, this action
is based on a medical excuse you
presented to the administration on
March 14th. Now, may I show
you —
A.I remember that letter.
Q.— another letter, and this
is the letter dated March 12th. Is
that a letter in which Mr. Dolecki is
referring?
A.Yeah.
Q.That's a letter from Dr.
Mercatoris.
A.Dr. Mercatoris, yes.
Q.Right.  And he says there —
he says, one, he advises as to Ms.
deLeon's condition. He also says
that because of the situation, she
needs to take time off of work from
3/13/02 to 3/17/02.  You were aware,

Page 134 - Page 137

Page 136

1  you've seen this letter and you were
2  aware  of its contents; is that
3  correct?
4  ATTORNEY BINDER-HEATH:
5  Objection, asked and
6  answered.  We went over this
7  in detail in Direct. You can
8  answer.
9  A.Yes.
10  BY ATTORNEY NICHOLS:
11  Q.Now, returning to the letter
12  of March 18th, which is written by
13  Mr. Dolecki to Ms. deLeon, my
14  understanding is — correct me if
15  I'm wrong, you physically
16  hand-carried this letter to Ms.
17  deLeon; is that correct?
18  A.That's correct.
19  Q.And you met with Ms. deLeon at
20  the school, her workplace?
21  A.I believe it was in the
22  conference room in the high school,
23  yes.
24  Q.And who else was an attendant
25  of the meeting on that occasion?

Page 137

1  A.The same players that I've
2  stated in the past today:  Mr.
3  Higgins —
4  Q.Mr. Higgins was present.
5  A.— Mr. Deshner, Ms. deLeon
6  and a few CCEA reps.  Like I said,
7  there were at least two of them at
8  our meetings.
9  Q.Okay.  All right.  Now, let me
10  just step back, if I may, a moment.
11  Before delivery of the — and at the
12  time of its composition or on
13  thereabout this composition with Mr.
14  Dolecki drafted it, now that you were
15  privy to the making of the draft and
16  the — you were privy to it?
17  A.Yes.
18  Q.Right.  Now, my question to
19  you then is, did you or Mr. Dolecki,
20  do you know if you or Mr. Dolecki
21  consulted Dr. Mercatoris regarding
22  Ms. deLeon's condition prior to your
23  delivery of the letter?
24  A.Did we consult, or did I
25  consult?

Page 137

Multi-Page™

```
 1  Mercatoris or suggest that you call
 2  him or someone else on the staff call
 3  him to inquire regarding the letter,
 4  his letter, Dr. Mercatoris' letter on
 5  March 12th?
 6  A.I just told you a minute ago I
 7  didn't remember, why would I change
 8  my mind? I don't remember.
 9  Q.You don't remember what?
10  A.I don't remember what you just
11  asked me about the contact of Dr.
12  Mercatoris: I said, I don't -- I
13  didn't contact him and I don't
14  remember if Mr. Dolecki contacted him
15  or not.
16  Q.But I asked you a very
17  different question. I asked you, did
18  you discuss with Mr. Dolecki, Dr.
19  Mercatoris' letter? That's a very
20  different question.
21  A.That's not the question you
22  asked me.
23  Q.Well, I'm asking that question
24  now. If you'd be so kind to respond.
25  ATTORNEY BINDER-HEATH:
```

```
 1  Q.Did you or Mr. Dolecki or
 2  anyone else on the staff of the
 3  School District consult with Dr.
 4  Mercatoris?
 5  A.I don't remember, I don't
 6  remember.
 7  Q.He says, in his letter on May
 8  12th, he said, Dr. Mercatoris, to
 9  whom it may concern, if there are any
10  questions regarding this, please feel
11  free to contact this office. Now,
12  I'm asking did you, did Mr. Dolecki,
13  or both, did you consult with the
14  doctor?
15  A.I didn't consult with the
16  doctor.
17  Q.You didn't. Do you know
18  whether Mr. Dolecki consulted?
19  A.I said, I don't remember. I
20  don't know if he did or not, I don't
21  remember.
22  Q.Do you recall whether in the
23  course of your discussion with him in
24  the preparing of this matter whether
25  be ever said, I think I will call Dr.
```

```
 1  At the time, you mean?
 2  BY ATTORNEY NICHOLS:
 3  Q.On or about March 18th.
 4  Either before March 18th on or about
 5  at the time of the drafting of the
 6  letter of March 18th.
 7  A.Are you talking about the
 8  letter that says that she's under the
 9  care of Dr. Richards and Dr.
10  Mercatoris and that it's recurrent
11  severe depression?
12  Q.Right, right.
13  A.I'm sure that that was a topic
14  of conversation.
15  Q.Between you and Mr. Dolecki?
16  A.Probably it was.
17  Q.All right.
18  A.I said, probably.
19  Q.Let's move forward, let's --
20  not fast forward, but let's step
21  forward if we may. On this delivery,
22  you -- now on the 18th you delivered
23  the letter, which was prepared by Mr.
24  Dolecki, calling for the resignation
25  -- not the resignation rather, but
```

```
 1  suspension of Ms. deLeon -- not Ms.
 2  Dolecki, excuse me. Ms. deLeon.
 3  Okay. And also ordering her to
 4  undergo a psychiatric exam. You
 5  physically delivered that letter to
 6  her. Now, my question to you is did
 7  you ask for Ms. deLeon's resignation
 8  on that occasion?
 9  ATTORNEY BINDER-HEATH:
10  Objection, asked and
11  answered. You may answer.
12  A.I said earlier what I said
13  BY ATTORNEY NICHOLS:
14  Q.And what did you say earlier,
15  because it's not clear to me what you
16  said? I ask that you say it again.
17  A.Okay. I guess the -- what I
18  said was, I know what I said, but the
19  purpose behind saying it was -- and
20  you wouldn't understand this because
21  you weren't there at the meeting so I
22  couldn't expect you to understand
23  what her behavior and demeanor and
24  her emotional state was like, but she
25  had stated, I can't do this anymore
```

