NOTES

**Tuesday March 25th**

*Claudette called to say her 2nd period Spanish I students were not following directives and she was sending a student to the office. I asked if she wanted me to come up to her classroom and she said, "Yes". When I arrived Claudette was arguing with a student regarding a worksheet. Claudette said that she had given the entire class a worksheet. He said he did not have one. She finally gave him a worksheet. She then sees that another student does not have a worksheet and asks the young lady where her worksheet was? The young lady tells Claudette that she never received one. Claudette again says that she gave everyone a worksheet and continues to ask the student where her worksheet was. The student starts to get irate with Claudette so she is finally given a worksheet. As Claudette moves to the front of the classroom a third student has her hand raised. When called upon this student says she does not have a worksheet. Without further argument Claudette gives this student a worksheet. Two students from this class were written up and sent to the office before my arrival. (See Misconduct Records)

**Wednesday March 26th**

*Adam Albaugh stopped in to see me 1st period. He informed me that Claudette had lost his notebook. His mother called me at 11:40 to voice her concern in regard to Claudette losing her son's classwork.

**Thursday March 27th**

*Claudette forgot she was having surgery today. My secretary informed me that Claudette was trying to get in touch with the sub service to secure a substitute for the day. I was able to locate a substitute for Claudette.

**Tuesday April 1st**

*Claudette stopped in 7th period to inform me Missy Cobb had threatened her. She allegedly said to Claudette, "My mom can beat you up, my aunt can beat you up, and my grandmother can beat you up. My whole family can beat you up". Claudette said to me that she felt threatened and didn't want to get beat up.

When Mr. Deshner and myself questioned Missy Cobb she denied saying her family was going to beat up Claudette. She said that when Claudette had asked her about a phone call she had made home she had responded that her mom wanted to MEET her. After further investigation into this it was discovered that Missy was not being truthful with us. Missy was subsequently suspended for 3 days for making inappropriate comments to a staff member. I would like to note that Missy had complained to me on Tuesday that Claudette had lost her notebook.

*Nicole Dawson stopped in at 10:12 to inform me Claudette had lost her worksheets that she handed in yesterday (Monday March 31st). Student was very upset.

EXHIBIT
9D
tabbies

Said Claudette had told her she had not collected any homework. Claudette had given this student a pass to come see me during class time. I informed Nicole that I would speak to Claudette.

*Samantha McNicholas stopped in at 10:20 to inform me Claudette had lost her worksheets. Again Claudette had given this student a pass to come see me during class time. Samantha informed me that she had turned the work in and Claudette was telling her she never received any work from Samantha. I informed Samantha that I would speak with Claudette.

*Mr. Apel (Guidance Counselor) called at 12:15. He said one of Claudette's students was in his office. He informed me the student (Heather Longstreth) was upset, because she felt Claudette was losing her homework and not giving equal credit for the same assignment.

*Cheryl Albaugh called at 1:45 to see if I found out anything in regard to Adam's notebook. I informed her I had spoken to Claudette about the notebook and that Claudette had said she never received a notebook from Adam.

*Claudette stopped in to see me near the end of 7th period. She informed me that she never collected the work that Samantha and Nicole were talking about. She said Nicole always does her work and the work was probably in Nicole's own binder. I believe Claudette was insinuating that the student had only thought she handed it in and instead had put the work in her Spanish binder by mistake. Claudette continued by stating that Samantha is not a reliable student and never does any work. She felt Samantha was lying about doing the worksheets.

**Wednesday April 2nd**

*Claudette stopped in at 7:40 am to inform me that she had located Samantha and Nicole's missing assignments in another class folder. Apparently Claudette had collected the worksheets, but put them in the wrong folder.

**Tuesday April 8th**

*Samantha McNicholas was allowed to come to my office at 9:53 during her 3rd period Spanish II class. The reason was to speak to me about a detention that Claudette had given her for talking in class. Samantha was upset, because she felt Claudette was being unfair to her. She said Claudette had not informed her she was getting a detention for talking and that Claudette has lost her assignment's before and denied losing them. She feels that the administration is not getting a clear picture of what's happening in the classroom, because when we observe her she tries to act like a real teacher. She wanted to know why we couldn't put cameras in the classroom. I informed her that I could not overturn a teacher detention and to make sure to account for all assignments in the future.

# NOTES

**Friday August 30th**

*Claudette sent Ryan Jack to auditorium study hall, because she said he wasn't following her rules of no talking. He said she wanted him out of her study hall. He said he was talking, but so were other people. I spoke with Ryan and explained that he needed to follow her rules.

*Dallas received detention from Claudette for FFD/Not being seated. Said he never got a warning.

**Friday September 13th**

*Mrs. deLeon called Mr. Apel 3rd period requesting that Nicole Dawson be removed from her class. Student refuses to cooperate or do anything. Said she would call parent and suggest she drop class. Mr. Apel advised her not to since it was a course she requested and received a "B" in last year. Mr. Apel said he would speak with Nicole.

**Friday September 20th**

*4th period, at 10:31 today I was in C-Wing. I noticed there was no teacher in Mrs. deLeon's class. She did not arrive until 10:35 (4 min. late). She informed me that she was speaking to Meg Daniels about a student.

**Monday December 9th**

*8th period 2:50 p.m. Tried calling Claudette, but there was no answer. I went to her classroom and a student (Chris Fisher) was sitting outside her classroom. He said he was kicked out for talking. When I stepped into the room Claudette was teaching and did not acknowledge me for 25-30 seconds. I asked her to call me when she got a chance. I turned on the ringer before I left so she could receive phone calls.

**Monday December 16th**

*Meeting with Mrs. Wisinski/Mrs. deLeon – Claudette admitted that she put Evan's name on the board. "I want to give Evan a detention" she then had the class translate to Spanish.

**Tuesday December 17th**

*Mrs. Gigogne called regarding Claudette and the detention she gave her daughter. Said daughter has had problems with Claudette all year.

**Wednesday January 15th**

*7:35 a.m. Claudette stopped by my office to talk about the meeting with Mrs.Wisinski. I suggested putting assignments for the 6-week period on the computer so she would have a better idea of what the student was missing.

**Tuesday March 25th**

*Nick Grindstaff and Amber Lenhart sent to office by Claudette to speak to me about not putting their heads on desk.

*Claudette called to say her 2nd period Spanish I students were not following directives and she was sending a student to the office. I asked if she wanted me to come up to her classroom and she said, "Yes." When I arrived Claudette was arguing with a student regarding a worksheet. Claudette said that she had given the entire class a worksheet. She finally gave him a worksheet. She then sees that another student does not have a worksheet and asks the young lady where her worksheet was? The young lady tells Claudette that she never received one. Claudette again says that she gave everyone a worksheet and continues to ask the student where her worksheet was. The student starts to get irate with Claudette so she is finally given a worksheet. As Claudette moves to the front of the classroom a third student has her hand raised. When called upon this student says she does not have a worksheet. Without further argument Claudette gives this student a worksheet. Two students from this class were written up and sent to the office before my arrival. (See Misconduct Records)

Wednesday March 28th

*Adam Albaugh stopped in to see me 1st period. His mother called me at 11:40 to voice her concern in regard to Claudette losing her son's classwork.

Thursday March 27th

*Claudette forgot she was having surgery today. My secretary informed me that Claudette was trying to get in touch with the sub service to secure a substitute for the day. I was able to locate a substitute for Claudette.

*Claudette stopped in 7th period to inform me Missy Cobb had threatened her. She allegedly said to Claudette,"My mom can beat you up, my aunt can beat you up, and my grandmother can beat you up. My whole family can beat you up". Claudette said to me that she felt threatened and didn't want to get beat up. When Mr. Deshner and myself questioned Missy Cobb she denied saying her family was going to beat up Claudette. She said that when Claudette had asked her about a phone call she had made home she had responded that her mom wanted to MEET her. After further investigation into this it was discovered that Missy was not being truthful with us. Missy was subsequently suspended for 3 days for making inappropriate comments to a staff member. I would like to note that Missy had complained to me on Tuesday that Claudette had lost her notebook.

Tuesday April 1st

*Nicole Dawson stopped in at 10:12 to inform me Claudette had lost her worksheets that she handed in yesterday (Monday March 31st). Student was very upset. Said Claudette had told her she had not collected any homework. Claudette had given this student a pass to come see me during class time. I informed Nicole that I would speak to Claudette.

*Samantha McNicholas stopped in at 10:20 to inform me Claudette had lost her worksheets. Again Claudette had given this student a pass to come see me during class time. Samantha informed me that she had turned the work in and Claudette was telling her she never received any work from Samantha. I informed Samantha that I would speak with Claudette.

*Mr. Apel (Guidance Counselor) called at 12:15. He said one of Claudette's students was in his office. He informed me the student (Heather Longstreth) was upset, because she felt Claudette was losing her homework and not giving equal credit for the same assignment.

*Cheryl Albaugh called at 1:45 to see if I found out anything in regard to Adam's notebook. I informed her I had spoken to Claudette about the notebook and that Claudette had said she never received a notebook from Adam.

*Claudette stopped in to see me near the end of 7th period. She informed me that she never collected the work that Samantha and Nicole were talking about. She said Nicole always does her work and the work was probably in Nicole's own binder. I believe Claudette was insinuating that the student had only thought she handed it in and instead had put the work in her Spanish binder by mistake. Claudette continued by stating that Samantha is not a reliable student and never does any work. She felt Samantha was lying about doing the worksheets.

Wednesday April 2nd

*Claudette stopped in at 7:40 am to inform me that she had located Samantha and Nicole's missing assignments in another class folder. Apparently Claudette had collected the worksheets, but put them in the wrong folder.

Tuesday April 8th

*Samantha McNicholas was allowed to come to my office at 9:53 during her 3rd period Spanish II class. The reason was to speak to me about a detention that Claudette had given her for talking in class. Samantha was upset, because she felt Claudette was being unfair to her. She said Claudette had not informed her she was getting a detention for talking and that Claudette has lost her assignment's before and denied losing them. She feels that the administration is not getting a clear picture of what's happening in the classroom, because when we observe her she tries to act like a real teacher. She wanted to know why we couldn't put cameras in the classroom. I informed her that I could not overturn a teacher detention and to make sure to account for all assignments in the future.

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT

OF PENNSYLVANIA

* * * * * * * *

CLAUDETTE DELEON,          *

    Plaintiff          *

  vs.          *

CRAWFORD CENTRAL          *

SCHOOL DISTRICT,          *

CRAWFORD CENTRAL          *     Case No.

SCHOOL BORAD,          *     05-126E

MICHAEL E. DOLECKI*

SUPERINTENDENT,          *

CHARLES E. HELLER,*

III, ASSISTANT          *

SUPERINTENDENT,          *

    Defendants          *

* * * * * * * *

DEPOSITION OF

DEBORAH ENGLEBAUGH

APRIL 24, 2006

Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.

