IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CLAUDETTE de LEON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| Vs. | ) (NO. 05-126E) |
| | ) |
| CRAWFORD CENTRAL SCHOOL DISTRICT | ) |
| CRAWFORD CENTRAL SCHOOL BOARD, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| MICHAEL E. DOLECKI, SUPERINTENDENT, | ) |
| | ) JURY TRIAL DEMANDED |
| Defendant, | ) |
| | ) |
| CHARLES E. HELLER, III, ASSISTANT | ) Judge McLaughlin |
| SUPERINTENDENT, | ) |
| | ) **Defendants' Statement of** |
| Defendant | ) **Undisputed Facts** |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) Filed on behalf of |
| | ) Defendants by: |
| | ) **ANDREWS & BEARD** |
| | ) |
| | ) Roberta Binder Heath, Esquire |
| | ) Pa.Id. No. 50798 |
| | ) rbheath@andrewsbeard.com |
| | ) 3366 Lynnwood Drive |
| | ) Altoona, PA 16602 |
| | ) 814-940-8670 |

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CLAUDETTE deLEON,                              )
                                              )
                    Plaintiff,                )
                                              )
            Vs.                               )        (NO. 05-126E)
                                              )
CRAWFORD CENTRAL SCHOOL DISTRICT,             )
CRAWFORD CENTRAL SCHOOL BOARD,                )
                                              )
                    Defendants,               )
                                              )
MICHAEL E. DOLECKI, SUPERINTENDENT,           )
                                              )
                    Defendant,                )
                                              )
CHARLES E. HELLER, III, ASSISTANT             )
SUPERINTENDENT,                               )
                                              )
                    Defendant                 )

## STATEMENT OF UNDISPUTED FACTS

1.  Plaintiff, Claudette deLeon, is an Hispanic female. (Plaintiff's Amended Complaint).

2.  Defendants include the Crawford Central School District ("the District"), the Crawford Central School Board ("the Board), and Superintendent, Michael E. Dolecki, in his personal capacity, and Assistant Superintendent, Charles E. Heller III, in his personal capacity. (*Id.*)

3.  Plaintiff commenced her employment as a Spanish teacher at the District in September 1989 at the Cochranton High School.  In or about January 1991, she was transferred to the Meadville High School where she continued her duties as a Spanish teacher.  (*Id.* at paragraph seven (7)).

4.  According to the School Code, all temporary professional employees hired on or before June 30, 1996 who completed two (2) years of satisfactory service were entitled to tenure.[1]  24 P.S. § 11-1121(b)(1).  Plaintiff was afforded tenure on that basis.

5.  At all times material hereto, Plaintiff was a member of the teacher's Union and subject to the terms and conditions of a Collective Bargaining Agreement ("CBA"), which Agreement also afforded procedural and substantive safeguards regarding employment and terms and conditions of same, as agreed upon by the parties and mandated by law. (eg. CBA for August 29 2000 - ; Ex. 97)

6.  Teachers are subject to yearly employment evaluations.  The District issued an unsatisfactory evaluation for Plaintiff for the 1993-1994 school year. (Ex. 1 – Unsatisfactory Evaluation for 1993-1994 school year *changed to "satisfactory" as per arbitration decision).

7.  Plaintiff utilized the grievance process and went to arbitration concerning the unsatisfactory rating.  The decision sustaining the grievance was based on procedural versus substantive reasons, such as concerns about hearsay evidence relative to parent complaints.  (Ex. 2 – decision of Arbitrator Stoltenberg).  Despite this decision, the District believed the unsatisfactory evaluation was merited. (Ex. 3 – deposition transcript of former Principal, George Deshner, at p. 11).

8.  The District had documented and experienced on-going issues concerning Plaintiff's tardiness, repeated problems between students and parents involving Plaintiff's unprofessional behavior, and persistent classroom management issues.  (Ex. 1; Ex. 3 – Deposition Transcript of George Deshner, former Principal, at pp. 11, 69-73; Ex. 4 – Deposition of Carol Templeton, former Assistant Principal at pp. 20-21; Ex. 5 – January 5, 1994 from Deshner to Plaintiff re: tardiness; Ex. 6 – Survey re: student; Ex. 7 – letter from Deshner to Mr. Gray re: student issues; Ex. 8 – April 21, 1994 letter

---

[1] In 1996, the General Assembly enacted the Tenure Reform Act broadening the reasons for permissible discharge of tenured employees and increasing the length of time an individual must be employed before achieving tenure to these (3) years. 24 P.S. § 11-1122

from Superintendent LaScola to Plaintiff re: ongoing classroom problems; Ex. 9 – April 22, 1994

memo from Deshner to Plaintiff re: parent conferences).  One specific reprimand leading to the

unsatisfactory evaluation was an inappropriate student survey issued by Plaintiff in her own

handwriting to her students.  Questions in the survey included the following: "34. How often did I

make PMS jokes?  What did I say?"; "35, How often do I bring my personal life into the subject?  Did

I say something irrelevant to the subject?  What did I say?"; "36. How often do I talk about my

daughter?  What did I say?"; "37. How often have I used profanity within the class?  What did I say?

Why?".  (Ex. 6).  Circumstances surrounding the dissemination of this survey and the discussion of

same were also deemed to be a breach of student confidentiality.  (Ex. 2; Ex. 13, N.T. Deardorff at

pp. 29-30).  Mr. Deshner discussed the importance of confidentiality and keeping Plaintiff's personal

life to herself at the time (*Id*).

9.    Plaintiff's own Union representative, a former Union president, Patricia Deardorff testified the survey

       questions were inappropriate.  (Ex. 13 – N.T. Patricia Deardorff at pp. 16-20).  Ms. Deardorff testified

       only because she appeared pursuant to a subpoena.  (*Id.* at p. 48)

10.   Mr. Deshner, Principal at Meadville High School from the fall of 1984 until June of 2003 and

       Plaintiff's direct supervisor, testified the 1993-1994 unsatisfactory evaluation was warranted.  (Ex. 3 –

       N.T. Deshner at pp. 11; 69-73).  Part of his concerns that year also included Mr. Deshner's

       questioning Plaintiff's credibility concerning disciplinary notes she had taken concerning another

       student, Scott Hogan.  Mr. Deshner maintained Plaintiff entered different notes into evidence at the

       arbitration from those discussed and question as to their authenticity at the parent/teacher meeting,

       which contention was deemed hearsay as the parents did not testify. (*Id*; Ex. 2).

11.   Plaintiff contends she was targeted as a member of a protected class and treated differently than

       her co-workers relative to being reprimanded for tardiness, which was part of the basis for her first

unsatisfactory evaluation  (Plaintiff Amended Complaint at paragraph 21 (b); Ex. 10, N.T. deLeon April 4, 2006 at pp. 60-72)

12.  Plaintiff does not deny she was tardy.  (Ex. 10, 11, 12 – deposition transcripts of Plaintiff).

13.  Despite her contention she was treated differently, Plaintiff admits she has no actual knowledge as to whether or not other teachers were reprimanded or disciplined for being tardy.  (Ex. 10, N.T. deLeon at pp. 64-67, 143)

14.  Patricia Deardorff testified repeated tardiness and issues with classroom management were ongoing themes with Plaintiff, which were not related to her being Hispanic.  (Ex. 13 N.T. Deardorff at p. 25).

