## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CLAUDETTE deLEON** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | **(Civ. Dkt. 05-126 Erie)** |
| **vs.** | ) | |
| | ) | |
| | ) | |
| **CRAWFORD CENTRAL SCHOOL DISTRICT** | ) | |
| **CRAWFORD CENTRAL SCHOOL BOARD** | ) | **Honorable Sean J. McLaughlin** |
| | ) | |
| | ) | |
| **Defendants,** | ) | |
| | ) | |
| **MICHAEL E. DOLECKI, SUPERINTENDENT,** | ) | |
| **(Suable and Liable Personal Capacity)** | ) | |
| | ) | |
| **Defendant,** | ) | |
| | ) | |
| | ) | |
| **CHARLES E. HELLER, III,** | ) | |
| **ASSISTANT SUPERINTENDENT** | ) | |
| **(Suable and Liable Personal Capacity)** | ) | |
| | ) | |
| | ) | |
| **Defendant,** | ) | |
| | ) | |
| | ) | |

_____

**Plaintiff's Brief In Support of Dispositive Motions For Summary Judgment**

*Caleb L. Nichols*
**Caleb L. Nichols**
**Attorney for Plaintiff**

## MOTION FOR SUMMARY JUDGMENTS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiff, respectfully, moves the Court to grant summary judgment with respect to the following issues, or alternatively, find that there exist triable issues of fact for the jury.

## ISSUES

(1)     that the Defendants violated the American with Disabilities Act (ADA) and the Pennsylvania Human Relations Act (PHRA) when they terminated Plaintiff for Disability Discrimination in April 2003;

(2)     that the Defendants violated the American with Disabilities Act when they suspended Plaintiff for a medically excused absence on March 18, 2002 and requested her resignation;

(3)     that the Defendants unlawfully retaliated against the Plaintiff in violation of the American with Disabilities Act;

(4)     that the reasons asserted by Defendants for Plaintiff's termination are pretextural, untrue and unbelievable;

(5)     that the Defendants failed to accommodate Plaintiff's known disability;

(6)     that the DEFENDANTS CREATED and Maintained A Hostile Working Environment, to which Plaintiff was subjected;

(7)     that the Defendants unlawfully retaliated against Plaintiff because she engaged in protected activity;

(8)     that Plaintiff was treated more Harshly or Less Favorably Than her Co-Workers;

2

(9)    whether Messrs. Michael Dolecki, Superintendent and Charles Heller III, Assistant
       Superintendent are personally suable and liable under the anti-discrimination
       provisions of the Pennsylvania Human Relations Act.

I.      **THE DEFENDANTS VIOLATED THE AMERICAN WITH DISABILITIES ACT (ADA) WHEN THEY TERMINATED PLAINTIFF IN APRIL 2003**

(A)     <u>Plaintiff Is Covered By ADA</u>

Plaintiff has a long history of depression and anxiety, having had two previous hospitalizations at St. Vincent Health Center and one hospitalization at the Suicidal Crisis Center. In 1998, her condition was diagnosed as major depression, recurrent, severe, with psychotic features, and Post-Traumatic Stress Disorder. For the 1998/1999 school year, Plaintiff was on a medical sabbatical leave undergoing treatment for this medical condition. (Exhibit 1) She has been under doctor's care since at least 1997, and has been treated by varied medical professionals including Dr. Luis Torres, a psychotherapist (Exhibit 2), Dr. Richard McFadden, (Exhibit 3), Dr. Michael Mercatoris, a psychiatrist, and Dr. Gregory L. Richards, a psychiatrist (Exhibit 4) and Dr. Gretchen Bybel, who authorized that Plaintiff be medically excused from work for 33 days starting November 11, 1997 (Exhibit 5). On January 12, 1998, Plaintiff was medically excused from work for 90 days by the Superintendent of Crawford Central School District (Exhibit 6).

Based upon the collective medical documentary evidence contained in the record, it is Plaintiff's position that her mental condition qualifies as a disability under the ADA. Medical diagnoses and evaluations demonstrate that Plaintiff's condition is longstanding, and a severe psychological impairment. However, a reasonable fact-finder could determine that there is sufficient evidence to establish that Plaintiff was qualified to perform the essential functions of her job with or without reasonable accommodation (Exhibit 7), and that her firing in April 2003 by the Crawford Central School District was an adverse employment action and was the result of disability discrimination. <u>Gaul (v) Lucent Technologies, Inc.</u> 134 F. 3d 576 (3rd Cir.

4

1998).  At the time she was fired in April 2003, she was a qualified person with a disability (29 C.F.R. App. 1630.2(m)) (Exhibit 8).

The ADA defines disability to include "mental impairments" (42 U.S.C. 12102 (2) (A)) defining disability as "physical or mental impairment").  Under the regulations implementing Title I of the ADA, impairments encompass "any mental or psychological disorder, such as…emotional or mental illness." (29 C.F.R. 1630.2(h)(2)), therefore, depression and other mental illness may qualify as impairments for purposes of the ADA. (See, Pritchard (v) Southern Co. Services 92 F. 3d 1130, 1132 (11th Cir. 1996), amended on rehearing 102 F. 3d 1118 (11th Cir. 1996) (stating that depression has been held to constitute mental impairment); Duda (v) Bd. Of Education 133 F.3d 1054, 1059 (7th Cir. 1998) (recognizing manic depression as disabling under ADA; Den Hartog (v) Wasatch Academy 129 F. 3d 1076, 1081 (10th Cir. 1997) (recognizing bipolar disorder as a mental disability under ADA); Olson (v) General Electric Astrospace 966 F. Supp. 312, 316 (D.N.J. 1997) recognizing depression as a disability under ADA.  It is Plaintiff's view that this case is largely controlled by Pinson (v) Berkley Medical Resources, Inc. 2005 U.S. Dist. LEXIS 13045 (U.S.D.C. (W.D. Pa,) (June 21, 2005).

(B)     THE DEFENDANTS VIOLATED ADA WHEN THEY FIRED PLAINTIFF FOR DISABILITY DISCRIMINATION IN APRIL 2003

Under the ADA, an employer cannot discriminate against a qualified individual with a disability with regard to the advancement, discharge and other privileges of employment (42 U.S.C. 12112 (a)).  It is believed that Plaintiff was fired for impermissible reasons including race, national origin, gender, but a determinative and primary motivation was due to her known mental disability or impairment.

(C)     The Arbitration Award of January 26, 2004.

Paragraphs 23, 24, 25, 26, 27 and 28 of the Fourth Claim for Relief of Plaintiff's Amended Complaint (and by reference Paragraph (d) of the Second Claim for Relief) outlined the basis of Plaintiff's ADA Claim.

First, of the three arbitration awards referenced in Paragraph (d) of the Second Claim, the pertinent one involving the ADA was rendered by Arbitrator James Duff on January 26, 2004. In that Arbitration, the Plaintiff, as grievant, and the Crawford Central Education Association representing her, challenged the unsatisfactory rating or evaluation that she had received for the 2001-2002 school year. The Association contended on behalf of the Plaintiff that because she was required to submit to a psychological examination that requirement was unwarranted and a violation of the ADA. Conversely, the Defendant School District argued that its offer to allow the Plaintiff to resign in March 2002 was legitimately tied to her unstable emotional state and not evidence of discrimination. Arbitrator Duff determined that Plaintiff's emotional distressed behavior as of March 12, 2002 did not warrant the premature unsatisfactory rating for the entire 2001/02 school year that she was given by the School District. Arbitrator Duff therefore invalidated the unsatisfactory rating. (Exhibit 9)

The consequences of the negative or unsatisfactory rating that the School District assessed Plaintiff for the 2001/02 school year on the impermissible grounds of disability discrimination constituted an adverse employment action. Robinson (v) Shell Oil Co. 519 U.S. 337 (1997).