Case 1:05-cv-00126-SJM Document 50-18 Filed 06/26/2006 Page 37 of 46

and she was emotional, crying, making statements like that over and over again until she was eventually ushered out because it was in the best interest of her to be ushered out of the room by the CCEA. I went back and shared that with Mr. Dolecki, and because we had a concern for her wellbeing, particularly after that letter from Dr. Mercatoris was forwarded to Mr. Dolecki, and we have a very big concern for learning and what's in the best interest of our student, I said to her, and I didn't demand, I just suggested, that if you're willing to turn in your letter of resignation we would grant you full pay for the remainder of the school year. That's what I said and that's it. Is that clear? Because that's what I said.

**Q. I heard you, Mr. Heller. My further question is this though, and you express concern as to her --- based upon the meeting that occurred**

**with Ms. deLeon on the 12th. But my question, further question is, if you were so concerned and Mr. Dolecki was so concerned, why were you not also moved to call Dr. Mercatoris?**

ATTORNEY BINDER-HEATH:

Objection, he indicated he didn't know if Mr. Dolecki did or not.

A. Yeah, I never said nobody called him, I just said I didn't know.

BY ATTORNEY NICHOLS:

**Q. So you didn't know?**

A. I don't remember.

**Q. So I mean, you can't confirm for the record that a call was made to Dr. Mercatoris. Now, my query here is this --- I don t mean to be argumentative, but you, sir, used the term concerned and I'm not saying you were not concerned. I'm not questioning your bona fide values in that regard, but if you were really concerned, why didn't you or someone**

**on the staff of the superintendent's office didn't pick up the telephone and call Dr. Mercatoris?**

ATTORNEY BINDER-HEATH:

Objection, you're simply being argumentative now.

ATTORNEY NICHOLS:

Okay. All right. We'll move forward. Okay. All right.

BY ATTORNEY NICHOLS:

**Q. Now, you said you did --- I used the term, asked for, you used the term request Ms. deLeon's resignation on the 18th in the letter. What was Ms. deLeon's response?**

A. well, we didn't get her resignation, so obviously she wasn't willing to give it to us at that particular time.

**Q. You're an administrator, you are a manager, the assistant superintendent. You have certain**

**responsibilities, and one of which is the administration of an ADA law, we just talked about that. What is your understanding of the ADA law as it relates to employer right, a prerogative, a right to ask for an employee's resignation due to a medical condition?**

ATTORNEY BINDER-HEATH:

Objection, I have many objections. First of all, it's calling for a legal conclusion. Second of all, it assumes that she's disabled under the ADA, which we disagree with. And third, you're not being specific as to his particular situation.