EXHIBIT
91

1

Page 2

```
 1
 2                    DEPOSITION
 3                       OF
 3          DEBORAH ENGERMANN, taken on behalf
 4      of the Plaintiff herein, pursuant to
 5      the Rules of Civil Procedure, taken
 6      before me, the undersigned, Jackie
 7      Aust, a Court Reporter and Notary
 8      Public in and for the Commonwealth of
 9      Pennsylvania, at the Days Inn, 18350
10      Conneaut Lake Road, Meadville,
11      Pennsylvania, on Monday, April 24,
12      2005, beginning at 10:18 a.m.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1          A P P E A R A N C E S
 2
 3      CARL NICHOLS, ESQUIRE
 4      P.O. Box 1585
 5      Erie, PA 16507
 6          COUNSEL FOR PLAINTIFF
 7
 8      ROBERTA ELMER BEATH, ESQUIRE
 9      Andrews & Beard
10      3366 Lynwood Drive
11      P.O. Box 1311
12      Altoona, PA 16603
13          COUNSEL FOR DEFENDANT
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1
 2                    I N D E X
 3      WITNESS: DEBORAH ENGERMANN
 4      EXAMINATION
 5          by Attorney Nichols         7 - 33
 6      EXAMINATION
 7          by Attorney Beath          34 - 67
 8      RE-EXAMINATION
 9          by Attorney Nichols        68 - 71
10      RE-EXAMINATION
11          by Attorney Beath          71 - 73
12      CERTIFICATE                    74
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1              EXHIBIT PAGE
 2
 3                              PAGE
 4  NUMBER  DESCRIPTION       IDENTIFIED
 5  One     Subpoena             7
 6  Two     1/4/91 Grievance    22
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Case 1:05-cv-00126-SJM     Document 50-23     Filed 06/26/2006     Page 8 of 35

Page 6

```
OBJECTION PAGE
                    PAGE
ATTORNEY            70
Heath               70
```

Page 7

```
1  PROCEEDINGS
2
3  DEBORAH ENGLEBAUGH, HAVING FIRST BEEN
4  DULY SWORN, TESTIFED AS FOLLOWS:
5  ------
6  EXAMINATION
7  BY ATTORNEY NICHOLS:
8  Q.Okay. Ms. Englebaugh, Debra
9  Englebaugh, I'm Caleb Nichols here
10 representing the Plaintiff,
11 Claudette, in this proceeding of
12 deLeon versus the Crawford Central
13 School District and others. First of
14 all, I want to thank you for
15 appearing this morning and we offer
16 our apologies for being late. But I
17 want to thank you very much. You
18 appear here today pursuant to a
19 subpoena that I've issued on behalf
20 of the Claimant and I would ask that
21 this be marked Plaintiff Exhibit One.
22 (Plaintiff Exhibit Number
23 One marked for
24 identification.)
25 BY ATTORNEY NICHOLS:
```

Page 8

```
1  Q.Ms. Englebaugh, would you for
2  the record state your professional
3  background if you will, please
4  commencing with your education,
5  college education, bringing us
6  current, please?
7  A.Okay. I have a Bachelor of
8  Fine Arts Degree from Penn State
9  University. I also have a Master of
10 Arts from Edinboro University and I
11 also received my certification in art
12 education from Edinboro. I taught
13 three years in Meadville at Seton
14 School and then approximately seven
15 years at Crawford Central School
16 District.
17         I'm a published author. I
18 wrote three art education books that
19 were published by a company in
20 Colorado. I'm in their book survey
21 nationally and within the United
22 States. I'm continuing to take
23 college credits at Slippery Rock
24 University currently. I am not
25 employed. I'm the mother of two boys
```

Page 9

```
1  and I live in Hermitage,
2  Pennsylvania.
3  Q.And when did you commence your
4  teaching career?
5  A.At what age?
6  Q.Or what year?
7  A.What year?
8  Q.When and where?
9  A.I believe it was 1984.
10 Q.And then where was this?
11 A.That was at Meadville at Seton
12 School.
13 Q.Okay. And how long did you
14 teach there?
15 A.I taught there for three
16 years.
17 Q.And what did you teach?
18 A.I taught art and that was
19 kindergarten through eighth grade.
20 Q.I see.
21 A.And that was a part-time
22 position.
23 Q.I see. And from there where
24 did you go?
25 A.And then I --- during my
```

1 second year at Seton I started to
2 take classes to become certified,
3 because at that point I only had a
4 Bachelor of Fine Arts degree. But at
5 Seton, because it was a parochial
6 school I did not need a teaching
7 certificate, but decided to go ahead
8 --- because I loved teaching so much
9 I decided to go ahead and get my
10 certification while I was working at
11 Seton.
12 And at that --- I guess it was
13 probably my third year I started to
14 substitute teach at Meadville and
15 Penn Crest School District, which is
16 Saegertown and the areas north of
17 Meadville. And then the fourth year
18 of my teaching I was hired full time
19 at Meadville.
20 Q.That was the high school?
21 A.At that point I was hired at
22 Cochranton Elementary, which is part
23 of the District. Cochranton is part
24 of their school district and I taught
25 for three years at Cochranton and

1 then a job opening became available
2 at Meadville High School in a
3 photography position. And I bid on
4 that position because I had a
5 Master's degree. I was more
6 qualified than anyone else that bid
7 on that position, because of my
8 Master's degree. So they reluctantly
9 gave me the position.
10 Q.When did you start to work for
11 the Meadville High School?
12 A.That would have been in the
13 fall of 1989.
14 Q.And what did you teach there?
15 A.I taught photography, a couple
16 of sections of photography and some
17 basic classes, like a craft class and
18 basic drawing.
19 Q.And who was the principal at
20 Meadville?
21 A.The head principal was George
22 Deshner and the assistant principals
23 were Carol Templeton and Mike Ferala
24 (phonetic). I think that's how you
25 pronounce his name, Ferala.

1 Q.Okay. And you taught there
2 how many years?
3 A.Two years.
4 Q.So specifically you taught as
5 to the dates, we're talking about
6 what years?
7 A.'89 --- I taught the school
8 year '89 to '90, '90 to '91.
9 Q.Okay. And what was your
10 experience as a teacher there under
11 Mr. Deshner serving as principal?
12 A.It was the most horrifying
13 experience I've ever had in my life.
14 Q.Let's be specific if we can.
15 A.Specific.
16 Q.You called it horrifying?
17 A.It was. I can't even think
18 about the experience without getting
19 emotional. So you'll have to excuse
20 me.
21 Q.Take your time.
22 A.When I took the position as I
23 said, he gave it to me reluctantly,
24 my understanding was that there was
25 no photography studio or classroom

1 before 1989. His friend that was at
2 the junior high helped him to
3 establish a photography studio to,
4 you know, write up the name of the
5 course and to put in the dark room.
6 And I think they figured as long as
7 this gentleman was doing this he
8 would automatically receive the
9 position.
10 But because we had a contract
11 and there were certain rules that
12 they had to follow, they had to open
13 the position up for bidding. And I
14 bid on the position, because I was
15 qualified. I had photography
16 experience from Penn State and I also
17 had the Master's degree, so they had
18 no choice but to give me the
19 position.
20 And I remember when Jim
21 LaScala called me and said that it
22 was my position. He did so in very
23 rude tone. He was like, it's yours
24 if you want it kind of attitude.
25 Q.What was Mr. LaScala's

**Multi-Page™**

Page 14

```
 1  position?
 2  A I believe at that point he was
 3  the assistant superintendent.  So you
 4  know, I wanted the job because I
 5  wanted --- to me high school was the
 6  premier position for an art teacher.
 7  And also I was pregnant and we were
 8  going to have a baby that summer and
 9  I wanted to be closer to home which
10  was, you know, three or four miles
11  from the high school.  Cochranton
12  was, you know, a 20-minute drive from
13  my home.
14  Q What was the method of
15  evaluation for the position that
16  those who apply as candidates ---?
17  A Those who applied ---
18  Q How were they screened?
19  A --- first --- well, the
20  criteria was qualifications, the
21  contract stated that it was based on
22  qualifications.  And because Mr.
23  Gettys, who was the art teacher that
24  Mr. LaScala wanted to give the
25  position to, did not have his
```

Page 15

```
 1  Master's, he did not have higher
 2  qualifications than I.
 3  Q How was it --- tell us, how
 4  was the screening done?  In terms,
 5  where there was an interview
 6  committee?
 7  A I think it was just --- no,
 8  no, no.  For the position basically
 9  I believe you just sent them a
10  request saying that this --- the
11  posting --- referring to the posting
12  of the job and that, you know, I was
13  interested in the position and they
14  --- I believe I may have sent them my
15  qualifications.  But I'm sure they
16  had those on record because, you
17  know, any classes or anything I had
18  to take, they were aware of my
19  qualifications.  But I believe I
20  probably sent them an updated version
21  of mine.
22  Q They didn't call you?
23  A No.  No.  There was no
24  interview process because of the
25  bidding system, you know.  When
```

Page 16

```
 1  there's an opening, they post it.
 2  There's so many days you have to
 3  apply for that position and I applied
 4  within the time frame, you know ---.
 5  Q How did you know his friend
 6  applied for the position?
 7  A I got a lot of comments from
 8  people saying that Mr. Gettys
 9  designed the class, Mr. Gettys laid
10  out the darkroom, it should be Mr.
11  Gettys' job.  Other art teachers that
12  were in the district.
13  Q This was after you had gotten
14  the job?
15  A Before and after.  Before and
16  after.  Yes.  People --- other art
17  teachers trying to talk me out of it
18  because, you know, they were friends
19  with Mr. Gettys.  But I was
20  qualified.  I had ---.
21  Q All right.  Tell us, you
22  called this a horrifying experience?
23  A Yes.
24  Q Be particular about it.  Be
25  specific.  Why was it horrifying?
```

Page 17