15.   Plaintiff herself admits Defendants never said anything negative about her being Hispanic.  (Ex. 11, N.T. deLeon at p. 83).

16.  Plaintiff does not attempt to tie the tardiness issue to gender.  (Ex. 10, 11,12 – deposition transcripts of Plaintiff).

17.   The 1993-1994 evaluation pre-dated Plaintiff's medical sabbatical or her presenting any information to the District concerning her alleged mental health problems.  Thus, these issues did not relate to any perceived disability.  (Ex. 20, N.T. Dolecki at p. 18; Ex. 23 – 11-10-97 letter from Edinboro Medical Center).

18.  Part of Plaintiff's claims that her rights were violated under Title VII relate to not having union representation at a parent-teacher conference with the Hogans.  Presumably, this contention also relates to her Section 1981, 1983 and Fourteenth Amendment Claims.  (Amended Complaint at paragraph 21 (b) and Sixth Claim for Relief).

19.  Plaintiff testified she requested union representation because the meeting with the Hogans was confrontational, but was denied.  (N.T. deLeon, Ex. 12 at pp. 14-24).  Both the Administration and

the union representatives agree it is not mandated nor is it common practice to permit union representation at a parent-teacher conference. (Ex. 3, N.T. Deshner at pp. 67, 71-74; Ex. 13 N.T. Deardorff at pp. 15-16, 20; Ex. 30, meeting notes of Roznowski; Ex. 32, meeting notes of JoAnn Willison).

20. Plaintiff received an unsatisfactory evaluation for the 1995-1996 school year. (Ex. 14 – 1995-1996 unsatisfactory evaluation).

21. Plaintiff grieved the negative rating and the case went to arbitration. The Arbitrator did not overturn the evaluation on the merits, but rather on procedural grounds for a lack of anecdotal records and failure to meet the five (5) day statutory requirement for discussion. (Ex. 15 decision of Arbitrator Talarico).

22. In support of the unsatisfactory evaluation, the District reported on-going issues with student confidentiality, classroom management, student discipline issues, and poor professional judgment. (Ex. 16 – July 10, 1996 information re: unsatisfactory evaluation). Mr. Deshner testified he believed the negative evaluation was warranted on the merits. (Ex. 3, N.T. Deshner at pp. 11-13)

23. District teachers are bound by and expected to perform in accordance with a job description and the Code of Professional Conduct. (Ex. 17 - Job Description; Ex. 18 - Code of Professional Conduct; Ex. 20, deposition transcript of Superintendent, Michael Dolecki at pp. 73-77).

24. In addition, the District has adopted and utilizes a "Philosophy and Rationale in Evaluating Teachers," which states in pertinent part:

> "Continued improvement in the performance of education responsibilities in the Crawford Central School District can be achieved through evaluation with the proper use of the evaluation with the proper use of the evaluation instrument. While several objectives for such an instrument may exist, the primary object must certainly be to foster dedication and positive attitudes in order to improve instruction.
> …the overriding rational for the evaluation of professional employees is that improved instructional services to children might be

realized in the Crawford Central School District. The process through
which the evaluation instrument was developed will lend, itself toward
establishing a cooperative atmosphere conductive to improved teacher
performance."

(Ex. 19 – Philosophy and Rationale in Evaluating Teachers, at pp. 1, 7-8).

25.    The District's ultimate obligation is to the students, and the purpose of the evaluation process is to make better teachers. (*Id.* Ex. 20 – N.T. Dolecki at p. 73)

26.    The District continued to document on-going problems with Plaintiff's performance, which escalated at the outset of the 1997-1998 school year. These issues again related to classroom management and student discipline issues. Carol Templeton, Assistant Principal, documented several problems within the first two (2) months of school. For example, on September 18, 1997, Ms. Templeton issued a memorandum to Plaintiff concerning a student discipline issue. (Ex. 21 – September 18, 1997 memo re: student discipline). A further issue related to student problems was documented on October 10, 1997. (Ex. 22 – October 10, 1997)

27.    On October 3, 1997, Ms. Templeton documented a meeting she had with Plaintiff and her union representative to discuss on-going student discipline problems after four (4) students had complained as group about Plaintiff to Ms. Templeton. (Ex. 23 – October 3, 1997 memo re: meeting; Ex. 4, N.T. Templeton at pp. 25-27).

28.    At the meeting, Ms. Templeton attempted to discuss student concerns relative to inconsistent treatment and broach potential solutions, but Plaintiff was not receptive and became agitated. (Ex. 23; Ex. 4, N.T. Templeton at pp. 39, 25-35, 48). Plaintiff recalls she told her supervisor, Ms. Templeton, that she [Templeton] was being "totally unprofessional and rude" and that she [Templeton] was trying to get rid of her [Plaintiff]. (Ex. 11, N.T. deLeon at pp. 106,110).

29. Carol Templeton testified that no other teacher afforded her the same amount of attitude issues or level of recurring problems, particularly with students, as Plaintiff. (Ex. 4, N.T. Templeton at pp. 35-41, 48)  She testified deLeon refused to accept criticism to help her improve. (*Id.*)

30. Ms. Templeton recalled one incident when Plaintiff wore her bra outside her shirt for "spirit day", which Ms. Templeton found indicative of Plaintiff's poor professional judgment. (Ex. 4, N.T. Templeton at pp. 47-48).

31. Ms. Templeton indicated she had a positive experience in the District as a woman.  She further testified she had no issue with Plaintiff because she was a woman or was Hispanic as many of Templeton's relatives are Mexican. (Ex. 4 at pp. 22, 52-53).

32. Plaintiff was suspended for 3 ½ days on October 15, 1997, for unprofessional conduct.  This decision was made after the Administration determined Plaintiff had inappropriately discussed her arrest for a DUI and eluding the police with her students.  No dispute exist that she was arrested for being under the influence or eluding the police after a highway chase. (Ex. 25 – Article form paper re: DUI arrest).  Mr. Michael Dolecki, then Assistant Superintendent, made this decision after Mr. Deshner provided him with information on this issue, which Mr. Dolecki investigated and discussed with Plaintiff and her union representatives.  (Ex. 25 – Deshner memo re: discussion of DUI and Transcript of Meeting; Ex. 20 – N.T. Dolecki at pp. 54-58, 67-69).  Plaintiff does not deny she was afforded union representation as part of her due process rights for this meeting which potentially could and did result in discipline.