(D)    Suspension of Plaintiff on March 18, 2002

As alleged in Paragraph 27 of the Fourth Claim for Relief of the First Amended Complaint, the Defendant School District suspended Plaintiff on March 18, 2002 for more than two (2) months (Exhibit 10) based on a medical

excuse that Dr. Mercatoris directed to the School District Administration (Exhibit 11). Discharges, have been held to constitute adverse employment actions. Aman (v) Cont Furniture Rental Corp 85 F. 3d 1074 (3rd Cir. 1996)(discharges). Likewise, suspensions have been so held to be adverse employment actions. Hunt-Golliday (v) Metropolitan Water Reclamation District 104 F. 3d 1004 (7th Cir. 1997); (See: 544 U.S. 167 (2005); 534 U.S. 506 (2002)).

Per the letter of March 18th, Plaintiff was not only suspended, but by a directive of the Superintendent, required to undergo a psychiatric examination to be conducted by a psychiatrist selected by the School District. In conjunction, with this directive, the Superintendent requested Plaintiff's resignation, first, through Assistant Superintendent Heller who hand-carried and presented the letter of March 18th to Plaintiff, and subsequently by a written letter (Exhibit 12). By letters dated March 14th (and March 18th addressed to Assistant Superintendent Heller) from Plaintiff's treating psychologist, the School District was informed that Plaintiff was under the doctor's treatment for the recurrence of severe depression. The letters also advised the School District that Plaintiff was to take off work for three days because of her psychological condition and that it would not be advisable for her to be involved in an evaluative meeting on March 18th (at 3 p.m.). At least three of Plaintiff's professional cohorts who are white females have taken sick leave and medical sabbaticals and were not suspended (i.e. Patricia Appel, Mary Lynne Peters and Barbara Gregozewsky). In the Defendants' Responses to Plaintiff's Supplemental Interrogatories No. 11, it is stated that the School District has never requested any teacher to resign due to a psychiatric disability (Exhibit 14). Because the Defendant has sought to refute what Exhibits 10 and 12 make so papably clear, the Defendants' Response to Interrogatory Nos. 11, 12 and 13 should be discredited. Further, in the Responses to Plaintiff's Supplemental Interrogatories, the Defendants mischaracterized Plaintiff's conduct at the March 12th meeting as

unprofessional and bizarre suggesting that Plaintiff's conduct was justification for requesting her resignation and requiring her to submit to a psychiatric examination. These Responses to the Interrogatories are overwrought, untrustworthy, misleading, and not true. The deposition testimony of those who attended the March 12th meeting at no time observed the type of conduct which the Defendants ascribed to the Plaintiff.

(E)    <u>Meetings with Plaintiff on March 7th and March 12th</u>

Prior to the class observation which Assistant Principal John Higgins conducted on Plaintiff on March 7, 2002, he had rated the Plaintiff's performance satisfactory. However, the class observation which he conducted on March 7th resulted in an unsatisfactory rating. The class observations noted by Mr. Higgins related to perceived deficiencies in the Plaintiff's class organization and management routines and procedures and her alleged failure to follow the assigned Action Plan and to pursue professional development. The subsequent meeting which occurred on March 12th included Plaintiff, Mr. Higgins, Mr. Heller, and Mr. Mehak, a union representative. It is said that at the meeting of March 12th Plaintiff was vocal, negative and emotionally distraught.

I have searched the record in vain and found no instance during the March 12th meeting in which Plaintiff sought to physically accost anybody or direct profanity at anyone in attendance. A fair reading of the record indicates that she simply sought to honestly express her frustrations at the School Administration, that she believed that she was being mistreated and unfairly evaluated, and that she did what she was rightfully entitled to do, i.e., defend her dignity in the workplace (Tr., dep., Higgins, 4/25/06, pp. 59, 60).

What is troubling and questionable about Mr. Higgins' deposition testimony is that his negative rating of Plaintiff was so markedly and wildly at

variance with her previous record of performance. On direct examination, Mr. Higgins' testimony was largely misleading, in which Plaintiff's achievements and efforts were diminished and her human deficiencies were magnified. For example, on cross-examination he did acknowledged that Plaintiff did substantially complete the Assigned Action Plan, that she did prepare and maintain a student disciplinary log, and that she made a conscious effort to comply with the Action Plan (pp. 163-169). Further, Mr. Higgins displayed an astounding lack of familiarity with the ADA law, which, as a school administrator, he was charged with knowing, and only an uncertain understanding of FERPA, both federal mandates which the Administration sought to use to dismiss the Plaintiff. (pp. 172, 173, 174, 175).

It was the alleged conduct of Plaintiff that was observed at the March 7th classroom observation and the March 12th meeting that was used as the basis by the School District to suspend the Plaintiff on March 18th for more than two months for a medically excused absence in violation of ADA, and to assess her a negative evaluation on March 18th. Inexplicably, this negative evaluation was issued to Plaintiff on May 28, 2002, only after Dr. McFadden had found her mentally fit and able to return to work on May 3, 2002. (Exhibit 15).

(F)    DEFENDANTS VIOLATED THE ADA WHEN IT SUSPENDED PLAINTIFF FOR A MEDICALLY EXCUSED ABSENCE ON MARCH 18, 2002 AND REQUESTED HER RESIGNATION.

Nothing which the Plaintiff said or did during the March 12th meeting justified the Defendant in suspending the Plaintiff on March 18th for a medically excused absence. In so doing, the Defendant discriminated against Plaintiff because it did not penalize Plaintiff's professional cohorts for taking medical leave or sabbatical. Defendants' Counsel admits in the Responses to Plaintiff's Interrogatories that the School District had never requested any

teacher to resign due to a psychiatric disability.  In addition, Arbitrator Duff explicitly concluded that the School District had wrongly evaluated Plaintiff on March 18th on the basis of her known disability.  This ADA violation was compounded by requesting her resignation.

(G)    The Defendants Also Violated the ADA When It Required Plaintiff to Submit to a Psychiatric Examination on March 18th.

Neither Plaintiff's conduct during the March 12th meeting nor the Responses provided by Defendants' Counsel to Plaintiff's Supplemental Interrogatories afford a sufficient legal basis to the Defendants to have required the Plaintiff to undergo a psychiatric examination at the directive of the Superintendent issued March 18, 2002.