BY ATTORNEY NICHOLS:

**Q. Let me ask you this, Mr. Heller, if I may, what is the School District's policy then with respect to asking when an employee may be required to undergo a psychiatric exam? What is the School District's**

Multi-Page™

Page 146

```
 1  policy?
 2  ATTORNEY BINDER-HEATH:
 3       I'm going to object
 4  because there is the Americans
 5  With Disabilities Act and also
 6  the Family and Medical Leave
 7  Act, both which may involve
 8  them.
 9  ATTORNEY BINDER-HEATH:
10       Right, so ---.
11  ATTORNEY BINDER-HEATH:
12       One is serious health
13  condition, one is a
14  disability. They are very
15  different things.
16  BY ATTORNEY NICHOLS:
17  Q I'm just simply asking your
18  understanding. You are charged as
19  the administrator to administer those
20  laws; are you not? That's a fair
21  question. Are you an administrator,
22  Mr. Dolecki is an administrator. Are
23  you not charged with administering
24  these federal mandates? Are you not?
25  ATTORNEY BINDER-HEATH:
```

Page 147

```
 1       Is that your question?
 2  ATTORNEY NICHOLS:
 3       Well, that's one
 4  question.
 5  BY ATTORNEY NICHOLS:
 6  Q Mr. Heller, as a manager,
 7  assistant superintendent, you're
 8  charged with administering those
 9  mandates aren't you? One of which is
10  ADA law; correct?
11  A Yes.
12  Q charge?
13  Q Are you charged? Do you have
14  a responsibility for the
15  administration or implementation of
16  that law?
17  A Yes.
18  Q Okay. All right. So it's a
19  fair question. I'm not throwing a
20  curve ball at you am I? Am I
21  throwing a curve ball at you?
22  ATTORNEY BINDER-HEATH:
23       Mr. Nichols, can you
24  please keep your voice down.
25  ATTORNEY NICHOLS:
```

Page 148

```
 1       Okay.
 2  BY ATTORNEY NICHOLS:
 3  Q I'm just asking you a fair
 4  question. What was your
 5  understanding of the ADA law?
 6  A Put it this way, you took a
 7  long way to get to it. You could've
 8  taken a shortcut.
 9  Q All right. Let's take a
10  shortcut. All right? Let's take a
11  shortcut.
12  A I answered.
13  Q No, you didn't answer your
14  understanding. I asked your
15  understanding of the ADA law.
16  A No, you didn't. You asked me
17  ---.
18  Q Okay. All right. Now, all
19  right.
20  A Responsible. I did answer
21  that.
22  Q You answered that. You
23  answered that very directly, I
24  appreciate that.
25  A Thank you.
```

Page 149

```
 1  Q Now, my next question. All
 2  right. Next question here. I asked
 3  what was your understanding of the
 4  ADA law as it --- to the extent that
 5  it places responsibilities on an
 6  employer who seeks to require the
 7  employee to undergo an independent
 8  medical examination or a psychiatric
 9  exam? That's my next question.
10  ATTORNEY BINDER-HEATH:
11       I'll object to form.
12       You may answer if you
13  understand the question.
14  A I don't understand the
15  question, I guess.
16  ATTORNEY BINDER-HEATH:
17       Are you asking him,
18  under the law are they
19  permitted to seek an
20  independent medical exam.
21  BY ATTORNEY NICHOLS:
22  Q All right. Let's just use
23  that question that your Counsel
24  framed. Let's go there.
25  ATTORNEY BINDER-HEATH:
```

Multi-Page™

Page 150

1 Do you want me to
2 repeat it?
3 A. Yes, please.
4 Under the law, is an
5 Under the law,
6 employer entitled to require
7 an independent medical
8 examination under the ADA, his
9 right?
10 A. I believe that the employer
11 has rights.
12 BY ATTORNEY NICHOLS:
13 Q. But under what circumstance?
14 What must be shown? What I'm asking
15 you, when an employer, you as an
16 employer, Mr. Dolecki's an employer,
17 and you say, you tell that employee,
18 I want you to undergo a psychiatric
19 exam and the employee says no. An
20 example. I'm not going to them.
21 What must you show in terms under
22 your policy, under the law, as your
23 Counsel has phrased it, to require
24 that employee to undergo a
25 psychiatric exam.

Page 151

1 ATTORNEY BINDER-HEATH:
2 Isn't that when you
3 call your solicitor?
4 A. I was just going to say, we
5 operate under the -- under the
6 assumption of advice. I don't know
7 the answer to that question.
8 BY ATTORNEY NICHOLS:
9 Q. ...
10 ATTORNEY BINDER-HEATH:
11 When you are saying
12 you, is that the universal you
13 incorporating Mr. Dolecki, or
14 do you mean, you personally?
15 ATTORNEY NICHOLS:
16 ...
17 ATTORNEY NICHOLS:
18 What? I'm sorry.
19 ATTORNEY BINDER-HEATH:
20 When you say you, do
21 you mean the District, or do
22 you mean Mr. Heller
23 personally? Did you consult
24 with a solicitor?
25 BY ATTORNEY NICHOLS:

Page 152

1 Q. I'm speaking of it in a
2 cooperative sense. The entire
3 superintendent's office. Inclusive.
4 A. Did we -- okay. So you're
5 talking, in general?
6 Q. Right. A corporate sense.
7 A. I would say that there was
8 some consultation with a solicitor at
9 that time.
10 Q. And I know, at the risk of --.
11 A. But not by me specifically.
12 You understand that I'd only been
13 here for 30 days.
14 Q. I understand. I understand.
15 All right. Now, Mr. Heller, we
16 covered that. Mr. Heller, I saw --
17 I think it's also in the record, so
18 I'm not going to offer that, is that
19 Ms. deLeon was evaluated, and on the
20 evaluation was May 18th -- March
21 18th, correction. March 18th. And
22 it was an unsatisfactory evaluation.
23 Do you recall having seen that also?
24 A. Yes.
25 Q. And I also recall on the very

Page 153

1 bottom of that evaluation was a
2 notation, a handwritten notation.
3 saying that I believe, it was not --
4 that it was not completed due to Ms.
5 deLeon's being on leave. Okay. Of
6 course, understood she's having been
7 suspended by Mr. Dolecki on the 18th;
8 right?
9 A. Yes.
10 Q. Right.
11 A. Yeah.
12 Q. And therefore there is as I
13 understand it, what I saw on this
14 document is that Ms. deLeon was not
15 given a copy or was not provided a
16 copy of that negative evaluation
17 until May 28th? May 28th.
18 A. Uh-huh (yes).
19 Q. And my question is this, which
20 is the correct -- when was she --
21 which is the correct date? When was
22 she officially issued a negative
23 evaluation? Was it the 18th which
24 appears on the front, or was it the
25 28th, May 28th after she had been

**Page 154**

```
1  instructed to return to --- allowed
2  to return to work by the doctor. The
3  doctor said she was well enough to
4  return to work and she was given that
5  and the doctor made the determination
6  on May 3rd, she returned to work on
7  or about --- let me see. Well,
8  anyway, it's in the record, it's in
9  May, I think May 20-something, and
10 then May 28th she was given the
11 signed copy. Which is the correct
12 copy of that --- when was that
13 evaluation officially given to her?
14 It's confusing to me.
15 A.First of all, she was rated
16 unsatisfactory based on the period of
17 time from when school started through
18 March 18th, 2003, I believe, and
19 physically because she was not in
20 attendance at school she was
21 physically provided that document on
22 the 28th of May is the reason.
23 Q.That's the reason why it was
24 given to her belatedly like that?
25 A.Yeah, hadn't been in school to
```

**Page 155**

```
1  receive the evaluation.
2  Q.I see. Why was it given to
3  her belatedly in that sense if she
4  was suspended with pay, you could've
5  always called her earlier and given
6  it to her, right? She was suspended
7  without pay, she was already --- I
8  mean, she was able to come and get
9  it.
10 A.Why would we?
11 Q.Huh?
12 A.Why would we do it?
13 Q.That's what I'm saying. It's
14 dated 18th, I don't know why it was
15 then 82 days later you gave it to
16 her?
17 A.She was marked --- that was an
18 evaluation over that period of time
19 to the 18th of March, and she didn't
20 come back to work until May 23rd when
21 we gave her an opportunity to get her
22 feet planted and get back in the
23 system before we met with her again
24 and gave her the document on the
25 28th. I think, again, you know, I'm
```

**Page 156**

```
1  going to tell you that she was under
2  the care of the doctor, we had a
3  letter stating that she was under the
4  care of her physician. What good
5  would it do to provide her a document
6  at that point? You want to wait
7  until she's cleared. So I think we
8  were completely showing our genuine
9  concern not to bring her back
10 prematurely without a document from
11 her doctor.
12 Q.Don't you think there's
13 another interpretation there that the
14 reason people could conclude that the
15 reason you waited and gave it to her
16 on the 28th, indeed, that's the date
17 that it was signed off on, is because
18 really it was retaliation because the
19 doctor had found May 3rd that she was
20 able and willing to return to work?
21 ATTORNEY BINDER-HEATH:
22 Are you asking if
23 that's what happened or if
24 that's what someone could
25 potentially interpret.
```

**Page 157**

```
1  ATTORNEY NICHOLS:
2  If someone has a that's
3  a reasonable interpretation.
4  ATTORNEY BINDER-HEATH:
5  Reasonable and
6  potential are not the same.
7  BY ATTORNEY NICHOLS:
8  Q.Moving forward, okay. Now,
9  Mr. Heller, my reading of the record
10 and particularly commencing, let's
11 see, in the fall, September and
12 moving forward 2002 up to the time
13 --- the charges the Board recommended
14 by the administration that Ms. deLeon
15 be terminated and that was April
16 2003. You evaluated her at least
17 twice.
18 A.Observed.
19 Q.Observed, you observed, right.
20 And as I read the record, she was
21 observed, I guess, inclusive twice by
22 you, at least five other observations
23 were made within eight months, eight
24 months?
25 A.Correct.
```

Q. Now, I also noticed --- my observation revealed is that of the two observations you made, they were satisfactory really, the scoring. I mean, you indicated on the second one there was need for improvement and we have covered that this morning with your Counsel, but neither observations by you were unsatisfactory; is that correct?