```
 1  A Well, he made it very clear
 2  from the beginning that he wanted ---
 3  That he wanted Mr. Gettys in the
 4  position and not myself.
 5  Q When you say he, you're
 6  referring to?
 7  A George Deshner.
 8  Q Okay.
 9  A And --- did not let me help in
10  any of the ordering the supplies or
11  anything concerning the actual class,
12  I was not permitted to help out.  And
13  all I did was go in and teach.  Mr.
14  Gettys had control over everything,
15  because even though I got the job
16  somehow he managed to let Mr. Gettys
17  come up there half time.
18  He ended up being --- I had to
19  share the room with him.  Somehow
20  there was a job for him there.  Even
21  though I bid on this position and got
22  it, I ended up having to share my
23  classroom with him.  And I wasn't the
24  only photography teacher, he taught
25  some of the classes.
```

**Multi-Page™**

Page 18

1 Q Did Mr. Desiner, your
2 principal of the school, treat you
3 less favorably than your professional
4 colleagues, to other teachers.
5 A Oh, definitely. Without a
6 doubt.
7 Q How so?
8 A He just treated me rudely. He
9 was very short with me. There was
10 one one incident where he screamed
11 at the top of his lungs in the
12 hallway during the class change and I
13 went running to my room in tears.
14 Q Was it in the presence of your
15 colleagues, your students?
16 A I would — it was in the
17 presence of everyone that was in the
18 hallway during class change and we
19 were in the main corridor where four
20 halls come together. So I imagine
21 there were some of my colleagues
22 there, there were a lot of my
23 students, but by the end of the day
24 everyone knew what had happened, you
25 know, because it was the talk of the

Page 19

1 school that day —.
2 Q Do you recall specifically the
3 nature of the remarks that he
4 directed at you on that occasion?
5 A I can't remember the specific
6 things that he said because it was
7 quite some time ago. I do remember
8 him turning bright red and screaming
9 at me. It had something to do with
10 the fact that how he was, you know,
11 favoring Mr. Gettys and treating me
12 so badly.
13 Q Well, is it fair to say that
14 they were derogatory remarks as best
15 as you can recall?
16 A Prior to him screaming, you
17 know, he said that I didn't have the
18 qualifications or something like
19 that, you know, those kind of remarks
20 that he goes to Mr. Gettys for
21 information concerning the
22 photography department or room,
23 because, you know, Mr. Gettys was the
24 one that was qualified. Something to
25 that extent.

Page 20

1 Q So it's fair to say that he
2 favored Mr. Gettys and he disfavored
3 you?
4 A Definitely. Definitely.
5 Q Do you think that was because
6 of your gender?
7 A No, I think that he
8 definitely disliked me because I was
9 a woman and I knew what I was doing.
10 I was a successful woman, and I think
11 I intimidated him because I was good
12 at what I did and I was a woman. I
13 think — those things stick out of
14 my mind more than anything.
15 Q Now, you taught there two
16 years you say?
17 A Yes.
18 Q During the course of your
19 teaching there two years, did you
20 have an opportunity to discuss these
21 matters with your colleagues?
22 A You know, he treated me so
23 badly that I was being watched
24 constantly by he and his other
25 principals that I was afraid to talk

Page 21

1 to a lot of the staff. There were a
2 few people that I did talk with,
3 Claudette was one. There were a
4 couple of others that, you know, knew
5 — mostly the union representatives
6 I guess. They came to my assistance
7 and helped me out.
8 But you know, I was afraid to,
9 you know, talk to too many people
10 because I felt like I was always
11 being watched and I was. They would
12 listen in on my class, you'd hear the
13 intercom click on and off and they
14 would listen in. He had kids that
15 would go to report to him about my
16 behavior.
17 The biggest thing was, he
18 would listen in and my students got
19 so upset with it that I remember one
20 of them climbing up on the chair and
21 blasting something very loud in the
22 intercom. You know, putting
23 something up to the speaker and
24 making a really loud noise, because
25 they were so upset that they were

Multi-Page™

Page 22

1 being spied on.
2 Q Now, there was the evaluation
3 of your performance after the first
4 year?
5 A Yes.
6 Q Was that a negative or a
7 positive?
8 A Yes. Very negative. I ended
9 up with an unsatisfactory rating and
10 may I say that prior to being at
11 Meadville High School I was at
12 Cochranton and I received nothing but
13 outstanding evaluations from the
14 principal, Lynn Dixon.
15 Q Now, this is Exhibit Two.
16 I'll show you a copy of what has been
17 marked Plaintiff Exhibit Two. It's
18 the decision rendered by an
19 Arbitrator, William Heekin, relative
20 to apparently a complaint that you
21 filed as a consequence of
22 unsatisfactory rating received by Mr.
23 Desher. And I would ask if you
24 recognize this document?
25 (Plaintiff Exhibit Number

Page 23

1 Two marked for
2 identification.)
3 A Yes.
4 BY ATTORNEY NICHOLS:
5 Q Do you recognize Exhibit Two
6 as Arbitration decision rendered by
7 William Heekin on your complaint?
8 A Yes, I do.
9 Q And I notice that you agree
10 with what's sustained by the
11 Arbitrator; that is correct?
12 A Yes. Correct.
13 Q And I notice also in the
14 evaluation, the scoring that
15 virtually --- I notice also in the
16 scoring that in the certain parts of
17 the --- it looks like the evaluation
18 of a preparation plan instruction,
19 the teacher-student action management
20 you received satisfactory.
21 A Yes.
22 Q But on the other part you
23 received unsatisfactory. Can you
24 explain that?
25 A No, I can't. I cannot

Page 24

1 explain, other than at a certain
2 point they decided that they wanted
3 me out of that position and they
4 treated me in such a way as to
5 fulfill that. They were going to
6 remove me from that position and
7 their way of doing it was to give me
8 an unsatisfactory. And if I had not
9 filed the grievance, if I had
10 received one more unsatisfactory
11 rating I would have been removed from
12 that position. I would have been
13 removed from the school district.
14 Q And this was in 1990-'91
15 school year?
16 A Yes, it was.
17 Q Okay. And the next school
18 year, '91-'92 school year, what was
19 your evaluation like?
20 A In --- I'm not understanding.
21 Q Subsequent school year?
22 A When I was moved to another
23 building?
24 Q Oh, you were moved to another
25 building?

Page 25

1 A Right. Even though I --- one
2 of the reasons I --- one of the other
3 reasons I filed a grievance is
4 because they removed me from that
5 position and put me at Cochranton
6 Elementary and gave the male teacher,
7 Mr. Gettys, my position. And after
8 two years I was removed. They filed
9 the unsatisfactory ratings against
10 me. I filed the grievance, but I
11 never received my position back. The
12 district never repaired that damage.
13 Q Who ordered your removal from
14 the senior high school to you say
15 elementary school.
16 A To Cochranton Elementary.
17 Q Who ordered that? Was that
18 Mr. Desher?
19 A I believe he had a part in it.
20 Yes. I'm not sure whether it was Mr.
21 LaScala, Mr. Desher or --- it was
22 one of those two gentlemen. I guess
23 I always believed it was the two
24 together that made that decision.
25 Q How was that effected? Did

Multi-Page™

Page 26

1 they write you a written order? Was
2 there a written order saying that you
3 are to leave one school and go to
4 another?
5 A. Yes. I remember the day like
6 it was yesterday. We were getting
7 ready to take our son to the
8 Pittsburgh Zoo and the mail came and
9 I received a certified letter and
10 said that you will be — you will
11 report to Cochranton Elementary
12 School. That you will no longer be
13 teaching at Meadville High School.
14 Q. And this was at the conclusion
15 of this second year?
16 A. At the school year. Yes.
17 Q. That conclusion of the second
18 year?
19 A. Yes.
20 Q. Did they articulate reasons
21 why they were ordering you to move
22 from —
23 A. No. They only —.
24 Q. — one school to another?
25 A. The only thing I was told by

Page 27

1 the principal at Cochranton
2 Elementary was that since I seemed to
3 do okay at Cochranton Elementary that
4 he was required to keep an eye on me.
5 And that's why I went to Cochranton
6 Elementary. And you know, —.
7 Q. Was this okay with you?
8 A. No. I was devastated. It was
9 punishment.
10 Q. You saw it as a punishment?
11 A. Oh, without a doubt. I was
12 more qualified and they handed a man
13 with less qualifications this art
14 position over me who had more
15 qualifications.
16 Q. You saw this as a demotion?
17 A. Oh, without a doubt. It was
18 meant to be a demotion.
19 Q. You saw it as possible
20 derailing your professional career?
21 A. Definitely. Without a doubt.
22 Q. And you thought — was it
23 your feeling that these actions on
24 the part of the administrators,
25 whoever did order it — made this

Page 28

1 order that you move from one school
2 to another, was conscience and
3 deliberate?
4 A. Oh, without a doubt. Without
5 a doubt. I have no doubt in my mind.
6 It was meant to be a punishment and
7 it was to the extent that as soon as
8 I could get out of the district and
9 end my teaching career the better I
10 would be, because I lived through
11 hell.
12 Q. Now, you said for the record
13 that you felt that you — you call
14 this a horrifying experience and you
15 attributed it at least in part to
16 your gender. Are there other reasons
17 other than your gender that you feel
18 that you were subjected to this
19 horrifying experience?
20 A. There could possibly be no
21 other reason because I was a very
22 good teacher. I was the type of
23 teacher you would want your child to
24 have.
25 Q. Okay. I notice that you

Page 29

1 physically moved. I think it's fair
2 to say you feel that you have — you
3 feel you've been damaged
4 professionally?
5 A. Oh, without a doubt. As an
6 example of how I was damaged, when
7 another opening came in the district
8 in 1993, I bid into a new position,
9 and it was a ceramics department at
10 their junior high. And upon
11 arriving, after I received the bid
12 and upon arriving to get my room in
13 order, I was met by a number of
14 teachers who told me they knew all
15 about me from Mr. Gettys, the art
16 teacher that took my place at
17 Meadville High School, and I got an
18 earful. That's the most humiliating
19 thing that you could imagine.
20 So there I was in a new
21 building, getting a — not to
22 mention I was six months pregnant,
23 they let me know what they thought of
24 me and treated me very poorly. They
25 watched me very carefully. They

Multi-Page™

**Page 30**

1 turned me into the principal for
2 every little thing you could ever
3 imagine. They told him how I stood
4 in the doorway or stood in the
5 hallway. It was just unimaginable
6 the things that they — every move I
7 made they reported me to the
8 principal, because of their friends
9 reporting to them about me.
10 Q.You think Mr. Deshner had
11 anything to do with that?
12 A.Oh, without a doubt. It was
13 Mr. Gettys and Mr. Desiner turned my
14 reputation into dirt.
15 Q.And that was after you had
16 left Meadville High?
17 A.It was the whole — during
18 the time those two years that I was
19 at the high school and —.
20 Q.What I'm talking about is
21 after you left?
22 A.No. That was two years later,
23 two or three later.
24 Q.Then you went to the
25 elementary school?

**Page 31**

1 A.I went to the elementary
2 school I believe for two years, and
3 then the third year when I bid into
4 the junior high position, which was
5 where Mr. Gettys was when he wanted a
6 high school position —.
7 Q.So are you telling us that
8 this horrifying experience —
9 A.It continued.
10 Q.— that it continued even
11 after you left?
12 A.Oh, without a doubt. Without
13 a doubt. Because my principal at
14 Cochranton Elementary told me that he
15 was instructed to watch every move I
16 made.
17 Q.I see. All right. And how
18 long were you there at the elementary
19 school?
20 A.I believe just two years after
21 the experience at the high school I
22 was there for two years and then the
23 third year I moved to the junior
24 high.
25 Q.And how long did you stay at

**Page 32**

1 the junior high?
2 A.Just a few months, because I
3 was pregnant when I started the
4 school year and I delivered —
5 actually I went into labor on a
6 Thursday when I was teaching and
7 never returned after that. It was
8 December 16th or 15th, I believe was
9 my last day.
10 Q.Okay. Now, it's obvious that
11 you have suffered and that you have
12 been wronged as documented in this
13 report.
14 A.Yes. No doubt.
15 Q.I'm referring to the
16 Arbitration Award. Now, have you
17 been made whole? When I say made
18 whole, in terms of your professional
19 career having been damaged either in
20 terms of compensation or has there
21 been any special remorse on the part
22 of the administrators who did this?
23 A.Nothing. No. Because
24 actually the — you know, the
25 statement said that I had basically

**Page 33**

1 won the case, but I wasn't returned
2 to my position, my teaching position.
3 I was —.
4 Q.Did you ask to be returned
5 there?
6 A.Yes, I did. And they said
7 that that was not accept — that was
8 not something that they were planning
9 to do and I was still being punished
10 because I was being watched by Lynn
11 Dixon, who was the principal at
12 Cochranton Elementary.
13 Q.Were you compensated in any
14 way?
15 A.No. No. Never. Never
16 compensated. The only thing that was
17 did was make me never want to teach
18 again. As soon as I was able to get
19 out of the classroom I did that,
20 because it was just — it was not
21 the experience that would make you
22 ever want to stay in the district and
23 give your heart and soul.
24 Q.Okay.
25 ATTORNEY NICHOLS:

Multi-Page™

Page 34

1 A. Right. Counsel, I
2 h-e no other questions,
3 Counsel.
4 ATTORNEY HEATH:
5 Do you need a minute?
6 In okay.
7 EXAMINATION
8 BY ATTORNEY HEATH:
9 Q. My name is Robin Binder Heath
10 a-d I represent the Crawford Central
11 School District and the current
12 s-perintendent and the assistant
13 s-perintendent in an action that Ms.
14 dadson has brought against them
15 c-ncerning alleged discrimination
16 b-sed on her gender and her national
17 o-rgin and received disability
18 c-ncerning her mental state. And I'm
19 h-re to represent the school
20 d-strict's position in this lawsuit
21 a-d ask you some follow-up questions
22 from what Counsel has asked you
23 a-ready.
24 Just so I'm clear about a
25 c-uple of things. You indicated that

Page 35

1 — now, this grievance that was
2 marked as Plaintiff's Exhibit Two,
3 you filed it June 11th of 1991; is
4 that correct?
5 A. I believe, if that's what it
6 says. That's correct.
7 Q. And if you look at the last
8 page it was decided in 19 — May
9 20th of 1992?
10 A. Okay.
11 Q. So it was about 14 years ago;
12 is that accurate?
13 A. Yes. Uh-huh (yes).
14 Q. And when Mr. Nichols asked you
15 if you've been compensated, you never
16 lost any money, any salary; is that
17 correct, as a result of your working
18 with ---?
19 A. No.
20 Q. Let me just finish my
21 question.
22 A. No.
23 Q. Working with the school
24 district, is that correct? They did not

Page 36

1 lose any money;
2 Q. And when you were moved back
3 to the elementary position I
4 understand you didn't want to be, but
5 it was the same salary step; is that
6 correct?
7 A. That's correct.
8 Q. Under the contract?
9 A. That's correct.
10 Q. And the grievance that was
11 marked as Plaintiff's Exhibit Two
12 related to your unsatisfactory
13 evaluation?
14 A. That's correct.
15 Q. But it didn't have anything to
16 do with moving your position?
17 A. Well, ---.
18 Q. Well, it doesn't indicate
19 here ---.
20 A. It doesn't indicate there, but
21 the reason I was moved was all tied
22 in to that. They didn't just move me
23 on a whim. That was out of the
24 contract. You couldn't do that to a
25 teacher because of our teaching

Page 37

1 contract.
2 Q. Correct. So my question to
3 you is, because then you were moved,
4 did you file an additional grievance
5 or try to seek additional redress to
6 your union for their being in
7 violation to collect a bargaining
8 agreement for moving you into
9 position that you didn't want to be
10 in?
11 A. Well, because I was being
12 guided by the union, that was all in
13 one package, you know, as my
14 understanding was. That it was the
15 unsatisfactory rating was one thing
16 that they were dealing with and the
17 other item that they were dealing
18 with was the fact that I was moved as
19 a punishment because of the
20 unsatisfactory ratings.
21 Q. And when you were on your
22 grievance ---?
23 A. They — the district said,
24 no.
25 Q. That's what I'm asking you,

Multi-Page™

Page 38

1 I did you ever file with your union to
2 try to the retain your position, ---
3 A. No.
4 Q. --- regain your position?
5 A. No.
6 Q. At the time, who was your
7 union president?
8 A. Grant Shors, I believe was
9 the president.
10 Q. Who were your union
11 representatives that you were dealing
12 with, do you remember?
13 A. I believe Jay Froth (phonetic)
14 was one, Grant Shors and I'm not
15 clear on the names of the others.
16 Q. Did you deal with Patricia
17 Deardorff?
18 A. Yes. She was at my grievance
19 --- like the meetings that we would
20 have with the attorney, she was
21 present, I believe, if I'm
22 remembering her role correctly. I
23 believe Pat also participated.
24 Q. And just because we're on the
25 record here, I just wanted to make it

Page 39

1 clear. You're a Caucasian female,
2 correct?
3 A. Yes. But my appearance is
4 much different now then it was --- as
5 a matter of fact when Claudette
6 walked in the door she noted that she
7 didn't really recognize me. When I
8 taught at that time I had very long
9 hair probably down to my waist, it
10 was black. I highlight it now so
11 that's why it appears to be blonde
12 because I have a lot of gray, so ---.
13 But I had very dark hair, very
14 tanned skin, Italian looking. A lot
15 smaller, you know, after --- since
16 then I gave birth to two kids so I
17 definitely had a smaller belt. But I
18 was --- my appearance was drastically
19 different then ---.
20 Q. You're saying you looked
21 Italian?
22 A. Oh, yes. Definitely. Because
23 I always had a nice tan before I
24 started to worry about wrinkles.
25 Q. Well, did you think that was

Page 40

1 an issue with this district that they
2 thought you were Italian?
3 A. No. But that I was a female
4 and I definitely had an ethnic look
5 to me, you know. I think that was an
6 issue.
7 Q. Did you --- I'm sorry. Did
8 you suffer from any disability or
9 does the district perceive you from
10 suffering any disabilities,
11 physically or mental?
12 A. You know, I regret to this day
13 that I didn't file a suit because of
14 the anguish that I went through. I
15 was a new mother and I remember
16 sitting nights and just crying
17 because of what I was going through.
18 It's like it was yesterday. I can
19 remember just crying night after
20 night. I was so, so upset, so hurt,
21 so distraught and I regret to this
22 day that I didn't take legal action.
23 Q. On what?
24 A. On the grounds that it was
25 harassment because I was a female.

Page 41

1 Q. But you didn't suffer from any
2 --- they didn't think you suffered
3 from any disability, physically or
4 mentally?
5 A. Who didn't you think?
6 Q. The district, is that
7 accurate?
8 A. I didn't go that route.
9 Q. I mean, you didn't say, I have
10 issues, I have postpartum depression,
11 you didn't tell them that, did you?
12 A. No. It had nothing to do with
13 the direction we had gone at that
14 time.
15 Q. And at the time when you were
16 at the Meadville High School, the
17 assistant principal was a female,
18 correct?
19 A. Yes.
20 Q. That was Carol Templeton?
21 A. Yes.
22 Q. And did you feel --- that
23 didn't make you have any comfort
24 level?
25 A. No. I think that she was told

Multi-Page ™

Page 42