33. From November 1997 until September 1999, Plaintiff was on sabbatical leave.  Prior to that time, the District was unaware of any medical or mental health issues.  The reasons provided for the sabbatical request were not specific and were probably from a woman's health center. (Ex. 20, N.T. Dolecki at p. 18; Ex. 23, November 10, 1997 letter from Edinboro Medical Center).  Even the Union

believed the issues precipitating the leave were gynecological in nature. (Ex. 13, N.T. Deardorff at p. 21)

34.   At or about the time she took her sabbatical, Plaintiff testified her personal life was in upheaval. She had been married for 16 years to Mr. Mahoney, divorced in 1992; remarried to Mr. Mitchell in 1993 for 3 ½ years; then in 1996 married Mr. McCracken. (Ex. 10, N.T. deLeon at pp.11-13). She was taking medication at or about the time of the DUI arrest, including Zoloft, which made her "a wild and angry woman". She found out her husband was a "pedophile" who had posed in front of her daughter "masturbating." (Ex. 10, N.T. deLeon a pp. 84-87). She was arrested for eluding the police and driving under the influence. She denies the charges and claimed she was targeted because she was Hispanic. (*Id.* at pp. 90-95). She does, however, admit to drinking, taking medication, and only stopping after police put strips down on the road to puncture her tires. Plaintiff contends the police knew she was Hispanic by driving past her car, even though it was a dark, foggy night and her car registration was under the name McCracken. (Ex. 10, N.T. deLeon, at pp. 86-87, 90-94)[2].

35.   Plaintiff claims she suffered a "nervous breakdown" in March 1998. (Ex. 10, N.T. deLeon at p. 74). She was not even working at the District at the time, nor are there records that the District was aware of this alleged "breakdown".

36.   In September 1999, Plaintiff returned to work without restriction. (Ex. 27 - 1999 return to work letters). Plaintiff provided no evidence that she had a documented disability at this time or requested any accommodations based on any alleged disability.

37.   Plaintiff primarily relates her ADA claim to her return to work after her sabbatical when she was scheduled as a traveling teacher. (See Ex. 28 – Plaintiff's Responses and Supplemental Response

---

[2] At a later deposition, she recants her testimony concerning being targeted because she was Hispanic. (Ex. 11, N.T. Plaintiff at pp. 211-212). She admits it would not make sense under the circumstances.

to Interrogatories Response and Supplemental Responses to Interrogatories at No. 8, Amended

Complaint at Count Four paragraph 29). She further contends being a traveling teacher evidences

she was being targeted as being Hispanic. (Ex. 11, N.T. deLeon at pp. 80-81).

38. Plaintiff admits, however, the Administration never said anything directly to her about being Hispanic,

nor did she overhear any racial/ethnic comments. (Ex. 11, N.T. deLeon at p. 83; Ex. 12, N.T.

Deleon at pp. 130-132).

39. Plaintiff admits she was not the only traveling teacher, others included a white male, Doug Mehok.

(Ex. 11, N.T. deLeon at pp. 80-82). Other traveling teachers were male and female. (Ex. 29, N.T.

Roznowski at pp. 69-72). The issue of race was not explored by Plaintiff. Plaintiff presents no

evidence that the other traveling teachers were disabled or regarded as disabled. (Se Ex. 10, 11,

12, & 28).

40. Plaintiff fails to mention that she had been a traveling teacher prior to her second unsatisfactory

evaluation. (Ex. 16). At that time, she was among several other traveling teachers. (Ex. 4, N.T.

Templeton at pp. 58-645, 112). Prior to her leave, she did have a temporary classroom in a

modular unit. (Ex. 16). This was an issue of scheduling and not enough space before the

renovation of the building. (Ex. 4, N.T. Templeton at p. 58, 62-65).

41. Union representative, Carl Roznowski, represented Plaintiff at numerous meetings over the years.

Pursuant to a subpoena, he appeared for deposition and brought his notes concerning Plaintiff's

meetings with the Administration. (Ex. 30 - Roznowski meeting notes; Ex. 29, N.T. Roznowski).

42. Mr. Roznowski testified other teacher, also due to space concerns, traveled beside Plaintiff,

including Helen Carr, Shawn Brown and Denny McDonald. Pat Deardorff confirmed that other

teachers traveled. (Ex. 29, N.T. Roznowski at pp. 69-72,82; Ex. 13, N.T. Deardorff at pp. 22-23).

Both agreed being scheduled to travel was not a seniority issue.  (*Id.*).  Building principals, not the

Superintendent, assign classrooms.  (Ex. 20, N.T. Dolecki at p. 36; Ex. 4, N.T. Templeton at p. 62).

43.  Although the union/teacher is not in a position to request a room per se as it is not a grievable issue,

Mr. Roznowski attempted to assist in getting Plaintiff her own room to facilitate implementation of her

corrective Action Plan for the 2001-2002 school year, which was discussed at an August 14, 2001

meeting.  (Ex. 29, N.T. Roznowski at pp. 66-72, 81; Ex. 30, Note of August 14, 2001).  This request

for a room had nothing to do with the ADA, but rather related to helping Plaintiff facilitate more

efficient classroom management.  (Ex. 31 – N.T. JoAnn Willison, Union Representative at p. 25; Ex.

30, Roznowski's notes; Ex. 29, N.T. Roznowski a pp. 25-28).  Roznowski testified the Administration

understood Plaintiff's concerns and attempted to make changes to assist her.  (Ex. 29, N.T. p. 26).

No mention was made that a classroom was needed as an accommodation.  (*Id.*)

44.  Plaintiff testified she had complained to the Administrators about being a traveling teacher <u>only</u> in

relation to the physical extension related to pushing a cart, which had nothing to do with any alleged

mental disability or allegedly perceived mental condition.  (Ex. 11, N.T. Plaintiff at pp. 71-72, 79-80).

45.  Plaintiff also contends that she was discriminated against, both on the basis of her disability and

race/national origin, when the District gave her "lower level" classes to teach.  (Ex. 11, N.T. deLeon

at pp. 79, 80-81, 101; Ex. 28)  She does not relate this issue to gender bias as the "higher level"

classes were taught by another female. (*Id.*)

46.  Plaintiff does not dispute that her teaching certification is for teaching all grades and levels of

Spanish, K-12.  (Ex. 33 – Teaching Certification).

47.  Plaintiff admits that her conclusion regarding there being no minority teachers in the District is

inaccurate as refuted by the data provided by the District.  (Ex. 10, N.T. deLeon at pp. 99-103, Ex.

34 – Hiring Data of Minorities in District).

48. Plaintiff's primary complaint was she had to teach special education children in the lower level classes, which she found difficult and which she claimed caused her more stress. (Ex. 11, N.T. deLeon at pp. 99-102).

49. Plaintiff contends that Janine G. Maziarz will support her claims. (Ex. 49- Maziarz Affidavit). Ms. Maziarz, herself a Moroccan female, offers nothing in her affidavit to support claims of discrimination or harassment (Ex. 49).

50. For the 1999-2000 school year, Plaintiff received a satisfactory rating. (Ex. 35 – Satisfactory Rating 1999-2000 school year).

51. Given the population pool, the number of minority teachers is not disproportionate. The District also actively recruits minorities. (Ex. 48.; deposition transcript of Assistant Superintendent, Charles Heller, III, at pp. 101-102).