Under the ADA, the only medical exam that an employer may require of employees are those that are "job-related and consistent with business necessity".  (ADA  102 (c)(4)(A)).  Also, medical examinations may not be used to discriminate against an individual who remains qualified for a job (ADA 102 (c)(4)(B)(C)).  There was no evidence to suggest as of March 18th that Plaintiff was not able to work.  Indeed, Arbitrator Duff refuted this suspension.  In issuing the directive of March 18th subjecting the Plaintiff to undergo a medical examination, the Superintendent failed to act on the basis of any objective and factual evidence that Plaintiff posed a direct threat to herself or other (29 C.F.R. pt. 1630 app.}1630.2 (r) and 29 C.F.R. pt. 1630 app.  1630.10; 29 C.F.R.  1630.13, 1630.14).  Because the Superintendent did not require Plaintiff's professional cohorts to also undergo a psychiatric exam in this situation, there is at least a triable issue of fact that the Defendants impermissibly discriminated against Plaintiff in violation of the ADA.

(H)    THE DEFENDANTS UNLAWFULLY RETALIATED AGAINST THE PLAINTIFF IN VIOLATION OF ADA

The Defendant suspended the Plaintiff on March 18, 2002 because she presented the Superintendent with a medically excused absence authorizing her to take off work from 3/13/02 to 3/17/02. The Defendant also sought to penalize or retaliate against Plaintiff because she challenged an unsatisfactory evaluation that she received on March 18th as a result of a March 7th class observation and a March 12th meeting. The retaliation took the form of the School District requiring her to undergo a psychiatric examination as a result of which she was found able to return to work, without restrictions, on May 28, 2002. The medically excused absence for which Plaintiff was suspended on March 18, 2002 was protected activity under the ADA. The expression of Plaintiff's frustration with the Administration on March 12, 2002 at what she believed to be discriminatorily inspired mistreatment was constitutionally protected speech.

ADA retaliation claims are analyzed under the same <u>McDonnell Douglas</u> burden-shifting framework as ADA discrimination claims. Plaintiff makes out a prima facie case by showing: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action. <u>Shellenberger (v) Summit Bancorp, Inc.</u> 318 F. 3d 183, 187 (3rd Cir. 2003). Because Plaintiff has satisfied this three prong test, the burden is now on the Defendants to justify the suspension and the negative (unsatisfactory) evaluation which it assessed Plaintiff on March 18, 2002. Significantly, in a ADA retaliation, Plaintiff is not required to establish that she is a "qualified" individual with a disability, but rather that she engaged in protected activity under the ADA. <u>Krouse (v) Am. Sterilizer Co.</u> 126 F. 3d 494, 501 (3rd Cir. 1997). Nor is a retaliation Plaintiff required to establish the underlying discrimination in order to recover on the retaliation claim. Significantly, the Supreme Court has recently handed down a case which are pertinent to Plaintiff's retaliation claims in this case. In <u>Burlington N. & S. F. R. Co. (v)</u>

11

White 548 U.S. – (June 22, 2006) the Supreme Court ruled that the anti-retaliation provision of the 1964 Civil Rights Act, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment.  In so ruling, the Supreme Court rejected the standards applied by the Third Circuit which applied the same standard for retaliation that it applied to a substantive discrimination offense.  Robinson (v) Pittsburgh 120 F. 3d 1286 (3rd Cir. 1997). The Court is urged to review Plaintiff's retaliation claims in light of the new standard enunciated by Burlington, supra.

(I)    PENNSYLVANIA HUMAN RELATIONS ACT DISABILITY
       DISCRIMINATION

Plaintiff also asserted claims for disability discrimination under the PHRA.  In Paragraph 41 of the Seventh Claim, the PHRA's definition of "disability" is substantially the same as the definition of "disability" under the ADA.  Fehr (v) McLean Packaging Corp. 860 F. Supp. 198,200 (E.D. Pa. 1994).  Pennsylvania Courts generally interpret the PHRA in accord with its federal counterparts.  Kelly (v) Drexel Univ. 94 F. 3d 102, 105 (3rd Cir. 1996).  Therefore, in making out a case for violation of the ADA, Plaintiff also makes out a case under PHRA.

(J)    THE REASONS ASSERTED FOR PLAINTIFF'S TERMINATION ARE
       PRETEXTURAL, UNTRUE, AND UNBELIEVABLE

Plaintiff alleged in Paragraphs 26 and 28 of the Fourth Claim for Relief of the First Amended Complaint that she was terminated in April 2003 because of an ADA documented disability, i.e. severe, recurrent depression.  The Defendant's motives to terminate and remove the Plaintiff from her professional position was most visibly shown when it sought to use the Plaintiff's disability as a basis for assessing an unsatisfactory evaluation for

the school year 2001/02. Arbitrator Duff unqualifiedly determined that Plaintiff's emotional state prior to March 2002 and her emotional distress exhibited on March 12, 2002 did not justify the unsatisfactory rating for school year 2001/02 and thus invalidated the negative rating.

Failing to achieve their ultimate objective of "firing Plaintiff by the book", the Defendants continued their quest on March 18, 2002, by suspending Plaintiff for approximately 90 days for taking a medically excused absence of three (3) days and requesting her resignation on March 18th and 26th. Because Plaintiff refused to resign and since it was medically determined in May 2002 that she was able to return to work, without restrictions, the Defendants resorted to other sinister tactics to remove Plaintiff.

Commencing September 2002 and continuing through April 2003 when Plaintiff was terminated, the Defendants subjected Plaintiff to excessive micro-management, classroom observations, evaluations, and meetings. Documentary evidence indicates that the School Administration conducted seven observations of the grievant's classes, six formal and one informal, between September 9, 2002 and April 2, 2003. (Tr, Amis, Arbitration, Crawford Central Education Association and Crawford Central School District/deLeon/ pp. 47-50 (January 12, 2005). On September 9, 2002, Asst. Principal Higgins conducted a classroom observation of Plaintiff and rated her performance satisfactory. On September 20, 2002, Principal George Deshner observed Plaintiff's class and rated her performance satisfactory with commentary relative to the need for improvement in the area of control and discipline and consistency in the application of rules and procedures. On October 16, 2002, Assistant Superintendent Heller found Plaintiff's class performance satisfactory. On November 19, 2002, Assistant Principal Higgins conducted an informal observation and found one student disrespectful and another disruptive. Again, on December 19, 2002, Mr. Higgins observed in Plaintiff's class a problem with control and discipline.

13

On, January 9, 2003, Asst. Superintendent Heller noted some class disruptions and student unpreparedness. As a result of a classroom observation conducted by Principal Deshner on April 2, 2003, he noted fourteen areas of concern and Superintendent Dolecki assessed the Plaintiff an unsatisfactory rating in April 2003. In November 2002, Plaintiff was suspended for three days for allegedly violating the confidentiality of students, and, again suspended for five days in March 2003 for violating confidentiality policies when she transmitted documents to her PSEA attorney, and the Pennsylvania Human Relations Commission relative to the complaint that she had filed against the School District.

Notably, the Plaintiff's ratings of classroom observations remained consistently satisfactory, subject to some commentary indicating areas where improvement was needed. It was the suspension of five (5) days in March 2003 for allegedly violating confidentiality policies as result of transmitting documents to her legal counsel and PHRC, a protected activity, which the School District seized upon for retaliatory purposes. It was primarily because Plaintiff had sought to vindicate her civil rights in the workplace by filing a complaint with the PHRC after her March 18, 2002 suspension and consulting with the PHRC representative that Superintendent Dolecki charged her with, among other things, immorality, and assessed her an unsatisfactory evaluation on pretextural basis on April 11, 2003, and set the stage for her recommended termination on April 16, 2003. There is a material issue of fact whether the School District engaged in retaliation when it gave Plaintiff an unsatisfactory evaluation, initiated and recommended that she be terminated for engaging in protected activity involving the release of documents to her attorney and PHRC. Hochstadt (v) Worcester Found. For Exp. Biology 545 F. 2d 222 (1st. Cir. 1976); Dempckey Monsanto Co., supra. The point is that retaliation was the motivating force why the School District Superintendent, negatively evaluated Plaintiff.