A. No, that's not correct.

Q. Which one was unsatisfactory?

A. The second one.

Q. The second one was unsatisfactory?

A. There was reason for a lot of improvement on the second one. The first one was fine and I said that earlier. And I gave her words of encouragement and complimented her. She didn't accept it but I gave it to her.

Q. Right. Now, now, now I listened carefully to your testimony this morning a few minutes ago about

Ms. deLeon in the workplace, and much about what you had to say about her, your interaction with her really boiled down to difference of personality. Is that a fair statement?

A. Between who?

Q. As you perceived her, it was a matter of personality; right? I mean, you never quibbled with her ability as a teacher, her teaching skills? I didn't hear you quibble with that, question that. It was always her attitude, you say; right?

A. No, no, I didn't say that. I didn't say it was always her attitude.

Q. But that was the predominant concern; right?

A. No, you can't pin me down on just one thing. I said there were many more.

Q. I see, I see. But it was not her teaching ability and skills were never a concern? You were never

troubled by that; right.

ATTORNEY BINDER-HEATH: Objection.

A. That's not true.

BY ATTORNEY NICHOLS:

Q. That's not true? Your daughter was a student of Ms. deLeon. Of course you knew. Did she ever complain about Ms. deLeon?

A. No, my daughter got all As in her class, why would she complain?

Q. Well, I mean, she was a student. Other students apparently were more judgmental as you have testified.

A. Well, one thing, one thing you need to understand, Caleb, if you ever bring my daughter's name up again, because I don't really appreciate it.

Q. Well, I didn't mean in that sense. I didn't me anything derogatory. I was simply she --- Ms. deLeon tells me that she was a student of hers.

A. That's correct.

Q. Right.

A. But, I don't use my daughter for my advantages and I don't want you to think so. And I'd appreciate if you don't bring it up again.

Q. Fine, fine. I was just simply saying that --- it's just simply what my client ---.

A. Just drop it and we'll be happy with that.

Q. Okay. All right. Now, the Action Plan ---.

ATTORNEY BINDER-HEATH: Are you talking 2002-2003?

BY ATTORNEY NICHOLS:

Q. Let's start with 2001, I believe that's when it was implemented. The first action plan. And that was devised by Mr. Deshner; is that correct, sir?

A. There was one that was devised prior to me coming to Crawford Central. There may have been more,

Multi-Page™

Page 162

1  but I was aware of the one that I
2  think Mr. Destner and Mr. Higgins put
3  together in 2001-2002.
4  ATTORNEY BINDER-HEATH:
5  It's Exhibit Three.
6  ATTORNEY NICHOLS:
7  Exhibit Three.  Okay.
8  Action plan.
9  BY ATTORNEY NICHOLS:
10  Q Now, as best as you know, Mr.
11  Heler, who were typical candidates
12  to be put on an action plan? What
13  would be a typical profile of a
14  teacher who would be put on an action
15  plan?
16  A My experience has been, and
17  I'm talking experiences prior to
18  being here because what was --- this
19  was shared with me by Mr. Dolecki who
20  was in my position prior to me, is
21  that anybody that was on an action
22  --- anybody that received an
23  unsatisfactory rating was on an
24  action plan automatic. And then
25  according to the -- at that time if

Page 163

1  you had --- there was 11 different
2  sections in the appendix A, and it
3  was possible and this has happened
4  during my time, that if you received
5  one, two, three blocks that were
6  rated unsatisfactory you could also
7  be put on an action plan if there was
8  --- if, administratively there was
9  --- if the administrators felt there
10  was need to put that person on an
11  action plan. And I have been part of
12  that process where we've done that.
13  The person didn't get an overall
14  satisfactory rating.
15  Q Did you participate in
16  devising this particular action plan
17  in which Ms. deLeon was placed on?
18  A Not this one.
19  Q You had no participation
20  whatsoever in that?
21  A I wasn't employed at the
22  District in 2001.
23  Q All right. Let's confirm
24  2002, it was revised, as I
25  understand, in 2002, that Action