```
 1 b y a male administration to get me
 2 o ut of there.
 3 Q And percentage-wise, how would
 4 you characterize the schools that you
 5 were affiliated with the Crawford
 6 Central School District? Would you
 7 s ay there's a higher percentage of
 8 women teachers versus male teachers?
 9 A I thought there were a lot of
10 m en teachers, but I don't know the
11 p ercentage. The majority of the
12 p eople that when I would work in the
13 teachers lounge and do my lesson
14 p lans and different things, I recall
15 a lways being a large number of males.
16 Q Other than — and for now the
17 Claudette thing on the side, but
18 o ther than Ms. deLeon, did you ever
19 h ave any other female teachers say
20 that they believe that there's gender
21 b ias?
22 A I didn't talk to a lot of
23 teachers because of the treatment
24 that I received from the
25 administration. I felt that I was
```

Page 43

```
 1 being — I didn't want to put a toe
 2 out of line. I tried very carefully
 3 not to talk to a lot of people in
 4 general because I was afraid of
 5 somebody going back and reporting
 6 something.
 7 Q So the answer would be no?
 8 A No.
 9 Q It wasn't a discussion that
10 you had?
11 A No. No.
12 Q With regard to Mr. Gettys, you
13 said he was — at least you believe
14 he was a friend of Mr. Deshner?
15 A I believe they were friends.
16 Q And so you believe that the
17 primary issue when you first started
18 was because you felt the
19 administration, particularly Mr.
20 Deshner, wanted his friend in that
21 position?
22 A Uh-huh (yes). Uh-huh (yes).
23 Q And you said that he — you
24 were sharing a room with him at that
25 time and he said he was teaching some
```

Page 44

```
 1 classes. You were still paid your
 2 full salary; is that correct?
 3 A Yes. I wasn't given the job
 4 that I had bid into. I was — I'd
 5 bid into the photography position and
 6 end up having to share my photography
 7 position with him. Which, you know,
 8 if you're hired for a position and
 9 outbid somebody, how do you end up
10 sharing the position?
11 Q Now, I understand that, but
12 Mr. Nichols had been asking you about
13 compensation.
14 A I know.
15 Q I just want to make sure that
16 we're clear, monetarily, that you
17 were paid your full salary?
18 A I was paid my full salary, but
19 I have not taught since —
20 Q I understand.
21 A — 1993 because I just
22 couldn't do it anymore.
23 Q I understand. You said with
24 regard, for example, ordering
25 supplies. Now, I maybe was wrong
```

Page 45