52. In accordance with state law and school district policy, administrators are permitted to observe teachers' performance formally and informally. (24 P.S. § 11-1122-1126; Ex. 17 & 19).

53. John Higgins was hired as Assistant Principal in April of 2000. (Ex. 36 – N.T. John Higgins at p. 13).

54. Mr. Higgins had no prior dealings with Plaintiff before observing her for the first time in May of 2000. (Ex. 36, N.T. Higgins at pp. 15-16; Ex. 37 – May 1, 2000 Classroom Observation).

55. Mr. Higgins had been directed to take an unbiased look at Plaintiff's performance. (Ex. 36, N.T. Higgins at p. 17).

56. Policy 412 of the District identifies the objectives of the District in evaluating and improving teachers' performance. (Ex. 38 – School District Policy 412, Evaluation of Professional Employees). Higgins utilized Policy 412, the District Philosophy and Rationale, and the teacher job description to evaluate Plaintiff both formally and informally. (Ex. 36, at pp. 21-23). Mr. Higgins utilized these three (3) tools

in his dealings with Plaintiff to fulfill the overall objective of improving teacher performance to provide the highest quality student education. (Ex. 36, N.T. Higgins at pp. 18-24).

57. During the 2000-2001 school year, both Mr. Higgins and Mr. Deshner observed the Plaintiff's performance and prepared documentation accordingly. These documents included the following:

     (a) January 18, 2001 – classroom observation signed by Higgins, containing a number of commendation and several recommendations to improve performance (Ex. 39 – 1-18-01, observation report).

     (b) May 25, 2001 – classroom observation and notes signed by Mr. Deshner, containing concerns. (Ex. 40, May 25, 2001, Deshner classroom observation).

58. Also, on February 2, 2001, Mr. Higgins wrote to Plaintiff because Plaintiff failed to follow protocol and left the building and went home without providing proper notice to the Administration and her leaving students alone in the classroom without proper supervision. (Ex. 36, N.T. Higgins at pp. 29-33, Ex. 41 February 2, 2001 letter from Higgins to Plaintiff.)

59. Based on the informal and formal observations and regular interactions with Plaintiff by the Administration, the District provided a satisfactory evaluation to Plaintiff for the 2000-2001 school year with a Corrective Action Plan. (Ex. 42 – Evaluation 2000-2001; Ex. 43 – Corrective Action Plan 2000-2001).

60. Mr. Higgins worked with Mr. Deshner to create the Corrective Action Plan for the purpose of assisting Plaintiff in improving her performance in the areas of classroom management, consistent student discipline, and parent/student relations. (Ex. 36, N.T. Higgins at pp. 34-35; Ex. 3, N.T. Deshner at pp. 28-31).

61. The District does not typically give Corrective Action Plans to younger or more inexperienced teachers. Thus, Plaintiff was not singled out and treated less favorably than others. In fact, Mr.

Deshner testified all three teachers given Action Plans that year were tenured, one with more experience than Plaintiff and one with less. (Ex. 3, N.T. Deshner at pp. 32-34).

62.  Mr. Higgins testified that the Action Plans he implemented involved teachers, the two (2) others being male. One was younger than Plaintiff and one teacher was older. (Ex. 36, N.T. Higgins at pp. 177-178). A former teacher placed on an action plan about which Higgins was aware was a younger male. (*Id.*)

63.  Patricia Deardorff, former Union President, testified that in her experience non-tenured teachers are <u>not</u> more likely to receive Correction Action Plans and it is about a fifty-fifty split between tenured versus non-tenured teachers. (Ex. 13, N.T. Deardorff at pp. 34-36). Thus, Plaintiff was not treated differently by virtue of her gender nor treated less favorable than similarly situated tenured teachers.

64.  Plaintiff had union representation when the Corrective Action Plan was discussed and the Union deemed it fair. Both Mr. Roznowski and Ms. Deardorff acting in their capacities as union representatives believed the Plan was warranted and within the District's managerial rights. (Ex. 29, N.T. Roznowski at p. 66.; Ex. 30 – Roznowski notes August 8, 2001; Ex. 13, N.T. Deardorff at p. 15; Ex. 36, N.T. Higgins at p. 41; Ex. 42 & 43).

65.  Deardorff testified deLeon never told her she felt she was being discriminated against or mistreated by the Administration by virtue of being in a protected class. (Ex. 13, N.T. Deardorff at p. 43). Plaintiff does not claim she voiced allegations of discrimination to the Union. (Ex. 10, 11, 12 and 28).

66.  Ms. Deardorff does recall Plaintiff's behaving inappropriately during the meeting to discuss the Corrective Action Plan. Specifically, Ms. Deardorff recalled Plaintiff had difficulty focusing, she would look at the floor and a one point turned her back on the Administration. (Ex. 13, N.T. Deardorff pp. 26-27).

67.  Plaintiff and her union representative signed off on the 2000-2001 evaluation and Correction Action Plan. (Ex. 42 & 43).

68.  However, in this lawsuit, Plaintiff claims the Corrective Action Plan is evidence of "harassment", but fails to adequately explain any rational basis for this assertion. (Ex. 11, N.T. deLeon at pp. 183-191).

69.  Plaintiff claims her Fourteenth Amendment rights were violated.  However, it is undisputed that the District permitted union representation at any meeting that may have resulted in disciplinary consequences.  Most often two (2) representatives attended meetings with her, one to keep her focused and one to take notes.  (Ex. 13, N.T. Deardorff at pp. 25-26, Ex, 30 & 32).

70.  The Corrective Action Plan was the guideline for supervising Plaintiff's performance for the 2001-2002 school year.  (Ex. 36, N.T. Higgins at pp. 36-39, 41).

71.  Mr. Higgins was pleased with his first observation of the 2001-2002 school year, as evidenced by his positive report of September 20, 2001, and he believed Plaintiff was following the directives set forth in the Corrective Action Plan.  Plaintiff signed off on the report after a conference on September 24, 2001.  (Ex. 44; Ex. 36, N.T. Higgins at pp. 40-42).

72.  Also, on September 20, 2001, Mr. Higgins provided Plaintiff with a letter and packet of information designed to help her perform her observations of other teachers as specified in the Corrective Action Plan.  (Ex. 45 – September 20, 2001 letter and packet; Ex. 36, N.T. Higgins at pp. 43-44).  This tool was designed to help Plaintiff observe other teaching methods of handling discipline and other student issues arising in the classroom.  (Ex. 43 & 45).

73.  On December 3, 2001, Mr. Higgins visited Plaintiff's classroom for a second time.  All areas of performance were satisfactory, and his report included a commendation and recommended action. (Ex. 46 – 12-3-2001 observation report; Ex. 36, N.T. Higgins at pp. 45-46).

74.   On March 7, 2002, Mr. Higgins made his third visit of the school year to Plaintiff's classroom, which observation did not generate a positive report.  Mr. Higgins documented eight (8) specific and detailed points of concern and attached those to the report.  (Ex. 47 – March 7, 2002 observation report with note; Ex. 36, N.T. Higgins at pp. 46 – 56).