The charge of immorality upon which Plaintiff was unsatisfactorily evaluated in April 2003 and subsequently fired was invalidated by Arbitrator Amis, finding no dishonesty, deceit or guile on the part of Plaintiff in releasing documents, in her defense, to the PHRC. The charges that Plaintiff was persistently negligent are not true because her performance track record as a teacher belies that assertion. On cross-examination, Assistant Principal Higgins acknowledged that Plaintiff made a conscious effort to comply with the Action Plan. The assertion that Plaintiff was incompetent is wholly discredited by the fact that her performance ratings as a teacher since 1989 were consistently satisfactory, that she was granted tenure in 1993, and that she won three (3) of four arbitration Complaints that she filed.

Regarding ADA retaliation, the Defendants clearly engaged in ADA retaliation when it wrongly and discriminatorily evaluated her on March 18th, and suspended her that same date for a medically excused absence, and terminated her in April 2003. What possible legitimate, non-retaliatory reason would justify these adverse employment actions taken against the Plaintiff? It is Plaintiff's position that a retaliatory animus played a determinative role in each adverse action taken against her. Krause (v) American Sterilizer Co. 126 F. 3d 494 (3rd Cir. 1997). Plaintiff can make out a prima facie case on the grounds of ADA retaliation: (1) the Plaintiff engaged in protected activity at all relevant times, (2) adverse action was taken against Plaintiff; (3) and there is a causal connection between the protected activity and subsequent suspension and termination (Sheridan (v) E.I. Dupont 100 F3d 1061, 1067-68 (3rd Cir. 1996), Woodson (v) Scott Paper Co. 109 F. 3d 913, 920 (3rd Cir. 1997). Arguably, under the new Burlington standard, a trier of fact may consider negative evaluations as sufficient adverse employment action to make a prima facie case to support a finding of retaliation.

In this case, the truth is that the Defendants have sought to misuse ADA, and FERPA, as pretexts to remove Plaintiff from her position. The

15

Defendants cannot articulate a legitimate, nondiscriminatory reason why it suspended, negatively evaluated the Plaintiff for engaging in protected activity, nor can it show justification for sanctioning Plaintiff for releasing documents to the PHRA or disclosing to a parent by phone that his child was sleeping in class which was patently obvious to all his classmates.

The plaintiff takes the position that the Defendants have engaged in pretext because she was suspended, and terminated not for the reasons stated by the School District in April 2003 recommending her firing but, rather, discrimination, and retaliation were the real reasons. There is sufficient evidence in the record for a trier of fact to disbelieve the School District and to conclude that racial, national origin, gender and disability discrimination more likely than not motivated the actions taken against Plaintiff.  (Jones (v) School District of Philadelphia 198 F. 3d 403 (3rd Cir. 1999).

The statement of charges dated April 30, 2003 lodged against Plaintiff by the Board of Directors of the School District charged Plaintiff with incompetency, unsatisfactory teaching performance, persistent negligence in the performance of duties, persistent and willful violation of Pennsylvania school laws and immorality.  The charge of unsatisfactory teaching performance/incompetency is untenable because it runs counter to Plaintiff's twelve years of previous successful teaching performance, her attainment of tenure in 1993, and deposition testimony proffered by Plaintiff, colleagues, students, and the evaluations of the School Administration and School District (Exhibit 16).  Further, the negative evaluation assessed against Plaintiff on March 18, 2002 was invalidated by Arbitrator Duff January 26, 2004.  This determination very much discredits the pretext that the School District acted on the basis of two consecutive unsatisfactory ratings to fire Plaintiff. Additionally, the immorality charge was set aside or determined that there was insufficient evidence to establish it by Arbitrator Amis on January 12, 2005.

Deposition testimony of Plaintiff and others discredits the ancillary charges that Plaintiff was persistently negligent and willfully violated school policies.

(K)    THEORY OF "REGARDED AS"

From at least March 2002 until Plaintiff was terminated April 2003, Defendant held a misperception regarding Plaintiff's disability.  Because the School District suspended and subjected Plaintiff to undergo a psychiatric exam in March 18, 2002 for an ADA condition, but without a job-related or business necessity justification, there is plausible grounds to conclude that the Defendant sought to unjustifiably stigmatize Plaintiff.  Certainly, after Plaintiff was found by the doctor as being able to return to work, without restrictions, there was no basis to further used a pretext to remove her from her teaching position and demand her termination in April 2003.  (See Taylor (v) Pathmark Stores, Inc. 177 F. 3d 180, 190, (3rd Cir. 1999)).

The Third Circuit has concluded that requesting an independent medical examination, (IME) when combined with other evidence could satisfy a "regarded as" disabled claim.  Tice (v) Centre Area Transportation Authority 247 F. 3d 506 (3rd Cir. 2001).  In the case at hand, Plaintiff was not only required to submit to an IME, but suspended for 90 days in March 2002, given an unsatisfactory evaluation on May 28, 2002, suspended for three days, without pay, in November 2002, suspended for five days, without pay, in March 2003, given an unsatisfactory evaluation in April 2003, and terminated April 2003.  Believing that these adverse employment actions were taken because of Plaintiff's ADA condition, it is Plaintiff's view that her ADA claim as outlined in Paragraph 26 of the First Amended Complaint is actionable and sustainable.

(L)    BEING A QUALIFIED PERSON WITH A DISABILITY, THE
       DEFENDANTS FAILED TO REASONABLY ACCOMMODATE
       PLAINTIFF'S KNOWN DISABILITY.

At least since 1998, the School District has known of the Plaintiff's
documented ADA disability. (Exhibits 1, 5, 6)  Paragraph 29 of the Fourth
Claim for Relief manifests the lack of reasonable accommodation with which
the Defendants are charged.  More significantly, the Plaintiff was suspended,
without pay, for three days in November, 2002, for 10 days (five days without
pay) in March 2003 and for more than two months with pay in March 2002,
and without pay effective April 14, 2003.  Suspensions have been held to be
actionable (Hunt-Golliday (v) Metropolitan Water Reclamation District 104 F.
3d 1004 (7th Cir. 1997).  Under Third Circuit precedent, suspensions without
pay involve economic deprivation and are therefore actionable as an adverse
employment action.  Suspensions, without pay, affected the Plaintiff's
employment relationship and employment opportunities as a tangible
detriment.  Nelson (v) Upsala College 51 F. 3d 383, 387 (3rd Cir. 1995).
Durham Life Insurance Co. (v) Evans 166 F. 3d 139 (3rd Cir. 1999); Dilenno
(v) Goodwill Industries of Mid-Eastern Pennsylvania 62 F.3d 235 (3rd Cir.
1998).