Page 164

1  Plan. Did you have an input in the
2  revision of it?
3  A As I explained to Ms. Heath, I
4  had some input. As you can see that
5  --- and we followed it because my
6  position, not my name, is within the
7  Action Plan. Number two,
8  professional competency that I will
9  observe Ms. deLeon along with the
10  building principals. So I was part
11  --- I had some input that I didn't
12  have --- as I said earlier, I didn't
13  have a lot of input. I would credit
14  Mr. Higgins with the majority of the
15  Action Plan. I read through it. I
16  thought it was put together very
17  well, and that's it.
18  Q I recall you said there were
19  other teachers that were placed in
20  that type of Action Plan? There were
21  other teachers you knew of?
22  A Yeah.
23  Q I'm referring now to Crawford
24  Central
25  A Yes, there has been other

Page 165

1  teachers on an Action Plan.
2  Q I'm not asking for names, I'm
3  just simply asking for your best
4  estimate of numbers who were placed
5  on this type of action plan.
6  ATTORNEY BINDER-HEATH:
7  Since he's been there,
8  or before that he just knows
9  of?
10  BY ATTORNEY NICHOLS:
11  Q Either before, or either ---
12  essentially being there or that you
13  have made it your business to find
14  out before --- the period before you
15  got there.
16  A I can't speak before.
17  Q Or that has come to your
18  knowledge since.
19  A But there has been action
20  plans that implemented in the School
21  District. Let's say, we'll start at
22  2002-2003 school year and beyond, and
23  there has been teachers with action
24  plans and I have been involved in all
25  since then. Yes.

Case 1:05-cv-00126-SJM   Document 50-18   Filed 06/26/2006   Page 43 of 46

Page 166

```
 1 Q Now, I don't think --- the
 2 question. I asked you I don't think
 3 you responded to. I asked you the
 4 typically profile of a teacher that
 5 would be placed on an action plan.
 6 A I respond to that.
 7 Q You did?
 8 A Yeah.
 9 Q Oh, you said on who had
10 failing and one of those scorings,
11 one of the little areas, a component
12 of the scoring.
13 A Right.
14 Q And that person would be ---
15 does that mean if a teacher had a
16 failing in either one of those
17 components that that would
18 necessarily mean the teacher would be
19 placed in an Action Plan or is it
20 discretionary on the part of the
21 principal or whoever?
22 A I said earlier if it's not
23 unsatisfactory, it's discretionary,
24 but there has been, since I've been
25 here, I can tell you, there has been
```

Page 167

```
 1 many people that have been on an
 2 Action Plan under the discretionary
 3 model as there has been for an
 4 unsatisfactory model.
 5 Q Is it fair to say the typical
 6 profile of the teachers is in the
 7 younger junior, less senior status?
 8 A Nope. I wouldn't say it's
 9 like that.
10 Q That has not been your
11 experience?
12 A Nope. That hasn't been my
13 experience.
14 Q Your Counsel referred to the
15 FERPA, acronym for a Federal law
16 dealing with the privacy ---
17 A Yes.
18 Q --- the privacy of handling
19 the student record. And you
20 testified that you did provide ---
21 the administration does provide
22 training, or did provide training to
23 the teaching staff, is that correct?
24 A Yes.
25 Q How is that accomplished?
```

Page 168

```
 1 Describe the training program?
 2 A Training?
 3 Q The training program on the
 4 FERPA, I mean to which the teaching
 5 staff, including Ms. deLeon would
 6 have been exposed to.
 7 A It's something that they go
 8 over in faculty meetings.
 9 Q Receive ---
10 Q It's not a formal training
11 program?
12 A No.
13 Q It's informal?
14 A Yes.
15 Q Conducted at faculty meetings?
16 A Yes.
17 Q Is it done on a periodic basis
18 or is there some fixed schedule that
19 it must get done?
20 A Yearly.
21 Q Who conducts it?
22 A Typically the building
23 principal.
24 Q Will conduct the training?
25 A Yes.
```

Page 169

```
 1 Q Does the administration
 2 oversee the implementation of this
 3 training on the part of the FERPA
 4 training?
 5 ATTORNEY BINDER-HEATH:
 6 You mean the
 7 superintendents, because the
 8 principal would be,
 9 technically administration?
10 ATTORNEY NICHOLS:
11 Right. Right.
12 BY ATTORNEY NICHOL:
13 Q I'm now saying, does the
14 superintendent's office have any
15 oversight and oversee the
16 implementation of this type of
17 training involving FERPA?
18 A Anything that takes place in
19 the School District is overseen by
20 the superintendent.
21 Q Is the training, is it
22 verbally done or is it conducted or
23 does it involve a written component?
24 A It's mostly verbal.
25 Q Mostly verbal. Does it
```