```
 1 about this, but typically in my
 2 experience, because the budget has to
 3 be finalized at the end of June in
 4 the school district, everybody for
 5 the next year has to get in their —
 6 A Very early.
 7 Q — budget supply that spring,
 8 at least; is that correct?
 9 A No. It's actually due before
10 that.
11 Q Before that. So the first
12 year you went to the high school you
13 wouldn't have been ordering supplies
14 anyway?
15 A Right. Right.
16 Q So you would have had one year
17 where you said you were not permitted
18 to order supplies for the next year?
19 A Right. Uh-huh (yes).
20 Q And who was ordering the
21 supplies?
22 A I believe Mr. Gettys did.
23 Q Did you see a list or anything
24 in that nature?
25 A No.
```

Page 46

1 Q Okay.
2 A But it was more than just the
3 supplies, it was just the attitude
4 that -- it was just an example of,
5 you know, how I was not treated as if
6 I even existed or was of any
7 importance in that position. It was
8 always up to Mr. Gettys what was
9 occurring and how things were done.
10 And he make it clear to me that he
11 was the one that knew photography and
12 I didn't. That was his opinion.
13 Q And you said that you believe
14 that Mr. Deibner was targeting you
15 because you were a woman and one who
16 knew what they were doing?
17 A That's correct.
18 Q Did he ever make any comment
19 about you that related to your
20 gender?
21 A That related to my gender? I
22 don't remember specifically comments
23 that related to my gender. It was
24 just the treatment that he gave me
25 and I think it was because of my

Page 47

1 gender.
2 Q And as you sit here today,
3 it's your testimony that I understand
4 when you were at Cochranton you were
5 teaching K through 8 art classes?
6 A No. Cochranton --
7 Q I'm sorry.
8 A -- was K through sixth.
9 Q K through sixth?
10 A Uh-huh (yes).
11 Q Before you went to the high
12 school?
13 A Before I went to the high
14 school.
15 Q And that was art classes?
16 A That's correct.
17 Q And then you got satisfactory
18 evaluations?
19 A Always. And comments, very
20 positive comments without a doubt.
21 Q And the next job then you went
22 to the high school?
23 A Uh-huh (yes).
24 Q So it's older students and you
25 were teaching photography, is that

Page 48

1 correct?
2 A Uh-huh (yes).
3 Q And you would agree that's a
4 totally different student group?
5 A Teaching is teaching.
6 Q And totally different
7 curriculum?
8 A I teach adults, I was -- in
9 the past I've taught pre-schoolers,
10 When you teach it doesn't matter the
11 age level. I'm competent to teach at
12 any level --
13 Q I understand your certificate
14 would be K through 12?
15 A Right. I'm competent to teach
16 at any level and I did an extremely
17 good job.
18 Q And you didn't encounter any
19 difficulty?
20 A Not with my students. Other
21 than the normal ones that you go over
22 with being a new teacher in a new
23 building, which were minor.
24 Q At your Arbitration Hearing
25 prior to rendering the decision which

Page 49

1 was has been marked as Plaintiff's
2 Exhibit Two, did you provide any
3 testimony concerning your feeling
4 that you were targeted because of
5 your gender?
6 A At the hearing?
7 Q At the hearing?
8 A I'm not sure what we discussed
9 as far as I don't know that we -- I
10 don't recall ever being asked why
11 they were targeting me. I don't
12 remember ever being asked that.
13 Q Okay. Would you agree with me
14 that the decision itself hasn't
15 mentioned anything about any
16 allegations of gender bias?
17 A Well, it doesn't mention my
18 position being moved either. So we
19 didn't cover --
20 Q Well, I'm just asking --
21 A That's correct. It doesn't
22 cover every item that occurred in my
23 experience teaching there.
24 Q And as far as you know,
25 however, you don't recall whether you

Multi-Page™

Page 50

1 tatified or you don't believe you
2 tatified about having gender bias
3 Our at this particular hearing?
4 A Ido remember testifying that
5 I don't understand, you know, why
6 — you know, someone that taught
7 It was as professional as I was and
8 this is successful as I was in the
9 C tsroom would have to go through
10 something like that. I remember
11 specifically being confused about
12 this —
13 Q again —
14 A — and I think — I don't
15 recall testifying to that, but it
16 doesn't mean that it isn't the case.
17 Q No, I'm not saying. I'm just.
18 a saying you, it's not addressed in
19 this case, correct?
20 A Right. Right. But there's a
21 lot of things that aren't addressed
22 in that grievance.
23 Q Well, again, when I asked you
24 about moving, for example, your
25 position, you believed it was

Page 51

1 consumed in this particular
2 agreement. But when they didn't put
3 you back in the position, it was
4 something that you followed up on?
5 A Right. Right.
6 Q In looking at this decision, I
7 just — I'm quickly glancing at the
8 — there's your evaluation that's
9 contained in part of the decision
10 itself and one of the areas that you
11 received unsatisfactory were a couple
12 of the areas that would be in
13 response to supervision and also
14 would — comments it says with
15 ability to cooperate, very
16 uncooperative towards administrative
17 suggestions and directives. It does
18 say cooperative with staff members.
19 And then on the next page of
20 page six of the decision it
21 indicates, she, being you, has little
22 respect for policies or directions.
23 She isn't in agreement with
24 consistently undermining
25 administrative authority. Now, is

Page 52

1 that something that you believe is
2 totally invalid?
3 A Yes. Without a doubt.
4 Q And you do agree that you had
5 issues with Mr. Destner?
6 A No. I believe Mr. Destner had
7 issues with me.
8 Q Other than the time he — you
9 recounted that he screamed at you in
10 the hallway, did you have any
11 confrontations with him or any other
12 administrator?
13 A No, I believe briefly after
14 that he put Ms. Templeton on to my
15 situation and she continued with the
16 — I don't know what you would call
17 it, the abuse.
18 Q So you didn't get along with
19 Ms. Templeton either?
20 A She would — no, she treated
21 me with a great deal of disrespect.
22 She — they spied on me, they would
23 not let me have a union
24 representative in when I would have
25 evaluations with her and she would be

Page 53

1 very rude and nitpick and say
2 inappropriate things to me.
3 Q Such as?
4 A Just, you know, that I was
5 unprofessional, that I was — you
6 know, just nitpicked about things
7 that were appropriately done, but she
8 — I think was on — was told to
9 find something wrong with me and she
10 worked very hard at fabricating and
11 coming up with things just to write
12 an evaluation to try to get rid of
13 me. So no, I was never uncooperative
14 with the administration. I was never
15 — you know, I was in fear of losing
16 my job because they were looking for
17 something. I can tell that they were
18 looking for something to find fault
19 with and to get rid of me.
20 Q You said about the spying.
21 For example, you said, the intercom
22 would click on and off.
23 A Well, you would know when the
24 morning announcements were coming
25 because you hear that little click

Case 1:05-cv-00126-SJM    Document 50-23    Filed 06/26/2006    Page 20 of 35

Page 54

1 and then they would speak or when
2 they would call to your room and say
3 we need such and such student to come
4 down to the office, you would hear
5 that little click and then they would
6 wait, you know, for your answer. We
7 would always hear the little click
8 and the whole class would look up
9 like, they're listening to you, you
10 know, kind of thing. Because even
11 the students were aware from Mr.
12 Deshner. I had a couple of students
13 that he was friends with that he
14 shared this information with.
15 Q.Now, did you go to your union
16 about that?
17 A.Yes. Oh, they knew. They
18 knew about all of that.
19 Q.Did they try to help you?
20 A.Well, through the grievance
21 they did.
22 Q.But this was really basically
23 --- was this --- the listening in,
24 was that before the incident?
25 A.The listening in was that ---

Page 55

1 Q.The year of the incident?
2 A.I believe it was both years.
3 Q.Both years?
4 A.Both years.
5 Q.And then you went to another
6 school?
7 A.Uh-huh (yes).
8 Q.And who was the principal at
9 the other school?
10 A.Lynn Dixon.
11 Q.Is that a male or female?
12 A.Alf's a male.
13 Q.Is it Lynn or Lyn?
14 A.Lynn, L-Y-N-N.
15 Q.And then you said that you
16 ended up bidding into a junior high
17 position; correct?
18 A.That's correct.
19 Q.And you said that when you
20 went there you were met by a number
21 of teachers who said that they knew
22 all about you and said unkind things
23 to you?
24 A.Uh-huh (yes). Right. From
25 Mr. Getty. They were ---

Page 56

1 Q.And who are these teachers?
2 A.I don't remember their names.
3 Q.Were they male or female?
4 A.They were male.
5 Q.And were they art teachers
6 or ---?
7 A.No. Well, no. I'm trying to
8 think what classes were across the
9 hall. Math or science. They were
10 male.
11 Q.And how many of them?
12 A.Two or three.
13 Q.Do you recall anything
14 essentially that they said to you?
15 A.No, other than they heard all
16 about me. That --- just told me what
17 a terrible person I was. Just things
18 like that.
19 Q.Because of why ---?
20 A.What I've done to Mr. Gettys
21 taking his position at the high
22 school, you know. That was their
23 take on it. You know, and they also
24 just made comments in general about
25 what a trouble maker I was. Because,

Page 57

1 you know, all they knew was what Mr.
2 Gettys had told them.
3 Q.And I'm assuming this from
4 what you said. You didn't get along
5 at all with Mr. Gettys?
6 A.I didn't have any problem with
7 Mr. Gettys.
8 Q.You're saying he had a problem
9 with you?
10 A.Yes.
11 Q.Did you ever try to discuss it
12 with him?
13 A.I didn't ever try to discuss
14 it with him because he let it be
15 known to a lot of people that he
16 disliked me.
17 Q.Simply because you bid into
18 the position?
19 A.Uh-huh (yes). That he was led
20 to believe this was by Mr. Deshner.
21 Q.Now, it seems to me that you
22 would have a bigger issue with other
23 people since you were just following
24 the contract agreement.
25 A.But --- I don't know. I don't

Multi-Page™

1  I knew.
2  Q Did you said you thought that
3  the fellow teachers turned you into
4  the principal at the middle school?
5  A Yes.
6  Q Junior high.
7  A Because I was called in --- as
8  an example, I had a student teacher.
9  And instead of --- you know, the
10  student teachers take over your
11  teaching position at a certain point.
12  And I had in-school suspension and I
13  let --- the student teacher went to
14  the in-school suspension. After
15  going there with the student teacher
16  several times I felt that they would
17  be able to do that on their own. And
18  plus it was just, you know, a short
19  distance from my room and I would
20  walk by and check --- listen at the
21  door and check on that student
22  teacher.
23  Well, they turned me in saying
24  that, oh, how unprofessional, she's
25  dumping on her student teacher, her

1  student teacher, you know, shouldn't
2  be in there. Just everything you can
3  imagine they turned me in for.
4  Q Other than that can you think
5  of anything else?
6  A Now, he ---
7  Q I know it's a long time ago.
8  A When the principal called me
9  in he apologized and he said that he
10  understood that, you know, I came in
11  with a bad reputation and that these
12  people were giving me a hard time and
13  he wanted to talk to me about it and
14  let me know what was going on. He
15  didn't make me go into the room that
16  my student teacher was doing the
17  in-school suspension. So basically
18  he was just informing me that I was
19  being watched by these people and he
20  was getting his reports.
21  Q Was it the same two or three
22  people?
23  A My understanding, yes.
24  Q And how did you get along with
25  the administration at the junior

1  high?
2  A He was very kind to me, they
3  --- I didn't have any trouble.
4  Q And who was that?
5  A I can't even --- I can't.
6  recall.
7  Q And when you then went into
8  labor and had your baby in December,
9  what year was that?
10  A That was December of '93.
11  Q You said you never returned?
12  A Well, I took --- I had a lot
13  of sick days and then I took the
14  sick days accumulated so I took my
15  parental leave and then because I
16  still wasn't sure if I could go back,
17  they gave me an extension. I believe
18  I almost had two years to decide and
19  I just couldn't do it.
20  Q And even though that was ---
21  and you would have gone back to the
22  junior high?
23  A Right. Uh-huh (yes).
24  Q And you didn't have a problem
25  with administration?

1  A No, I didn't have a problem
2  with administration, but all of the
3  teachers I felt ---
4  Q Or at least two or three?
5  A Two or three. But they all
6  talked and I felt very uncomfortable.
7  I was never, you know --- can you
8  imagine being nine months pregnant
9  and no one even saying how do you