75.   In the interim, Charles Heller started with the District as Assistant Superintendent on February 18, 2002.  (Ex. 48 – N.T. Charles Heller at p. 14).

76.   After the March 7, 2002 observation, Mr. Heller and Mr. Higgins met with Ms. deLeon and her union representatives on March 12, 2002 to review Mr. Higgins' observation and suggestions.  (Ex. 36, N.T. Higgins at pp. 57-60).

77.   Mr. Heller did not believe Plaintiff was paying attention to Mr. Higgins in discussing the observation and was ignoring him. Mr. Heller then asked her if she understood what was going on.  (Ex. 48, N.T. Heller at pp. 39, 42).

78.   It was at this point, about halfway through the meeting, Plaintiff became negative and distraught. Her behavior deteriorated to a point where her union representatives had to usher her out of the room.  Thus, the meeting did not conclude. (Ex. 36, N.T. Higgins at pp. 59-60; Ex. 48, N.T. Heller at p. 38-40; Ex. 13, N.T. Deardorff at pp. 31-32).

79.   Both Mr. Heller and Mr. Higgins testified they had never experienced a similar encounter with a teacher. (Ex. 36, N.T. Higgins at pp. 59-60; Ex. 48, N.T. Heller at p. 38-40).  Mr. Heller recalled no one from the Administration was speaking in a loud voice or behaving in any way that would incite such an outburst on Plaintiff's part. (Ex. 48, N.T. Heller at pp. 42-44).  Simply hearing some negative comments caused this emotional outburst. (Ex. 36, N.T. Higgins at p. 59).

80. Plaintiff admitted that at the meeting in question she started crying, stating they [the Administrators] where "harassing" her again and "retaliating against her" and stated she "could not go on". (Ex. 10, N.T. deLeon at p. 37).

81. Mr. Heller confirms that Plaintiff lost her composure and started crying, indicating she was not capable of finishing the meeting, and stated she could not "go on" teaching in a loud voice. (Ex. 48, N.T. Heller at pp. 42-43, 130-132).

82. Both Mr. Heller and Mr. Dolecki were concerned about Plaintiff's ability to return to the classroom given the level of her loss of composure at the meeting and her comments that she could "not go on". (Ex. 20, N.T. Dolecki at pp. 41-43, 52; Ex. 48, N.T. Heller at pp. 42-46). Mr. Heller described her behavior as "volatile" and was concerned about her being able to rationally handle a classroom full of students and keep her composure. (Ex. 48, N.T. Heller at pp. 43, 142).

83. Ms. Deardorff recalls Plaintiff walked out of the meeting very upset. She also recalls that it took her approximately one half hour to calm Plaintiff and try and convince her to continue speaking with the administration. (Ex. 13, N.T. Deardorff at pp. 31-32).

84. Because of Plaintiff's volatile and emotional behavior and contention that she could not "go on", Mr. Heller provided Plaintiff with an option to resign with pay. (Ex. 48, N.T. Heller at pp. 46-47, 142). (Ex. 49, March 12, 2002 letter). This meeting occurred in the presence of a union representative. (Ex. 13, N.T. Deardorff at pp. 31-32).

85. The option to resign was not a mandate. Plaintiff chose not to exercise that option. She did have her doctor, Dr. Mercatoris, fax a medical excuse requesting three (3) days as time off for mental heath reasons. (Ex. 48, N.T. Heller at pp. 46-47). (Ex. – 50). This was the first document related to an alleged health condition since Plaintiff's sabbatical leave, which commenced in November 1997 until her return to work without restrictions in September of 1999.

86.   On March 13, 2002, Plaintiff submitted a handwritten note agreeing to comply with the suggestions included in Mr. Higgins' last classroom observation, which was discussed in part at the March 12, 2002 meeting, at which Plaintiff became emotional and could not conclude the meeting. (Ex. 51 – March 13, 2002 note from deLeon to Higgins; see prior facts #75-79).

87.   In order to address its concerns, the District exercised its legal right and requested Plaintiff undergo and independent medical evaluation ("IME") ensuring her fitness to return to the classroom.  (Ex. 52 - IME letter and suspension letter).  On March 18, 2002, Superintendent Doleki prepared a letter to Plaintiff suspending her for three (3) days with pay based on Dr. Mercatoris' excuse of March 12, 2002 (received March 14, 2002), and requesting she submit to an IME for a psychiatric evaluation. Plaintiff agreed (See, Ex. 52).

88.   Plaintiff then commenced a paid leave of absence pending her medical evaluation.

89.   On April 25, 2002, provided information to Plaintiff concerning the doctor, time, date and location of the IME.  (Ex. 53 – April 25, 2002 letter from Dolecki to Plaintiff).  Dr. McFadden was to see Plaintiff on May 3, 2002[3].

90.   On May 17, 2002, Dr. McFadden released Plaintiff to return to work **without restrictions** as of her May 3, 2002 evaluation.  (Ex. 54 – May 17, 2002 release to return to work from Dr. McFadden).

91.   Prior to the IME taking place, on March 18, 2002, the District had prepared an unsatisfactory evaluation, which was discussed with Plaintiff upon her return from her paid leave.  Essentially, the reasons provided meriting the unsatisfactory evaluation related to Plaintiff's argumentative attitude and emotional outburst at administrative meetings, which thwarted any suggested improvements to her teaching performance.  (Ex. 55 – unsatisfactory evaluation March 18, 2002).  Mr. Higgins

---

[3] Although the District scheduled an earlier IME on March 26, 2002 at the Clarion Center, it did not occur. (Ex. 53, B -

testified he believed the rating was warranted, which he explained in detail at his deposition. (Ex. 36, N.T. Higgins at pp. 60-67).

92.    Plaintiff grieved the evaluation and said grievance was sustained on procedural grounds by Arbitrator Duff because he deemed Plaintiff's unprofessional behavior at administrative meetings, in particular the meeting of March 12, 2002, insufficient to support an unsatisfactory evaluation for the entire year. (Ex. 56 – Arbitrator Duff decision)

93.    Plaintiff does relate her allegations against Mr. Doleki and Mr. Heller personally to the March 2002 incidents in particular concerning the offer of the option of resigning and requesting she undergo an independent evaluation to determine her fitness to re-enter the classroom. She also contends that the Administration's requesting her students to take a Spanish proficiency test was "discriminatory" and "retaliatory." (Ex. 10, N.T. deLeon at pp. 33-37; Ex. 11, N.T. deLeon at p. 94). Plaintiff testified she makes no distinction between the personal allegations against Mr. Dolecki and Mr. Heller. She specified all of her allegations against those two (2) individuals stem from the spring of 2002 up through her termination in April 2003. (Ex. 10, N.T. deLeon at p. 42; Ex. 92)

94.    In this regard, she viewed her Corrective Action Plan for the 2002-2003 to be a manifestation of the "harassment" she encountered. (Ex. 11, N.T. deLeon at pp. 184-187); (Ex. 57 – Corrective Action Plan). She did not raise this concern with her Union and both Plaintiff and the union representative signed off on same. (Ex. 57; Ex. 29, N.T. Roznowski at p. 23; Ex. 30 – Roznowski Notes).