Further, the ADA coverage of Plaintiff extended to all aspects of the
employment relationship including discharge or termination.  The provisions
of 42 U.S.C.  12112 (b)(5)(A) state that an employer must make reasonable
accommodations "to the known physical or mental limitations of an otherwise
qualified individual with a disability".  Dr. Byron E. Hillin, Ph.D., a clinical
psychologist, who evaluated Plaintiff for a disability determination concluded
in March 2005 that her documented disabilities are directly related to her
stress in the workplace (Exhibit 17, p. 6).  It is believed that the stress of the
workplace caused the Plaintiff's nervous breakdown in 1998/99 school year.

Paragraph 23 of the First Amended Complaint alleged that the Defendants violated ADA when they fired her from her teaching position in April 2003. It is important that when the Plaintiff was suspended on different occasions, with and without pay, and when she was fired the School District completely disregarded its statutory obligations which it owed the Plaintiff. When she was suspended on March 18, 2002 purportedly for vocalizing her frustration during the March 12th meeting, the School Administration made no effort to consult her psychologist who informed them of Plaintiff's condition just prior to the suspension. (Exhibit 4). On cross-examination, Assistant Principal Higgins did not know whether the staff of the School District received training in the ADA. Plaintiff testified upon deposition taken April 4, 2006 that she requested Principal Deshner to restore to her the opportunity to teach again higher Spanish classes and her classroom as a reasonable accommodation to reduce the stress level. The request was denied (pp. 101, 102). When Plaintiff received an unsatisfactory evaluation on March 18th, there was no regard shown by the School District for the Plaintiff's mental condition. In invalidating and setting aside the negative evaluation, Arbitrator Duff was emphatic that the School District was wrong in using the Plaintiff's mental condition as basis for giving her a negative evaluation on March 18, 2002. Moreover, when she was again suspended in March 2003, and in April 2003, and then fired April 2003, the School District showed no efforts to accommodate Plaintiff's condition. On the contrary, the School Administration sought to exacerbate her condition, subjecting her to seven (7) evaluations within eight (8) months under the closest scrutiny and observation by at least four or five administrators. With this regimen, Plaintiff was subjected to an Action Plan which required that she meet a standard of performance far more stringent and exacting than that imposed on her professional cohorts. In firing the Plaintiff, the School District, not only severely diminished Plaintiff's professional career and prospects, but more immediately put her condition at risk because she no longer had the resources to meet her medical needs, all benefits were stopped. The point is that in

firing the Plaintiff in the manner that the School District did, it violated and evaded its ADA statutory responsibilities owed to Plaintiff. When Plaintiff returned from medical sabbatical leave in 1999/2000 school year, Plaintiff was relegated to a position inferior to the teaching position that she held before taking the sabbatical. Under the ADA, upon returning from leave, Plaintiff was entitled to the same position that she held prior to leave. (42 U.S.C. 12111(9)(B)). At least one authoritative source has opined that the ADA imposes, as a matter of law, the duty to reasonably accommodate and that a claim for failure to reasonably accommodate arises as a matter of law. Such claim does not turn on whether the employer discriminated against Plaintiff. Accordingly, the intent of the employer is not relevant and no burden shifting analysis is necessary. (Oncidi, Employment Discrimination Deposition, Juris Publishing (2005)(p. 281). Thus, on this authority, the Defendants violated Plaintiff's ADA rights, as a matter of law.

II.    **THE DEFENDANTS SCHOOL DISTRICT AND BOARD ACTING THROUGH THEIR AGENTS AND EMPLOYEES CREATED AND MAINTAINED A HOSTILE WORKING ENVIRONMENT.**

The Third Claim for Relief of the First Amended Complaint outlined the factual circumstance that contributed to the hostile work environment in which Plaintiff worked. In order to establish a claim for employment discrimination due to an intimidating or offensive work environment, "a Plaintiff must establish by the "totality of the circumstances", the existence of a hostile or abusive environment which is severe enough to affect the psychological stability of a minority employee" Meritore Savings Bank (v) Vinson 477 U.S. 57 (1986); Andrews (v) City of Philadelphia 895 F. 2d 1469, 1482 (3d Cir. 1990) (quoting Vance (v) Southern Bell Tel. And Tel. Co. 863 F. 2d 1503, 1510 (11th Cir. 1989). Specifically, a Plaintiff must show: (1) that she suffered intentional discrimination because of her sex; (2) that the discrimination was pervasive and regular; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person of

the same sex in the same position; and (5) the existence of respondeat superior liability (see: _Aman (v) Cort Furniture Rental Corp._ 85 F. 3d 1074, 1081 (3rd Cir. 1996) (describing the requirements for racial harassment); Kunin (v) Sears Roebuck and Co. 175 F. 3d 289, 293 (3rd Cir. 1999) (describing the requirements for sexual harassment).  In the subject case, these five constituents converged to establish a sexually hostile work environment claim under Title VII.  Further, in applying Andrews, supra, to determine whether Defendants are liable for a sexually hostile environment, agency principles impose liability where the Defendant knew or should have known of the harassment and failed to take prompt and remedial action. Because the School District Administration including Superintendent Dolecki and Assist. Superintendent Heller knew or should have known and did nothing, the School District is liable, virtually as a matter of strict liability. (Ellerth 524 U.S. 72 (1998); Faragher 524 U.S. 775 (1998).

It is asserted that a combination of Plaintiff's race, gender, national origin and documented disability engendered the hostile work environment.  Dr. Hillin observed a direct correlation between Plaintiff's disabilities and the stress to which she was exposed in the workplace.  By deposition and affidavit provided the PHRC, Plaintiff has testified that she was abused, mistreated, ridiculed and discriminated against because of her gender, race and national origin.  It is documented that the Plaintiff has incurred several disciplinary actions during her tenure with the School District.  For example, on April 1994, she received a letter of reprimand, on October 15, 1997, she was suspended for 3 ½ days, and received a series of written reprimands in October 1997, on March 18, 2002, suspended for more than two months, on November 20, 2002, she was suspended for three days, without pay, on March 2003, suspended five days without pay, on April 16, suspended without pay, and fired April 30, 2003.

Regarding the allegation contained in Paragraph 22 (a) of the Third Claim For Relief, alleging that Plaintiff was subjected to a double standard in regards to her performance, Plaintiff will offer at trial three Arbitration Awards, rendered by Messrs. Carl Stoltenberg, Ronald Talarico, and James Duff, which invalidated

unsatisfactory ratings assessed the Plaintiff for school years 1993/94, 1995/96, and 2001/02, respectively. In general, arbitration awards are admissible as evidence and accorded such weight as a Court deems appropriate. Alexander (v) Gardner-Denver Co. 415 U.S. 36, 60 (1973) (see footnote 21).