Multi-Page™

Page 170

1 involve any written component?
2 A It has to do with --- no.
3 Q No written component?
4 A No, not that I'm aware of.
5 Q If I requested the document of
6 the administration of this training
7 by the School District in the past
8 five years you could document that?
9 Would there be any way of documenting
10 such training?
11 ATTORNEY BINDER-HEATH:
12 You mean other than
13 just the policy that exists?
14 ATTORNEY NICHOLS:
15 That this training was
16 conducted as he says at the
17 faculty meetings.
18 ATTORNEY BINDER-HEATH:
19 Right.
20 BY ATTORNEY BINDER-HEATH:
21 Q That's all I'm asking you.
22 Could that be documented, Mr. Heller?
23 A I don't know for sure. I
24 can't say.
25 Q But why are you hesitant. I

Page 171

1 mean, it was done. Do you have any
2 way of maintaining that to ensure
3 that it was done?
4 A I told you it was done
5 verbally, so how can I have any
6 documentation for it?
7 Q Yes, but what I'm saying is
8 for your own record-keeping purposes
9 don't you commit something to writing
10 for your own record-keeping purposes?
11 A What do you mean like a
12 tickler file or something?
13 Q I don't know. I was just
14 wondering. It's a federal law and
15 supposing there is some kind of
16 audit, you know, by federal agencies.
17 You know, that's why I was wondering.
18 Do you know what I mean?
19 A I can't answer that question.
20 Q Now, your Counsel also went
21 into another matter dealing with Mr.
22 Flippin and that was disclosure of
23 documents. It said that there was
24 certain student documents disclosed
25 to the --- Mr. Flippin who was a

Page 172

1 representative of PHRC, Pittsburgh
2 office.
3 A Right.
4 Q My question to you is, was Ms.
5 deLeon sanctioned for that? That she
6 was sanctioned for that activity, I
7 mean, for that, or what allegedly had
8 been done or what is being said in
9 terms of releasing documents. Is
10 that correct, she was charged for
11 having committed an act of
12 immorality? That's what I
13 understand.
14 A Are you talking about that
15 memo that I didn't get that she sent
16 to me?
17 ATTORNEY BINDER-HEATH:
18 Look at Exhibit 17,
19 statement of charges letter,
20 which is the last one.
21 A Yeah, she was.
22 BY ATTORNEY NICHOLS:
23 Q Charged with immorality.
24 Right?
25 A I wouldn't say immorality

Page 173

1 I would I?
2 Q Well, at any rate have you had
3 opportunity to read the arbitration
4 opinion rendered my Mr. Amis?
5 A Yeah. Yes, a long time ago I
6 did.
7 Q And do you recall that Mr.
8 Amis said that particular charge
9 could not stand? He said the school
10 district did not prove its case on
11 that judgment, that she had committed
12 immorality by disclosing documents to
13 Mr. Flippin.
14 ATTORNEY BINDER-HEATH:
15 And again, let me lodge
16 my objection. We went through
17 this already once today. The
18 decision speaks for itself,
19 and it's not that the
20 arbitrator said it didn't
21 happen or that what she did
22 was okay. He just simply said
23 that it was not immorality
24 under the code.
25 ATTORNEY NICHOLS:

Multi-Page™

Page 174

1 But he al s went on to
2 say that I'm was no
3 indication of deceit or
4 dishonesty on the part of Ms.
5 deLeon. That's what he said.
6 ATTORNEY NICHOLS:
7 I just want to say, and
8 I'm not going to belabor this
9 point.
10 ATTORNEY BINDER-HEATH:
11 Didn't we already do
12 this once?
13 ATTORNEY NICHOLS:
14 We already did but it
15 was brought up again today,
16 and there I are, I feel the
17 obligation to set the record
18 straight here, because I don't
19 want my —.
20 ATTORNEY BINDER-HEATH:
21 Please don't use set
22 the record straight, the
23 record speaks for itself.
24 ATTORNEY NICHOLS:
25 But I don 't want my

Page 175

1 client to go from here today
2 with a cloud over her head
3 saying that she is committing
4 immorality on that charge.
5 ATTORNEY BINDER-HEATH:
6 I'm not saying that.
7 ATTORNEY NICHOLS:
8 That's what I'm saying.
9 ATTORNEY BINDER-HEATH:
10 The record speaks for
11 itself.
12 ATTORNEY NICHOLS:
13 The record speaks for
14 itself. Okay. I don't want
15 that to go unsaid,
16 unchallenged.
17 ATTORNEY BINDER-HEATH:
18 Okay.
19 ATTORNEY NICHOLS:
20 All right. That's what
21 he said, no dishonesty, no
22 deceit on her part.
23 BY ATTORNEY NICHOLS:
24 Q Now, Exhibit 16, what has been
25 marked Exhibit 16. There seems to be