10  feel, how are you today? Not one.
11  Q So you decided it was not
12  something you wanted to return to?
13  A No. And really, you know, at
14  that point, we were living in Mercer,
15  Lake Latonka. We actually after all
16  of this went on at the high school
17  made the decision to sell our home,
18  because I couldn't bring my child ---
19  my children up through the district
20  after they permitted what went on
21  with me. I could not in good faith
22  send my children to a district that
23  permitted that to happen.
24  Q And you had just said earlier
25  that you're a published author,

Multi-Page™

## Page 62

1  correct?
2  A.Yes. I have three books.
3  Q.That's very impressive. When
4  did you do that?
5  A.I started that in --- let me
6  think of the time, right about the
7  time that I started to go through all
8  of this in 1992, I believe when I
9  made the decision that I needed to
10  get out, '92, '93 was prior to ---
11  because I was finishing my first book
12  when I was a month pregnant with my
13  second child. So I decided I needed
14  to find some way to get out of
15  teaching.
16  Q.And then subsequently then you
17  published the other two books?
18  A.Two books, yes.
19  Q.What years was that?
20  A.The last book was published in
21  --- probably three years ago.
22  Q.So around 2003?
23  A.Yes. Uh-huh (yes). They're
24  art.
25  Q.The first one?

## Page 63

1  A.Was in early the '90s.
2  Q.And then the other one is
3  somewhere in between?
4  A.Yes.
5  Q.And what kinds of books are
6  these?
7  A.They are art education books.
8  They're designed for classroom
9  teachers. They combined --- two of
10  the books combined art and children's
11  literature and one book combines art
12  and advertising. And they're lessons
13  that a classroom teacher, ordinary
14  teacher can use to integrate art and
15  literature in their classroom. And
16  they're step-by-step-type books that
17  guide the reader through a process so
18  that they can end up with the
19  finished product with their students.
20  Q.Is it elementary age?
21  A.They're elementary, yes.
22  Q.Other than Mr. Destner, did
23  you have much interaction with the
24  superintendent, LaScala?
25  A.At the time he was the

## Page 64

1  assistant superintendent. The only
2  interaction I would have had
3  initially with him was he was the
4  principal at Meadville High School
5  the year I substituted before I was
6  hired full time. He was the one who
7  interviewed me and gave me the
8  position, which was kind of confusing
9  because he knew the quality teacher I
10  was.
11  But yet he, I felt, was part
12  of this --- he didn't do anything to
13  help the situation. I felt that he
14  was on Mr. Destner and Ms. Templeton
15  and Mr. Gettys' side as far as ---
16  you know, I always felt that there
17  was something --- some reason why,
18  you know, there was this group of men
19  --- it was like you hear the good old
20  boys' club, you know. I felt like I
21  couldn't win, because there was the
22  good old boys' club getting me out of
23  a position and it was confusing
24  because he knew the quality teacher I
25  was. But there was some alliance or

## Page 65

1  some connection he had with Mr.
2  Gettys and Mr. Destner that kept him
3  from doing the right thing. And the
4  right thing was to get them to stop
5  harassing me and to let me do the job
6  I was hired to do without the stress
7  and the --- it was just ---
8  Q.And somehow Ms. Templeton was
9  in this good old boys' club?
10  A.She --- yes, she was. Because
11  I think her instructions were ---
12  because we don't want to be perceived
13  as being, you know, going after this
14  woman for sexual harassment because
15  we're not. You're going to do our
16  dirty work.
17  Q.And that was just your
18  conclusion?
19  A.That is my conclusion because
20  of what I've observed.
21  Q.And meaning anything specific?
22  A.Just --- no. Nothing
23  specific, but you know, I'm a lot
24  older now and I feel that if I was
25  this age and I had gone through that

Multi-Page™

Page 66

1 that, there would have been a lawsuit
2 filed by me. And I just regret never
3 filing that lawsuit, because I think
4 then they were free to go on and do
5 what they did to me to somebody else.
6 Nothing was there to stop them except
7 a little slap on the wrist, oh, take
8 away her unsatisfactory rating.
9 But the damage — no. If
10 wasn't monetary damage because I
11 didn't lose my salary, but that's
12 something you can't put a price on
13 what they did to me. I had parents
14 who absolutely loved me. One of the
15 parents of a special-needs student
16 wrote a letter and specified to be
17 put in my file because she had a
18 special-need student who never
19 thought that she would ever see a
20 college classroom. And because she
21 took my photograph and I encouraged
22 this girl — she went on to go to
23 college with her learning disability.
24 And that's the kind of teacher I was
25 and they took that away.

Page 67

1 Q.And you have not thought about
2 going to another district?
3 A.I'm afraid to, because if they
4 call and ask for a recommendation
5 somewhere in my file I'm afraid that
6 this information will get out and
7 then I will be ruined. Somebody in
8 another district will find this out
9 and my reputation will be —.
10 Q.Well, there's nothing in your
11 file —
12 A.I don't believe that. I don't
13 believe that.
14 Q.— that would — nor are the
15 people that were there still there.
16 A.And I didn't know that since I
17 live an hour away, I didn't know that
18 all those people were gone.
19 Q.Okay.
20 ATTORNEY HEATH:
21 Thank you. I have
22 nothing further.
23 ATTORNEY NICHOLS:
24 Ms. Englebaugh, just a
25 couple more questions if I

Page 68

1 may.
2 RE-EXAMINATION
3 BY ATTORNEY NICHOLS:
4 Q.I didn't have the privilege
5 — access to the transcript of the
6 proceeding of this arbitration
7 proceeding. But I noticed back in
8 1991, several years ago — but if
9 you remember, if you don't, of
10 course, you can say, no, you don't
11 remember. I noticed here on the
12 facing page Mr. Deshner and Ms.
13 Templeton appeared for — made
14 appearances and — at the
15 arbitration proceeding. Do you
16 recall whether they testified?
17 A.I believe they did.
18 Q.If I can jog —.
19 A.Yes, they did.
20 Q.If I can jog your memory. I
21 know it's been many years ago. Do
22 you recall what Mr. Deshner testified
23 to at the proceeding?
24 A.Not specifically, I don't,
25 other than that I just remember when both

Page 69

1 of those people testified, I
2 remember, you know, thinking where
3 are they getting this from and why
4 are they doing this. You know, the
5 things they were saying that I was,
6 you know, were so untrue.
7 I just remember the feeling of
8 the day. I don't remember
9 specifically what they said, but I do
10 remember my feelings about that, that
11 — you know, because I even remember
12 writing on a tablet, you know, tried
13 to stay calm and not cry because one
14 of the things that I, you know,
15 didn't want to let him see is me
16 getting upset because of what he was
17 doing.
18 Q.Okay. All right. Is it fair
19 to say as a consequence that you've
20 described as a horrifying experience
21 under the principalship of Mr.
22 Deshner at Meadville High School,
23 that that really destroyed your
24 professional career as a teacher?
25 ATTORNEY HEATH:

Multi-Page™

Page 70

1 Objection to form.
2 BY ATTORNEY NICHOLS:
3 Q.You may answer.
4 A.Definitely. After the
5 experience that I went through with
6 the high school and then it carried
7 over into the elementary school
8 because I was told that I was being
9 watched. And then knowing that I
10 went to another building and thinking
11 that everything would be okay and
12 immediately being told that I was no
13 good and that the --- you know, the
14 principal told me what was going on.
15 No, I didn't feel that I could
16 return and be an effective teacher
17 because of the stress and the upset
18 that I was constantly feeling over
19 it. I mean, I still --- I've driven
20 to Meadville. My son comes up here
21 for baseball games or basketball game
22 and I just get sick to my stomach
23 when I pull into town.
24 Q.Did you seek medical
25 attention?

Page 71

1 A.No, I didn't.
2 Q.You didn't?
3 A.No, I did not.
4 Q.Okay.
5 ATTORNEY NICHOLS:
6 All right. I have no
7 further questions. Do you
8 have any further questions?
9 ATTORNEY HEATH:
10 Just one more
11 follow-up.
12 RE-EXAMINATION
13 BY ATTORNEY HEATH:
14 Q.You indicated that --- and I'm
15 trying to get the year straight. I'm
16 not sure I'm straight. But when you
17 were at the senior high school,
18 Meadville Senior High School, that
19 was 1990 to '91, '91-'92?
20 A.No, '89 ---
21 Q.To '90?
22 A.--- to '90, '90-'91 school
23 year.
24 Q.Okay. And during that time
25 you know Claudette deLeon?

Page 72

1 A.Yes.
2 Q.What was her last name at the
3 time?
4 A.Mahoney. I know someone
5 that's Omahaney (phonetic), and I
6 always get it --- you know, the
7 pronunciation ---.
8 Q.Did you work near her and was
9 your class near her?
10 A.No. But I believe our plan
11 period or lunch or something were at
12 a similar time, and the art room was
13 pretty much by itself. There wasn't
14 a lot in that hallway, but I do
15 recall, you know, having small chats
16 with her. She was one of the only
17 people that would talk to me.
18 Q.Would it be fair to say that
19 you never had an opportunity to
20 observe her classroom teaching?
21 A.I never had the opportunity to
22 observe her classroom, no.
23 ATTORNEY HEATH:
24 Thank you.
25 ATTORNEY NICHOLS:

Page 73

1 Okay. Thank you for
2 coming.
3 A.Thank you very much.
4 ********
5 ********
6 DEPOSITION CONCLUDED AT 11:23 A.M.
7 ********
8 ********

COMMONWEALTH OF PENNSYLVANIA )
                             )
COUNTY OF VENANGO            )

C E R T I F I C A T E

I, Jacqueline L. Hazlett, a Notary Public in

and for the Commonwealth of Pennsylvania, do

hereby certify:

That the witness whose testimony appears in

the foregoing deposition, was duly sworn by me on

said date and that the transcribed deposition of

said witness is a true record of the testimony

given by said witness;

That the proceeding is herein recorded fully

and accurately;

That I am neither attorney nor counsel for,

nor related to any of the parties to the action in

which these depositions were taken, and further

that I am not a relative of any attorney or

counsel employed by the parties hereto, or

financially interested in this action.

_Jacqueline L. Hazlett_

Jacqueline L. Hazlett, Reporter

NOTARIAL SEAL
JACQUELINE L. HAZLETT, Notary Public
Johnstown, Cambria County, PA
My Commission Expires Nov 4, 2008

SARGENT'S
COURT REPORTING
SERVICE, INC.
210 Main Street
Johnstown, PA 15901

·PITTSBURGH, PA    ·ERIE, PA    ·INDIANA, PA    ·PHILADELPHIA, PA
·CLEARFIELD, PA    ·OIL CITY, PA    ·SOMERSET, PA
·STATE COLLEGE, PA    ·HARRISBURG, PA    ·GREENSBURG, PA    ·WILKES-BARRE, PA
·HOLLIDAYSBURG, PA    ·CHARLESTON, WV

CRAWFORD CENTRAL SCHOOL DISTRICT
Meadville, Pennsylvania
PROFESSIONAL EVALUATION INSTRUMENT

Appendix A must be used in conjunction
with the Philosophy and Religious Section.

Teacher _____deLeon, Claudette_____

Subject Area __Foreign Language__ Date _4-11-03_  Grade Level __9__ - __12__  Years of Service as a full-time employee in the District ___10___

Building ____MASH____

B - Satisfactory    U - Unsatisfactory

**I. PROFESSIONAL COMPETENCY**

**A. PROFESSIONAL - PLANNING PREPARATION**

[S] ALL PROFESSIONAL STAFF SHOULD DEMONSTRATE THE ABILITY TO PREPARE, PLAN AND USE EFFECTIVELY INSTRUCTIONAL LESSONS APPROPRIATE TO THEIR TEACHING ASSIGNMENT.

The following criteria are guidelines for consideration:
Instruction indicates definite goals have been established in correlation with the curriculum.
Resourceful in selection of instructional materials.
Teacher participates in peer-group discussion of teaching techniques.
Lesson plans well purposed.

Has written plans, lesson charts, plus special schedules available (when appropriate).
The room is attractive and neat (use of bulletin boards, posters, etc.).
Teacher adjusts the physical features of the room to provide a healthful and meaningful learning environment.
Décor of room corresponds to curriculum.

**Comments:**

**B. TECHNIQUE - TEACHING EFFECTIVENESS**

[U] ALL PROFESSIONAL STAFF SHOULD DEMONSTRATE THE ABILITY TO USE APPROPRIATE TEACHING TECHNIQUE TO ENHANCE TEACHER EFFECTIVENESS.

The following criteria are guidelines for consideration:
Uses auditory and visual aids purposefully.
Makes explanations clear and concise.
Uses a variety of instructional methods.
Stimulates interest and curiosity.
Obtains positive reaction from most students.
Makes effective use of community resources.

Encourages and directs student involvement.
Attempts to motivate students in reaching levels of performance consistent with their ability.
Provides for student involvement in planning of classroom activities.
Provides alternative methods of study.
Maintains class course material up to the teaching process.
Teacher demonstrates knowledge of the subject.