95.    Plaintiff changed her testimony in her third deposition, wherein she specified that Mr. Higgins and Mr. Heller "harassed" her, but **not** Mr. Dolecki. (Ex. 12, N.T. deLeon at 55). Thus, Plaintiff's precise allegations against Mr. Dolecki remain unclear.

96.  Plaintiff returned to work for the 2002-2003 school year, at which time she was subject to a
     Corrective Action Plan designed to address specific concerns relating to her teaching performance.
     (Ex. 57 – Corrective Action Plan for the 2002-2003 school year).

97.   Although many areas of concern regarding Plaintiff's performance, such as classroom
     management and implementing consistent student discipline, were revisited in the latter Plan, the
     2002-2003 Plan also highlighted specific concerns addressed in her evaluation from the prior year.
     One specific area related to the importance of Plaintiff's acting in a professional manner in
     administrative meetings so as to assist in the constructive process of ultimately improving Plaintiff's
     teaching performance.  (Ex. 57; Ex. 36, N.T. Higgins at pp. 70-77).   This directive is also included in
     District policy and the teachers' job description. (Ex. 17, 19, 38).  The Action Plan also contained
     suggestions for success and certain "tips" and strategies.  Mr. Higgins also arranged for Plaintiff to
     observe other teachers for a helpful hands-on approach.  (Ex. 57; Ex. 58, October 30, 2002 letter
     from Higgins re: teacher observations; Ex. 36, N.T. Higgins at pp. 78-81).

98.  During the 2002-2003 school year, Mr. Higgins was the point person who primarily observed and
     interacted with Plaintiff to implement the Corrective Action Plan. (Ex. 36, N.T. Higgins at pp. 78-83)

99.   On September 11, 2002, Mr. Higgins observed Plaintiff's classroom performance, and drafted a
     report and memorandum to Plaintiff dated September 13, 2002 (Ex. 59 & 60).  The report specifies,
     and Mr. Higgins confirmed, that the evaluation of that class was very positive and he was very
     pleased.  He provided commendations and one procedural recommendation concerning changing
     the form of one of the posted rules.  (Id., Ex. 36, N.T. Higgins at pp. 84-85).

100. On September 23, 2002, Mr. Higgins prepared a memorandum to Plaintiff as a reminder that it was
     important to be on time for class after he had personally observed Plaintiff's being tardy and leaving

a class unattended for several minutes. (Ex. 61 September 23, 2002 Tardiness Memo; Ex. 36, N.T. Higgins at pp. 87-88).

101.   The next day, Plaintiff responded to Mr. Higgins reminder, arguing about the veracity and validity of Mr. Higgins' own observation. Plaintiff attached a class roster to her response indicating a student left her class at 10:34 AM for the library, meaning she could not have arrived late to class at 10:35 AM as noted by Mr. Higgins (Ex. 62 – Plaintiff's Response to Higgins' Memo).

102.   Because Mr. Higgins was confident he had been correct, he double-checked the student roster information against the library information. He discovered discrepancies leading him to conclude Plaintiff was being untruthful and falsified records, which information he documented and shared with Plaintiff. (Ex. 63, October 2, 2002 memo from Higgins to Plaintiff with attachments; Ex. 36, N.T. Higgins at pp. 90-97, 210-212). He did not believe this was the first time the Plaintiff had given him inaccurate or misleading information. (Ex. 36, N.T. at p. 210).

103.   Because of his conclusion of lack of veracity on the part of the Plaintiff, Mr. Higgins heightened his scrutiny of Plaintiff. (Ex. 36, N.T. at p. 98).

104.   In the meantime, on September 30, 2002, Mr. Deshner performed a classroom observation of Plaintiff, with an attached report. Although the overall evaluation was satisfactory, Mr. Deshner offered suggestions to enhance the lesson and maintain consistency in implementing student discipline. (Ex. 64 – September 30, 2002 observation and report).

105.   Mr. Higgins testified that throughout September and October of 2002, he received multiple telephone calls from parents complaining about Plaintiff. In turn, he encountered Plaintiff continuing to ignore administrative directives concerning student situations and student discipline. (Ex. 36, N.T. Higgins at pp. 98-100). The ongoing problems are illustrated, in part, by an October 15, 2002 letter from a parent, Deborah Carmen, voicing concerns about Plaintiff's classroom management issues

with students, "lost" assignments, and Plaintiff's truthfulness.  (Ex. 65, October 15, 2002 memo from Carman re: Plaintiff).

106.    On November 13, 2002, Mrs. Carman's letter was followed by another letter from a concerned parent, Robin Stockton, regarding Plaintiff's breach of student confidentially by discussing her son's grades and behavior over the telephone with her in front of the entire class.  (Ex. 66 – Letter from Robin Stockton).

107.    The Administration investigated the matter, which investigation included a due process meeting with Plaintiff and her union representative.  The Administration concluded the incident occurred as reported and that such an inappropriate discussion of student grades and behavior in front of other students was a serious violation of law and school policy concerning confidentially.  (Ex. 31, N.T. Willison at pp. 57-62; Ex. 48, N.T. Heller at pp. 66-69).

108.    The District has a confidentiality policy, and confidentiality is often discussed with staff.  (Ex. 20, N.T. Dolecki at p. 73; Ex. 36, N.T. Higgins at pp. 102; Ex. 48, N.T. Heller at pp. 62-65).

109.    Plaintiff's union representative, Carl Roznowski, recalled the incident and testified Plaintiff would be breaching student confidentiality by discussing a student over the telephone in front of other students.  (Ex. 29, N.T. Roznowski at pp. 30-32; Ex. 30, Roznowski notes for 11-13-02 due process meeting).  JoAnn Willison, Plaintiff's other union representative, agreed and testified she is also well-aware of the importance of student confidentiality.  (Ex. 31, N.T. Willison at pp. 57-62).

110.    Plaintiff admits she called a student's mother, Robin Stockton, and discussed the student's sleeping in class, not getting his work done, and his incomplete grade in front of the entire class.  (Ex. 11, N.T. Plaintiff at pp. 153-157).

111.    Also, on November 19, 2002, Plaintiff was observed on an informal basis by Mr. Higgins, who prepared an observation report with anecdotal records, which he had discussed with Plaintiff.  The

purpose of this discussion was to assist with student discipline. (See, Ex. 67; Ex. 36, N.T. at pp. 114-119).

112.    On November 20, 2002, Plaintiff was suspended for three (3) days without pay for breaching student confidentiality, exercising poor professional judgment, and violating her Corrective Action Plan.  The District characterized these violations as being persistent negligence in performing duties, willful neglect of duties, and persistent and willful violation of or failure to comply with the law, and failure to follow administrative directives.  (Ex. 68 – November 20, 2002 letter suspending Plaintiff for three (3) days).  This letter also served as a final warning that any further violations could result in termination.  (Id. at p. 2).