**III.    DEPOSITIONS OF CLAUDETTE deLeon**

(A)    DEPOSITION OF PLAINTIFF ON MARCH 6, 2006

According to Plaintiff's testimony, she was compelled by Superintendent Dolecki on March 18, 2002 to undergo a psychiatric examination. (pp. 38, 39)

Plaintiff testified that when she returned from her medical sabbatical leave after having had a nervous breakdown March 1998, Defendants subjected her to even greater stress (p. 131) including the effort to decertify her (p. 55) and returned her to an inferior position including the loss of her classroom (p. 142). Plaintiff further testified that the hostile work environment commenced as early as 1994 when she filed to arbitrate her first unsatisfactory rating (p. 68), and that Assistant Principal Templeton scolded her for giving students detentions (p. 87). Plaintiff testified that Principal George Deshner constantly harassed and abused her, screamed and yelled at her with threats of firing her (p. 98) and accused her of insubordination. Plaintiff was hospitalized at St. Vincent's on two occasions in 1998 and a suicidal crisis center in 1998, first for eleven (11) days, and then for a week, and another week at the crisis center (p. 117). Exhibit 18 is offered to corroborate Plaintiff deposition testimony

(B)    DEPOSITION OF PLAINTIFF ON APRIL 4, 2006

Because the School Administration took away the Plaintiff's classroom and that she was reduced to a "traveling teacher" having to travel to and from different classes as stated in paragraph 22(d) of the Third Claim for Relief, (pp. 71, 72, 73) her

situation as a traveling teacher caused her to unfairly receive many tardies (p. 73).
Her classroom and Spanish classes were unfairly taken from her and given to her
white co-worker in violation of seniority rights and the ADA mandate (pp. 77-82).

Plaintiff further testified upon deposition that the stress in the workplace
exacerbated her condition which caused her a nervous breakdown and horrible
nightmares (pp. 84-86). Plaintiff did not have psychological problems before she
assumed her teaching position with the School District (pp. 87-88). Her
psychological problems really began in 1995 as a consequence of the first grievance
(pp. 90-91). Plaintiff also testified that she was discriminated against and terminated
because she was regarded as being disabled. (pp. 94, 97, 98, 99) Plaintiff further
testified that a major part of the cause of the hostile work environment resulted from
the lack of support from the School Administration noted in paragraph 22(b) and (c)
of the Third Claim for Relief. (pp. 100-103, 105-106, 109) The School District
replaced Plaintiff with a younger white male (p. 115). Plaintiff believed Principal
Deshner was a homosexual, that he hated women and that Mrs. Englebaugh, as she
had been harassed by Principal Deshner (pp. 115-116). Plaintiff also testified that a
white teacher who served as her substitute teacher was never criticized for
disciplining the same students whom she was criticized for disciplining by Assistant
Principal Higgins (pp. 145, 146). As for the Action Plan that Plaintiff was required to
follow, she testified on April 4, 2006 that she fully complied with the requirements of
the Action and Revised Action Plan (pp. 191-195) and that she maintained a daily log
of all student disciplinary actions (p. 145).

(C)    PLAINTIFF'S DEPOSITION TAKEN APRIL 24, 2006

On April 24, 2006, Plaintiff testified that Janine Maziarz, a professional
cohort, with whom she had taught for approximately fifteen years, provided
an Affidavit, which attest to the abuse and harassment endured by Plaintiff in
the workplace (pp. 8, 9) (Exhibit 18).

Further, Plaintiff was verbally abused by the parents of a student at a parent-teacher conference at which Principal Deshner also publicly screamed at her in the presence of others (Exhibit 19). It was on this occasion that Plaintiff was denied union representation by Principal Deshner (pp. 23, 24).

Four arbitration awards of which Plaintiff was a grievant were identified and entered into the record (pp. 38-42) (pp. 46-58). Plaintiff further testified that because she won her arbitration grievance for the unsatisfactory evaluation given in 1993/94 school year, the School District retaliated by giving her a second unsatisfactory evaluation for 1995/96 school year, which was also overturned by Arbitrator Talarico (p. 41).

(D)    DEPOSITION OF DEBORAH ENGLEBAUGH TAKEN ON APRIL 24, 2006

Mrs. Deborah Englebaugh who formerly taught at Meadville High School, commencing 1989, testified that she taught two years under Principal Deshner. Mrs. Englebaugh testified that her two years teaching under Mr. Deshner was a most horrifying experience (p. 12), stating that Mr. Deshner preferred to hire Mr. Getty, a male applicant than she (p. 17), that he treated her rudely in the presence of others, and screamed at her in the presence of students (pp. 18, 29), that he favored the male employee over her that he disliked her because of her gender, and that she was always being watched by the School Administration (pp. 20-21). Mrs. Englebaugh further testified that she concluded the first year with an unsatisfactory rating, an evaluation that was starkly different from her ratings at Cochranton Elementary. She grieved the negative rating and her grievance was sustained by the Arbitrator and the unsatisfactory rating assessed by Principal Deshner was overturned (p. 24). After two years in the position at Meadville Area High School, the School District (with Mr. Deshner involved) removed her from her teaching position and replaced her with Mr. Getty, a white male (p. 25). She further testified

24

that her teaching career was derailed and that the School Administration
sought to demote and punish her (pp. 27) and attributed her unfair treatment to
her gender (pp. 28, 40). She detailed how she was professionally damaged
even after she had left Meadville High School, largely due to the influence of
Principal Deshner (pp. 29-33) whom she believed targeted her because of her
gender (p. 46). She testified that Assistant Principal Templeton was rude and
disrespectful and spied on her (p. 52), and used by Mr. Deshner to harass her.
She knew the Plaintiff when they taught at Meadville High and talked from
time to time (p. 72).

## IV.    PRIMA FACIE CASE FOR HOSTILE WORK ENVIRONMENT

Plaintiff has made out a prima facie case regarding the Claim for Hostile Work
Environment because she can demonstrate:

(1) that she is a member of a protected class; (2) that she was qualified for
her position; (3) despite her qualifications, she was suspended and fired;
and (4) that non-members of her protected class were treated more
favorably. McDonnell Douglass 411 U.S. 792 (1973); Pivirotto (v)
Innovative Systems, Inc. 191 F. 3d 344, 352-356 (3rd 1999); (In this
case, Plaintiff was replaced by a younger white male teacher, as well as
in the case of Mrs. Englebaugh, an act inferring sexual discrimination
(Fuentes 32 F. 3d 759, 764 (3rd Cir. 1994). Moreover, Plaintiff can show
that she satisfied the requisite criteria of Andrews (v) City of
Philadelphia, supra, in particular, with respect to gender discrimination
in the workplace that was sufficiently pervasive and regular, which
detrimentally affected Plaintiff has been documented by her medical
records. Significantly, harassment which creates a hostile work
environment does not necessarily need to be sexual in nature. Title VII
will also punish harassment in cases where the acts would not have
occurred "but for" the gender of the complainant. The Third Circuit has

held that "intimidation and hostility toward women because they are women can obviously result from conduct other than explicit sexual advances". <u>Calloway (v) E.L. Dupont de Nemoues & Co.</u> 2000 WL 1251909 (E.D. Pa. 2000), <u>affd,</u> 29 Fed Appx. 100 (3rd Cir. 2002). Plaintiff must show that gender is a substantial factor in the discrimination. The complainant need not allege overt sexual harassment in order to establish a hostile work environment claim under Title VII.

## III.    THE DEFENDANTS UNLAWFULLY RETALIATED AGAINST PLAINTIFF BECAUSE SHE ENGAGED IN PROTECTED ACTIVITY

(A)    The Plaintiff's Second Claim For Relief alleges several retaliatory events which the Defendants took against the Plaintiff.

(B)

Plaintiff filed her first Complaint with PHRC in 1994 for having received her first negative performance evaluation in June 1994. She filed a Second Complaint with the Commission in March 1996 and received a second negative evaluation in June 1996. Then she received a series of written reprimands on October 1, 3, 7, and 10, 1997, as well as being suspended in October 1997.