Page 176

1 to me, a discontinuity in your
2 evaluations of Ms. deLeon in the
3 fall, I believe I just talked about
4 it, fall of 2002, and then in your
5 subsequent recommendation that she be
6 terminated. You did participate in
7 the recommending that she be
8 terminated; is that correct?
9 A Yes.
10 Q Is that correct?
11 A That's correct.
12 Q The recommendation and charges
13 that were leveled against her by the
14 School District in April 2003. You
15 did participate in that; right? You
16 recommended that she be — right?
17 A Yes.
18 Q Is that correct?
19 A That's correct.
20 Q Uh-huh (yes). And who else
21 made recommendations that went into
22 the framing of those charges that Ms.
23 deLeon be terminated? Can you say
24 for the record?
25 A I think there were a lot —

Page 177

1 we function as a team input from all
2 the administrators that were
3 involved.
4 Q Right, can you say for the
5 record who else participated in that?
6 A First and foremost, Mr.
7 Dolecki as the superintendent.
8 Q Can you say Mr. Dolecki, he
9 made a recommendation that she be
10 terminated; right?
11 A Ultimately it becomes his
12 recommendation.
13 Q And who else?
14 A But he takes input from people
15 in —.
16 Q Right. And on this occasion
17 from who else did he take
18 recommendations other than you?
19 A Mr. Deshner.
20 Q Mr. Deshner has already
21 testified what he said — be
22 recommended. I know that, it's on
23 the record. Who else?
24 A Mr. Higgins.
25 Q And Mr. Higgins. What did Mr.

Multi-Page™

Page 178

1 Higgins recommend?
2 A I'd assume he'd recommended
3 the same thing.
4 Q Anybody else?
5 A Not to my knowledge. The
6 advice of our labor attorney. We had
7 acted under the advice of our labor
8 attorney.
9 Q Your labor attorney?
10 A Our labor attorney
11 Q Now, your Counsel also asked
12 you about the harassment policy. Did
13 the District have a harassment
14 policy? Okay. You say you do have a
15 policy that addressed harassment.
16 Okay. Is that correct, harassment?
17 Discrimination, sexual harassment;
18 right?
19 A We do.
20 Q Now, my question is, is that
21 disseminated to the staff, the
22 teaching staff, the administrative,
23 the support staff? How is that
24 disseminated or made known?
25 A We have a district policy book

Page 179

1 and that policy is in every building.
2 I believe people are made aware
3 through different reasons.
4 Different, I guess formats. I know
5 part of -- we go over certain
6 policies that we need our staff to
7 know when they are new in our school
8 district. There is different
9 vehicles, I guess, that get the word
10 around. The union is very proactive.
11 Q Do you also conduct education
12 courses with respect to this type of
13 policy?
14 A No.
15 Q No formal education program?
16 A No.
17 Q No program like in the other
18 case you said you had an education
19 with respect to the other policies I
20 was asking you about. Oh, the FERPA,
21 like FERPA. You don't have a similar
22 kind of education program, to educate
23 the staff as to, you know, about the
24 act of harassment laws, the act of
25 discrimination policies that are

Page 180

1 binding on the district and the
2 district staff and personnel.
3 A We don't have an education
4 program, per se, that makes people
5 learn these policies, no. No.
6 Q Now, Ms. deLeon's case has
7 been with us for a long time. Any
8 reasonable person would say, this
9 reaches back to 1994 over a decade
10 she's been filing these complaints.
11 We have four arbitrations, three of
12 which she has prevailed. There have
13 been all these other things dealing
14 with Ms. deLeon, between the District
15 and Ms. deLeon, and they have
16 involved Civil Rights Laws in the
17 workplace. Now, the question is
18 this, what has the District done to
19 address these problems in terms of
20 correcting it or directing? Have you
21 put into place any new policies to
22 address harassment and discrimination
23 or sexual harassment?
24 ATTORNEY BINDER-HEATH:
25 I'm going to object.

Page 181

1 BY ATTORNEY NICHOLS:
2 Q Can you speak to that?
3 ATTORNEY BINDER-HEATH:
4 I'm going to object
5 you're assuming facts not in
6 evidence. You are assuming
7 that there is a violation of
8 the policy.
9 ATTORNEY NICHOLS:
10 I only know what the
11 arbitrator said. The three
12 arbitrators say.
13 ATTORNEY BINDER-HEATH:
14 Again objection, I
15 don't care what the arbitrator
16 said. This is a federal
17 lawsuit. This involves a
18 totally separate animal. And
19 what you are doing by that
20 virtue of your question is
21 assuming facts not in
22 evidence. That she was
23 harassed, that she was
24 discriminated against in some
25 fashion, which no arbitrator,