**Comments:** Continued lack of classroom control contributes greatly to ongoing classroom management problems.

**C. TEACHER - STUDENT INTERACTION**

[U] ALL PROFESSIONAL STAFF SHOULD ENCOURAGE POSITIVE TEACHER - STUDENT RELATIONSHIPS.

The following criteria are guidelines for consideration:
Courtesy and tact - is polite, considerate, and respectful with students, and attempts to maintain consistent good when working with students.
Encourages positive, professional relationship with students.
Strives to develop self-discipline and a responsible behavior, respect and honesty in the student.
Understands and respects differences in abilities, interests and needs of students.

Encourages student interaction and free expression of ideas.
Encourages the development of desirable study habits and/or use of study time.
Encourages the student to do his/her best in the planning classroom activities.
Establishes an attitude of friendliness and a feeling of mutual interest between students and teacher, shows no favoritism or partiality.

**Comments:** Ms. deLeon continues to be inconsistent in her dealings with students. Classroom rules are not enforced uniformly with all students. Misconduct reports contain mis-information which initiates anger in students & parents and extra work for the administration to sort it out.

**II. PERSONAL CHARACTERISTICS AND TRAITS**

**A. RESPONSE TO SUPERVISION**

[U] ALL PROFESSIONAL STAFF SHOULD BE ABLE TO RESPOND EFFECTIVELY TO SUPERVISION.

The following criteria are guidelines for consideration:
Demonstrates ability to work with administrators to achieve educational improvement.
Observes administrative policies while reserving the right to seek change.
Responds to previous evaluations by supervisors demonstrated her unwillingness to work with administration in an effort to improve. She consistently uses the word "fight" the administration on issues of improvement. She has lately become more verbally and physically aggressive towards the building administration.

**B. ATTITUDE**

[U] ALL PROFESSIONAL STAFF SHOULD DISPLAY POSITIVE ATTITUDE TOWARD ACHIEVING EDUCATIONAL GOALS.

The following criteria are guidelines for consideration:
Displays interest, enthusiasm, flexibility and dedication as a teacher.
Is polite and considerate.

**Comments:** Ms. deLeon continues to exhibit a negative attitude towards administrative suggestions in regard to classroom management.

EXHIBIT
9a

☐ U

The following criteria are guidelines for consideration:
Maintains sound relationship and works cooperatively with students, parents and school personnel.
Carries out extra duty assignments regularly.

**Comment** Ms. deLeon has not maintained good parental contact. There have been verified violations of breach of student confidentiality, and missing work have Mis-information to parents concerning student grades and missing work is found. later been resolved when parents have had conferences and work is found.

---

☐ U

**G. MATURITY**

ALL PROFESSIONAL STAFF SHOULD DISPLAY MATURITY.

The following criteria are guidelines for consideration:
Demonstrates self-confidence and a pleasant disposition toward students, parents and co-workers, has a sense of humor.
Exhibits intelligent, mature behavior and conducts himself in a manner which exhibits professional dignity.
Demonstrates honesty and respect for others.

**Comment** Ms. deLeon s negativity towards administration has been extremely unprofessional. Parents and students who question her become the targets of negative views and comments with a resulting drop in grades.

---

☐ U

**E. DEPENDABILITY**

ALL PROFESSIONAL STAFF SHOULD BE DEPENDABLE.

The following criteria are guidelines for consideration:
Is punctual in meeting schedules, can be relied upon to take some initiative and cope with various circumstances which may arise.
Is responsible in meeting education obligations.

Solves everyday problems realistically.
Record keeping is accurate and reports are submitted promptly and neatly.

**Comment** Ms. deLeon does not deal with classroom problems in an effective manner. She denied they have occured, Provides mis-information and does not investigate situations thoroughly to determine what happened.

---

☐ F

**F. COMMUNICATION**

ALL PROFESSIONAL STAFF SHOULD DEMONSTRATE THE ABILITY TO COMMUNICATE EFFECTIVELY.

The following criteria are guidelines for consideration:
Demonstrates appropriate use of language and voice control.
Gives clear and concise instructional directions.

Has listening ability.
Has skill in asking pertinent questions.

**Comment** Ms. deLeon refuses to communicate with the administration. She refuses to accept suggestions, administrators observations, and the action plan developed to help her in the classroom.

---

☐ S

**G. PHYSICAL CHARACTERISTICS**

ALL PROFESSIONAL STAFF SHOULD GIVE ADEQUATE ATTENTION TO PERSONAL AND PHYSICAL CHARACTERISTICS.

The following criteria are guidelines for consideration:
Gives adequate attention to personal grooming and appropriate dress.

Solves everyday problems realistically.
Record keeping is accurate and reports are submitted promptly and neatly.
Is physically fit as evidenced by regular attendance, and the ability to carry a normal assignment. (This does not apply to temporary disabilities).

**Comments**

---

☐ S

**H. PROFESSIONALISM**

ALL STAFF SHOULD STRIVE FOR CONTINUED PROFESSIONAL GROWTH OPPORTUNITIES.

The following criteria are guidelines for consideration:
Strives to attend workshops, seminars, etc. to provide for professional growth.
Is an active member in professional organizations.

Demonstrates a willingness to serve in a responsible position in local, district or state educational organizations.

**Comments**

---

Teacher's Comments:

OVERALL EVALUATION:
☐ S - Satisfactory
☑ U - Unsatisfactory

I have read this report and discussed it with my evaluator.

(If using comments area is needed, please attach an additional sheet.)

_[signature] Christina deLeon will add an attachment_

Signature of Teacher

_[signature]_

Signature of Evaluator



EXHIBIT
93

# CRAWFORD CENTRAL SCHOOL DISTRICT

Instructional Support Center
11280 Mercer Pike
Meadville, Pennsylvania 16335-9504
Telephone: (814) 724-3960
FAX: (814) 333-8731
www.craw.org

Michael E. Dolecki, Superintendent

Charles E. Heller III
Assistant to Superintendent
Shawn G. Simpson
Business Manager/Board Secretary
Suzanne L. Good
Director of Elementary Curriculum
Jennifer A. Brown
Director of Secondary Curriculum
Nicholas J. Checopovich
Director of Special Services
John M. Blauer
Supervisor of Buildings & Grounds
Richard F. Fraker
Coordinator of Technology

## OFFICE OF THE SUPERINTENDENT

April 16, 2003

CERTIFIED MAIL NO. 7001 1940 0007 0045 8495

Ms. Claudette G. deLeon
11983 Eureka Road
Edinboro, PA 16412

## RE: Suspension Without Pay

Dear Ms. deLeon:

The purpose of this letter is to confirm your suspension without pay effective Monday, April 14, 2003, as communicated to you by the Assistant Superintendent with my authorization at the conclusion of the meeting held on Friday, April 11, 2003, with your Association Representative.

At that meeting, you had occasion to discuss with those in attendance issues that were a carryover from the meeting on April 10, 2003, surrounding missing student assignments, student notebooks, and your failure to properly and timely provide a student with assignments for work. The meeting was also scheduled to follow up in regard to your conduct and behavior in a meeting with the High School and Assistant High School Principal, when they were meeting with you the day before to discuss work performance issues and to follow up on the classroom observation of April 2, 2003.[1]  Please keep in mind that the meeting of April 10, 2003, needed to be discontinued due to your conduct where you became verbally and physically aggressive toward the High School Principal.

As a result of ongoing deficiencies, the Administrators met with you on April 11, 2003, to present you with an unsatisfactory evaluation for the 2002-2003 school year.

[1] Please note a meeting to discuss your observation was not held until April 10, 2003, due to your absence on Thursday, April 3, 2003, and the absence of the High School Principal on Wednesday, April 9, 2003.

In light of your continued work deficiencies, ongoing student discipline issues to include but not limited to, student interactions, student assignments, missing assignments, missing notebooks, failure to properly and timely provide a student with an assignment, failing to adhere to the provisions of your corrective action plan, failing to adhere to directives of your supervisor and your most recent interactions with the Administration on April 10, 2003, it was determined that a recommendation should be made for your dismissal from employment.

As such, the Administrative team, after discussing the issues among themselves and after consulting with me on the matter, it was determined that we would proceed with a recommendation for your dismissal from employment for the following reasons:

1. Immorality

2. Willful neglect of duties

3. Persistent negligence in the performance of duties

4. Persistent and willful violation of or failure to comply with school laws of this Commonwealth (including official directives of the District and its administrative members)

5. Incompetency

6. Unsatisfactory work performance as accompanied by two unsatisfactory ratings.

Subsequent to you being informed of the recommendation for your dismissal from employment, you were also advised that you were being suspended without pay until action is taken on this recommendation.

Please keep in mind that the decision to recommend your dismissal from employment was not taken lightly, however, I do have to reflect upon the fact that last school year you were issued an unsatisfactory rating and issued an improvement plan for the 2002-2003 school year. That improvement plan contained many recommendations for suggestions for improvement.

During the first semester of the 2002-2003 school year, you were observed and provided with additional suggestions for improvement. Despite the suggestions and recommendations for improvement, your work performance did not significantly improve and remained at a sustained level. Although we met with you to revise your improvement plan for the balance of the 2002-2003 school year, your work performance during this school year was marred with various work infractions, failure to adhere to directives by your supervisors as well as to adhere to the improvement plan. It even became necessary to suspend you without pay on two occasions for three (3) and five (5) days respectively in November 2002 and March 2003.

At the time you were issued the five (5) days suspension without pay, various deficiencies were brought to your attention. You were cautioned and issued a final warning that should you engage in any like or similar conduct it may result in a recommendation for your dismissal.

In that letter it also explained that upon your return from suspension you were to significantly improve your work performance and maintain it at a sustained and satisfactory level. Despite the caution to improve your work performance in this area, your conduct, actions and behavior have further demonstrated your inability to perform at a satisfactory level. This would also include your inability to adhere to directives of your supervisors, adhere to the requirements of your action plan as well as suggestions for improvements without becoming combative and confrontational.

Accordingly, based on the totality of your conduct, you leave me with no other alternative but to recommend your dismissal from employment. As such, I am recommending to the School Board that you be relieved of your teaching duties at Crawford Central School District.

Please be aware that I will be asking that a statement of charges be issued within the next week to 10 days outlining the reasons for my recommendation for your dismissal from employment and affording you with an opportunity for a hearing before the Board of School Directors. As outlined before, this recommendation shall encompass: immorality, willful neglect of duties, persistent negligence in the performance of duties, persistent and willful violation of or failure to comply with school laws of this Commonwealth (including official directives of the District and its administrative members), incompetency and unsatisfactory work performance as accompanied by two unsatisfactory ratings.

Please keep in mind that pursuant to the statement of charges, you will be afforded an opportunity to have a hearing before the Board of School Directors at which time you can be represented by counsel, present evidence on your behalf and cross examine witnesses.

• Please keep in mind that during the period of your suspension without pay, you are prohibited from coming onto District property without the prior authorization of the Principal or Superintendent's office.

Sincerely,

Michael E. Dolecki
Superintendent of Schools

MED/d

PC:    Charles E. Heller, III, Assistant Superintendent
       George H. Deshner, High School Principal