113.    On December 19, 2002, Mr. Higgins performed an observation and provided a report with specific suggestions as noted on a January 3, 2003 memo.  The discussion occurred as soon as school resumed from Christmas break.  (Ex. 69 – December 19, 2002 observation; Exhibit 70 – January 3, 2003 memo from Higgins; Ex. 36, N.T. Higgins at pp. 104-113).

114.    On January 9, 2003, Mr. Heller observed Plaintiff and prepared a report on January 10, 2003 relative to multiple areas of improvement he felt were needed noting specific examples.  (Ex. 71 – January 9, 2003 observation report; Ex. 72 – January 10, 2003 memo from Heller noting reasons for improvement needed).

115.    Mr. Heller testified that, when a teacher is working pursuant to a Corrective Action Plan, he expects to see improvement between fall and winter. In Plaintiff's case, he saw a regression.  (Ex. 48, N.T. Heller at pp. 69-72).  Mr. Heller discussed his areas of concern with Plaintiff and recalled her response was very negative.  Plaintiff argued with Mr. Heller even about the issue of students leaving the room when Mr. Heller had the time documented.  (Ex. 48, N.T. Heller at pp. 73, 75-76).  He felt Plaintiff was insubordinate and questioning his credibility.  (Id. at p. 76).

116.    On February 3, 2003, Mr. Deshner prepared a memorandum to Plaintiff concerning the incident

that occurred on January 31, 2003, wherein a student was disciplined for throwing gum in Plaintiff's

hair. (Ex. 73 – February 2, 2003, Deshner memo).  This incident involved an investigation because

Plaintiff believed the wrong student was guilty of the infraction and refused to accept she was wrong

even after the guilty student confessed.  (Ex. 36, N.T. Higgins at pp. 120-122; Ex. 73; Ex. 31, N.T.

Willison at pp. 28-29).

117.    During January and February 2003, several meetings occurred regarding student discipline issues

with the Union present to represent Plaintiff's interest.  (Ex. 29, N.T. Roznowski at p. 34; Ex. 30

Roznowski notes; Ex. 36, N.T. Higgins at pp. 107-120, 128-132; Ex. 74 – student discipline

memos).

118.  Despite prior discussion about and acceptance of the Corrective Action Plan with the Union and the

Administration, Plaintiff contended the Plan "did nothing" for her.  (Ex. 3, N.T. Deshner at pp. 36-38;

Ex. 11, N.T. Plaintiff at pp. 187-192; Ex. 3,1 Mr. Willison at pp. 19-20; Ex. 32, Willison notes).

119.  As problems failed to be corrected and instead a pattern of regression in performance had

reasserted itself, the Administration felt the Action Plan should be revised.  (Ex. 25, Revised

Corrective Action Plan; N.T. Higgins at pp. 123-125; Ex. 48, N.T. Heller at pp. 78-79).

120.  Thus, the Plan was revised to assist Plaintiff more specifically.  (Ex. 3, N.T. Deshner at pp. 35-37).

The revised version was prepared in February 2003, (Ex. 36, N.T. Higgins at pp. 122-125; Ex. 75 –

Revised Correction Action Plan).  The revised Plan included directives to focus Plaintiff on the areas

of heightened concern.  These directives emphasized keeping a log of parent discussions and

keeping a daily student discipline log.  (Ex. 75; Ex. 36, N.T. Higgins at pp. 124-127).  Union

representative, JoAnn Willison, recalled the meeting to review the revised Plan.  She did not find it

unusual to request keep a discipline log.  However, she recalled Plaintiff was very angry and was told by Mr. Heller to act professionally.  (Ex. 31, N.T. Willison at pp. 35-37).

121.  As a matter of good teaching practice, Union representative JoAnn Willison keeps a discipline and parent contact log even though she was not required to do so by any Corrective Action Plan.  (Ex. 31, N.T. Willison at p. 35).  Ms. Willison also admitted Plaintiff's failure to abide by the Corrective Action Plan and keep discipline and parent call logs would be considered insubordination.  (*Id.* at p. 64, 70).

122.  In February 2003, student issues continued and the Administration concluded on several occasions that Plaintiff's assumptions and accusations were inaccurate.  (Ex. 36, N.T. Higgins at p. 127; Ex. 74 – student discipline memos).  For instance, Plaintiff provided a student with a misconduct slip for allegedly calling Plaintiff a "whore", which was supposedly corroborated by another student witness.  Both the student receiving the misconduct slip and the purported witnessed adamantly denied the comment occurred.  All other students interviewed also denied any such comment was made.  (Ex. 76 – February 11, 2003, student discipline information and Ex. 77 – February 28, 2003, Higgins memo to Plaintiff).  An additional memo was also provided.

123.  Plaintiff responded with a memorandum, wherein she disagreed with the administrative findings and accused Mr. Higgins of creating a "hostile environment".  Students were mentioned by name.  Plaintiff copied a PHRC investigator, Mr. Flipping, on the memorandum.  (Ex. 78, Plaintiff Memo; Ex. 36, N.T. Higgins at pp. 139-140).

124.  As per the Corrective Action Plan, Mr. Higgins requested a student discipline log.  On February 25, 2002, Mr. Higgins and Mr. Heller met with Plaintiff to discuss her work performance issues.  Mr. Heller recalled Plaintiff behaving in an insubordinate uncooperative manner during the meeting.  (Ex.

48, N.T. Heller at pp. 75-81). At the time, she did not have the log but claimed she had the information.

125. She submitted the log on the February 27, 2003. (Ex. 81; Ex. 36, N.T. Higgins at pp. 136-137).

126. When Plaintiff submitted the first discipline log, Mr. Higgins asked for supporting data, such as student files. Plaintiff said she kept those records at her home. (Ex. 36, N.T. Higgins at p. 137). Student files should be kept on school property to ensure confidentiality (*Id.*) She was given until Monday, March 3, 2003 to provide that information. (*Id.* at pp. 138-139).

127. Higgins received a second log on February 28, 2003. (Ex. 82 – second student log; Ex. 36, N.T. Higgins at p. 140). Mr. Higgins compared the two logs, received a day apart, and discovered 20-30 differences among the two logs and student files. (Ex. 83 – Higgins' analysis of student discipline logs and supporting data).

128. On March 4, 2003, Plaintiff submitted a memo to Mr. Deshner containing students' information and disciplinary issue on which Mr. Flipping of the PHRC was copied. (Ex. 84 – March 4, 2003, Plaintiff memo to Deshner). This memorandum contained confidential student information. (*Id.*)

129. On March 4, 2003, Mr. Dolecki, Mr. Higgins, Mr. Deshner and Mr. Heller met with Plaintiff to discuss ongoing problems with her performance, defiant attitude, repeated breaches of confidentiality, and failure to follow the directives of the Corrective Action Plan. She had two (2) Union representatives with her. (Ex. 29, N.T. Roznowski at pp. 35-40, Ex. 30, notes; Ex. 32, Willison notes). The Administrator's concerns were discussed and Plaintiff was informed she would be suspended with pay pending an investigation into the issues raised concerning breaching student confidentially and keeping inaccurate records. (Ex. 48, N.T. Heller at pp. 78-82). These issues were addressed in writing in the March 6, 2003 letter to Plaintiff from Mr. Heller concerning Plaintiff's suspension with

pay pending the outcome of the investigation. (Ex. 85 – March 6, 2003 letter to Plaintiff re: suspension with pay).