In the school year 2001/02, Plaintiff was assessed another unsatisfactory evaluation. In November 2002, Plaintiff was suspended for three days without pay, and suspended without pay, again in April 2003 and fired or terminated in April 2003. There is a temporal relationship between the Complaints which Plaintiff filed with the PHRC, and the unsatisfactory ratings that she received and her success in having the Arbitrators invalidate three of four of the unsatisfactory ratings that she received. In choosing to exercise her rights, the Defendant engaged in retaliatory conduct against Plaintiff.

(C)     Section 704 of Title VII prohibits an employer from retaliating against an employee for engaging in protected activity (42 U.S. (2000-3(a)). To establish a prima facie claim of retaliation, Plaintiff must show that: (1) she engaged in protected activity, (2) that the Defendant took an adverse employment action against her, and (3) that there is a causal connection between the protected activity and the adverse employment action. (Woodson (v) Scott Paper Co. 109 3d 913, 920 (3rd Cir. 1997). Further, the McDonnell Douglas burden shifting approach also applies to retaliation claims. See: Wrenn (v) Gould 808 F. 2d 493, 500 (6th Cir. 1977); Corley (v) Jackson Police Dept., 566 F.2d 994, 999 (5th Cir. 1978); Novotoy (v) Great American Fed Savings & Loan Association 539 F. Supp. 437, 449 (W.D. Pa. 1982); Weston (v) Pennsylvania251 F. 3d 420, 430 (3rd Cir. 2001); Farrell (v) Planters Lifesavers Co. 206 F. 3d 271, 279 (3rd Cir. 200); Kachmar (v) Sungard Pasta Systems, Inc. 109 F. 3d 173, 177 (3d Cir. 1997); Robinson (v) City of Pittsburgh 120 F. 3d 1286, 1299 (3rd Cir. 1997). Importantly, an employee may have a meritorious retaliation claims, even though the underlying discrimination or harassment claim is determined to have no merit. The actions which the Plaintiff initiated to vindicate her federal and state rights including the filings of Complaints with the PHRC and the claims for arbitration involved protected activity, including the medically excused absence per the ADA. The Third Circuit has ruled that temporal proximity between protected activity and the termination of an employee is sufficient to establish, a causal link. Woodson, supra. The most salient characteristic of the retaliatory tactics and methods employed by the Defendants in the subject case were those involving short duration between the protected activity and the retaliation. This pattern was consistent from 1993/94 school year up to the event of termination in April 2003. The tactics including suspensions, written reprimands, unsatisfactory evaluations, and other forms of indignities in the workplace varied, but the ultimate objective of firing and removing Plaintiff for pretextural reasons remained consistent and unabated. The pretext offered

by Defendants for the termination of Plaintiff involves alleged violations of confidentiality policies, persistent negligence, incompetence and immorality, but, in truth, the real reasons why Plaintiff was sanctioned, suspended on multiple occasions, and then terminated were due to her race, national origin, gender and documented disabilities.

(D)    (C) In applying the pretext theory, the Third Circuit has followed the burden-shifting analysis of the <u>McDonnell Douglas/Burdine</u>.  The dispositive issue becomes whether Plaintiff can present sufficient evidence from which a jury could reasonably find a prima facie case of retaliation. We think so.  In articulating the pretext theory, Judge Becker of the Third Circuit instructed that a Plaintiff can establish a causal link between his/her protected activity and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period (pp. <u>Woodson</u>, supra, pp. 920, 921).


Much antagonism occurred and persisted during the Plaintiff's long, protracted and arduous tenure including a double standard of evaluation as shown by the unsatisfactory evaluations that were invalidated, the repeated sanctions including suspensions without pay, reprimands, verbal abuses, and tardies, unwarranted requirements to undergo psychiatric examinations, the inequitable scrutiny and micro-engagement, the failure of the School District to support and foster a workplace environment in which Plaintiff could be an effective teacher, very much involving the School Administration pitting the students against the Plaintiff in terms of classroom management, and a lack of general respect for the teacher to discipline unruly students.  In the seminal case of <u>Andrews (v) City of Philadelphia</u>, supra, the Third Circuit cautioned that the dispositive issue must be decided on whether the evidence is sufficient based on the whole picture (p. 1484).  Plaintiff's deposition established that she was singled out and treated in an invidious and substandard manner in the workplace, for no other reasons than her race, gender, national origin and

disabilities. She was sanctioned and fired in complete disregard of the ADA mandate. "An atmosphere of condoned racial harassment in the workplace increases the likelihood of retaliation for complaints in individual cases". (Woodson, supra, p. 922). It raises an inference of discrimination that the employer has failed to respond to the harassment. (p. 922)

(E)     Deposition testimony provided by Joann Willison, a teacher and union representative, is probative on the issue that Plaintiff was unfairly subjected to burdens and indignities under an Action Plan that her professional co-workers were not subjected, (Tr., Dep., Willison, (3/6/06)(p. 25) with respect to having to be a "traveling teacher," that principal Deshner scolded her (p. 29), the requirement to maintain a student disciplinary log (p. 35), that the matter concerning the Plaintiff misplacing students' assignment and work was not an ongoing issue for which she was suspended and fired (pp. 41, 42), that she was viewed as belligerent simply because she asserted her right to grieve mistreatment (p. 45), and that she did not physically approach Principal Deshner at a meeting on April 10, 2003, as Administration personnel have testified. The deposition testimony also indicated that Mr. Heller viewed the Plaintiff's vocal defense of her rights as acts of insubordination (pp. 49, 50). There is also deposition testimony that in April 2003 when she was recommended to be fired she was also suspended without pay (pp. 54, 55), that as a teacher in the School District, the deponent never received any training involving student confidentiality policies under FERPA. The deponent further testified, that Plaintiff was required to keep student discipline logs, but, other teachers were given the option not to maintain such records (pp. 63, 64), and that during the April 10th meeting, Plaintiff did not attempt to physically accost Principal Deshner (p. 63).

(F)     Some unidentified party has filed with the Pennsylvania Department of Education an educator misconduct complaint against the Plaintiff. Plaintiff has requested a copy of the complaint and the identity of the complainant

from the Department of Education.  However, Plaintiff has been unable to access this misconduct complaint because the Department views these documents as confidential even as to the Plaintiff.  If the Defendants are shown to have been involved in filing a Complaint to decertify Plaintiff, it will be viewed by Plaintiff as continuing retaliation.

IV.   **PLAINTIFF WAS TREATED MORE HARSHLY OR LESS FAVORABLY THAN HER CO-WORKERS**

The First Claim For Relief of the First Amended Complaint outlines a disparate treatment claim.  Section 703 of Title VII forbids an employer "to discriminate against any individual with respect to her compensation, terms, conditions or privileges of employment because of such individual's race, color, religion, sex or national origin" and encompasses claims of disparate treatment and hostile work environment. (42 U.S.C. 2000e-2(a)(1)).  The McDonnell Douglas test described herein applies to disparate treatment.  Plaintiff establishes a prima facie case because (1) she is a member of a protected class; (2) she was qualified for the position; (3) despite being qualified, she was fired, and (4) a younger white male replaced her. Plaintiff was disciplined and sanctioned more often than her co-workers for alleged infractions and violations that were not used as a basis to sanction her co-workers. This is true of her white co-workers, at least three of whom are named herein, who were not suspended for taking medical leave as was true in Plaintiff's case.  Plaintiff contends in the First Claim for Relief a litany of abuses; indignities, double standard and disparity in performance evaluations, written reprimands, suspensions, retaliations and firing from her teaching position.