       John C. Higgins, Assistant High School Principal
       Carl Beard, Esquire
       Emil Spadafore, Esquire



EXHIBIT
94

# CRAWFORD CENTRAL SCHOOL DISTRICT

Instructional Support Center
11280 Mercer Pike
Meadville, Pennsylvania 16335-9504
Telephone: (814) 724-3960
FAX: (814) 333-8731
www.craw.org

Michael E. Dolecki, Superintendent

Charles E. Heller III
Assistant Superintendent
Shawn G. Sampson
Business Manager/Board Secretary
Suzanne L. Good
Director of Elementary Curriculum
Jennifer A. Brown
Director of Secondary Curriculum
Nicholas J. Chieppodudi
Director of Special Services
John M. Bauer
Supervisor of Buildings & Grounds
Richard L. Fraker
Coordinator of Technology

April 30, 2003

CERTIFIED MAIL NO. 7002 0510 0003 4972 8305

Claudette G. deLeon
11983 Eureka Road
Edinboro, PA 16412

**RE: Notice of Hearing and Statement of Charges**

Dear Ms. deLeon:

This letter is to advise you that a hearing will be held before the Crawford Central Board of School directors to determine whether you should be dismissed from your employment with the District as a professional employee. The hearing has been scheduled for Wednesday, May 14, 2003, at 7:00 P.M. in the Board Room of the Administrative Offices at the Instructional Support Center, 11280 Mercer Pike, Meadville, PA 16335-9504.

The charges brought pursuant to Section 1122 of the Public School Code of 1949, as amended, 24 PS §11-1122. You are being charged by the Administration with incompetency, unsatisfactory teaching performance, persistent negligence in the performance of duties, persistent and willful violation of or failure to comply with the school laws of the Commonwealth of Pennsylvania, including official directives of the District and its administrative members, and immorally as contemplated by Article XI of the Public School Code of 1949, as amended, arising out of your commission and/or omission of the following:

1. Unsatisfactory teaching performance/incompetency as evidenced by two consecutive unsatisfactory ratings, i.e. 2001-2002 school year and for the period covering the issuance of your second unsatisfactory rating during the second week of April 2003. In the case of the first unsatisfactory evaluation, this was presented to you on or about May 28, 2002. At the time the evaluation was presented to you, information which led to the issuance of the unsatisfactory evaluation was discussed with you. An Action Plan for improvement for the 2002-2003 school year was developed and presented to you as a result of this unsatisfactory rating.

During the 2002-2003 school year, you were issued a second consecutive unsatisfactory evaluation covering the first and portions of the second semester of the 2002-2003 school year. The unsatisfactory evaluation was presented and discussed with you on April 11, 2003, by the High School Principal, Assistant High School Principal and Assistant Superintendent in the presence of your Association representatives. During the 2002-2003 school year, you were observed several times and provided with suggestions for improvement both formally and informally through meetings, discussions, communications, observations and through a revised Action Plan. Despite various suggestions for improvement, you did not demonstrate significant and sustained improvement in work performance thereby resulting in your second unsatisfactory evaluation.

2. In addition to the issuance of two consecutive unsatisfactory evaluations for unsatisfactory teaching performance and/or incompetency, you also engaged in inappropriate conduct and failed to adhere to directives of your supervisor. As outlined previously in the suspension without pay letter dated April 16, 2003, on April 10, 2003, a meeting was held with you for the purposes of discussing issues surrounding missing student assignments, student notebooks, and your failure to properly and timely provide a student with assignments for make-up work. This meeting was also being held to follow-up relative to a classroom observation of your teaching performance on April 2, 2003. At the time these issues were being discussed with you, you became verbally and physically aggressive toward the high school principal necessitating the discontinuance of the meeting.

It should be noted that the meeting of April 10, 2003, was preceded by a meeting of April 4, 2003, wherein similar issues surrounding missing student work and maintenance of grades was discussed. During this meeting, you made inappropriate statements to the Administrators who were attempting to provide suggestions for improvement in you work performance. Several times during this meeting your Association Representative had to ask you to refrain from your comments after you were instructed by the Principal to refrain from such sarcastic and reactionary conduct. Despite this, you continued with your comments and blaming the Administration for the events occurring in your classroom as opposed to taking responsibility yourself for such actions.

In addition, at the April 11, 2003, meeting, you were informed of other infractions and/or work deficiencies that included, but are not limited, to the following:

A. Student interactions
B. Student assignments
C. Missing assignments
D. Missing notebooks
E. Failure to properly and timely provide a student with an assignment
F. Failing to adhere to the provisions of your Action Plan
G. Failing to adhere to directives of your Supervisors.
H. Providing inaccurate information regarding situations with students

It needs to be noted that although the Administration met with you during the course of the 2002-2003 school year to revise your Action Plan for the balance of the 2002-2003 school year, your work performance during the 2002-2003 school year was marred by various work infractions, failure to adhere to directives by your supervisor, as well as to adhere to the Action Plan. As was noted, it even became necessary to suspend you without pay on two occasions for three (3) and five (5) days in both November 2002 and March 2003, respectively.

On November 20, 2002, you were issued a three (3) day suspension for persistent negligence in the performance of duties, willful neglect of duties, and persistent willful violation of or failure to comply with the school laws of the Commonwealth of Pennsylvania and failure to follow official directives from the Administration. This three (3) day suspension without pay was a result of you exercising poor professional judgement in dealing with a matter within your classroom setting. In addition to interrupting the education of the entire class to make a parental contact, you openly discussed the student's behavior and grades on the phone while students were in the classroom. At that time, your were advised that your actions violated the directives of your Action Plan.

Subsequently, on March 17, 2003, you were issued a five (5) day suspension without pay for immorality, willful neglect of duties, persistent negligence in the performance of duties and persistent and willful violation of or failure to comply with the school laws of the Commonwealth of Pennsylvania (including official directives or established policies of the

**Notice of Hearing and Statement Charges**
**Claudette G. deLeon**

District or any of its administrators). At that time, you were advised that you were being suspended for: 1) failure to adequately maintain a log of student discipline and parental contacts as previously directed; 2) breach of student confidentiality to include providing student discipline and other student information to outside parties; 3) inaccurate reporting of student misconduct on student disciplinary referrals; and 4) not properly following through on student discipline issues as previously directed.

At the time you were issued the five (5) day suspension without pay, you were also cautioned and issued a final warning that should you engage in any like or similar conduct it may result in a recommendation for termination of your employment.

In that letter, it was also explained that upon your return from suspension you were to significantly improve your work performance and maintain it at a satisfactory level. Despite the caution to improve your work performance and to refrain from inappropriate conduct/actions/behavior, since the issuance of your revised Action Plan and the five (5) day suspension without pay, your work performance has remained at an unsatisfactory level.

It needs to also be noted that in past years you have also been suspended and reprimanded for other infractions regarding your conduct and behavior within the school setting. Despite clear directives and warnings being issued to you, your interactions with administration and students has not improved.

Accordingly, it is the belief of the Administration that your actions as set forth above evidence incompetency, unsatisfactory teaching performance, intemperance, willful neglect of duties, persistent negligence in the performance of duties, persistent and willful violation of or failure to comply with the school laws of the Commonwealth of Pennsylvania. Your actions are also a violation of the Educators Code of Conduct as outlined in 22 Pa. Code. 235.1, et.seq. The Administration believes through your actions over the course of the 2001-2002 school year as well as the 2002-2003 school year, you have failed to exercise the level of judgement and direction expected of a professional educator as well as the standard of work performance at the satisfactory level.

Because of the ongoing deficiencies and because you have been previously warned regarding the need to improve your performance and behavior in this regard, the Superintendent has requested a statement of charges be issued recommending that you be dismissed from your employment.

Please keep in mind that additional evidence of the above charges demonstrating unsatisfactory work performance, poor professional judgement, inappropriate conduct and statements, may be presented at the hearing to be considered by the Board of School Directors.

A hearing has been scheduled for Wednesday, May 14, 2003, at 7:00 P.M. At that hearing you will be entitled to the following rights:

1.  The right to be represented by counsel;
2.  The right to hear the witnesses and evidence against you and to cross examine said witnesses;
3.  The right to present witnesses and evidence on your own behalf and to testify on your own behalf;
4.  The right to present evidence as to whether discharge or some other lesser personnel action is appropriate under the circumstances;
5.  The right to have your choice of either a public or private hearing;
6.  All other rights guaranteed to you by the Constitution and applicable law.

Notice of Hearing and Statement Charges                                    Page 4.
Claudette G. deLeon

If you have any questions, feel free to contact or have your attorney contact Carl P. Beard, Esquire, who will be representing the Administration in the prosecution of this case. Mr. Beard's telephone number and mailing address are as follows:

Carl P. Beard, Esquire                    Phone: 814-943-7962
Andrews Wagner & Beard
3366 Lynnwood Drive                       FAX: 814-943-3430
P.O. Box 1311
Altoona, PA 16603-1311

Pursuant to the express terms of your professional employee contract and Section 1121 of the Public School Code, 24 P.S. 11-1121, your right to a hearing describe herein is conditioned upon your written request for the hearing within ten (10) days after your receipt of this notice. If you desire a hearing, your written request for a hearing must be delivered to the Board Secretary's Office located at the Administrative Offices at the Instructional Support Center, 11280 Mercer Pike, Meadville, PA 16335-9504.

**Your failure to request a hearing will constitute a waiver of your statutory and constitutional rights and you will be discharged from employment without any hearing. IF YOU CONTEST YOUR DISMISSAL, YOU MUST ASK FOR A HEARING OR YOU WILL LOOSE ALL OF YOUR RIGHTS and the hearing described above will be cancelled.**

In lieu of a School Board hearing, you would be able to pursue this dismissal action against you through grievance arbitration as outlined in the collective bargaining agreement.

CRAWFORD CENTRAL SCHOOL DISTRICT
BOARD OF SCHOOL DIRECTORS

Attest:

_____                   _____
Shawn G. Sampson, Board Secretary         Jan R. VanTuil, Board President

PC:  Michael E. Dolecki, Superintendent of Schools
     Carl P. Beard, Esquire
     Dan W. Hootman, C.C.E.A. President
     Personnel File

## Affidavit

## Roberta Binder Heath, Esquire



I, Roberta Binder Heath, do hereby solemnly attest and affirm that my review of the PHRC file for Claudette deLeon, provided pursuant to a subpoena, did not include any April 30, 2003 termination letter or directive to amend the PHRC Complaint to include termination.

Roberta Binder Heath, Esquire

Sworn to and subscribed before me

this 23rd day of June, 2006.

Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Kathryn A. Milward, Notary Public
City Of Altoona, Blair County
My Commission Expires Feb. 4, 2010
Member, Pennsylvania Association of Notaries