130. The Administration concluded the investigation supported the allegations of failure to keep an accurate student log and actually falsifying records, breach of student confidentiality, and failure to follow the Corrective Action Plan. (Ex. 48, N.T. Heller at p. 83). The Administration met with Plaintiff and her Union representatives on March 11, 2003, to discuss the findings and five (5) day suspension without pay. (*Id.* at pp. 83-84; Ex. 36, N.T. Higgins at pp. 145-147).

131. During the March 11, 2003 meeting, Plaintiff attempted to take a call from Mr. Flipping of the PHRC, but was discouraged by her representative. (Ex. 48, N.T. Heller at p. 85)

132. On March 18, 2003, Plaintiff was suspended for five (5) days without pay, which was communicated in writing. (Ex. 86 – March 18, 2003, letter to Plaintiff re: suspension without pay)

133. On April 2, 2003, Mr. Deshner performed a classroom observation and prepared a written report with anecdotal notes. The report was negative in various aspects. Primarily, Mr. Deshner observed Plaintiff failed to adequately explain the lesson despite a student's asking her to slow down. Mr. Deshner noted she did not remain on task and became engaged in unnecessary and distracting banter with students. (Ex. 87 – April 2, 2003, observation report).

134. On April 4, 2003, a post-observation conference was held. On-going student issues were discussed. (*Id.*) Plaintiff had Union representation. (Ex. 29, N.T. Roznowski at pp. 47-48, Ex. 30 notes; Ex. 31, 32 Willison notes). At the time of the meeting, Mr. Deshner had not yet finalized the written report, but reviewed points noted in the observation report. (Ex. 87 and 89). Mr. Deshner summarized the meeting in an April 7, 2003 memo. (Ex. 89 – April 7, 2003 memo from Deshner to Plaintiff).

135. On April 7, 2003, the District received another parent complaint, Cheryl Albaugh, concerning Plaintiff, on April 7, 2003. (Ex. 88 – April 7, 2003 letter from parent to Plaintiff; Ex. 36, N.T. Higgins at pp. 149-152). The parental issue was also addressed in Mr. Deshner's memo of April 7, 2003. (Ex. 89 – April 7, 2003 Deshner memo to Plaintiff). Mr. Albaugh complained of a "missing" notebook, a familiar theme of parental complaints concerning Plaintiff. (Ex. 88 – Albaugh letter; Ex. 36, N.T. Higgins at pp. 149-152, See also, Ex. 65, prior parental complaint).

136. Mr. Higgins prepared a memorandum on April 8, 2003 regarding on-going student issues and his significant concerns. (Ex. 90 – April 8, 2003, anecdotal record of Higgins re: Plaintiff).

137. On April 10, 2003, the Administration met with Plaintiff to discuss her last observation, which was in a sealed envelope. Plaintiff looked at the ground, refused to open the envelope. She also refused to engage in the discussion until her union representatives admonished her. (Ex. 29, N.T. Roznowski at p. 50, 30 Notes; Ex. 31, N.T. Willison at p. 40-42; Ex. 32 notes).

138. It is undisputed that the meeting of April 10, 2003 became heated and that the Union representatives had to physically grab ahold of Plaintiff and remove her from the room after she got up from her chair and moved toward Mr. Deshner. union representative JoAnn Willison refers to Plaintiff's behavior as "belligerent". Roznowski, Mr. Heller, and Mr. Deshner all testified Plaintiff got up from her chair and aggressively moved toward Deshner, resulting in the decision by the union representatives to physically escort Plaintiff from the room. (Ex. 3, N.T. Deshner at p. 54-57, 74-75; Ex. 29, N.T. Roznowski at pp. 76-81; Ex. 31; N.T. Willison at pp. 40-48; Ex. 32 notes; Ex. 48, N.T. Heller at pp. 90-93)

139. Willison and Roznowski, Plaintiff's union representatives, tried to calm her down, but the meeting did not resume. (Ex. 31, N.T. Willison at pp. 48-50).

140. On April 11, 2003, the District issued an unsatisfactory evaluation to Plaintiff based on a variety of reasons, including but not limited to her failure to follow directives and the failure to behave in a professional manner. (Ex. 92 – Unsatisfactory Evaluation for the 2002-2003 school year).

141. On April 16, 2003, Plaintiff was suspended without pay pending discharge. (Ex. 93 – April 16, 2003 letter).

142. On April 30, 2003, the District issued a statement of changes letter recommending dismissed to the Board. (Ex. 94). Changes were as follows:

> "Immorality; willful neglect of duties, persistent negligence in performing duties, persistent and willful violation of a failure to comply with laws of this Commonwealth (including official directives of the District and its administration members); incompetency; unsatisfactory work performance…" (*Id.* at p. 2)

143. The PHRC file does not contain the April 30, 2003 letter nor any draft or final Complaint regarding termination. (Ex. 95 - Roberta Binder Heath Affidavit)

144. Plaintiff was terminated. The issue went to arbitration and Arbitrator Amis upheld the termination for just cause. (Ex. 96 – Decision of Arbitrator Amis). The unsatisfactory evaluation was also upheld. (*Id.*)

145. Plaintiff believed Arbitration Amis was paid and is part of a conspiracy with the Administrators. (Ex. 11, N.T. deLeon at p. 211-212). She also believes the PHRC was involved as she was told she made "too many enemies" by an unnamed supervisor at the PHRC. (Ex. 10, N.T. deLeon at p. 109; Ex. 11, N.T. deLeon at p. 128, 135-136). She claims to be dissatisfied with the way in which "everyone" at the PHRC handled her case. (Ex. 11, N.T. Plaintiff at pp 134-136).

146. No formal Complaint was ever issued from the PHRC relative to Plaintiff's termination. (Ex. 96 – March 2003, PHRC Complaint: Suspension/Last one filed)

147. The District has unlawful harassment as well as other anti-harassment policies in place. (Ex. 98 & 99).

148. The District takes proactive steps to train administrators on its unlawful harassment and other policies. (48, N.T. Heller at pp. 99-100).

149. The deposition of Deborah Englebaugh, the Affidavit of Maziarz, and the testimony of John Stanford do not support Plaintiff's case under any of the claims. (Ex. 49, 91, & 100). These were the only witnesses Plaintiff deposed whom she believed would provide supportive evidence.

Respectfully submitted:

ANDREWS & BEARD

*/s/ Roberta Binder Heath*
Roberta Binder Heath, Esquire
Pa. I.D. No. 50798
Counsel for Defendants
CRAWFORD CENTRAL SCHOOL DISTRICT,
CRAWFORD CENTRAL SCHOOL BOARD,
MICHAEL E. DOLECKI, SUPERINTENDENT,
CHARLES E. HELLER, III, ASSISTANT
SUPERINTENDENT