In particular, Plaintiff has alleged in her First Amended Complaint disparate treatment as a "traveling teacher", public humiliation and abuse by the management and administration of Meadville Area Senior High School.   The duration of these acts of mistreatment, from 1993 until April 2003, and possibly still

30

continuing due to some complainant's effort to decertify her, is a matter of serious consequence.

Plaintiff further contends that, by reference, the factual basis supporting her claims in the First Claim For Relief, are also implicit in the Third Claim For Relief. Therefore, in making a case for the maintenance of hostile work environment Plaintiff necessarily establishes disparate treatment.

As a part of the fact-finding conference, as well as through deposition testimony, it has been documented that on June 7, 2002, Plaintiff was issued a written warning for tardies upon entering school but that her white colleague, Debbie Lemansky was not penalized; that she was required to turn in typed lesson plans during the 2001/02, 2002/03 school year every Friday, whereas, her co-workers submitted lesson plans less frequently; that her classes were observed more frequently than other teachers; that she was criticized unfairly for picking on certain students, although her long term substitute teacher, Ms. Lynn, encountered no such criticism from the Administration; that, inexplicably, and in violation of the collective bargaining agreement, the School Administration maintained two sets of her personnel files, that she was sanctioned and punished in violation of the School District's ADA policy in which School Administration did not provide staff training, as well as the student confidentiality policy under FERPA. Plaintiff further asserted on deposition that she was a victim of gender discrimination, having been replaced by a younger white male, as was also shown in the deposition of Deborah Englebaugh who described the workplace as a horrifying experience under Principal Deshner and his staff; that the School District required her to submit to a psychiatric exam, although the school had never made such requirements of a teacher under the stated circumstances, and that she was charged with immorality which was invalidated by the Arbitrator.

## V.    DEFENDANTS' INADEQUATE RESPONSES TO PLAINTIFF'S FIRST AND SECOND SET OF INTERROGATORIES.

(A)    Because it is shown that the management of the School District had actual or constructive knowledge about the existence of the sexually hostile environment and failed to take prompt remedial action, the School District is liable. There is reason to believe that the management of the School District including the School Administrators acquiesced in the discrimination.

The vague and inadequate response which the Defendants gave to Plaintiff's Interrogatory No. 27 (First Set of Interrogatories) (Exhibit 14) is wholly inadequate.

At a minimum, the School District is required to demonstrate that its supervisory personnel investigated Plaintiff's complaints and took responsive actions to those inquiries that Plaintiff posed in Interrogatory No. 27.

(B)    Further, the Defendants' Response to Interrogatory No. 10 (Frist Set (Supplemental) Interrogatories is disingenuous and not believable as basis for suspending Plaintiff and assessing her a unsatisfactory evaluation on March 18, 2002. Moreover, Defendants' Response to Interrogatory No. 12 is not credible because Exhibit 10 explicitly states that Plaintiff was suspended for the medically excused absence. As well, Defendants' Response to Interrogatory No. 13 is misleading. Defendants' Responses to Interrogatories Nos. 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, and 26 are objectionable for reasons that they are misleading, non-responsive, and essentially pretextural and offered to justify the adverse employment actions including termination taken against Plaintiff.

(C)    By equal measure, Defendants' responses to Interrogatories Nos. 1, 2, 3, 4, 5, and 6 propounded in Plaintiff's Second Set of Interrogatories are also non-

32

responsive, pretextural, and incredible. The Defendants have simply failed to honestly tell the Plaintiff the real reasons that she was mistreated and terminated. In Sheridan (v) E.I. Dupont deNemours and Co. 100 F. 3d 1061 (3rd Cir. 1996), the Third Circuit declared that a Plaintiff alleging discrimination is entitled to know the real reason for her adverse employment action (p. 1070). Sheridan, supra, also makes clear that where the Plaintiff shows the Defendants proffered reason for the adverse personnel action and makes out a prima facie case, this is sufficient basis to sustain a finding of intentional discrimination (p. 1071).

(D)    Since the Plaintiff has made a prima facie case, and shown that the Defendants' reasons for mistreating and firing Plaintiff are pretextural, there is basis for a trier of fact to find intentional discrimination.

## VI.    PERSONAL SUABILITY AND LIABILITY OF MESSRS. DOLECKI AND HELLER UNDER PHRA

In Paragraph 42 of the Seventh Claim For Relief, it is alleged that Superintendent Dolecki and Assistant Superintendent Heller acted in their personal capacities in aiding and abetting discrimination against the Plaintiff in violation of state anti-discrimination laws, as provided in PHRA. Although an individual employee cannot be held liable under Title VII, the Third Circuit has recognized that individuals may be suable and possibly liable under section 955(e) of PHRA. Dici (v) Commonwealth of Pennsylvania 91 F. 3d 542 (3rd Cir. 1996). Prevailing decisional law states that if the person who created the hostile environment is the Plaintiff's supervisor or in the line of supervisory authority, then the employer is automatically liable for the conduct of the harassment results in some tangible employment actions made by its supervisor. Burlington Industries, Inc. (v) Ellerth 524 U.S. 72 (1998); Faragher (v) City of Boca Raton 524 U.S 775 (1998).

First, Messrs. Dolecki and Heller as Senior Management of the School District were very much involved in perpetuating the pretext for firing Plaintiff and participated in the termination of Plaintiff's contractual relationship with the School District. Thus, the School District is liable for the discrimination committed by Dolecki and Heller against Plaintiff. They served as agents or proxy of the School District and therefore their discriminatory acts are attributable to the School District. Both Dolecki and Heller are liable in their personal capacity per Paragraph 35 of the Fifth Claim for participating in Plaintiff's firing. Hafer (v) Melo 502 U.S. 21, 112 S. Ct. 350 (1991). Section 1981 assures the right to contract on the basis of equality to minorities and non-minorities alike. This constitutional right encompasses and applies to all aspects of the contractual relationship including the termination of the employment contract. Spriggs (v) Diamond Auto Glass 165 F. 3d 1015 (4th Cir. 1999). The 1991 Act amended Section 1981 by adding a new broad definition of "make and enforce contact". Likewise, Messrs. Dolecki and Heller are also exposed to personal liability if it is shown under Paragraph 38 of the Sixth Claim For Relief that they engaged or acquiesced in or approved unlawful employment practices. In particular, Paragraph 38 of the Sixth Claim where it is shown that Messrs. Heller and Dolecki acquiesced or approved longstanding harassment against the Plaintiff and took no corrective measures to investigate and stop it, the Defendant's School District is under a heavy burden to avoid liability Easter (v) David Grassi, et al (Civil Action No. 98-226-Erie) (Court Order, McLaughlin, J., Hearing On Motions For Summary Judgment, (p. 8), (3/15/2001)).

Respectfully submitted,

Caleb L. Nichols
Attorney for Plaintiff
Claudette deLeon

6/26/06

34